# EXHIBIT H

to

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## Civil Action No.: 1:10-cv-00986-JFA

*Transcript from deposition of Christopher Robinson*

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

In the United States District Court
District of South Carolina
Aiken Division
Case No: 1:10:CV-00986-MBS#

```
                              )
Margo J. Hein-Muniz,  )
MD,                           )
                              )
         Plaintiff(s),        )         Deposition
                              )
vs.                           )             of
                              )
Aiken Regional       )
Medical Centers, et  )CHRISTOPHER ROBINSON, MD, MSCR
al.,                          )
                              )
         Defendant(s),  )
                              )
```

Deposition of CHRISTOPHER ROBINSON, MD, MSCR, taken before Nicole C. Gleaton, Certified Verbatim Court Reporter and Notary Public in and for the State of South Carolina, scheduled for 12:30 p.m. and commencing at the hour of 12:36 p.m., Friday, May 15, 2012, at the office of Womble Carlyle Sedgfield & Rice, PLLC, Charleston, SC, South Carolina.

Reported by:
Nicole C. Gleaton

## EXHIBITS

Plaintiff's Exhibit No. 1    Invoices (4 pgs)

Plaintiff's Exhibit No. 2    Hearing Panel Report
8/20/10 (4 pgs)

Plaintiff's Exhibit No. 3    Hearing Panel Report
9/22/10 (3 pgs)

Plaintiff's Exhibit No. 4    Letter 10/7/10 (1 pg)

Plaintiff's Exhibit No. 5    Hearing Panel Report
10/12/10 (2 pgs)

---

Any court, party, or person who has purchased a transcript may, without paying a further fee to the reporter, reproduce a copy or portion thereof as an exhibit pursuant to court order or rule or for internal use, but shall NOT otherwise provide or sell a copy or copies to any other party or person without the express consent of the reporter and/or reporting agency.

APPEARANCES

For the Plaintiff(s):
Thornwell F. Sowell, Esquire
David C. Dick, Esquire
Sowell Gray Stepp & Laffitte, LLC
1310 Gadsden Street
Columbia, South Carolina 29201

For the Defendant(s):
Travis Dayhuff, Esquire
Nelson Mullins Riley & Scarborough, LLP
1320 Main Street, 17th Floor
Columbia, South Carolina 292011

For the Witness:
J. Marshall Allen, Esquire
Womble Carlyle Sandridge & Rice, PLLC
5 Exchange Street
Charleston, South Carolina 29401

INDEX

Stipulations . . . . . . . . . . . . . . . 4
Direct Examination by Mr. Sowell . . . . . . 5
Cross Examination by Mr. Dayhuff . . . . . . 82
Cross Examination by Mr. Allen . . . . . . . 110
Re-Direct Examination by Mr. Sowell . . . . 111
Re-Cross Examination by Mr. Dayhuff . . . . 113
Re-Direct Examination by Mr. Sowell . . . . 113
Certificate . . . . . . . . . . . . . . . . 115

---

4

```
1          STIPULATIONS
2      This deposition is being taken pursuant to the
3   Federal Rules of Civil Procedure.
4          - - - -
5      The reading and signing of this deposition is
6   waived by the deponent and counsel for the
7   respective parties.
8          - - - - -
9   Whereupon,
10      CHRISTOPHER ROBINSON, MD, MSCR, being duly
11   sworn and cautioned to speak the truth, the
12   whole truth, and nothing but the truth,
13   testified and deposed as follows:
14          - - - - -
15   MR. DAYHUFF: One thing additionally, I think we
16      have been marking these deposition transcripts
17      confidential for the peer review information
18      they would have within them?  Are you okay
19      with that?
20   MR. SOWELL: Yeah.
21   MR. DAYHUFF: Because I'm sure we will be talking
22      about some peer review information here today.
23   MR. SOWELL: That's fine.
24   MR. DAYHUFF: And the exhibits.
25   MR. SOWELL: And the exhibits.
```

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**5**

1    MR. DAYHUFF: The whole shooting match.
2    MR. SOWELL: Some of the exhibits probably have
3        confidential stamped on them.
4
5              DIRECT EXAMINATION
6    BY MR. SOWELL:
7    Q.  Dr. Robinson?
8    **A.  Yes, sir.**
9    Q.  How are you?
10   **A.  Doing great.**
11   Q.  Good.  State your full name.
12   **A.  It's Christopher Joe Robinson.**
13   Q.  And what is your birthday?
14   **A.  My birthday is February 6, 1974.**
15   Q.  And where were you born?
16   **A.  I was born in Anderson, South Carolina.**
17   Q.  And did you finish high school there?
18   **A.  I did.**
19   Q.  Anderson High School?
20   **A.  No.  Belton Honea Path, small town.**
21   Q.  I know it well.  And then went to Erskine?
22   **A.  That's right.**
23   Q.  Finished Erskine?
24   **A.  Finished Erskine.**
25   Q.  Went to MUSC?

---

**6**

1    **A.  Went to MUSC.**
2    Q.  And then did some residencies/fellowships
3        that ended up in maternal fetal medicine?
4    **A.  That's correct.**
5    Q.  And you're board certified in OB/GYN and maternal
6        fetal medicine?
7    **A.  That is correct.**
8    Q.  And the reason you're here today is because you
9        served on a hearing panel with respect to Margo
10       Muniz, Dr. Margo Muniz at the Aiken Regional
11       Medical Center back in the summer of 2010?
12   **A.  That is correct.**
13   Q.  All right.  But I think you were there for two days
14       in June, a day in August, back a couple of days
15       later in August for some deliberations.  And then
16       you deliberated a couple of times by telephone?
17   **A.  That's right.**
18   Q.  Okay.
19   **A.  I believe that's correct.**
20   Q.
21       MR. SOWELL: I'll make this Exhibit 1.
22       (Plaintiff's Exhibit Number 1 was marked
23           for    identification purposes.)
24   Q.  I'm going to hand you Plaintiff's Exhibit 1.
25   **A.  Okay.**

---

**7**

1    Q.  It appears to be your invoice with respect to your
2        services rendered in connection with the Dr. Muniz
3        ARMC Hearing Panel?
4    **A.  That is correct.**
5    Q.  All right.  Now, first of all let me ask you this.
6        Before you did this, you did not have any
7        affiliation with the Aiken Regional Medical Center?
8    **A.  That is correct.**
9    Q.  All right.  And you are the one independent person
10       on that hearing panel?
11   **A.  As far as I know, that's correct.  I believe**
12   **everyone else was affiliated with the hospital.**
13   Q.  You were engaged by Terry Ergle?
14   **A.  That is correct.**
15   Q.  Who is an administrative person at ARMC?
16   **A.  As best I know.**
17   Q.  Before you arrived for the first hearing on June
18       28th, did you have any conversations with anybody
19       about the hearing, the upcoming hearing?
20   **A.  So when it was -- the only conversation I had had**
21   **was the presentation from Terry.  And she had**
22   **called me as a result.  She had actually called one**
23   **of my partners, and one of my partners had referred**
24   **her to me.  And she called me and told me that**
25   **there would be a hospital hearing of the medical**

---

**8**

1    **executive committee for a review.  And they were**
2    **looking for an external physician.  But the details**
3    **of which or anything beyond that really were**
4    **undiscussed.**
5    Q.  All right.  So she didn't give you any of the
6        substantiative details?
7    **A.  No.  You know, specifically, my question to her was**
8    **what was the time commitment, you know, we were**
9    **talking about.  And those sorts of things, what I**
10   **was to expect from that standpoint.**
11   Q.  Did you receive any papers prior to June 28, 2010?
12   **A.  I did not.**
13   Q.  All right.  And when you got there you got a
14       notebook with some exhibits in it?
15   **A.  That's correct.**
16   Q.  Now, are those the first papers related to the
17       matter that you received?
18   **A.  That is correct.**
19   Q.  All right.  Looking at your invoice which is
20       Exhibit 1, on June 28, 2010 you spent 5.33 hours as
21       part of the panel?
22   **A.  That is correct.**
23   Q.  And you traveled from Charleston to Aiken and back?
24   **A.  That is correct.**
25   Q.  All right.  On June 29, 2010 you spent 6.25

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

9

1  hours with the panel?
2  **A. That is correct.**
3  Q. And you traveled from Charleston to Aiken and back?
4  **A. That is correct, too.**
5  Q. On August 17th you spent 6.25 hours with the panel?
6  **A. That is correct.**
7  Q. And you traveled to Aiken and back?
8  **A. That is correct.**
9  Q. Now, those three occasions are the actual hearing
10  dates; am I correct?
11  **A. That is correct. Best of my knowledge I believe**
12  **that's correct.**
13  Q. And although it says 8/18 I believe it was August
14  19th that you traveled back to Aiken and spent 3 ½
15  hours deliberating?
16  **A. That may be, that may also be correct, yeah.**
17  Q. Then if you look on the second page. This is a
18  reconstructed invoice but it's actually backed up
19  by the actual invoices. You also spent another
20  half of an hour on September 22nd by
21  teleconference with the panel. You spent a second
22  half hour on October 12, 2010 by teleconference
23  with the panel?
24  **A. That is correct.**
25  Q. That is an accurate summary of your services and

---

10

1  your contributions to the panel?
2  **A. Yes, sir.**
3
4  MR. SOWELL: All right. Let's mark this
5  document as Exhibit 2.
6  (Plaintiff's Exhibit Number 2 was marked
7  for identification purposes.)
8
9  Q. Now, let me go back to Exhibit 1 and just make sure
10  I've rounded this out. Exhibit 1 is your entire
11  invoice reflecting all of the time you spent with
12  respect to the Margo Muniz matter at ARMC?
13  **A. You know, it is all the time that I billed for.**
14  Q. Yes.
15  **A. Certainly, you know, as far as all the time, I'm**
16  **certain there's probably more time involved. But**
17  **that was all the time that was billed for, yes.**
18  Q. Do you remember anything else in particular that
19  you did that's not described in the invoices?
20  **A. Yeah. The only thing that, you know, I did not**
21  **bill them for was every night when we would leave**
22  **very late, instead of driving all the way back to**
23  **Charleston, I would stay at the Hampton Inn in**
24  **Orangeburg. And then get up the next morning and**
25  **drive back in. So, you know, there were other**

---

11

1  **expenses but, you know, those were not billed**
2  **separately.**
3  Q. Were there any other substantial bodies of time
4  that you contributed to this matter?
5  **A. No, sir.**
6  Q. So this is essentially a summary of the time that
7  you contributed to the Muniz matter?
8  **A. Yes, sir.**
9  Q. All right. Now, can you identify Exhibit 2?
10  **A. Yes, sir. This reads, "Aiken Regional Medical**
11  **Center report of the hearing panel." And this is a**
12  **copy of -- that was forwarded to me for review.**
13  Q. Okay. Now, am I correct that you met with the
14  panel for the 3 1/2 hours the night before this
15  particular document was generated?
16  **A. This -- that I cannot remember exactly, you know,**
17  **dates per say, exactly when it did occur. But this**
18  **document was basically emailed to me if I'm -- if**
19  **I'm not mistaken.**
20  Q. Okay. Let me refresh your recollection.
21  **A. Uh-huh (affirmative response).**
22  Q. And see if it helps any. I think that August 17,
23  2010 was a Tuesday?
24  **A. Uh-huh (affirmative response). Okay.**
25  Q. August 18th, which is what you've got on your bill,

---

12

1  would have been the next night.
2  **A. Uh-huh (affirmative response).**
3  Q. But we believe that the panel deliberated
4  on Thursday night.
5  **A. Okay.**
6  Q. Which would have been the 19th --
7  **A. Okay.**
8  Q. -- of August, 2010.
9  **A. Okay.**
10  Q. Then this document is dated August 20, 2010 --
11  **A. Right.**
12  Q. -- which is the next day.
13  **A. The next day, okay.**
14  Q. Friday.
15  **A. Okay.**
16  Q. Is it your recollection that you deliberated the
17  night before you received this by email?
18  **A. I don't remember the specific time line. I know we**
19  **did deliberate and this is the result of the**
20  **deliberation. But I don't remember the exact time**
21  **lines is what I would say.**
22  Q. Okay. Is Exhibit 2, is it an accurate
23  representation of the results of your deliberations
24  the day or so prior to August 20, 2012?
25  **A. I believe that, you know, for the most part that is**

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**13**

1  correct. It is an accurate representation, but it
2  was sent out to me to review. It was sent to me to
3  review and comment upon, and that's what I had done
4  with this document. So I basically saved this
5  document and did track changes and make track
6  changes to it in places where I felt like that
7  there were things that needed to be modified with
8  this. In other words, this was a preliminary, you
9  know, report that was sent out.
10 Q. Now, Exhibit 2, which is the August 20, 2010 draft
11 report of the hearing panel. Who sent it to you?
12 A. You know, the problem is is I don't know for
13 absolute certain. But I know that every
14 communication that I had was basically with Ernie
15 Nauful. So when there was information being moved
16 back and forth, as far as the panel's concern, it
17 was Ernie. When it was things dealing with the
18 scheduling of things it was Terry. So those were
19 basically the only two individuals that I had
20 contact with.
21 Q. So this most likely came from Ernie Nauful?
22 A. That's correct. That's what I believe.
23 Q. And when he was there on either the 18th or the
24 19th, this is the night of the 3 ½ hours
25 of deliberations shortly after the hearing ended?

