# EXHIBIT I

to

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## Civil Action No.: 1:10-cv-00986-JFA

*Transcript from deposition of Terri Ergle*

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

In the United States District Court
District of South Carolina
Aiken Division
Case No: 1:10-CV-00986-MBS

Margo J. Hein-Muniz, MD )
and Parkside Medical )
)
Consultants, LLC d/b/a )
)
Magnolia Medical, )
)                    Deposition
Plaintiff(s),  )
)                       of
vs.                      )
)                    TERRI ERGLE
Aiken Regional Medical   )
Centers, Universal Health)
Services, Inc., Aiken    )
Obstetrics & Gynecology  )
Associates, P.A., Carlos )
A. Milanes, K.D. Justyn, )
Oletha R. Minto, MD, James )
F. Boehner, MD, Robert D. )
Boone, MD, Jonathan H.   )
Anderson, MD, Thomas P.  )
Paxton, MD,              )
)
Defendant(s),  )
)
)

Deposition of TERRI ERGLE, taken before Jennifer
L. Thompson, CVR, Nationally Certified Verbatim Court
Reporter and Notary Public in and for the State of South
Carolina, scheduled for 10:00 a.m. and commencing at the
hour of 10:11 a.m., Tuesday, August 23, 2011, at the
office of Aiken Regional Medical Center, Columbia, South
Carolina.

Reported by:
Jennifer L. Thompson, CVR

Exhibit No. 9  1/5/11 Request (1 pg)
Exhibit No. 10 1/18/11 Response (1 pg)
Exhibit No. 11 Incident Summary Report (1 pg)
Exhibit No. 12 Affiliation Verification Request (1 pg)
Exhibit No. 13 Affiliation Verification Explanation (1 pg)
Exhibit No. 14 10/23/10 Letter (1 pg)
Exhibit No. 15 GA Credentialing Form (2 pgs)
Exhibit No. 16 3/6/07 Transcript of Meeting (1 pg)
Exhibit No. 17 5/4/10 Letter (3 pgs)
Exhibit No. 18 Affiliation Request 4/29/10 (1 pg)
Exhibit No. 19 Email 5/4/10 (1 pg)
Exhibit No. 20 4/19/10 Affiliation Request (1 pg)
Exhibit No. 21 CREDENT Request (1 pg)
Exhibit No. 22 1/12/10 Affiliation Request (1 pg)
Exhibit No. 23 Weatherby Locums Request 3/24/10 (2 pgs)
Exhibit No. 24 Trinity Affiliation Request (2 pgs)
Exhibit No. 25 Email (1 pg)
Exhibit No. 26 OG/GYN Unassigned Cost Schedule (1 pg)
Exhibit No. 27 3/3/10 Minutes (2 pgs)
Exhibit No. 28 3/9/10 Minutes (1 pg)
Exhibit No. 29 3/16/2010 Letter (2 pgs)
Exhibit No. 30 Email (1 pg)
Exhibit No. 31 1/7/10 Letter (1 pg)
Exhibit No. 32 AllMed Peer Review (5 pgs)
Exhibit No. 33 Dr. Roland Peer Review (27 pgs)
Exhibit No. 34 Hysterectomy Summary (1 pg)
Exhibit No. 35 AllMed Invoice (1 pg)
Exhibit No. 36 Code of Conduct (4 pgs)
Exhibit No. 37 2/25/10 Letter (6 pgs)
Exhibit No. 38 Undated Letter (6 pgs)
Exhibit No. 39 9/24/10 Letter (6 pgs)
Exhibit No. 40 Revised Report (5 pgs)
Exhibit No. 41 12/17/10 Letter (2 pgs)
Exhibit No. 42 Handwritten Hearing Notes - Ergle (42 pgs)

---

Any court, party, or person who has purchased a
transcript may, without paying a further fee to the
reporter, reproduce a copy or portion thereof as an
exhibit pursuant to court order or rule or for internal
use, but shall NOT otherwise provide or sell a copy or
copies to any other party or person without the express
consent of the reporter and/or reporting agency.

APPEARANCES

For the Plaintiff(s):
Thornwell F. Sowell, Esquire
David C. Dick, Esquire
Sowell, Gray, Stepp & Laffitte, LLC
1310 Gadsden Street
P. O. Box 11449
Columbia, South Carolina 29211

For the Defendant(s):
Travis Dayhuff, Esquire
Nelson, Mullins, Riley, & Scarborough, LLP
1320 Main Street
Meridian/17th Floor
Columbia, South Carolina 29201

INDEX

Stipulations . . . . . . . . . . . . . . . . 4
Direct Examination by Mr. Sowell . . . . . . . 4
Cross Examination by Mr. Dayhuff . . . . . . 134
ReDirect Examination by Mr. Sowell . . . . . 153
Errata . . . . . . . . . . . . . . . . . . . 158
Certificate . . . . . . . . . . . . . . . . 159

EXHIBITS

Exhibit No. 1  Job Description (1 pg)
Exhibit No. 2  ByLaw Amendments (3 pgs)
Exhibit No. 3  JCAHO Standard (4 pgs)
Exhibit No. 4  Privilege Log (28 pgs)
Exhibit No. 5  Service Line Assessment and Action Items
(2 pgs)
Exhibit No. 6  Agenda (1 pg)
Exhibit No. 7  Nauful Statement of Services (2 pgs)
Exhibit No. 8  National Practitioner Data Bank document
(1 pg)

---

4

1          STIPULATIONS

2      This deposition is being taken pursuant to the

3  Federal Rules of Civil Procedure.

4          - - - -

5      The reading and signing of this deposition is

6  reserved by the deponent and counsel for the

7  respective parties.

8

9  Whereupon,

10     TERRI ERGLE, being duly sworn and cautioned

11  to speak the truth, the whole truth, and

12  nothing but the truth, testified and deposed

13  as follows:

14  Court Reporter:  State your full name for the

15  record, please.

16  Witness: Terri Ergle

17          - - - - -

18          DIRECT EXAMINATION

19  BY MR. SOWELL:

20  Q   Terri, do you understand your testimony today is

21      being -- being given under oath?

22  A   Yes.

23  Q   Subject to penalties of perjury?

24  A   Yes.

25  Q   Where were you born?

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

5

1    A   Fort Gordon.
2    Q   And what's your birthday?
3    A   9/28/58.
4    Q   And where did you finish high school?
5    A   Aiken High School.
6    Q   And what did you do after that?
7    A   I went to Aiken Tech.
8    Q   What year did you finish Aiken High School?
9    A   1976.
10   Q   What did you do at Aiken Tech?
11   A   I got an Associate degree in accounting.
12   Q   And what year was that in?
13   A   1978.
14   Q   What did you do after that?
15   A   I came to work here, second shift, in May of --
16       March of 1977.  And once I got my accounting degree
17       I moved from a second shift switchboard job to the
18       business office.
19   Q   And when you say the accounting degree, you're
20       speaking of the Associate's degree in accounting --
21   A   Yes.
22   Q   -- from Aiken Tech?
23   A   Yes.
24   Q   And after you got that you moved where?
25   A   I had a second shift job here at the hospital on

6

1        the switchboard in admissions.
2    Q   Right.
3    A   I moved into the business office.
4    Q   And what were you doing in the business office?
5    A   I was doing patient refunds.
6    Q   For how long?
7    A   Oh, gosh, I don't know how long.  It was several
8        years, and then I became the collections manager
9        for probably seven or eight more years.
10   Q   Who were you reporting to as collections manager?
11   A   I don't remember his name.  It was the business
12       office manager.  Business office director.  It was
13       a man, but I don't remember his name.
14   Q   Who was the CEO of the hospital then?
15   A   I don't remember.  I know the names of several CEOs
16       that were here, but I don't know who was here at
17       that time.
18   Q   Approximately what time was that, that seven or
19       eight years?  What is that time frame that you were
20       the collections manager?
21   A   I would say probably '79 on till sometime in '80.
22       Like '87, '88.
23   Q   Was ARMC a private hospital then?
24   A   It was owned by HCA.
25   Q   When did it cease to be owned by HCA?

7

1    A   I believe it was 1995.
2    Q   Is that when UHS bought it?
3    A   Yes.
4    Q   After you were the collections manager what did you
5        do?
6    A   Then I went to the accounting department and I did
7        Medicare -- prepared Medicare logs for
8        reimbursement.
9    Q   For how long?
10   A   I did that for about two years maybe.
11   Q   And then what?
12   A   Then I was the payroll coordinator, still in the
13       accounting department.  And I did that for about 10
14       years.
15   Q   Until approximately 2000?
16   A   October 1998 I went to physician services, in the
17       job I'm in now.
18   Q   Have you received any additional formal training
19       beyond the Aiken Tech Associate's degree?
20   A   I have received on-the-job training for medical
21       staff coordinator, and conferences, and gotten my
22       certification.
23   Q   Is that the CPCS?
24   A   Yes.
25   Q   And what is that?

8

1    A   Certified Provider Credentialing Specialist.
2    Q   And who provides that certification?
3    A   It's NAMSS, the National Association of Medical
4        Staff Services.
5    Q   When did you receive that, that certification?
6    A   In '06.  November of 2006.  And I was recertified
7        every three years.  So the recertification was
8        November of '09.
9    Q   Do you have to take a test?
10   A   No.  You have to do 30 CEU units in the three year
11       period.
12   Q   What do you have to do to get certification to
13       begin with?
14   A   You have to take a long test.
15   Q   Are you married?
16   A   I'm divorced.
17   Q   Who is your husband?
18   A   Who was my husband?
19   Q   Yes.
20   A   Steve Ergle.
21   Q   When were you divorced from him?
22   A   August of 2005.
23   Q   Was that in Aiken County?
24   A   Yes.
25   Q   What is your address?

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

9

1 **A    1112 Hathaway Ridge Road. And that's Aiken.**
2 Q    Does Steve Ergle live in Aiken County?
3 **A    Yes.**
4 Q    Where does he live?
5 **A    I don't know.**
6 Q    Where does he work?
7 **A    He is a trim carpenter. He's self-employed.**
8 Q    Do you have any children?
9 **A    I do. I have two.**
10 Q    What are their names and ages?
11 **A    Kirby, K-i-r-b-y. You need her last name?**
12 Q    If it's different from Ergle.
13 **A    It is. It's Gall, G-a-l-l. And she's 26.**
14 Q    Where does she live?
15 **A    She lives in Aiken.**
16 Q    Where does she work?
17 **A    At Trinity in Augusta.**
18 Q    The hospital?
19 **A    Yes. She's an RN.**
20 Q    And what's her husband's name?
21 **A    She's not married.**
22 Q    All right. Now, Kirby Gall . . .
23 **A    Yes.**
24 Q    Was she married?
25 **A    Actually, I'm sorry, she is married, but the**

---

10

1    **divorce papers have been filed.**
2 Q    Okay. What is her husband's name?
3 **A    His name is Jason.**
4 Q    And where does he work?
5 **A    I don't know. He's -- he doesn't live here**
6    **anymore.**
7 Q    Okay. And the other child.
8 **A    Steven, with a V, S-t-e-v-e-n.**
9 Q    Ergle?
10 **A    Ergle, yeah. He's 24.**
11 Q    Does he live in Aiken County?
12 **A    Yes.**
13 Q    And what does he do?
14 **A    He is a heavy equipment operator.**
15 Q    For whom?
16 **A    He's in the local union, the Equipment Operators**
17    **Union, but he works at SRS right now.**
18 Q    Is he married?
19 **A    No.**
20 Q    Now, your marriage that ended in divorce to Steve
21    Ergle, was that your -- or is that your only
22    marriage?
23 **A    Yes.**
24 Q    Do you regularly attend church?
25 **A    Not regularly, no.**

---

11

1 Q    Where do you attend when you go?
2 **A    Cedar Creek.**
3 Q    And what is that?
4 **A    It's a Baptist church.**
5 Q    Is it in Aiken?
6 **A    Yes.**
7 Q    Are there any social or professional organizations
8    that you belong to in Aiken?
9 **A    No.**
10 Q    That you participate in?
11 **A    No.**
12 Q    I know you said you didn't really have any free
13    time right now, but when you have it what do you do
14    with it generally?
15 **A    I go to the lake. My parents camp a lot, so we go**
16    **to the lake or the beach.**
17 Q    Okay. Speaking of that, what is your maiden name?
18 **A    Derrick, D-e-r-r-i-c-k.**
19 Q    And do they live in Aiken County?
20 **A    They do.**
21 Q    What are their names?
22 **A    My dad's name is Ray. My mom's name is Helen.**
23 Q    And what did they do for a living?
24 **A    My dad was with Aiken Electric Coop for 30 plus**
25    **years, and my mom was the head bookkeeper with**

---

12

1    **Winn-Dixie for some 30 plus years.**
2 Q    Do you have siblings?
3 **A    I have one brother.**
4 Q    What's his name?
5 **A    Tom Derrick.**
6 Q    Does he live in Aiken County?
7 **A    He does.**
8 Q    What does he do?
9 **A    He retired from the Air Force after 27 years and he**
10    **drives a truck now.**
11 Q    Anybody in particular he drives it for?
12 **A    He is employed by someone but I don't know who.**
13
14    (Whereupon, Job description, consisting
15    of 1 page, was marked as Plaintiff's
16    Exhibit No. 1 for identification.)
17
18 Q    What I've handed you is Exhibit 1 to your
19    deposition, or Ms. Thompson has, is your job
20    description that was provided to us by counsel for
21    the hospital. Now, can you identify this as your
22    job description?
23 **A    Yes.**
24 Q    As medical staff coordinator?
25 **A    Yes.**

---

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

13

1  Q  That also includes physician services?
2  A  Yes.
3  Q  All right.  Has this been your job description
4     since you've assumed this position in October of
5     1998?
6  A  Yes.
7  Q  Has it changed?
8  A  No.
9  Q  All right.  It says that you maintain credentials
10    files?
11 A  Yes.
12 Q  Which means you respond to credentialing requests?
13 A  Yes.
14 Q  From other institutions or healthcare providers?
15 A  Yes.
16 Q  You also maintain bylaws?
17 A  Yes.
18 Q  And you work with the Bylaws Committee?
19 A  Yes.
20 Q  Now, the bylaws were recently amended?
21 A  Yes.
22 Q  All right.  Who led the endeavor to amend those
23    bylaws?
24 A  Dr. Ratliff, the bylaws chairman.
25 Q  Jack Ratliff?

---

14

1  A  Yes.
2  Q  And do you recall what the amendments were about?
3  A  The main reason for revising the bylaws at this
4     time was a new Joint Commission standard that had
5     to do with conflict of interest.
6  Q  All right.  In what respect?
7  A  It made a pathway for the physicians to go directly
8     to the board if they had some conflict, rather than
9     having to go up through the channels of the medical
10    staff.
11 Q  Is that with respect to peer review?
12 A  No.  This is just any issue that a physician might
13    have that they wanted to get some change.  It would
14    not do -- would have nothing to do with peer
15    review.
16 Q  All right.  Now, this JCAHO, can you identify it
17    for us?
18 A  I can tell you the number but I can't tell you what
19    it says.
20 Q  Okay.
21 A  It's MS 01.01.01, and there's a period in between
22    the 01s.
23 Q  And when was that promulgated?
24 A  They ask that we have that in effect by March 31st
25    of 2011.

---

15

1  Q  And so, bylaws were amended to accommodate that
2     JCAHO standard?
3  A  Yes.  And we reviewed for any other issues that we
4     might need, and, you know, there were some changes
5     made, but I -- I can't tell you in detail what they
6     were.  I'd have to go --
7  Q  Can you remember what they were --
8  A  -- back and look.
9  Q  -- generally?
10 A  That was the big one, the conflict of interest.
11 Q  When you say conflict of interest, do you mean that
12    the physicians were allowed to go straight to the
13    board because there was concern that people on the
14    MEC might have conflicts of interest with respect
15    to whatever they wanted, decided?
16 A  No, I don't think that's what it is.
17 Q  All right.
18 A  I think what it is, is that if a physician had
19    something they wanted to get passed, whether it be
20    a policy or -- or a practice, and they felt like
21    maybe they were getting stalled somewhere, then
22    they would not have to call for a meeting of MEC.
23    They could go straight to the board.
24 Q  What I don't understand is the notion of conflict
25    of interest.  Whose conflict of interest?

---

16

1  A  Joint Commission's wording.
2  Q  Right.  What did you understand, though, to be the
3     conflict of interest they were concerned about in
4     MS 01.01.01?
5  A  I understood it to be just a pathway for a
6     physician to go to the board.  Not that someone had
7     some conflict.  I know what you're referring to as
8     a conflict of interest.  That was not my
9     understanding of it.  But I would have to read it
10    again and --
11 Q  Do you have it?
12 A  I don't have it in my hands.
13 Q  I know.
14 A  Yes.
15 Q  But in the hospital, right?
16 A  Yes.  I can --
17 Q  Could you call somebody and just ask them to send
18    us three copies of it, MS 01.01.01?
19 A  Yes.
20
21    MR. DAYHUFF:  I'll handle the production, or lack
22       thereof of documents to you guys --
23    MR. SOWELL:  Yes.
24    MR. DAYHUFF:  -- rather than her.  If you put it in
25       an email or letter, I'll take that up after

---

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

17

1    this deposition. MS 01.01.01 is available if
2    you Google it.
3    WITNESS: Yeah.
4    MR. DAYHUFF: Just FYI.
5    MR. SOWELL: I understand that.
6    MR. DAYHUFF: Okay.
7    MR. SOWELL: But I want to ask her about it today.
8    MR. DAYHUFF: Okay.
9    MR. SOWELL: Since she's referring to it and can't
10   remember it, what I -- what I would like to be
11   able to do is just ask her to refresh her
12   recollection so we will know --
13   MR. DAYHUFF: Okay.
14   MR. SOWELL: -- what it is she's referring to
15   rather than coming back for, you know, 10
16   minutes of a discussion.
17   MR. DAYHUFF: Sure. Well, we wouldn't have to come
18   back because it's not an exhibit. But I'll
19   tell you what I'll do. On my break with the
20   court, I will look at that and talk to her
21   about it, if you'd like, because we get a
22   chance to consult on it, and then decide
23   whether we're going to bring back copies of
24   it. Good?
25   MR. SOWELL: Sounds good.

18

1    MR. DAYHUFF: Okay.
2
3    Q    So you don't know what the conflict of interest was
4    related to?
5    A    I really can't, without looking at it again, be
6    sure.
7    Q    Now, other than the conflict of interest issue
8    that's raised by MS 01.01.01, are there any other
9    changes to the bylaws that you can recall?
10   A    We changed the category -- staff category, I do
11   know that, just simply to be consistent nationwide.
12   We have categories active courtesy and we changed
13   it to active and associate, which is what is used
14   nationwide. It didn't change any content. It just
15   changed the name of it.
16   Q    Okay.
17   A    I can't think. I just -- I can't remember what we
18   did. There were several changes and I -- you know,
19   I can produce that, but I don't off the top of my
20   head remember.
21   Q    Do you remember any of the other changes?
22   A    I can't right now, no.
23   Q    Now, your job description also says that you plan
24   agendas and prepare for meetings.
25   A    Yes.

