# EXHIBIT S

to

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Civil Action No.: 1:10-cv-00986-JFA**

*Transcript from deposition of Carlos Milanes*

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

In the United States District Court
District of South Carolina
Aiken Division
Case No: 1:10-CV-00986-MBS

Margo J. Hein-Muniz, MD )
and Parkside Medical )
)
Consultants, LLC d/b/a )
)
Magnolia Medical, )
) Deposition
Plaintiff(s), ) of
vs. ) CARLOS A. MILANES
)
Aiken Regional Medical )
Centers, Universal Health )
Services, Inc., Aiken )
Obstetrics & Gynecology )
Associates, P.A., Carlos )
A. Milanes, K.D. Justyn, )
Oletha R. Minto, MD, James )
F. Boehner, MD, Robert D. )
Boone, MD, Jonathan H. )
Anderson, MD, Thomas P. )
Paxton, MD, )
)
Defendant(s), )

Deposition of CARLOS A. MILANES, taken before
Jennifer L. Thompson, CVR, Nationally Certified Verbatim
Court Reporter and Notary Public in and for the State of
South Carolina, scheduled for 3:00 p.m. and commencing
at the hour of 3:32 p.m., Monday, July 25, 2011, at the
office of Aiken Regional Medical Center, Columbia, South
Carolina.

Reported by:
Jennifer L. Thompson, CVR

Any court, party, or person who has purchased a
transcript may, without paying a further fee to the
reporter, reproduce a copy or portion thereof as an
exhibit pursuant to court order or rule or for internal
use, but shall NOT otherwise provide or sell a copy or
copies to any other party or person without the express
consent of the reporter and/or reporting agency.

APPEARANCES

For the Plaintiff(s):
Thornwell F. Sowell, Esquire
David C. Dick, Esquire
Sowell, Gray, Stepp & Laffitte, LLC
1310 Gadsden Street
P. O. Box 11449
Columbia, South Carolina 29211

For the Defendant(s):
Travis Dayhuff, Esquire
Nelson, Mullins, Riley, & Scarborough, LLP
1320 Main Street
Meridian/17th Floor
Columbia, South Carolina 29201

INDEX

Stipulations . . . . . . . . . . . . . . . . . 4
Direct Examination by Mr. Sowell . . . . . . . . 4
Cross Examination by Mr. Dayhuff . . . . . . . . 139
Re-Direct Examination by Mr. Sowell . . . . . . 153
Errata . . . . . . . . . . . . . . . . . . . 156
Certificate . . . . . . . . . . . . . . . . . 157

EXHIBITS

Plaintiff's Exhibit No. 1    Letter 2/25/2010 (5 pgs)
Plaintiff's Exhibit No. 2    Letter 3/16/2010 (2 pgs)
Plaintiff's Exhibit No. 3    Letter May 2010 (5 pgs)
Plaintiff's Exhibit No. 4    Letter 5/12/2010 (4 pgs)
Plaintiff's Exhibit No. 5    Letter 5/19/2010 (2 pgs)
Plaintiff's Exhibit No. 6    Letter 9/24/2010 (5 pgs)
Plaintiff's Exhibit No. 7    Letter 10/7/2010 (6 pgs)
Plaintiff's Exhibit No. 8    Letter 10/13/2010 (2 pgs)
Plaintiff's Exhibit No. 9    Letter 10/14/2010 (4 pgs)
Plaintiff's Exhibit No. 10   Letter 10/22/2010 (4 pgs)
Plaintiff's Exhibit No. 11   Letter 11/22/2010 (1 pg)
Plaintiff's Exhibit No. 12   Letter 12/7/2010 (1 pg)
Plaintiff's Exhibit No. 13   Letter 1/18/2011 (4 pgs)
Plaintiff's Exhibit No. 14   Email(1 pg)
Plaintiff's Exhibit No. 15   Disproportionate Share
                             Sheet(1 pg)
Plaintiff's Exhibit No. 16   Check requisition (1 pg)
Plaintiff's Exhibit No. 17   Email (1 pg)
Plaintiff's Exhibit No. 18   Call Agenda (1 pg)
Plaintiff's Exhibit No. 19   Email (1 pg)
Plaintiff's Exhibit No. 20   OPS Call Agenda (1 pg)
Plaintiff's Exhibit No. 21   Monthly Report (1 pg)
Plaintiff's Exhibit No. 22   Monthly Report (1 pg)
Plaintiff's Exhibit No. 23   Email (1 pg)
Plaintiff's Exhibit No. 24   Frank Lopez Agenda (1 pg)
Plaintiff's Exhibit No. 25   Email (1 pg)
Plaintiff's Exhibit No. 26   Email (2 pgs)
Plaintiff's Exhibit No. 27   Email (1 pg)
Plaintiff's Exhibit No. 28   Nat'l Practitioner
                             Databank Report (1 pg)
Plaintiff's Exhibit No. 29   Email (3 pgs)
Plaintiff's Exhibit No. 30   Email (4 pgs)
Plaintiff's Exhibit No. 31   Incident Summary Report (1
                             pg)
Plaintiff's Exhibit No. 32   Email (1 pg)
Plaintiff's Exhibit No. 33   Email (2 pgs)
Plaintiff's Exhibit No. 34   Email (1 pg)
Plaintiff's Exhibit No. 35   Calendar On-call Schedule
                             (2 pgs)
Plaintiff's Exhibit No. 36   KD Justyn Interview (4
                             pgs)
Plaintiff's Exhibit No. 37   UHS Monthly Report (1 pg)
Plaintiff's Exhibit No. 38   Email (1 pg)
Plaintiff's Exhibit No. 39   Email (2 pgs)
Plaintiff's Exhibit No. 40   Disruptive Conduct Policy
                             & Procedure (4 pgs)
Plaintiff's Exhibit No. 41   Letter 3/12/2010 (2 pgs)

4

```
 1              STIPULATIONS
 2      This deposition is being taken pursuant to the
 3   Federal Rules of Civil Procedure.
 4              - - - -
 5      The reading and signing of this deposition is
 6   reserved by the deponent and counsel for the
 7   respective parties.
 8
 9   Whereupon,
10      CARLOS A. MILANES, being duly sworn and
11   cautioned to speak the whole truth, the whole truth,
12   and nothing but the truth, testified and
13   deposed as follows:
14   Court Reporter:  State your full name for the
15   record, please.
16   Witness: Carlos Alberto Milanes
17              - - - -
18           DIRECT EXAMINATION
19   BY MR. SOWELL:
20   Q   Mr. Milanes, where were you born?
21   A   Havana, Cuba.
22   Q   At what age did you migrate to the United States?
23   A   1960.  I was seven years old.
24   Q   When were you born?
25   A   You're asking me when?
```

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**5**

1  Q   When.
2  A   **March 9, 1953.**
3  Q   And I assume you are by now a United States
4       citizen?
5  A   **I became a citizen in 1961.**
6  Q   After you arrived at seven years old in 1960, where
7       did you live?
8  A   **I lived in Miami, Florida.**
9  Q   And did you finish high school there?
10 A   **I did.**
11 Q   Where did you finish?
12 A   **Christopher Columbus High School.**
13 Q   And what did you do after you finished high school?
14 A   **I went to University of Florida.**
15 Q   And did you finish?
16 A   **Yes.**
17 Q   What year?
18 A   **My initial bachelor's degree, finished in 1975.**
19     **Then I went on to get a master's degree 1977. And**
20     **I went back to school in 1982 for another couple of**
21     **years and I received another master's degree, and I**
22     **graduated the second time in 1984.**
23 Q   What was the degree awarded in in terms of
24     discipline in 1975?
25 A   **Psychology.**

---

**6**

1  Q   And the master's degree in 1977?
2  A   **It was a dual master's in education and psychology.**
3  Q   And the 1984 master's?
4  A   **Was also a dual master's: one in business and one**
5      **in health care administration.**
6  Q   Were you employed during that period of time
7      between the commencement of your bachelor's degree
8      at the University of Florida and the completion of
9      your master's degree second time in 1984 at the
10     University of Florida --
11 A   **I was employed from -- I'm sorry.**
12 Q   One little issue.  One preliminary issue.  Let me
13     finish because the reporter will have trouble with
14     speaking over, and I'll try to do the same as well.
15         So back to the question.  Between the time you
16     commenced the University of Florida, I suppose in
17     about 1971, and you finished that dual master's in
18     1984, did you work?
19 A   **Yes.**
20 Q   Where?
21 A   **I worked in a couple different places in**
22     **Gainesville.**
23 Q   Doing what?
24 A   **As a mental health therapist, psychologist.**
25 Q   Any other work during that period of time?

---

**7**

1  A   **No.**
2  Q   When you finished that second master's in 1984,
3      what did you do?
4  A   **I started to work for a company call Humana.  And I**
5      **started to do what I'm doing now, healthcare**
6      **administration.**
7  Q   What was your first job for Humana?
8  A   **It was assistant administrator in one of their**
9      **hospitals in Alabama.**
10 Q   What was the name of that hospital?
11 A   **Humana Hospital Florence.**
12 Q   How long did you do that?
13 A   **I did that for approximately a year.**
14 Q   And then what?
15 A   **I was transferred to one of their other hospitals**
16     **in Pompano Beach called Humana Hospital Cypress.**
17 Q   Were you an assistant administrator there?
18 A   **I was promoted to be an associate administrator**
19     **there.**
20 Q   How long did you work there as associate
21     administrator?
22 A   **I was there until 1988.**
23 Q   What did you do after that?
24 A   **I was CEO at another company called Charter Medical**
25     **Corporation for a year.**

---

**8**

1  Q   Where?
2  A   **In Bradenton, Florida.**
3  Q   What were the circumstances of your departure from
4      Humana?
5  A   **A promotion.**
6  Q   A promotion to Charter?
7  A   **A promotion to Charter, more money and a better**
8      **position.**
9  Q   Different companies though?
10 A   **Different company.**
11 Q   So you became the CEO of Charter Hospital in
12     Bradenton?
13 A   **Yes.**
14 Q   For how long?
15 A   **A year.**
16 Q   Then what did you do?
17 A   **Then I left the psychiatric hospital field and I**
18     **went back to acute care.  That was in 1989, and I**
19     **worked for the company I work for today, Universal**
20     **Health Services.**
21 Q   So everything prior to 1989 was psychiatric
22     hospitals administration?
23 A   **No.**
24 Q   What was it not in psychiatric --
25 A   **The only psychiatric --**

---

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

9

1 Q -- hospital administration?
2 A **The only psychiatric hospital administration was**
3 **the one year in Charter.**
4 Q So were the ones prior to that acute care?
5 A **Yes.**
6 Q So in 1989 when you went to -- I don't remember
7 where you went. Oh, yeah, you went with Universal
8 Health Services, right?
9 A **Yes.**
10 Q King of Prussia, Pennsylvania is their home office?
11 A **Yes.**
12 Q Have you been in acute care since then?
13 A **Yes.**
14 Q Now, does Universal Health Services have an acute
15 care division?
16 A **Yes.**
17 Q And who is the head or president, the chief
18 officer, of the acute care division of Universal
19 Health Services today?
20 A **Mark Miller.**
21 Q How long has he been the head person?
22 A **He's been the president of the acute care division**
23 **for approximately a couple of years because he is**
24 **now -- he's been the interim until the company has**
25 **searched for a new president.**

---

11

1 Q Including Aiken Regional Medical Centers?
2 A **That's correct.**
3 Q Who is he employed by?
4 A **He's employed by Universal Health Services.**
5 Q Who are you employed by?
6 A **Universal Health Services.**
7 Q And who is Mark Miller employed by?
8 A **Universal Health Services.**
9 Q Is acute care division just what it implies: a
10 division, not a separately established corporate
11 entity?
12 A **That's correct.**
13 Q So the group vice president, Frank Lopez, would he
14 report to Mark Miller?
15 A **Yes, he reports to Mark Miller.**
16 Q How long has that been the case?
17 A **Since the fall, I believe, of 2009 is when I first**
18 **started to report to Frank.**
19 Q Was it February 2009 when you became CEO?
20 A **March 2009.**
21 Q And before that you were the COO of --
22 A **That's correct.**
23 Q -- of Aiken Regional Medical Centers?
24 A **That's correct.**
25 Q For approximately five years?

---

10

1 Q Is he also an owner of Universal Health Services?
2 A **Yes.**
3 Q And is his brother an owner of Universal Health
4 Services?
5 A **I don't know that he has a brother.**
6 Q Okay. So what is his ownership interest?
7 A **I do not know that.**
8 Q You do not know what Mark Miller's ownership
9 interest is at Universal Health Services?
10 A **No.**
11 Q Is it publicly traded?
12 A **Yes.**
13 Q Did he take it public?
14 A **It's been public since the company first started.**
15 **It was in 1978, I believe.**
16 Q So it started as a public company?
17 A **Yes, that's my understanding.**
18 Q Is Mark Miller the person whom you report to today?
19 A **No.**
20 Q Who do you report to today?
21 A **Frank Lopez.**
22 Q And what is his job?
23 A **He's what is termed a group vice president.**
24 Q For whom?
25 A **For several of the acute care hospitals.**

---

12

1 A **From April 2003 until March 2009.**
2 Q Now, the Palm Springs Hospital.
3 A **Yes.**
4 Q In Florida.
5 A **Yes.**
6 Q Is that a UHS hospital?
7 A **No.**
8 Q Well, how did it get left out in the chronology?
9 A **You didn't ask me.**
10 Q Well, I was asking you for your work. And so -- we
11 don't need to argue about it. I'll go back and ask
12 you again. The Palm Springs Hospital, you worked
13 there for about twelve years?
14 A **I did.**
15 Q And what was your job there?
16 A **I was CEO.**
17 Q Who owned the Palm Springs Hospital?
18 A **It was a private for profit ownership.**
19 Q And were you the CEO for twelve years?
20 A **Yes.**
21 Q What town is that located in?
22 A **Hialeah, Florida.**
23 Q That's a suburb of Miami?
24 A **Yes.**
25 Q And what were the circumstances of your leaving

---

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

13

1    there?
2  A  We had been relocated, my family and I, to McGowan,
3     Texas with UHS.  And, basically, we were not happy
4     living in Texas and I wanted a way out, and they
5     offered me a CEO position which would have been my
6     first CEO for acute care back in my home state.
7     And so it was a very attractive move for me.
8  Q  Now, I think we're on a little bit of a different
9     train track, because my question -- And I may be
10    confused, maybe my fault.  My question was what
11    were the circumstances of your leaving Palm Springs
12    Hospital.
13  A  Oh, I'm sorry, I thought you meant leaving to go to
14    Palm Springs.  Leaving Palm Springs Hospital was a
15    personal family issue.
16  Q  Was it in any way, directly or indirectly, a
17    performance issue?
18  A  Not at all.
19  Q  So I take it that before you were the CEO at Palm
20    Springs Hospital you worked for UHS?
21  A  Yes.
22  Q  Including in McGowan, Texas?
23  A  Yes.
24  Q  All right.  So, now, I want to go back to get this
25    straight.  Let me make sure I've got it straight.

---

14

1     In 1988 you worked one year as the CEO of a Charter
2     Hospital in Bradenton, Florida?
3  A  Yes.
4  Q  Which was a psych hospital?
5  A  Yes.
6  Q  Psychiatric hospital.  After that, in 1989, you
7     began working for the acute care division of
8     Universal Health Services.  When did you go to Palm
9     Springs?
10  A  It was in December of 1991.
11  Q  So you worked a couple of years, round numbers, for
12    UHS.  You went to Palm Springs for twelve years and
13    then you returned to UHS?
14  A  Yes.
15  Q  When you returned to UHS, you returned to UHS at
16    the Aiken Regional Medical Centers in Aiken, South
17    Carolina?
18  A  Yes.
19  Q  As the COO?
20  A  Yes.
21  Q  And that's where you worked for between five and
22    six years as COO?
23  A  Yes.
24  Q  Until March of 2009 when you succeeded KD Justyn as
25    the CEO?

---

15

1  A  That's correct.
2  Q  Now, when you were being trained in any of the
3     training at the University of Florida in any
4     subsequent training, any sort of continuing
5     education, have you been trained with respect to
6     protocols for peer review?
7  A  The peer review process was more when I assumed the
8     position of COO.
9  Q  Here?
10  A  When I first took a job back in Humana.  I was very
11    familiar with peer review process.
12  Q  Have you had any formal training related to peer
13    review?
14  A  The training would be what I learned when I was on
15    the job, reading bylaws, et cetera.
16  Q  Anything beyond that?
17  A  No.
18  Q  Have you ever received any formal advice with
19    respect to the peer review protocols at the Aiken
20    Regional Medical Centers?
21  A  We have -- if formal advice means legal advice, we
22    have our bylaws.  And the fair hearing process is
23    part of those bylaws reviewed by an attorney at
24    least once a year.
25  Q  Who does that?

---

16

1  A  Our corporate attorneys do.
2  Q  In house?
3  A  In house.
4  Q  King of Prussia?
5  A  Some were King of Prussia.  Some are located
6     outside of King of Prussia.
7  Q  In Texas?
8  A  If you -- I know Gary Petok is one of them.  I
9     don't know if he's in Texas.  If that's who you're
10    referring to, then the answer would be yes.
11  Q  Okay.  Is that Austin, Texas?
12  A  I have no clue.
13  Q  But you believe he lives in Texas?
14  A  I don't keep up with Gary's whereabouts, yeah.  But
15    he's not in King of Prussia, that's correct.
16  Q  Who prepared those bylaws as they relate to peer
17    review?
18  A  Gary's been the one that has reviewed them the last
19    time that I remember.
20  Q  When they were last a new iteration, who prepared
21    them?
22  A  There's been one recently, and those were done by
23    Charles Smouse who's one of our new corporate
24    attorneys.
25  Q  Could you spell his last name?

---

**Thompson Court Reporting, Inc.**
**www.thompsonreporting.com**

Carlos A. Milanes - 7/25/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

17

1   A   It's mouse with an s at the beginning.  So it's
2       Smouse.
3   Q   And when was that iteration?
4   A   Back in the spring time.
5   Q   Of this year?
6   A   Of this year.
7   Q   Spring 2011?
8   A   Yes.
9   Q   Which would have been after Dr. Muniz's peer
10      reviews?
11  A   Yes.
12
13      MR. SOWELL: Travis, we'd like to get a copy of
14      those.
15      MR. DAYHUFF: Okay.
16      MR. SOWELL: I'm making the request and David's
17      keeping the list and we'll write you a letter.
18      MR. DAYHUFF: Excellent.
19      MR. SOWELL: But I just want to make the request
20      while I'm thinking about it.
21      MR. DAYHUFF: All right.  I think you already have
22      the other bylaws, right?
23      MR. SOWELL: Yes.
24      MR. DAYHUFF: The ones that were in place.
25      MR. SOWELL: Yes.