---

**14**

1  A. Uh-huh (affirmative response).
2  Q. Was he typing things on his computer?
3  A. No, sir. When we completed that hearing, the vote
4  of the panel was to ask Ernie to draft a document
5  that encompassed the discussion in what had
6  occurred and to bring that back to the hearing
7  committee.
8  Q. And is Exhibit 2 that document?
9  A. That is correct, yes, sir.
10 Q. All right. Now, when you left there after the 3 ½
11 hours of deliberations, was there anybody who was
12 remarkably opposed to what was put into Exhibit 2?
13 A. So we didn't have Exhibit 2 at the time is what I
14 would say. So Exhibit 2 had not been -- in other
15 words, this paper and this specific writing was not
16 in front of us when we left at that time.
17 Q. Understood. But with the predicate that we
18 discussed --
19 A. Okay.
20 Q. -- a minute ago.
21 A. Okay.
22 Q. That Exhibit 2 was intended to reflect
23 the conclusions of the hearing panel?
24 A. Uh-huh (affirmative response).
25 Q. If it did that was there anybody who was remarkably

---

**15**

1  opposed to those conclusions before they were put
2  in writing?
3  A. We --
4  Q. On that evening?
5  A. We did not have -- okay. So in that evening, we
6  did not have like a specific list of things where
7  we basically said, you know, we agree or strongly
8  oppose to this. Basically, we had deliberated as a
9  group where there was a back and forth discussion
10 amongst all the physicians in the room. And at
11 that end of that hearing, we asked that Ernie draft
12 a report of what our deliberations had, you know,
13 said at that point and to bring that back to us.
14 Q. Now, if you look at the third page of Exhibit 2.
15 A. Okay.
16 Q. Do you see that it has 5 recommendations at the
17 bottom of the third page?
18 A. Yes. Okay. Yes, sir.
19 Q. The first of which is that the practitioner's
20 suspension is lifted?
21 A. Yes, sir.
22 Q. And was that the conclusion of the panel when they
23 deliberated on either August 18 or 19, 2010?
24 A. Yes, sir.
25 Q. All right. And was there anybody who was

---

**16**

1  vehemently opposed to that or opposed whatsoever?
2  A. That I cannot -- this was, this was obviously a
3  very long, lengthy deliberation, okay. On each,
4  you know, of the points. But I can't
5  really remember the specifics, but I remember that,
6  you know -- in other words, when I got this, when I
7  got this back, the only thing I can say is that I
8  didn't make a track change to that. So I don't
9  believe that I felt like it was outside of what we
10 believed, you know, at that time. But I
11 don't remember the exact specifics.
12 Q. The only one of the recommendations you made a
13 change to was Number 5 for the reason noted in your
14 track change?
15 A. Let's see, let me read it here. Yes, sir, I did
16 strike -- I struck the entire 5th comment because
17 basically I didn't feel like that you could
18 practice without interacting with other
19 specialties.
20 Q. As reflected in your note?
21 A. Yes, sir.
22 Q. Or comment. We'll call it a comment.
23 A. Yes, sir.
24 Q. Back to something fundamental about Exhibit 2, this
25 is the Ernie Nauful of the deliberations with the

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

17

1  exception of your track comments?
2  A.  That is exactly -- so in other words, if there were
3      no changes, you know, if there had been no comments
4      or strikes within this, this would have been the
5      original document.
6  Q.  Because you took and made your changes on the
7      original?
8  A.  I made -- that's correct.  So in other words, I
9      saved a copy of the original and the track changes
10     and changed things and then sent this back.
11 Q.  Right.  So if we could take an Etch A Sketch and do
12     away with your track changes, this would have been
13     your Ernie Nauful document you received by email?
14 A.  I believe that's correct.
15 Q.  Now, did you believe at the end of that hearing
16     that Dr. Muniz's privileges should be terminated?
17 A.  I did not believe at the end of that hearing that
18     her privileges should be terminated.
19 Q.  And why not?
20 A.  At that point we had deliberated -- so first of
21     all, from the standpoint of what are actions, what
22     the possible realm of actions were, it was
23     understood to be fairly free and open.  And that's
24     what occurred in this report, is we made
25     observations and recommendations, you know, as a

18

1      result of those things.  And being a maternal fetal
2      specialist, you know, we heard from witnesses from
3      both sides.  We heard from physicians, non-
4      physicians, professionals in this center, things of
5      that nature.  And I didn't feel like there was
6      anything that could have been done differently in
7      the management of the patient that would change the
8      outcome.
9  Q.  That was patient no. 6, correct?
10 A.  Correct.
11 Q.  That is correct, that is Number 6?
12 A.  Right.  And so I didn't feel like there was
13     anything that could have been done.  And in
14     discussing it, you know, the whole question was
15     here's a practitioner under 100 percent review.  If
16     there was nothing that could have been done, would
17     she ever have been here in the first place.  So
18     would she have ever been, you know, reviewed.
19     Certainly, there's, you know, it's a very serious
20     case because a baby died and that always is
21     reviewed.  But did she contribute to that, and my
22     opinion was no.
23 Q.  If you would, look at page 2 of the Exhibit 2.
24 A.  Okay.
25 Q.  And tell me what is your comment there on page 2

19

1      that's dominated WU1.
2  A.  Okay.  I put, "Here I think we have to address the
3      fact that the three points in the MEC committee
4      report were not fully substantiated by the
5      record/testimony.  I do not have a copy of the
6      record in front of me, but these would include to
7      the best of memory: 1) Failure to respond to
8      nonreassuring fetal status. 2) Delay in cesarean.
9      3.) Can't remember.  Please send me a copy and I
10     can comment further."
11 Q.  Okay.  So it was your belief that the time you made
12     that comment that those three points in the MEC
13     committee report had not been fully substantiated
14     by the evidence?
15 A.  I felt like that, you know, those three things were
16     not, yes, were not, you know, deviations from the
17     care or substantiated.
18 Q.  So she admits them with respect to those particular
19     points?
20 A.  Yes, sir.
21 Q.  All right.  Were you the only OB/GYN on that panel?
22 A.  I was.
23 Q.  And you were the only maternal fetal medicine
24     expert on that panel?
25 A.  I was.

20

1  Q.  All right.  Now, looking further at page 2, there's
2      one other change.  And that is you struck out, I
3      guess you would say, the finding or conclusion,
4      Number 4?
5  A.  Yes, sir.
6  Q.  And also Number 5?
7  A.  Yes, sir.
8  Q.  And is that on the premise that you did not believe
9      those particular findings had been adequately
10     substantiated either?
11 A.  On Number 4, you know, I can't remember
12     specifically why I struck it.  But the reason I
13     took it out is I did not feel like that that was my
14     belief as far as the interpretation of what had
15     occurred.  So that was not my -- I did not agree
16     with those statements.
17 Q.  Okay.
18 A.  Is what I would say.
19 Q.  Okay.  What about Number 5?  Is that the same?
20 A.  Let's see, that is the same thing.  In this case,
21     we heard a lot of -- obviously, the only
22     individuals that really were privy to that
23     information were a nurse who, best of my
24     recollection, had had a family member die and
25     called into the panel at some point and Dr. Muniz

**Christopher Robinson, MD, MSCR - 5/18/12**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

21

1     herself.  And we also heard from either the
2     patient or the patient's mother,
3     but --
4   Q.  The patient's mother.
5   A.  You know, I didn't feel like -- we were instructed
6     to take certain testimony if you believed it, you
7     could believe it.  And if you didn't feel like it
8     held water, you could ignore it.  And so there were
9     some -- you know, we certainly weighed the
10    evidence.  And I didn't believe that that was
11    substantiated.
12  Q.  And that's Number 5?
13  A.  That is Number 5, yes, sir.
14  Q.  Now, does your computer tell you when you made
15    these suggested changes?
16  A.  Not that I know of.  I don't believe so.  Not that
17    I know of but --
18  Q.  Can you go back and look?  I don't mean right this
19    minute.
20  A.  Sure.
21  Q.  I mean, if you could do it right this minute, that
22    would be fine.
23  A.  Sure.  I don't have it with me but I could.
24  Q.  If you would just let Marshall know.  He can let us
25    know --

22

1   A.  Okay.
2   Q.  -- if he deems it appropriate.
3   A.  Okay.
4   Q.  Now, you also made a change to what was in Mr.
5    Nauful's draft report to paragraph 6, correct?
6   A.  Okay.  Let me see.  When you say paragraph 6
7   Q.  Well, it's changed to paragraph 4, so this is on
8    the third page.
9   A.  Oh, okay.  So statement 4, okay.  That is true.
10    That is, that is true.
11  Q.  And is that because of whatever inconsistencies
12    were referred to or in your opinion relatively
13    minor?
14  A.  That is correct.  And this, you know, I do remember
15    a little bit about, we actually sat down and
16    actually wrote out at some point a time line.  And
17    there was some, you know, basically correlating
18    that with what was said.  And, I mean, there were
19    people who, you know, in the room were talking
20    about, you know, did 5 minutes make a difference or
21    7 minutes.  And I explained to them in no
22    contemporaneous entry of the record.  It's not like
23    an electronic medical record where things are
24    necessarily going to be exactly timed.  And so I
25    didn't feel like that the time was out.  And then

23

1     probably also commented on that at the time because
2     of just being several inconsistencies, and not
3     having any specific, you know, statement because I
4     couldn't remember that.
5   Q.  Now, with respect to what started out in Mr.
6    Nauful's report as Paragraph 7, which is the next
7    one.  It's reduced down to 5 because of the
8    changes.
9   A.  Okay.
10  Q.  There's a reference in there to the proposition
11    that, "There was an approximate 50 minute delay
12    between the time the practitioner was informed by
13    Dr. Toomer."  T-O-O-M-E-R.
14  A.  Uh-huh (affirmative response).
15  Q.  "That there was a placenta abruption.  And when the
16    baby was delivered such delay would not have
17    changed the outcome."  Now, the conclusion of the
18    panel on August 18th or 19th is that whatever the
19    delay was, if it was approximately 50 minutes, it
20    would not have changed the outcome?
21  A.  That is correct.
22  Q.  And your additional comment was to record that term
23    as, "Interval," rather than "Delay," because of the
24    lack of nonreassuring fetal status?
25  A.  That is correct.  So, yeah, in my opinion delay

24

1     would have suggested that there was a lack of
2     response to something that had a necessary
3     response.  And I didn't believe that was the case.
4   Q.  Now, did you ever take issue with the proposition
5    that Dr. Muniz had ordered the ultrasound to rule
6    out the abruption?
7   A.  I did not.
8   Q.  You thought that was appropriate?
9   A.  I did.
10  Q.  And within the standard of care?
11  A.  It was.
12  Q.  And there were at least three OB/GYN maternal fetal
13    medicine -- actually four if you take into account
14    the guy out of Pennsylvania who testified that is
15    within the standard of care?
16  A.  Uh-huh (affirmative response).
17  Q.  Yes?
18  A.  Yes, sir.
19  Q.  All right.  If you would, comment WU4.
20  A.  Okay
21  Q.  Does the WU stand for anything in particular?
22  A.  I don't know.  That's a good question.  I don't
23    know if that's -- I don't know.
24  Q.  Yeah.  But it's your fourth comment; you know that?
25  A.  It is.

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

25

1   Q.  You also suggested that there be a change to the
2      term, "Placenta abruption," to "Suspected placental
3      abruption," correct?
4   **A.  Yes, sir, that is correct.**
5   Q.  For the reason given that that is what the medical
6      records stated in the radiology report?
7   **A.  That is correct.**
8   Q.  All right.  Now, you also struck out in what had
9      been Mr. Nauful's paragraph 9, the phrase, "Since
10     this demonstrates the potential to fabricate
11     facts?"
12   **A.  That is correct.  I did.**
13   Q.  Because you didn't agree with that particular
14     statement?
15   **A.  I believe that is correct.**
16   Q.  All right.  Then if you, if you move on to what was
17     paragraph 10, now paragraph 8 with your changes.
18     I'm going to read it out loud.  You can just read
19     it with me to refresh your own recollection.  It
20     says, "The initial fetal monitor strip clearly
21     demonstrated an isolated incident of fetal
22     bradycardia, but the strip fails to reflect any
23     evidence of fetal distress up to the time of
24     delivery via caesarean section.  Although the
25     limited evidence available to the MEC, including

---

26

1     practitioner's statement and appearance, supported
2     such conclusion, the totality of the record now
3     before the hearing panel indicates there was no
4     emergent situation requiring a caesarean section
5     before an ultrasound could be performed and
6     interpreted."  Now, that is essentially the
7     conclusion we just talked about a minute ago,
8     that you did not think there was an
9     emergent situation such that the caesarean needed
10    to be done before the ultrasound could be performed
11    and interpreted?
12   **A.  That is correct.**
13   Q.  All right.  And apparently the panel as a
14     whole agreed on that when they deliberated on
15     August 18th or 19th?
16   **A.  That is -- I don't know what happened after this**
17     **statement came out.  But I do know during the**
18     **deliberation when we discussed this. You know, I**
19     **led this part of the deliberation, you know,**
20     **talking about what, you know, talking about what,**
21     **you know, was seen.  We called in, we looked at the**
22     **images from the ultrasound that was performed.**
23     **And, you know, after extensive discussions about**
24     **what an obstetrician would do and the standard of**
25     **care, I believe we did, you know, we had a**

---

27

1     **consensus at that point on that point.**
2   Q.  That is reflected in paragraph 10 of Mr. Nauful's
3     report?
4   **A.  Correct.**
5   Q.  All right.  This is the area, the specific area I
6     suppose, of the issues deliberating that you would
7     have the most expertise with respect to since you
8     were the only OB/GYN or maternal field medicine
9     expert there?
10   **A.  Yes, sir.**
11   Q.  All right.  And you firmly believed what is here in
12     paragraph 10?
13   **A.  Yes, sir.**
14   Q.  Now, if you would look at what would be Mr.
15     Nauful's paragraph 11.  You also struck that out as
16     not necessary.
17
18     MR. DAYHUFF: Object --
19   **A.  Yes, sir.**
20
21     MR. DAYHUFF: Object to the form of the question.
22     We should mention there will be on occasions
23     objections to the form of the question.  After
24     I say that, you answer his question.
25    WITNESS: Okay.