19

1    Q    All right. In the last three years what agendas
2    have you planned and what meetings have you
3    prepared for?
4    A    I do the Medical Executive Committee, the
5    Credentials Committee, Bylaws Committee, Department
6    of Medicine, Department of Surgery, Medical Staff
7    Peer Review, and MS QIC, Q-I-C. It's Medical Staff
8    Quality Improvement Committee. I believe that's
9    it.
10   Q    And you record the minutes of all of those
11   meetings?
12   A    I do not record them. I take them by hand. I make
13   notes.
14   Q    What do you do with the notes?
15   A    As soon as I type the minutes from the notes, I
16   destroy the notes.
17   Q    Has that always been your protocol?
18   A    Years ago I did audio when I first started this
19   job, because I wasn't sure I would write everything
20   down. And when we did audio we erased the tapes as
21   soon as we typed the minutes. But I don't do audio
22   anymore. I just do my handwritten notes.
23   Q    So, have you been doing that, destroying those
24   notes since, let's say, the beginning of 2010?
25   A    Oh, since 1998.

20

1    Q    Yeah. How long after you actually make up the
2    minutes do you destroy the notes?
3    A    Usually within the week, because I try to type the
4    minutes, you know, as soon as possible.
5    Q    Now, the notes, are they handwritten or computer?
6    A    They're handwritten.
7    Q    Do you maintain any other records of those meetings
8    other than those handwritten notes and then the
9    minutes themselves?
10   A    That's it.
11   Q    When did you stop using the audiotapes?
12   A    I would say probably around 2001.
13   Q    Are you the only person who keeps records of those
14   meetings?
15   A    Those committees that I told you about, yes. The
16   official record is in my office.
17   Q    Were you ever informed by anybody at the hospital
18   that you were to maintain those records after Dr.
19   Muniz brought suit in this case?
20   A    I was told by the attorneys at that time.
21   Q    And did you keep them?
22   A    We -- did I keep the handwritten notes?
23   Q    Yes.
24   A    No, I didn't. I didn't think that was part of it
25   because those notes were typed into an official

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

21

1    record. So those notes were strictly for my memory
2    to type the minutes.
3  Q  Right.
4  A  So the minutes were my official record.
5  Q  Okay. But you knew you were supposed to retain any
6    records related to Dr. Muniz?
7  A  I was told not to delete any emails or any
8    correspondence.
9  Q  But despite that you threw away or destroyed these
10   handwritten notes?
11 A  Yes.
12 Q  Did you consult with counsel before you did that?
13 A  No.
14 Q  What kind of records do you maintain on your
15   computer with respect to any of these committees?
16 A  I maintain the computer copy of the minutes.
17   They're, you know, all the -- and I print them out
18   and put them in a book for the Joint Commission,
19   but it's all maintained on my computer. It's a
20   minute form like any of the minutes you've seen.
21   Word documents.
22 Q  Anything else you regularly maintain in your
23   computer?
24 A  Well, my computer has a database of physicians.
25   It's a program, you know, where we have all their

22

1    credentials.
2  Q  Does it have a database with respect to Margo
3    Muniz?
4  A  Yes.
5  Q  And what's in there? Just take her file, for
6    instance. What would typically be in that database
7    for credentials for a physician like Dr. Muniz?
8  A  Okay. It's called MIDAS, M-I-D-A-S, and it's a
9    credentialing software. And we put in biographical
10   information, you know, name, address, phone number,
11   home, office. We put in education, where they went
12   to medical school, residency. We put in their
13   licenses and their insurance. And any CMEs that
14   they give me. If they go offsite to get a CME and
15   they send it to me, then I'll keep up with it for
16   them. And that's pretty much it.
17 Q  Do you maintain that database outside of requests
18   for information related to credentialing?
19 A  No.
20 Q  Where is that maintained?
21 A  They just -- that comes in through the mail or the
22   fax, and we fill it out and fax it back or mail it
23   back. Normally I do not keep those. If I get a
24   request for a physician who's on staff in good
25   standing with no suspensions or no issues, then I

23

1    just send it back and I don't even keep it, because
2    I get hundreds. If I have a physician who may have
3    something going on, some suspensions or, you know,
4    something like Dr. Margo Muniz had, then I will
5    keep that.
6  Q  Where do you keep it?
7  A  I keep it in a file in my office. It's a hard
8    copy. It's not on the computer.
9  Q  Does that file have a name?
10 A  It would just be the credentials file.
11 Q  For Dr. Muniz?
12 A  Yes.
13 Q  Do you have any other files in your office related
14   to Dr. Muniz?
15 A  No.
16 Q  And when I say in your office, I probably should
17   stretch that out a little bit. Do you have any
18   other files in your care, custody or control
19   related to Dr. Muniz?
20 A  No. Mine would be the credentials file.
21 Q  Okay. Now, tell me what you do on a day-to-day
22   basis in your job?
23 A  I process new applications, a physician requesting
24   privileges. I do a lot of it through the Internet.
25   A lot of letters I send out requesting information

24

1    on that physician. I again prepare agendas for the
2    meetings that are coming up. I type the minutes
3    from the meetings that we've just had. I do
4    orientation for those new physicians. They come in
5    and spend a day with me. I pull reports for
6    reappointments.
7  Q  Anything else?
8  A  I think that's it.
9  Q  Now, are you continuing to destroy your handwritten
10   notes related to these meetings?
11 A  Yes.
12 Q  Including the MEC meetings?
13 A  Yes.
14 Q  And you attend the MEC meetings, obviously.
15 A  Yes.
16 Q  Do you participate in them?
17 A  No.
18 Q  Now, what's Sharon's last name, Hagan?
19 A  Hagan.
20 Q  Does she attend the MEC meetings?
21 A  She does.
22 Q  Does she participate in them?
23 A  She may participate in the conversation if they ask
24   her something. It would strictly be for the
25   credentialing process, or the recruitment process.

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

25

1    Q    And Carlos Milanes would attend the MEC meetings?
2    A    Yes.
3    Q    Does he participate in them?
4    A    In the conversation, yes.  The discussion.  And he
5         has a report.  He gives the board report.
6    Q    To the MEC?
7    A    Yes.
8
9         MR. SOWELL:  Travis, we'd like to -- we hereby
10        request any such reports related to Dr. Muniz.
11        MR. DAYHUFF:  I'm sorry.  Can -- and what kind of
12        reports are we talking about?
13        MR. SOWELL:  Board reports to the MEC.
14        MR. DAYHUFF:  Board reports, MEC.  Okay.  If you
15        put that in an email and send it to me, I'll
16        follow up on that, and we'll address that.
17
18   Q    Now, the MEC, that's made up of chief of staff and
19        the chairmen of the departments at the hospital?
20   A    There's 11 members.
21   Q    Right.  Who's on it other than the chief of staff
22        and the members of various departments?
23   A    The top three are the chief of staff, the chief of
24        staff elect, and the secretary/treasurer of the
25        medical staff.

26

1    Q    Is that a physician?
2    A    Yes.  There are all physicians.  Then we have the
3         chairman and the vice chairman of the Department of
4         Medicine and the Department of Surgery.  And then
5         we have four additional members, two from the
6         Department of Surgery and two from the Department
7         of Medicine, all physicians.
8    Q    So you've got four from surgery and four from
9         medicine?
10   A    Right.
11   Q    Who's currently on the MEC from surgery?
12   A    Department of Surgery would be Dr. Massie is the
13        chairman, Dr. Chase is the vice chairman, Dr.
14        Anderson is one of the additional members, and Dr.
15        Frye is the other member.
16   Q    That's Jonathan Anderson?
17   A    Yes.
18   Q    Is Dr. DiBona still the chief of staff?
19   A    No.
20   Q    Who is the chief now?
21   A    Dr. Paxton.
22   Q    Who's the vice chief?
23   A    Dr. Ezekiel.
24   Q    Is there anybody from the outside of the MEC
25        itself, other than yourself, Sharon Hagan, Carlos

27

1         Milanes, who attend and participate in the MEC
2         meeting?
3    A    The COO attends.
4    Q    And what's his name?
5    A    Scott Ansede.
6    Q    And does he participate in terms of discussion?
7    A    Discussion, yes.  They're not voting members, so .
8         . . and Denyse Finkbeiner who is the chief nurse
9         executive.
10   Q    Now, what's Scott -- did you say, is it Ansede?
11   A    It's Ansede.
12   Q    Ansede.
13   A    A-n-s-e-d-e.
14   Q    Now, am I correct that Carlos Milanes is employed
15        by Universal Health Services in Delaware?
16   A    Yes.
17   Q    And Sharon Hagan is employed by Universal Health
18        Services of Delaware?
19   A    No.  Sharon is employed by Aiken Regional.
20   Q    All right.  What about Scott Ansede?
21   A    He is employed by UHS.
22   Q    Of Delaware?
23   A    I don't know the difference.  I just know UHS.
24   Q    All right.  What about Denyse Finkbeiner?
25   A    I believe she is employed by UHS, but I don't know

28

1         for sure.
2    Q    Anybody else who attends those MEC meetings?
3    A    No.
4    Q    Now, do you attend the board meetings?
5    A    No.
6    Q    Do you have any responsibilities or interface with
7         the Board of Governors?
8    A    The only thing I do is prepare a summary from the
9         med exec meeting of items that go to the board for
10        approval, but I give that report to Pat Jackson.
11
12        MR. SOWELL:  Travis, to the extent that any of
13        those reports relate to Dr. Muniz, we request
14        the summary reports of the MEC meetings that
15        go to Pat Jackson.
16
17   Q    Now, who is Pat Jackson?
18   A    She is Carlos' executive assistant.
19   Q    Now, your office, is it in the same suite as Mr.
20        Milanes?
21   A    Yes.
22   Q    And the same suite as Pat Jackson?
23   A    Yes.
24   Q    And the same suite as these other executive
25        officers?

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

| | 29 |
|---|---|
| 1 | **A** **Yes.** |
| 2 | Q And that's on the sixth floor? |
| 3 | **A** **Yes.** |
| 4 | Q Next to the board room? |
| 5 | **A** **Yes.** |
| 6 | Q Okay. Who do you report to? |
| 7 | **A** **Sharon Hagan.** |
| 8 | Q And how long has that been the case? |
| 9 | **A** **Since 1998.** |
| 10 | Q She's been here that long, too? Yes? |
| 11 | **A** **Yes. I think she's been here since '92.** |
| 12 | Q All right. What was your involvement regarding the |
| 13 | peer reviews of Margo Muniz? |
| 14 | **A** **I have no involvement until I started taking** |
| 15 | **minutes just several months ago.** |
| 16 | Q Minutes of what? |
| 17 | **A** **The peer view meeting.** |
| 18 | Q Now, is that the peer review committee that you're |
| 19 | -- |
| 20 | **A** **The peer review committee, right.** |
| 21 | Q All right. That's one of your jobs, but it was |
| 22 | not your job before? |
| 23 | **A** **Right.** |
| 24 | Q All right. When did that begin, your taking the |
| 25 | minutes of the peer review committee? |

| | 31 |
|---|---|
| 1 | review committee before August of 2010? |
| 2 | **A** **No.** |
| 3 | Q Who was doing that before? |
| 4 | **A** **That was Barb Miller.** |
| 5 | Q Yeah. Where is Barbara Miller? |
| 6 | **A** **I don't know.** |
| 7 | Q Do you know why she left the hospital? |
| 8 | **A** **I understood she got an offer somewhere else and** |
| 9 | **left. I don't know why.** |
| 10 | Q Do you know who she reported to? |
| 11 | **A** **She initially reported to Mark Tierney who was the** |
| 12 | **CFO.** |
| 13 | Q Is that job vacant now, or am I wrong about that? |
| 14 | **A** **It is vacant. Well, someone has been hired. They** |
| 15 | **start in September.** |
| 16 | Q When did he leave, Mark Tierney? |
| 17 | **A** **He left two, three months ago.** |
| 18 | Q Do you know why? |
| 19 | **A** **He got a job offer in Florida.** |
| 20 | Q Do you know where in Florida? |
| 21 | **A** **I don't.** |
| 22 | Q Let me back up then and ask you. We'll move off of |
| 23 | peer review and move into the hearing panel. |
| 24 | **A** **Okay.** |
| 25 | Q Now, Dr. Muniz has had two hearings. She had the |

| | 30 |
|---|---|
| 1 | **A** **Approximately one year ago.** |
| 2 | Q So about August of 2010, right? Have their been -- |
| 3 | I mean, have there been any discussions or minutes |
| 4 | related to Dr. Muniz at peer review since August of |
| 5 | 2010? |
| 6 | **A** **I don't believe so.** |
| 7 | Q Yeah. Well, we know that the amended revised |
| 8 | recommendation of the hearing panel was dated |
| 9 | August 12, 2010. |
| 10 | **A** **But that doesn't go through peer review.** |
| 11 | Q I understand. I'm just trying to get all this |
| 12 | straightened out. So you're differentiating |
| 13 | between peer review and the fair hearing panel, or |
| 14 | the hearing panel? |
| 15 | **A** **Yes.** |
| 16 | Q Those are two different things in your mind? |
| 17 | **A** **That's two different things.** |
| 18 | Q And probably there are no minutes related to Dr. |
| 19 | Muniz and the peer review committee since August of |
| 20 | 2010 since she'd already gone to a hearing. |
| 21 | **A** **Right.** |
| 22 | Q Is that your recollection? |
| 23 | **A** **Yes.** |
| 24 | Q Okay. So let's move off of peer review for a |
| 25 | minute. Did you have any interface with the peer |

| | 32 |
|---|---|
| 1 | one that Dr. Ratliff chaired in 2009, and then she |
| 2 | had the one that Ernie Nauful acted as hearing |
| 3 | officer for in 2010. |
| 4 | **A** **Yes.** |
| 5 | Q And did you participate in both of those? |
| 6 | **A** **I attended the meetings.** |
| 7 | Q All right. Let's go back to 2009, the Jack Ratliff |
| 8 | panel. What was your function with respect to that |
| 9 | hearing panel? |
| 10 | **A** **I was there for process support. If there were any** |
| 11 | **questions about the bylaws or the process.** |
| 12 | Q Did you keep any notes, minutes or records of the |
| 13 | deliberations or the activities, I guess, of that - |
| 14 | - |
| 15 | **A** **No.** |
| 16 | Q -- hearing panel? Did anybody keep any records, |
| 17 | notes or minutes of the -- |
| 18 | **A** **No.** |
| 19 | Q -- activities or deliberations of that hearing |
| 20 | panel? |
| 21 | **A** **Not that I'm aware of.** |
| 22 | Q Now, what was your participation in the 2010 peer |
| 23 | review? |
| 24 | **A** **I was -- the same. There just for support for the** |
| 25 | **process and the bylaws.** |

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

33

1  Q  Did you keep any notes, records or minutes of those
2     activities or deliberations?
3  A  I did take some notes at those hearings.
4  Q  All right. Where are those notes?
5  A  I produced them.
6
7     MR. DAYHUFF: They've been produced in this case.
8     MR. SOWELL: Really? Let's go off the record a
9        minute.
10
11        (Off the Record)
12
13  Q  Were there any other records maintained of those
14     deliberations or proceedings other than your
15     handwritten notes?
16  A  Just the book that everybody had there.
17  Q  Right.
18  A  But nothing other than that, no.
19  Q  Right. You didn't maintain any recordings?
20  A  No.
21  Q  Do you know how Ernie Nauful was chosen to be a
22     hearing officer for that hearing panel?
23  A  Celeste Jones mentioned to me that she knew someone
24     who was a retired judge that did hearings, and I
25     contacted him and asked him if he would do that.

---

34

1  Q  Do you know why one was chosen, given that there
2     was none for the 2009 hearing panel?
3  A  I don't.
4  Q  I mean, who made that decision?
5  A  I don't know.
6  Q  You didn't make it?
7  A  I didn't, no.
8  Q  You just carried it out?
9  A  I just -- right.
10  Q  Do you know who told you to seek out a hearing
11     officer?
12  A  I'm sure it would have been in the conversations
13     with Carlos and Celeste, but I don't -- I can't say
14     when it actually was said.
15  Q  So did you call Ernie Nauful and engage him to be
16     the hearing officer?
17  A  Yes.
18  Q  Did you have any correspondence with him?
19  A  Nothing other than, you know, an occasional email,
20     maybe when -- you know, I don't remember all of
21     them. But nothing other than something like that
22     where he would say, you know, get this to the
23     doctors, or here's the date we're going to meet.
24     Nothing other than that.
25  Q  Okay. I'm going to show you Exhibit 25 to the

---

35

1     deposition of Carlos Milanes.
2
3     MR. DAYHUFF: This is one of the documents you gave
4        me earlier?
5     MR. SOWELL: I don't know.
6     MR. DICK: Yeah.
7     MR. DAYHUFF: It is?
8     MR. DICK: Yeah.
9     MR. DAYHUFF: Okay. As long as it is, that's fine.
10     MR. DICK: I gave you all the same documents that
11        we used for Carlos.
12
13  Q  What's the Bates number down in the bottom right on
14     that?
15  A  002374.
16
17     MR. DAYHUFF: I don't recall that one.
18     MR. SOWELL: Yeah, I don't think it's in here.
19     MR. DAYHUFF: So why don't we put that in the pile
20        of documents that I'll chat with her about --
21     MR. SOWELL: Yeah.
22     MR. DAYHUFF: -- at the break.
23     MR. SOWELL: That's fine.
24
25        (Off the Record)

---

36

1  Q  I'm going to hand you Exhibit 25 to Carlos Milanes'
2     deposition.
3  A  Okay.
4  Q  Can you identify that?
5  A  It appears to be an email from Sharon to Ernie
6     Nauful.
7  Q  Right. Regarding a question you had posed to Ernie
8     the prior Friday?
9  A  Okay. I would -- I do remember asking Ernie about
10     the vote. There was no vote at our deliberation.
11     I went on vacation, and then Sharon followed up
12     with him.
13  Q  Right. But the words in the parenthesis, those
14     were apparently your questions to Ernie Nauful?
15  A  Yes.
16  Q  Did you pose that question by email or by
17     telephone?
18  A  I don't remember. I think it would have been
19     email, but I don't remember.
20  Q  Do you know where that email is?
21  A  It should have been on my computer. If there was
22     an email, it would have been on my computer,
23     because none were deleted.
24  Q  I understand.
25