18

1
2   Q   Do you recall what were the primary changes in the
3       bylaws when Charles Smouse did his iterations in
4       the spring of 2011?
5   A   I can talk in generalities, because a lot of that
6       was legalese that we had to put in there relative
7       primarily to comply with the joint commission which
8       is our regulatory body, some changes that they
9       wanted relative to the medical staff communication
10      with the Board of Governors.
11  Q   Were there changes made with respect to the
12      protocols for peer review?
13  A   I don't know exactly what those changes are if they
14      were made.  If they were made, they were not
15      substantive.
16  Q   Other than Charles Smouse, who is most aware here
17      on premises of the changes in those bylaws?
18  A   Our medical staff coordinator.  Her name is Terri
19      Ergle.
20  Q   Where is your office physically located in the
21      premises?
22  A   On this floor.
23  Q   Yeah.  I mean, through that door?
24  A   Through this door.
25  Q   Yeah.  And we're on the fourth floor in the

19

1       conference room just across from the classrooms?
2   A   This is the sixth floor.
3   Q   Sixth floor, I'm sorry.  I went to the fourth
4       floor.
5   A   You went to the fourth floor.
6   Q   So we're on the sixth floor across from the
7       classrooms in the conference room?
8   A   Yes.
9   Q   Which is generally next to your suite of offices?
10  A   Yes.
11  Q   Who else occupies your suite of offices?
12  A   My chief operating officer.
13  Q   Who is that?
14  A   Scott Ansede.
15  Q   Could you spell his last name?
16  A   I sure will.  A-n-s-e-d-e.
17  Q   Okay.
18  A   Our risk manager.  Her name is Lois El.  E-l.  Our
19      director of business development.  Her name is
20      Sharon Hagan.  H-a-g-a-n.  Terri Ergle, medical
21      staff coordinator I just spoke about.  Renee
22      Freeman.  And that's spelled as it is said, and she
23      is our data analyst.  Our chief financial officer
24      who is now sits empty because we're looking for
25      one.

20

1   Q   Empty?
2   A   And the two administrative assistants, Patricia
3       Jackson and Nancy Kneece.  K-n-e-e-c-e.
4   Q   Have you ever been sued before?
5   A   No.
6   Q   Have you ever sued?
7   A   Do you mean on a personal level?
8   Q   Yes.
9   A   No.
10  Q   On any level?  Have you ever brought suit -- well,
11      I take that back.  That's not a very good question.
12      So you're -- Okay.  So Carlos Milanes has never
13      been sued and Carlos Milanes has never sued?
14  A   That's correct.
15  Q   Now, the Aiken Regional Medical Centers, in the
16      last five years, what litigations have you been
17      involved in as either Plaintiff or Defendant?
18  A   Our risk manager, Lois El, will be able to give you
19      those answers in detail.  I'm not going to misspeak
20      by talking conjecture.  But, of course, we have
21      pending lawsuits, whether it deals with a potential
22      malpractice case, that is dealt with through our
23      risk management group.
24  Q   That's Louis El?
25  A   Lois.

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

21

```
1   Q   Lois, I'm sorry.
2   A   Yes.
3   Q   And I was thrown off because everybody has always
4       called her heretofore Lois El.  So I was
5       concentrating on the last name.
6   A   Maybe I said it wrong.
7   Q   Lois El is the risk manager.  But she would have
8       that information?
9   A   Yes, she would.
10  Q   Now, which of these lawsuits are preeminent enough
11      that you can tell me about them now?
12  A   I can't talk about any of the lawsuits at all.
13  Q   You mean you don't know of any others?
14  A   I'm not going to -- if I know of any others, which
15      would be peripheral, it would be on a generic
16      level.  I'm not at liberty to tell you about a
17      pending lawsuit.
18  Q   Well, you are at liberty because I'm asking you.
19      Unless your counsel instructs you not to answer --
20      And I'm not trying to be harsh with you.  I'm just
21      telling you straight out that unless your counsel
22      instructs you not to answer, you must tell me.
23
24          MR. DAYHUFF: Are there any of these lawsuits that
25          are under a confidentiality order in state
```

22

```
1           court or federal court, or do you know?
2
3   A   I don't know that.  I'm going to make that
4       assumption, unless I know different.
5
6           MR. DAYHUFF: Why don't we deal with that in a
7           discovery request?  That way Mr. Milanes won't
8           be turning over information that he may or may
9           not be allowed to turn over.
10          MR. SOWELL: That's okay.  But reserving my right to
11          come back and ask him about those lawsuits and
12          what he knows about them.
13          MR. DAYHUFF: Fine.  And I want to reserve my right
14          to object to this on the basis of relevance
15          when I get your discovery request.
16          MR. SOWELL: The problem with that is we're here
17          today and he knows something about these
18          lawsuits.
19          MR. DAYHUFF: Right.
20          MR. SOWELL: And I understand what he said, but
21          unless they are the subject of a protective
22          order they're not privileged, not the --
23          MR. DAYHUFF: I agree.
24          MR. SOWELL: -- existence of it.
25          MR. DAYHUFF: I agree.
```

23

```
1           MR. SOWELL: And, therefore, I think I'm entitled to
2           know --
3           MR. DAYHUFF: How about this?  How about this?  And
4           I don't want to interrupt the flow of the
5           deposition.  If he is aware of any that are
6           not subject to a confidentiality order or a
7           protective order, he can answer those
8           questions.  (To Mr. Milanes) Are you
9           comfortable with that?  Because he's right.
10          He does get to get stuff -- these are public
11          record if they've been filed.  Now, if you
12          don't know, that's something different.
13
14  A   I can answer that very easily, Biff.  Okay.  If
15      you're asking me about details of any other
16      malpractice lawsuit, I do not know of them period.
17  Q   Well, see, what I want to know isn't details.  I'm
18      not talking about, you know, where the scalpel was
19      left.  I'm asking who's the Plaintiff and who were
20      the Defendants.
21  A   I would not know that.  I'd be thinking in terms of
22      memory.  I'd be trying to recall facts that are
23      probably unclear in my mind.  So the answer is I
24      don't know.
25  Q   Are there any of them that you know of?
```

24

```
1   A   I don't know of any of them enough to intelligently
2       speak about them at all, even generically speak
3       about them at this point.
4   Q   Doesn't have to be intelligent.
5   A   Or generic.
6   Q   It can be unintelligent and generic.
7   A   Or unintelligent or even from the stupid basis.  I
8       do not feel comfortable talking about any other
9       lawsuit.
10  Q   Okay.  Well, we'll just reserve our rights and go
11      from there.  I'm going to back up a minute, so I'll
12      give you time to look at that when we get back to
13      it.
14  A   Okay.  Not a problem.
15  Q   I kind of got sidetracked by the Smouse answer.
16      Bylaws that preceded the new bylaws, do you know
17      who prepared those for the hospital?
18  A   My understanding is Gary Petok.
19  Q   How are they adopted by the hospital?
20  A   It goes through a process as delineated in the same
21      bylaws in terms of the approval process.  It's a
22      delineation of approval by notice to the medical
23      staff of changes, approval by the general medical
24      staff, eventual approval by the Board of Governors.
25      And it's sequential.
```

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

|  | 25 |
|---|---|
| 1 | Q   So that was done in connection with the spring 2011 |
| 2 | revisions? |
| 3 | A   Yes. |
| 4 | Q   And it was done in connection with prior iteration |
| 5 | prepared by Gary Petok? |
| 6 | A   Yes. |
| 7 | |
| 8 | (Whereupon, Letter 2/25/2010, consisting |
| 9 | of 5 pages, was marked Plaintiff's |
| 10 | Exhibit No. 1 for identification.) |
| 11 | |
| 12 | Q   Let's look at this letter that's marked as |
| 13 | Plaintiff's Exhibit No. 1 to this, dated, it's |
| 14 | dated February 25, 2010.  Did you sign the letter? |
| 15 | A   Yes. |
| 16 | Q   Who prepared the letter? |
| 17 | A   It was prepared through our legal counsel. |
| 18 | Q   Who was that? |
| 19 | A   From my recollection, this would have been Gary |
| 20 | Petok. |
| 21 | Q   Now, do you know why it was signed by Dr. DiBona, |
| 22 | Dr. Minto and yourself? |
| 23 | A   I as CEO.  Dr. Minto as chief of surgery, and Dr. |
| 24 | DiBona as chief of medical staff. |
| 25 | Q   I see that. |

|  | 26 |
|---|---|
| 1 | A   Okay. |
| 2 | Q   I can read that part. |
| 3 | A   Okay. |
| 4 | Q   But the question remains, why was it signed by Dr. |
| 5 | DiBona, Dr. Minto and Carlos Milanes? |
| 6 | A   As opposed to? |
| 7 | Q   As opposed to just -- |
| 8 | A   I don't understand your question. |
| 9 | Q   Just Dr. DiBona as the chief of staff or just |
| 10 | Oletha Minto as the chief of surgery or just Carlos |
| 11 | Milanes as the chief executive officer. |
| 12 | A   Because at the time there was not only -- there was |
| 13 | the clinical investigation by Dr. Minto, Dr. DiBona |
| 14 | also.  They wanted me as CEO to support them.  And |
| 15 | this was to show -- this was to show that we were |
| 16 | all in sync with the decision. |
| 17 | Q   Now, before this letter was executed, signed, what |
| 18 | did you do? |
| 19 | A   Can you rephrase that?  What did I do? |
| 20 | Q   Did you review the chart? |
| 21 | A   I'm not a clinician.  I don't review the chart, no. |
| 22 | Q   So the second paragraph that begins with the |
| 23 | sentence, "Specifically, you attended to the |
| 24 | patient who presented to labor and delivery 30 |
| 25 | weeks pregnant and in pain."  That second paragraph |

|  | 27 |
|---|---|
| 1 | as a whole.  You didn't review the records with |
| 2 | respect to that assertion? |
| 3 | A   I did not review the medical records.  I received |
| 4 | that input from my medical staff. |
| 5 | Q   Who? |
| 6 | A   Dr. Minto, Dr. Rod Robinson, who was the chairman |
| 7 | of peer review at the time, Dr. Cindy Besson who |
| 8 | was the second OB/Gyn that reviewed the chart, and |
| 9 | Dr. Francis DiBona who was our chief of staff that |
| 10 | concurred with what the OB/Gyns had said. |
| 11 | Q   Now, do you know who chose Dr. Minto or Dr. Besson |
| 12 | to review the chart? |
| 13 | A   Dr. Minto was involved peripherally with being on |
| 14 | the unit, so she was actually present, plus she was |
| 15 | chief of surgery.  So that's part of her role.  Dr. |
| 16 | Besson was chosen as a second opinion. |
| 17 | Q   Who chose Dr. Besson? |
| 18 | A   From my recollection, I don't remember who chose |
| 19 | her.  Dr. DiBona or Dr. Robinson I believe would |
| 20 | have been the ones who chose her specifically. |
| 21 | Q   And would they have been the ones who chose Dr. |
| 22 | Minto as well? |
| 23 | A   Dr. Robinson probably was involved in choosing Dr. |
| 24 | Minto.  But she, even if he would not have chosen |
| 25 | her, would have reviewed the record by default |

|  | 28 |
|---|---|
| 1 | because she was the chief of surgery. |
| 2 | Q   What about the chief of perinatal care? |
| 3 | A   We don't have a chief of perinatal care. |
| 4 | Q   You don't have a perinatal service that's distinct |
| 5 | from the other services? |
| 6 | A   No.  We have a very informal meeting of perinatal, |
| 7 | but it's not a separate division or anything that |
| 8 | we acknowledge in the bylaws. |
| 9 | Q   So do the OB/Gyns fall under surgery? |
| 10 | A   Yes. |
| 11 | Q   So you believe Dr. Robinson in part chose Dr. |
| 12 | Minto, and then she also reviewed them because she |
| 13 | was on the floor that night?  And also Dr. Robinson |
| 14 | appointed Dr. Besson to review it? |
| 15 | A   That's my recollection. |
| 16 | Q   Now, is Dr. Besson a personal friend of yours? |
| 17 | A   No. |
| 18 | Q   What about Dr. Minto? |
| 19 | A   No. |
| 20 | Q   Let's look at -- |
| 21 | |
| 22 | MR. SOWELL: We'll ask Ms. Thompson to mark this |
| 23 | Plaintiff's Exhibit No. 2. |
| 24 | |
| 25 | (Whereupon, Letter dated March 16, 2010, |

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

29

1    consisting of 2 pages, was marked Exhibit
2    No. 2 for identification.)
3
4    Q   Now, that's a letter that you executed on or about
5        March 16, 2010?
6    A   That's correct.
7    Q   Who drafted that letter?
8    A   Mr. Petok.
9    Q   What is his job?
10   A   He is one of our corporate counsel.
11   Q   Do you know where he got the information to draft
12       this letter?
13   A   He would have gotten it from the hospital from us.
14   Q   But from whom?
15   A   For the most part, Terri Ergle.
16   Q   And would that be true also with respect to
17       Plaintiff's Exhibit No. 1, the letter of February
18       25, 2010 that we just looked at?
19   A   Not as much, because that was more influenced by
20       the two OB/Gyns reviews and also the review of Dr.
21       DiBona. So Terri would have just processed the
22       information to him.
23   Q   But you think probably he got the information that
24       makes up what's in the March 16, 2010 letter from
25       Terri Ergle?

30

1    A   With regard to the medical executive meeting when
2        they met, what did they decide, procedural issues,
3        yes. Not decision-making issues, but procedural
4        issues. That's what Terri's role would be.
5    Q   You see paragraphs two and three. Actually, I
6        guess it would be paragraph two that it's stated
7        that "The basis of that recommendation is as
8        follows: . . ." And then it gives the reason for
9        the recommendation, correct?
10   A   Yes.
11   Q   Where would that have come from?
12   A   That would have come from the recommendation from
13       peer review through Dr. Robinson to the Medical
14       Executive Committee.
15   Q   So that was the basis of their recommendation to
16       continue the suspension of Dr. Muniz's clinical
17       privileges?
18   A   Yes.
19   Q   Now, down at the bottom it says in paragraph one,
20       "You will be notified of the identities of the
21       committee members and provided an opportunity
22       before the hearing to object to any member of the
23       hearing panel or to the hearing officer or
24       presiding officer."
25           Now, do you know that there was a hearing

31

1    officer selected in this case?
2    A   There was.
3    Q   Who selected him?
4    A   That was selected through advice of our counsel.
5    Q   And who was that?
6    A   The ones we fired.
7    Q   Celeste Jones?
8    A   Celeste Jones, yes.
9    Q   And Jane Trinkley?
10   A   Yes.
11   Q   So Celeste Jones and Jane -- and/or Jane Trinkley
12       advised the hospital with respect to the selection
13       of Ernest Nauful as the hearing officer?
14   A   That's my recollection.
15   Q   He was the hearing officer? You understand that?
16   A   Yes.
17   Q   Now, has the hospital, the Aiken Regional Medical
18       Centers, had any relationship before or after with
19       Ernest Nauful?
20   A   Not afterwards. Before so, prior to my time
21       period, I don't know. During my time period, I
22       don't recall if we did.
23   Q   So not afterwards. You don't recall during your
24       time period, but could have been. And could have
25       been before?

32

1    A   Could have been.
2    Q   Why did you choose to fire Celeste Jones and Jane
3        Trinkley?
4    A   That wasn't my decision. It was the decision of
5        our corporate counsel.
6    Q   Is that Gary Petok?
7    A   No. That's Matt Klein who's our chief counsel.
8    Q   Is he in King of Prussia?
9    A   Yes.
10   Q   Is that K-l-e-i-n?
11   A   Yes.
12   Q   Do you know why he made that decision?
13   A   I don't. I don't want to conjecture. I think
14       there was multiple issues.
15   Q   Did he tell you?
16   A   No.
17   Q   Has anybody told you?
18   A   Has anyone told me? no. It was a decision made
19       through the corporate office. They are the ones
20       that allow us to contract with outside counsel.
21   Q   But Celeste Jones and Jane Trinkley represented,
22       before they were fired, the Aiken Regional Medical
23       Centers?
24   A   Yes.
25   Q   And just for formality, this is your signature on

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

33

1    the letter of --
2  A   Yes.
3  Q   -- March 16, 2010?
4  A   That's correct.
5
6         (Whereupon, undated Letter May 2010,
7         consisting of 5 pages, was marked
8         Plaintiff's Exhibit No. 3 for
9         identification.)
10
11 Q   This is the letter that does not have a date on it,
12     but it's stamped received by the McNair Law Firm on
13     May 4, 2010.  So am I correct that it was probably
14     mailed by certified mail --
15 A   Yes.
16 Q   -- sometime shortly prior to that?
17 A   Yes.
18 Q   And that's your signature on the last page of it?
19 A   That is not my signature.  That is a signature on
20     my behalf.
21 Q   By whom?
22 A   It looks to me like that would be my chief
23     operating officer Scott Ansede.
24 Q   Now, do you see that in the third full paragraph
25     the sentence that starts off with, "The

34

1    recommendation of the medical staff executive
2    committee is further based upon your history,
3    including the prior peer review proceeding in which
4    the Board of Governors required that you submit to
5    an evaluation and treatment if needed by a
6    physician with expertise in identifying and
7    treating disruptive physicians and physicians with
8    personality behavioral disorders and issues, and
9    also require 100 percent monitoring of your
10     clinical cases for twelve months."
11 A   I read that.
12 Q   You see that?  Have you seen that in these two
13     letters that preceded this letter?
14 A   No.
15 Q   Now, who drafted this letter?
16 A   Also through Gary Petok.
17 Q   Did you have any input?
18 A   I would have peripheral input on this.
19 Q   Well, who's giving him the information from which
20     he drafts these letters?
21 A   Terri Ergle and the McNair Law Firm would have been
22     --
23 Q   McNair?
24 A   McNair for the most part.
25 Q   Was Terri Ergle the primary interface between the

35

1    Aiken Regional Medical Centers and the McNair Law
2    Firm with respect to this peer review proceeding?
3  A   Yes, she would have been.  She and Gary Petok.
4    They both would have been.
5  Q   Now, there's reference on the third page to some
6    witnesses, one of whom's Dr. Thomas Roland, Jr. and
7    another of whom is Shahab, S-h-a-h-a-b, Minassian,
8    M-i-n-a-s-s-i-a-n, MD.  Did you ever review their
9    reviews of the medical chart in this matter?
10 A   Yes.
11 Q   Did you review their reviews of the medical chart
12     in this matter before you wrote this letter?
13 A   I would have seen it, yes.
14 Q   Did you ever review any of the medical charts in
15     the prior five cases that was subject of the 2009
16     peer review?
17 A   Not the specific records, no.
18 Q   Did you ever review any of the outside reviewer's
19     reports with respect to those records?
20 A   Yes.
21 Q   And did you review the one that was favorable to
22     Dr. Muniz?
23 A   You're talking about the five cases on the first
24     set of hearings?
25 Q   Yes.