---

28

1   **A.  Can you repeat the question?**
2   Q.  Yes.  I'll rephrase it hopefully to address Mr.
3     Dayhuff's objection.
4
5     MR. DAYHUFF: Well, see, and I can tell you if you'd
6     like, but I don't want to interfere.
7
8   Q.  Did you strike out paragraph 11?
9   **A.  Yes, sir.**
10   Q.  And did you strike it out for the reasons that are
11     noted in WU5, the track comment in the right hand
12     column or margin?
13   **A.  Yes, sir.**
14   Q.  And that is, "Not sure that this is important in
15     this case so far as review panel is examining the
16     action of the MEC in this case or in the case?"
17   **A.  Yes, sir.**
18   Q.  Now, did the hearing panel -- and I keep saying
19     August 18th or 19th.  I think it was the 19th, but
20     since your bill since the 18th I say 18th or 19th.
21     But there was only one 3 1/2 hour  deliberation --
22   **A.  Uh-huh (affirmative response).**
23   Q.  -- back at ARMC, correct?
24   **A.  Best of my knowledge, I believe that is correct.**
25     **One of those days.**

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**29**

1  Q.  The recommendations that are numbered 1 through 5,
2       was there a consensus of when you left those
3       deliberations on August 18th or 19th with respect
4       to those recommendations?
5  A.  I believe that is correct.
6  Q.  And the way the report is initially drafted by Mr.
7       Nauful, it is to require the signatures of
8       each hearing panel and we're including yourself?
9  A.  That appears the case even though it
10      wasn't specifically stating it.
11 Q.  Now, if you would, look at page 2 of Exhibit 2, the
12      third full paragraph.
13 A.  Okay.
14 Q.  Now, I'm going to read it aloud just so it will be
15      on this record, but you can read it with me.  "Once
16      a record is established and evidence submitted,
17      section 7.D.2 of the credentialing policy
18      establishes the basis of any hearing panel
19      recommendation in the following manner: The hearing
20      panel shall recommend in favor of the medical
21      executive committee unless it finds that the
22      individual who requested the hearing has proved, by
23      clear and convincing evidence, that the
24      recommendation that prompted the hearing was
25      arbitrary, capricious, or not supported by credible

---

**30**

1       evidence."  You see that?
2  A.  Yes, sir.
3  Q.  During the deliberations on August 18th or 19th
4       that took 3 ½ hours, was that proposition ever
5       discussed?
6  A.  I cannot remember the specifics of that.  I know
7       that I didn't have a piece of paper, you know, in
8       front of me that specifically gave any of that
9       information.  I know that, you know, Ernie did give
10      us, you know, rules.  He helped direct traffic, you
11      know, during the deliberation, those sorts of
12      things.  But didn't act as a, you know, as a part
13      of the deliberation.  But I don't remember
14      specifically.
15 Q.  All right.  So now the question that we're talking
16      about now is pretty precise.
17 A.  Uh-huh (affirmative response).
18 Q.  I want to make sure we're on the same brainwave.
19 A.  Okay.
20 Q.  During the deliberations on August 18th or 19th,
21      you know it was only one time for 3 ½ hours.
22 A.  Uh-huh (affirmative response).
23 Q.  Do you recall if Mr. Nauful or anybody else ever
24      explained or proved to you on that occasion?
25 A.  I don't remember the specifics of that date.  I

---

**31**

1       really -– I just don't remember the specifics.  I
2       know that he did give us instruction, but I don't
3       remember the specifics of the instruction.
4  Q.  But do you remember when he gave you the
5       instructions?  Keeping in mind -- now, this is what
6       I'm after.
7  A.  Okay.
8  Q.  I'm trying to discern whether you know if it was on
9       August 18/19, September 22nd, or October 12th?
10 A.  The thing number is I remember the three points
11      of arbitrary, capacious, and not supported by
12      credible evidence.  And it came up at multiple
13      times, but I can't specifically say at which times
14      it came up.  But I do know that, you know, in the
15      instructions we received at one point or the other,
16      those three components were presented.
17 Q.  So at some point in these deliberations, three
18      times, 3 ½ hours the first time, half hour the
19      second time, half an hour the third time, you were
20      instructed with respect to the concepts of
21      arbitrary, capricious, or not supported by credible
22      evidence?
23 A.  Yes, sir, I believe that -– yes, sir.
24 Q.  Now, do you see where in this third paragraph on
25      page 2 of Exhibit 2 -– I want you to read this

---

**32**

1       with me carefully, the quotation.  "The hearing
2       panel shall recommend in favor of the medical
3       executive committee unless that it finds that the
4       individual who requested the hearing has proved by
5       clear and convincing evidence that the
6       recommendation that prompted the hearing was
7       arbitrary, capricious, or not supported by credible
8       evidence."  Do you see that?
9  A.  Yes, sir.
10 Q.  Did you have an understanding before you reached a
11      final conclusion in this matter, who had that
12      burden of proving that the hearing was prompted by
13      something that was arbitrary, capricious, or
14      not supported by credible evidence?
15 A.  You know, I can't speak to my state of mind exactly
16      what I knew at that time, you know, or what the
17      explanation was.  In other words, I guess I thought
18      a lot more about the after coming paragraphs, you
19      know.  And so the majority of the decision making
20      and the things that we deliberated about were those
21      after coming paragraphs.  So in coming to a
22      decision at this point, a decision was about, you
23      know, Dr. Muniz.  It was about, you know, the MEC's
24      decision, what the next steps.  What are the things
25      -- what were our findings, and what were the next

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

33

1  steps is the way I think we viewed it.
2  Q.  Okay.  So what I'm understanding you to say is that
3     in this time frame of August 18th and 19th, the day
4     or so before this Exhibit 2 was prepared, you were
5     not focused on what's in this paragraph, the third
6     paragraph on page 2?
7  A.  Well, I know, I know for certain that I didn't have
8     this, you know, as a piece of paper in front of me
9     that I was, that I was looking at during that
10    portion.  You know, I did have the manual of the
11    medical records and the notes.  I had a legal pad
12    of notes, those sorts of things.  But I don't think
13    that was my focus.
14  Q.  That legal pad of notes --
15  A.  Yes, sir.
16  Q.  -- have you retained that pad of notes?
17  A.  I have not.
18  Q.  So they're gone?  I mean --
19  A.  If I am not mistaken, it's all -- it was all left
20    with Aiken Regional Medical Center.
21  Q.  With Terry Ergle?
22  A.  I don't know who.  In other words, it was left in
23    the room, the deliberation room.
24  Q.  All right.  Who was in the deliberation room other
25    than the five panel members and Ernie Nauful?

34

1  A.  You know, when we were in deliberation, I remember
2     the room.  And I know that Ernie was there and I
3     know the panel members were there.  But I don't
4     remember specifics beyond that.  I know that you
5     were not there, Mr. Dick was not there.  And there
6     was an attorney for the other side, Celeste, and
7     she was not there.
8  Q.  Do you know if Terry Ergle was there?
9  A.  I don't remember.
10  Q.  All right.
11  A.  I know that -- when you say it, I guess I do know
12    that Terry's primary job it seemed was like, you
13    know, we would have like -- you know, most of these
14    would start at 5:00 or thereafter.  We'd have like
15    chicken fingers in the back, and maybe she would
16    set that stuff up or whatnot.  But I don't remember
17    specifically whether she stayed or did not stay for
18    those.
19  Q.  You know, if you want to take a break, I mean, we
20    can take one any time you want to or need to.
21  A.  Okay.
22
23       (Plaintiff's Exhibit Number 3 was marked
24        for identification purposes.)
25  Q.  I'm going to hand you Plaintiff's Exhibit 3 which

35

1  is another iteration denominated report of the
2  hearing panel dated September 22, 2010.  Now,
3  you've looked at this, I assume, in anticipation of
4  the deposition?
5  A.  Yes, I did get to see this last night.
6  Q.  Speaking of that, when have you done to prepare for
7  the deposition?
8  A.  Really, I don't have any materials.  What I did was
9     went back and looked to see.  I keep a folder, you
10    know, on my computer if there's a case or something
11    I'm reviewing where I keep, you know,
12    billing records, those sorts of things.  So I went
13    back to that folder and pulled all of that
14    information out to submit through my attorney I
15    believe to you guys.  But that's really the only
16    information that I had access to.  So --
17  Q.  So you reviewed that information?
18  A.  Right.
19  Q.  And we sent Marshall Allen some information.
20  A.  Right.
21  Q.  And I assume you reviewed that letter?
22  A.  I did.  I got that last night for the first time.
23    I believe this was part of it.
24  Q.  Yes.
25  A.  Yes.

36

1  Q.  Anything else that you did?
2  A.  No, sir.
3  Q.  Now, this document, Exhibit 3, it was not in the
4     documents that you provided to us?
5  A.  That is correct.
6  Q.  All right.  Do you know why you did not have this
7     document?
8  A.  That's a good question.  I mean, the only thing --
9     you know, and I'm just thinking from a standpoint
10    of how I work.  If I make changes to something, if
11    I go back and I make changes, I have to save it.
12    So usually I would save it to that folder, make the
13    track changes and then, you know, send it back to a
14    person, you know, with changes.  But I did not have
15    a copy of this.
16  Q.  Do you know if you received a copy of this before
17    you got it via Marshall Allen yesterday who got it
18    from us?
19  A.  I do not know that for certain.  I don't have
20    a -- I don't have a copy of it, so I don't have
21    any email records, you know, that go back that far.
22    So I can't say for absolute certain.
23  Q.  Now, if you look at it, page three.
24  A.  Uh-huh (affirmative response).
25  Q.  You see that it has been changed at least in the

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

37

1  sense that it does not have five signature lines on
2  it anymore?
3  **A. Yes, sir.**
4  Q. It has no place for your signature?
5  **A. Yes, sir.**
6  Q. And fairly obviously you never signed it?
7  **A. Yes, sir.**
8  Q. So it's certainly conceivable you never received
9  it?
10 **A. That's possible. I don't know that for certain.**
11 Q. Okay. I understand, I understand. You don't know
12 one way or the other?
13 **A. I do not. That's correct.**
14 Q. All right. Well, let's look at it. Now, just as
15 sort of -- let's see what they've got. If you
16 would, compare the first page to Exhibit 2.
17 **A. Okay.**
18 Q. I've done it and I don't see that there are any
19 changes on the first page, but if you
20 would just review it and tell me if there are any
21 that jump out upon you.
22 **A. Okay. I mean, just looking at the way the**
23 **paragraphs end and the fact that the page is the**
24 **same, I'm going to say that they're probably**
25 **identical.**

---

38

1  Q. I mean, they're the same at the bottom?
2  **A. They are, they are.**
3  Q. All right. Let's look at the second page then.
4  Now, I'll look through here. I'll ask you to do
5  the same.
6  **A. Okay.**
7  Q. But I found one change.
8  **A. Okay.**
9  Q. And that is paragraph 4 was added, starts the
10 quote, "It was more, sanction 7.D.2."
11 **A. Okay.**
12 Q. You see that?
13 **A. I do see that.**
14 Q. And that appears to be something new?
15 **A. It does.**
16 Q. All right. Do you see anything that appears to be
17 new on the second page of Exhibit 3?
18 **A. Yeah, there are some other things like if you go**
19 **down to like -- Number 1 has been changed between**
20 **Ernie's original to the second one.**
21 Q. Which paragraph was that?
22 **A. Number 1 --**
23 Q. Oh, yeah.
24 **A. -- is different than -- I think that's it.**
25 Q. Okay. I gotcha. Yeah, he struck out the part

---

39

1  about "Contained in the limited record before and
2  at the time it made its decision," correct?
3  **A. That is correct.**
4  Q. All right. Paragraph 3 is also redacted; is it
5  not?
6  **A. Let's see. Yeah, there's the change from Patient 5**
7  **to Patient 6.**
8  Q. Right. But otherwise, page two is comparable?
9  **A. It is.**
10 Q. If you would to page three.
11 **A. Okay.**
12 Q. And it is remarkably different; is it not?
13 **A. Yes, it is.**
14 Q. For instance, the finding that in the Exhibit 2,
15 August 20 version, which was Mr. Nauful from 10, it
16 is redacted in its entirety?
17 **A. That is correct.**
18 Q. Which was the point that you led the discussions on
19 and that you were -- that you believed indicated
20 that she had not reached the standard of care, Dr.
21 Muniz?
22 **A. That's the part that, yes, that I discussed during**
23 **the -- yes.**
24 Q. You led the discussions as the OB/GYN maternal
25 fetal medicine expert, and you concluded she had

---

40

1  not breached the standard of care?
2  **A. Yes, sir.**
3  Q. And t hat particular finding has been redacted from
4  the September 22nd version which is Exhibit 3?
5  **A. Yes, sir, it doesn't appear there.**
6  Q. All right. And what is added -- well, let me, I'm
7  going to have to go into a little bit more detail.
8  The reference in Exhibit 2 to the original
9  paragraph 7.
10 **A. The original 7?**
11 Q. Right.
12 **A. Okay.**
13 Q. About the delay.
14 **A. Okay.**
15 Q. That the delay would not have changed the outcome,
16 that is also redacted from Exhibit 3?
17 **A. That paragraph is -- or the spirit of that is**
18 **deleted. Number 8 in, I guess, Exhibit 3 kind of**
19 **says, "While an argument can be made in a delay of**
20 **performing did not affect the ultimate outcome."**
21 Q. Right.
22 **A. So a different rewording of part of it.**
23 Q. Well, you have concluded that whatever delay there
24 was -- or interval actually. Whatever interval
25 there was between the time Dr. Muniz knew that

---

Christopher Robinson, MD, MSCR - 5/18/2012
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

41

1    there was an abruption from the radiologist and the
2    time the baby was delivered, you have concluded and
3    believed that such delay would not have changed the
4    outcome?
5    A.  That's correct.
6    Q.  And you continue to believe that today?
7    A.  Yes, sir.
8    Q.  All right.  Now, if you would look at what was
9        originally paragraph 8 in Mr. Naufal's August 20th
10       report.
11   A.  Okay.
12   Q.  Now, that particular paragraph which relates to the
13       administration of terbutaline, T-E-R-B-U-T-A-L-I-N-
14       E, also known as breathine, B-R-E-A-T-H-I-N-E, that
15       particular paragraph is deleted in its entirety?
16   A.  That is correct.
17   Q.  Did you also reach a firm conclusion that the
18       use of terbutaline in the face of a possible
19       placenta or placental abruption was not
20       contraindicated?
21   A.  Personally, I did.
22   Q.  Okay.  That's what you believe?
23   A.  Yes.
24   Q.  And then on paragraph 10 in the original August
25       20th which is Exhibit 2 report is deleted in its

42

1    entirety?
2    A.  That paragraph does not appear, that's correct.
3    Q.  And then the recommendations, of course, in the
4        August 20th version, Exhibit 2, there were
5        originally five recommendations.  The first of
6        which was to lift her suspension.  And in the
7        recommendation in the Exhibit 3, September 22,
8        2010, the recommendation has changed simply to,
9        "The action of the medical executive committee
10       should confirm?"
11   A.  That is correct.
12   Q.  And then it as signed only by Robert F. or Robert
13       Searles?  I don't know, maybe he's an 'F' but maybe
14       he's an 'R'.  Robert R. Searles, Doctor of
15       Obstetrics, correct?
16   A.  That's correct.
17   Q.  Do you know how this report which is Exhibit 2
18       dated August 20th translated into what is Exhibit 3
19       dated September 22, 2010?
20   A.  I do not.  I do remember in somewhat generic terms
21       that the statement had come back to us that
22       basically we had to meet again because we had not
23       followed what we were supposed to do.  That we had
24       gotten off track in what our recommendations were
25       supposed to be, how we were supposed to consider

43

1    it.  And that's what led to moving from, you know,
2    Plaintiff's Exhibit 2 to Number 3.  We were told
3    that basically we had to -- that the decision was
4    to either uphold or vote not to uphold the MEC's
5    original decision.
6    Q.  Who told you that?
7    A.  I believe every time that, you know, I had an
8        interaction it would have been Ernie.  In other
9        words, I don't think that any of us -- there was no
10       one that was on the committee that had
11       anymore experience than anyone else in this type of
12       scenario.  So I believe in all of those scenarios
13       it was Ernie.
14   Q.  Now, looking at Exhibits 2 and 3 in a very broad
15       sense now, of course, Exhibit 2 was actually
16       published a day or two days at the most after your
17       3 ½ hours of deliberations?
18   A.  I believe that's correct.
19   Q.  Exhibit 3 was published over a month later after
20       what appears to be a half an hour of deliberations?
21   A.  I believe that's correct.
22   Q.  Now, do you know why it took a month for all of
23       this
24       to --
25   A.  I don't.  When I -- so when I left -- when we

44

1    completed this report, I assumed this was the end.
2
3    Q.  Yes.
4    A.  And so I didn't, didn't anticipate there would be
5        future need for any more discussion.
6    Q.  So when you left on August 18th or 19th, you
7        anticipated that the suspension of Dr. Muniz's
8        privileges would be lifted and they would not be
9        terminated?
10   A.  That is correct.  I believed that our
11       recommendations would be what would take place at
12       that point.
13   Q.  All right.  And then sometime during the interim --
14       and I'm not trying to fit in your mouth words
15       here --
16   A.  Uh-huh (affirmative response).
17   Q.  -- because I really do want to know what you
18       recollect.
19   A.  Uh-huh (affirmative response).
20   Q.  But sometime in the interim it was reported back to
21       you that you had to meet again because you were off
22       track and didn't do exactly what you needed to do?
23   A.  Uh-huh (affirmative response).
24   Q.  Yes?
25   A.  Yes.