---

Thompson Court Reporting, Inc.
www.thompsonreporting.com

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

| | 37 |
|---|---|
| 1 | MR. SOWELL:  Travis, we request that email. |
| 2 | MR. DAYHUFF:  Yeah. |
| 3 | MR. SOWELL:  Because I don't think we have it. |
| 4 | MR. DAYHUFF:  Yeah, if it would have been on the |
| 5 | computer, if there was an email, we collected |
| 6 | all the emails -- |
| 7 | MR. SOWELL:  Yeah. |
| 8 | MR. DAYHUFF:  -- between Terri and anybody |
| 9 | regarding this case, so.  And produced them. |
| 10 | |
| 11 | Q   You see there's a reference to there was one member |
| 12 | adamantly against the MEC's decision about we only |
| 13 | need a majority? |
| 14 | A   Yes. |
| 15 | Q   Who was that member? |
| 16 | A   That would have been Chris Robinson. |
| 17 | Q   Okay.  And he's the gentleman who's the maternal |
| 18 | fetal medicine person from the University of South |
| 19 | Carolina? |
| 20 | A   Yes. |
| 21 | Q   What was his position with respect to the hearing |
| 22 | and the draft recommendation? |
| 23 | A   You're saying what he was against? |
| 24 | Q   Yes. |
| 25 | A   His concern was that we were only reviewing one |

| | 38 |
|---|---|
| 1 | case for termination of privileges. |
| 2 | Q   And he was opposed to that? |
| 3 | A   For one case only, yes. |
| 4 | Q   Okay.  Now, did he maintain that position, or |
| 5 | opposition, up to the end? |
| 6 | A   No. |
| 7 | Q   Why not? |
| 8 | A   I don't know why not.  I mean, they deliberated and |
| 9 | he changed his position. |
| 10 | Q   Was there anybody else on the hearing panel that |
| 11 | was concerned about taking Dr. Muniz's privileges |
| 12 | over one case? |
| 13 | A   No. |
| 14 | Q   All right.  That one case was the stillborn infant? |
| 15 | A   Yes. |
| 16 | Q   I'm going to show you Exhibit 27 of Carlos Milanes' |
| 17 | deposition.  I'm going to have to come over there |
| 18 | because I don't have a copy of that.  Do you see |
| 19 | where it says, "I did hear back from Dr. Kinsey and |
| 20 | he has a problem with what Dr. Robinson wants to |
| 21 | do." |
| 22 | A   Yes. |
| 23 | Q   Do you know what that's in reference to? |
| 24 | A   I don't.  Because this draft was interaction |
| 25 | between the hearing officer and the -- |

| | 39 |
|---|---|
| 1 | Q   Right. |
| 2 | A   -- hearing panel. |
| 3 | Q   And you were not in that loop? |
| 4 | A   I was not in that, no. |
| 5 | Q   Okay.  I'm going to just sit here for a second, so |
| 6 | I don't have to hover over you like a vulture. |
| 7 | There's just some here I don't have copies of.  I'm |
| 8 | going to show you Deposition Exhibit 29 and ask you |
| 9 | if you can identify that. |
| 10 | A   Okay. |
| 11 | Q   Are those some emails between you and Ernie Nauful? |
| 12 | A   Yes. |
| 13 | Q   After you get through looking at them just hand |
| 14 | them back to me so I'll -- |
| 15 | A   I'm trying to see how they go. |
| 16 | Q   That's fine.  You usually read them from the |
| 17 | bottom. |
| 18 | A   Right.  That's what I was looking at.  Okay. |
| 19 | Q   Now, in the emails dated August 31 from Ernie to |
| 20 | you it says, and I'll show you where it is, "and I |
| 21 | sent each of them a draft of the panel report." |
| 22 | Now, do you know who drafted the panel report? |
| 23 | A   Ernie did that. |
| 24 | Q   "Dr. Robinson responded immediately and I made some |
| 25 | changes and sent them to him.  When I heard from |

| | 40 |
|---|---|
| 1 | Dr. Kinsey he indicated he could not sign the |
| 2 | report as originally drafted."  Do you know why Dr. |
| 3 | Kinsey could not sign the report as originally |
| 4 | drafted? |
| 5 | A   I do not. |
| 6 | Q   You do not know? |
| 7 | A   No, I do not know. |
| 8 | Q   But these drafts that Ernie Nauful was talking |
| 9 | about in this August 31, 2010 email, do you have |
| 10 | copies of it? |
| 11 | A   No.  He sent those directly to the hearing panel |
| 12 | members. |
| 13 | Q   Okay.  Looking back at Milanes -- M-i-l-a-n-e-s, |
| 14 | Deposition Exhibit 26, there's an email to Celeste |
| 15 | Jones from Ernie Nauful.  The one on the top.  It |
| 16 | says, "Sorry for the error.  Ask Terri to set up a |
| 17 | conference call with the panel and I will prepare |
| 18 | an amended report correcting the error for them to |
| 19 | consider."  Now, did he prepare an amended report? |
| 20 | A   He did, but it wasn't a conference call.  They came |
| 21 | together and met. |
| 22 | Q   Okay.  So after he prepared the amended report |
| 23 | there was a meeting of the panel? |
| 24 | A   Yes. |
| 25 | Q   To consider the amended report? |

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

41

1   A   Yes.
2   Q   And were all of the members present?
3   A   Everyone was there except Chris Robinson, and he
4       was there by phone.
5   Q   How was Chris Robinson chosen for the panel?
6   A   I was given a name of the chairman of the
7       department of OB/GYN at MUSC and he could not do it
8       and he gave me Chris' name.
9   Q   I want to show you Exhibit 30 to Carlos Milanes'
10      deposition.  I ask if you can review it and tell me
11      if you can identify it.
12  A   Okay.
13  Q   Are those some emails between you and Ernie Nauful?
14  A   Yes.
15  Q   And also between you and Celeste Jones and Gary
16      Petok?
17  A   Yes.
18  Q   Right here?
19  A   Yes.
20  Q   Now, do you remember that Carlos Milanes sent a
21      letter to Ernie Nauful requesting him to revise the
22      report in connection with the burden of proof?
23  A   I know there was a letter sent.  I'm not sure if it
24      came from Carlos or med exec.
25  Q   Right.  Well, actually, it was a letter from the

42

1       Medical Executive Committee to Carlos that he sent
2       Ernie Nauful.
3   A   Okay.
4   Q   Do yo remember that?
5   A   Yes.
6   Q   And I think that's -- I don't know, because I don't
7       have it, but I think that's the letter because it's
8       dated October the 7th.
9   A   Right, and it says request letter, --
10  Q   Yes.
11  A   -- so that is what it would have been.
12  Q   Okay.  So that correspondence that was sent to
13      Ernie Nauful was forwarded by you to Celeste Jones
14      and Gary Petok?  Right -- right here?
15  A   I would have -- yes.
16  Q   Who were they representing when you sent that to
17      them?
18  A   Celeste represented the med exec, and Gary Petok is
19      our legal advice from our corporate office.
20  Q   UHS?
21  A   Yes.
22  Q   And then there's a subsequent email, I guess, three
23      days later, I'm looking at October 11th, that you
24      sent to Celeste Jones, Gary Petok and Ernie Nauful
25      asking for a status.

43

1   A   Yes.
2   Q   And then Ernie on the 11th, at the top up here --
3   A   Uh-huh.
4   Q   -- responded with the corrected report.
5   A   Right.
6   Q   And this is the corrected report, --
7   A   Okay, right.
8   Q   -- is it not?
9   A   Yes.
10  Q   With no date on it.  You see it's October blank
11      2010.
12  A   Right.  Because they hadn't met yet.
13  Q   So sometime after this they met in person with
14      Ernie, --
15  A   Yes.
16  Q   -- and Chris Robinson participated by telephone?
17  A   Yes.
18  Q   Now, these notes that David is looking at over here
19      that were given to us two or three weeks ago, are
20      any of those notes of these deliberations?
21  A   No.
22  Q   All right.  Did you make any notes of the
23      deliberations?
24  A   No.
25  Q   Were all of those notes related to the hearing?

44

1   A   The notes he's looking at?
2   Q   Yeah, the ones he's looking at.
3   A   Yes.
4   Q   So none of them are related to any of the
5       deliberations?
6   A   No.
7   Q   They're purely related to the hearing?
8   A   Yes.
9   Q   Now, when the panel met and discussed the
10      recommendation did they consider the prior peer
11      review, 2009 peer review?
12  A   They -- yes.  They discussed that there was a prior
13      peer review.
14  Q   And was that part and parcel of their conclusion to
15      recommend termination of Dr. Muniz's privileges?
16  A   I believe so, yes.
17  Q   And is that what -- was Dr. Robinson opposed to
18      that, or what?
19  A   No.  That -- that gave him more history than one
20      case.
21  Q   Okay.  So it was relied upon to bring Dr. Robinson
22      around to agree with the rest of the panel?
23  A   Yes.
24  Q   The 2009 peer review?
25  A   Yes.

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**45**

1  Q   Okay. We were talking about earlier, conflict of
2      interest. And really what that is, is conflict
3      management process?
4  A   Yes.
5  Q   So is this --
6
7      MR. SOWELL: And I'm going to ask the reporter to
8          mark this as -- let's see. I'm sorry,
9          Jennifer. I don't mean to be faking you out.
10         Whatever the next exhibit number is.
11     COURT REPORTER: Two.
12     MR. SOWELL: Exhibit No. 2.
13
14         (Whereupon, Bylaw Amendments, consisting
15          of 3 pages, was marked Plaintiff's
16          Exhibit No. 2 for identification.)
17
18 Q   Exhibit No. 2. Were these the bylaw changes?
19 A   **That's the change in the new bylaws.**
20 Q   Yeah. And that's the main one that you were
21     referencing?
22 A   Yes.
23 Q   Okay. And this was done to accommodate JCAHO?
24 A   Yes.
25

---

**46**

1          (Whereupon, JCAHO MS.01.01.01, consisting
2           of 4 pages, was marked Plaintiff's
3           Exhibit No. 3 for identification.)
4
5  Q   Okay. And that amendment was done as a reaction to
6      Exhibit No. 3 to your deposition?
7  A   Yes.
8  Q   I'm going to show you Exhibit No. 3. And those are
9      the JCAHO standards rationale elements of
10     performance and scoring?
11 A   Yes.
12 Q   And they require an MS 01.01.01 that the medical
13     staff bylaws address self governments and
14     accountability to the governing body?
15 A   Yes.
16 Q   So Exhibit No. 2, which is the amendment to the
17     bylaw, was effected in order to comply with Exhibit
18     No. 3?
19 A   Yes.
20 Q   And that was the major revision to the bylaws?
21 A   Yes.
22 Q   Okay. I'm going to show you -- well, I don't need
23     to show it to you. Do you want to see it? You've
24     seen it before, I'm sure.
25 A   **Yeah, I have.**

---

**47**

1  Q   This is the current July-September 2011 Quality of
2      Life magazine, I guess. ARMC.
3
4      MR. DAYHUFF: I thought we took them off the
5          mailing list.
6      MR. SOWELL: I pick one of these up every time I
7          come over here. It's the same one though.
8
9  Q   There's an article in here about the Vein Center.
10 A   **Okay.**
11 Q   Like on page three.
12 A   **Yes.**
13 Q   Do you see that?
14 A   **Yes.**
15 Q   Dr. Paxton runs the Vein Center, correct?
16 A   **Yes.**
17 Q   And the Vein Center is right up the hall here on
18     the second floor.
19 A   **Yes.**
20 Q   It has it's own waiting room.
21 A   **Yes.**
22 Q   Who owns the Vein Center? In other words, who does
23     it operate on behalf of?
24 A   **Aiken Regional.**
25 Q   Okay. And is Dr. Paxton paid by Aiken Regional

---

**48**

1      Medical Center to head up the Vein Center?
2  A   **Dr. Paxton is an employee.**
3  Q   Yeah. He's an employee of Aiken Regional --
4  A   **Yes.**
5  Q   -- Medical Center? Yes?
6  A   **Yes.**
7  Q   Okay. And how long has that been the case?
8  A   **The Vein Center has only been open a couple of**
9      **months at best.**
10 Q   Do you know if he was an employee before that?
11 A   **I know that he became employed, I believe, on**
12     **October 1, 2010.**
13 Q   Was he subsidized by the hospital before that?
14 A   **That I don't know.**
15 Q   Was he employed by the hospital before that?
16 A   **No.**
17
18     MR. DAYHUFF: Are we going to make this an exhibit?
19     MR. SOWELL: No.
20     MR. DAYHUFF: Okay. No.
21     MR. SOWELL: Well, if you -- not -- unless you want
22         to.
23     MR. DAYHUFF: No. That's fine. I was just going
24         to put it in the pile of exhibits.
25     MR. SOWELL: A frame of reference.

---

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

49

1  Q   Do you know where Ernie Nauful took or received the
2      information to prepare this recommendation for a
3      report?
4  A   I don't understand.
5  Q   Well, he prepared one in the beginning. We know
6      that.
7  A   Yes.
8  Q   And it was circulated.
9  A   Yes.
10 Q   One that you didn't even see.
11 A   Right.
12 Q   And then he prepared one that actually became the
13     recommendation and the report of the hearing panel.
14 A   Okay.
15 Q   Correct?
16 A   Yes.
17 Q   All right. Do you know how he prepared it?
18 A   Yes.
19 Q   All right. How?
20 A   He came for that meeting with his laptop and a
21     stick. He did some things, gave me the stick, and
22     I went to my office and printed it. Made the
23     corrections. So I did the secretarial duties, and
24     then gave it to him.
25 Q   All right. Now, was that prepared after a meeting

50

1      of the hearing panel?
2  A   Yes. Well, my changes to it.
3  Q   Did he come with one already prepared?
4  A   Yes. He had something on the stick.
5  Q   All right. So he came to the first meeting of the
6      hearing panel with a report prepared on the stick?
7  A   Now, you said the first meeting?
8  Q   Yes.
9  A   No. Not the first deliberation.
10 Q   All right. What was the first deliberation, or
11     when? When was it? That's the best way to say
12     what it was.
13 A   I don't know the date, but everyone was there and
14     that's when they started their deliberations.
15 Q   Okay. So when did he bring the stick with the
16     initial report? Was it at the second meeting?
17 A   He -- no. The stick came at the meeting when we
18     needed to correct the report. He came with his
19     laptop at all the meetings --
20 Q   Right.
21 A   -- and as they deliberated and made a decision, he
22     created -- or started creating the report. And
23     that's when you see the email where he says "I
24     emailed the report."
25 Q   Uh-huh.

51

1  A   So I had not seen anything at that time. He sent
2      that out.
3  Q   Okay.
4  A   What I saw was the corrected report at the end.
5  Q   Okay. You also saw the interim report. The pre-
6      corrected report.
7  A   Yes. Yes. But I had no input into that. I did
8      not make any changes, or print, or do anything with
9      that one.
10 Q   The only one you had any interface with, to any
11     degree, was the amended one?
12 A   Yes.
13 Q   Because he made the changes at the last meeting?
14 A   Right.
15 Q   And you made the revisions on your computer?
16 A   Yes.
17 Q   All right. Did you have any other drafts of that
18     report other than the original report before you
19     made those changes to it?
20 A   No.
21 Q   Was there any discussion among the panel members
22     with Ernie Nauful about the revised burden of
23     proof?
24 A   Oh, yes. That was their last meeting --
25 Q   Right.

52

1  A   -- when they talked about the burden of proof.
2  Q   All right. And what did he tell them?
3
4      MR. DAYHUFF: Hold on. Let me think about this for
5        a minute. He's providing legal advice to the
6        panel, right? I mean, you wouldn't be
7        inquiring into legal advice, right?
8      MR. SOWELL: I'm not sure what he's doing. We'd
9        probably have some disagreement about that. I
10       don't know. Well, he's acting as hearing
11       officer.
12     MR. DAYHUFF: Yeah. I think he's acting as hearing
13       officer and a legal adviser to the panel. Am
14       I missing something?
15     MR. DICK: There's no privilege that would cover
16       that though. I mean, he's not the -- they're
17       not the client of him or anything.
18     MR. DAYHUFF: Okay.
19     MR. DICK: I mean, it would be like if you provided
20       --
21     MR. DAYHUFF: That's probably -- that might be
22       right.
23     MR. DICK: -- legal advice to somebody on the
24       street it wouldn't be privileged.
25     MR. DAYHUFF: Well, I don't know if that's the

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**53**

1  case. Well, what's your question? Did he
2  consult with them about the burden of proof
3  issue?
4  MR. SOWELL: Yes. Yes. The question was, what did
5  he tell them. Yeah, I think that was the
6  question. I think we had gotten beyond the
7  part about consulting with them. I think
8  Terri said yes, he did, at the last meeting.
9  And so, the question was, what did he tell
10 them.
11 MR. DAYHUFF: Do we have the bylaws with us, by any
12 chance?
13 MR. SOWELL: In the car probably.
14 MR. DICK: Yeah, they're all in the car.
15 MR. DAYHUFF: Can we defer what he told them
16 specifically --
17 MR. SOWELL: Yeah.
18 MR. DAYHUFF: -- and then I'll think about that --
19 MR. SOWELL: Yeah.
20 MR. DAYHUFF: -- before we end this. I want to
21 look and see what the bylaws say. If it says
22 just hearing officer, that's fine. And it may
23 be fine anyway, particularly if you would
24 agree with me that it's not any kind of a
25 waiver of privilege --

---

**54**

1  MR. SOWELL: Oh, I would agree.
2  MR. DAYHUFF: -- it's not privileged communication.
3  But let's -- let's leave that aside for a
4  moment.
5  MR. SOWELL: I got you.
6
7  Q  Now, do you have records of the times that the
8     hearing panel met?
9  A  No, I don't.
10 Q  Do you have a calendar that says when they met and
11    how many times they met?
12 A  I do not.
13 Q  Do you know how many times they met?
14 A  I couldn't say. I couldn't know. I --
15    it's not something I kept minutes for or anything,
16    so I -- I don't know. It may be in my emails.
17
18 MR. DAYHUFF: I've decided. I don't want to ruin
19    your flow, but if you agree that it's not
20    privileged, I'm fine. Go ahead.
21 MR. SOWELL: Yeah. Okay.
22 MR. DAYHUFF: I don't want to defer that any
23    longer.
24
25 Q  So what did Ernie say to them about the burden of

---

**55**

1  proof?
2  A  What I remember is that he just explained to him
3     the burden of proof. That, you know, they
4     considered it one way and it needed to be
5     considered another way. So he said we've come back
6     together for you to reevaluate your decision based
7     on this burden of proof. And then they
8     deliberated.
9  Q  Are you aware that there was an additional ground,
10    ground number nine that was added to the
11    recommendation when it was revised?
12 A  I'm not familiar with that.
13 Q  Okay. I'm going to ask you about this privilege
14    log.
15
16 MR. SOWELL: Let's mark that.
17
18    (Whereupon, Privilege Log, consisting of
19    28 pages, was marked Plaintiff's Exhibit
20    No. 4 for identification.)
21
22 Q  All right. This is a privilege log that your
23    counsel, Mr. Dayhuff, has provided to us, and I
24    want to ask you about some of the entries on here.
25    You see the second entry, Patricia Jackson is the

---

**56**

1  author or the recipient?
2  A  Yes.
3  Q  Is she a lawyer?
4  A  No.
5  Q  All right. Now, the third entry there, there's a
6     reference to Matthew Klein. Who is that?
7  A  He is an attorney at our corporate office.
8  Q  At UHS?
9  A  Yes.
10 Q  Now, if you look down one, two, three, four, five,
11    six lines there's a reference to Sharon Hagan and
12    Carlos Milanes.
13 A  Yes.
14 Q  Are either one of them lawyers?
15 A  No.
16 Q  All right. Skip down two more lines. There's a
17    reference to a Scott Schweiger, S-c-h-w-e-i-g-e-r.
18 A  Yes.
19 Q  Do you know who that is?
20 A  He is an attorney for UHS.
21 Q  Do you know where he's located?
22 A  I do not.
23 Q  All right. In the next line, I think we've already
24    covered this, but neither Patricia Jackson nor
25    Carlos Milanes is a lawyer?