36

1  A   I recall one of them was -- may have been
2    favorable, or at least not saying that she was
3    substandard of care.  If you ask me which one was
4    that, I don't recall.
5  Q   Do you know that that particular review was not
6    provided to Dr. Muniz?
7
8    MR. DAYHUFF: Object to the form of the question.
9    You can answer.
10
11 A   Okay.  What I understand is that that review was
12     produced at the hearing but was not evidently
13     evident at the hearing.  I don't know why that
14     would be.  There's no reason for us to disclose --
15     to not to disclose everything.
16 Q   Now, are you also aware that after the 2009 peer
17     review -- let me back up.  You know the 2009 peer
18     review panel, the hearing panel chaired by Dr.
19     Ratliff made a finding that there was insufficient
20     evidence to support terminating Dr. Muniz's
21     privileges?
22 A   Yes.
23 Q   And you also know that subsequent to that, the
24     board of directors made a recommendation and
25     finding that Dr. Muniz submit to a hundred percent

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

37

1  review for a year and also go see a psychiatrist
2  with respect to I'll say generally the issue of
3  disruptive physician.
4  A  Yes.
5
6      MR. DAYHUFF: Object to the form of the question
7      with the respect of the characterization of
8      the evidence in the record.  You can answer,
9      but you already have.
10
11 Q  And you saw, I suppose since you asked for it, Dr.
12 Schwartz-Watts' report?
13 A  I would have read the reports.
14 Q  Are you aware that that report was never given to
15 Dr. Muniz?
16 A  I'm aware that that was produced during the
17 hearing.
18 Q  Can you think of any reason the hospital would
19 request that report and receive it and then not to
20 give a copy of it to Dr. Muniz for several months?
21 A  There is absolutely no reason we would have
22 withheld that.
23
24
25      (Whereupon, Letter 5/12/2010, consisting

---

38

1      of 4 pages, was marked Plaintiff's
2      Exhibit No. 4 for identification.)
3
4  Q  Now, this is Plaintiff's Exhibit No. 4 that you
5  just reviewed, correct?
6  A  Correct.
7  Q  Which is the letter of May 12, 2010 written to you
8  by me?
9  A  Yes.
10 Q  Did you receive that letter?
11 A  Yes.
12
13      (Whereupon, Letter 5/19/2010, consisting
14      of 2 pages, was marked Plaintiff's
15      Exhibit No. 5 for identification.)
16
17 Q  I'm going to ask you review the Plaintiff's Exhibit
18 No. 5 which the reporter has handed you.  It is a
19 letter of May 19, 2010, and I ask you if that is
20 your response to my letter of May 12, 2010?
21 A  Yes.
22 Q  Now, with respect to paragraph four in my letter, I
23 ask you to produce any financial ties that any
24 member of the hearing panel might have with the
25 hospital, including but not limited to contracts,

---

39

1  salaries, stipends, referral fees, allowances and
2  subsidies.  And you responded in paragraph four
3  that my request was respectively denied, correct?
4  A  Yes.  I don't see those words on here, but, more or
5  less, that's what it says.
6  Q  Well, it's the last sentence?
7  A  I see, I see it.  I'm sorry.
8  Q  Now, who drafted this letter of May 19, 2010 which
9  is Plaintiff's Exhibit No. 5?
10 A  This would have been, again, a combination of our
11 outside firm and Gary Petok.
12 Q  So that would have been the McNair Firm and Gary
13 Petok?
14 A  Yes.
15 Q  Now, did the hospital have any financial ties as
16 described in paragraph four with any member of the
17 hearing panel?
18 A  Of the eventual hearing panel of the initial --
19 Q  The eventual --
20 A  -- appointed --
21 Q  Yes, the eventual hearing panel.
22 A  If you tell me who they are.
23 Q  Okay.  They were Alyssa Degnan, osteopath internal
24 medicine.
25 A  No.

---

40

1  Q  And when I say Ms. Degnan, I'm including her group.
2  A  I understand.
3  Q  Robert Searles, osteopath radiology.
4  A  He is one of the radiologists that we contract with
5  for radiology services.
6  Q  Radiology is a hospital-based service?
7  A  Yes.
8  Q  And so you have a contract with that group --
9  A  Yes.
10 Q  -- who provided those services to the hospital?
11 A  Yes.
12 Q  Any other arrangements, financial ties with that
13 group other than what you just described?
14 A  No.
15 Q  Jill Buchanan, general surgery.
16 A  No.
17 Q  Timothy Kinsey, pediatrics.
18 A  No.
19 Q  And Christopher Robinson, maternal fetal medicine.
20 A  No.
21 Q  Now, you know he's from the Medical University of
22 South Carolina?
23 A  Yes.
24 Q  Has he ever had any relationship with the hospital
25 other than serving on this panel?

---

Carlos A. Milanes - 7/25/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

41

1   A   Not that I know of.
2   Q   Who paid him for his service?
3   A   I don't recall who paid him.
4   Q   Do you know he was paid?
5   A   I assume he was paid.
6   Q   And do you assume he was paid by the hospital?
7   A   I would assume that he was paid by the hospital if
8       we're the ones who asked him to come to the panel,
9       yes.
10  Q   Who paid Ernest Nauful?
11  A   I would assume the hospital also.
12  Q   You understand -- you agree with me, I assume, that
13      the bylaws requires him to be a fair and impartial
14      hearing officer?
15  A   Yes.
16  Q   Who chose or appointed the, I'll call them the
17      ultimate hearing panel members, the ones whose
18      names I just read off which were Dr. Degnan, Dr.
19      Searles, Dr. Buchanan, Dr. Kinsey and Dr.
20      Christopher Robinson?
21  A   Typically, the hearing panel members in this case
22      would be a typical case are appointed through a
23      combination of input from myself, Terri Ergle, even
24      Dr. DiBona.  And it's usually the ones that
25      volunteer.  It's not that we have a plethora of

42

1       these physicians wanting to join a hearing panel.
2   Q   But you believe that it was probably a consultation
3       between you, Ms. Ergle and Dr. DiBona?
4   A   Yes.
5   Q   And Dr. DiBona was in that loop because he was the
6       chief of staff at the time?
7   A   Yes.
8   Q   Now, if you would, look back at my Exhibit No. 4
9       which is my letter of May 12, 2010 to you.  And
10      also look at Exhibit No. 5 which is your letter May
11      19, 2010 to me with respect to Exhibit No. 7.  Now,
12      do you see that my request -- not Exhibit No. 7.
13      Exhibit No. 4.  Do you see my request in paragraph
14      seven is for handwritten notes or other notes taken
15      with respect to the MEC's recommendation referenced
16      in the notice of hearing letter?
17  A   Yes.
18  Q   And you see that that request is respectfully
19      denied in your letter of May 19?
20  A   Okay.
21  Q   Now, when the medical staff executive committee
22      meets, who serves as the secretary or the recorder
23      for those meetings?
24  A   Terri Ergle.
25  Q   And she has for some time?

43

1   A   She has for some time.
2   Q   As long as you've been here?
3   A   As long as I've been here.
4   Q   Now, does she take handwritten notes?  In other
5       words, --
6   A   I have to think back if she carries a recorder.  I
7       believe she takes handwritten notes.
8   Q   Does she also carry a recorder?
9   A   I'm trying to think in my -- I'm trying to envision
10      that, and I don't envision that.  But you'd have to
11      ask her exactly how she does it.
12  Q   Do you know if there are any audio tapes of the MEC
13      meetings?
14  A   I know there are no audio tapes.
15  Q   Are there any audio tapes of the board meetings?
16  A   There are audio tapes of board meetings.
17  Q   Who has possession of those?
18  A   Patricia Jackson.
19  Q   Her job is administrative assistant to you?
20  A   Yes.
21  Q   How far back do those go?
22  A   I don't know the answer to that.
23  Q   Do they go back as long as you've been here?
24  A   Do they go back meaning do we have them in our
25      possession or do they go back meaning that we've

44

1       recorded them since I've been here?
2   Q   The latter first.
3   A   We've recorded them since I -- since Pat has been
4       on the job she has recorded them.
5   Q   But you don't know how many of them have been
6       retained?
7   A   I don't know that.
8   Q   But you know some of them have been retained?
9   A   I don't even know if some of them have been
10      retained.  I don't know how she does that.
11  Q   If they've been retained, then Patricia Jackson
12      should have them?
13  A   Yes.
14  Q   Now, does she perform that function as -- well, let
15      me ask you this way.  The last time I looked, you
16      are the secretary to the board of directors.
17  A   Yes.
18  Q   Is that still true?
19  A   Yes.
20  Q   Was that true when all of Dr. Muniz's peer reviews
21      came to the board?
22  A   That's true as of April 2009 when I officially
23      became CEO.
24  Q   So do you delegate the actual functioning of that
25      job when it comes to taking the minutes or whatever

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

45

```
 1    to Patricia Jackson?
 2  A  It seems like I do.
 3  Q  Okay.  Do you know if she takes handwritten notes?
 4  A  No, she does not.  From what I know.  She may take
 5     some notes, but for the most part she uses the
 6     recorder.
 7  Q  So you think she prepares the official minutes of
 8     the board meeting from the recordings?
 9  A  Yes.
10  Q  Does anybody else take notes at the board meetings?
11  A  No.
12  Q  Going back to my question about the MEC, medical
13     staff executive committee, do you know if those
14     meetings are audio taped?
15  A  I don't believe they are.
16  Q  But if they are, Terri Ergle would be the person
17     who does it and keeps those audio tapes?
18  A  Yes.
19  Q  And you believe takes notes?
20  A  Yes.
21  Q  So she should be the person with those notes if she
22     retains them?
23  A  Yes.
24  Q  Do you know if she retains them?
25  A  I don't know.
```

46

```
 1  Q  Do you know if the minutes are prepared from her
 2     notes?
 3  A  The minutes are prepared from her notes.
 4
 5     MR. SOWELL: Travis, we would like to have the audio
 6        tapes and the notes.
 7     MR. DAYHUFF: I'll look into that for you after the
 8        deposition.
 9     MR. SOWELL: For both the board meeting and the MEC
10        meetings, any of them that relate directly or
11        indirectly to Dr. Muniz.  In fact, I think I
12        would say all of them for the last five years.
13     MR. DAYHUFF: That relate to Dr. Muniz?
14     MR. SOWELL: No.  All of them for the last five
15        years.
16     MR. DAYHUFF: I'll definitely have a relevance issue
17        there, but we will look into the existence of
18        tapes and notes and respond to you.
19     MR. SOWELL: And, like I say, we'll write you a
20        letter just to summarize all this because
21        David's taking notes.
22     MR. DAYHUFF: Yeah.  That would be very good to do.
23
24  Q  Who decided that it would be appropriate to include
25     at this stage - I'm talking about this general time
```

47

```
 1     frame we're talking about. - Dr. Muniz's prior peer
 2     review in connection with the 2010 peer review?
 3  A  Rephrase that?
 4  Q  Well, there's a change in the letters that are
 5     written.  The first couple of letters refer to this
 6     one chart.  You agree with that?
 7  A  I agree with that.
 8  Q  Then there's a letter, I'll call it the third
 9     letter.  It could be the fourth.  I'd say it was
10     probably the third letter.  It's the letter that is
11     the one we talked about a minute ago which is
12     Plaintiff's Exhibit No. 3.
13  A  Okay.
14  Q  It has something new in it which is this prior peer
15     review proceeding.
16  A  Okay.
17  Q  Who decided to include that?
18  A  That would have been at the medical staff executive
19     committee level.
20  Q  And is Terry Ergle, she's for lack of a better
21     word, she's like Girl Friday to the Medical
22     Executive Committee?
23  A  Yes.
24  Q  I mean, her official title is what?  Director of
25     physician services?
```

48

```
 1  A  Yes, I believe so.
 2
 3     MR. DAYHUFF: David, we'll have to look up that
 4        reference.
 5     MR. DICK: Yeah, I've never heard that one.
 6     MR. SOWELL:  What?
 7     MR. DICK:  Girl Friday.
 8     MR. DAYHUFF: Girl Friday.
 9     MR. MILANES: He knew I was old enough.
10     MR. SOWELL:  The witness knows.
11     MR. DAYHUFF:  Well, that's who you're asking the
12        questions of.  You're definitely tailoring it
13        to the right person.
14     MR. MILANES:  That's not fair.
15
16        (Whereupon, Letter dated September 24,
17        2010 consisting of 5 pages, was marked
18        Exhibit No. 6 for identification.)
19
20  Q  The reporter has handed you Plaintiff's Exhibit No.
21     6 which is a letter of September 24, 2010 signed
22     apparently by Dr. Searles.  No, I'm sorry.  Signed
23     by you.
24  A  Yes.
25  Q  On the second page.
```

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

49

1   **A  Yes.**
2   Q  Is that your signature?
3   **A  Yes, it is.**
4   Q  Who prepared this letter?
5   **A  Gary Petok in conjunction with McNair.**
6   Q  You know where they took the phrase "judicial
7     hearing decision"?  It's in the Re.
8   **A  We base everything on what's in the bylaws.**
9   Q  Do you know where they took the phrase "Judicial
10    Hearing Committee" that shows up in the first
11    sentence?
12   **A  No.**
13   Q  What do those phrases imply to you, judicial
14    hearing?  What does a judicial hearing mean to you?
15   **A  That it's -- talks about the hearing panel.  It**
16    **refers to the hearing panel and the hearing panel's**
17    **recommendation.  That's all that means to me.**
18
19           (Whereupon, Letter dated October 27,
20           2010, consisting of 6 pages, was marked
21           Exhibit No. 7 for identification.)
22
23   Q  Is Plaintiff's Exhibit No. 7 a letter of October
24    27, 2010 that you wrote to Ernest Nauful?
25   **A  Yes.**

---

50

1   Q  Who wrote that letter?  Who drafted it?
2   **A  That would have been though Gary and myself and**
3    **Terri Ergle.  I don't think we would have needed**
4    **McNair for that letter.**
5   Q  And appended to it is Dr. DiBona's letter of
6    October 7, 2010?
7   **A  Yes.**
8   Q  To you?
9   **A  Yes.**
10   Q  And also my letter of October 4, 2010 to you?
11   **A  Yes.**
12   Q  Now, if you would, look at my letter of October 4,
13    2010.  You see in there that we, on behalf of Dr.
14    Muniz, raised some flaws in connection with the
15    report, the original report.
16
17      MR. DAYHUFF: Object to the form of the question.
18        You can answer.
19
20   **A  I see that.  I see your objections.**
21   Q  The first one was that the hearing panel made its
22    recommendations based upon an incorrect burden of
23    proof, correct?
24   **A  I understand.**
25   Q  And you understand that was the case?

---

51

1   **A  Yes.**
2   Q  Because they corrected it.
3   **A  Yes.**
4   Q  You see that the second ground was that "The
5    presiding officer was biased and unduly influenced
6    the hearing panel so as to provide an unfair
7    hearing." You see that?
8   **A  I see that.**
9   Q  Did you take that into account before you forwarded
10    these two documents back to Mr. Ernie Nauful for a
11    resubmission to the hearing panel in the
12    preparation of a revised report?
13   **A  Yes.  We did not feel that there were any grounds**
14    **whatsoever to call the hearing unfair or capricious**
15    **or that he was biased.**
16   Q  Did you review the transcript before you wrote this
17    letter?
18   **A  I didn't read the transcript word for word, but I**
19    **read some of the transcript.**
20   Q  But you concluded that he was not biased?
21   **A  Yes.**
22   Q  Do you know who prepared the erroneous report, the
23    first report?
24   **A  Would have been Mr. Nauful.**
25   Q  Do you know if anybody assisted him in the

---

52

1    preparation of that report?
2   **A  I don't know that.**
3   Q  What about the second report after you wrote him
4    this letter of October 7, 2010?
5   **A  What about the second report?**
6   Q  Do you know who prepared it?
7   **A  He did.**
8   Q  Do you know who assisted him with it?
9   **A  I don't know who would assist him.  I know that he**
10    **was under direction to reconsider the case with a**
11    **correct burden of proof which would have been on**
12    **the Medical Executive Committee, not on the doctor.**
13   Q  Did you ever record any specific findings that
14    Ernie Nauful was not biased?
15   **A  I don't understand the question.**
16   Q  Well, you don't reference it in this letter.
17   **A  Okay.**
18   Q  And I don't believe you ever wrote us and said he
19    was not biased.  So my question is, is internally,
20    can be externally, but I don't know of any
21    external, so I'm really sort of referring to
22    internal.  Did you ever make any finding or record
23    that Ernie Nauful was not biased before you wrote
24    this letter of October 27, 2010?
25   **A  If you're saying do I have anything that I wrote**

---

Carlos A. Milanes - 7/25/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

53

1    down after this --
2    Q    Yes.
3    A    No, I didn't write anything down after this.
4    Q    So that was just a mental note to yourself?
5    A    And from the appointment of him to begin with, and
6         our counsel's advise, be it from Gary Petok --
7
8         MR. DAYHUFF: Yeah. Mr. Sowell isn't asking you for
9            the content of any advice that you got from
10           counsel. So we all know that you were advised
11           by counsel through this process. So I just
12           want to caution you not to reveal the actual
13           advice that was rendered.
14        MR. MILANES: Okay.
15        MR. DAYHUFF: I didn't know if you were getting
16           close to that there or not, but . . .
17
18   A    No. I was just going to say from the information
19        that I knew and that I heard and that I read and
20        that I understood, he was unbiased.
21   Q    Unbiased?
22   A    Not biased.
23   Q    Yeah. You concluded that he was not biased?
24   A    Yes.
25   Q    And it didn't concern you that he had written the

---

54

1    first report with a burden of proof specified in it
2    that was directly contrary to what he had agreed
3    with both counsel would be the burden of proof, not
4    only at a pre-hearing conference but also on the
5    record at the beginning of the peer review hearing?
6    A    It concerned us enough to have him reconsider the
7         case with the correct burden of proof.
8    Q    Now, when the Judicial Hearing Committee conducted
9         its deliberations was Terri Ergle present?
10   A    Yes.
11   Q    Was anybody else in the hospital present?
12   A    No.
13   Q    Who employs Terri Ergle?
14   A    Aiken Regional.
15   Q    Not Universal Health Services?
16   A    That's correct.
17   Q    Now, the other upper level officers here, the COO,
18        Lois El, risk manager, who are they employed by?
19   A    The only people working at Aiken Regional Medical
20        Centers that are employed by Universal Health
21        Services are the C-Suite, which would be myself,
22        chief operating officer, our future chief financial
23        officer, our chief nursing officer, and in this
24        particular hospital, our controller.
25   Q    Who is the chief nursing officer and the

---

55

1    controller?
2    A    Controller is Talmon Ayers. A-y-e-r-s. And Denise
3         Finkbeiner is our chief nursing officer.
4    Q    Everybody else here who is employed by the hospital
5         is employed by Aiken Regional Medical Centers?
6    A    Yes.
7    Q    Which is a wholly-owned subsidiary of Universal
8         Health Services?
9    A    Yes.
10   Q    Now, did Terri Ergle take notes of these
11        deliberations?
12   A    I was not present at the hearing panel, so I don't
13        know how she recorded it.
14   Q    Do you expect it was audio taped?
15   A    I don't know how she recorded it. I have -- I do
16        not know that.
17   Q    But you do expect she recorded it in some way,
18        shape, or form?
19   A    Yes. And I suspect it was probably through an
20        audio, I would say.
21
22        MR. SOWELL: Travis, we would request -- we do
23           request those audio tapes or any other
24           recordings, whether they be handwritten or
25           whatever, of those deliberations.