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

45

1  Q.  Do you know who that came from?
2  A.  Well, I know that in the terms of how I was always
3     contacted, I believe we gave you a copy of my
4     emails and my prints from Outlook.  Every time I
5     was contacted by email, my general rule was to cut
6     and copy the email, put it into the comments part
7     of that appointment on my calendar.
8  Q.  Right.
9  A.  And so for these dates, I'm assuming, it was by
10    telephone because I didn't have, you know, an
11    email.  And every time I was contacted by
12    telephone, I don't remember Ernie ever calling me
13    so by -- and Terry was always the person to set
14    things up.  So I'm going to assume it was Terry
15    even though I don't know.
16 Q.  You believe it was Terry?
17 A.  I believe it was Terry.
18 Q.  That was one thing that struck me when I was
19    reading all these papers, how computer efficient
20    you are.
21 A.  That's how we end up in the right place at the
22    right time.
23 Q.  Yeah.  In fact, at the last meeting which I guess
24    was on like October 12th, it was scheduled for
25    home --

---

46

1  A.  Uh-huh (affirmative response).
2  Q.  Because they were calling you on your cell phone, I
3     believe?
4  A.  Uh-huh (affirmative response).
5  Q.  All right.  So you were told probably by Terry
6     Ergle but you're not sure.  But you were told that
7     you had to meet again.  You, you meaning the panel
8     as a whole, was off track and had not done what it
9     needed to do?
10 A.  I don't believe I knew why I had to meet.  So in
11    other words, generally when I was told things like
12    that, it would be that, "We need the panel to
13    meet."
14 Q.  Okay.
15 A.  But I was not explained as to, you know, as to why
16    we had to meet.
17 Q.  All right.  So probably then when the second
18    meeting occurred, you appeared by telephone
19    September 22, 2010?
20 A.  I believe that's correct.
21 Q.  For about a half an hour, that was your next
22    interface with the whole process, substantive
23    interface?
24 A.  I believe that's correct.
25 Q.  What happened during that half an hour?

---

47

1  A.  You know, that is a harder -- I can talk in
2     generalities is what I would say.  Just because I
3     remember a lot more about when I was in person, and
4     I remember people a little bit better than
5     telephone calls.  But there was a discussion of why
6     we had to meet, and I can't tell you exactly why
7     that was.  But I remember in generality it was an
8     issue of we had not followed -- the generality was
9     we had laid out a plan for the MEC, but we had not
10    actually voted on what we were supposed to which
11    was the only question really before us which was to
12    uphold or not to uphold the MEC's decision.  And
13    therefore what we had done previously was not what
14    we were charged to do.
15 Q.  And was that information that you just related to
16    me coming from Ernie Nauful?
17 A.  I believe that's absolutely correct, yes, sir, in
18    some form.
19 Q.  So this notion about the panel had not voted on the
20    MEC recommendation, that probably came from Ernie
21    Nauful?
22 A.  Yes, sir.
23 Q.  All right.  So then what transpired?  And we're
24    talking about September 22nd now.
25 A.  That's where it's hard to really tell you

---

48

1     specifically what happened.  I believe that because
2     I know it happened at some point.  But I can't tell
3     you exactly when, is that specific points were
4     reviewed, read, and votes were taken, you know, as
5     to each point.  And, you know, it was a up and down
6     vote on each point, but the recommendation was
7     voted on also separately from the points.
8  Q.  Are there certain other points that ended up in the
9     September 22, 2010 report, Exhibit 3, that you
10    voted against?
11 A.  I do not believe that I voted for everything, and I
12    did not vote against everything.  I know it was not
13    as straightforward as, you know, going straight
14    down the list and agreeing or not agreeing, you
15    know, with everything.
16 Q.  What about the end game on September 22nd which is
17    the recommendation that, "The action of the medical
18    executive committee should be affirmed?"
19 A.  That was voted for.
20 Q.  You voted for that?
21 A.  I did vote for that.
22 Q.  Why?
23 A.  Basically, the MEC, you know, we listened to both
24    sides of the equation.  And the question was did
25    the MEC, did they act to those three things?  It

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

49

1   was basically capricious, arbitrary, and without
2   lack of credible evidence.  And there was a debate,
3   I believe, yet again over that.  And basically the
4   debate broke down this time amongst --- and I don't
5   remember specifically when it occurred.  But it
6   broke down into professionalism versus, you know,
7   care issues.  And I believe it was focused a lot
8   more on professionalism instead of care issues, but
9   I don't remember the specifics.
10  Q.  Because you never reached a conclusion that she had
11      breached the standard of care with respect to
12      Patient Number 6?
13  A.  That's correct.
14  Q.  All right.  And this Exhibit 3, if you look at the
15      changes from Exhibit 2 to Exhibit 3, this hearing
16      panel board migrates away from standard of care
17      with respect to Patient 6 to questions of
18      professionalism?
19  A.  I believe that is correct.
20  Q.  Do you believe that is how the report that is
21      Exhibit 3 was transformed from the report that was
22      Exhibit 2?
23  A.  I don't know because I don't even have a
24      specific -- you know, like I say, we talked about
25      this by phone.  And the best I remember, that's

50

1   what occurred in this situation.  I don't -- I    didn't
2   have -- I don't know that I had this in    front of me
3   at the time or not.
4   Q.  Right.
5   A.  I just can't remember if that was the case or not.
6   Q.  Can we say then that you do not remember having
7       Exhibit 3 in front of you at the time these
8       deliberations were going on on September 22nd?
9   A.  That's correct.  I don't remember.
10  Q.  And can we also say that you don't remember ever
11      having received Exhibit 3?
12  A.  Not to, you know, I can't prove that I did receive
13      it.  I just don't remember.
14  Q.  You don't have any copy?
15  A.  I do not.
16  Q.  You don't have any evidence of having
17      received --
18  A.  I do not, I do not.  And that's what I'm going on
19      basically, is the fact that I don't have any.
20  Q.  And you have looked?
21  A.  I have.
22  Q.  And you do have evidence and a copy of the August
23      20th report that's Exhibit 2?
24  A.  I do.  And basically everything I found in this was
25      all in one place.  It's in one folder, so it's not

51

1   scattered about.
2   Q.  So if you had received Exhibit 3 which is the
3       September 22 hearing panel report, would you expect
4       to have it in your papers in that place you just
5       referred to?
6   A.  I don't know for certain because it would
7       depend upon whether I had edited it, you know.  And
8       I don't remember, I don't remember editing anything
9       else in this case.  And, you know, when I saw this
10      last night I didn't remember issuing any edits.
11  Q.  Did you even remember --
12  A.  But I didn't remember, I didn't remember seeing it.
13      I do remember that we discussed that would it be
14      okay for a single panel member to sign a report.
15      We did discuss that, and we agreed that would be
16      okay for that to occur.  But I don't remember
17      specifically seeing it.  So I didn't sign it.  I
18      didn't receive it that I remember.
19  Q.  Under the circumstances, you would not have had to
20      receive it because you were not going to sign it?
21  A.  Correct.
22  Q.  All right.  Your best recollection is that you have
23      not received it?
24      MR. DAYHUFF:  Object to the form of the
25          question.

52

1   A.  I don't know whether I did or did not receive it
2       I just don't know which, which is the case.
3   Q.  You have no evidence that you received it?
4   A.  I do not.
5   Q.  All right.  Now, let's look at paragraph -- well,
6       the third full paragraph on the second page of
7       Exhibit 3.  If you would read that.  I'm going to
8       read it, again, into the record so just have it out
9       there on the table.  It says, "Once a record is
10      established and the evidence submitted, section
11      7.D.2 of the credentialing files.  It establishes
12      the basis of any hearing panel recommendation in
13      the following manner:  1)The hearing panel shall
14      recommend in favor of the medical executive
15      committee unless it finds that the individual who
16      requested the hearing has proved, by clear and
17      convincing evidence, that the recommendation that
18      prompted the hearing was arbitrary, capricious, or
19      not supported by credible evidence."  Do you see
20      that?
21  A.  Yes, sir.
22  Q.  Now, is that the same paragraph that you found in
23      Exhibit 2?
24  A.  Let me, let me look.  I believe it is.
25  Q.  So the standard that is being imposed upon the

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

53

1    hearing panel is the same on September 22nd as it
2    was on August 20th?
3    **A.  It appears that way, the same.**
4    Q.  Do you recall if during the discussion on September
5    22nd by telephone whether there was a discussion of
6    that paragraph and that standard?
7    **A.  I do not remember.  I don't remember that specific.**
8    Q.  All right.  Look at the next paragraph which would
9    be the fourth full paragraph.
10   **A.  Uh-huh (affirmative response).**
11   Q.  Do you see it says, "In accordance with section
12   7.D.2 of the credentialing files the hearing panel
13   determined that final adjournment is deemed to be
14   in receipt of the transcript of the third hearing
15   which was delivered to the hospital on September
16   10, 2010."  Do you see that?
17   **A.  Yes, sir.**
18   Q.  Now, did you ever get the full transcript for
19   review before September 22nd?
20   **A.  I can't remember.  If, you know, if I had received**
21   **it, it would have had to have come to my home, you**
22   **know, I'm assuming.  I don't remember receiving**
23   **anything like that via email.**
24   Q.  This is the transcript.
25   **A.  Okay.**

---

54

1    Q.  I will represent to you volumes -– I'm going to let
2    you look at it.
3    **A.  Okay.**
4    Q.  Volume 1 from the first day.
5    **A.  Uh-huh (affirmative response).**
6    Q.  Do you see that, June 28th?
7    **A.  Sure.**
8    Q.  Volume 2 from the second day, June 29th.
9    **A.  Okay.**
10   Q.  Volume 3 from the third day, August 17th.
11   **A.  Okay.**
12   Q.  Do you recall having received any of those?
13   **A.  I don't remember.  I just don't remember if I**
14   **received this or not.**
15   Q.  Do you recall if you ever read it?
16   **A.  I'm trying to remember if we looked at –**
17   Q.  You would not have had the third volume.  That's
18   what that paragraph we -–
19   **A.  Yeah.**
20   Q.  -– we just read is all about.
21   **A.  Yeah, okay.**
22   Q.  When you met in person on August 20th -– no, the
23   18th or the 19th, you would not have had the third
24   volume?
25   **A.  I do not remember reading this.**

---

55

1    Q.  Okay.  Now, according to your invoice, you met
2    again on October 12, 2010 for half an hour by
3    teleconference.  I think that's the one where
4    according to your very detailed computer records
5    was a call to your cell phone?
6    **A.  Was it a call to my -– the best ir remember every**
7    **time I called I called them.**
8    Q.  Okay.
9    **A.  I don't remember but it would have been probably**
10   **via cell phone, no doubt.**
11   Q.  I think the schedule said you were going to take
12   that call or make that call from home?
13   **A.  Okay.**
14   Q.  But, anyway, that doesn't particularly matter.
15   **A.  Okay.**
16   Q.  Before we get to that though, I want to get back to
17   September 22, 2010 and that teleconference.  What
18   else do you remember about that telephone
19   conference other than what you've related to me
20   already?
21   **A.  I remember Ernie always started, you know.  I**
22   **remember that.  We -–**
23   Q.  So would he lead the discussion?
24   **A.  I don't remember that specific.  It wasn't really a**
25   **leading of the -– a lot of times it was reading or**

---

56

1    **leading.  I don't know which it was.**
2    Q.  Okay.
3    **A.  But I know that sometimes there were votes taken.**
4    **And the committee was present, you know, there.**
5    Q.  Do you know if the committee members, all of whom
6    were on staff at ARMC except you?
7    **A.  Correct.**
8    Q.  Do you know if between the times you met, the there
9    times you met to deliberate, do you know if they
10   ever discussed the case between themselves?
11   **A.  I do not know.**
12   Q.  Did you ever discuss the case with any of them
13   between the times you -–
14   **A.  I did not.  I actually didn't even know their**
15   **contact.  Some of them I didn't eve know their**
16   **first names.**
17   Q.  Okay.  So back to the sort of fundamental question,
18   do you recall -– and you were talking about Ernie
19   started out the conversations.  Do you recall
20   anything else specifically that was discussed or
21   that transpired on the September 22, 2010?
22   **A.  I don't remember specifically.  I do know that**
23   **every time we met it was always, the question was**
24   **always why are we meeting.  So Ernie would usually**
25   **start out with that, I believe.  In other words,**

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**57**

1  why –- because every time we left, I thought this
2  was the end.  So every time that we met, we would,
3  you know, that was probably the first thing
4  discussed.  But beyond that, I don't remember the
5  specifics of the telephone calls.
6  Q.  Okay.  All right.  So there was the third call or
7      deliberation on October 12, 2010.  Do you recall
8      what that was about or what prompted it?
9  A.  Was that the second call?
10 Q.  Third.  Well, it was the second call.  You had
11     the deliberations in person August 18th or
12     19th --
13 A.  Uh-huh (affirmative response).
14 Q.  -- for 3 ½ hours.
15 A.  Right.
16 Q.  You had the --
17 A.  But just two phone calls.
18 Q.  Two phone calls.
19 A.  Right.
20 Q.  Both for a half an hour.
21 A.  Okay.
22 Q.  This was the second phone call.
23 A.  Yes.
24 Q.  Do you recall what prompted that?
25 A.  You know, after looking last night at the documents

---

**58**

1      that you had forwarded, it had to do with evidently
2      the burden of proof in the case.  You know, was the
3      burden of proof on the MEC or was the burden of
4      proof on Dr. Muniz.
5  Q.  Okay.  And you know that the burden of proof was
6      changed for the third report, the October 12th
7      report?
8  A.  Right.  I believe it was different.
9
10     MR. SOWELL: I'm going to ask the reporter to
11     mark this as Exhibit 4.
12        (Plaintiff's Exhibit Number 4 was marked
13        for   identification purposes.)
14
15 Q.  This is a letter written October 7, 2010 by Francis
16     DiBona, the Chief of Staff, do you remember, who
17     prosecuted the case for the MEC?  Carlos Milanes,
18     the President of the hospital or Chief Executive
19     Officer of the hospital.  I ask you if you can
20     identify it or have you ever seen it before?
21 A.  I don't believe I've seen this, no.
22 Q.  Well, you can see in here, the third paragraph,
23     that Dr. Muniz -- that would be Mr. Dick and myself
24     that raised the question about the burden of proof
25     of standard.  Do you see that in the third

---

**59**

1      paragraph?
2  A.  Yes, sir.
3  Q.  And do you see that the MEC agreed that the burden
4      of proof was on the MEC irrespective of the bylaw
5      provision of section 7.D.2?
6  A.  Yes, sir.
7  Q.  Do you see that the MEC requested the hearing panel
8      to review and reconsider the matter based upon the
9      agreed upon burden of proof standard?
10 A.  Yes.
11 Q.  And issue a revised report?
12 A.  Yes, sir.
13 Q.  Now, do you remember what was the reason for the
14     October 12th convening of the panel?
15 A.  Based on what we've reviewed, I believe it would
16     have been to consider that specific issue?
17 Q.  What was discussed?
18 A.  I don't remember, I don't remember.  You know, I
19     believe that -- I just don't remember specifically
20     what was discussed.
21 Q.  Did the revisions of the burden of proof not make
22     an impression upon you?
23 A.  I don't -- that's a good question.  I don't think
24     so.  I don't think it did but I don't know.  I
25     don't feel like it likely did.