---

Terri Ergle - 8/23/2011
**Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.**

---

57

1   **A   No.**
2   Q   Now, third line from the bottom it says a E. Brohl,
3       E, B-r-o-h-l. Was that the former chairman of the
4       Board of Governors, or do you know?
5   **A   I know she is on the Board of Governors. I believe**
6   **she was a chairman, yes.**
7   Q   But that is who that is a reference to?
8   **A   Yes.**
9   Q   The lady who is on the Board of Governors.
10  **A   Yes.**
11  Q   The last name Brohl, B-r-o-h-l.
12  **A   Brohl, yeah.**
13  Q   All right. There's a reference in the next line to
14      Mike Marquez. Can you tell us who that is.
15  **A   He works at UHS. I'm not sure who he is.**
16  Q   And you don't know what his job is?
17  **A   I do not.**
18  Q   Who is Frank Lopez?
19  **A   He would be Carlos' boss, but I don't know his**
20  **title.**
21  Q   And he works at UHS?
22  **A   Yes.**
23  Q   Either UHS -- either Universal Health Services,
24      Inc. or UHS of Delaware, Inc.?
25  **A   I -- like I said, I'm not aware of the difference**

---

58

1       of the two.
2   Q   But Frank Lopez is not a lawyer, is he?
3   **A   That I do not know.**
4   Q   He's not a lawyer as far as you know?
5   **A   Right.**
6   Q   Who is Molly Farrel, F-a-r-r-e-l?
7   **A   She is Gary Petok's administrative assistant.**
8   Q   Who is Paul Yakulis, Y-a-k-u-l-i-s?
9   **A   I've never heard that name.**
10  Q   Who is Joan Roli --
11  **A   Raulinaitus.**
12  Q   Raulinaitus, yes.
13  **A   She is another employee at UHS corporate office.**
14  **I'm not sure what her title is.**
15  Q   Of course, Mark Tierney is the former CFO?
16  **A   Yes.**
17  Q   And what was Chuck Tawwater's, T-a-w-w-a-t-e-r's,
18      job?
19  **A   Chuck Tawwater is in the risk management**
20  **department, but I don't know what --**
21  Q   At UHS?
22  **A   Yes.**
23  Q   All right. What about Bern OKane?
24  **A   I don't know who that is.**
25  Q   Do you know Nancy Kneece?

---

59

1   **A   Yes.**
2   Q   Who is that?
3   **A   She is the administrative assistant to the CFO, the**
4   **risk manager and the director of development.**
5   Q   At ARMC?
6   **A   Yes.**
7   Q   So that would be Lois El and Sharon Hagan?
8   **A   And Mark Tierney when he was here.**
9   Q   Is she still here?
10  **A   Yes.**
11  Q   Sharon Hagan is not a lawyer?
12  **A   No.**
13
14      MR. DAYHUFF:  Biff, it looks like we misspelled
15        Tarwater, so we have --
16      WITNESS:  No, It's Tawwater.
17      MR. DAYHUFF:  Oh, is it Taw?
18      WITNESS:  Taw, T-a-w.
19      MR. DAYHUFF:  Well, we didn't.
20
21  Q   Who is Kevin Kingery, K-i-n-g-e-r-y?
22  **A   He is the director of our information services here**
23  **at Aiken Regional.**
24  Q   Okay. Who is Sajan, S-a-j-a-n, Thomas?
25  **A   I don't recognize that name.**

---

60

1   Q   Now, who is Lisa Barrett?
2   **A   I recognize the name, but I'm not sure who she is.**
3   Q   Now, you are not a lawyer?
4   **A   No.**
5   Q   Lisa Barrett is not a lawyer?
6   **A   I don't know.**
7   Q   Kevin Kingery is not a lawyer?
8   **A   No.**
9   Q   The service desk is not a lawyer?
10  **A   No.**
11
12      MR. DAYHUFF:  Depends on who's there.
13      MR. SOWELL:  Huh?
14      MR. DAYHUFF:  Depends on who's there.
15      MR. SOWELL:  Who mans the service desk. That was
16        my next question. I was going to help you
17        out.
18      MR. DAYHUFF:  Okay.
19
20  **A   If that would be the service desk here?**
21  Q   I don't know. That's just what shows up on this
22      sheet, so. I'm thinking it's some email address.
23      I don't even know what it is. That's why I'm
24      asking you.
25  **A   If I put in a request to IS for some issue I'm**

---

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

| | 61 |
|---|---|
| 1 | having, be it email or, you know, logging onto |
| 2 | something, I get an email back from the service |
| 3 | desk. So it would be IS. |
| 4 | Q Information services, service desk? |
| 5 | A Yeah. |
| 6 | Q Okay. Turn over to the ninth page. I don't think |
| 7 | it's numbered but you'll just have to count them. |
| 8 | Get over to the ninth one. |
| 9 | A Okay. |
| 10 | Q Right down to sort of about 60 percent down is kind |
| 11 | of a thick email crowd, and it says Scott |
| 12 | Schweiger. Did you know who he was? |
| 13 | A Yes. He is an attorney for UHS. |
| 14 | Q Yeah. Travis, and then Minto, Oletha, I guess. Is |
| 15 | that right? |
| 16 | A Yes. |
| 17 | Q Do you know who MKJA is? |
| 18 | A I believe that is Dr. Anderson. |
| 19 | Q Yeah, John Anderson. And then Dr. Boehner? |
| 20 | A Yes. |
| 21 | Q Who is adconcept1@bellsouth.net? |
| 22 | A I don't know that one. |
| 23 | Q And then PL Paxton would be Dr. Paxton? |
| 24 | A Right. |
| 25 | Q Who is David Koyne, K-o-y-n-e? |

| | 62 |
|---|---|
| 1 | A I don't recognize that name. |
| 2 | Q Do you know who is Lisa Gibson? |
| 3 | A I do not recognize that name. |
| 4 | Q Do you know who is Debbie Brown? |
| 5 | A Debbie Brown used to be the medical record director |
| 6 | here at ARMC. |
| 7 | Q Where is she now? |
| 8 | A She retired. |
| 9 | Q Do you know who is dhugheslaw@bellsouth.net? |
| 10 | A I believe that is Dr. Paxton's attorney. |
| 11 | Q Do you know that attorney's name? |
| 12 | A I think it's David, but I'm not positive. |
| 13 | Q Does he live in Aiken? |
| 14 | A No. |
| 15 | Q Do you know where he lives? |
| 16 | A I don't. |
| 17 | Q Lois El, she's not a lawyer? |
| 18 | A No. |
| 19 | Q I've probably asked you this, but who is Mark |
| 20 | Miller? |
| 21 | A I'm sorry. Who? |
| 22 | Q Mark Miller. |
| 23 | A Mark Miller? |
| 24 | Q Uh-huh. |
| 25 | A Is -- I don't know his title, but he's part of UHS. |

| | 63 |
|---|---|
| 1 | Q He's an owner and a high up person? |
| 2 | A Yes. |
| 3 | Q Do you know if he's a lawyer? |
| 4 | A I don't know that. |
| 5 | Q As far as you know, he's not a lawyer? |
| 6 | A Right. |
| 7 | |
| 8 | (Whereupon, Service Line Assessment and |
| 9 | Action Items, consisting of 2 pages, was |
| 10 | marked Plaintiff's Exhibit No. 5 for |
| 11 | identification.) |
| 12 | |
| 13 | Q Can you identify Exhibit No. 5 to your deposition? |
| 14 | A No. |
| 15 | Q I'm going to ask Ms. Thompson to mark this and hand |
| 16 | you Exhibit No. 6. |
| 17 | |
| 18 | (Whereupon, Agenda, consisting of 1 |
| 19 | pages, was marked Plaintiff's Exhibit No. |
| 20 | 6 for identification.) |
| 21 | |
| 22 | Q Can you identify Exhibit No. 6? |
| 23 | A No. |
| 24 | Q So you don't prepare that -- an agenda for a |
| 25 | conference call with Frank Lopez? |

| | 64 |
|---|---|
| 1 | A No. |
| 2 | Q That's something Pat Jackson would probably do? |
| 3 | A I would think so, yes. |
| 4 | Q I'm going to hand you -- actually it's two |
| 5 | documents. |
| 6 | |
| 7 | MR. SOWELL: I'm going to ask Ms. Thompson to |
| 8 | staple these together, just because I think |
| 9 | they go together. We'll mark them as the next |
| 10 | exhibit and then I'll ask you about both of |
| 11 | them. |
| 12 | |
| 13 | (Whereupon, Nauful Statement of Services, |
| 14 | consisting of 2 pages, was marked |
| 15 | Plaintiff's Exhibit No. 7 for |
| 16 | identification.) |
| 17 | |
| 18 | Q And this is Exhibit No. 7. Do you recognize |
| 19 | Exhibit No. 7 to your deposition? |
| 20 | A Yes. |
| 21 | Q This is Ernie Nauful's interim statement for |
| 22 | services? |
| 23 | A Yes. |
| 24 | Q And he sent that to ARMC in care of Celeste Jones? |
| 25 | A Yes. |

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

65

1   Q   And she sent it to you --
2   A   Yes.
3   Q   -- for payment, correct?
4   A   Yes.
5   Q   So the hospital paid him?
6   A   Yes.
7   Q   All right.
8
9       MR. SOWELL:  I'm going to ask Ms. Thompson to mark
10      this as Exhibit No. 8.
11
12          (Whereupon, National Practitioner Data
13          Bank document, consisting of 1 pages, was
14          marked Plaintiff's Exhibit No. 8 for
15          identification.)
16
17  Q   Do you recognize Exhibit No. 8?
18  A   Yes.
19  Q   Do you know who prepared the reporting part of
20      that?
21  A   I did with assistance from Gary Petok.
22  Q   And he is a UHS lawyer in Austin, Texas?
23  A   Yes.
24  Q   Have you had any interface with Gary Petok before
25      this affair?

---

66

1   A   Yes.
2   Q   So you have regular interface with him?
3   A   Yes.
4   Q   I mean, is he the primary counselor for ARMC at
5       UHS?
6   A   Depends on the issue.  He was for bylaws and
7       physician issues.
8   Q   All right.
9
10          (Whereupon, 1/5/11 Request, consisting of
11          1 pages, was marked Plaintiff's Exhibit
12          No. 9 for identification.)
13
14  Q   Ms. Thompson's handed you Exhibit No. 9 to your
15      deposition.  Do you recognize that?
16  A   Yes.
17  Q   You received that in your capacity as a physician
18      services person?
19  A   Yes.
20  Q   Because you respond to these, correct?
21  A   Yes.
22  Q   Now, you see that it was written on January the
23      5th.
24  A   Yes.
25  Q   And they requested a response as soon as possible?

---

67

1   A   Yes.
2   Q   And they wanted one to present on January the 10th,
3       2011?
4   A   Okay.
5   Q   Do you see that?
6   A   Yes.
7   Q   All right.
8
9           (Whereupon, 1/18/11 Response, consisting
10          of 1 pages, was marked Plaintiff's
11          Exhibit No. 10 for identification.)
12
13  Q   Ms. Thompson's handed you Exhibit No. 10 to your
14      deposition.
15  A   Yes.
16  Q   Is that your response to that Exhibit No. 9 letter?
17  A   Yes, it is.
18  Q   And it was sent on January 18, 2011?
19  A   Yes.
20  Q   And that's the same day that Dr. Muniz's privileges
21      were terminated?
22  A   January 18th?
23  Q   Yes.
24  A   I don't know the date the privileges were
25      terminated.

---

68

1   Q   Well, that's what it says here, so that's why I'm
2       asking.
3   A   Oh, okay.  Yes.  I see that.
4   Q   Now, back to Exhibit No. 10.  Do you know why that
5       letter was not sent before January 18th?
6   A   I do not.
7   Q   Was there any interim correspondence between you
8       and Bamberg with respect to their request?
9   A   No.
10
11          (Whereupon, Incident Summary Report,
12          consisting of 1 pages, was marked
13          Plaintiff's Exhibit No. 11 for
14          identification.)
15
16  Q   Now, can you identify Exhibit No. 11 to your
17      deposition?
18  A   No.
19  Q   Do you know who would maintain these instant
20      summary reports?  I mean, is that peer review, or
21      who is that?
22  A   I'm not sure.
23  Q   But now, you are assistant to peer review now?
24  A   Now, yes.
25  Q   Have you seen something like this before in the

---

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

69

1       peer review meetings?
2   A   No.
3   Q   So you don't know who maintains --
4   A   No.
5   Q   -- this kind of record?  No?
6   A   No.
7   Q   All right.
8
9           (Whereupon, Affiliation Verification
10          Request, consisting of 1 pages, was
11          marked Plaintiff's Exhibit No. 12 for
12          identification.)
13
14  Q   The reporter has handed you Exhibit No. 12.  Can
15      you identify Exhibit No. 12?
16  A   Yes.
17  Q   And what is that?
18  A   It's a request from University Hospital for
19      affiliation verification.
20  Q   And it's dated October 15, 2008?
21  A   Yes.
22  Q   And it made its way to you?
23  A   Yes.
24  Q   To respond to it?
25  A   Yes.

70

1   Q   All right.  Did you inform Carlos Milanes that this
2       request had been received?
3   A   I don't typically do that.  I don't know if I told
4       them I had it or not.  I can't say.
5   Q   Okay.  And you sent it back on October 16?
6   A   Yes.
7   Q   With the information in the first block completed?
8   A   Yes.
9   Q   And the rest of it crossed out?
10  A   Yes.
11  Q   I'll show you Exhibit 13.
12
13          (Whereupon, Affiliation Verification
14          Explanation, consisting of 1 pages, was
15          marked Plaintiff's Exhibit No. 13 for
16          identification.)
17
18  Q   Is this the explanation that is referenced in
19      Exhibit No. 12?
20  A   Yes.
21  Q   So what you were telling them was that you needed a
22      release specific to peer review information in
23      order to answer the balance of the questions on
24      Exhibit No. 12?
25  A   Yes.

71

1   Q   Did you ever get that release?
2   A   No.
3   Q   Did you ever supplement what is in Exhibit No. 12?
4   A   No.
5   Q   Were you ever asked to by University Healthcare
6       Systems?
7   A   I don't recall being asked.
8   Q   Do you recall any communications with University
9       Healthcare Systems with respect to Exhibits No. 12
10      and 13 other than what's in Exhibits 12 and 13?
11  A   I don't -- sometimes I will get phone calls that
12      say why haven't you answered us.  You know, that
13      may have happened.  I don't remember.  But I -- I
14      would not have said anything other than you have my
15      response and we need a release.  I don't remember
16      any.
17  Q   A release for peer review information?
18  A   Right.
19  Q   Because that's what you believed was requested in
20      the balance of this request?
21  A   Yes.
22
23          (Whereupon, 10/23/08 Letter, consisting
24          of 1 pages, was marked Plaintiff's
25          Exhibit No. 14 for identification.)

72

1   Q   The reporter has handed you Exhibit No. 14.  Can
2       you identify that exhibit to your deposition?
3   A   Yes.
4   Q   This is an October 23, 2008 letter from the
5       Hospital Corporation of America to the ARMC --
6   A   Yes.
7   Q   -- that would have been received by you?
8   A   Yes.
9   Q   Did you understand this was in connection with an
10      application by Dr. Muniz for privileges at Doctors
11      Hospital Augusta?
12  A   All I knew was that it was for privileges at an HCA
13      facility.  I did not know where.
14  Q   All right.  Was this ever completed and returned?
15  A   I do not know.
16  Q   Well, if it had been, it should be in your records
17      --
18  A   Right.
19  Q   -- correct?
20  A   We would have a copy of it.
21  Q   So we would believe most probably it was not?
22  A   Correct.
23
24      MR. DAYHUFF:  Object to the form.
25      MR. SOWELL:  I'm going to ask Ms. Thompson to

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

73

1    staple these two pages together because I
2    think they belong together. If you think they
3    don't, you can tell us and we'll take them
4    apart.
5
6        (Whereupon, GA Credentialing Form,
7        consisting of 2 pages, was marked
8        Plaintiff's Exhibit No. 15 for
9        identification.)
10
11   Q  Now, that's Exhibit No. 15 to your deposition. Do
12      you recognize that?
13   A  Yes.
14   Q  Now, that is a Georgia Uniform Healthcare
15      Practitioner Credentialing application form?
16   A  Yes.
17   Q  Does that authorize you to give not only
18      credentialing information but also peer review
19      information? Look at paragraph six.
20
21      MR. DAYHUFF: Object to the form. It calls for a
22        legal conclusion.
23
24   Q  And paragraph seven.
25   A  It does say records and peer review information.

74

1    Q  This is a standard form, is it not?
2    A  Yes.
3    Q  It is the Georgia --
4    A  From Georgia, yes.
5    Q  Right. Well, that -- I mean, University Hospital
6       and Doctors Hospital are both in Augusta, Georgia?
7    A  Yes.
8    Q  This is -- then you don't object to a Georgia
9       Uniform Healthcare Credentialing application form,
10      do you?
11   A  No.
12   Q  Don't you get those all the time?
13   A  Yes.
14   Q  So am I correct that this authorization and release
15      of information form signed by Dr. Muniz would have
16      allowed you to provide both credentialing and peer
17      review information?
18
19      MR. DAYHUFF: Same objection. You can answer.
20
21   A  Yes. But legal advice told me to get a specific
22      release for peer review. They did not like this
23      one.
24   Q  And who was that?
25   A  That would be Matt Klein at UHS.

75

1    Q  So you actually talked to him about this particular
2       authorization and release of information form?
3
4       MR. DAYHUFF: Object. Mr. Sowell's attempting to
5         elicit communications you've had with
6         attorneys in this matter. So I'm sure he's
7         not doing that. So . . .
8       MR. SOWELL: The question is, is did she discuss
9         with Matt Klein. Not what she discussed --
10      MR. DAYHUFF: Okay.
11      MR. SOWELL: -- but did she discuss with him
12        Exhibit No. 15.
13      MR. DAYHUFF: That's fine.
14
15   A  Yes.
16   Q  So when this Exhibit No. 15 was received, there was
17      no further information that went out to either
18      University Hospital or Doctors Hospital with
19      respect to Dr. Muniz's applications for privileges
20      there?
21   A  Not that I can recall, no.
22   Q  And as far as you know, this Exhibit No. 15 was the
23      last thing you got?
24   A  Yes.
25   Q  And after that you did not have further

76

1    correspondence with either University Hospital or
2    Doctors Hospital?
3    A  No.
4    Q  Now, I'm going to show you what Ms. Thompson will
5       mark as Exhibit No. 16.
6
7        (Whereupon, Meeting Transcript 3/6/07,
8        consisting of 1 pages, was marked
9        Plaintiff's Exhibit No. 16 for
10       identification.)
11
12   Q  Do you recognize that?
13   A  Yes.
14   Q  All right. Tell me what it is.
15   A  It is the transcript from a meeting that Dr.
16      Anderson, as chief of staff, and Dr. Muniz and KD
17      Justyn had a meeting to discuss her behavior.
18   Q  Has that been kept in your records?
19   A  Yes.
20   Q  Do you see the last paragraph there? If you would,
21      just read that to yourself.
22   A  Yes.
23   Q  Do you see where it says, "That any future behavior
24      of this type will be dealt with according to the
25      medical staff code of conduct policy"?