---

56

1         MR. DAYHUFF: I'll look into that for you.
2
3            (Whereupon, letter dated October 13, 2010
4            consisting of 2 pages, was marked
5            Plaintiff's Exhibit No. 8 for
6            identification.)
7
8    Q    Now the reporter has handed you Plaintiff's Exhibit
9         No. 8 which is my letter of October 13, 2010 to
10        you. And my first question is did you receive it?
11   A    Yes.
12   Q    Did you ever respond to it?
13   A    I'd have to see what else we have on the record.
14   Q    I can't show you anything else because I haven't
15        seen anything else --
16   A    Okay.
17   Q    -- that responds to this letter.
18   A    I'd have to look at my records. If I responded to
19        this letter, you guys would have a copy of it.
20   Q    Okay. Well, we don't, so --
21   A    Okay.
22   Q    -- we think you did not. And my question,
23        therefore, is if that's true and, of course, you
24        can correct the record later if you find a letter,
25        we said to you that it was inappropriate for you or

---

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

57

1    the MEC to request Ernest Nauful resubmit the
2    matter and prepare a revised report when Dr. Muniz
3    has raised an issue as the presiding officer's
4    fairness. That's in the second full paragraph. So
5    my question is, do you recall ever having responded
6    to this letter or ruled on that issue as chief
7    executive officer?
8  A  No. If I -- if you do not have a copy of my
9     response, it means I did not respond.
10 Q  What did you do before you concluded that Ernest
11    Nauful was fair and impartial?
12 A  What did I do? I don't understand.
13 Q  What did you do in forming that conclusion?
14 A  How did I form that conclusion?
15 Q  Yes.
16 A  Because of advice from counsel and because of what
17    I saw in the limited basis on the transcripts.
18 Q  You didn't read both of the transcripts?
19 A  I didn't read them all word for word.
20
21        (Whereupon, Letter dated October 14, 2010
22        consisting of 4 pages, was marked
23        Plaintiff's Exhibit No. 9 for
24        identification.)
25

---

58

1  Q  The reporter has handed you Plaintiff's Exhibit No.
2     9 which is, I believe, your letter of October 14,
3     2010.
4  A  Yes.
5  Q  To Dr. Muniz, correct?
6  A  Yes.
7  Q  And again, you make a reference to the judicial
8     hearing decision.
9  A  Yes.
10 Q  In the Re line.
11 A  Yes.
12 Q  And also in the first line to a Judicial Hearing
13    Committee.
14 A  Yes.
15 Q  This is essentially a re-transmittal of the new
16    recommendation of the MEC.
17 A  Yes.
18
19    MR. SOWELL: May I get some water? Why don't we
20    take a break.
21
22        (Short Break)
23
24 Q  Back to Plaintiff's Exhibit No. 9, which is your
25    letter of October 14, 2010. Who prepared that

---

59

1    letter?
2  A  Same folks that prepared the other letters.
3  Q  Gary Petok?
4  A  In conjunction with McNair.
5  Q  What about Terri Ergle?
6  A  She may have given some input, but apparently Terri
7     Ergle was more of a procedural input, not a legal
8     input.
9  Q  Now, the corrected report of the hearing panel
10    dated October 12, 2010, did Gary Petok participate
11    in the preparation of that?
12 A  I would assume so, yes.
13 Q  What about the McNair firm?
14 A  Probably both.
15 Q  Anybody else?
16 A  No.
17
18        (Whereupon, Letter dated October 22,
19        2010, consisting of 4 pages, was marked
20        Plaintiff's Exhibit No. 10 for
21        identification.)
22
23 Q  Can you identify Plaintiff's Exhibit No. 10 as a
24    letter of October 22, 2010 from me to you?
25 A  Yes.

---

60

1  Q  And was it receipted for on your behalf by Terri
2     Ergle?
3  A  Yes.
4  Q  I know Terri Ergle is the director of physician
5     services. What does she do for you as chief
6     executive officer? I mean, we know, for instance,
7     -- I'll kind of explain a little bit. We know she
8     receipted for this letter, so she has done that at
9     a minimum. But what else does she on a common,
10    typical basis, day-to-day basis do for the chief
11    executive officer?
12 A  Informational. She keeps me informed in terms of
13    who may be applying to staff that I should know
14    about. Any letters that she may have received from
15    the physicians that I need to know about. She
16    reports directly to Sharon Hagan. A lot of
17    information that I get may actually be through
18    Sharon.
19 Q  Sharon reports directly to you?
20 A  Yes.
21 Q  And she's the director of development?
22 A  Yes.
23 Q  But they all reside over here in this executive
24    wing to my left?
25 A  That's correct.

---

Carlos A. Milanes - 7/25/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

61

1
2          (Whereupon, Letter dated November 22,
3      2010, consisting of 4 pages, was marked
4      Plaintiff's Exhibit No. 11 for
5      identification.)
6
7  Q    Now, do you recognize Plaintiff's Exhibit No. 11 as
8      a November 22, 2010 letter that you wrote to Dr.
9      Muniz?
10 A    Yes.
11 Q    Who drafted that letter?
12 A    Probably myself and Terri with some input, probably
13     not much.
14 Q    Who chose the members of the Appellate Review
15     Panel?
16 A    I did with Dr. Kelly.
17 Q    Dr. Kelly, PhD?
18 A    Yes.
19 Q    What was his role in choosing?
20 A    He was our vice chief of -- vice chairman of the
21     board.
22 Q    Okay.  So the secretary to the board and the vice
23     chairman of the board chose these panel members?
24 A    And CEO.
25 Q    Right.  You're secretary of the board and CEO, yes?

62

1  A    Yes.
2  Q    What about the chairman of the board, Dr. Boehner?
3  A    We did not want to include Dr. Boehner giving that
4      he's the same specialty as Dr. Muniz, and we didn't
5      want any perception that there was bias in choosing
6      those Appellant Review Committee.
7  Q    Now, Dr. Boehner is chairman of the board?
8  A    Yes.
9  Q    And has been for how many years?
10 A    He was -- this would be his second year, so it
11     would have been 2010 and 2011.
12 Q    But he was chairman of the board at the time the
13     Judicial Hearing Committee conducted this most
14     recent hearing on Dr. Muniz?
15 A    Yes.
16 Q    So Dr. Kelly, PhD, he chose himself --
17 A    Yes.
18 Q    -- and Bob Alexander and Jonathan Collins, MD?
19 A    Yes.
20 Q    Now, what is Dr. Collins' specialty?
21 A    Pediatrics.
22 Q    Does he have any financial ties with the hospital?
23 A    No.
24
25          (Whereupon, Letter dated December 7,

63

1      2010, consisting of 1 page, was marked
2      Plaintiff's Exhibit No. 12 for
3      identification.)
4
5  Q    I'm going to show you -- the reporter has handed
6      you Plaintiff's Exhibit No. 12 and ask you if that
7      is your letter of December 17, 2010 to Dr. Muniz?
8  A    Yes.
9  Q    And you say in there that the Appellant Review
10     Panel has concluded its deliberations, correct?
11 A    Yes.
12 Q    Were those deliberations recorded?
13 A    I don't know.
14 Q    Was Terri Ergle present during those deliberations?
15 A    I believe she was.
16 Q    Was anybody else present during those
17     deliberations?
18 A    Not that I know of.
19 Q    Does Terri Ergle have an official job description?
20 A    Yes.
21 Q    A written job description?
22 A    Yes.
23
24          MR. SOWELL: We'd like to get that too, Terri
25      Ergle's job description.

64

1
2  Q    And do you have a job description?
3  A    Yes.
4
5          MR. SOWELL: We'd like to get that also.
6          MR. DAYHUFF: Put it in your letter.
7          MR. SOWELL: We will.
8
9  Q    And the letter says that the Appellate Review
10     Panel's recommendation was submitted to Board of
11     Governors on December 15, 2010 for final decision.
12 A    Yes.
13 Q    Now, who was on that Board of Governors other than
14     yourself as secretary, Dr. Kelly as vice chair, Dr.
15     Boehner as chairman, Bob Alexander?  Jonathan
16     Collins?
17 A    Yes.
18 Q    Who else?
19 A    The board -- I could get you a list of 2010 board
20     members.  Those are published.
21 Q    But all three of the Appellate Review Panel members
22     are on the board?
23 A    Yes.
24 Q    And were on the board at the time this
25     recommendation was forwarded to the Board of

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

65

1  Governors for final decision?
2  A  **Yes.**
3  Q  Did all three of them participate in the final
4     decision?
5  A  **Did all three participate?**
6  Q  Yes.
7  A  **They participated in the Appellate Review Panel.**
8  Q  Right.  But did they participate in the final
9     decision of the Board of Governors?
10 A  **They would have been members of the board in 2010,**
11    **yes.**
12 Q  Okay.  And did Dr. Boehner participate in the
13    decision of the Board of Governors?
14 A  **He recused himself.**
15 Q  Did anybody recuse himself other than Dr. Boehner?
16 A  **In my recollection Dr. Boehner.  I don't remember**
17    **who else.**
18 Q  Do you remember if anybody else recused himself or
19    herself?
20 A  **I don't.**
21 Q  But that should be the subject of an audio tape?
22 A  **That would be on record, yes.**
23 Q  Would the vote be on record?
24 A  **I don't know if vote by individual would be on**
25    **record or not.**

---

66

1
2            (Whereupon, January 18, 2011, consisting
3            of 4 pages, was marked Plaintiff's
4            Exhibit No. 13 for identification.)
5
6  Q  The reporter has handed you Plaintiff's Exhibit No.
7     13 which is the letter of January 18, 2011 to Dr.
8     Muniz.  Is that your letter?
9  A  **Yes.**
10 Q  It says, "The Board of Governors has concluded its
11    deliberations concerning your appeal and the
12    Appellate Review Panel's recommendation."
13 A  **Yes.**
14 Q  Now, were those deliberations conducted all in one
15    meeting?
16 A  **What deliberations are those?**
17 Q  The ones that were concluded by the Board of
18    Governors concerning Dr. Muniz's appeal.
19 A  **In that meeting, the deliberations regarded the**
20    **Appellate Review Panel's recommendation.**
21 Q  All in one meeting?
22 A  **Yes.**
23 Q  Was that in here?
24 A  **It would have been the meeting of December 15,**
25    **2010, if I'm remembering this correctly.**

---

67

1  Q  Well, now, the Appellant Review Panel's decision
2     was December 15, 2010.
3  A  **Then it would have been at the Board of Governors**
4     **meeting.**
5  Q  Right.  Would that have been in this room?
6  A  **We were meeting at that time in the classroom.**
7  Q  Across the hall?
8  A  **Yes.**
9  Q  But did those deliberations that are referenced in
10    the January 18th letter all occur in one meeting?
11 A  **Yes.  December -- I'm sorry.  December 6th.  I**
12    **don't remember the exact date of the Board of**
13    **Governors meeting.  I'd have to go back and look.**
14 Q  But there should be a record of who deliberated.
15 A  **Yes.**
16 Q  And what was deliberated.
17 A  **Yes.**
18 Q  And what was voted upon.
19 A  **Yes.**
20 Q  And who voted.
21 A  **Yes.**
22 Q  And who did not.
23 A  **Yes.**
24 Q  Now, I noticed in some of these records that you
25    and Terri Ergle and Sharon Hagan regularly attend

---

68

1     the meetings of the Medical Executive Committee.
2  A  **That's correct.**
3  Q  And that is customary, is it not?
4  A  **Yes.**
5  Q  How do you participate in those meetings?
6  A  **I participate as the CEO.**
7  Q  How does Sharon Hagan participate?
8  A  **In her role as director of development.**
9  Q  And how does Terri Ergle participate?
10 A  **Mostly procedural, taking minutes, so on and so**
11    **forth following the agenda.**
12 Q  What is the job of Sharon Hagan as director of
13    development?
14 A  **She has multiple duties, one of them being**
15    **physician relations.  She's also responsible for**
16    **marketing.  She's responsible for development of**
17    **general business.  She's responsible for recruiting**
18    **physicians.**
19 Q  This is a for profit hospital?
20 A  **Yes.**
21 Q  Is it its own profit center?
22 A  **Is it its own profit center meaning?  What do you**
23    **mean by that?**
24 Q  Meaning do they record your profits.
25 A  **Yes.**

---

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

69

1   Q   Alone.
2   A   We have our own financial statements, if that's
3       what you're asking.
4   Q   Yeah.
5   A   Yes.
6   Q   Who watches over those at UHS?
7   A   We have our chief financial officer, typically. We
8       have a regional finance director.
9   Q   Who is that?
10  A   His name is Cliff Somers.
11  Q   Where is he located?
12  A   King of Prussia.
13  Q   Anybody else?
14  A   My group vice president reviews our financials.
15      His boss reviews our financials. Cliff's boss
16      reviews our financials.
17  Q   Your boss is Frank Lopez?
18  A   Yes.
19  Q   And his boss is Mark Miller?
20  A   Yes.
21  Q   Who drafted the letter that's Plaintiff's Exhibit
22      No. 13?
23  A   Combination of myself, Gary, and typically Celeste
24      is who would help us.
25  Q   Celeste Tiller Jones?

---

70

1   A   Yes.
2
3       (Whereupon, Email, consisting of 1 page,
4       was marked Plaintiff's Exhibit No. 14 for
5       identification.)
6
7   Q   The reporter has handed you Plaintiff's Exhibit No.
8       14 which appears to be an email from Melissa Summer
9       to Sharon Hagan, Carlos Milanes. Melissa Summer,
10      just to confirm, is the director of marketing?
11  A   Yes.
12  Q   Does she report to Sharon Hagan?
13  A   Yes.
14  Q   Now, Direct Doctors, that's your phone line where
15      people can call in and get referrals from the
16      hospital?
17  A   Get referrals to physicians, that's correct.
18  Q   So once Dr. Muniz - it says "confirmation of taking
19      Dr. Muniz of Direct Doctors," but it's probably
20      "taking Dr. Muniz off of Direct Doctors" and not --
21  A   That's correct.
22  Q   So on March 3rd Melissa Summer confirmed from Betty
23      Weglos that Dr. Muniz had been taken off of Direct
24      Doctors?
25  A   Yes.

---

71

1   Q   So as of March 3rd she was not going to be getting
2       anymore referrals from ARMC?
3   A   That's correct.
4   Q   Now, who is Betty Weglos?
5   A   She is -- works for UHS and runs the Direct Doctors
6       program.
7   Q   Where is she located?
8   A   I don't know that.
9   Q   Not Aiken?
10  A   Not Aiken.
11  Q   So either King of Prussia, Pennsylvania or
12      somewhere in Texas or somewhere else other than
13      Aiken?
14  A   That's correct.
15  Q   But she is an employee of Universal Health
16      Services?
17  A   That's correct.
18  Q   Is it Services or Systems?
19  A   Services.
20  Q   Who would have told Betty Weglos to take Dr. Muniz
21      off of Direct Doctors?
22  A   Melissa would have come to me.
23  Q   So you would have directed her to --
24  A   Yes.
25  Q   -- direct Betty Weglos?

---

72

1   A   Yes.
2
3       (Whereupon, Disproportionate Share Sheet,
4       consisting of 1 page, was marked
5       Plaintiff's Exhibit No. 15 for
6       identification.)
7
8   Q   Reviewing Plaintiff's Exhibit No. 15, which you've
9       been handed by the reporter, is that some sort of
10      spreadsheet related to some kind of
11      disproportionate share?
12  A   Yes.
13  Q   And what is that? What is the disproportionate
14      share?
15  A   It's a program that the state currently has to
16      reimburse hospitals for what is considered charity
17      care, and those are patients that specifically
18      qualify for that reimbursement.
19  Q   Patients?
20  A   Yes.
21  Q   Who applies for that disproportionate share?
22  A   It is a reimbursement to hospitals only.
23  Q   So who applies for it?
24  A   We, as a hospital, they apply for it through our
25      Medicaid roles.

---

Carlos A. Milanes - 7/25/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

73

1  Q  And so you receive some reimbursements?
2  A  Yes.
3  Q  From the state of South Carolina?
4  A  Yes.
5  Q  Now, do the physicians also receive reimbursements?
6  A  From the hospital.
7  Q  Who receives reimbursements from the state of South
8     Carolina?
9  A  Yes.
10 Q  So some of the reimbursements to ARMC are passed on
11    to the physicians?
12 A  They are passed on to the physician because we
13    wanted to reimburse physicians who are on call and
14    treat indigent patients some type of reimbursement.
15    We do not have to do that. We did that because of
16    our volition.
17 Q  Well, this amount that's referenced in here, it's
18    referenced in some other documents, is $8,265.61.
19    Was it ever paid to Dr. Muniz?
20 A  2006, 2007, I believe this was. It would have been
21    -- we would have paid this in 2009, I believe.
22 Q  So you think this was paid?
23 A  I think this was paid. It's typically two or three
24    years tardy.
25 Q  Now, do you know if the hospital is delinquent on

74

1     any physician reimbursement for disproportionate
2     share to Dr. Muniz currently?
3  A  There is one year. I think it was the base year
4     after this one that we requested records from Dr.
5     Muniz. And we would be happy to pay her.
6  Q  What kind of records?
7  A  What we typically do is we ask Dr. Muniz for this
8     time period what specific records did you treat in
9     the ED that were indigent. We validate those, and
10    we pay them the Medicaid rate given those records.
11 Q  Have you actually requested those of Dr. Muniz?
12 A  Yes.
13 Q  Who did it?
14 A  We did through our business office, which is what
15    we typically do.
16 Q  And you're convinced of that?
17 A  I know it.
18 Q  So you think that the 8265.61 was paid probably in
19    2009, although it actually looks like, if you look
20    at this document right here, and I'll show it to
21    you --
22 A  It may have been '08. Yeah, you'll have to show me
23    --
24 Q  It looks like it was January of 2010.
25 A  Okay. It's typically two or three years tardy.

75

1
2         (Whereupon, Check Requisition, consisting
3         of 1 page, was marked Plaintiff's Exhibit
4         No. 16 for identification.)
5
6  Q  So that's Exhibit No. 16, Plaintiff's Exhibit No.
7     16. So it looks like there was a check requisition
8     for that disproportionate share of 8265.61 in
9     January of 2010. So you believe it was paid by
10    mail as indicated in that block down at the bottom?
11 A  Yes.
12 Q  But there is a check subsequent to that that hasn't
13    been paid because you requested some records from
14    Dr. Muniz?
15 A  Yes.
16 Q  And it is just one year?
17 A  Yes. It would be the base year after this one.
18
19         (Whereupon, Email, consisting of 1 page,
20         was marked Plaintiff's Exhibit No. 17 for
21         identification.)
22
23 Q  Can you identify Plaintiff's Exhibit No. 17?
24 A  Yes.
25 Q  What is that?

76

1  A  It would be just a note from Mark Tierney, our
2     former CFO, to Cliff Somers, the regional vice
3     president of finance.
4  Q  Where is Mark Tierney now?
5  A  He is in one of our hospitals in Bradenton,
6     Florida.
7  Q  Still employed by UHS?
8  A  Yes.
9  Q  Who is Talmon Ayers? I think you mentioned him
10    earlier.
11 A  He's our controller.
12 Q  So the attachment -- well, it says the subject is
13    case mix and LOS analysis. What is LOS?
14 A  Length of stay.
15 Q  For patients?
16 A  Yes.
17 Q  Because that impacts profitability, I assume? Both
18    case mix and length of stay?
19 A  That's correct.
20 Q  And the attachment is September case mix?
21 A  Yes.
22 Q  I mean, is that generally a mix between Medicare,
23    Medicaid, private insurance, no pay?
24 A  No. What this refers to is severity.
25 Q  Severity. You mean of illness or injury?