---

**60**

1  Q.  Do you know if it was explained to you?
2  A.  I don't remember.
3  Q.  So what happened at the third convening,
4      convocation?
5  A.  I know that obviously we had another report come
6      out, but I don't remember the specifics of a phone
7      call.
8  Q.  And you don't have any notes of it?
9  A.  No.  In fact, the first time that I had seen that I
10     remember the report or seeing the report -- I don't
11     remember seeing it other than last night, I saw the
12     report.  But it's just been a long time ago, so.
13 Q.  I'm going to hand you -- do you want me to hold up?
14 A.  Is this Five?
15 Q.  Yeah, Plaintiff's Exhibit 5.
16
17        (Plaintiff's Exhibit Number 5 was marked
18        for identification purposes.)
19 Q.  If you would, I think you ought to read the first
20     page to yourself.  I know you've already read it.
21     But just read it and we'll talk about it.
22 A.  Okay.  Just the paragraph or the whole thing?
23 Q.  Well, the whole thing.
24 A.  Okay.
25 Q.  I think you've got to read paragraphs 1, 2, and 3

---

Christopher Robinson, MD, MSCR - 5/18/2012
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

61

1    because they all relate to the correct burden of
2    proof.
3    **A. Yes, okay.**
4    Q. Do you see that it is stated at the end of the
5    first paragraph that the hearing panel applied the
6    incorrect standard of proof in reaching their
7    decision on September 22, 2010?
8    **A. Yes, sir.**
9    Q. All right. And do you see that it states in the
10   third paragraph that the hearing panel finds and
11   concludes the MEC has shown by the greater weight
12   or preponderance of the evidence as follows. And
13   then it sets out paragraphs 1 through 9.
14   **A. Yes, sir.**
15   Q. If you look back at Exhibit 3 which is the
16   September 22nd, do you see that it only has eight
17   findings or conclusions?
18   **A. Yes, sir.**
19   Q. So Number 9 is avid; is it not?
20   **A. Yes, sir.**
21   Q. Do you recall that?
22   **A. I don't recall the specifics, no, I do not.**
23   Q. Do you recall anything about it?
24   **A. You know, I ---**
25   Q. About how it got in here, particularly when the

62

1    burden of proof has been changed placing it on the
2    medical executive committee?
3    **A. I don't remember specifically. You know, I -- it**
4    **seems like that, you know -- I just don't remember**
5    **specifically**
6    **how ---**
7    Q. Did you understand that when you met on October
8    12th ---
9    **A. Uh-huh (affirmative response).**
10   Q. -- that the burden of proof had been changed?
11   **A. So it seems that the things that kind of ring a**
12   **bell with me when I read through it were a couple**
13   **of things in here. One was I remember a discussion**
14   **about the greater weight or preponderance, okay.**
15   **And that seemed to be, you know, a catch phrase**
16   **that, you know, I believe I probably heard, and I'm**
17   **going top assume it was at that time. And there**
18   **was something else. You know, it seems like Ernie**
19   **probably did tell us that he had instructed us**
20   **wrong. Because, again, every time we met the whole**
21   **issue was is why are we here. You know, like why**
22   **are we re-discussing this again. And that's kind**
23   **of what paragraph 1 does. But I do remember, you**
24   **know, greater weight or preponderance being**
25   **something that was probably discussed.**

63

1    Q. Let's look at Exhibit 3.
2    **A. Uh-huh (affirmative response).**
3    Q. And Exhibit 5. So we'll be looking at the third
4    full paragraph on the second page of Exhibit 3.
5    **A. Okay.**
6    Q. We'll be comparing that to the third full paragraph
7    on the first page of Exhibit 5.
8    **A. Okay.**
9    Q. Do you see that the burden, when the September 22nd
10   report was done, is on the individual who requested
11   the hearing?
12   **A. Yes, sir.**
13   Q. That would be Dr. Muniz?
14   **A. That's correct.**
15   Q. To prove by clear and convincing evidence that the
16   recommendation that prompted the hearing was
17   arbitrary, capricious, or not supported by
18   credible evidence?
19   **A. That's correct.**
20   Q. All right. And apparently as of August 18th
21   or 19th you, at least had concluded, and
22   apparently the panel as a whole had concluded that
23   Dr. Muniz had met that burden because you
24   recommended not terminating her privileges.
25   MR. DAYHUFF: Object to the form of the question.

64

1    **A. Can you repeat it?**
2    Q. Yes.
3    **A. Okay.**
4    Q. I'm going to take you through it in some detail.
5    **A. Okay.**
6    Q. August 18th or 19th you deliberated?
7    **A. Uh-huh (affirmative response).**
8    Q. Yes?
9    **A. Yes, sir.**
10   Q. All right. As a result of that, you get the August
11   20th document?
12   **A. Yes, sir.**
13   Q. The original draft of the hearing panel. And it
14   recites this same burden of proof verbatim, that
15   the burden is on the individual, Dr. Muniz, to
16   prove by clear and convincing evidence that the
17   recommendations that prompted the hearing was
18   arbitrary, capricious, or not supported by credible
19   evidence. So my question to you is is when the
20   hearing panel originally deliberated on August 18th
21   or 19th and made the conclusions that are set out
22   in the August 20th report, you would have
23   necessarily have concluded that Dr. Muniz had
24   met her burden because you concluded not to
25   terminate her privileges?

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

65

1
2     MR. DAYHUFF: Object to the form of the question.
3       You can answer.
4
5  A.  What I wonder is in that first meeting when we
6      deliberated, I would say that the focus was not on
7      that statement at all.
8  Q.  Right.
9  A.  What I would say is that the focus was on what is
10     the appropriate -- what are the findings and what
11     are the appropriate remedies to those findings.  So
12     in other words, the final conclusion was not really
13     to examine that statement is what I would say.
14  Q.  Okay.  Now, did the issue of Dr. Muniz's prior peer
15     review ever come up?
16  A.  I know that on the very first day that we
17     arrived -- you know, because we didn't know what
18  was going on.  We were taken into a room by Ernie
19  and told that, in generic terms, we would be
20  discussing a patient case, Patient Number 6.  That
21  our conclusions and deliberations were to be based
22  upon Patient Number 6, okay.  But at some point, I
23  know that I did know that there were other cases  that
24  preceded it because -- you know, it was      probably in
25  a testimony at some point

---

66

1     that -- because I know that the reason she ended up
2     here -- because when we deliberated, one of the
3     things I pointed out was the reason she ended up  here
4     was, you know, something that occurred that  was not
5     preventable.
6  Q.  Bad luck?
7  A.  But she was under a 100 percent review at the time.
8     So, you know, in my mind that meant that something
9     had to have occurred.  And I don't remember if it
10     was referenced specifically.  I didn't know what
11     the five cases were if there were five and then
12     this is the sixth.  But something had led to being
13     on the 100 percent review.
14  Q.  During any of these deliberations, was the
15     proposition that she was on 100 percent review and
16     to add this prior peer review ever discussed or
17     relied upon in concluding that her privileges
18     shouldn't be terminated?
19  A.  No, it was not.  However, one of the statements
20     that came into this about being uncomfortable with
21     working with appeared, did come up, you know, by
22     one of the individuals in the room.  So there was a
23     discussion of, 'I don't know if I could work with
24     this person.'  And, you know, it was a very, you
25     know, it was a very intense deliberation.  I mean,

---

67

1     you know, basically, you know, my thoughts at that
2     time were that she did not deserve to lose
3     her privileges.  And that it didn't have to do with
4     what another person's opinion was.  It had to do
5     with -- you know, and I did remind people of that
6     when we deliberated.  That we were only considering
7     Patient 6.  It didn't have to do with other issues
8     or anything else that was going on from their
9     standpoint.
10  Q.  And it was --
11  A.  Right.
12  Q.  -- to be directed at Patient 6?
13  A.  Right.
14  Q.  Do you think some of them forgot that?
15  A.  I don't think so.  I don't think they did, you
16     know, but I know that -- I don't know how you
17     remove it, you know.  In other words, I did remind
18     them that, you know, obviously I came from a very
19     different background because I don't work in a
20     center and I didn't know a single person.  So as
21     far as everybody sitting around, I didn't know a
22     single person.  What I was able to gage is, you
23     know, different people's testimony.  Whether I
24     thought it was -- whether I thought it held water
25     or, you know -- because Ernie did charge us with

---

68

1     the fact of weighing what we believed about
2     testimony.  Did we believe that, you know, if we
3     found that something just didn't feel right, then
4     we could ignore the entirety of that testimony.
5  Q.  Did Ernie Nauful ever give you a written
6     discussion?  Or if you said it in big court, it
7     would be called a charge.
8  A.  Okay.
9  Q.  It would be like a charge to the jury which is
10     essentially what you're talking about informally.
11     But did he ever give a written standard to govern
12     by?
13  A.  No, sir.
14  Q.  All right.  Now, back to my question about Exhibit
15     3.  Now, Exhibit 3 -- well, I take it back.
16     Exhibit 5.  Do you see Exhibit 5 in the third
17     paragraph states towards the end, "The hearing
18     panel finds and concludes the MEC is shown by the
19     greater weight or preponderance of the evidence as
20     follows?"  The it repeats grounds one through eight
21     and adds nine.
22  A.  Yes, sir.
23  Q.  Do you understand that between the time of
24     September 22nd report and the October 12th report
25     the burden of proof has been totally shifted from

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

69

1      the individual practitioner, Dr. Muniz, to the
2      medical executive committee?
3   **A.  Yeah.  From my reading, yes.  But from my**
4   **recollection, I can't recall specifically.**
5   Q.  Do you recall that you understood that before the
6      October 12th report was uttered?
7   **A.  I just don't remember enough about the specifics of**
8   **that, you know, teleconference.**
9
10       MR. DAYHUFF:  Doc, do you need a break?
11       WITNESS: I'm good.
12
13   Q.  Now, I probably already asked you this, but I'll
14      ask you again anyway to be sure.  Exhibit 5, which
15      is the October 12th report, you do not have any
16      evidence that you haven't received a copy of this?
17   **A.  I do not.**
18   Q.  And do you know beyond that what you received a
19      copy of?
20   **A.  I do not.**
21   Q.  So you don't independently recollect receiving a
22      copy of it?
23   **A.  I do not.**
24   Q.  You've got no evidence in your file you have a copy
25      of it?

---

70

1   **A.  I do not.**
2   Q.  Was there any discussion among the panel about
3      whether to vote -- there had to be a majority vote
4      or a unanimous decision?
5   **A.  There was not.**
6
7       MR. SOWELL: Let's take a break.
8           (Off the Record.)
9
10   Q.  Let's look back at Exhibit 3.  Two broad questions
11      with some subparts.  Look on the first page of
12      Exhibit 3, look at the second paragraph if you
13      would.  Just read that.  Take your time and read
14      it, and then I'll ask you a couple of questions
15      about it.
16   **A.  Okay.**
17   Q.  Do you see that the preamble to this report, the
18      September 22, 2010 report, it states that these
19      proceedings were commenced as a result of a summary
20      suspension, correct?
21   **A.  Yes, sir.**
22   Q.  By the MEC?  It doesn't say that but, I mean,
23      that's what happened?
24   **A.  Okay.**
25   Q.  There was a summary suspension --

---

71

1   **A.  Yes.**
2   Q.  -- by the MEC?  And then they give the reason; do
3      you see that?
4   **A.  Yes, sir.**
5   Q.  And that reason is restricted to, "A catastrophic
6      outcome of a 30-31 week fetus following a placenta
7      abruption of her obstetrical patient.  (Hereinafter
8      Patient Number 6.)  Do you see that?
9   **A.  Yes, sir.**
10   Q.  There were no other reasons given for that
11      suspension?
12   **A.  Yes, sir.**
13   Q.  And do you understand that was the sole reason for
14      her suspension?
15
16       MR. DAYHUFF: Object to the form of the
17           question.
18
19   **A.  That is what is stated there.  But there's also the**
20   **comment, you know, below it that basically says**
21   **that her failure to timely recognize the abruption**
22   **and perform a caesarean.**
23   Q.  Right.  I see, I see that.
24   **A.  Yeah.**
25   Q.  But it's all related to Patient 6; isn't it?