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

77

```
1    A   Yes.
2    Q   And are you aware that there is a medical staff
3        code of conduct policy related to disruptive
4        physicians?
5    A   Yes.
6    Q   And is that what he's referring to?
7    A   Yes.
8    Q   Do you know if Dr. Muniz was ever after this
9        subjected to the medical staff code of conduct
10       policy for disruptive physicians?
11   A   I'm not aware of any.
12
13           (Off the Record)
14
15       MR. DAYHUFF:  These are new.  But in the interest
16           of moving along, I'll let you go ahead.
17
18           (Whereupon, 5/4/10 Letter, consisting of
19           3 pages, was marked Plaintiff's Exhibit
20           No. 17 for identification.)
21
22   Q   Can you identify Exhibit No. 17 to your deposition?
23   A   Yes.
24   Q   And that's a request from the Conway Medical Center
25       for information with respect to Dr. Muniz's
```

79

```
1    A   Right.
2    Q   And you respond to privileges applications directed
3        to Aiken Regional Medical Center?
4    A   Right.  But this is not directed to Aiken Regional.
5        This is directed to the chief of surgery, Dr.
6        Minto, for her opinion.
7    Q   Okay.  Did Dr. Minto tell you why she was not
8        responding to it?
9    A   She just said I don't feel comfortable answering
10       these questions.
11   Q   So neither one of you responded to it?
12   A   No.  I would not have responded to this, no.
13   Q   And as far as you know, she did not --
14   A   As far as --
15   Q   -- because she said she was not going to?
16   A   Correct.
17   Q   Did she say anything else to you with respect to
18       this particular document?
19   A   No.
20
21           (Whereupon, Affiliation Response,
22           consisting of 1 pages, was marked
23           Plaintiff's Exhibit No. 18 for
24           identification.)
25
```

78

```
1        application for privileges there?
2    A   Yes.
3    Q   Was it ever returned?
4    A   It was addressed to Dr. Minto.
5    Q   Did it make its way to you?
6    A   Dr. Minto brought it to me and said I'm not going
7        to answer this.  So as far as I know, she did not
8        answer it.
9    Q   Did you ever answer it?
10   A   It was not addressed to me, so no.
11   Q   Understood.  Did you ever answer it?
12   A   No.
13   Q   So it just went into the file and stayed there?
14       Your file?
15   A   Yes.
16   Q   Okay.  Well, I mean, you are the person responsible
17       for responding to these kinds of applications, are
18       you not?
19   A   I respond to affiliation requests from the -- you
20       know, to -- information from Aiken Regional.
21       Facilities will also ask for information from the
22       chief of surgery or the chief of staff.  Those are
23       handled by those physicians.
24   Q   Well, it says in here she holds privileges at Aiken
25       Regional Medical Center, right?
```

80

```
1    Q   Can you identify Exhibit No. 18?
2    A   Yes.
3    Q   Now, did you complete that response?
4    A   Yes, I did.
5    Q   All right.  And that's your signature on April 29,
6        2010?
7    A   Yes.
8    Q   Did you return it to the Carolina Pines Regional
9        Medical Center?
10   A   Yes.
11
12           (Whereupon, Email 5/4/10, consisting of 1
13           pages, was marked Plaintiff's Exhibit No.
14           19 for identification.)
15
16   Q   Ms. Thompson has handed you Exhibit No. 19.  Can
17       you identify that?
18   A   Yes.
19   Q   So this is a follow-up email from Chris Dale
20       Copeland at the Carolina Pines Regional Medical
21       Center in Hartsville?
22   A   Yes.
23   Q   There's a follow up to Exhibit No. 18 which was
24       your response?
25   A   Yes.
```

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

81

1  Q  So she was asking you for additional information?
2  A  Yes.
3  Q  And you did not give it to her?
4  A  No.
5  Q  Now, was that your own decision, or was that made
6     in concert with other persons?
7  A  With our legal.
8  Q  Who?
9  A  Gary Petok.
10
11        (Whereupon, 4/19/10 Affiliation Request,
12        consisting of 1 pages, was marked
13        Plaintiff's Exhibit No. 20 for
14        identification.)
15
16 Q  Now, can you identify Exhibit No. 20?
17 A  Yes.
18 Q  What is that?
19 A  That's an affiliation request from Palmetto Health.
20 Q  And did you respond to it?
21 A  I did.
22 Q  Do you know when?
23 A  I don't. It's not dated, so I don't know when it .
24    . .
25 Q  Now, it's got a facsimile date at the top, does it

82

1     not?
2  A  Right. But that's when I received it.
3  Q  Right. And actually, she -- she, Christina Lown or
4     Lown, L-o-w-n, signed for it April 19, 2010,
5     correct?
6  A  I don't know what you mean signed for it.
7  Q  Well, it just says up there at the top, signed,
8     Christina B. Lown. You see that up above where the
9     writing starts?
10 A  Up here?
11 Q  No. Go about -- yeah, right there. See where it
12    says, signed, Christina B. Lown?
13 A  That's when she sent it to me.
14 Q  Yeah, April 19, 2010?
15 A  Right.
16 Q  Do you know when you returned it?
17 A  I don't.
18 Q  But you completed it and you returned it?
19 A  Yes.
20 Q  But you did not complete paragraphs two through
21    five?
22 A  The questions, --
23 Q  Yes.
24 A  -- no.
25 Q  Why not?

83

1  A  Well, that was advice from legal. But we don't
2     respond to any peer -- it would be peer review
3     information. It's competency questions.
4  Q  Do you know what was attached to this?
5  A  I believe it would have been that same attachment
6     you saw with the other ones, --
7  Q  Right.
8  A  -- but it just listed the dates.
9  Q  Okay. That would be -- it's in here, but it'll be
10    the last one that shows up. It's Exhibit No. 10?
11 A  Yes.
12 Q  Okay. How long does it typically take to turn
13    these requests for information around?
14 A  I try to respond within a week, depending on what's
15    going on in the office and how busy we are.
16
17        (Whereupon, CREDENT request, consisting
18        of 1 pages, was marked Plaintiff's
19        Exhibit No. 21 for identification.)
20
21 Q  Ms. Thompson's handed you Exhibit No. 21. Can you
22    identify Exhibit No. 21?
23 A  Yes.
24 Q  Is that a request for information from the CREDENT
25    Verification and Licensing Services with respect to

84

1     Dr. Muniz?
2  A  Yes.
3  Q  It was sent to you on April 5, 2010?
4  A  Yes.
5  Q  Do you think the attachment is the same one?
6  A  It would be the same thing.
7  Q  But you sent it back on April 12, 2010?
8  A  Yes.
9  Q  You completed it and sent it back?
10 A  Yes.
11
12        (Whereupon, Affiliation Request
13        1/12/2010, consisting of 1 pages, was
14        marked Plaintiff's Exhibit No. 22 for
15        identification.)
16
17 Q  Can you identify --
18 A  Yes.
19 Q  -- Exhibit No. 22?
20 A  Yes.
21 Q  All right. And what is that?
22 A  It's another request for affiliation information.
23 Q  And that's directed to Sharon Hagan?
24 A  Yes.
25 Q  Somebody at Weatherby Locums in Ft. Lauderdale?

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

|  | 85 |
|---|---|
| 1 | A  Yes. |
| 2 | Q  And if you look at -- Do you know why that was not |
| 3 | completed and returned? |
| 4 | A  I don't.  I can't say that I even got it.  I mean, |
| 5 | I don't know. |
| 6 | Q  Well, you report to Sharon Hagan, right? |
| 7 | A  Yes. |
| 8 | Q  And she knows you do these kind of things? |
| 9 | A  Yes. |
| 10 | Q  So she probably would have given it to you? |
| 11 | A  Yes. |
| 12 | Q  But there's no evidence it was ever returned? |
| 13 | A  No. |
| 14 | Q  Now, what does it say up at the top? |
| 15 | A  Urgent, please respond. |
| 16 | Q  All right.  But as far as you know you never |
| 17 | responded? |
| 18 | A  No.  And, like I said, I don't know that -- that |
| 19 | even Sharon ever got it.  It's a fax. |
| 20 | Q  Well, I mean, it comes out of the ARMC records. |
| 21 | A  Uh-huh.  Oh, okay.  I'm sorry. |
| 22 | Q  See, look down at the bottom right-hand corner. |
| 23 | A  Right. |
| 24 | Q  You see that, ARMC? |
| 25 | A  Right. |

|  | 86 |
|---|---|
| 1 | Q  So it's somewhere here in the hospital.  And the |
| 2 | most logical place would be you. |
| 3 | A  It would, yes. |
| 4 | Q  All right.  I'm going to show you Exhibit No. 23, |
| 5 | which is two pages. |
| 6 | |
| 7 | (Whereupon, Weatherby Locums Request |
| 8 | 3/24/2010, consisting of 2 pages, was |
| 9 | marked Plaintiff's Exhibit No. 23 for |
| 10 | identification.) |
| 11 | |
| 12 | Q  Can you identify that document? |
| 13 | A  Yes. |
| 14 | Q  And what is that? |
| 15 | A  It's the same thing sent on a third date, March. |
| 16 | Q  Yeah.  March the 24th, 2010? |
| 17 | A  Yes. |
| 18 | Q  So it looks like -- it looks like it was sent first |
| 19 | on October the 6th, 2009. |
| 20 | A  Yes. |
| 21 | Q  And then it was sent on January the 12th, 2010. |
| 22 | A  Okay. |
| 23 | Q  Correct? |
| 24 | A  Yes. |
| 25 | Q  Then it was sent on March the 24th, 2010. |

|  | 87 |
|---|---|
| 1 | A  Yes. |
| 2 | Q  All right.  And the first evidence of any response |
| 3 | to it is this Exhibit No. 23 on March the 24th, |
| 4 | 2010? |
| 5 | A  Yes. |
| 6 | Q  Now, when it was originally sent in October 2009, |
| 7 | Dr. Muniz was not under suspension, was she? |
| 8 | A  October of 2009? |
| 9 | Q  Right. |
| 10 | A  I'd have to look at the dates.  I don't -- I don't |
| 11 | know.  I mean, I could look at that Exhibit No. 10. |
| 12 | Q  Okay.  That'll be good. |
| 13 | A  She was suspended through October 22nd.  So yes, |
| 14 | when we received that on the 16th she was |
| 15 | suspended. |
| 16 | Q  All right.  But she went off of suspension on |
| 17 | October the 22nd? |
| 18 | A  22nd, yes. |
| 19 | Q  And then you got another request on January the |
| 20 | 12th, 2010. |
| 21 | A  Yes. |
| 22 | Q  Which as best we can tell was never returned, |
| 23 | correct? |
| 24 | A  Right. |
| 25 | Q  And at that point in time her privileges were |

|  | 88 |
|---|---|
| 1 | active. |
| 2 | A  Yes. |
| 3 | Q  They were not under suspension. |
| 4 | A  Correct. |
| 5 | Q  But you did not return that request? |
| 6 | A  No. |
| 7 | Q  All right.  And then there was a third request |
| 8 | March the 24th, 2010 that was returned -- |
| 9 | A  Yes. |
| 10 | Q  -- showing that her privileges were suspended. |
| 11 | A  Yes. |
| 12 | Q  Why did you not return those prior two requests? |
| 13 | A  I can't answer that.  I would not have returned |
| 14 | anything without legal advice, so I can only -- |
| 15 | Q  Assume? |
| 16 | A  -- assume that I must have been told not to. |
| 17 | |
| 18 | (Whereupon, Trinity Affiliation Request, |
| 19 | consisting of 2 pages, was marked |
| 20 | Plaintiff's Exhibit No. 24 for |
| 21 | identification.) |
| 22 | |
| 23 | Q  Can you identify Exhibit No. 24? |
| 24 | A  Yes. |
| 25 | Q  And what is that? |

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

89

1    A    It's another affiliation request from Trinity
2         Hospital.
3    Q    And that was sent on February 17, 2010?
4    A    Sent -- yes.
5    Q    And that was a second request?
6    A    Yes.
7    Q    Do you know where the first request is?
8    A    I do not.
9    Q    Now, on February 17, 2010 Dr. Muniz was not under
10        suspension?  In other words, her privileges were
11        active according to that Exhibit No. 10.
12   A    February 17th?
13   Q    Yes.
14   A    Correct.  No -- yes, you're right.
15   Q    All right.  Now, the response to this was done by
16        Dr. DiBona on March the 5th, 2010?
17   A    Yes.
18   Q    Why did he respond to this?
19   A    I don't know, unless they asked for -- yeah,
20        department chief or chief of staff.  They asked for
21        that.
22   Q    Do you know why it wasn't returned the first time
23        it was requested?
24   A    I don't.
25   Q    Do you know why it wasn't returned the second time

---

90

1         it was requested before March the 5th, 2010?
2    A    We received it on March 2nd.
3    Q    Are you sure about that?
4    A    Received time March 2nd, 4:00 p.m., medical staff
5         office.
6    Q    Where is that?  Oh, down at the bottom.
7    A    Uh-huh.
8    Q    All right.
9    A    And then I would have given it to Dr. DiBona who
10        responded on the 5th.
11   Q    And that's from Trinity Hospital in Augusta?
12   A    Yes.
13   Q    Now, if there was a first request in your files, we
14        should have it, right?
15   A    Yes.
16
17            (Off the Record)
18
19            (Whereupon, Email 4/6/2010, consisting of
20             1 pages, was marked Plaintiff's Exhibit
21             No. 25 for identification.)
22
23   Q    Ms. Thompson's going to hand you Deposition Exhibit
24        No. 25.  Do you recognize that?
25   A    Yes.

---

91

1    Q    That's the email you sent to Shirley McIntosh --
2    A    Yes.
3    Q    -- to take Dr. Muniz off the internal directory?
4    A    Yes.
5    Q    What does that mean to take her off the internal
6         directory?
7    A    We have an internal phone directory which lists all
8         the physicians and their phone numbers and their
9         fax numbers.  So we put new physicians on and take
10        physicians who are no longer on staff off the list.
11        Shirley prints that as needed.
12   Q    Okay.  Isn't there also some sort of a physician
13        referral service inside the hospital?
14   A    It's not inside the hospital.  It is called Direct
15        Doctors.
16   Q    Exactly.
17   A    It's -- I don't -- I don't know where it's at.
18   Q    Yeah.  But she was taken off of that also?
19   A    Yes.  It's an Aiken referral number.
20
21            (Whereupon, OG/GYN Unassigned Cost
22             Schedule, consisting of 1 pages, was
23             marked Plaintiff's Exhibit No. 26 for
24             identification.)
25

---

92

1    Q    Do you recognize Exhibit No. 26?
2    A    Yes.
3    Q    What is that?
4    A    It is the OB/GYN unassigned cost schedule.
5    Q    And who prepares that?
6    A    I do.
7    Q    Who prepared this one for February 2010?
8    A    I did that.
9    Q    Now, who was on call for February the 23rd?
10   A    Brandon Daniels.
11   Q    Is that Junior Daniels?
12   A    Yes.
13   Q    The younger --
14   A    Yes.
15   Q    -- Dr. Daniels?  All right.  Now, you know Dr.
16        Muniz - because you went to the hearings and so on.
17        - You know she was called by the nursing staff to
18        come over and respond to the patient?
19   A    Yes.
20   Q    Do you know why?
21   A    I can tell you how the call schedule works and why
22        she would have been called there.  This is the
23        unassigned call schedule, which is a rotation of
24        all OB/GYNs, regardless of what group they belong
25        to.

---

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

93

1  Q  Right.
2  A  **Now, the groups have their own call schedules for**
3     **their patients.  And like Minto, Boone and Boehner,**
4     **they take care of their own.  Dr. Muniz and Dr.**
5     **Daniels and Dr. Bryan, as three different groups,**
6     **work together and cover all their patients.  So the**
7     **unassigned is Brandon Daniels, but Dr. Muniz was on**
8     **call for their group, so she took the call instead**
9     **of Brandon.**
10 Q  How do you know that?  What makes you believe that,
11    that she was on call on Tuesday, February the 23rd
12    for Brandon Daniels?
13 A  **Because she was called by the perinatal -- by the**
14    **OB department.  They have the group -- you know,**
15    **they know who's on call for the groups.  So they**
16    **would have known who to call.**
17 Q  So you're going -- you're sort of tracing it
18    backwards?
19 A  **Yeah.**
20 Q  You're saying because the perinatal -- it was labor
21    and delivery, was it not?
22 A  **Labor and delivery.**
23 Q  Because labor and delivery called her, you believe
24    that she was covering for Brandon Daniels?
25 A  **Yes.**

---

94

1  Q  But you don't know?
2  A  **I don't know that for sure.**
3  Q  You do know Brandon Daniels was on the schedule?
4  A  **On the unassigned schedule, yes.**
5  Q  Well, this was an unassigned patient.
6  A  **Yes.**
7  Q  Who came in off the street from Spartanburg.
8  A  **Yes.**
9  Q  So the person who should have been called would
10    have been Brandon Daniels.
11 A  **That's not the practice for the groups.  They take**
12    **each other's calls.**
13 Q  So what you're saying is that if Dr. Muniz was
14    taking call for Brandon Daniels on that day,
15    Tuesday, February 23rd, it would  have been
16    appropriate for the nursing staff to call her?
17 A  **Yes.**
18 Q  What if she were not taking calls for Brandon
19    Daniels on that day?
20 A  **Then she would have responded to them, "I'm not on**
21    **call."**
22 Q  Well, they should not have called her if she was
23    not taking calls then, --
24 A  **Right.**
25 Q  -- correct?

---

95

1  A  **Right.**
2  Q  All right.  Do you know who placed that call to
3     her?
4  A  **I do not.**
5  Q  Do you know if it was Jessie Ford?
6  A  **I don't know.**
7  Q  Is there any sort of record that they maintain
8     there at the nursing station on labor and delivery
9     about who is to be called?
10 A  **I don't know that.**
11 Q  So you don't know -- you don't know ministerially
12    how it came to be that she was called instead of
13    Brandon Daniels on February 23rd, 2010?
14 A  **No.**
15 Q  No?
16 A  **No.**
17 Q  But if she was not taking call for Brandon Daniels
18    on that Tuesday she should not have been called?
19 A  **Correct.**
20
21          (Whereupon, Minutes 3/3/10, consisting of
22           2 pages, was marked Plaintiff's Exhibit
23           No. 27 for identification.)
24
25 Q  Ms. Thompson has handed you Exhibit No. 27 to your

---

96

1     deposition.  Can you identify that document?
2  A  **Yes.**
3  Q  And these are some minutes that were done with
4     respect to a special called meeting of the Medical
5     Executive Committee on March 3rd, 2010?
6  A  **Yes.**
7  Q  And you prepared those minutes?
8  A  **Yes.**
9  Q  From your notes?
10 A  **Yes.**
11 Q  Which no longer exist?
12 A  **Correct.**
13 Q  Were those discarded at or about the time these
14    minutes were prepared?
15 A  **The notes?**
16 Q  Yes.
17 A  **Yes.**
18 Q  Is there any other record of this meeting other
19    than these minutes?
20 A  **No.**
21 Q  Okay.  Now, if you would, look in paragraph three.
22 A  **Okay.**
23 Q  Do you see where it says, "It was reported that the
24    medical record has also been sent to an outside
25    reviewer but the results are not back yet"?