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

77

1 **A   Yes.**
2 Q   Who is Chuck Tawwater?
3 **A   He's one of our corporate risk managers.**
4 Q   T-a-w-w-a-t-e-r?
5 **A   Yes.**
6 Q   And where is he located?
7 **A   King of Prussia.**
8 Q   Does Lois El report to him?
9 **A   She doesn't report to him.  She has him as her**
10 **corporate contact.  She reports to me.**
11 Q   So he's a reference point for her?
12 **A   Yes.**
13
14        (Whereupon, Call Agenda, consisting of 1
15        page, was marked Plaintiff's Exhibit No.
16        18 for identification.)
17
18 Q   What is Plaintiff's Exhibit No. 18?
19 **A   Every month, subsequent to the month end, we have a**
20 **phone call with my boss, Frank Lopez, and we**
21 **discuss the financials, primarily.  And then I add**
22 **to that call an agenda of items that I want to**
23 **inform him about.**
24 Q   Who's on that call typically, other than you and
25 Frank Lopez?

---

78

1 **A   Scott Ansede would be there.  Sharon Hagan would be**
2 **on the phone call.**
3 Q   Scott's the COO?
4 **A   Yes.**
5 Q   Sharon's the director of development?
6 **A   Yes.  Denise Finkbeiner, our chief nursing officer.**
7 Q   Denise Finkbeiner.  Anybody else?
8 **A   And once -- sometimes Cliff Somers joins.**
9 Q   He's the controller?
10 **A   Cliff Somers is the regional finance.**
11 Q   Oh, yeah.  Now, I'm sure I've asked you some of
12 this.  But Frank Lopez is in King of Prussia?
13 **A   Yes.**
14 Q   And so is Cliff Somers?
15 **A   Yes.**
16 Q   And they both report to Mr. Martin?  Is it Martin
17 or Miller?
18 **A   Frank Lopez reports to Mark Miller.**
19 Q   Yeah, Mark Miller.
20 **A   And the regional -- the VP of finance for the**
21 **company is JP Christen.**
22 Q   Is that who Cliff Somers --
23 **A   I believe he does.**
24 Q   -- reports to?
25 **A   I don't know if there's a middle person.  I believe**

---

79

1 **Cliff does report directly to JP.**
2 Q   Do you have -- does Universal Health Systems have
3 an intranet?
4 **A   Intranet?**
5 Q   Yes.
6 **A   Yes.**
7 Q   Does Aiken Regional Medical Centers have an
8 intranet?
9 **A   Yeah.**
10 Q   Separate from Universal Health Systems?
11 **A   Yes.**
12 Q   And are you on both of them?
13 **A   Yeah.  I have access to both of them.**
14 Q   Who else in the executive suite has access to both
15 of them?
16 **A   Our intranet locally, all our employees do.**
17 Q   What about Universal Health Systems?
18 **A   Typically, UHS employees and the -- folks that we**
19 **feel are privy to some of that.  It's basically**
20 **information based.**
21 Q   Who, though, typically?
22 **A   The C-Suite, Universal Health Services employees.**
23 Q   The ones up here that you outlined earlier?
24 **A   Yes.**
25 Q   Now, at about this time -- about the time this

---

80

1 litigation commenced I wrote either Celeste Tiller
2 Jones or Jane Trinkley a letter and asked them to
3 put a hold on any electronic mails that ARMC
4 employees or Universal Health Systems might have
5 with respect to Dr. Muniz and these proceedings.
6 Did you do that?
7 **A   Yes.**
8 Q   And was that done through some manager of
9 information services?
10 **A   It was done through our own computers.  We do not**
11 **delete anything.  And also through IS.  They were**
12 **also aware not to have anything deleted.**
13 Q   At Universal Health Services?
14 **A   And here.**
15 Q   Okay.  Who is the manager of information systems
16 here?
17 **A   Kevin Kingrey.**
18 Q   And who is the manager of information services at
19 Universal Health Services?
20 **A   You're asking me all these quiz questions and it's**
21 **late.  I will get you that.**
22 Q   Okay.  Now, have you found any emails related to
23 Dr. Muniz?
24 **A   Have I found any?  I have not deleted any since**
25 **that point.**

---

Carlos A. Milanes - 7/25/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

81

1   Q   Have you looked for any?
2   A   I have no reason to look for any.
3   Q   Well, we've requested them in our document request.
4   A   No, everything I have you have.
5   Q   And you think that would be true also for the
6       people in C-Suite?
7   A   Yes.
8   Q   Now, these calls, what do they typical cover?
9   A   Primarily it's a financial review.
10  Q   But there may be some other items like item six
11      here, Muniz update?
12  A   Informational - this is what happened to her
13      privileges; this is where she's the status; this is
14      where she's requesting a hearing. That type of
15      information.
16  Q   Now, do you make notes in order to present this
17      report?
18  A   Primarily I have mental notes. This is my notes.
19  Q   So you don't think you would have any other notes
20      related to this Muniz update?
21  A   No. No, these are my notes.
22  Q   Why are you reporting this to Universal Health
23      Services?
24  A   I report everything that occurs locally to Frank.
25  Q   Have they given you any direction with respect to

---

82

1       Dr. Muniz?
2   A   No.
3   Q   None?
4   A   No.
5   Q   Except for your lawyer, Gary Petok?
6   A   Yes.
7
8       MR. DAYHUFF: Petok.
9       MR. SOWELL: Petok, yes.
10
11  Q   Except for Gary Petok?
12  A   That's correct.
13  Q   You've gotten no direction from Universal Health
14      Services?
15  A   That's correct.
16
17      (Whereupon, Email, consisting of 1 page,
18       was marked Plaintiff's Exhibit No. 19 for
19       identification.)
20
21  Q   Now, this is an email at the top -- Of course, you
22      read from top to bottom, but the latest one is from
23      you to Sharon Hagan. Very cryptic. Have not. But
24      the original email is from Sharon Hagan to Rachel
25      Moulton and copied to you. Who is Rachel Moulton?

---

83

1   A   She, at the time, was our acting CEO at our Aurora
2       Pavilion which is our psych facility next door.
3   Q   Is that where Dr. Muniz is located?
4   A   No. She's located at a medical office building on
5       campus.
6   Q   What is Aurora Pavilion? I didn't quite understand
7       that.
8   A   It's a 47 bed, free standing psychiatric facility
9       that is under the license of the hospital.
10  Q   I see. You said psych. I missed that part. So
11      it's a psychiatric facility?
12  A   Yes.
13  Q   Okay. Now, why is Sharon Hagan interested in what
14      Dr. Muniz is doing with her office space?
15  A   She would not be. She's interested in that that
16      could potentially compete with the service that
17      we're providing.
18  Q   You mean the drug and alcohol center?
19  A   Yes.
20
21      (Whereupon, OPS Call Agenda, consisting
22       of 1 pages, was marked Plaintiff's
23       Exhibit No. 20 for identification.)
24
25  Q   Plaintiff's Exhibit No. 20, now it says it's an

---

84

1       OPS. Is that operations call agenda?
2   A   We call it OPS call, but operations call.
3   Q   I mean, is that any different from the ones we were
4       looking at before?
5   A   Same exact thing.
6   Q   Who prepares these agendas?
7   A   I do.
8   Q   What is Universal Health Services' interest in Dr.
9       Muniz?
10  A   The interest would only be through vice president
11      and any time a physician is affected in terms of
12      anything, whether they be privileges or in terms of
13      the business, we are very concerned about it.
14
15      (Whereupon, Monthly Report, consisting of
16       1 page, was marked Plaintiff's Exhibit
17       No. 21 for identification.)
18
19  Q   What is Plaintiff's Exhibit No. 21?
20  A   This is part of what we call our monthly report.
21  Q   Is it different from this OPS report?
22  A   The monthly report comes first. The OPS call
23      agenda and the OPS call comes after that. And some
24      of what we discussed in the OPS call is this
25      monthly report which also deals with our

---

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

85

1    financials.
2  Q   The monthly report is a written report to Universal
3      Health Services and the OPS thing is more of an
4      agenda for call with Universal Health Services?
5  A   Yes.
6
7          (Whereupon, Monthly Report, consisting of
8          1 page, was marked Plaintiff's Exhibit
9          No. 22 for identification.)
10
11 Q   What is Plaintiff's Exhibit No. 22?
12 A   It looks to be the monthly report from October
13     2009.
14 Q   It's just a different -- it says CEO monthly report
15     --
16 A   It's just titled differently.
17 Q   -- but it's the same?  Same report?
18 A   Same report.
19 Q   Now, who receives this report?
20 A   I send it to Frank Lopez and then Cliff Somers gets
21     a copy.
22
23          (Whereupon, Email, consisting of 1 page,
24          was marked Plaintiff's Exhibit No. 23 for
25          identification.)

---

86

1
2  Q   What is Plaintiff's Exhibit No. 23?
3  A   This was I -- typically before I finalize the
4      agenda I will ask some members of my senior team,
5      specifically the COO and the CFO, for their input.
6      Do they have anything that I missed, anything I
7      should address.
8  Q   And so this is just one of those from Mark --
9  A   It's Mark getting back to me saying you may want to
10     mention this.
11 Q   And Patricia Jackson does the actual editing as a
12     physical function?
13 A   Yes.
14 Q   As your administrative assistant?
15 A   Yes.
16 Q   So she's the scrivener of these documents?
17 A   There you go.  Like a Girl Friday.
18 Q   Okay.
19
20          (Whereupon, Frank Lopez Agenda,
21          consisting of 1 page, was marked
22          Plaintiff's Exhibit No. 24 for
23          identification.)
24
25 Q   Now, is Plaintiff's Exhibit No. 24 something

---

87

1      different from these monthly calls?
2  A   No.
3  Q   But in this particular case that's what this is?
4      This is the agenda for the monthly call?
5  A   This is an agenda.  When Frank Lopez visits Aiken
6      Regional, which he does once every few months, I
7      also prepare an agenda for him so we'll have some
8      structure as to certain discussion points.
9  Q   So this was a meeting where he attended in person?
10 A   This looks like a meeting where he was here in
11     Aiken.
12 Q   And this particular case, Sharon Hagan was going to
13     give the update on Dr. Muniz?
14 A   She was going to give an update in general of
15     physician issues, and Dr. Muniz would have been one
16     of those.
17 Q   Now, why is she interested in Dr. Muniz?
18 A   She's interested in the business development for
19     the hospital.  And if Dr. Muniz, -- at the time, we
20     had issues with her in terms of her practice that
21     affects us financially.
22 Q   How so?
23 A   How so?  Because she contributes to a specialty
24     where we are very under served here in Aiken.
25 Q   Are you recruiting an OB/Gyn now?

---

88

1  A   Yes.
2  Q   And how are you recruiting one?
3  A   We have corporate recruiting that helps us, which
4      they go nationwide.
5  Q   And will that person be subsidized in the
6      beginning?
7  A   Typically when we recruit a physician from out of
8      town, yes, we subsidize them for a certain period
9      of time.
10 Q   I mean, who -- is this somebody Universal Health
11     Services has got a corporate recruiter doing?
12 A   Yes.
13 Q   Who is that?
14 A   I don't know her name.  The gentleman who's in
15     charge of the whole area of recruitment as well as
16     other responsibilities, his name is Ken Griffin.
17 Q   Is he in King of Prussia?
18 A   He's in Tampa.
19
20          (Whereupon, Email, consisting of 1 page,
21          was marked Plaintiff's Exhibit No. 25 for
22          identification.)
23
24 Q   Can you identify Plaintiff's Exhibit No. 25?
25 A   As I'm reading it, I can identify it.

---

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

|  | 89 |
|---|---|
| 1 | Q   What is it? |
| 2 | A   It's a note, looks like from Sharon to Mr. Nauful, |
| 3 | asking him to explain the vote. |
| 4 | Q   Do you know if she, Sharon Hagan, was in regular |
| 5 | communication with Ernie Nauful, the hearing |
| 6 | officer? |
| 7 | A   She wasn't, Terri was. |
| 8 | Q   Okay.  And Terri was in communication with the |
| 9 | hearing officer on behalf of whom? |
| 10 | A   It would have been on behalf of the hospital. |
| 11 | Q   Aiken Regional Medical Centers? |
| 12 | A   Yes. |
| 13 | Q   Do you know who was the one member of the panel |
| 14 | adamantly against the MEC's decision? |
| 15 | A   I don't.  I don't recall. |
| 16 | Q   Do you remember what the reason for it was? |
| 17 | A   I don't remember that either. |
| 18 |  |
| 19 | (Whereupon, Email, consisting of 2 pages, |
| 20 | was marked Plaintiff's Exhibit No. 26 for |
| 21 | identification.) |
| 22 |  |
| 23 | Q   Can you identify Plaintiff's Exhibit No. 26? |
| 24 | A   As I'm reading it. |
| 25 | Q   Yeah.  You see it's an email from Ernie Nauful to |

|  | 90 |
|---|---|
| 1 | Celeste Jones? |
| 2 | A   Yeah. |
| 3 | Q   Is anybody else copied on that email? |
| 4 | A   Doesn't look like it. |
| 5 | Q   And then there's preceding it an email from Celeste |
| 6 | Jones to Ernie Nauful. |
| 7 | A   Yes. |
| 8 | Q   Is anybody copied on that email? |
| 9 | A   Doesn't look like it. |
| 10 | Q   Does it appear that Celeste Jones is telling Ernie |
| 11 | Nauful that he's not done the report correctly? |
| 12 |  |
| 13 | MR. DAYHUFF: Object to the form of the question. |
| 14 | You can answer it. |
| 15 |  |
| 16 | A   I can only interpret what she's saying by what I |
| 17 | read.  This is the first I've seen this.  And I was |
| 18 | not copied on this. |
| 19 | Q   I mean, does it look like she's telling Ernie |
| 20 | Nauful that he didn't do the first report |
| 21 | correctly? |
| 22 |  |
| 23 | MR. DAYHUFF: Object to the form of the question. |
| 24 | You can answer it. |
| 25 |  |

|  | 91 |
|---|---|
| 1 | A   It appears that, yes, Celeste is advising Ernie to |
| 2 | reconsider a decision with the correct burden of |
| 3 | proof.  I believe that's what this meant. |
| 4 | Q   And who was Celeste representing when she sent this |
| 5 | email? |
| 6 | A   Representing the hospital. |
| 7 | Q   Aiken Regional Medical Centers? |
| 8 | A   Yes. |
| 9 | Q   Who was representing the Medical Executive |
| 10 | Committee during these hearings? |
| 11 | A   Same counsel. |
| 12 | Q   Celeste Jones and Jane Trinkley? |
| 13 | A   Yes. |
| 14 | Q   So they represented both the hospital and the |
| 15 | Medical Executive Committee? |
| 16 | A   Yes. |
| 17 | Q   All at the same time? |
| 18 | A   Yes. |
| 19 | Q   And they advised Ernie Nauful on how he was to |
| 20 | prepare his report? |
| 21 |  |
| 22 | MR. DAYHUFF: Object to the form of the question. |
| 23 | You can answer it. |
| 24 |  |
| 25 | A   She wrote in this email about redoing the hearing |

|  | 92 |
|---|---|
| 1 | panel decision with the correct burden of proof. |
| 2 |  |
| 3 | (Whereupon, Email, consisting of 1 page, |
| 4 | was marked Plaintiff's Exhibit No. 27 for |
| 5 | identification.) |
| 6 |  |
| 7 | Q   Have you ever seen this email from Ernie Nauful to |
| 8 | Celeste Jones dated August 27, 2010 which is |
| 9 | Plaintiff's Exhibit No. 27? |
| 10 | A   No. |
| 11 | Q   Did you ever understand that Dr. Kinsey had a |
| 12 | problem with the report? |
| 13 | A   No. |
| 14 | Q   Is anybody copied on this email other than Celeste |
| 15 | Jones? |
| 16 | A   No. |
| 17 |  |
| 18 | (Whereupon, National Practitioner |
| 19 | Databank Report, consisting of 1 pages, |
| 20 | was marked Plaintiff's Exhibit No. 28 for |
| 21 | identification.) |
| 22 |  |
| 23 | Q   Can you identify Plaintiff's Exhibit No. 28? |
| 24 | A   Yes. |
| 25 | Q   What is that? |

Carlos A. Milanes - 7/25/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

93

1  A  It's the National Practitioner Databank Report on
2     Dr. Muniz.
3  Q  Processed on February 3, 2011?
4  A  Yes.
5  Q  Who prepared this?
6  A  This would have been with legal counsel.  Same
7     legal counsel we were talking about.
8  Q  Mr. Petok?
9  A  Mr. Petok, primarily.
10 Q  And McNair firm?
11 A  I believe they were still our legal firm.  (To mr.
12    Dayhuff) When did you guys take over?  And outside
13    counsel.
14 Q  Whoever it was.  So you think it was probably Gary
15    Petok and the outside counsel?
16 A  Primarily this would have been Gary.
17 Q  Was it submitted from here or did he submit it?
18 A  We submit it online.
19 Q  But who actually submitted it?
20 A  It would have been from here through Terri.
21
22        (Whereupon, Email, consisting of 3 pages,
23        was marked Plaintiff's Exhibit No. 29 for
24        identification.)
25

94

1  Q  Now, do you see that Plaintiff's Exhibit No. 29 is
2     some emails back and forth between Ernie Nauful and
3     Terri Ergle?
4  A  Yes.
5  Q  And Terri Ergle was acting on behalf of the Aiken
6     Regional Medical Centers?
7  A  Yes.
8  Q  And Ernie Nauful was operating as independent
9     hearing officer?
10 A  Yes.
11 Q  Is anybody copied on these emails?
12 A  No.
13 Q  If you look on the second page it looks like
14    there's a forwarding in the matter of Margo Muniz.
15    I guess that's a forwarding of that bottom email,
16    is that what you think that is?
17 A  The one from Ernie to Terri?
18 Q  Yeah.  It doesn't make any sense.
19 A  I don't see that there's a forwarding there.
20 Q  Well, I'm looking, you see where it says forwarded
21    in the matter of Margo Muniz, MD.  Do you know what
22    is being forwarded?
23 A  I don't.
24 Q  Now, this is being done on Universal Health
25    Services intranet?

95

1  A  This would be our email system through Outlook
2     Express.
3  Q  Universal Health Services?
4  A  It's through Outlook, yes.
5  Q  Okay.  I got you.  So that's just her regular email
6     address?
7  A  That's her regular email.
8  Q  Now, as all of this is going on is Terri Ergle
9     keeping you apprized of the progress of the matter?
10 A  She does typically.  Not every single step of the
11    way, but she does when it's germane.
12 Q  I mean, does she do it by just walking into your
13    office or picking up the telephone and telling you?
14 A  Yes.
15 Q  Do you know what is typically referred to as due
16    process or the due process clause?
17 A  Yes.
18 Q  What does that mean?
19 A  Due process that we follow the bylaws.
20 Q  So for ARMC, due process to you means you follow
21    the bylaws?
22
23    MR. DAYHUFF: Object to the form of the question.
24       Calls for a legal conclusion, but you can
25       answer it.

96

1
2  A  We follow the fair hearing process in regard to
3     this case with bylaws.
4  Q  Do you know what ex parte communications are?
5  A  Not specifically.
6
7        (Whereupon, Email, consisting of 4 pages,
8        was marked Plaintiff's Exhibit No. 30 for
9        identification.)
10
11 Q  Plaintiff's Exhibit No. 30, the second email down
12    from the top, that's an email from Terri Ergle to
13    Celeste Jones who was the hospital's attorney,
14    correct?
15 A  Yes.
16 Q  She was also the EMC's attorney at the hearings,
17    correct?
18 A  Yes.
19 Q  Gary Petok, who is the hospital's attorney?
20 A  Yes.
21 Q  And Ernie Nauful, who is the independent hearing
22    officer?
23 A  Yes.
24 Q  Were there any copies there to Biff Sowell or David
25    Dick?