---

72

1   **A.  That's correct.  It was just Patient 6.**
2   Q.  All right.  And it is stated, "Subsequently, the
3      medical executive committee found that the
4      practitioner's care of Patient Number 6 and death
5      of the baby were the result of her failure to
6      timely recognize the abruption and timely perform a
7      caesarean section and by administering an
8      inappropriate medication to Patient Number 6?"
9   **A.  Yes, sir.**
10   Q.  Nobody on the panel ever concluded that she
11      inappropriately administered a medication to
12      Patient 6 as we discussed earlier?
13   **A.  I don't remember all of the panel individuals but I**
14   **didn't.**
15   Q.  And that particular finding was stricken in one of
16      these reports; was it not?
17   **A.  I believe so.  Yes, I believe I struck it from one**
18   **of these reports.**
19   Q.  So you did not believe that she had inappropriately
20      administered terbutaline also known as breathine?
21   **A.  That's correct.**
22   Q.  All right.  And as discussed earlier, you also
23      believed that she timely recognized the abruption
24      and timely performed a caesarean section?
25   **A.  So she did not recognize the abruption, but rather**

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

73

1    I believe that she responded appropriately to the
2    information that she had at the time which seemed
3    to be a suspected abruption.
4  Q. Right. That's what you put in one of your little
5    margin --
6  A. Right.
7  Q. But in some, with respect to Patient 6, and these
8    issues about how she addressed that acute
9    situation, you believed that she acted within the
10    appropriate standard of care?
11  A. I did.
12  Q. Now, that being the case and it being the case also
13    that this report makes it clear that this hearing
14    was with respect to Patient 6. And you concluded
15    as did the panel as a whole on August 18th or 19th
16    not to terminate her privileges. What caused you
17    to change your vote between then and September
18    22nd?
19
20    MR. DAYHUFF: Object to the form of the question.
21      You can answer.
22
23  A. So our vote was not -- so the first vote as we
24    understood it was not -- it as to -- we understood
25    it to be the findings and then decide what the

---

74

1    recommendation should be, okay. But in the second
2    vote, the subsequent votes, that it didn't seem
3    that our decision was now to decide about her
4    privileges. In other words, our only decision was
5    to uphold or not uphold the MEC's decision.
6  Q. And that came from Ernie Nauful?
7  A. We were -- so Ernie had instructed us at some
8    point. And I don't remember the specific point,
9    but we had gone astray. We were outside of what we
10    were supposed to be doing as the panel. But, you
11    know, at the same time, we had given him the report
12    to do the report. So the report had come from him.
13    It didn't come, you know, the written report on the
14    20th did not come from me, the first draft. It
15    came from him. So, you know, I assumed that we
16    were doing the right thing.
17  Q. I understand. But sometime after the August 20th
18    report is when he informed you that you were not on
19    the right track?
20  A. I'm assuming that is the case, yes.
21  Q. Because when that August 20th report was uttered,
22    you expected it to be the final report hopefully
23    with your suggested changes?
24  A. That's correct.
25  Q. And you believed in that report with your changes?

---

75

1  A. That's correct.
2  Q. And you probably would have believed in it without
3    the changes?
4  A. I don't know. I think I would always, I would
5    always look at it and make a decision about the
6    changes, yeah.
7  Q. But you were comfortable with the conclusion that
8    her privileges not be terminated and that
9    suspension be lifted?
10  A. Yes, sir.
11  Q. All right. Now, if you would look back on the
12    third paragraph on page 2 of this Exhibit.
13  A. From which one, 3?
14  Q. Yeah.
15  A. Okay.
16  Q. This is the one where this September 22, 2010
17    report sets out the standard of proof. Do you see
18    that where we've discussed where it says, "The
19    hearing panel shall recommend in favor of the
20    medical executive committee unless it finds that
21    the individual who requested the hearing has
22    proved, by clear and convincing evidence?"
23  A. Second page?
24  Q. Yeah.
25  A. Yes.

---

76

1  Q. Do you see where it starts off, "The hearing panel
2    shall recommend in favor of the medical executive
3    committee?"
4  A. Yes.
5  Q. "Unless it finds that the individual who requested
6    the hearing is, proved by clear and convincing
7    evidence, that the recommendation that prompted the
8    hearing was arbitrary, capacious, or not supported
9    by credible evidence." Now, my question to you is
10    do you think you were influenced to change your
11    vote by that standard of proof that is reflected
12    there in the September 22nd report?
13  A. I do not remember. I do not remember, you know,
14    exactly. I do remember that it wasn't a change in
15    the vote necessarily. It was more of a change --
16    it was a new vote to me. In other words, it wasn't
17    even the same as what we had done on the previous
18    encounter. It was a totally different scenario now
19    because I didn't feel like that her privileges
20    should be restricted, okay -- on the initial vote.
21    And now the discussion, whatever the discussion was
22    which I don't specifically remember, it led me a
23    different direction. And I don't know specifically
24    what did that.
25  Q. But you do know that between the time you voted the

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

77

1    first time August 18th or 19th and September 22nd
2    came around, you were informed that the panel was
3    not on the right track?
4    **A. At some point we had -- we were informed that we**
5    **had gone off the base. We were doing, we were**
6    **doing things we were not charged to do. So I guess**
7    **I didn't understand the charge.**
8    Q.  Okay.  Now, was that statement to you and to the
9    rest of the hearing panel, is that what
10   influenced the hearing panel to change its
11   decision?
12   **A. See, I don't remember the statement exactly.**
13   **That's the problem, is I don't have a recollection**
14   **of the specifics of what was said or what**
15   **specifically changed my impression. I just don't**
16   **remember the specifics.**
17   Q.  But something was said that changed your impression
18   because you believed that after August 20th the
19   case was over?
20   **A. I believed that the case was over, and I was called**
21   **back again. So the only reason, you know, that I**
22   **was even back in was being called back again.**
23   Q.  Right.
24   **A. And there was a different consideration the next**
25   **time.**

---

78

1    Q.  Somewhere between the first time August 18th
2    or 19th and the second time on September 22nd, you
3    were informed in some way, shape, or form that the
4    panel was off track?
5    **A. I believe it would have been at the time of**
6    **actually being on the telephone.**
7    Q.  Yes.
8    **A. I don't believe I knew that in advance of that. So**
9    **I wouldn't have had -- clearly, I wouldn't have had**
10   **as much time to think about it.**
11   Q.  And that deliberation took 30 minutes?
12   **A. Yeah, that's about right.**
13   Q.  Compared to the first deliberation which was 3 ½
14   hours?
15   **A. That's right.**
16
17       MR. SOWELL: Let me confer with David here for
18       one second.
19
20   Q.  Looking back at Exhibit 3, the second paragraph,
21   where we talked a minute ago about how you did not
22   agree that Dr. Muniz had breached the standard of
23   care with respect to Patient 6 and her baby?
24   **A. Yes, sir.**
25   Q.  We established that, correct?

---

79

1    **A. Yes, sir.**
2    Q.  All right.  That being the case, what led you to
3    change your vote to uphold the MEC's
4    recommendation?
5
6       MR. DAYHUFF: Object to the form of the question.
7
8    **A. I don't remember specifically, you know, what the -**
9    **- I know that at some point during all this there**
10   **was a change from the mode of the medical**
11   **management to the professionalism components.  And**
12   **that's what I would say was the most likely thing**
13   **looking backwards, is it had something to do more**
14   **with professionalism rather than medical**
15   **management.  And so -- but I don't remember**
16   **specifically what the --**
17   Q.  But you do understand from a review of Exhibit 3
18   that what she's being charged with by the MEC was
19   restricted to medical management?
20
21       MR. DAYHUFF: Object to the form of the question.
22
23   Q.  With respect to Patient 6?
24
25       MR. DAYHUFF: same objection.

---

80

1    **A. So, yes, I do understand that.  But at the time**
2    **when we discussed -- at some point when we**
3    **discussed what was happening in the case -- hard to**
4    **remember.  During the deliberations, okay.  I did**
5    **discuss at some point and I don't remember which**
6    **point, but the premise was would she be here if she**
7    **had not -- if she had not had an event to led**
8    **to under the 100 percent review, would she have**
9    **been reviewed in the first place.  And that's what**
10   **she did, a, you know -- if there's no medical**
11   **problems, would there be any issue?  And then the**
12   **focus, the best of my recollection, became to look**
13   **at what her response to the MEC was.  In other**
14   **words, she was asked to give a response to the MEC**
15   **and the documentation was examined and things as to**
16   **far as whether she was being an open and as honest**
17   **as possible, you know, with the process at that**
18   **point.  And I did have a discussion, you know, with**
19   **them about the fact that here's a person under 100**
20   **percent review who now realizes the gravity of the**
21   **situation.  I mean, certainly being reviewed is not**
22   **a minor thing.  And she's having to defend herself,**
23   **you know.  And so we did weigh at some point, and I**
24   **don't remember how we came down but, you know, what**
25   **was defending herself versus what was going beyond**

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

81

1　　　that, just defending herself.  You know, the
2　　　question of fabrication.  I just remember from the
3　　　standpoint of fabrication being included in some of
4　　　these reports.  The question of fabrication came in
5　　　from that discussion, but I don't remember the
6　　　specifics.
7　Q.　And actually with respect to Exhibit 2, there was
8　　　some reference in there to fabrication, and I think
9　　　you struck it out in your margin note.
10　A.　I believe that's correct, yes.  And I remember at
11　　　that point a lot of the question had to do with the
12　　　times.  And the question was, you know, are the
13　　　times valid that were written into the chart at
14　　　different points.  And we had a lot of discussion
15　　　about that.  I mean, certainly, you don't stop and
16　　　check your watch and write down specifically, you
17　　　know, exactly what is going on at different times.
18　　　But I don't believe that's just where it ended.  I
19　　　mean, at different points during the deliberation,
20　　　there was discussion of her specific responses to
21　　　the MEC and what she had said to the MEC and
22　　　whether that was found in truth with the testimony
23　　　of what people had said.
24　Q.　Right.  All of those things that you're referring
25　　　to came after the event with respect to Patient

---

82

1　　　Number 6?
2　A.　That is correct.
3　Q.　All right.  And with respect to her treatment and
4　　　care of Patient Number 6, you've never changed your
5　　　opinion that she met the standard of care?
6　A.　I have not.
7　Q.　You believe she did?
8　A.　I do.
9
10　　　　MR. SOWELL:  Thank you.  That's all I have.
11　　　　　　　- - - - -
12　　　　　　CROSS EXAMINATION
13　BY MR. DAYHUFF:
14　Q.　Doctor, I have to ask you some questions.
15　A.　Okay.
16　Q.　For the record, I'm Travis Dayhuff, and I represent
17　　　the Defendants.  I've got several questions.  Mr.
18　　　Sowell did a great job of analyzing how you thought
19　　　about this and how the panel thought about this and
20　　　what was going on.  I want to make sure I
21　　　understand your views on all of this.  It seemed to
22　　　me that the burden of proof, the standard of
23　　　proof -- I'll just say legal standard for sake of
24　　　ease, was never a major focus for you in your
25　　　consideration of this case?

---

83

1　A.　I would agree with that.
2　Q.　And I guess that's not surprising since you're a
3　　　doctor and you're thinking about findings and I
4　　　guess the substantive things that are at issue in
5　　　this case?
6　A.　Correct.
7　Q.　All right.  Now, if I understood your testimony,
8　　　you do not have a problem on the standard of care
9　　　side with what Dr. Muniz did in Patient Number 6?
10　A.　I do not.
11　Q.　All right.  But I did understand you to say you
12　　　have concerns about the other side of the ledge,
13　　　professionalism concerns?
14　A.　As a group and I did share some of those.  We did
15　　　have concerns about professionalism.
16　Q.　All right.  And I think I understand some of those
17　　　from hearing your answers of Mr. Sowell.  Some of
18　　　the concerns arose from Dr. Muniz's response to the
19　　　MEC's questions and review of her?
20　A.　Right.  The only areas that I remember thinking
21　　　about in those terms were a couple and that's was
22　　　the times, which I believe that we basically
23　　　resolved as a group.  We decided that there was not
24　　　an issue with the times.  But I believe the
25　　　majority of the concern resided with the response

---

84

1　　　to the MEC and whether that response could be --
2　　　could it be upheld in the face of documentation as
3　　　well as the testimony that was brought.
4　Q.　And by that, do you mean you had concerns with her
5　　　candor and her response to the MEC?  Is that a
6　　　fair characterization?
7
8　　　　MR. SOWELL:  Object to the form of the question.
9
10　A.　I don't --
11　Q.　Well, you describe it.
12
13　　　　MR. SOWELL:  Well, let me tell you what my objection
14　　　　is.  The objection is is it you or is it the
15　　　　committee, the panel?  Are you talking about
16　　　　you or the panel?
17
18　Q.　Well, we'll start with you.
19　A.　I think I can only really speak for myself.
20　Q.　I agree.
21　A.　But I believe I had concerns after there were
22　　　certain key statements that had come in.  There was
23　　　one about -- in other words, when you look at what
24　　　people say.  Sometimes there's things that people
25　　　say that may throw up a red flag.  It may be a

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

85

1  statement that you couldn't --- that you don't feel
2  like yourself you could ever really apply that to
3  someone.  And there was a statement that came in at
4  some point about a discussion that the baby was
5  actually brain dead at the time, so it wouldn't
6  have made a difference, you know, the
7  caesarean -- because in the deliberations, you
8  know, and the witness testimony, there was a lot of
9  focus on whether or not this baby would or would not
10  have been a normal baby at the end of the day.  And I
11  never felt the caesarean was necessary, so I    didn't
12  focus on that as much when I was listening  to the
13  testimony.  I didn't think this baby was a  brain dead
14  baby, so I thought that was  overreaching. I mean,
15  it was going beyond. And     the question is why
16  would a person, you know,    say that. Here's a person
17  that's under 100 percent     review that is being
18  looked at under the    microscope.
19  Q.  Well, we certainly understand why or perhaps
20       why she made the statement.  Did you consider those
21       statements while she was under the microscope to be
22       negatives for you in your review of this matter?
23  A.  They did concern me, yes.  I don't know that -- in
24       other words, I don't remember the specific weight
25       of different things.  But it did cast.  That is

86

1  what casted.  So, you know, what the MEC had to
2  deal with when they made the decision as I
3  understood it was her report to them, her coming
4  into them.  So they did have that information in
5  making their decision.
6  Q.  All right.  And you just said and that's what
7       casted.  What do you mean by that?
8  A.  Well, in other words, I had no problem with the
9       standard of care.  So there was no issue for me
10       that there was anything done wrong in the care for
11       the patient.  And the charge had changed at some
12       point from us deciding what the ultimate fate of
13       the physician would be.  To instead of that, as I
14       understood it and as I still understand it today,
15       as being either we upheld or we did not uphold the
16       MEC's finding.  And I have to admit I did not, you
17       know, I did not consider it important as to who bit
18       more of the fruit because both groups were allowed
19       to present, you know, their side of the story.  And
20       I didn't feel like that based upon what the answers
21       to the MEC were that it was unreasonable.
22  Q.  Okay.  So ultimately that's the discussion we're
23       having now about professionalism, that's what's
24       allowed you to ultimately vote in support of the
25       MEC's recommendation?