---

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**97**

1  A  Yes.
2  Q  Now. Was that AllMed, Dr. Minassian?
3  A  I'm not sure, because there were two outside
4     reviews.
5  Q  Right. But --
6  A  So I'm not sure which one.
7  Q  Right. The other one was Dr. Roland?
8  A  Okay. Yes.
9  Q  Do you remember that?
10 A  Yes, I do.
11 Q  You testified --
12 A  Yes.
13 Q  And it says that the members suggested that an
14    additional outside review also be obtained,
15    correct?
16 A  Yes.
17 Q  All right. Now, where's the record of the
18    transmittal of these medical records to either Dr.
19    Minassian or Dr. Roland?
20 A  That would be in peer review.
21 Q  Who would have the autonomy or control over those?
22    Whose the person, the record person?
23 A  The person who would keep --
24 Q  Yes.
25 A  -- the information from AllMed and --

---

**98**

1  Q  The person who would send out the -- let me go back
2     and make sure this is straight. We're looking at
3     this paragraph three where it says it was reported
4     that the medical record has also been sent to an
5     outside reviewer. Yes?
6  A  Yes.
7  Q  Who would have sent that?
8  A  Physically sent that, it would have been -- when
9     was this, 2010?
10 Q  Uh-huh.
11 A  I believe it would be Rebecca Gardner, the peer
12    review coordinator, if she was here in March of
13    2010. But I don't think she -- I can't say when --
14 Q  But she'd have the records?
15 A  Yes.
16 Q  She's the current peer review coordinator.
17 A  Right.
18 Q  And therefore, if there's a record of that
19    transmittal, she would have it?
20 A  Yes.
21
22    MR. SOWELL: Travis, if there are any such records,
23       we would like to see them. A transmittal of
24       these medical records.
25

---

**99**

1  Q  Now, if we know that the Dr. Minassian went out
2     first, then Dr. Roland would have to be the
3     additional outside review, --
4  A  Okay.
5  Q  -- correct?
6  A  Yes.
7  Q  Now, has AllMed been traditionally used for outside
8     review here at the hospital?
9  A  As far as I know, AllMed has been used for several
10    years.
11 Q  Has Dr. Roland ever been used?
12 A  Not that I'm aware of.
13 Q  Do you know who chose Dr. Roland?
14 A  I'm not sure.
15 Q  Do you have any information about how he was
16    chosen?
17 A  I think it may have been Celeste, but I'm not
18    positive.
19 Q  Celeste Tiller Jones?
20 A  Yes.
21 Q  Now, when it says in the second paragraph this file
22    has been reviewed by the OB/GYN member of the peer
23    review committee, --
24 A  Yes.
25 Q  -- is that Dr. Besson?

---

**100**

1  A  Yes, it is.
2  Q  The second review is done by the chairman of
3     surgery. That's Dr. Minto?
4  A  Yes.
5  Q  And they both determined that treatment was delayed
6     for two hours?
7  A  Yes.
8  Q  Present for this meeting, for the people delineated
9     at the top to include Dr. Paxton, --
10 A  Yes.
11 Q  -- Dr. John Anderson and Dr. Oletha Minto, --
12 A  Yes.
13 Q  -- correct? Also Carlos Milanes, Sharon Hagan and
14    Scott Ansede, A-n-s-e-d-e.
15 A  Ansede.
16 Q  Ansede, yes.
17 A  Yes.
18 Q  And Terri Ergle?
19 A  Yes.
20 Q  And a motion was made to terminate Dr. Muniz's
21    medical staff appointment and privileges?
22 A  Yes.
23 Q  Did you have any record of who made the motion?
24 A  No. I don't -- I don't typically put the name.
25 Q  If there had been any discussion during this

---

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

101

1    meeting on March the 3rd, 2010 about some sort of
2    intermediate remedy for Dr. Muniz, for instance,
3    proctoring or reeducation, or something short of
4    termination of her privileges, you would have
5    recorded that in these minutes?
6  A  Yes.
7  Q  So there was no such discussion?
8  A  If it's not in the minutes, then no.
9  Q  Do you try to keep accurate minutes?
10 A  Yes.
11 Q  Detailed accurate minutes?
12 A  They're not real detailed.  It's a summary of the
13    discussion.  If there was items of discussion, I
14    may just list them, you know.  But I don't put
15    names and all that detail.
16
17        (Whereupon, Minutes 3/9/10, consisting of
18         1 pages, was marked Plaintiff's Exhibit
19         No. 28 for identification.)
20
21 Q  Ms. Thompson has handed you Exhibit No. 28 to your
22    deposition.
23 A  Okay.
24 Q  Do you recognize that document?
25 A  Yes.

102

1  Q  And what is that?
2  A  That's the minutes from the March 9th meeting.
3  Q  Also attended by Dr. Paxton, Dr. John Anderson, and
4    Dr. Oletha Minto?
5  A  Yes.
6  Q  And, of course, Dr. DiBona who was the chief of
7    staff at the time?
8  A  Yes.
9  Q  And Dr. DiBona also attended the meeting on March
10    the 3rd?
11 A  Yes.
12 Q  And again, there was a motion made to terminate Dr.
13    Muniz's medical staff appointment and privileges.
14 A  Yes.
15 Q  And there was no discussion of any sort of an
16    intermediate type of remedy or penalty to be
17    imposed upon her other than termination of her
18    privileges?
19 A  No.
20 Q  And the outside reviews, neither one of them were
21    back at that point?
22 A  Correct.
23
24        (Whereupon, 3/16/2010 Letter, consisting
25         of 2 pages, was marked Plaintiff's

103

1        Exhibit No. 29 for identification.)
2
3  Q  Ms. Thompson marked and to show you Exhibit No. 29
4    to your deposition.  Can you identify that
5    document?
6  A  Yes.
7  Q  All right.  It's dated March the 16th, 2010?
8  A  Yes.
9  Q  Do you know if either one of the outside peer
10    reviews had been received as of March 16th, 2010?
11 A  I believe they were.
12 Q  Both of them?
13 A  Yes.  I'm not positive because I don't have the
14    dates we receive them.  But based on the minutes
15    here and this letter, I would say that we got those
16    reviews and that's why this letter went out.
17 Q  Who would have a record of when those reviews were
18    received back at ARMC?
19 A  That should be in the peer review records.
20 Q  So Rebecca Gardner?
21 A  Yes.
22
23    MR. SOWELL:  Travis, if there's any record of when
24      those were received, we would like to see
25      them.

104

1  Q  Did you participate in the preparation of Exhibit
2    No. 29?
3  A  Yes.
4  Q  How?
5  A  The information from the minutes of the med exec
6    committee.  I put -- the bylaws -- I put together
7    the body of the letter and then get advice from
8    legal counsel on how to tweak it.
9  Q  Do you see that the basis of the recommendation was
10    that three line paragraph about medical record
11    227589?
12 A  Yes.
13 Q  And you took that from the records of the
14    deliberations of the Medical Executive Committee?
15 A  Yes.
16
17        (Short Break)
18
19        (Whereupon, Email 2/12/2010, consisting
20         of 1 pages, was marked Plaintiff's
21         Exhibit No. 30 for identification.)
22
23 Q  Ms. Thompson is handing you Exhibit No. 30.  Can
24    you identify that?
25 A  Oh, okay.  I didn't know who this person was.  I

Thompson Court Reporting, Inc.
www.thompsonreporting.com

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

105

1    guess it's just an email from Bamberg.
2  Q   About a reference verification on Dr. Hein-Muniz?
3  A   It says, "I will be faxing over a reference."
4  Q   Right.
5  A   Okay.
6  Q   What is this question about does either of those two
7      have a current PPD there?
8  A   That's a TB test.  Some facilities require that
9      doctors have a TB.
10 Q   Do you know if you ever responded to this request?
11 A   I don't know.
12 Q   Well, we don't have any record of it, of any
13     reference verification.
14 A   We do have the Bamberg.
15 Q   We do but, I mean, it's almost a year later.
16 A   Oh, okay.  No, I -- I don't know.
17 Q   What is a reference verification?
18 A   It's what we call an affiliation verification.
19 Q   So if there -- if one's not been produced by the
20     hospital, then there probably is not one?
21 A   Correct.
22 Q   And it was probably not responded to?
23 A   Correct.
24 Q   Now, with respect to Exhibit No. 29, if you look
25     back at it, if the Medical Executive Committee had

106

1      found any other basis for their recommendation, you
2      would have put it in this letter?
3  A   Correct.
4  Q   All right.  So what you put in this letter was the
5      basis of the MEC's recommendation --
6  A   Yes.
7  Q   -- that her clinical privileges and medical staff
8      membership be revoked?
9  A   Yes.
10
11          (Whereupon, 1/7/10 Letter, consisting of
12           1 pages, was marked Plaintiff's Exhibit
13           No. 31 for identification.)
14
15 Q   Do you recognize Exhibit No. 31?
16 A   Yes.
17 Q   Who prepared that letter?
18 A   I did.
19 Q   How were the hearing panel members chosen?
20 A   They were chosen by the CEO and the chief of staff.
21 Q   Dr. DiBona?
22 A   So this is for the hearing panel.
23 Q   Uh-huh.
24 A   Yes.  Yes.  That's how we chose the --
25 Q   Right.  So they would have been chosen by Carlos

107

1      Milanes who signed the letter --
2  A   Right.
3  Q   -- and Francis DiBona, chief of staff?
4  A   Yes.
5  Q   And with your aid, because you contacted MUSC for
6      somebody else and got a reference from Christopher
7      Robinson?
8  A   Correct.
9  Q   And you believe Ernie Nauful was provided by
10     Celeste Tiller Jones?
11 A   Yes.
12 Q   Do you recall at the 2009 hearing, the chair of
13     that was Dr. Ratliff, --
14 A   Yes.
15 Q   -- Jack Ratliff, your -- is he your bylaws man now?
16 A   He is now, yes.
17 Q   Yeah.  So there was no hearing officer for that
18     hearing?
19 A   No.
20 Q   Then there was a hearing officer for this hearing?
21 A   Yes.
22 Q   Do you know why?
23 A   I don't know why.  The bylaws allow for either --
24     either way.
25

108

1          (Whereupon, AllMed Peer Review,
2           consisting of 5 pages, was marked
3           Plaintiff's Exhibit No. 32 for
4           identification.)
5
6  Q   Can you identify Exhibit No. 32?
7  A   Yes.
8  Q   And is that the AllMed hospital peer review related
9      to Muniz in this one case that was the subject of
10     her 2010 hearing?
11 A   Yes.
12 Q   This one's directed to Rebecca Gardner?
13 A   Yes.
14 Q   And it's dated March 15, 2010?
15 A   Yes.
16 Q   But you don't -- do you know when she received it?
17 A   I don't know when she received it.
18 Q   But there should be some record of that in her
19     office?
20 A   I don't know how she stamps, or whatever, for
21     receipt.
22 Q   Right.
23 A   The letter that we wrote though was dated March
24     16th.
25 Q   Oh, I know.

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

109

1  A  Okay.
2  Q  That's why I'm interested in when this was
3     received.
4  A  Yeah.
5  Q  You know, if it came by the slow boat in China, it
6     might have come in a month later.  I know.  I know
7     you don't know.  But we don't know, do we?
8  A  No.
9  Q  Based on what we've got here.
10  A  I don't know if they faxed it, or mailed it, or
11     overnighted it.  I don't know.
12
13     MR. SOWELL: Travis, I've got some yellow marks on
14        this one.  I got off track.  We can substitute
15        one without the yellow if you want to.
16     MR. DAYHUFF: That's fine.  Or I don't care if you
17        want to -- it doesn't matter to me either way.
18        It won't show up once it's copied, I don't
19        think.
20
21        (Whereupon, Dr. Roland Peer Review,
22        consisting of 27 pages, was marked
23        Plaintiff's Exhibit No. 33 for
24        identification.)
25

---

110

1  Q  Can you identify Exhibit No. 33?
2  A  Yes.
3  Q  Now, you see that date down there in the bottom
4     right-hand corner that says March 15, 2010?
5  A  Yes.
6  Q  Whose handwriting is that?
7  A  It kind of looks like Rebecca's.
8  Q  All right.  Now, look on the next page.  You see
9     where it says summary of labor?
10  A  Yes.
11  Q  3/25-26?
12  A  Yes.
13  Q  Does that look like March 25 and 26?
14  A  I don't know.  I would think so, yeah.  It looks
15     like a date, March 25th to March 26th.
16  Q  Do you know when Dr. Roland actually did his work
17     on this report?
18  A  I don't.
19  Q  Do we have a bill from him for his services?
20  A  I'm sure we do.
21
22     MR. SOWELL: Travis, we'd like to see the bill,
23        because I don't think we've ever seen it.
24
25  Q  But, again, Rebecca Gardner should know when this

---

111

1     report came in?
2  A  Yes.
3  Q  And these are the two peer reviews that the Medical
4     Executive Committee wanted to see?
5  A  The outside reviews, yes.
6  Q  Yes.  There were no others?
7  A  No.
8  Q  Of course, if he had made his report on March the
9     25th and 26th, it would not have been received
10     before the letter of March 16?
11  A  Correct.
12
13        (Whereupon, Hysterectomy Summary,
14        consisting of 1 pages, was marked
15        Plaintiff's Exhibit 34 for
16        identification.)
17
18  Q  Can you identify Exhibit No. 34?
19  A  No.
20  Q  Does that look like a peer review document, or
21     quality control type document?
22  A  Some quality document, but I don't know that it
23     would be from peer review.
24  Q  Okay.  Are they different, quality control, or QIC
25     or whatever, and peer review?

---

112

1  A  It's two separate committees.
2  Q  Yeah.
3  A  QIC was just put together three months ago.
4  Q  Who had jurisdiction over quality before QIC was
5     put together?
6  A  We have a quality department.  Gail Hendricks is
7     the director of quality outcomes.
8
9        (Whereupon, AllMed Invoice, consisting of
10        1 pages, was marked Plaintiff's Exhibit
11        No. 35 for identification.)
12
13  Q  Ms. Thompson's going to hand you Exhibit No. 35.
14     Can you identify Exhibit No. 35?
15  A  Yes.
16  Q  What is that?
17  A  It's an invoice for -- from AllMed.
18  Q  Okay.  Back in November of 2007?
19  A  Yes.
20  Q  For two hospital peer reviews?
21  A  Yes.
22  Q  So they had been doing these peer reviews for ARMC
23     at least as far back as November of 2007?
24  A  Yes.
25  Q  That's the same AllMed that did the first peer

---

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

113

1    review on Dr. Muniz?
2    **A    Yes.**
3
4            (Off the Record)
5
6            (Whereupon, Code of Conduct for
7            Disruptive Behavior Policy & Procedure,
8            consisting of 4 pages, was marked
9            Plaintiff's Exhibit 36 for
10           identification.)
11
12   Q    Do you recognize -- okay, I should say this.  Ms.
13        Thompson handed you Exhibit No. 36.  Can you
14        identify it?
15   **A    Yes.**
16   Q    That is the policy and procedure regarding code of
17        conduct for disruptive conduct?
18   **A    Yes.**
19   Q    The one that was referenced in Dr. Anderson's
20        letter?
21   **A    Yes.**
22
23           (Whereupon, 2/25/2010 Letter, consisting
24           of 6 pages, was marked Plaintiff's
25           Exhibit No. 37 for identification.)

---

114

1    Q    Can you identify Exhibit No. 37?
2    **A    Yes.**
3    Q    Now, did you prepare that letter?
4    **A    Yes.**
5    Q    In conjunction with whom?
6    **A    Dr. DiBona, Dr. Minto and Carlos.**
7    Q    Anybody --
8    **A    And, of course, our legal counsel, Gary.**
9    Q    Do you know why Dr. DiBona, Dr. Minto and Carlos
10        all signed this letter?
11   **A    The bylaws allow for one or all and they decided to**
12        **just all do it together rather than it being just**
13        **one person.**
14
15           (Whereupon, Undated Letter - Response to
16           3/23/2010 Letter of Muniz, consisting of
17           6 pages, was marked as Plaintiff's
18           Exhibit No. 38 for identification.)
19
20   Q    Ms. Thompson just handed you Exhibit No. 38.  Can
21        you identify that document?
22   **A    Yes.**
23   Q    Did you prepare that document?
24   **A    Yes.**
25   Q    In conjunction with whom?

---

115

1    **A    Our legal counsel and, of course, Carlos, because**
2        **he's the one who signed it.**
3    Q    Anybody else?
4    **A    No.**
5    Q    Now, when you say legal counsel, you mean UHS?
6    **A    Gary Petok, yes.**
7    Q    Gary Petok.  And the second paragraph, where it
8        says, "The hearing panel will consider the
9        recommendation of the Medical Staff Executive
10        Committee that your clinical privileges and medical
11        staff membership be revoked.  The recommendation of
12        the Medical Staff Executive Committee was based
13        upon the following," and then you've got that
14        paragraph about medical record number 227589,
15        correct?
16   **A    Yes.**
17   Q    Where did that come from?
18   **A    What, that paragraph?**
19   Q    Yes.
20   **A    That was from the med exec minutes with their**
21        **recommendation.**
22   Q    And then in the following paragraph it says, "The
23        recommendation of the Medical Staff Executive
24        Committee is further based upon your history,
25        including the prior peer review proceeding in which

---

116

1    the Board of Governors require that you submit to
2    an evaluation," and so on.  Do you see that?
3    **A    Yes.**
4    Q    Where did that come from?
5    **A    That came from our legal advice.**
6    Q    So Gary Petok?
7    **A    Yes.**
8    Q    Not from the MEC minutes?
9    **A    No.  The MEC minutes were only that one case.**
10   Q    Yeah.  Which was medical record number 227589?
11   **A    Correct.**
12
13           (Whereupon, 9/24/10 Letter w/ attached
14           Report, consisting of 6 pages, was marked
15           Plaintiff's Exhibit No. 39 for
16           identification.)
17
18   Q    Can you identify Exhibit No. 39 to your deposition?
19   **A    Yes.**
20   Q    Now, is that the first report of the hearing panel?
21   **A    Yes, it is.**
22   Q    And who prepared that letter?
23   **A    I would have prepared the letter.**
24   Q    In conjunction with whom?
25   **A    With Gary Petok.**

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

117

1   Q   All right. Now, what about the report of the
2       hearing panel, who would have prepared that?
3   A   Ernie Nauful.
4   Q   Did you have any input with respect to the report?
5   A   No.
6   Q   Did he type it?
7   A   Yes.
8   Q   Are you sure he typed it?
9   A   Yes. Because I didn't.
10  Q   Well, you know you didn't.
11  A   I know I didn't.
12  Q   Yeah. So you don't know who did, but you know you
13      did not?
14  A   Correct.
15  Q   And as far as you know, it came from him?
16  A   Yes.
17  Q   He was the source of it?
18  A   Yes.
19
20          (Whereupon, Revised Report, consisting of
21          5 pages, was marked Plaintiff's Exhibit
22          No. 40 for identification.)
23
24  Q   Now, can you identify Exhibit No. 40 as the revised
25      report of the hearing panel?