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

97

1  A  No.
2  Q  Now, if you look down at the bottom there is a
3     reference in the subject line request letter. It
4     says, "Please see attached correspondence. Call me
5     so we can discuss the next step."
6
7     MR. SOWELL: Travis, I'd like to get that so I'll
8        know what these emails are about. This is the
9        October 8, 2010 from Terri Ergle to Ernie
10       Nauful which references some attached
11       correspondence.
12    MR. DAYHUFF: If we've got it.
13    MR. SOWELL: Yeah.
14    MR. DAYHUFF: Sure.
15
16 A  Does it reference an attachment?
17 Q  Yeah.
18 A  I see subject request letter. Is there something
19    that says attachment?
20 Q  Well, it says please see attached correspondence.
21 A  Okay.
22
23    MR. DAYHUFF: Yeah, just make sure that's on that
24       list and I'll take a look at it.
25

---

98

1  Q  Now, before the hearing panel issued either of its
2     reports in connection with 2010 hearings, did you
3     discuss the matter with anybody on the hearing
4     panel?
5  A  No.
6  Q  Did anybody in your office discuss the matter with
7     anybody on the hearing panel?
8  A  No.
9  Q  What about Terri Ergle?
10 A  She was part of -- she was sitting in the hearing
11    panel. She didn't discuss the decision with them.
12 Q  Who primarily responds to credentialing request
13    here?
14 A  Primarily responds to what type of credentialing
15    request?
16 Q  From other hospitals.
17 A  Terri Ergle.
18 Q  What's the relationship of ARMC to University
19    Hospital in Augusta?
20 A  We're the independent hospital. We both function
21    in a nearby market.
22 Q  You're competitors?
23 A  We're competitors.
24 Q  Would the same thing be true with respect to
25    Doctors Hospital in Augusta?

---

99

1  A  Peripherally so.
2  Q  Now, at some point, University Hospital was trying
3     to put some sort of satellite in Aiken, correct?
4  A  They bought land in Aiken.
5  Q  Did they ever proceed beyond that?
6  A  No.
7  Q  Why not?
8  A  You'd have to ask them that.
9  Q  Did you oppose it?
10 A  No. This was not a certificate of need issue.
11 Q  They never applied for a certificate of need?
12 A  No. They didn't have to.
13 Q  For that particular facility, you mean?
14 A  Not to buy land.
15 Q  Well, I understand. But if they were going to put
16    a facility on there, I guess they would.
17 A  Depending on what facility it was.
18 Q  So do they still own the land?
19 A  Yes. It's for sale if you want to buy it.
20 Q  I can't afford it. Wouldn't matter what it cost.
21
22    (Whereupon, Incident Summary Report,
23       consisting of 1 page, was marked
24       Plaintiff's Exhibit No. 31 for
25       identification.)

---

100

1
2  Q  Can you identify Plaintiff's Exhibit No. 31?
3  A  Yes. It's a summary of incidents produced by our
4     case management director at the time. And from
5     what I recall, this went to our peer review
6     committee.
7  Q  Who was the case manager director?
8  A  It was Barbara Miller.
9  Q  Is she still here?
10 A  No.
11 Q  Where is she now?
12 A  She, I believe, is -- I don't know where she is. I
13    know she -- she left here for another position, so
14    I don't know if she's still there or not. Outside
15    of Aiken.
16 Q  You notice in the middle there there's an
17    adjustment with respect to less than 39 week
18    inductions for c-sections?
19 A  Yes.
20 Q  Do you know why that's important?
21 A  I'm not a clinician, so I can't say specifically.
22    But those are the more sensitive babies to watch
23    and those are the more difficult cases.
24 Q  Less than 39 weeks?
25 A  Yes.

---

**Thompson Court Reporting, Inc.**
**www.thompsonreporting.com**

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

101

1
2       MR. SOWELL: Travis, we don't understand why -- we
3           can understand why you might black out the
4           names of the doctors, but we can't understand
5           why we wouldn't get the other statistics.
6       MR. DAYHUFF: Well, it's been blacked out because of
7           the peer review protection for the other
8           doctors and their information.  That is why
9           it's been redacted.  And I think the thinking
10          was -- I'd have to go back and look at the
11          document.  There are so few folks here that I
12          didn't feel comfortable and felt it would
13          violate that statute to produce the
14          substantive information about them, even with
15          their names redacted.
16      MR. SOWELL: We request you to go back and revisit
17          that issue.
18      MR. DAYHUFF: I will certainly revisit it.  I don't
19          think other people's peer review's relevant or
20          properly producible, but I will revisit it.
21      MR. SOWELL: The other thing is we have gotten a lot
22          of black holes documents.
23      MR. DAYHUFF: Indeed you have.
24      MR. SOWELL: Yeah.  And so we would like a privilege
25          log.  I think we're entitled to one.

---

102

1       MR. DAYHUFF: We can do that, as long as the
2           privilege log goes both ways.
3       MR. SOWELL: Oh, yeah.
4       MR. DAYHUFF: That's fine.
5       MR. SOWELL: You would be entitled to one from us
6           too.
7       MR. DAYHUFF: Absolutely.  Okay.  Well, I've
8           discussed that with your associate and the
9           other alternative we talked about was
10          removing, with respect to emails, so you can
11          see who to and from is.  And what you'll
12          see is a bunch of to and from the in-house
13          attorney and the outside attorney.  I don't
14          know if that would be acceptable to you as an
15          alternative.  But we can revisit that.
16
17              (Whereupon, Email, consisting of 1 page,
18              was marked Plaintiff's Exhibit No. 32 for
19              identification.)
20
21  Q    The reporter has handed you Plaintiff's Exhibit No.
22      32.  Now, this looks like a different agenda.  And
23      the reason I say that is because it's directed to
24      Mark Miller, not to Mr. Lopez.
25  A    I was reporting to Mark Miller at the time.

---

103

1   Q    Okay.  When did that change from Mark Miller to Mr.
2       Lopez?
3   A    **Shortly after this.  Maybe a month or two after**
4       **this.**
5   Q    But the same report?
6   A    **Same report.**
7   Q    And who is Russann Jeantet?
8   A    **Mark Miller's secretary.**
9
10              (Whereupon, Email, consisting of 2 pages,
11              was marked Plaintiff's Exhibit No. 33 for
12              identification.)
13
14  Q    Do you recognize Plaintiff's Exhibit No. 33 which
15      has been handed to you as the email we were talking
16      about a minute ago where I asked Jane Trinkley to
17      make sure you and ARMC and MEC and Universal Health
18      Services preserve all electronically stored
19      information related to Dr. Muniz?
20  A    **Yes.**
21  Q    And you've done that, to the best of your
22      knowledge?
23  A    **Yes.**
24  Q    Who is Aiken Regional Medical Centers' management,
25      would that be the C-Team or the C floor?

---

104

1   A    **Yes.  Local management would be the C-Suite.**
2   Q    What is the senior team?
3   A    **It's the C-Suite in addition to visit development**
4       **director which would be Sharon and my HR director**
5       **is on the senior team.  That's flexible depending**
6       **on different CEOs do things different ways.**
7
8               (Whereupon, Email, consisting of 1 page,
9               was marked Plaintiff's Exhibit No. 34 for
10              identification.)
11
12  Q    Now, is Plaintiff's Exhibit No. 34 an email from
13      Terri Ergle to the Aiken Regional Medical Centers
14      management distribution and the Aiken Regional
15      Medical Centers senior team dated February 25th?
16  A    **Yes.**
17  Q    Now, that's the date of Dr. Muniz's summary
18      suspension, is it not?
19  A    **I believe it is.**
20  Q    And so Terri Ergle's telling all these people that
21      effective immediately Dr. Muniz is no longer on the
22      medical staff and does not have privileges?
23  A    **Yes.**
24  Q    Who is Shirley McIntosh?
25  A    **Shirley McIntosh is our assistant marketing.**

---

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

| 105 |
| --- |

1  Q  Still here?
2  A  Still here.
3  Q  Reporting to whom?
4  A  She reports to Melissa Summer.
5  Q  Now, the disproportionate share payments that go to
6     the doctors, are those payments made as a result of
7     the requirement in the bylaws that these doctors
8     take emergency call?
9  A  Yes.
10 Q  And do you know who makes out the emergency call
11    schedule for the OB/Gyns?
12 A  Terri Ergle, in conjunction with communication with
13    them.
14 Q  With the OB/Gyns?
15 A  Yes. And other specialities.
16 Q  This appears to be, we believe it to be, the call
17    schedule for OB/Gyn. I don't know. It might be
18    labor and delivery. I don't know what they call
19    it, but that floor that Dr. Muniz responded to on
20    February 23, 2010. Who is listed as the call
21    doctor for February 23, 2010?
22 A  Brandon Daniels.
23 Q  And you think Terri Ergle would have made up this
24    schedule?
25 A  Terri Ergle would have possibly assisted in making

| 106 |
| --- |

1     up the schedule.
2  Q  Now, when the on-call physician is to be called,
3     who makes the call? In other words, who puts this
4     schedule into play?
5  A  If it's an emergency room patient, it would be the
6     emergency room physician or staff. If it's a labor
7     and delivery patient up on their floor, they would
8     make the call. So this may actually have been
9     produced by them.
10 Q  Okay.
11 A  That's the reason I'm not sure if Terri was
12    directly involved with this or not.
13 Q  Do you know why they would have called Dr. Muniz if
14    Brandon Daniels is the on-call physician on
15    February 23rd?
16 A  She would have been covering for them.
17 Q  That's what you believe?
18 A  That's what typically happens.
19
20        (Whereupon, KD Justyn Interview,
21        consisting of 4 pages, was marked
22        Plaintiff's Exhibit No. 36 for
23        identification.)
24
25 Q  Have you ever seen Plaintiff's Exhibit No. 36?

| 107 |
| --- |

1  A  Not as I'm looking at it today. But I believe I
2     know what it refers to.
3  Q  This 72,000 square foot medical complex on Silver
4     Bluff Road, is that the same piece of property that
5     you were talking about a minute ago?
6  A  Yes.
7  Q  Does it say that the Aiken Regional Medical Centers
8     has opposed the complex?
9  A  I'd have to read through the article. We did
10    oppose them building on that land, yes.
11 Q  Okay. Well, you can go ahead and read it.
12 A  I'm not going to read this whole thing.
13 Q  Okay. Well, then I'll go back --
14 A  I mean, I can recall enough of it not -- to not
15    have to read it.
16 Q  Okay. Can't have it both ways. If you want to
17    read it, read it. If you don't --
18 A  I will waive reading it for the sake of time.
19 Q  Now, it says the Aiken Regional Medical Centers has
20    opposed the complex, is that true?
21 A  Yes.
22 Q  For the reasons stated in the interview?
23 A  Yes.
24 Q  That it would hurt the ARMC?
25 A  Yes.

| 108 |
| --- |

1  Q  Well, why is it that University has not proceeded
2     beyond the purchase of the land?
3  A  You'd have to ask them that.
4  Q  Did the local government tell them they couldn't
5     build anything there?
6  A  No. The city counsel restricted the size of
7     building that they were going to build there.
8  Q  So it would have been less than 72,000 square feet?
9  A  Yes.
10 Q  What square footage was it restricted to?
11 A  I don't recall. I think it may have been maybe
12    possibly a third of that size.
13 Q  Now, did you have a lobbyist who lobbied city
14    counsel in that respect?
15 A  We didn't have a lobbyist per se. We had people
16    that were there that spoke on our behalf, KD Justyn
17    being one of them.
18 Q  Who else?
19 A  Dr. Kelly, I believe, may have spoken. I believe
20    one of our doctors spoke. And I don't recall who
21    else.
22 Q  Who was the doctor?
23 A  Dr. Tim Shannon.
24 Q  Is he still here?
25 A  Yes.

Carlos A. Milanes - 7/25/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

109

1   Q   What's his specialty?
2   A   **Orthopaedic surgeon.**
3   Q   Do you generally agree with what's stated in this
4       interview?
5   A   **Generally.**
6   Q   Let's look at the second page.  About 60 percent of
7       the way down the Aiken Standard says, "When I asked
8       University officials they were up front that this
9       is a business decision."
10  A   **Okay, I see it.**
11  Q   And then Ms. Justyn says, "Well, yes, now I recruit
12      doctors.  Do you think I'm going to recruit a
13      doctor who says to me I'm going to go live over in
14      Georgia and I'm going to get privileges at both
15      hospitals.  I'm looking for people who are just
16      going to service people in Aiken County and so are
17      they.  That's the truth of the business."  Do you
18      agree with that?
19  A   **Yes.**
20  Q   Does the Aiken Regional Medical Centers -- of
21      course, you receive Medicaid and Medicare funds,
22      don't you?
23  A   **Yes.**
24  Q   Is that part B or what is that?
25  A   **No.  Part B is for the physicians.**

---

110

1   Q   Part A, then?
2   A   **Part A.**
3   Q   What other -- and you receive these
4       disproportionate share funds from the state of
5       South Carolina?
6   A   **Yes.**
7   Q   Both for the hospital and the doctors?
8   A   **For the hospital.**
9   Q   Yeah.  But you pass some of it on to the doctor?
10  A   **Yes.**
11  Q   But you keep some of it?
12  A   **Yes.**
13  Q   So the Aiken Regional Medical Centers is supported
14      in part by Medicare and Medicaid Part A?
15  A   **Yes.**
16  Q   And also by the state of South Carolina?
17  A   **Yes.**
18  Q   Have you ever received any funds from Aiken County?
19  A   **No.**
20  Q   Never?
21  A   **No.**
22  Q   So the county never subsidized the Aiken Regional
23      Medical Centers, that you know of?
24  A   **No.**
25  Q   Now, any other governmental funds to subsidize the

---

111

1       medical center?
2   A   **No.**
3   Q   Do you have a policy here to restrict your
4       physicians from obtaining privileges in Augusta?
5   A   **No.**
6   Q   Is KD Justyn still paid by the hospital?
7   A   **No.**
8   Q   So she's not on consultancy or any kind of
9       contract?
10  A   **No.**
11
12          (Whereupon, UHS Monthly Report,
13          consisting of 1 page, was marked
14          Plaintiff's Exhibit No. 37 for
15          identification.)
16
17  Q   What is Plaintiff's Exhibit No. 37?
18  A   **It looks to be off of a monthly report of some**
19      **sort.**
20  Q   What sort, though?
21  A   **This probably is part of my monthly part.  It's**
22      **just different format.**
23  Q   You mean to UHS?
24  A   **To UHS.  Same report that I was giving to Frank**
25      **Lopez every month.**

---

112

1   Q   Do you know how Women -- who is Women Services?
2   A   **It would encompass labor and delivery, postpartum**
3       **diagnostic -- women's diagnostic services.**
4   Q   Is anybody in particular responsible for that?
5   A   **For the labor and delivery and the postpartum we**
6       **have a nurse manager.**
7   Q   Who is that?
8   A   **Jessie Ford.**
9   Q   How long has she been the nurse manager?
10  A   **She has been the nurse manager I believe shortly**
11      **after I got here.**
12  Q   As COO?
13  A   **As the nurse manager of labor and delivery.**
14  Q   Right.  Shortly after you got here as COO?
15  A   **As the COO, yes.**
16  Q   So a long time?
17  A   **She's been here a while as nurse manager, yes.**
18  Q   Does she report to the director of nursing?
19  A   **She reports through one of her directors and then**
20      **who reports to the director.  So there's a middle**
21      **level.**
22  Q   So who does Jessie report to?
23  A   **Gina Fallon.**
24  Q   So how did Women Services work with the existing
25      OB/Gyns to absorb the majority of Dr. Muniz's

---

Carlos A. Milanes - 7/25/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

113

```
1    volumes?
2  A  This is basically informing that, as far as we
3     knew, a good number of the patients that would have
4     gone to Dr. Muniz were not going to the other
5     practices.  And that's just by us talking to the
6     other doctors.  We didn't -- we don't -- we can't
7     influence that.  That's simply informational.
8  Q  Do you know if anybody at the hospital has tried to
9     influence that?
10 A  There's no way we can influence that.  We don't
11    have access to her patients or her case load.  We
12    have no way of doing that.
13
14       (Whereupon, Email, consisting of 1 page,
15       was marked Plaintiff's Exhibit No. 38 for
16       identification.)
17
18 Q  Can you identify Plaintiff's Exhibit No. 38?
19 A  Yes.
20 Q  What is that?
21 A  I believe it is the same email that I saw earlier
22    today.  It was Mark Tierney asking for direction of
23    what to do with her check.
24 Q  Well, I mean, her being on staff doesn't have
25    anything to do with it, does it?
```

114

```
1  A  Well, no, but our policy is we pay physician's
2     disproportionate share at the time they were on
3     staff, even though they're not on staff currently.
4  Q  Right.  So, I mean, why is he -- is he asking
5     whether she's on the staff?
6  A  He just wanted to validate whether he was going to
7     -- he would pay her or not.
8  Q  But it's back around to the proposition that for
9     that base year she will be paid if she presents the
10    records?
11 A  Yes.
12 Q  Who does she need to talk to about the records?
13 A  At this point?
14 Q  Yeah.
15 A  Natalie Jarrett, who wrote her the letter.
16 Q  So Natalie wrote her a letter and asked her for the
17    records?
18 A  Yes.
19 Q  Do you know when?
20 A  I don't remember the date.  I do have a copy of it
21    if you want it.
22 Q  I would.
23 A  Okay.
24
25       (Whereupon, Email, consisting of 2 pages,
```

115

```
1     was marked Plaintiff's Exhibit No. 39 for
2     identification.)
3
4  Q  Do you recognize Plaintiff's Exhibit No. 39?
5  A  Yes.
6  Q  So Ms. Janet Foster was complaining through the
7     patient advocate?
8  A  Yes.
9  Q  Now, why would we not be entitled to know who it is
10    she's complaining about?
11
12    MR. SOWELL:  I'm really directing that to you,
13    Travis, because I don't understand --
14    MR. DAYHUFF:  Yeah.  Let me look.  It's a peer
15    review issue, it would be my guess, but let me
16    look at this.  Well, you see after had during
17    delivery with Dr. blank.  See grievance.
18    She's referencing a grievance number.  That's
19    a grievance number that is part of the peer
20    review process at ARMC.  So we take the
21    position that that would be protected peer
22    review information.
23    MR. SOWELL:  Okay.
24    MR. DAYHUFF:  The part that we gave you is the part
25    that refers to Dr. Muniz.
```

116

```
1
2  Q  Does Eric Muhlbaier still work for the hospital?
3  A  Yes.
4  Q  In the same job?
5  A  Yes.
6  Q  Is Doctors Hospital owned by HCA?
7  A  Yes.
8  Q  Does the hospital or its medical staff have a
9     specific policy or procedure to address disruptive
10    conduct?
11 A  Yes.
12 Q  Do you know if it's ever been applied in the case
13    of Dr. Muniz?
14 A  I believe it has.
15 Q  When?
16 A  I would say prior to the hearings.  Probably prior
17    to 2009, from my recollection.  I can validate that
18    for you.
19 Q  You think there's some documentation of that?
20 A  I may have some, yes.
21 Q  If you have it, we would like to see it.
22 A  Okay.
23 Q  Because we say specifically that she was not given
24    those policies and procedures.
25 A  When the hearing panel -- when the hearing process
```

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

117

1    began and throughout the hearing process, that's
2    correct, she would not have been through the
3    disruptive physician policy.
4    Q   So what are you saying then?
5    A   It would have been whole other incident, whole
6    other behavioral issue.
7    Q   Okay.
8    A   We've done numerous of them throughout the years
9    with different physicians.
10   Q   I understood.  If you have any such thing with
11   respect to her, I'd just like to --
12   A   I understand.
13   Q   -- get it.
14   A   And I will validate that for you.
15   Q   Thank you.
16
17       MR. DAYHUFF: David, I think that has been produced.
18       I think I've seen that, but put it on your
19       list.  We'll check it.
20
21   Q   Have you ever talked to Dr. Gasnel Bryan - That's
22   G-a-s-n-e-l B-r-y-a-n. - about the events of
23   February 23, 2010 --
24   A   No.
25   Q   -- in labor and delivery?