87

1  A.  I believe that's correct to the best of my
2       knowledge.  I know it had nothing to do with the
3       quality of care or standard of care.
4  Q.  Right.
5  A.  But, you know, in my mind from the standpoint of
6       these type of reviews in my own hospital, you can
7       be -- you can have your medical privileges removed
8       for making poor judgments or not taking care of
9       patients.  But you can also have your privileges
10       removed for professionalism, and they're both
11       considered equal.
12  Q.  They're considered equal at your hospital.  Do you
13       consider them equally as well as a practitioner?
14  A.  I do.  I mean, it's critical because you have to
15       interact with a lot of other people, so it's very
16       important that other people feel the trust, you
17       know, be able to trust you and understand your
18       care.
19  Q.  Take a look for a moment at Exhibit 2 which is our
20       first version of the hearing report.  Mr. Sowell
21       did a good job of taking you through things that
22       were modified in the report.  I want to touch on a
23       few things that you apparently did not desire to be
24       modified or removed.
25  A.  Okay.

88

1  Q.  And I'm looking particularly on page 2.  Finding 1
2       is, "The action of the medical executive committee
3       was neither arbitrary nor capricious but was well
4       supported by credible evidence contained in
5       the limited record before it at the time it made
6       its decision, including the statement of the
7       practitioner."  Do you see that?
8  A.  Yes, sir.
9  Q.  Now, I see there's a comment associated with it.
10       But did you desire to have that edited in any other
11       way or deleted from this initial report?
12  A.  I think the issue here is to give specific examples
13       of why that was, why that was the case.  And what I
14       was trying to make the point of here is that it was
15       not a result of poor care.  So the care was not an
16       issue in this case from that standpoint.
17  Q.  So that's the crux of your point there?  Otherwise,
18       that finding was acceptable?
19  A.  I believe that is correct, yes.
20  Q.  Of course, you know, you're a guy who would make
21       comments if it was.  You've done that very
22       thoroughly here.
23  A.  Certainly.
24  Q.  Take a look at Number 2 for me.
25  A.  Okay.

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

89

1   Q.   "The evidence before the hearing panel inexorably
2        must lead to the conclusion that during the course
3        of these proceedings practitioner lacked candor in
4        dealing with her peers." I don't see any comment
5        or redaction or deletion by you on that one?
6   A.   Yes, sir.
7   Q.   Why is that?
8   A.   **We did find -- at that point, we had discussed the**
9        **fact of what the reaction was, at least, in two of**
10       **the answers to the MEC at that point.  And I**
11       **believe that's what that basically referred to.**
12  Q.   You were comfortable with that finding at this
13       point?
14  A.   Yes, sir.
15  Q.   And have you ever lost comfort with that finding?
16  A.   No, sir.
17  Q.   Look at Number 3.  "The testimony of practitioner,
18       when considered with other evidence in he record
19       raises serious questions regarding her credibility.
20       Clearly, she repeatedly asserted that Patient
21       Number 5," Changed to 6 by you.  "Had refused a
22       cesarean section, a fact that she later recanted in
23       the face of contradictory testimony."  Other than
24       the change of Patient 5 to 6, you made no edits or
25       redactions or deletions to that finding?

---

90

1   A.   I did not.
2   Q.   And would that indicate that you believed
3        that finding to be appropriate at that time?
4   A.   I did.
5   Q.   Have you changed your mind since that time about
6        the appropriateness of that as a finding in this
7        case?
8   A.   **I haven't changed.  I have not.**
9   Q.   I'm on the third page, and it's 9, becomes 7, I
10       guess through your changes.
11  A.   **Okay.**
12  Q.   "Practitioner's lack of candor and instances of a
13       lack of credibility raise serious concerns about
14       her ability to work with other members of the
15       medical staff."  And you make a deletion.
16       "This concern is reflected by the other instances
17       of misrepresentations, but particularly
18       practitioner's testimony that the pathologist told
19       her the baby was brain dead."  Now, obviously you
20       made one change there.  Does that mean that the
21       rest of the finding as you left it you were
22       comfortable with at that time?
23  A.   **I was comfortable with it.**
24  Q.   And have you changed your mind since time about
25       being comfortable with that finding?

---

91

1   A.   **I have not.**
2   Q.   All right.  I'm going to look at September 22, 2010
3        for a minute.  Now, you tell me if I'm wrong.  I
4        think this is the one where you said you were on
5        the phone; is that right?
6   A.   **That's correct.**
7   Q.   All right.  And you recall a reading of either the
8        whole report or the findings?
9   A.   **I don't remember.  I seem to remember that on**
10       **multiple occasions there was a reading of points**
11       **and then there was voting.**
12  Q.   Well, certainly there wouldn't have been a reading
13       of points and voting at your first deliberation
14       because you didn't have a report yet, right?
15  A.   **So that was actually sent out to all of us.**
16  Q.   Right.
17  A.   **But I can't remember that we voted on it because we**
18       **didn't have it.**
19  Q.   That's not my ---
20  A.   **My thought was that we gave it to Ernie and said,**
21       **"Ernie, you know," --  we may have told him points**
22       **and he took notes, I don't remember specifically.**
23       **But we asked him to away, field the report that we**
24       **had discussed and send it out, you know, for us to**
25       **look at.**

---

92

1   Q.   That's a good thing for my to clarify.  Do you
2        recall that intense long deliberation, the first
3        deliberation?
4   A.   **Uh-huh (affirmative response).**
5   Q.   Do you recall any votes taken at that deliberation?
6   A.   **I don't remember.**
7   Q.   Okay.
8   A.   **I don't remember.**
9   Q.   You recall kind of giving Ernie the charge, go
10       forth and try to encapsulate our deliberations into
11       a report?  Do you recall something like that?
12  A.   **We did do that, yes.**
13  Q.   Okay.  And then ultimately this gets generated?
14  A.   **That's correct.**
15  Q.   And sent to you?
16  A.   **That's correct.**
17  Q.   All right.

18       MR. SOWELL: Now, which one are we talking
19          about?
20       MR. DAYHUFF: I'm sorry, for the record,
21          Exhibit 2, the August 20, 2010.

24  Q.   Then you're on the phone for the next two
25       deliberation sessions?

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

93

1   A.  Uh-huh (affirmative response).
2   Q.  And if I heard you correctly, do you recall a yea
3       or nay on findings in the report?
4   A.  I seem to recall at some point there was votes,
5       yes.
6   Q.  And I think you said on some of them you said yes
7       and some of them you said no?
8   A.  That's correct.
9   Q.  All right.  And what it have likely been Ernie who
10      was reading the findings?
11  A.  Yes.
12  Q.  And taking the votes?
13  A.  Yes.  He always led each session.
14  Q.  I'm on the Exhibit 3 which is the September 22,
15      2010 vote or report.  Take a look at Finding 1.
16      "The action of the MEC was neither arbitrary
17      nor capricious but was well supported by credible
18      evidence contained in the record."  Do you recall
19      whether you voted yes or no to that finding?
20  A.  I believe that in that finding I voted yes.
21  Q.  Okay.  How about Number 2 on Exhibit 3, do you
22      recall whether you voted yes or no on Number 2?
23  A.  I believe I voted yes on that.
24  Q.  Same question, Number 3?
25  A.  That one, I believe I would have voted no even

94

1       though I can't say for absolute certain.
2   Q.  How about 4?
3   A.  I would have voted no on that statement.
4   Q.  How about 5?
5   A.  I would have voted no on that statement?
6   Q.  On 6?
7   A.  I would have voted yes on that statement.
8   Q.  On 7?
9   A.  I would have voted no on that statement.
10  Q.  On 8?
11  A.  And, again, this is based upon reading them now.
12      But I would have voted no on that statement.
13  Q.  The recommendation of the actual medical executive
14      committee should be affirmed, was there a vote
15      taken on that recommendation?
16  A.  I don't remember specific votes.  You know, I
17      remember votes being taken, but I believe there
18      would have been.
19  Q.  Okay.  And you believed you would have voted for
20      that recommendation?
21  A.  I would have voted yes.
22  Q.  With respect to the corrected hearing panel report
23      that's Exhibit 5.
24  A.  Okay.
25  Q.  And I'm not sure you said this, but I'm a losing

95

1       track of the reports.  Do you recall whether there
2       was a vote on the individual findings?
3   A.  You know, I remember there was a vote on the
4       individual findings maybe in both, at least once.
5       But I don't remember specifics.
6   Q.  Fair enough.  So if we were to go through all the
7       findings in Exhibit 5, your probably votes on all
8       those?
9   A.  I think Number 1 would be yes.  And, again, this is
10      just, you know, reading it now.  Number 9, I would
11      have been -- I would have voted yes, but I
12      would have stricken the potential to fabricate
13      facts.
14  Q.  Understood.  Now, when you were on the phone on
15      either instance, were you able to tell how the
16      others voted?
17  A.  I could not, no.
18  Q.  Was there any question in your mind that --
19  A.  Or at least that I remember.  I don't remember
20      knowing what other people were voting.
21  Q.  Or it may have been hard to tell on the phone?
22  A.  Yeah, I mean, I was on the telephone.  Yeah.
23  Q.  Okay.  If I understood your testimony, you clearly
24      remember supporting the MEC's recommendation?
25  A.  That's correct.

96

1   Q.  Do you remember whether the rest of the group
2       supported the MEC's recommendation?
3   A.  I don't remember the -- I don't remember.
4   Q.  Okay.
5   A.  I am -- I know that at one of these, you know,
6       maybe in both of them, we did discuss the fact
7       would it be okay for just the chairperson to sign
8       the report.  And I said yes to that.  I do remember
9       that.  The issue there was whether I would drive
10      back to sign the report.
11  Q.  No, I understand.  I understood your testimony that
12      you, I think, asked if it would be okay if the
13      Chair signed?
14  A.  Right.
15  Q.  In lieu of everyone?
16  A.  Certainly.
17  Q.  If I understood your testimony and let me just ask.
18      Do you believe that the action of the arbitrary?
19  A.  No.
20  Q.  Do you believe it was capricious?
21  A.  No.
22  Q.  Do you believe it was supported by credible
23      evidence?
24  A.  Yes.
25  Q.  All right.  What did you think of Mr. Nauful, the

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**97**

1   job he did as a Hearing Officer?
2   **A. I thought that he did a really good job of, you**
3   **know, directing traffic. Of, you know, keeping us**
4   **on task. He did a good job. I didn't exactly**
5   **understand why -- you know, I was always a little**
6   **confused as to why we had to come back so many**
7   **times. So, you know, I did understand why -- in**
8   **other words, we did spend a lot of time on the very**
9   **first report. We spent a lot of time determining**
10  **exactly what we felt was the appropriate action.**
11  **And, you know, we weren't told that, no, you**
12  **can't do that at the time. And we gave him the job**
13  **to go away and he would produce the report and, you**
14  **know, and -- but it was clearly -- it was evidently**
15  **way off because we ended up going back.**
16  Q.  You are such a nice guy. So let me try to
17  summarize that. You would have preferred perhaps a
18  clearer understanding of your charge at the first
19  meeting?
20  **A. I thing, I think so. In other words, well, when we**
21  **first convened, the only real thing that we were**
22  **looking at was one patient, our practitioner, and**
23  **evaluating that and the action maybe of the MEC or**
24  **something. I don't remember the specifics. But I**
25  **didn't have like a really, you know, elaborate**

---

**98**

1   **specific charge as to what we were going to do.**
2   Q.  Let me ask this more pointed question. Do you
3   think Ernie was fair in what he did as the Hearing
4   Officer? And by fair, I mean, there are two
5   parties in this. There was the MEC, and there was
6   Dr. Muniz's side.
7   **A. Yes.**
8   Q.  All right.
9   **A. So I think the answer there is yes. I mean, I**
10  **think there were different disagreements on either**
11  **side at different times. I mean, I remember there**
12  **were times when we had to leave the room for**
13  **discussions, things of that nature. And it always**
14  **seemed fair, yes.**
15  Q.  And you're talking about the hearing. And I want
16  to know specifically about the deliberations. Did
17  you ever sense anything when Ernie was supervising,
18  guiding, however you described it, anything unfair
19  or untoward?
20  **A. No. Basically, the deliberations themselves as far**
21  **as the direction of the deliberation and the things**
22  **that we talked about were generated and talked**
23  **about by the members. And it was back and forth.**
24  **Like, clearly, there were some things that we**
25  **didn't always agree on. And that's when, you know,**

---

**99**

1   he would, you know, ask everyone maybe to take a
2   vote. You know, we would do things of that nature
3   at different points. But that was basically the
4   directionality he gave us.
5   Q.  Is it fair to say it appeared to you to be fair and
6   neutral --
7   **A. Yes.**
8   Q.  -- as he was shepherding this process?
9   **A. Yes, yes.**
10  Q.  I want to ask you about your panel members, your
11  other pane l members. I think I know the answer to
12  this, but do you feel like they all took their job
13  very seriously?
14  **A. I do, I do.**
15  Q.  And did you see anything untoward, unfair, that
16  concerned you about your panel members and the job
17  they were doing during the deliberations?
18  **A. I did not. I didn't see anything. You know, the**
19  **only concern at one time that I had was what one**
20  **person felt like they couldn't potentially work**
21  **with someone. And I thought that was, you know,**
22  **outside of the bounds. But we did discuss it and**
23  **everyone agreed.**
24  Q.  Okay. You mean you were able to reach some sort of
25  resolution on that issue?