118

1   A   Yes.
2   Q   Now, if you look at 39 and compare it with 40, you
3       will see that 39 has eight grounds for the
4       recommendation. Do you see that?
5   A   Yes.
6   Q   And you see that 40 has an additional ground number
7       nine?
8   A   Yes.
9   Q   This thing about practitioner's lack of candor?
10  A   Yes.
11  Q   Do you know where that came from?
12  A   Just their deliberation.
13  Q   After the burden of proof had been changed?
14  A   Correct.
15  Q   Do you know who initiated the addition of number
16      nine?
17  A   I do not.
18  Q   Did you have anything to do with the appointment or
19      conduct of the activities of the appeal review
20      panel?
21  A   No.
22  Q   Did you attend that appeal review panel proceeding?
23  A   Yes.
24  Q   In what capacity?
25  A   The same as the others, just as a process person,

119

1       just to make sure they understood what they were --
2       you know, what the process was.
3   Q   How long did they deliberate before they concluded
4       to affirm the recommendation of MEC?
5   A   I want to say we were there a couple of hours.
6   Q   Did you keep any notes of those deliberations?
7   A   No.
8   Q   And that's Dr. Collins -- well, no, it wasn't. It
9       was Dr. Collins, Sam Kelly and a third person, Ms.
10      Clyburn, I believe.
11  A   Clyburn.
12  Q   Beverly Clyburn?
13  A   Yes.
14  Q   Was there ever any discussion about not affirming
15      the recommendation of the hearing panel?
16  A   No.
17  Q   Okay. Did the appellate review panel ever state
18      why they believed the recommendation of the hearing
19      panel should be affirmed or upheld?
20  A   I don't recall. I mean, there was lots of
21      discussion, but I don't recall any.
22  Q   Who else was present for those discussions other
23      than you?
24  A   No one.
25  Q   So it was you and those three people?

120

1   A   Yes.
2   Q   And nobody else?
3   A   No.
4
5           (Whereupon, 12/17/10 Letter, consisting
6           of 2 pages, was marked Plaintiff's
7           Exhibit No. 41 for identification.)
8
9   Q   Do you recognize Exhibit No. 41?
10  A   Yes.
11  Q   Who prepared that?
12  A   I did.
13  Q   In conjunction with whom?
14  A   Carlos and our legal counsel.
15  Q   Gary Petok?
16  A   Yes.
17  Q   And you said, I think, you did not participate in
18      the deliberations at the Board of Governors?
19  A   No.
20  Q   You were not present?
21  A   No.
22  Q   Did the appellate review panel ever discuss any
23      intermediate steps with respect to Dr. Muniz other
24      than termination of her privileges?
25  A   There was no recommendation of anything like that.

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

121

1   no.
2
3   MR. DAYHUFF:  David, can you do me a favor?  I have
4       not been getting any copies of most of the
5       stuff, which is fine.  I would like, and I
6       think Biff probably has one for me, each of
7       those exhibits that has to do with her
8       applications elsewhere, so I can use that.
9       I'm going to have the court reporter send back
10      by day after tomorrow.
11  MR. DICK:  You need each of the applications?
12  MR. DAYHUFF:  Right.  He should have a copy for me
13      over there.  What I'm saying is can I have a
14      copy of it to take with me today.
15  MR. SOWELL:  Those new ones.
16  MR. DICK:  Yeah, the new ones?
17  MR. DAYHUFF:  Right.  You don't have -- well, the
18      new ones.  Well, you sent me the old ones
19      yesterday.  You're right.
20  MR. SOWELL:  Yeah.
21  MR. DAYHUFF:  I have those.  Just the new ones then.
22      That would be perfect.  Okay.
23  MR. DICK:  Well, yeah, he'd have the only other
24      copy of that.
25  MR. DAYHUFF:  Oh, I'm sorry.  You don't have

122

1       multiple copies?
2   MR. DICK:  I only have two.  I had two copies of
3       those.  I'm sorry.
4   MR. DAYHUFF:  That's all right.  Well, just shoot me
5       those before Muniz's deposition.
6   MR. DICK:  Okay.
7
8   Q   Now, do you understand that Pat Jackson audiotaped
9       in some way, shape or form the Board of Governors
10      meetings?
11  A   Yes.
12  Q   Do you also understand that she does not retain
13      those audiotapes?
14  A   Correct.
15  Q   Why is that?
16  A   She does the same thing I do.  It is strictly for
17      memory for the minutes.  She types -- she listens
18      to the tapes, types the minutes, and then destroys
19      the tape.
20  Q   Would she have been subject to the same admonition
21      or instruction from counsel not to destroy any
22      electronic or other records related to Dr. Muniz?
23  A   I don't believe she was on that list.
24  Q   Who sent out that list?
25  A   I guess it came from Celeste.

123

1       (Off the Record)
2
3   Q   This is Exhibit No. 33 for the deposition of Carlos
4       Milanes.  Have you ever seen that document?
5   A   I can't say.
6   Q   But you received that instruction?
7   A   Yes.  Yes, I did.
8   Q   From Celeste?
9   A   Yes.
10  Q   And you think Pat Jackson probably did not receive
11      that instruction from Celeste?
12  A   Correct.
13  Q   Okay.  That's an email from me to Jane Trinkley
14      dated March 16th, 2010?
15  A   Yes.
16  Q   I assume you did not tape audiotape, or whatever,
17      the deliberations of the appellate review?
18  A   No.
19  Q   Did you ever have any substantive input to the
20      hearing panel?
21  A   No.
22  Q   Carlos Milanes testified in his deposition that he
23      had a summary of what happened at the hearing.
24      Now, if he had one, I'm assuming it came from you.
25      I'm just telling you what he said.

124

1   A   There was no summary written down and given to
2       Carlos.
3   Q   Did you provide any information from Carlos while
4       the hearing panel was conducting its deliberations
5       about what was going on in the hearing panel?
6   A   I provided to Sharon, my boss, just a verbal how
7       are things going, and that -- that's it.
8   Q   And she reports to Carlos?
9   A   Right.
10  Q   Is her office next door to his?
11  A   No.  It's around the corner.
12  Q   But it's in that suite --
13  A   It's in the suite.
14  Q   -- on the sixth floor?
15  A   Yes.
16  Q   But there were no written reports --
17  A   No.
18  Q   -- of the deliberations?  Have there been any other
19      hearings to revoke the privileges of any other
20      physician here in the last five years?
21
22      MR. DAYHUFF:  Without mentioning anybody's name.
23
24  A   Yes.
25  Q   How many?

Thompson Court Reporting, Inc.
www.thompsonreporting.com

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

125

1  A  In the last five years?
2  Q  Yes.
3  A  I would say one other.
4  Q  What was the outcome of that proceeding?
5  A  The physician left.
6  Q  All right. Before his or her privileges were
7     revoked?
8  A  No.
9  Q  Were they revoked?
10 A  A privilege was revoked.
11 Q  Okay. So not all of the privileges?
12 A  Not everything, but he chose to leave.
13 Q  So a component privilege was revoked and he chose
14    to leave?
15 A  Yes.
16 Q  And that was in the last five years?
17 A  I think so, yes.
18 Q  What kind of doctor was he?
19
20    MR. DAYHUFF: Don't answer that. I think that's
21    too --
22
23 Q  Well, let me ask -- I'll put it another way. Was
24    it an OB/GYN?
25 A  No.

126

1  Q  All right. Let's go back another five years.
2     Let's say in the last 10 years. Are there any
3     other physicians whose privileges have been the
4     subject of a hearing in the last 10 years? So
5     you'd be going back five more years.
6  A  Yeah.
7  Q  We've got the one.
8  A  I have been involved in three hearings. Well, four
9     if you count Dr. Muniz as two.
10 Q  Right.
11 A  So, yes, there were two others.
12 Q  And one of them was this one in the last five
13    years?
14 A  Correct.
15 Q  What was the other one?
16
17    MR. DAYHUFF: No names, no practice areas, nothing
18    that would identify.
19
20 A  There was a hearing on a physician to revoke a
21    particular type -- a speciality of privileges,
22    because he didn't meet the criteria.
23 Q  And did it happen?
24 A  Yes, it did happen.
25 Q  Did he remain at the hospital?

127

1  A  No.
2  Q  He left?
3  A  He left.
4  Q  So has there been any hearing in the last 10 years
5     to totally and utterly revoke anybody's privileges
6     other than Dr. Muniz?
7  A  No.
8  Q  Has ARMC been the subject of any lawsuits in the
9     last five years?
10 A  That, I would have no knowledge of.
11 Q  I'm just going to show you Travis's letter of
12    August the 11th written to David C. Dick that lists
13    all of the litigations and ask you if you know
14    anything about any of them.
15 A  Just Dr. Muniz.
16 Q  Right. Other than Dr. Muniz?
17 A  No, not -- no.
18 Q  Okay. Were you aware that Dr. Muniz, after the
19    incident on February 23rd, 2010 with respect to the
20    stillborn infant, had requested that the placenta
21    be sent outside the hospital for evaluation?
22 A  I heard that sitting in on the hearings, but no, I
23    would not be involved in that in any way.
24 Q  Do you know if Ernie Nauful has ever been otherwise
25    engaged by ARMC?

128

1  A  Not that I know of.
2  Q  Are you aware of whether ARMC in the last five
3     years has experienced other fetal deaths?
4  A  I do not know that.
5  Q  Are the physicians here required to provide
6     emergency call care as part and parcel of their
7     obligations pursuant to the bylaws?
8  A  Yes.
9
10    MR. DAYHUFF: Object to the form of the question.
11
12 Q  Did you have any communications with the members of
13    the 2010 hearing panel other than to set up
14    conferences?
15 A  No.
16 Q  Now, did you say that neither Carlos nor Sharon
17    Hagan vote at the MEC?
18 A  Correct.
19 Q  They just discuss?
20 A  Yes.
21
22    MR. SOWELL: Let's take a little short break.
23
24       (Short Break)
25

Thompson Court Reporting, Inc.
www.thompsonreporting.com

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

129

1   Q   Let's look back at the -- look back at Exhibit No.
2       30.  I'll just hand you these.
3   A   Okay.
4   Q   Exhibit No. 30 to Carlos' deposition.  There's an
5       email there from Ernie Nauful dated October the
6       11th, right?  Isn't that correct, up at the top?
7   A   Yes.  Yes, I see it.
8   Q   He sends the corrected report undated?
9   A   Yes.
10  Q   All right.  And it's appended.  I've got it right
11      here.  We looked at it before.
12  A   Right.
13  Q   And he sent that to you.  And does he say he wants
14      you to send it out to the other members of the
15      hearing panel?
16  A   "Provide a copy of this draft to the panel members
17      --"
18  Q   Yeah.
19  A   "-- and email to Dr. Robinson."
20  Q   All right.  Now, there was a meeting of the hearing
21      panel after that, correct?
22  A   Yes.
23  Q   And we know that the recommendation was dated
24      October the 12th.  So does that mean that that
25      meeting was either on the 11th or the 12th?

130

1   A   That meeting was on the 12th.
2   Q   Okay.  And you know that?
3   A   Yes.  Because we dated that report the day we were
4       sitting there in the room.
5   Q   And that was the last meeting?
6   A   Yes.
7   Q   Okay.  You can just drop that right there.  Now, do
8       you know why the McNair firm was terminated by the
9       hospital or the MEC?
10  A   I do not.
11
12      MR. DAYHUFF:  Object to the form of the question.
13         You can answer.
14
15  Q   You do not?
16  A   I do not.
17  Q   How did you find out about it?
18
19      MR. DAYHUFF:  Object to the form of the question.
20
21  A   I guess Carlos told me that we had new --
22  Q   Counsel?
23  A   -- or it may -- it was either Carlos or Gary Petok
24      who would have told me that we had new counsel.
25  Q   Okay.  Now, we talked about earlier that the two

131

1       reviewers who were referenced in the MEC minutes
2       that you made, that one chart --
3   A   Yes.
4   Q   -- were Dr. Oletha Minto?
5   A   Yes.
6   Q   And Dr. Cindy Besson?
7   A   Yes.
8   Q   Who chose them to make those reviews?
9   A   The peer review chairman, along with Rebecca, chose
10      Dr. Besson because she was the OB specialist on
11      peer review.  And when we got that one, then Carlos
12      and Dr. DiBona were meeting about that review and
13      said let's get one more, we want to be fair.  So we
14      got the department chairman, who just happened to
15      be an OB.
16  Q   And who -- who --
17  A   Dr. Minto.
18  Q   Right.  But who chose her?
19  A   That would have been Carlos and Dr. DiBona.
20  Q   Okay.  Are you aware that ARMC is recruiting a
21      doctor, an OB/GYN, now in conjunction with Aiken
22      Obstetrics and Gynecology Associates?
23  A   Yes.
24  Q   And are you participating in that?
25  A   I participate in the credentialing once a physician

132

1       is chosen.
2   Q   And apparently they've chosen one.
3   A   Yes.
4   Q   Has that person been credentialed?
5   A   Yes.
6   Q   Has that person arrived?
7   A   Yes.
8   Q   So that person is on staff?
9   A   Yes.
10  Q   Who is that person?
11  A   Jessica Keller.
12  Q   How long has she been here?
13  A   August 15th.
14  Q   All right.  And what did the hospital do to
15      participate in or cooperate in her recruitment?
16  A   That would be Sharon Hagan.  I don't -- I don't
17      have the details of that.
18  Q   Did UHS have any participation in her recruitment?
19  A   I know we have corporate recruiters that seek
20      physicians for our open positions.
21  Q   So probably they did?
22  A   Probably did.
23  Q   Yeah.  Now, have there been any other -- I was
24      asking you about hearings.  Have there been any
25      other cautionary or summary suspensions that you

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

133

1    know of in the last 10 years?  And just to give you
2    a point of reference, you know that Dr. Muniz was
3    the subject of a summary suspension.
4  A  Correct.
5  Q  That's the one that was signed by Carlos Milanes,
6    Oletha Minto, and Francis DiBona.
7  A  Yes.
8  Q  Has anybody else on staff here been the subject of
9    a summary suspension in the last 10 years?
10 A  That would be one of the other hearings we had,
11    yes.
12 Q  Okay.  And that was with respect to one component
13    of privileges?
14 A  Yes.
15 Q  So that person was not totally suspended, just that
16    one component was suspended?
17 A  Correct.
18 Q  Have there been any other persons, doctors, subject
19    to summary suspension in the last 10 years?
20 A  No.
21 Q  I'm going to show you --
22
23    MR. SOWELL:  We don't need to mark that.  That's
24      Exhibit No. what?
25    COURT REPORTER:  34 Milanes.

---

134

1  Q  34 to Carlos Milanes' deposition.  What is that?
2  A  That is my notice to the department managers at
3    ARMC that the physician is no longer on staff.
4  Q  That's because she was summarily suspended on
5    February the 25th, 2010?
6  A  Yes.
7  Q  So that was done before her privileges were
8    revoked?
9  A  Right.  But she was on suspension.
10 Q  Yeah.  Was she also removed from the website at
11    approximately that time?
12 A  I don't know the exact date of removing her from
13    the website.
14 Q  Who would have done that?
15 A  I would have given that information to marketing.
16 Q  Who?
17 A  Melissa Summer.
18
19    MR. SOWELL:  Thank you.
20
21          - - - - -
22          CROSS EXAMINATION
23 BY MR. DAYHUFF:
24 Q  A few questions, Ms. Ergle.  You mentioned to -- in
25    response to one of Mr. Sowell's questions, that you

---

135

1    provided oral reports regarding the deliberations
2    at the 2010 hearing panel.  I guess oral reports to
3    Ms. Hagan?
4  A  Yes.
5  Q  And you believe that she then provided reports to
6    Mr. Milanes after you?  Do you know if she provided
7    any reports to Mr. Milanes?
8  A  I don't know for sure, but probably.
9  Q  All right.  And I believe you described the nature
10    of your reports as kind of what's going on.  I
11    guess I wanted you to put some flesh on those
12    bones.  Are we talking about they got together and
13    met from this time to this time?  Tell me what kind
14    of reports you gave to Sharon.
15 A  Just information that may have come up.  How
16    witnesses did.  It was my notes that I took in
17    those --
18 Q  Okay.  I'm -- and I understand that you had notes
19    of the actual hearing itself.  I'm focused more
20    particularly on the time when you were sitting in,
21    and maybe I misheard this.  I understood you to say
22    that you sat in on the deliberations of the hearing
23    panel in 2010.
24 A  Yes.
25 Q  After the hearing was over --

---

136

1  A  Yes.
2  Q  -- their deliberations.
3  A  Yes.
4  Q  Did you provide oral reports of their deliberations
5    or not?
6  A  No.
7  Q  No.  Okay.  Then I misunderstood that.  So you did
8    not provide oral reports of the hearing panel
9    deliberation after the hearing to Ms. Hagan?
10 A  No.
11 Q  Okay.  Then I misunderstood.  You sat in on the
12    MEC's meetings in March of 2010 regarding Dr.
13    Muniz's peer review matter, right?
14 A  Yes.
15 Q  And you took minutes, is that right?
16 A  Yes.
17 Q  Okay.  Did the members of the medical staff who
18    were on the MEC at the time know in March of 2010
19    that Dr. Muniz, at the time this new case pops up,
20    was on 100 percent case review?
21 A  Yes.
22 Q  All right.  How did they know that?
23 A  That was reported to them.
24 Q  In the meeting?
25 A  In the meeting, yeah.

---

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

137

1  Q   All right. And did they know why she was on 100
2      percent case review?
3  A   No details were given to them.
4  Q   Okay. No details were given to them of the prior
5      cases --
6  A   Correct.
7  Q   -- at issue? And then this is a more specific
8      question, I guess. Did they know why she was under
9      100 percent case review? I understand the details
10     of the cases weren't given.
11 A   Some of them may have known, because they were in
12     other capacities. Dr. Anderson used to be chief of
13     staff. He was now on MEC. So there may have been
14     a couple that knew, yes.
15 Q   All right. And did the fact -- those -- those
16     members who -- apparently everybody knew she was
17     100 percent case review.
18 A   Yes.
19 Q   And some of the members knew that that 100 percent
20     case review had to do with a peer review hearing
21     back in 2009?
22 A   Correct.
23 Q   All right. Did those folks take into consideration
24     that 100 percent case review and what happened in
25     2009 in their decision making with respect to what

138

1      to do in 2010?
2  A   There was discussion, yes, on this has been going
3      on since '09, here we are again.
4
5      MR. SOWELL: Now, at what point are we talking
6          about, Travis?
7      MR. DAYHUFF: 2010, March MEC meeting is what we're
8          talking about.
9      MR. SOWELL: The 3rd or the 9th?
10     MR. DAYHUFF: I'm just talking about the meetings.
11         I'm not talking about any particular -- there
12         were two, I think.
13     MR. SOWELL: Yeah.
14     MR. DAYHUFF: I'm just getting her understanding of
15         what went on.
16     MR. SOWELL: Right. See, what I'm asking is, is it
17         the 3rd or the 9th?
18     MR. DAYHUFF: I don't know. I haven't asked that
19         question yet. Maybe you could follow up
20         maybe.
21
22 Q   I'm sorry. You were describing the discussion --
23 A   Yes.
24 Q   -- that I asked about.
25 A   Yes.