118

1    A   No.
2    Q   You know he was there assisting Dr. Muniz?
3    A   I don't know his role during that case.  I know he
4    was present on the suite.
5    Q   I mean, when the board of directors -- is it called
6    board of directors?
7    A   Board of Governors.
8    Q   -- Board of Governors decided to uphold the
9    appellate panel and the Judicial Hearing Committee
10   with respect to the 2010 recommendation, I mean,
11   were there any deliberations or just simply the
12   vote to uphold.
13   A   There was both.
14   Q   Was there anybody who opposed it?
15   A   No.
16   Q   Was there any review of the records?
17   A   There was review of the transcripts.  And the
18   records had been reviewed prior to that.
19   Q   By whom?
20   A   It would have been by the hearing panel, by the
21   physicians on the board had access to those
22   records.  They had access to all the transcripts
23   prior to the meeting.
24   Q   Now, was Dr. Boehner present during the
25   deliberations and the vote by the governing board

119

1    or the Board of Governors with respect --
2    A   Yes.
3    Q   I'm sorry.
4    A   Excuse me, I'm sorry.
5    Q   -- with respect to the 2010 peer review?
6    A   Yes.
7    Q   Did he participate in the discussions?
8    A   When he was asked as a OB/Gyn physician for
9    expertise he participated, sure.
10   Q   He was the chairman of the board, he was an OB/Gyn,
11   and he participated in the discussions with respect
12   to the affirmance of the termination of Dr. Muniz's
13   privileges?
14   A   Yes.
15   Q   Do you think his opinions were highly regarded?
16   A   Yes.
17   Q   I mean, I would assume his opinions have some
18   influence since he's been made chairman of the
19   board and he's an OB/Gyn?
20   A   Yes.
21   Q   And that would be correct with respect to this
22   proceeding?
23   A   Yes.
24   Q   And the Board of Governors?
25   A   Yes.

120

1    Q   Now, did Dr. DiBona, Francis Frank DiBona, did he
2    participate in the deliberations or the vote at the
3    Board of Governors?
4    A   He did.
5    Q   Both the deliberations and the vote?
6    A   Yes.
7    Q   And that's with respect to the 2010 proceeding?
8    A   That's correct.
9    Q   Now, is Dr. DiBona a partner of Dr. Minto?
10   A   Yes.
11   Q   And also the partner of Dr. Boone?
12   A   Yes.
13   Q   What is Pat Paxton's job at the hospital now?
14   A   Chief of medical staff.
15   Q   Is he an employee of the hospital?
16   A   He is now.
17   Q   How long?
18   A   I can get you that exact month.
19   Q   Would you --
20   A   It's been, I believe it was October of 2010.
21   Q   Was he subsidized by the hospital before that?
22   A   He was subsidized for a while.  Before that things
23   -- as a part of our recruitment of open heart
24   surgery.
25   Q   Do you have a contract with him?

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

121

1   A   Yes.
2   Q   Have a contract with him?
3   A   Yes.
4   Q   I'd like to see that also.  What's his job now as
5       an employee?  Just an in-house heart surgeon?
6   A   Yes.
7   Q   So is he employed with the hospital to perform
8       cardiothoracic surgery?
9   A   Take on-call for the emergency department and
10      direct that service line.
11  Q   Now, is Dr. Ratliff still on the staff here?
12  A   I don't believe so.
13  Q   So has he retired?
14  A   He's somewhat retired.  I'd have to -- the reason I
15      hesitate, I'm not sure of his exact status.
16  Q   Does he still live in Aiken?
17  A   Yes.
18  Q   Has the hospital ever taken any position with
19      respect to the local surgery center?
20  A   A position meaning?
21  Q   Well, to oppose it or to try to restrict it.  I
22      mean, do you feel that you are in competition with
23      that surgery center?
24  A   We are today.  We were partners at one point.
25  Q   Well, you were an owner at one point?

122

1   A   We were part owners at one point.
2   Q   Right.  And you sold your interest?
3   A   Yes.
4   Q   To whom?
5   A   To the physician group.
6   Q   The whole group, the balance of the owners?
7   A   Yes.
8   Q   So what's your relationship with them now, the
9       surgery center?
10  A   They are on -- near our campus and they are a
11      competitor.
12  Q   Why did the pathologist -- why were they asked to
13      leave?
14  A   You're talking about what pathologist?  Dr.
15      Parnell?
16  Q   Yeah.  Denyse Parnell and her partners.
17  A   We had issues, meaning Aiken Regional and Universal
18      Health Services, for several years with her.  And
19      it was not in terms of her clinical skills or her
20      performance.  It was more in terms of her outright
21      vocalization of hatred and disgust openly,
22      negatively toward the hospital and UHS.  And that's
23      not something that we were going to tolerate.
24  Q   What was the genesis of her openly -- open hatred
25      and disgust at UHS?

123

1   A   For a month -- from the day I got here until the
2       day she left, she was vocally negative.  So this is
3       something that was historical.  You'd have to ask
4       her how exactly she became that bitter.
5   Q   What exactly is 100 percent monitoring?
6   A   It means that we would have a review, either
7       retrospectively or concurrently, of a medical
8       record.
9
10           (Whereupon, Disruptive Conduct Policy and
11           Procedure, consisting of 4 pages, was
12           marked Plaintiff's Exhibit No. 40 for
13           identification.)
14
15  Q   Do you recognize the Plaintiff's Exhibit No. 40 as
16      the medical staff policy and procedure related to
17      disruptive conduct?
18  A   Yes.
19  Q   Is that the current policy and procedure?
20  A   There may have been a revision after this.  I could
21      validate that for you.
22  Q   Okay.  But this is generally the policy and
23      procedure --
24  A   Yes, that's correct.
25  Q   -- that would have been imposed upon Dr. Muniz if

124

1       she were accused of being a disruptive physician?
2   A   Yes.
3   Q   And I say would have.  I should also say should
4       have, should have been imposed?
5
6       MR. DAYHUFF: Object to the form of the question.
7
8   Q   Is that correct?
9
10      MR. DAYHUFF: It characterizes the policy.  You may
11          answer.
12
13  A   I don't understand your question.
14  Q   All right.
15  A   You made a statement.
16  Q   If Dr. Muniz is accused of being a disruptive
17      physician or displaying disruptive conduct as a
18      member of the medical staff, shouldn't she be
19      afforded the rights, privileges or whatever from
20      this policy and procedure that is Plaintiff's
21      Exhibit No. 40.
22
23      MR. DAYHUFF: Same objection.
24
25  A   It depends on when that disruptive behavior occurs

**Thompson Court Reporting, Inc.**
**www.thompsonreporting.com**

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

125

1    or when it's identified. If it's only disruptive
2    behavior or if it's an outburst on the floor, this
3    policy comes into play. What this policy's
4    intended to do is to see if we can keep the
5    physician away from the peer review process, the
6    fair hearing process through a collegial
7    conversation between either CEO, chief of staff,
8    chief of department and physician. With Dr. Muniz
9    it was much more complicated that. She had severe
10   clinical issues that, yes, were not identified with
11   the five cases because there was lousy
12   documentation on our part. But she had severe
13   clinical issues. The disruptive behavior only came
14   out subsequent to us reviewing those records. So
15   that's why this did not apply to her. This was
16   very limited in its scope. And her issues were
17   much more broad in their scope.
18   Q    So what you're saying is that with respect to that
19       first peer review of 2009 where she was deemed to
20       need a psychiatric evaluation that the issues with
21       respect to disruptive conduct came up after she was
22       charged?
23
24       MR. DAYHUFF: Object to the form of the question.
25           You can answer.

---

126

1
2    A    This policy was too limited in its scope to deal
3        with Dr. Muniz's disruptive behavior as it was
4        identified, not only during those proceedings but
5        even prior to that.
6    Q    So who chose to ignore it, disregard it?
7    A    We did not disregard it. This policy does not
8        apply -- did not apply in her case.
9    Q    Why not?
10   A    Because her case had clinical issues, had other
11       issues far above and beyond one outburst or one
12       incident. This typically regards to -- this
13       typically refers to one physician very well behaved
14       having an outburst unpredictably so. We try to
15       deal with him without going through the peer review
16       process to spare everybody that ordeal. Okay, with
17       Dr. Muniz it was numerous complaints, numerous
18       clinical issues, and that resulted in much more
19       lengthy review process.
20   Q    Now, when you say clinical issues, you're talking
21       about the practice of medicine --
22   A    Yes.
23   Q    -- or surgery?
24   A    Yes.
25   Q    That's distinct from being a disruptive physician?

---

127

1    A    Yes.
2    Q    So specifically what was it concluded that she'd
3        done that takes her outside of this policy and
4        procedure with respect to her disruptive conduct as
5        a member of the medical staff?
6    A    The destructive conduct that was identified through
7        the hearing panel was attitudinal on her part. It
8        was megalomaniac on her part, and it was her
9        exhibiting behavior which showed that she was more
10       talented or more skillful at certain surgical
11       procedures than she was trained to do or that she
12       was capable of doing. She would assume the role of
13       fixing a complication during a surgery on her own
14       without calling for a specialist. And the hearing
15       panel uncovered, correctly so, that her attitude is
16       what created her clinical issues to begin with
17       because she would take on things that were beyond
18       her scope. It was far beyond what this policy
19       covers.
20   Q    Did they ever tell her in advance of the hearing
21       that they were conducting it with respect to
22       anything other than those five charts?
23   A    At the beginning it was only those five charts that
24       were the focus. Her attitude and her opinions
25       regarding her own merit, which were not warranted,

---

128

1    came out during her interview during the hearing
2    panel.
3    Q    I understand. But was she ever told prior to the
4        2009 report recommendation of the MEC that she was
5        being taken to task with respect to disruptive
6        conduct?
7    A    Not at that point, no, she was not told.
8    Q    In fact, the first time it came out was in the 2009
9        report and recommendation, which the Board of
10       Governors acted on.
11   A    Yes.
12   Q    By putting her under 100 percent review and also
13       sending her to a psychiatrist?
14   A    Yes.
15   Q    And would you agree with me that the psychiatrist
16       wrote a letter that essentially said that she
17       functions normally with respect to the issue of
18       disruptive conduct?
19   A    Yes.
20
21           (Whereupon, Letter dated March 12, 2010,
22           consisting of 2 pages, was marked
23           Plaintiff's Exhibit No. 41 for
24           identification.)
25

---

Carlos A. Milanes - 7/25/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

129

1   Q   We were talking earlier - and we're looking at
2       Plaintiff's Exhibit No. 41. - We were talking
3       earlier about a letter from Natalie Jarrett to Dr.
4       Muniz.  I know this is from Laura Tierney, but is
5       this the letter?
6   A   No.
7   Q   So is this a letter -- this says payment will be
8       made in May 2010.  We know the last payment was
9       January 2010.  So what does this relate to?
10  A   **The subsequent year 2008.  The January payment was**
11      **2007.**
12  Q   So it does relate to that same base year we were
13      discussing?
14  A   **Yes.**
15  Q   Okay.
16  A   **Natalie wrote a follow-up letter to Dr. Muniz**
17      **asking her can you please provide the records, we**
18      **cannot reimburse you without those.**
19  Q   Well, this statement in here, please provide a copy
20      of your form CMS-15 or computer printout, those are
21      the records you were looking for.
22  A   **That's her billing record.**
23  Q   And then Natalie Jarrett wrote a follow-up letter
24      to this letter?
25  A   **Yes.**

130

1   Q   Does ARMC make referrals to any specific OB/Gyn
2       group?
3   A   **No.**
4   Q   So it's done on a rotating basis through Direct
5       Doctors?
6   A   **Yes.**
7   Q   Has that always been the case?
8   A   **Yes.**
9   Q   There's no department of OB/Gyn here?
10  A   **No.**
11  Q   No chief of OB/Gyn?
12  A   **No.**
13  Q   Has there ever been a chief or a department of
14      OB/Gyn?
15  A   **Not since I've been here.**
16
17          MR. SOWELL: We can take a break for a second.  I'm
18          just reviewing these questions.  If I don't
19          have any, we'll be through.
20
21          (Short Break)
22
23  Q   Are you aware that there was an issue raised about
24      the postpartum placenta?
25  A   **I don't understand your question.  You're talking**

131

1       about in the particular case?
2   Q   Yeah.  In the case, the 2010 case.
3   A   **Yes.  I understand generally.  As not being a**
4       **clinician, I understand generally what the issue**
5       **was.**
6   Q   What did you understand the issue to be?
7   A   **That there was an issue with the placenta which cut**
8       **off, basically, nourishment and oxygen to the baby.**
9       **And that it would have demanded an immediate c-**
10      **section.**
11  Q   You're talking about the abruption?
12  A   **I thought that's what you were talking about.**
13  Q   What I'm talking about is the actual physical
14      placenta after the delivery.
15  A   **No.**
16  Q   So you're not aware that Dr. Muniz has requested
17      that it be sent off, and it was not sent off?
18  A   **No, I'm not aware of that.**
19  Q   Do you know where it is?
20  A   **No.**
21  Q   Would you expect it to still be here at the
22      hospital?
23  A   **I would expect that, yes.**
24  Q   Do you know if it was ever evaluated outside of
25      ARMC?

132

1   A   **I don't know that.**
2   Q   Has the hospital, since you've been here,
3       experienced other fetal deaths?
4   A   **I don't recall since I've been here.**
5   Q   You mean you just --
6   A   **Not as a result of a physician behavioral issue or**
7       **a physician clinical issue.**
8   Q   So you don't recall any?
9   A   **One other.  There were fetal deaths.  There are**
10      **still borns.**
11  Q   Right.
12  A   **That that's happened.**
13  Q   But you don't recall any related to any question
14      about how the baby was delivered or not delivered?
15  A   **That's correct.  I don't recall that being tied to**
16      **any clinical competence issue with the surgeon.**
17  Q   Since you've been here?
18  A   **Yes.**
19  Q   What is your function as secretary to the board?
20  A   **I attend board meetings and I'm one of the officers**
21      **of the board.**
22  Q   So what does that give you?
23  A   **In terms of my function, I function more of a CEO.**
24  Q   So, I mean, that's more or less just some official
25      title with respect to your service on the board?

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

133

1  **A  Yes.**
2  Q  You don't have any additional functions as
3  secretary?
4  **A  That's correct.**
5  Q  Whatever record keeping function you have as
6  secretary is delegated to Pat?
7  **A  Yes.**
8  Q  Is there a description for your role as secretary
9  to the board?
10  **A  There would be in the board bylaws.**
11  Q  And a description also of Dr. Boehner's role as
12  chairman of the board?
13  **A  Yes.**
14  Q  The recruitment of a new OB/Gyn for Aiken Regional
15  Medical Centers staff, is that being done in
16  conjunction with Aiken Obstetrics and Gynecology
17  Associates?
18  **A  That is one group that we're recruiting into.**
19  Q  What other groups?
20  **A  We were looking for anyone else who wanted a**
21  **partner.**
22  Q  Does anybody else want a partner other than Aiken
23  Obstetrics and Gynecology Associates?
24  **A  No, they don't.**
25  Q  So the recruiting is being done currently in

134

1  conjunction with Aiken Obstetrics and Gynecology
2  Associates?
3  **A  Yes.**
4  Q  And exactly how does that function?  Do they do the
5  recruiting and you do the recruiting?
6  **A  We do primarily the recruiting.  However, they help**
7  **us in that the recruit has to fit into the group,**
8  **they have to accept him or her as a practitioner,**
9  **the recruit has to like the group, has to like the**
10  **area, the office.**
11  Q  Have they found anybody yet?
12  **A  We did.**
13  Q  And they're signed up?  Signed, sealed, delivered?
14  **A  Yes.**
15  Q  Who is that?
16  **A  Dr. Jessica Keller.**
17  Q  Where does she come from?
18  **A  I don't recall where she came from.  Outside of**
19  **Aiken.**
20  Q  Now, in the last couple of years you've had an
21  OB/Gyn that you recruited from Spartanburg who
22  didn't get privileges here?
23  **A  You'd have to remind me of who she is.  I don't**
24  **remember.**
25  Q  Yeah, I don't remember her name, but she was

135

1  recruited from Spartanburg and then she was not
2  credentialed.
3  **A  If you're referring to Dr. Kate Mays?**
4  Q  Yes.
5  **A  She is not an OB/Gyn.**
6  Q  What is she?
7  **A  Internal medicine.**
8  Q  What has been the outcome of her complaint?
9
10  MR. DAYHUFF: I think that case is subject to a
11  confidentiality order, so I don't think --
12  MR. SOWELL: I mean, if it is I understand.
13  MR. DAYHUFF: Yeah, I'm pretty sure it is.  And if
14  it was -- it sounds like a peer review matter.
15  It would be protected under the peer review
16  statutes.
17  MR. SOWELL: I don't think it's peer review.  I
18  think it may be subject to an order, but I
19  don't think it's peer review.
20  MR. DAYHUFF: I think I've been told by the McNair
21  attorneys, who I believe were handling that
22  matter, that that is subject to a
23  confidentiality order, so I wouldn't want him
24  to violate that order.
25  MR. SOWELL: But we are subject to a confidentiality

136

1  order.
2  MR. DAYHUFF: Sure.
3  MR. SOWELL: That would trump that confidentiality
4  order.
5  MR. DAYHUFF: I'm not sure I agree with that.  I
6  agree generally that federal law trumps state
7  law, but I -- I mean, there's a
8  confidentiality -- if there's a
9  confidentiality order in that case, and I
10  think there is, I don't think that's a proper
11  . . .
12  MR. SOWELL: Okay.  Well, --
13  MR. DAYHUFF: I mean, we could certainly take up
14  that question later.  But I don't want him to
15  violate that order.
16  MR. SOWELL: Let's just reserve our rights on that
17  for right now.
18  MR. DAYHUFF: Sure.  Fair enough.
19
20  Q  Is it Mays?
21  **A  Mays.**
22  Q  Has it been resolved?
23  **A  Yes.**
24  Q  Now, did you participate in the discussions at the
25  Board of Governors with respect to terminating Dr.