---

**100**

1   **A. Exactly.**
2   Q.  And it wasn't like argumentative?
3   **A. No, sir.**
4   Q.  Now, I want to ask you about the hospital folks.
5   There was some discussion on Terry Ergle.
6   **A. Uh-huh (affirmative response).**
7   Q.  It sounded like she was present perhaps. At
8   certain times, maybe not. I think she testified
9   that she was there during the deliberations?
10  **A. I don't know.**
11  Q.  Okay. But my question is this, did she inject
12  herself in any way during the deliberations,
13  interfere in any way in your deliberations?
14  **A. No. I would describe her as purely staff**
15  **secretarial support staff. You know, scheduling**
16  **meetings, making phone calls, things of that**
17  **nature.**
18  Q.  Anybody else from the hospital inject themselves or
19  interfere in your deliberations as a hearing panel?
20  **A. No.**
21  Q.  When I say hospital, I'm going to include Celeste
22  Jones in that and Jane Trinkley. They were the
23  attorneys who represented the MEC. Were they
24  present for any of your deliberations?
25  **A. I don't even know if I know the other person. I**

---

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

101

1    remember Celeste Jones, but she was never present.
2    I remember, you know, there were disagreements at
3    different at different times amongst the attorneys.
4    But the majority of those times, we would go out
5    into the hall and whatever was going on would be --
6    and Ernie would issue some statement, you know,
7    when we reentered.
8    Q.  And sure, that was during the hearing.  I'm going
9         to ask you more specifically about your
10        deliberations.  Did she play any role, Celeste
11        Jones --
12   A.  No.
13   Q.  -- in your deliberations?
14   A.  She was not there.
15   Q.  Communicate with you in any way?
16   A.  No.
17   Q.  If I understood you correctly, Terry was the
18        first person to contact you about your service on
19        the panel, Terry Ergle?
20   A.  That's correct.
21   Q.  She said nothing substantively when dealing about
22        the case, the doctors, when she called you?
23   A.  No.
24   Q.  I understand your opinion on the standard of care.
25        You have no problems with the standard of care

102

1    with respect to Patient Number 6.  Do you know if
2    that opinion was shared by everyone on the panel?
3    A.  Initially, no.  That was not an agreed upon --
4         initially, no, that was not agreed upon.  And there
5         was a lot of deliberation about should a
6         caesarean be performed.  But, you know, the
7         problems, you know, we were discussing it with
8         people who don't make the decision as to when to
9         perform a ceasarean delivery.  They don't, you
10        know, interpret fetal monitoring strips.  And a lot
11        of -- we were given the opportunity to examine, you
12        know, to ask questions of the different people who
13        were being brought up.  And, I mean, a lot of them
14        when the perform a caesarean in this scenario.  One
15        person I remember said that he would do it under a
16        local and did them everyday or something of that
17        nature.  I mean, that was a person, I took his
18        testimony and we set it aside and said that's not
19        reasonable.
20   Q.  Okay.  So at least initially at the beginning
21        of the deliberations, you were saying that she met
22        the standard of care.  There were others on the
23        panel that said, "No," or, I'm not so sure?"
24   A.  Correct.
25   Q.  Okay.

103

1    A.  There was difference of opinion on a lot of
2         different issues, and that was one of them.
3    Q.  Ultimately, and I don't know if you will know this
4         or not.  Do you have any sense of whether at the
5         end of this
6         process -- I know you were convinced she met the
7         standard of care, but what about the others?
8    A.  That's hard to say.  Because I don't how to
9         really capitulate what the others – I do know that
10        when we left -- in other words, when I got to
11        Ernie's report that we asked him, I didn't feel
12        like that it was significantly, that it was hugely
13        significantly wrong from what we had discussed.  I
14        mean, there were some modifications to be made to
15        it, but it wasn't, you know, it wasn't something
16        that like I didn't recognize or that I didn't
17        anticipate that it would be covered.
18   Q.  But, certainly, everyone, like you, had the
19        opportunity when they finally saw it in black and
20        white to say yea or nay or offer suggestions, you
21        don't know --
22   A.  Certainly.
23   Q.  -- whether folks were as comfortable --
24   A.  Yeah.  I do not know.  You know, what I know, I
25        guess, is that when we left that night, people

104

1    appeared to be comfortable with the person going
2    back -- or Muniz going back on 100 percent review.
3    To have privileges back but to have some type of
4    professional plan in place as far as monitoring or
5    maybe evaluation to ensure there was no issues
6    professionally that would, you know, practicing
7    normal practice.
8    Q.  Understood.  I had a question, and this is related
9         to the August report, Exhibit 2.
10   A.  Uh-huh (affirmative response).
11   Q.  It fits that issue, I guess.  One of the
12        recommendations -- and you've just summarized it.
13        Her suspension would be lifted and she would be on
14        probation, 100 percent review, zero tolerance, et
15        cetera, et cetera?
16   A.  Uh-huh (affirmative response).
17   Q.  I wondered if you had any thoughts on this.  Do you
18        think the recommendation 5 or the acknowledgment
19        that seems to be embedded in it, that she was going
20        to resign her clinical privilege in obstetrics.
21   A.  Uh-huh (affirmative response).
22   Q.  Do you think that notion in Number 5 got people
23        more comfortable with recommendation 1?  And I can
24        explain that but I think you know what I'm talking
25        about.

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

### 105

1  A.  Yeah.  So that's a good question.  And I don't
2     know whether or not that made -- in other words, I
3     guess you're saying is that how comfortable to say
4     that she will come back on staff and be 100 percent
5     monitoring if in 5 -- and the reason
6     I -- you know, probably one of the reasons I struck
7     it is because it made no sense to ask her to resign
8     her  privileges.
9  Q.  Certainly.  It made no sense to you?
10 A.  Right.
11 Q.  I guess what I'm asking is if I held a different
12    belief -- if I were a panel member with a different
13    belief that was concerned about the standard of
14    care in that obstetrics case, I think I would be  more
15    inclined to lift the suspension knowing that     she
16    was going to resign?  Or it indicated she was     going
17    to resign?  And that's what I'm asking.  Do  you have --
18 A.  I don't know.
19 Q.  Whoa, whoa, whoa.  I think there's going to be an
20    objection to the form.
21
22    MR. SOWELL: You heard that lengthy preamble,
23       right, to his question?  That lengthy
24       preamble, I object to it.
25    MR. DAYHUFF: You can answer.  I may never get

---

### 106

1     into evidence, but you can answer it.
2
3  A.  I don't know.  I don't know for certain, you know,
4     what the effect would be of, you know, 5 to 1,
5     other individuals.  Because, again, once I -- you
6     know, when I had this, I was not in their presence.
7  Q.  Okay.  So you're not aware of any kind of notion or
8     sentiment or idea, either you or anyone else, that
9     she had kind of made the job a little easier for
10    you if she was going to resign those privileges?
11    Made it easier for you not to impose the
12    harshest --
13
14    MR. SOWELL: I object to the form of the question.
15    MR. DAYHUFF: I can't ask that any other way.
16    MR. SOWELL: I know.  I can't do anything other
17       than object.
18    MR. DAYHUFF: You can answer.
19
20 A.  I guess if we boil it all down to a really simple
21    statement I didn't feel like she should lose her
22    privileges.  Bottom line, I think that was
23    appropriate in the setting.  In the future, I would
24    find out that that wasn't my choice.
25 Q.  Understood.

---

### 107

1  A.  But at this time, you know, that's the way I
2     basically took it.  But it just didn't seem right
3     that, you know, Number 5 would be put in there.
4  Q.  I think I understood your testimony about that.
5  A.  Yeah.
6  Q.  The instruction that you were to weigh the evidence
7     of the witnesses and only give credit to those that
8     you thought were credible witnesses.  Was that an
9     instruction given to you by Ernie Nauful?
10 A.  It came up. I believe that that was an instruction
11    that was provided at some point where, you know, we
12    were discussing -- you know, there were times when
13    we would  debate specific points that a person had
14    made.  When I went  into the panel, I took in a
15    legal pad and I wrote the name of the person at the
16    top of the page, what their role was.  Like whether
17    they were an OB or whether they were a nurse or
18    whatnot.  And there were some people who, you know,
19    came through that I felt like they had -- there
20    were definite problems with weighing their
21    testimony.  So, you know, there was the
22    radiologist.  And I knew that the other panel
23    members didn't understand it.  But, I mean, the
24    sonographer had come up there and taken, you know,
25    40 or 50 images of  the placenta.  And she had

---

### 108

1     spent that much time on the placenta, and the
2     radiologist interpretation of that was just that
3     there might be an abruption, a suspected
4     abruption.  It was a massive abruption, you know,
5     there in  my opinion with looking at it.  So that
6     was a little awkward with the radiologist on the
7     panel, but we discussed it.  And I don't feel
8     like I was ever held back in discussing
9     anything, you know, that we would talk about.  And
10    then there was a person who came through that said
11    that they would, you know, if anesthesia would have
12    done it -- you know, done it routinely or something
13    of that nature.  But it's like that doesn't hold
14    water or that's not part of standards of care.
15    And, you know, I ignored that person.  So we did
16    weigh each individual and kind of looked at it,
17    and there was, I believe -- I don't remember
18    whether it was the patient themselves who had lost
19    the baby or if it was a  family member or who it
20    was specifically.  But we were instructed with that
21    witness, for instance, that we would not want to
22    cross examine because there was an
23    attorney involved and potentially an
24    attorney/client privilege.  You know, it was clear
25    that person had an  ongoing case potentially

---

**Thompson Court Reporting, Inc.**
**www.thompsonreporting.com**

**Christopher Robinson, MD, MSCR - 5/18/2012**
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

### 109

1  involved in this. That evidence I didn't feel like
2  was reliable likely either given that it may impact
3  their case going forward, what they said.
4  Q.  I understood your testimony that from your
5      perspective and there was a consensus on the issue
6      of standard of care. Do you believe there was
7      consensus among the hearing panel on the issue on
8      the question of whether the MEC's recommendation
9      should be affirmed or denied?
10 A.  I do believe there was a consensus there, yes. And
11     the consensus was that it should be -- let me
12     restate that. I believe there was consensus
13     because the report was generated and completed and
14     executed. But did I know what people's votes were
15     specifically, no, I didn't.
16 Q.  And I guess the flip side, is there any evidence
17     that you picked up that that wasn't the consensus?
18 A.  No, there was not.
19 Q.  Same question on did you believe there was a
20     consensus among the panel on the issue of whether
21     the MEC had shown by preponderance of the evidence
22     that they weren't arbitrary, they weren't
23     capricious, and they supported their finding with
24     substantial evidence? Was there a consensus?
25 A.  I believe there was, yes. You know, I don't know

### 110

1      exactly how the vote came down. But, again, I
2      don't believe there was -- I don't certainly
3      remember any lengthy argument.
4  Q.  The flip side I'm going to ask you on that one,
5      too. Are you aware of any evidence that would lead
6      you to believe that that was not the consensus?
7  A.  I'm not aware of any.
8
9      MR. DAYHUFF: I think that's it for me.
10     - - - - -
11     CROSS EXAMINATION
12 BY MR. ALLEN:
13 Q.  Dr. Robinson, you responded to several questions
14     about your preparation for this deposition by
15     stating that you looked at the Exhibits last night?
16 A.  Yes, sir.
17 Q.  You also met with me last night to go over those
18     Exhibits?
19 A.  That is correct, yes, sir.
20 Q.  You responded to Mr. Sowell's question about any
21     recollection of the need for majority vote or a
22     unanimous vote by saying that you don't call?
23 A.  That is correct. I do not recall that, no.
24 Q.  Was there any discussions on the panel about
25     consensus?

### 111

1  A.  I do not remember that consensus being discussed as
2      necessary or even, you know, as to what degree of
3      necessity that would be. So I don't remember
4      discussions.
5
6      MR. ALLEN: Those are all my questions. Thank
7      you.
8      - - - - -
9      RE-DIRECT EXAMINATION
10 BY MR. SOWELL:
11 Q.  Very quickly. I think what you said when we were
12     talking about Exhibit 3 which is the September 22,
13     2010 report, when you told me at some point that
14     you had gotten off track. That was also the point,
15     was it not, that the focus went from standard of
16     care with these professionalism issues, the second
17     meeting?
18 A.  I believe there was more focus on professionalism,
19     that's right.
20 Q.  And that is ultimately what caused you to concur
21     the recommendation along with the fact that you
22     were told you had gotten off track and you could do
23     was either confirm or reject the MEC?
24
25     MR. DAYHUFF: Object to the form of the question.

### 112

1  A.  I don't remember specifically what caused, you
2      know, that change. But, you know, just grasping a
3      little bit, I do remember that my ability to decide
4      whether or not she had privileges or not was the
5      issue. And that was very different in the future.
6      The issue was only one thing, and that was MEC
7      upheld or MEC you disagreed with and you don't
8      agree with the MEC.
9  Q.  All right. You ultimately voted to agree with the
10     MEC?
11 A.  I believe that's the case, yes.
12 Q.  You believe? You don't remember specifically but
13     you believe that's the case based upon these
14     reports?
15 A.  I believe that I did vote to uphold the MEC in both
16     cases, yes.
17 Q.  And by that time, though, the discussion had gone
18     from the standard of care primarily to
19     professionalism issues as reflected on this report?
20 A.  I believe that is the case.
21 Q.  Just to round this out, I don't think I asked you
22     this in the beginning. What is your job?
23 A.  What is my job?
24 Q.  Yeah, job title. It usually comes at the
25     beginning.

---

Christopher Robinson, MD, MSCR - 5/18/2012
Margo J Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

113

1    A.  I'm an assistant professor at the Medical
2        University of South Carolina in maternal fetal
3        medicine in the Department of Obstetrics and
4        Gynecology.
5
6    MR. SOWELL: Thank you.
7    MR. DAYHUFF: I've got one question.
8                - - - - -
9             RE-CROSS EXAMINATION
10   BY MR. DAYHUFF:
11   Q.  Mr. Sowell asked you a question about this migrate
12       from the standard of care to professionalism.
13       Isn't it true that professionalism appeared in the
14       first report on the 20th and the last one?
15   A.  I believe it was, yes.
16   Q.  Okay.  So it was a consideration all through?
17   A.  It was deliberated throughout.
18   Q.  Which comports with what you think is important for
19       a position having both standard of care and
20       professionalism?
21   A.  I believe you have to have both, yes.
22                - - - - -
23            RE-DIRECT EXAMINATION
24   BY MR. SOWELL:
25   Q.  And with respect to the first report, the August

---

114

1        20th, where those issues were referenced, you voted
2        not to terminate her privileges?
3    A.  That is correct.
4    Q.  As did the balance of the panel?
5    A.  That is also correct, I believe.  We basically came
6        to a consensus, yes.
7
8    MR. SOWELL:  Thank you.
9                - - - - -
10       (Whereupon, at 3:15 p.m., the deposition
11       in the above-entitled matter was
12       concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

115

State of South Carolina  )
                          )         CERTIFICATE
County   of Barnwell   )
        Be it known that the foregoing Deposition of
CHRISTOPHER ROBINSON, MD, MSCR was taken by Nicole C.
Gleaton;
        That I was then and there a notary public in
and for the State of South Carolina-at-Large;

        That by virtue thereof I was duly authorized
to administer an oath;
        That the witness was by me first duly sworn to
testify the truth, the whole truth, and nothing but the
truth, concerning the matter in controversy aforesaid;
        The foregoing transcript represents a true,
accurate and complete transcription of the testimony so
given at the time and place aforesaid to the best of my
skill and ability;

        That I am not related to nor an employee of
any of the parties hereto, nor a relative or employee of
any attorney or counsel employed by the parties hereto,
nor interested in the outcome of this action.

        Witness my hand and seal 6 DAY OF JUNE, 2012


                            Nicole C. Gleaton

Notary Public for South Carolina
My Commission Expires: January 25, 2017

    This transcript may contain quoted material.  Such
    material is reproduced as read or quoted by the
    speaker.

---