139

1  Q   Go ahead.
2  A   They just -- you know, there's lots of discussion
3      going back and forth.
4  Q   Uh-huh.
5  A   And yes, it was mentioned we've got a previous peer
6      review that's required the 100 percent review.
7      Here we are again.
8  Q   All right. Now, I understood you to say that there
9      were -- there was not, and I want to be sure. Was
10     there discussion of any of the details of the
11     specific five cases under review --
12 A   No.
13 Q   -- in 2009? No?
14 A   No.
15 Q   But there was discussion of the fact that there was
16     a prior peer review history at the MEC meetings in
17     March of 2010?
18 A   Yes.
19 Q   All right. Now, Mr. Sowell is chomping at the bit
20     to know whether you can tell us if that discussion
21     we've just described occurred at the --
22
23     MR. DAYHUFF: What are the two dates? March --
24     MR. SOWELL: I believe it's March the 3rd and March
25         the 9th.

140

1  Q   March 3rd or March 9th. Are you able to recall
2      that?
3  A   It would have been the first meeting, March 3rd.
4  Q   All right. So is it fair to say that the MEC's
5      consideration in March of 2010 was not solely
6      limited to the single case of the stillborn baby as
7      Mr. Sowell describes it?
8  A   Yes.
9  Q   Okay. So it wasn't in a vacuum? That they were
10     looking at one case in the vacuum?
11 A   Right.
12 Q   All right. You observed this MEC. What do you
13     believe motivated the members of the MEC in coming
14     to the recommendation that they came to in 2010?
15 A   The one thing that consistently was said by the
16     members was protection of our patients.
17 Q   All right. And this is kind of the flip side of
18     that question. Did you observe anything, and do
19     you believe that any of those folks were motivated
20     by improper motives, economic motives, anything
21     else that wouldn't be the motive you just offered
22     to me?
23 A   No.
24 Q   All right. Mr. Sowell went through the dates of
25     the meetings, and ultimately the recommendation

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

141

1    that went out from the MEC of revocation that Dr.
2    Muniz ultimately appealed and we had a hearing.
3    And he was drawing your attention to the dates when
4    you would have received the outside reviews.  Do
5    you recall that --
6  A  Yes.
7  Q  -- discussion?
8  A  Yes.
9  Q  We saw reflected in the minutes, and I'm not sure
10   if it was the 3rd or the 9th, you probably know,
11   that the MEC decided to hold their recommendation
12   until the receipt of outside reviews or --
13 A  Yes.
14 Q  Okay.  By the holding of that recommendation, what
15   did that mean, and what were they -- why were they
16   holding, why were they waiting for the outside
17   reviews?
18 A  **They wanted to be sure that the outside reviews**
19   **reflected the same opinion as the two reviews we**
20   **had inside.**
21 Q  Okay.  Knowing that, do you believe that the letter
22   of -- stating the recommendation for revocation
23   came out before or after the receipt of those
24   outside reviews?
25 A  **It was after the receipt of the outside reviews.**

142

1    **And I do remember something now, if I may?**
2  Q  Okay.  Do you need a -- sure.  Do you need an
3    exhibit?
4  A  **No.  The review from Dr. Roland we did get on the**
5    **date that you see where Rebecca wrote it down.**
6    **However, it was just that little paragraph on the**
7    **first page.  And Dr. Roland was called and asked to**
8    **give a more detailed review.  So we had his review**
9    **that said it was substandard care, but it was in a**
10   **small paragraph.  That's why you see March 25th.**
11
12   MR. SOWELL:  That one page.  It's March 15, but
13      it's that one page.
14
15 A  **Right.  But I'm saying the second half that was**
16   **dated March 25th or 26th.**
17 Q  Oh, yeah.  I got you.
18 A  **We got the detail after.  Correct.**
19 Q  Why do you think he only gave a little paragraph of
20   explanation?
21 A  **He thought that that's all he had to fill out.  We**
22   **asked him, you know, would you please . . . And he**
23   **said, well, I only had that one page.  I thought**
24   **that's what I was supposed to do.**
25 Q  All right.  And let me ask this.  My guess is, on a

143

1    -- when you have a physician who's suspended, is
2    there a sense of urgency to move things along --
3  A  Yes.
4  Q  -- or is it take your time, don't worry about it?
5  A  **No.  There is a sense of urgency.**
6  Q  Okay.  So would you have requested these folks --
7    and by these folks, I mean, the external reviewers
8    -- to get this stuff to you ASAP?
9  A  Yes.
10 Q  All right.  And I believe -- and I could pull it
11   out, but I believe the date of the Minassian review
12   was the 15th, is that right, or did I miss that
13   one?
14 A  **That's AllMed.**
15 Q  AllMed.
16 A  Yes.
17 Q  Is that right?  That's right.  Okay.
18 A  Yes.
19 Q  Mr. Sowell brought out a couple, I think they were
20   emails, or perhaps attachments to emails where you
21   were taking Dr. Muniz off directories and where
22   there was some discussion of taking her off Direct
23   Doctors.
24 A  Yes.
25 Q  Is it the case that anybody who is suspended or

144

1    revoked comes off those items?
2  A  Yes.
3  Q  Okay.  So that's not -- that wasn't special for
4    her?
5  A  No.
6  Q  Mr. Sowell went through a large number of -- what
7    did you call them? affiliated requests or . . .
8  A  Yes.
9  Q  Is that what they're called --
10 A  Yes.
11 Q  -- from other hospitals?  Okay.  Did you withhold
12   responses to any of those entities represented by
13   the exhibits Mr. Sowell showed you in an attempt to
14   thwart Dr. Muniz's efforts to get on staff anywhere
15   else?
16 A  No.
17 Q  All right.  Did you withhold responses until such
18   time as you can send them when she was back on
19   suspension?
20 A  No.
21 Q  You didn't manipulate any time frames like that?
22 A  No.
23 Q  Did anybody at ARMC or UHS suggest to you that
24   that's what you should do?
25 A  No.

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

145

1   Q   Did you treat -- let me ask you this. You
2       mentioned, for my edification, I guess, when
3       someone sends you a request for information about a
4       physician, just generally, do you provide -- and
5       let's say the form includes, hey, we want to know
6       peer review information, tell us the details of
7       suspensions or investigations or whatever, do you
8       ever provide that for a physician?
9   A   No.
10  Q   No?
11  A   No. We will give dates of staff, and they may ask
12      questions like, I don't know, are they in good
13      standing. Those kind of questions. But no, we
14      don't give peer review information.
15  Q   All right. There's some question about an HCA
16      affiliation request. It appeared to be dated 2007
17      or 2008. Do you recall that? I can pull that out
18      if you don't. I think it's Exhibit No. 12 or 13.
19
20      MR. DAYHUFF: Biff, have you got it over there?
21      MR. SOWELL: Yeah, I got it. I'll just hand it
22          over to you. It's in there.
23      MR. DAYHUFF: Okay, thank you.
24
25  Q   Well, here's part of it. There's this Georgia --

146

1       was the Georgia Uniform Request, was that part of
2       Mr. Sowell's question regarding the HCA one or not?
3   A   I believe it was.
4   Q   I think it was.
5   A   It's right there.
6   Q   Here's the HCA. All right. I'm sorry. Fourteen
7       and 15. I guess my -- it seemed to me that the
8       line of questioning seemed to imply that you may
9       not have sent this back in. I mean, do you recall?
10      I mean, this is October of 2008. Do you recall
11      whether or not you returned this or not?
12  A   I don't.
13  Q   Okay. That's a long time ago. That's why I asked.
14      And I know we don't have additional documentation
15      apparently on this, but the question was do you
16      recall whether you sent it back or not?
17  A   I do not.
18  Q   All right. Did you withhold responses -- strike
19      that. I've already asked that question. Let me go
20      to this one since I pulled it out. Number 16,
21      Exhibit No. 16. I believe you testified that this
22      was a record of a meeting between the chief of
23      staff, the CEO, and Dr. Muniz that was undertaken
24      pursuant to the disruptive physician policy, --
25  A   Yes.

147

1   Q   -- is that right? What was the underlying conduct
2       that caused this little meeting and this record of
3       the meeting? Do you know?
4   A   I do.
5   Q   All right. Tell me what that was.
6   A   Dr. Muniz was frustrated with the OR staff and
7       walked out of the OR room and said, "I left a
8       sponge in the patient. See if you can find it."
9   Q   Okay. Then what?
10  A   That is disruptive behavior.
11  Q   So what happened?
12  A   The OR staff had to continuing doing a sponge count
13      to be sure that one was missing, and then they had
14      to search the patient for this missing sponge.
15  Q   All right. Did they locate the sponge?
16  A   Yes.
17  Q   Where did they locate the sponge?
18  A   I'm not sure. It was in a patient cavity, I do
19      know, but I'm not positive. I can't --
20  Q   Did Dr. Muniz assist them in locating the sponge?
21  A   No. She left.
22  Q   Left the --
23  A   She left the OR.
24  Q   All right. And I think Mr. Sowell asked you if
25      there were ever any other occasions when she was, I

148

1       guess, is it fair to describe, this is counsel
2       pursuant to the --
3   A   Yes.
4   Q   -- disruptive physician policy?
5   A   The first step in the code of conduct policy is to
6       have a collegial discussion.
7   Q   And I think he asked you if there were any other
8       occasions that you knew of where she was counseled
9       or --
10  A   I don't know of any others.
11  Q   -- under the disruptive physician policy? You
12      don't know?
13  A   No.
14  Q   Okay. Have there been other instances where she
15      has been disruptive that you know of?
16
17      MR. SOWELL: I object to the form of the question.
18
19  Q   You can answer.
20  A   I guess being disruptive you may be -- you may call
21      the incident she had with me, where she had a
22      conversation on the phone with me with many, many
23      expletives concerning another physician. And it
24      had to do with the call schedule. She was not
25      happy with my interaction with the call schedule

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

149

1    and she wrote a letter to the CEO about me.  Called
2    me a liar and said that I had no business doing the
3    call schedule.
4    Q    All right.  Did you take any action against her for
5         that?  And by action --
6    A    I did not.
7    Q    -- I mean -- okay.  You did not.
8    A    I did not.
9    Q    I meant did you report this such that there could
10        be counseling?
11   A    I told Sharon Hagan, my boss, just because I said
12        this was my interaction I just had with Dr. Muniz.
13        I want you to know in case anything happens.  To
14        officially report her for treating me that way?
15        No, I did not.
16   Q    Okay.  And why didn't you do that?
17   A    Because I know the frustration that physicians
18        have, and I work with them every day and I don't
19        typically report a physician for just an outburst.
20   Q    So I couldn't -- you give physicians some leeway --
21   A    Yes.
22   Q    -- on issues like that?
23   A    Yes.
24
25        MR. SOWELL:  You're not leading, are you, Travis?

---

150

1         MR. DAYHUFF:  Is that an objection?
2         MR. SOWELL:  It's too late, I guess.
3         MR. DAYHUFF:  That's all right.
4
5    Q    Could you have reported her?
6    A    Yes, I could.
7    Q    Did you report her?
8    A    I did not.
9    Q    All right.  Mr. Sowell asked you a lot of questions
10        about the privilege log that my firm has put
11        together in this matter, in this case.  He asked
12        you questions about the identity of various people.
13   A    Yes.
14   Q    Do you know whether those folks who you identified
15        as non-attorneys were receiving information
16        protected by the attorney/client privilege or
17        acting on an attorney's instruction?  You wouldn't
18        know that, would you, --
19   A    I don't know.
20   Q    -- from that document?
21   A    No.
22   Q    Okay.  I asked you the question about the MEC
23        because I guess you observe them.  You didn't
24        observe the medical peer review committee during
25        the relevant time.  That's a new task for you,

---

151

1    right?
2    A    Correct.
3    Q    Did you observe --
4
5         MR. SOWELL:  Would you just hand me those?
6         MR. DAYHUFF:  Sure.
7         MR. SOWELL:  I'll be looking through them why
8             you're asking these questions.
9
10   Q    You obviously had some occasion to observe UHS
11        folks, members of your staff here.  Do you have any
12        concerns that those folks were engaged in any kind
13        of improper conduct, conspiracy.  We've had
14        allegations of conspiracy and things like that
15        raised in this case.  Let me ask it this way.  What
16        do you think motivated Carlos?  I guess he
17        participated in some of the decision making here.
18        What do you think motivated him?
19   A    He's purely patient care, and it was -- it was
20        specifically said in many of the MEC meetings is we
21        hate to affect a physician's livelihood, but we
22        have to protect our patients.
23   Q    All right.  You were around for the hearing in
24        2010, right?
25   A    Yes.

---

152

1    Q    Was there ever an occasion when Mr. Nauful, Dr.
2         Minto, Dr. Boehner, and Celeste got together
3         outside the presence of Mr. Sowell and Mr. Dick?
4    A    Not with Mr. Nauful, no.
5    Q    Okay, all right.  Well, certainly Celeste and Jane
6         got together with Minto, Boehner, the folks that
7         were prosecuting the case, right?
8    A    Correct.
9    Q    But not with Mr. Nauful?
10   A    No.
11   Q    Okay.  Why do you know that?
12   A    Because every time he walked through the door I was
13        with him.
14   Q    Okay, all right.  The MEC meetings in 2010, do you
15        know whether or not Dr. Minto voted?
16   A    Dr. Minto, I do know recused herself from the
17        voting.
18
19        MR. SOWELL:  What year was that?
20        MR. DAYHUFF:  2010.  Thank you.  Follow up?
21        MR. SOWELL:  Just a couple.
22
23        (Whereupon, Handwritten Hearing Notes,
24        consisting of 42 pages, was marked
25        Plaintiff's Exhibit No. 42 for

---

Terri Ergle - 8/23/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

153

1                identification.)
2
3                    - - - - -
4                RE-DIRECT EXAMINATION
5    BY MR. SOWELL:
6    Q    Can you identify Deposition Exhibit No. 42?
7    A    That would be my notes that I took during the
8         hearing.
9    Q    Which we talked about earlier?
10   A    Yes.
11   Q    Okay.  Looking back at Deposition Exhibit No. 29.
12        That's the March 16 letter that was written to
13        recommend the revocation of Dr. Muniz's privileges,
14        correct?
15   A    Yes.
16   Q    All right.  Now, we know from your testimony, or at
17        least we believe that we had the Minassian review
18        on the 15th of March and one page of Dr. Roland's
19        review on the 15th of March.
20   A    Correct.
21   Q    The first page?
22   A    Yes.
23   Q    That little -- that short -- shorter paragraph.
24   A    Little paragraph.
25   Q    All right.  Now, and we also know that whenever the

---

154

1         Medical Executive Committee meets you take the
2         minutes?
3    A    Yes.
4    Q    And that's universally true, is it not?
5    A    Yes.
6    Q    All right.  So we know that the Medical Executive
7         Committee did not meet again between the time they
8         received the outside peer reviews and the writing
9         of this letter which is Exhibit No. 29?
10   A    Correct.
11   Q    All right.  So who decided to send that letter out
12        without another meeting of the Medical Executive
13        Committee?
14   A    That was decided in the minutes of the March 9th
15        meeting that if both outside reviews came back --
16   Q    Right.
17   A    -- with a negative response, we would proceed with
18        this.
19   Q    All right.  Who decided that both of those outside
20        reviews had come back with a negative response?
21   A    That was given to Dr. DiBona as the chief of staff
22        --
23   Q    Yes.
24   A    -- and Carlos --
25   Q    Yes.

---

155

1    A    -- and the peer review.  Rebecca and the doctor who
2         was peer review chairman.
3    Q    Dr. Besson?
4    A    No.  The chairman would have been Dr. Robinson.
5    Q    All right.  But who decided that -- I understood
6         what you said about the Medical Executive Committee
7         had decided if they both came back negative or
8         whatever, not favorable is probably a better word
9         to use in medical buildings, that they were going
10        to proceed with termination, correct?
11   A    Correct.
12   Q    Right.  Who decided that the two reviews that came
13        back on March the 15th were negative, or not
14        favorable?
15
16        MR. DAYHUFF:  Asked and answered.  You can answer.
17
18   A    Dr. DiBona and Carlos.
19   Q    Okay.  And so, they made the decision to write this
20        letter?
21   A    Correct.
22   Q    Without any further meetings of the Medical
23        Executive Committee?
24   A    Correct.
25   Q    All right.  Now, the interaction you had with Dr.

---

156

1         Muniz where she wrote the letter --
2    A    Yes.
3    Q    -- she was mad at Dr. Besson, I think.
4    A    Correct.
5    Q    When was that?  What year approximately?
6    A    I don't remember.
7    Q    Was it, I mean, before 2009?
8    A    Yes.
9    Q    I think there's a record of it somewhere.
10   A    There is.
11   Q    But it was before 2009?
12   A    Yes.
13   Q    All right.  So there was no -- between the time the
14        outside reviews were received on March 15, and the
15        writing of this letter on March the 16th that
16        members of the MEC, other than Dr. DiBona, did not
17        review the outside reviews?
18   A    No.
19   Q    Dr. DiBona and Carlos reviewed the outside reviews
20        and decided to send this letter out, Exhibit No.
21        29?
22   A    We did make a phone call to each of the MEC members
23        to let them know we had the reports --
24   Q    Right.
25   A    -- and that we were proceeding.

---

Thompson Court Reporting, Inc.
www.thompsonreporting.com

**Terri Ergle - 8/23/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

157

1  Q   But they did not review them?
2  **A   But they did not review them.  They had the option,**
3  **but --**
4  Q   They did not?
5  **A   They did not.**
6
7      MR. SOWELL:  Thank you.
8      MR. DAYHUFF:  No follow up.  Thanks.
9
10             - - - - -
11         (Whereupon, at 3:11 p.m., the deposition
12         in the above-entitled matter was
13         concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

---

158

1          The witness reserved his/her right to review
2     the deposition transcript.  This transcript has
3     been made available to the witness with the
4     appropriate instructions to complete the review and
5     submit a signed errata sheet within the thirty (30)
6     days provided for by the SC Rules of Civil
7     Procedure.
8
9          Any corrections and/or changes requested and
10     submitted by the witness will be sealed under
11     separate cover and forwarded to the taking party
12     with instructions to place with this original
13     sealed transcript.
14
15
16
17
18
19
20
21
22
23
24
25

---

159

State of South Carolina  )
                          )          CERTIFICATE
County   of Lexington  )
         Be it known that the foregoing Deposition of
TERRI ERGLE was taken by Jennifer L. Thompson, CVR;

         That I was then and there a notary public in
and for the State of South Carolina-at-Large;
         That by virtue thereof I was duly authorized
to administer an oath;

         That the witness was by me first duly sworn to
testify the truth, the whole truth, and nothing but the
truth, concerning the matter in controversy aforesaid;

         The foregoing transcript represents a true,
accurate and complete transcription of the testimony so
given at the time and place aforesaid to the best of my
skill and ability;
         That I am not related to nor an employee of
any of the parties hereto, nor a relative or employee of
any attorney or counsel employed by the parties hereto,
nor interested in the outcome of this action.

         Witness my hand and seal 6 DAY OF SEPTEMBER,
2011

                          Jennifer J. Thompson
                          Jennifer L. Thompson, CVR

Notary Public for South Carolina
My Commission Expires: August 14, 2019

         This transcript may contain quoted material.  Such
         material is reproduced as read or quoted by the
         speaker.

---