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

137

1   Muniz's privilege?
2   **A   More so as informational, procedural.**
3   Q   Did you vote?
4   **A   I vote as a member of the board.**
5   Q   So you voted to terminate her privileges?
6   **A   Yes.**
7   Q   Was that a unanimous vote?
8   **A   Other than the abstentions, yes.**
9   Q   And that was Dr. Boehner.
10  **A   Dr. Boehner, from what I remember.  I don't know**
11  **who else recused themselves.**
12  Q   Nobody else that you know of?
13  **A   No one else that I can recall.**
14  Q   Now, do you know if the vote at the Judicial
15  Hearing Committee was unanimous?
16  **A   From what I'm recalling, yes, it was.**
17  Q   In 2010?
18  **A   Yes.**
19  Q   But did you not see that email from Ernie Nauful
20  where he indicated that somebody was adamantly
21  opposed to the report?
22  **A   I saw that.**
23  Q   But you still think the vote was unanimous in the
24  end?
25  **A   Yes.**

138

1   Q   What makes you think that?
2   **A   From what I remember, reading the transcripts and**
3   **then remembering the conversations I had.**
4   Q   Did you have transcripts of the deliberations?
5   **A   No.  I had a summary of what happened at the**
6   **hearing panel.  From what I remember from**
7   **conversations with Terri, the vote was unanimous.**
8   Q   Does she have notes of that deliberation?
9   **A   You would have to ask her that.  She may have notes**
10  **in that.**
11  Q   Okay.
12
13      MR. SOWELL: If she does, we'd like to get them.  Or
14      audiotapes.  Whatever.
15      MR. DAYHUFF: I'll check.  I'm not aware of either
16      of those two.
17
18  Q   Were there any emails between you and Dr. Boehner
19  with respect to Dr. Muniz?
20  **A   No.**
21  Q   Why did KD Justyn leave the Aiken Regional Medical
22  Centers?
23  **A   She retired.**
24  Q   But nothing forced about it?
25  **A   No.**

139

1   Q   She wasn't ousted?  She just decided to retire?
2   **A   Yes.**
3
4      MR. SOWELL: Thank you
5      MR. DAYHUFF: A few questions.
6
7      - - - - -
8      CROSS EXAMINATION
9   BY MR. DAYHUFF:
10  Q   Mr. Sowell asked you a lot of questions about Terri
11  Ergle's interaction with and role with the hearing
12  panel of 2010, so I want to make sure I understand
13  what you know about that interaction.  Tell me what
14  you think -- what you believe that Terri did with
15  respect to the hearing panel.  What was her
16  function?
17  **A   Basically from an administrative assistant,**
18  **secretarial function.**
19  Q   Anything else?
20  **A   No.**
21  Q   Did you use Terri, or did anyone else in your
22  administration, use Terri as a way to influence the
23  hearing panel in the decision that they rendered?
24  **A   No.**
25  Q   I think -- I don't remember what you testified to

140

1   about whether Terri took minutes or notes or had an
2   audio recording with respect to her interactions
3   with the hearing panel.  Do you know whether she
4   recorded any of that deliberation in any way?
5   **A   I don't know that.**
6   Q   So we'd have to ask Ms. Ergle about that?
7   **A   Yes.**
8   Q   I think there were some other questions about board
9   minutes and whether notes -- there were notes and
10  minutes and whether there were audio recordings of
11  board minutes or board deliberation with respect to
12  the 2010 matter.  Do you know whether there were
13  either an audio -- whether there was an audio
14  recording or handwritten notes regarding the
15  Appellant Review Committee's deliberations?
16  **A   I don't know.**
17  Q   Same question of the Board of Governors when they
18  considered the 2010 recommendation.
19  **A   From what I know of Pat, she typically audio**
20  **records the board minutes.**
21  Q   We know she typically does that.  Do you know
22  whether she did it or not in this particular case?
23  **A   I don't know.**
24  Q   We'd have to ask --
25  **A   Pat.**

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

141

1   Q   -- Pat. Okay. Mr. Sowell asked you the question
2       about -- this is Exhibit No. 13. This is you
3       sending the notice of the Board of Governors' final
4       decision to Dr. Muniz. That's not particularly
5       what I wanted to ask you about, but it has attached
6       to it the corrected report of the hearing panel.
7       Now, we went through a lot of notices that went out
8       from Aiken from you regarding this peer review
9       matter, right? And correct me if I'm wrong, but it
10      seemed to be your testimony was these notices were
11      generated as a result of information from the
12      hospital, MEC, board, others, is that right?
13  A   Yes.
14  Q   And then you also had legal advice from Gary Petok
15      at UHS and Celeste Jones and/or Jane Trinkley from
16      McNair on certain correspondence, is that right?
17  A   Yes.
18  Q   Now, I think Mr. Sowell asked you about this
19      report. This is the corrected report of the
20      hearing panel. First thing I want to ask you --
21
22      MR. SOWELL: What exhibit is that?
23      MR. DAYHUFF: I'm sorry. That is Exhibit No. 13.
24          It's attached to Exhibit No. 13.
25

142

1   Q   I think you said in your testimony that Celeste
2       Jones and/or Gary Petok may have had or had a role
3       in drafting the corrected report of the hearing
4       panel, is that accurate?
5   A   That's not accurate.
6   Q   Who would have been responsible for and would have
7       drafted the corrected report of the hearing panel?
8   A   It would have been Mr. Nauful.
9   Q   Nauful.
10  A   Nauful.
11  Q   And why would he have done that rather than Celeste
12      Jones or Jane Trinkley or Gary Petok?
13  A   He was the presiding officer and the person we had
14      in charge of the hearing panel.
15  Q   He was the hearing officer, right?
16  A   Yes.
17  Q   Okay. And did you understand that one of the
18      things the hearing officer did was to advise the
19      panel on legal issues?
20  A   Yes.
21  Q   Same question. I'm not -- because I don't remember
22      if Mr. Sowell asked this of the corrected report,
23      the hearing panel, or the original report. Do you
24      believe that Celeste Jones, Jane Trinkley, Gary
25      Petok assisted with the writing of the original

143

1       report of the hearing panel?
2   A   No.
3   Q   Who would have assisted with that?
4   A   It would have been Mr. Nauful.
5   Q   And whose opinions and findings do both of those
6       reports reflect?
7   A   The findings and the opinions of the hearing panel
8       members.
9   Q   Mr. Sowell asked you several questions about
10      Celeste's communications with Ernie Nauful, and you
11      saw the emails. You recall those?
12  A   Yes.
13  Q   Do you believe that Ms. Jones used those
14      communications with Mr. Nauful to influence the
15      substance of the clinical findings, the medical
16      findings in the reports?
17  A   No, not at all.
18  Q   What was Ms. Jones doing with respect to Mr. Nauful
19      in those communications?
20  A   Just informational.
21  Q   You sent a notice to Dr. Muniz that Mr. Nauful was
22      going to be the hearing officer, is that correct?
23      We went over one of those notices.
24  A   Yes.
25  Q   Did you receive an objection to Mr. Nauful's

144

1       serving as the hearing officer at the time you
2       provided that notice to Dr. Muniz?
3   A   No, I did not.
4   Q   Are you aware of any objection to the service of
5       Ernie Nauful that was offered during the three day
6       hearing by Dr. Muniz?
7   A   No.
8   Q   When did counsel for Dr. Muniz make an objection to
9       the service of Mr. Nauful, do you recall?
10  A   After the deliberation.
11  Q   After the deliberation. Was it even after the
12      results of the report?
13  A   After the decision.
14  Q   If you would have learned that Celeste Jones or
15      Terri Ergle were attempting to influence the
16      findings of the hearing panel, what would you have
17      done as the CEO?
18  A   Terri would have not been employed and Celeste, we
19      would have asked for another firm.
20
21      MR. SOWELL: Say that again. What did you say?
22      MR. DAYHUFF: Would have asked for another firm.
23      MR. SOWELL: Celeste would have asked for another
24          firm?
25

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

145

1   A   No. We would have, this hospital. He asked what I
2       would have done.
3
4       MR. SOWELL: I got you.
5
6   Q   Another question. We went over questions about
7       notes that may have been taken, audio recordings
8       that may have happened that resulted in minutes,
9       perhaps. Is it your understanding, and I'm not
10      sure if you're aware of this or not, do you know
11      whether Dr. Muniz, as part of the 2010 matter, and
12      as part of the 2009 for that matter, received
13      copies of the MEC minutes that reflected the MEC's
14      consideration of the cases at issue in her care as
15      part of the hearing? Do you know if she received
16      those?
17  A   I don't know -- I don't know that.
18  Q   Fair enough. There was a question about a
19      radiologist, a Dr. -- Is it Dr. Searles?
20  A   Dr. Searles.
21  Q   Was he a panel member in 2010 or 2009?
22  A   He was a panel member, from what I remember. I'd
23      have to look.
24
25      MR. DAYHUFF: Do you guys know?

---

146

1       MR. SOWELL: 2010.
2       MR. DAYHUFF: Okay, 2010.
3
4   Q   Dr. Searles is currently the radiologist?
5   A   One of the radiologists.
6   Q   One of the radiologists. So his group has a
7       contract with the hospital?
8   A   Yes.
9   Q   Before his service on the hearing panel, was it
10      common knowledge among members of the medical staff
11      that Dr. Searles' group had a contract with the
12      hospital to perform radiology services?
13  A   Yes.
14  Q   Would Dr. Muniz have known that?
15  A   Yes.
16  Q   Did Dr. Muniz object to the service of Dr. Searles
17      on the hearing panel?
18  A   No.
19  Q   Mr. Sowell asked you about I think it was
20      University Hospital's attempt to buy land for some
21      sort of a project. Do you recall that line of
22      questioning?
23  A   Yes.
24  Q   What, if anything, did that have to do with Dr.
25      Muniz's peer review?

---

147

1   A   Nothing at all.
2   Q   Gasnel Bryan. Mr. Sowell asked you if he was
3       interviewed by you, I guess, as part of the 2010
4       peer review. Do you recall that?
5   A   Yes.
6   Q   Do you know whether or not Gasnel Bryan testified
7       at the 2010 hearing?
8   A   I believe he did.
9   Q   What, if anything, does the independent surgery
10      center and the pathology group that -- the one
11      that's whose name I'm forgetting, her departure
12      from the hospital. - What does that, if anything,
13      have to do with the peer review matter involving
14      Dr. Muniz?
15  A   Nothing at all.
16  Q   The 2009 hearing panel report, and I'll read to you
17      the findings.
18
19      MR. DAYHUFF: You guys want a copy of that? You
20      guys probably have that memorized. I'll give
21      you a copy.
22
23  Q   I'm going to read from this -- the findings that
24      are numbered. Number one says, "The five cases
25      presented by the MEC provide insufficient evidence

---

148

1       on which determining Dr. Muniz's privileges." Two
2       "Notwithstanding the first recommendation, the
3       hearing panel finds significant issues of concern
4       with respect to Dr. Muniz. Evidence presented to
5       the hearing panel indicates that Dr. Muniz is
6       narcissistic and lacks insight into her behavior.
7       Evidence also indicates she may not recognize or
8       does not respect the limits of her clinical skills.
9       Documents in evidence indicate episodes of
10      assertion, confrontation, angst and aggressions
11      such as incidents in which Dr. Muniz has engaged in
12      inflammatory note entries concerning nursing
13      staff."
14      That evidence that's being referred to there
15      and the evidence also indicates documents in
16      evidence, where do those documents come from?
17      Where did that evidence come from?
18  A   Several places.
19
20      MR. SOWELL: What are you talking about?
21      MR. DAYHUFF: Are you on the right . . .
22      MR. SOWELL: Yeah, I don't see that part about
23          documents in evidence, so where is that? Oh,
24          yeah, I do.
25      MR. DAYHUFF: You see it on number 2a?

---

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

149

```
1        MR. SOWELL: I got you.
2
3   Q    My question is that evidence came from somewhere.
4   A    Yes.
5   Q    Did that evidence come from the five cases under
6        review in 2009?
7   A    Some of that evidence came from the five cases.
8   Q    Are you aware of anywhere else that this evidence
9        came from, other than the five cases under review?
10  A    Nursing complaints relative to the five cases maybe
11       regarding documentation.  I know one of them she
12       wrote a note that was contrary to what she had
13       verbally told the nurses, and --
14  Q    Right.  And that was a note that a medical --
15  A    -- those nurses were interviewed.
16  Q    I'm sorry.  Go ahead.
17  A    Those nurses were interviewed.
18  Q    And that note you were mentioning about the nurses.
19       That was a note that was in the medical record of
20       one of the five cases on the review --
21
22       MR. SOWELL: I object to the form of the question.
23
24  Q    Where did that note come from that you just
25       mentioned?
```

150

```
1   A    That note was part of the records, part of the
2        medical records.
3   Q    Of the five cases under review?
4   A    Yes.
5   Q    In subpart b - And I'm just skipping the rest of
6        subpart a. - It says, "Evidence also demonstrates
7        several inconsistencies in the five cases presented
8        which inconsistencies raised questions about the
9        credibility of Dr. Muniz.  Do you recall that
10       finding?
11  A    Yes.
12  Q    And then the hearing panel recommends an
13       evaluation.  All right.  Have you ever made false
14       statements about Dr. Muniz or her practice?
15  A    No.
16  Q    Have you ever conspired with members of the medical
17       staff to harm Dr. Muniz?
18  A    No.
19  Q    Are you aware of anyone in your administrative
20       group who have made false statements about her or
21       conspired against her with the medical staff
22       members?
23  A    No.
24  Q    What do you think motivated -- I mean, you've
25       worked -- part of the peer review process that
```

151

```
1        you've obviously observed your medical staff
2        engaging in peer review, have you not?
3   A    Yes.
4   Q    What do you believe they were motivated by in 2010?
5   A    Patient safety.
6   Q    Anything else?
7   A    Primarily that.
8   Q    You mentioned you were employed by UHS.  And we
9        were using UHS I think kind of generally.  Do you
10       know the actual corporate name of the UHS entity
11       that employs you?
12  A    Universal Health Services, Inc.
13  Q    Is that Universal Health Services of Delaware, Inc.
14       or Universal Health Services, Inc.?
15  A    I believe it is the latter.
16  Q    Okay.
17  A    But it is a Delaware Corporation.  I believe both
18       are.
19  Q    All right.  Are you sure about that?
20  A    As far as I know, yes, they're both Delaware
21       corporations.
22  Q    Well, now, are you sure about which of those two
23       entities employs you?
24  A    Oh, no.
25  Q    Have you or any other -- have you personally
```

152

```
1        mistreated Dr. Muniz's patients in an effort to
2        harm her patient basis and Dr. Muniz?
3   A    No.
4   Q    Did you or anybody on your staff try to delay or
5        drag out the peer review process in 2010?
6   A    No.
7   Q    Did you engage your influence in the peer review
8        action as a means of retaliating against Dr. Muniz
9        for applying for privileges in other hospitals?
10  A    No.
11  Q    How about for use of a pathology group outside the
12       hospital?
13  A    No.
14  Q    Do other physicians use that pathology group
15       outside the hospital?
16  A    Yes.
17  Q    How about the OB/Gyns, do they use it?
18  A    Yes.
19  Q    Dr. Minto?
20  A    Yes.
21  Q    Dr. Boehner?
22  A    Yes.
23  Q    Dr. Boone?
24  A    Yes.
25  Q    Dr. Besson, she and Dr. Minto reviewed the 2010
```

**Carlos A. Milanes - 7/25/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**153**

1    case, is that right?
2  **A   Yes.**
3  Q   Then went on to the MEC, is that right?
4  **A   Yes.**
5  Q   I guess before you sent your notice out for the
6      precautionary suspension, do you know Dr. Besson
7      was a member of the medical peer review committee
8      at that time?
9  **A   She was.**
10 Q   I think you said Dr. Minto was the chair of
11     surgery?
12 **A   Yes.**
13
14     MR. DAYHUFF: That's all I got.  Got anything?
15
16         - - - - -
17         RE-DIRECT EXAMINATION
18 BY MR. SOWELL:
19 Q   Have you ever generated any emails related to Margo
20     Muniz?
21 **A   No.  I don't recall that I did.  Typically I would**
22     **be copied on emails.  All emails that I have you**
23     **have.**
24 Q   Okay.  Either sent or received?
25 **A   Sent or received.**

---

**154**

1  Q   Now, there's an entity called Universal Health
2      Services Real State Trust or something like that.
3  **A   Yes.**
4  Q   They own the properties, I assume?
5  **A   Yes.**
6  Q   You're not employed by them?
7  **A   No.**
8  Q   Are you paid by them?
9  **A   No.**
10 Q   What was that dialogue about Delaware versus some
11     other UHS?
12 **A   The UHS, Inc. of Delaware is a separate corporation**
13     **than UHS, Inc.  How they're related I don't know**
14     **exactly.  But I do know that I report through UHS.**
15     **That's who employs me.**
16
17     MR. SOWELL:  This is what we've been wondering is
18        whether there's some, you know, funky entity
19        in between.  Jane Trinkley told us that at one
20        point.  If you say there's not then we'll
21        forget about it.
22     MR. DAYHUFF: We'll talk about it.
23     MR. SOWELL: Okay.
24     MR. DAYHUFF: I'm aware of that question.  That's
25        what I tried to inquire into.  I'm not sure

---

**155**

1      that I provided any in my email yet, but I may
2      be able to do that outside of this deposition.
3
4  Q   Oh, one other question.  Who brought up at the
5      Board of Governors, because it had never been
6      brought up before, with respect to the 2009 peer
7      review, the notion of 100 percent review?
8  **A   That was brought up at the Board of Governors, from**
9      **what I remember, at that meeting.  Who**
10     **specifically?  I don't recall that.**
11 Q   But that's the first time it was ever brought up?
12 **A   Yes.**
13
14     MR. SOWELL: Thank you.
15     MR. DAYHUFF: Thank you.
16
17         - - - - -
18     (Whereupon, at 7:08 p.m., the deposition
19      in the above-entitled matter was
20      concluded.)
21
22
23
24
25

---

**156**

1      The witness reserved his/her right to review
2  the deposition transcript.  This transcript has
3  been made available to the witness with the
4  appropriate instructions to complete the review and
5  submit a signed errata sheet within the thirty (30)
6  days provided for by the SC Rules of Civil
7  Procedure.
8
9      Any corrections and/or changes requested and
10 submitted by the witness will be sealed under
11 separate cover and forwarded to the taking party
12 with instructions to place with this original
13 sealed transcript.

---

157

State of South Carolina  )
                         )        CERTIFICATE
County    of Lexington   )

    Be it known that the foregoing Deposition of
CARLOS A. MILANES was taken by Jennifer L. Thompson,
CVR;

    That I was then and there a notary public in
and for the State of South Carolina-at-Large;

    That by virtue thereof I was duly authorized
to administer an oath;

    That the witness was by me first duly sworn to
testify the truth, the whole truth, and nothing but the
truth, concerning the matter in controversy aforesaid;

    The foregoing transcript represents a true,
accurate and complete transcription of the testimony so
given at the time and place aforesaid to the best of my
skill and ability;

    That I am not related to nor an employee of
any of the parties hereto, nor a relative or employee of
any attorney or counsel employed by the parties hereto,
nor interested in the outcome of this action.

    Witness my hand and seal 4 DAY OF AUGUST, 2011

        Jennifer L. Thompson, CVR

Notary Public for South Carolina
My Commission Expires: August 14, 2019

    This transcript may contain quoted material.  Such
     material is reproduced as read or quoted by the
               speaker.