# EXHIBIT W

to

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## Civil Action No.: 1:10-cv-00986-JFA

### *Unpublished Opinions*

2012 WL 1059079
Only the Westlaw citation is currently available.
United States District Court,
D. New Mexico.

Chinonyerem OSUAGWU, Plaintiff,

v.

GILA REGIONAL MEDICAL CENTER, John Doe, and Jane Doe, Defendants.

No. 11cv1 MV/SMV. |    March 27, 2012.

**Synopsis**

**Background:** Physician who contracted with hospital to provide obstetrical/gynecological services brought action against hospital and individual members of its internal peer review committee (PRC), among others, alleging that defendants violated his constitutional rights by temporarily and then indefinitely suspending his medical privileges, and asserting related claims under state law. Defendants moved for summary judgment on ground that they were entitled to immunity under Health Care Quality Improvement Act (HCQIA).

**Holdings:** The District Court, Martha Vazquez, J., held that:

[1] it was not necessary for medical executive committee (MEC) to give physician predeprivation notice and hearing before it temporarily suspended his privileges pending further investigation, but

[2] defendants were not immune under HCQIA.

Motion denied.

West Headnotes (18)

[1]    **Health**    ⚷ Liability or Immunity

Health Care Quality Improvement Act (HCQIA) provides qualified immunity from damages actions for hospitals, doctors, and others who participate in professional peer review proceedings. Health Care Quality Improvement Act of 1986, §§ 423(a)(1), 412(a), 42 U.S.C.A. §§ 11133(a)(1), 11112(a).

[2]    **Health**    ⚷ Liability or Immunity

Peer review participant is immune under Health Care Quality Improvement Act (HCQIA) from private damages claims stemming from peer review action if peer review action meets certain standards specified by Congress. Health Care Quality Improvement Act of 1986, §§ 423(a)(1), 412(a), 42 U.S.C.A. §§ 11133(a)(1), 11112(a).

[3]    **Health**    ⚷ Liability or Immunity

Unlike qualified immunity under § 1983, Health Care Quality Improvement Act (HCQIA) immunity is immunity from liability only, not immunity from suit. Health Care Quality Improvement Act of 1986, § 412(a), 42 U.S.C.A. § 11112(a); 42 U.S.C.A. § 1983.

**[4]**    **Health**  🗝  Actions and Judicial Review

Health Care Quality Improvement Act (HCQIA) immunity is question of law for district court to decide and may be resolved whenever record in particular case becomes sufficiently developed. Health Care Quality Improvement Act of 1986, § 412(a), 42 U.S.C.A. § 11112(a).

**[5]**    **Health**  🗝  Actions and Judicial Review

If evidence is undisputed, district court might determine at early stage of litigation that a defendant involved in professional review action has met standards for immunity under Health Care Quality Improvement Act (HCQIA), even though plaintiff might be able to demonstrate that professional review action was otherwise improper; at that point, it would be in order for court to rule on immunity, and in such case, court could still proceed to determine whether injunctive, declaratory, or other relief would be in order. Health Care Quality Improvement Act of 1986, § 412(a), 42 U.S.C.A. § 11112(a).

**[6]**    **Health**  🗝  Actions and Judicial Review

Immunity for making report to National Practitioner Data Bank exists under Health Care Quality Improvement Act (HCQIA) as matter of law unless there is sufficient evidence for jury to conclude report was false and reporting party knew it was false. Health Care Quality Improvement Act of 1986, §§ 412(a), 427(c), 42 U.S.C.A. §§ 11112(a), 11137(c).

**[7]**    **Federal Civil Procedure**  🗝  Particular Cases

When a defendant asserts Health Care Quality Improvement Act (HCQIA) immunity in motion for summary judgment, in action stemming from peer review proceedings, there is unconventional twist to burden of proof in summary judgment standard because HCQIA expressly entitles defendant to rebuttable presumption that peer review proceedings satisfied HCQIA's requirements unless presumption is rebutted by preponderance of evidence. Health Care Quality Improvement Act of 1986, § 412(a), 42 U.S.C.A. § 11112(a).

**[8]**    **Health**  🗝  Actions and Judicial Review

One way of stating summary judgment standard in case in which defendants assert Health Care Quality Improvement Act (HCQIA) immunity from damages arising from peer action is to ask whether reasonable jury, viewing facts in best light for plaintiff, would allow jury to conclude that he has shown, by preponderance of evidence, that defendants' actions are outside scope of HCQIA's immunity provision; if so, even if defendants rely on medical expert who opines that their actions were reasonable, plaintiff will be allowed to proceed to trial to see if jury will find, by preponderance of evidence, peer-review action was not reasonable. Health Care Quality Improvement Act of 1986, § 412(a), 42 U.S.C.A. § 11112(a).

**[9]**    **Federal Civil Procedure**  🗝  Particular Cases

In determining on motion for summary judgment whether peer review participant is immune under Health Care Quality Improvement Act (HCQIA), proper inquiry for district court is whether plaintiff-physician has provided sufficient evidence to permit jury to find she has overcome, by preponderance of evidence, any of the four statutory elements required for immunity under HCQIA. Health Care Quality Improvement Act of 1986, § 412(a), 42 U.S.C.A. § 11112(a).

**[10]    Health**  🔑  Liability or Immunity

District courts apply objective standard in determining whether peer review action was reasonable under Health Care Quality Improvement Act's (HCQIA) immunity provision. Health Care Quality Improvement Act of 1986, § 412(a), 42 U.S.C.A. § 11112(a).

**[11]    Constitutional Law**  🔑  Health Care Professionals

**Health**  🔑  Suspension or Termination of Privileges;  Discipline

What minimum procedural process is due under Health Care Quality Improvement Act (HCQIA) must be adjudged in light of constitutional due process protections. U.S.C.A. Const.Amend. 14; Health Care Quality Improvement Act of 1986, § 412(a), 42 U.S.C.A. § 11112(a).

**[12]    Constitutional Law**  🔑  Duration and Timing of Deprivation;  Pre- or Post-Deprivation Remedies

One who has property interest protected by due process is ordinarily entitled to some sort of hearing before government acts to impair that interest, although hearing need not necessarily provide all, or even most, of protections afforded by trial. U.S.C.A. Const.Amend. 14.

**[13]    Constitutional Law**  🔑  Factors Considered;  Flexibility and Balancing

Due process is flexible and calls for such procedural protections as particular situation demands. U.S.C.A. Const.Amend. 14.

**[14]    Constitutional Law**  🔑  Duration and Timing of Deprivation;  Pre- or Post-Deprivation Remedies

In context of procedural due process, important government interest, accompanied by substantial assurance that deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing opportunity to be heard until after initial deprivation. U.S.C.A. Const.Amend. 14.

**[15]    Constitutional Law**  🔑  Duration and Timing of Deprivation;  Pre- or Post-Deprivation Remedies

**Constitutional Law**  🔑  Health Care Professionals

Quick action may turn out to be wrongful action, but due process in matters of public health and safety requires only postdeprivation opportunity to establish error; discovery that physician constitutes imminent danger to public safety is precisely kind of circumstance where government must act quickly. U.S.C.A. Const.Amend. 14.

**[16]    Privileged Communications and Confidentiality**  🔑  Public Officers and Records

Where governmental action seriously injures an individual, and reasonableness of action depends on fact findings, evidence used to prove government's case must be disclosed to individual so that he has an opportunity to show that it is untrue; while this is important in case of documentary evidence, it is even more important where evidence consists of testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. U.S.C.A. Const.Amend. 6.

**[17]    Health** 🔑 Suspension or Termination of Privileges;  Discipline

It was not necessary under Health Care Quality Improvement Act's (HCQIA) immunity provision for hospital's medical executive committee (MEC) to give physician who contracted with hospital to provide obstetrical/gynecological services predeprivation notice and hearing before it temporarily suspended his privileges and imposed other restrictions pending further investigation. Health Care Quality Improvement Act of 1986, § 412(a)(2), 42 U.S.C.A. § 11112(a)(2).

**[18]    Health** 🔑 Suspension or Termination of Privileges;  Discipline

**Health** 🔑 Liability or Immunity

Peer review action resulting in suspension of medical privileges of physician who contracted with hospital to provide obstetrical/gynecological services did not meet standards specified in Health Care Quality Improvement Act (HCQIA), and thus hospital and individual members of hospital's committees were not immune from physician's private damage claims stemming from peer review action; peer review committee's (PRC) hearing panel was not impartial, physician was not given fair opportunity to confront and cross-examine other physicians who prepared PRC forms, and medical executive committee (MEC) gave no reasons for ignoring recommendations of PRC and fair hearing committee (FHC), both of which conducted much more thorough review of hospital records than had MEC members. Health Care Quality Improvement Act of 1986, §§ 412(a)(2), 412(a)(3), (4), 42 U.S.C.A. §§ 11112(a)(2), 11112(a)(3), (4).

**Attorneys and Law Firms**

Dr. Chinonyerem Osuagwu, pro se, Albuquerque, NM, for parties.

Candace J. Cavanaugh, Butt Thornton & Baehr PC, Albuquerque, NM, for Defendant Gila Regional.

**Opinion**

*MEMORANDUM OPINION AND ORDER*

MARTHA VAZQUEZ, District Judge.

**\*1  THIS MATTER** is before the Court on Defendant Gila Regional Medical Center's *Motion for Summary Judgment,* filed August 8, 2011 [Doc. 57]. Having considered the record and undisputed facts, the parties' briefs, and the applicable law, I will deny the motion.

Pro se Plaintiff Dr. Chinonyerem Osuagwu sued Gila Regional and several individuals [1] under 42 U.S.C. § 1983 for damages and injunctive relief, alleging violation of his due-process rights, defamation, and intentional infliction of emotional distress. He alleges that Gila Regional, through the actions and conduct of Don White (the Chairman of its Board of Trustees); Dr. Jean Remillard (its Chief Medical Officer); the individual members of its internal Peer Review Committee ("PRC"); the members of its Medical Executive Committee ("MEC"); the members of its Fair Hearing Committee ("FHC" or "panel"); and Ronald Dehyle [2], an Outside Peer Reviewer, violated his civil rights when, without a reasonable belief that their actions were warranted by known facts, without a reasonable effort to obtain facts, and without following the process due to Plaintiff, the MEC and Board of Trustees temporarily and then indefinitely suspended his medical privileges and imposed harsh requirements for regaining those privileges, and Dr. Remillard filed notice of that adverse action with the National Practitioner Databank and the New Mexico Medical Board. Plaintiff also contends that the Defendants have tortiously damaged his reputation and intentionally inflicted emotional distress. The basis of Gila Regional's motion for summary judgment is that it, its committees, and all of

the individual defendants, are "immune from suit under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 1110111152 and the Review Organization Immunity Act (ROIA), NMSA 1978 §§ 41–9–1 to –7." [3] Doc. 57 at 1.

## I. APPLICABLE LEGAL STANDARDS.

[1]  [2]  [3]  [4]  [5]  Under HCQIA, any health-care entity that takes final peer-review action [4] that adversely affects a physician's hospital privileges for a period longer than thirty days must report that final action to the state board of medical examiners. See 42 U.S.C.A. § 11133(a)(1). The board of medical examiners must then report this information to the National Practitioner Data Bank. See 45 C.F.R. § 60.11(b). The HCQIA also "provide[s] qualified immunity from damages actions for hospitals, doctors and others who participate in professional peer review proceedings." Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1333 (10th Cir.1996). "[A] peer review participant is immune from private damage claims stemming from the peer review action" if the peer-review action meets certain standards specified by Congress." Id. Qualified immunity on the issue of damages is provided if the peer-review action was taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

*2  (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a). But, unlike qualified immunity under 42 U.S § 1983, HCQIA immunity is "immunity from liability only," not immunity from suit. Decker v. IHC Hosps., Inc., 982 F.2d 433, 436 (10th Cir.1992); Summers v. Ardent Health Serv., L.L.C., 150 N.M. 123, ——, 257 P.3d 943, 949 n. 3 (2011) ("HCQIA does not provide immunity for suits for injunctive or declaratory relief."); 42 U.S.C. § 11111(a)(1) (limiting immunity to liability "in damages"). "HCQIA immunity is a question of law for the court to decide and may be resolved whenever the record in a particular case becomes sufficiently developed." Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1332 (11th Cir.1994). Thus, if the evidence is undisputed,

a court might determine at an early stage of litigation that the defendant has met the [section 11112(a) ] standards, even though the plaintiff might be able to demonstrate that the professional review action was otherwise improper. At that point, it would be in order for the court to rule on immunity. In such a case, the court could still proceed to determine whether injunctive, declaratory, or other relief would be in order.

Id. at n. 24 (citing H.R.Rep. No. 903, at 12, reprinted in 1986 U.S.C.C.A.N. at 6394).

[6]  Section 11112(b) of HCQIA more fully defines the minimum "adequate" notice and hearing procedures referred to in § 11112(a)(3). This subsection provides:

A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

(1) Notice of proposed action

The physician has been given notice stating—

(A)(i) that a professional review action has been proposed to be taken against the physician,

(ii) reasons for the proposed action,

(B)(i) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating—

(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

**\*3**  (B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B)—

(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)—

(i) before an arbitrator mutually acceptable to the physician and the health care entity,

(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician involved has the right—

(i) to representation by an attorney or other person of the physician's choice,

(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii) to call, examine, and cross-examine witnesses,

(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

(v) to submit a written statement at the close of the hearing; and

(D) upon completion of the hearing, the physician involved has the right—

(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.

42 U.S.C. § 11112(b). In addition, HCQIA

confers immunity on any person who makes a report to the National Practitioner Data Bank 'without knowledge of the falsity of the information contained in the report.' 42 U.S.C. § 11137(c) (1994). Thus, immunity for reporting exists as a matter of law unless there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false.

*Brown,* 101 F.3d at 1334.

[7]  [8]  [9]  [10]   When a defendant asserts HCQIA immunity in a motion for summary judgment, there is an "unconventional twist to the burden of proof in our summary judgment standard," *Sugarbaker v. SSM Health Care,* 190 F.3d 905, 912 (8th Cir.1999), because HCQIA expressly entitles the defendants to a rebuttable presumption that the peer-review proceedings satisfied all four requirements of § 11112(a)(1)-(4) "unless the presumption is rebutted by a preponderance of the evidence," § 11112(a). Thus, in resolving Gila Regional's motion for summary judgment, while reviewing the evidence in a light most favorable to Plaintiff, I must determine whether he has "satisfied his burden of *producing* evidence that would allow a reasonable jury to conclude that [Gila Regional] peer review disciplinary process failed to meet the standards of HCQIA." *Bryan,* 33 F.3d at 1334 (internal quotation marks omitted) (italics added); *Brader v. Allegheny Gen. Hosp.,* 167 F.3d 832, 839 (3d Cir.1999) (accord). Another way of stating the summary-judgment standard is: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" *Bryan,* 33 F.3d at 1334 (internal quotation marks omitted). If so, even if the Defendants rely on a medical expert who opines that their actions were reasonable, the Plaintiff will be allowed to proceed to trial to see if a jury will "find, by a preponderance of the evidence, the peer review action was not" reasonable. *Brown,* 101 F.3d at 1333 (holding that "the district court did not err in failing to find [the defendants] immune, as a matter of law, from damages stemming from the revocation of [the physician's] obstetrical privileges"). As the Tenth Circuit noted, "to remove a plaintiff's claims from the jury simply because 'a difference of opinion among experts' exists would abrogate the jury's responsibility to weigh the evidence and determine the credibility of witnesses." *Id.* at 1334 n. 9. Thus, when resolving a summary-judgment motion on the issue of HCQIA immunity, "in determining whether a peer review participant is immune under [HCQIA], the proper inquiry for the court is whether [the physician] has provided sufficient evidence to permit a jury to find she has overcome, by a preponderance of the evidence, any of the four statutory elements required for immunity under 42 U.S.C. § 11112(a)." *Id.* "Courts apply an objective standard in determining whether a peer review action was reasonable under 42 U.S .C. § 11112(a)." *Id.* at 1333.

*4 [11]  [12]  [13]  [14]  [15]   Of course, what minimum procedural process is due under HCQIA must also be adjudged in light of constitutional due-process protections. The Eleventh, Sixth, and Fifth Circuits have explicitly held that a physician has a constitutionally-protected property interest in medical-staff privileges where the hospital's bylaws detail an extensive procedure to be followed when corrective action or suspension or reduction of these privileges is going to be taken. *See Shahawy v. Harrison,* 875 F.2d 1529, 1532 (11th Cir.1989) (holding that a physician has a "constitutionally-protected property interest in medical staff privileges"); *Yashon v. Hunt,* 825 F.2d 1016, 1022–27 (6th Cir.1987); *Northeast Ga. Radiological Assoc. v. Tidwell,* 670 F.2d 507, 511 (5th Cir. Unit B 1982) ("Medical staff privileges embody such a valuable property interest that notice and hearing should be held prior to [their] termination or withdrawal, absent some extraordinary situation where a valid government or medical interest is at stake."). The Tenth Circuit has noted this property interest in at least one case in which the parties conceded the interest exists. *See Setliff v. Mem'l Hosp. of Sheridan County,* 850 F.2d 1384, 1395 (10th Cir.1988). The Defendants have not challenged Plaintiff's right to constitutional due process either in this summary-judgment motion or in their previous motion to dismiss, and the time for filing further pre-trial motions has expired.

Ordinarily, "one who has a protected property interest is entitled to some sort of hearing before the government acts to impair that interest, although the hearing need not necessarily provide all, or even most, of the protections afforded by a trial." *Camuglia v. City of Albuquerque,* 448 F.3d 1214, 1220 (10th Cir.2006) (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The Supreme Court has repeatedly held, "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar,* 520 U.S. 924, 930, 117 S.Ct.

1807, 138 L.Ed.2d 120 (1997). Furthermore, "[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *Id.* at 93031.

"In matters of public health and safety, the Supreme Court has long recognized that the government must act quickly. Quick action may turn out to be wrongful action, but due process requires only a postdeprivation opportunity to establish the error." *Camuglia,* 448 F.3d at 1220 (citing *North American Cold Storage Co. v. City of Chicago,* 211 U.S. 306, 315, 29 S.Ct. 101, 53 L.Ed. 195 (1908)).

 **\*5** The discovery that a physician constitutes an imminent danger to public safety is precisely the kind of circumstance where the government must act quickly.

*Guttman v. Khalsa,* 669 F.3d 1101, ——, 2012 WL 76055, \*8–\*9 (10th Cir.2012).

## II. UNDISPUTED FACTS AND ANALYSIS

Plaintiff contracted with Gila Regional to provide obstetrical/gynecological services in February 2008. He worked in an obstetrical/gynecological practice with Dr. Nwachuku, who was the head of obstetrics at Gila Regional. It appears that the MEC at Gila Regional consisted of Dr. Michael Sargent, who was its acting Chief of Staff [5] , Dr. Remillard, who was its Chief Medical Officer, Dr. Carreon, Dr. Koury, and Dr. Montoya, a retired gynecologist who was also a member of the Board of Trustees (and who also attended the peer review meetings). *See* Doc. 44, Ex. R at 4–8 (Tr. of Dec. 15, 2008 Fair Hearing).

Under Gila Regional's bylaws, upon the request of the CEO, Board of Trustees, or its Chief of Medical Staff, the MEC may authorize an immediate, maximum 14–day summary suspension of any physician when "the failure to take such action may result in imminent danger to the health of any individual *and* otherwise be in the best interest of patient care at [Gila Regional]," during which time the hospital would investigate to determine the need for permanent action. Doc. 44, Ex. J at 1, ¶ 7.2–1. Within the following 5 days, the MEC is mandated to "interview the practitioner affected by the summary suspension," and to inform him of its specific basis, including a written statement and summary "of at least one or more particular incidents giving rise to the assessment of imminent danger" "demonstrating that failure to suspend could have reasonably resulted in an imminent danger to the health of an individual." *Id.* at 1–2, ¶ 7.2–2, 669 F.3d 1101. The bylaws expressly require the suspended practitioner "to be given an opportunity to discuss, explain, or refute the facts that made the basis of the suspension." *Id.* at 2, ¶ 7–2–2, 669 F.3d 1101. Within 10 days of the suspension, the MEC is required to report its findings, and if it finds that a failure to modify or continue the suspension may result in imminent danger, it must notify the doctor and provide a formal fair hearing as required by section 8 of the bylaws. *Id.,* ¶ 7 .2–3, 669 F.3d 1101. The notice of hearing is required to state "the acts or omissions with which the practitioner is charged, a list of specific or representative charts questioned, and/or the other reasons or subject matter that was considered in [the MEC] making the adverse recommendation...." *Id.* at 5, ¶ 8.3–2, 669 F.3d 1101. The MEC appoints a representative at the fair hearing, who bears the burden to "present appropriate evidence in support of the adverse recommendation." *Id.* at 8, ¶ 8.5–8, 669 F.3d 1101. The suspended physician has the right to "challenge any witness, [and] to rebut any evidence." *Id.* ¶ 8.5–9, 669 F.3d 1101. The hearing may be recessed and reconvened for the participants' convenience or for the purpose of "obtaining new or additional evidence or consultation," and after all of the presentation of evidence, the hearing is concluded and closed for the purposes of deliberation "outside the presence of the practitioner." *Id.* ¶ 8.5–10, 669 F.3d 1101. Within 30 days of the adjournment of the hearing, the FHC panel prepares a recommendation for the Board of Trustees to either continue, modify, or drop the suspension. *See id.* ¶ 8.5–11, 669 F.3d 1101. The MEC also must make a recommendation to the Board of Trustees to accept or deny the FHC's recommendation within 45 days of the adjournment of the hearing, *id.* at 9, ¶ 8.5–12, 669 F.3d 1101, and the physician also may similarly prepare a written statement that discusses the facts and recommendations with which he disagrees, which must become part of the record of the fair hearing that is presented to the Board, *id.* ¶ 8.5–13, 669 F.3d 1101. After the 45–day period has passed, the Board then must schedule a public hearing to review the findings and recommendations, which the physician must be allowed to attend. *Id* . ¶¶ 8.6–1, –2, 669 F.3d 1101. But the public hearing "shall not be an evidentiary proceeding" and the Board cannot admit or accept any evidence that the

FHC panel did not consider unless "it could not have been presented to the hearing committee." *Id.* ¶ 8.6–6, 669 F.3d 1101. The Board issues its final ruling regarding the suspension after the public hearing. [6]

### A. The events instigating the initial 14–day suspension of laparoscopic privileges.

**\*6** On November 17, 2008 after a "Special [MEC] meeting," of which Plaintiff was completely unaware, based on "complications from two diagnostic laparoscopic procedures," the MEC summarily but temporarily suspended Plaintiff's privileges to perform elective laparoscopic procedures for 14 days, and required Dr. Nwachuku to assist Plaintiff on emergency laparoscopies during that 14–day period. Doc. 57, Ex. 1. In violation of Gila Regional's Bylaws, *supra,* the notice of suspension did not specify which laparoscopic procedures were in question, nor did the MEC ever interview the Plaintiff regarding the charges against him or the two cases it was considering. *See id.;* Doc. 44, Ex. R at 31–32.

At the fair hearing, Dr. Carreon, whom the MEC appointed to present its case, explained that the MEC believed that, although the two surgical cases had been "difficult" and "high-risk" ones, "having two complications [from bowel perforations] in the [5 to 6–week period of time] was a little bit over the acceptable limit," and it wanted a Peer Review Committee ("PRC") to further investigate Plaintiff's performance. Doc. 44, Ex. R at 9–12. Although not mentioned in its November 17, 2008 notice of suspension, Dr. Carreon also cited a recent instance in which Plaintiff attempted to schedule an exploratory laparoscopy of an obese patient, which was cancelled when the nurse anesthetist refused to administer anesthesia. *See id.* at 6–8. It was this third event that actually instigated the MEC's summary-suspension action. *See id.; id.* at 11–12. As noted, it is undisputed that, contrary to the Bylaw's requirements and the usual procedure at Gila Regional, neither the MEC nor the PRC interviewed or otherwise question the Plaintiff about these three cases before or during the initial 7–day suspension or during the subsequent indefinite extension and expansion of Plaintiff's suspension during the three weeks before the fair hearing. *See id.* at 31–32. At the fair hearing, although he was not a "voting member" of the PRC, Dr. Remillard justified the departure from the required procedure, stating "we [the PRC] felt that the magnitude of the threat to the public was such that we needed to take immediate action. And so we moved very, very swiftly to present it to the appropriate bodies, in this case the MEC, to say, no, we really need to suspend." *Id.* at 32. Except for Plaintiff's comments given at the fair hearing noted below, the following is a summary of the three cases based on the hospital records before the MEC and PRC.

Case 10 [7]—# 41872. On August 8, 2008, Plaintiff and Dr. Nwachuku, as the primary surgeon, had performed a laparotomy to remove a ruptured ectopic pregnancy on an obese patient. *See* Doc. 44, Ex. R at 93–94; Doc. 63 at 3–4. She returned to the hospital on September 2, 2008 with a fever and a high white-blood-cell count, and a CT scan found "inflamed adipose tissue." Doc. 44, Ex. R at 94, 101. After treatment with antibiotics did not lessen her severe pain, because he thought the patient may have developed adhesions at the laparotomy site [8], Plaintiff performed an "exploratory laparoscopy with lysis of adhesions" on September 4, 2008. Doc. 44, Ex. R. at 94, 96, 99. The patient's white-blood-cell count subsequently rose from 12,000 on September 4th to 15,000 on September 5, and continued to rise to 23,000 on September 6. *See id.* at 108. Plaintiff ordered a second, post-laparoscopy CT scan late on September 4, which showed some "free air," so Plaintiff consulted with a radiologist, who did not think the "free air" was much to worry about because it could have been introduced during the laparoscopy. *See id.* at 100–102. Plaintiff requested pulmonary and internal medicine consults on September 5 after the patient experienced some breathing issues. *See id.* at 95. Plaintiff also requested a general surgical consult on September 5, but the surgeon did not suggest there could be a perforated bowel or that she be immediately transferred to a larger hospital. *See id.* at 97, 110, 115. When the patient's condition continued to worsen on September 6, and after she experienced some heart issues, Plaintiff asked for the patient to be transferred to UNM hospital on September 7, 2008, where it was determined that her bowel had been perforated. *Id.* at 94, 100, 104.

**\*7** After reviewing the hospital chart, according to Dr. Remillard, the only reasons the MEC stated they were initially concerned about this case what they perceived as "the [un]timeliness of obtaining consultation on this patient" from the general surgeon and the fact that she was not transferred to another hospital until September 7. Doc. 44, Ex. R at at 104. In other words, the MEC apparently did not believe that the Plaintiff's actions had placed this patient in "imminent danger."

Case 7—# 196208. Dr. Nwachuku and Plaintiff operated on this patient in July 2008 to remove an ovarian cyst and her uterus. *See* Doc. 44, Ex. R at 119–121, 138. She came back to Plaintiff on November 8, 2008 because of severe abdominal pain, and he performed an exploratory laparoscopy to try and determine the cause of her pain and to remove adhesions, after which she went home. *See id.* at 116, 119–122. A few hours later, she returned to the ER with abdominal pain, but Dr. Nwachuku sent her back home after examination. Two days later, while Plaintiff was out of town, the patient came to the ER and was placed in ICU. *See id.* at 116, 122. Dr. Nwachuku and Dr. Wendler, a general surgeon, performed a laparotomy on November 10, during which they discovered two bowel perforations and a large hematoma. *See id.* at 116.

Case 9—# 76636. On November 14, 2008, Plaintiff tried to schedule an exploratory laparoscopic procedure on a 45–year–old, obese patient. This patient had severe, chronic pelvic pain after multiple gynecological and abdominal surgeries by other physicians, including the prior removal of two ovarian tumors and her uterus. She had been referred to Plaintiff by another doctor to diagnose the cause of her pain. *See* Doc. 44, Ex. K10 at 3, 5–6. The patient was taking several medications for asthma, high cholesterol, and high blood pressure, but her blood pressure at the time of admission was normal and she was not currently experiencing any heart, breathing, or swelling issues. *See id.* at 6. A sonogram showed a "complex adnexal cystic structure," or mass, in the uterine area. *See id.* Before the scheduled surgery, Plaintiff confirmed that Dr. Wendler, a general surgeon, would be available to assist him, should the need for a laparotomy arise. *See id.* at 3. But the nurse anesthetist "refused to perform the case," opining that the patient was "a high risk status," and the head of anesthesiology—who was also the hearing officer for the fair hearing in this case cancelled—the surgery. *Id.; and see* Doc. 44, Ex. N at 1; Doc. 44, Ex. R at 7–8, 81. The MEC never concluded that Plaintiff had put this patient in "imminent danger" by attempting to schedule the elective exploratory laparotomy.

## B. The PRC review and the suspension of all gynecologic privileges.

After its summary suspension of laparoscopic privileges, the MEC asked the hospital's PRC to review the two cases and provide recommendations. The PRC consisted of several physicians, none of whom were gynecologists. Doc. 44, Ex. R at 37–38. But Dr. Remillard, who states he was not a "voting member" of the PRC but otherwise fully participated in the review, allegedly provided "expert opinion" input at the PRC meetings as a non-practicing gynecologist, *see id.* at 34, 37–38, as did Dr. Montoya, a retired gynecologist, who was a member of the MEC and Gila Regional's Board of Trustees. *See id.* In addition, either Dr. Carreon or Dr. Remillard informally talked with some unidentified non-MEC-member physicians (who had been invited to the MEC meetings) who had previously consulted on some of the Plaintiff's cases, and who allegedly told them that they "should have seen the patient earlier" in unidentified instances. *Id.* at 20, 34. After looking at the two cases discussed *supra,* and after other, unidentified physicians who performed laparoscopic procedures allegedly told Dr. Remillard or Dr. Carreon that they had *never* perforated a bowel during a laparoscopic procedure, the PRC decided to look at not only the Plaintiff's surgical skills, but also at his other skills to see if there was "a problem with any other kind of cases." *See id.* at 9–11.

**\*8** The PRC pulled 34 of Plaintiff's patients' hospital charts, divided them up between "four or five" unidentified physicians for review, *id.* at 29, and the reviewers filled out "Medical Staff QA & I" forms by giving a brief summary of the reviewer's "findings" and "conclusions" regarding each case; answering 8 general questions about the patient's clinical management; and rating it between a 1 and a 5. *See, e.g.,* Doc. 44, Ex. K1 at 1–2. Category 3 cases indicated a "marginal deviation from the standard of care;" category 4 cases indicated "some deviation from the standard of care with possible change of outcome," and category 5 cases indicated "deviation from the standard of care with probable change of outcome.[9]" *See id.* at 2. Although the forms provided for the name and signature of the PRC member who reviewed the hospital chart, all of the forms for Plaintiff's cases were unsigned. At a joint meeting on November 22, 2008, the PRC determined that 12 or 13 of the cases caused them some concern. *See* Doc. 44, Ex. R at 12, 25, 36; Doc. 44, Ex. N at 2. Dr. Carreon testified that the PRC was concerned that the hospital charts indicated deficiencies in "preoperative evaluation[s]," absences of "documented pelvic exam[s]," lack of documentation regarding what "workup" had been done "prior to taking somebody to surgery;" "whether general surgery should have been involved and wasn't," about "hesitating to obtain consultations in patients that were very ill," about the "timeliness of consultations," and about a "diagnosis prior to an operation and the [subsequent] pathology not being consistent." Doc. 44, Ex. R at 13–14, 16, 20, 23. Again, no one asked Plaintiff to appear before the PRC to comment on the cases or provide evidence or explanation during this peer-review process. *Id.* at 31–32. But Dr. Carreon testified that unspecified members of the PRC

again allegedly informally discussed the cases with unidentified "people that are in that field" who reportedly said, "I would have done this first [or] I would have done that," in arriving at their conclusion that certain cases were concerning. *Id.* at 12, 14–15. Although he was never interviewed, Plaintiff was asked at some point to provide written comments or explanations on 1 of the 12 cases that gave the PRC some concern and on several cases that were *not* cause for concern. *See id.* at 36. There is nothing in the record evidencing any written recommendations by the joint members of the PRC. And the MEC presented nothing indicating that any of the cases, other than the single laparoscopic case in which the Plaintiff apparently had perforated the bowel, gave cause to believe that Plaintiff's patients were in "imminent danger."

According to Dr. Remillard, who was involved in the PRC's November 22 meeting, at the PRC's urging, the MEC held an "emergency meeting" on November 24, 2008, at which time the PRC recommended that Plaintiff's "laparoscopic privileges be suspended indefinitely." Doc. 44, Ex. R at 29–31; *see* Doc. 44, Ex. Q. Although the Amended Complaint states that the PRC "submitted findings in a report to the ... MEC," Am. Compl. at ¶ 51, that report has not been submitted in the summary-judgment record. Without explanation in the record, and with no finding of "imminent danger," in violation of the Bylaws, the MEC "broadened [the suspension] to *all* gynecological privileges and also to have mandatory consultation when obstetrical care ... deviated from normal because of the timeliness of consultation." Doc. 44, Ex. R at 30; *see* Doc. 57, Ex. 2. Dr. Carreon stated that the PRC decided to send the charts "to somebody else outside the hospital to have them reviewed and see what their opinion was, as well." [10] Doc. 44, Ex. R at 26; Doc. 57, Ex. 2. The MEC then informed Plaintiff of its decision to broaden and continue the suspension, but again, the notice did not inform Plaintiff which charts were under scrutiny or what specific actions he had taken or not taken that supplied support for immediate, summary suspension of all of his gynecological privileges, nor did it mention "imminent danger." Instead, the notice obliquely stated that "there were a high number of cases in which a change of outcome could have been achieved for the patients...." Doc. 57, Ex. 2. When asked by the FHC panel why Plaintiff was not given the opportunity to provide input during the whole peer-review process, Dr. Remillard attempted to justify the failure to do so by stating "we have enough evidence to support those actions, and to make sure that our public is protected, that [Plaintiff] doesn't have privileges to go back to the OR and potentially put other patients in harm's way." Doc. 44, Ex. R at 31–33. After receiving notice of the indefinite and expanded suspension, Plaintiff asked for a fair hearing as provided by the Bylaws.

### C. The fair hearing.

**\*9** The FHC panel consisted of Dr. Remillard, Dr. Russell Kleinman, Dr. Mark Donnell (who served as the hearing officer), Dr. Adele Lente, and Dr. Bill Neely [11], *see* Doc. 44, Ex. R at 2. The fair hearing was held on December 15, 2008. Dr. Carreon, who was appointed to present the MEC's case in the absence of Dr. Koury, who was ill, was not prepared to do so. *Id.* at 4. Over Plaintiff's objections and request for specific information about each case in which he was accused of not meeting a standard of care, *see, e.g. id.* at 15–16, 21–24 [12], Dr. Carreon stated that he did not have time to go through each case the PRC had reviewed; thus he simply gave a general summary from his "memory" about what he thought the problems actually were. *See* Doc. 44, Ex. R at 4–6; *id.* at 16. Dr. Carreon called no witnesses, experts, or other physicians/consults who had worked with Plaintiff on any of the cases. After giving the general summary, and summarizing case # 9, regarding Plaintiff's attempt to schedule the diagnostic laparoscopy for the obese patient with asthma issues that had led to the initial suspension and investigation, Dr. Carreon apparently left at the first break, instead of presenting all of the evidence on which the MEC had based its two summary-suspension decisions. *See id.* at 5–28.

Dr. Remillard then took over questioning the Plaintiff, and finished presenting and arguing the MEC's case, even though a review of the transcript shows that he was never sworn in (in contrast to Dr. Carreon, *see id.* at 5), he was not appointed to present the MEC's case, and he was a voting member of the FHC panel. *See, e.g ., id.* at 29–30, 66–68, 73, 77; Doc. 44, Ex. W at 2. Indeed, Dr. Remillard played roles as Dr. Oswagwu's accuser and "expert witness" against him, by virtue of his involvement in the MEC and PRC committees; as his prosecutor and as an unsworn witness at the Fair Hearing; and as a judge at the Fair Hearing. Although Gila Regional's Bylaws do not preclude its Chief Medical Officer's involvement in every stage of an investigation, disciplinary sanction, and "fair" hearing to determine if the sanction was appropriate, minimal constitutional due-process standard does preclude involvement to this degree. "[T]he Due Process Clause of the Fifth Amendment guarantees a hearing concerning the deprivation of ... a recognized property or liberty interest before a fair and impartial tribunal. This

guarantee applies to administrative adjudications as well as those in the courts." *Harline v. Drug Enforcement Admin.* 148 F.3d 1199, 1203 (10th Cir.1998) (internal citations omitted). Even in the context of a prison disciplinary hearing,

> [a]n impartial hearing board has been required, to the extent that a member of the board may not participate in a case as an investigating or reviewing officer, or be a witness. The Third Circuit, ... has also held, in the context of the federal system where a prisoner whose good time is taken away goes first to a disciplinary committee and then to the Good Time Forfeiture Board, that an associate warden could not sit on both committees.

**\*10** *Wolff v. McDonnell,* 418 U.S. 539, 572 n. 20, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *id.* at 592 (Marshall, J., concurring) ("Due process is satisfied as long as no member of the disciplinary board has become involved in the investigation or presentation of the particular case or has any other form of personal involvement in the case."). As a matter of law, Gila Regional and its MEC cannot show that it afforded a fair hearing by impartial decisionmakers to Plaintiff when it conducted the disciplinary proceedings in this fashion.

Instead of requiring the MEC to present evidence in support of its two suspensions, the FHC decided to itself go through the charts of the cases that the PRC members had rated to see "what peer review said;" and to allow Plaintiff an opportunity to "explain his perceptions of the cases and discuss them." Doc. 44, Ex. R at 38. The question regarding "what peer review said" appears to be contained solely in the "Medical Staff QA & I" forms prepared by various anonymous members of the PRC between November 17 and 22, 2008. The forms had apparently been given to Plaintiff before the fair hearing so that he could comment in writing on the case and the criticisms. *See* Doc. 44, Exs. K1–K13; Doc. 44, Ex. R. at 44. The FHC discussed, however, and the Plaintiff was permitted to discuss, only the following cases at the fair hearing:

1. Case 8 # 65998—category 5 (reduced to category 4 at the hearing because the FHC panel concluded that the Plaintiff's medical decisions were not questionable under the circumstances). The PRC form stated that the major criticism was the Plaintiff's insufficient documentation regarding what he saw and what he did before deciding to remove an ovary, after which the FHC panel determined that it was not a standard-of-care issue, but rather a documentation issue, *see* Doc. 44, Ex. R at 39–57. But the PRC form also made the statement, "should pt. have had doppler?" even though the PRC reviewer subsequently stated that there was documentation that "clinically pertinent diagnostic tests" had been ordered; and the PRC reviewer questioned whether there "was an [undescribed] avoidable incident that extended the length of stay or compromised the outcome?" Doc. 44, Ex. K1 1 at 1, 2. The medical records and evidence at the hearing showed that the 15–year old patient had presented to Gila Regional's ER reporting abdominal pain for two weeks and constant, more severe pain for 24 hours. Doc. 44, Ex. R at 39, 47. A CT scan showed "an enlarged abnormal right ovary consistent with torsion and infarction," and a doppler ultrasound report stated that there was no blood flow to the ovary. *Id.* at 39–40; *see also* Doc. 44, Ex. K11 at 5 (radiologist's opinion that, given the long duration of symptoms, "the ovary could be infarcted and necrosed"). After viewing the ovary and seeing, in fact, that it was greatly enlarged and twisted and not receiving proper blood flow, Plaintiff believed that it was infected and not viable, and he removed the ovary laparoscopically. Doc. 44, Ex. R at 47–50, 55. The patient recovered fully and was released from the hospital the next day. *See id.* at 57.

**\*11** The post-op pathology report stated that, although the ovary was swollen and had a cyst, it was otherwise "relatively normal." *See id.* at 56. At first, Dr. Remillard stated that the PRC Committee was satisfied with Plaintiff's documentation regarding his procedures. *See id.* at 44. The PRC appeared to be unhappy about the *outcome* because Plaintiff had removed what appeared on pathology to be a non-necrotic ovary in a young woman, thereby negatively affecting her fertility. *See id.* at 40–42. But *after* Dr. Remillard and the other doctor/committee members at the fair hearing agreed that taking the patient to surgery was reasonable and two of the doctors commented that, based on the CT and ultrasound scans, radiology report, enlarged size, and torsion, there was a definite risk of *not* removing the ovary, *see id.* at 45, 46, 49–50, Dr. Remillard's major criticism was that Plaintiff did not sufficiently document the specific circumstances that led him to make the surgical decision to remove the ovary. *See id.* at 50–51; 54–55. In response to Plaintiff's question of what he should have done that he did not do, Dr. Donnell, the hearing officer, told Plaintiff "the only thing that probably would have helped ... would have been better documentation of your exam when you got in there at the ovary, referencing twisting." *Id.* at 57. Dr Remillard then stated,

> I ... can't criticize the surgical management. I probably would have done the same thing. It would have been
> nice to write an extra two or three lines ... [saying] this is what I'm seeing, that is what I'm finding, this is what
> I'm thinking, and this is what I acted upon. And it wasn't very clear in there.

*Id.* at 57–58. One of the other panel members then commented that, if it was a documentation issue, and Dr. Remillard would
have done the same thing, it really wasn't a standard-of-care issue. *Id.* at 58.

2. Case 4—# 219986—category 5 (reduced to a 4 at the hearing because nothing negative happened to the patient). The PRC's
only criticism was Plaintiff's failure to document the fetal "dating criteria" or gestational weight in the hospital charts and failure
to document why he decided to deliver a 34 week + 4 day fetus (with a fundal height of 35 weeks) at Gila Regional instead of
arranging to transfer the mother to Albuquerque, *see id.* at 61–80; *see* Doc. 44, Ex. K4 at 2 (rating all areas "satisfactory" except
"was there documentation in the medical record evidencing clinical decision making as timely and appropriate?"). Plaintiff
explained that, according to the lab reports he ordered that were in the record, there were no infection or other issues with the
fetus other than that it was premature; that when he first started working at Gila Regional, they told him that they were confident
in caring for infants that were gestationally older than 34 weeks in their level-one nursery; that the mother had reported, and
he confirmed through tests, that she was leaking amniotic fluid for 1–2 days; and that the mother's drug screen was negative
even though she had taken drugs early in the pregnancy. See Doc. 44, Ex. R at 65. Dr. Remillard noted that he had called "the
perinatologist regarding this case, and they felt that inducing [this] patient ... would be appropriate in this scenario." *Id.* at 77.

**\*12** 3. Case 9—# 76636—category 5 (but surgery was cancelled, so no harm to patient)case discussed, *supra.* The only
criticism seemed to be that the patient was a high anesthesia risk and that Plaintiff failed to document in the hospital charts the
connection between the CT scan showing a mass and the pain in his decision to perform a diagnostic laparoscopy. *See* Doc.
44, Ex. R at 80–93. The Plaintiff pointed out that a cardiac specialist determined on December 10, 2008 that the patient was a
"low and reasonable risk" for surgery. *See* Doc. 44, Ex. K10 at 13 (cardiologist's report). Further, although the PRC reviewer
had stated: "No pelvic—not really GYN case," the medical records shows that the patient subsequently saw Dr. Nwachuku,
who (with Dr. Wendler) performed an open laparotomy and adnexectomy to remove an ovarian mass under anesthesia a month
later, with no complications. *See* Doc. 44, Ex. K10 at 7; Doc. 44, Ex. R at 86.

4. Case 10—# 41872—category 4, discussed, *supra,* "medical management question." Doc. 44, Ex. R at 93. As noted, *supra,*
the major complaint was the alleged untimeliness of calling in a surgical consult. *See id.* at 104. At the fair hearing, Plaintiff
explained that surgeons at UNM did an open surgery and found that her small bowel had been perforated. *See id.* at 100. After
reviewing the hospital charts, one of the panelists/surgeons expressed "the likelihood" that the perforation happened during
Plaintiff's and Dr. Nwachuku's original laparotomy because of her symptoms when she was admitted on September 2 and
because discovery of perforations are often delayed until they "actually necrose to the wall." *Id.* at 112. In his opinion, based
upon her symptoms, the "idea to [do the exploratory laparoscopy] was right. The idea to operate for adhesions was wrong"
because Plaintiff should have been looking for perforations at that point in time. *Id.* at 113. Another doctor suggested that,
if "omentum is wrapped around a little, small perforation," when adhesions are released, "you stir all that up and it spreads
out," making it worse. *Id.* at 112. But because Plaintiff had requested a surgical consult, and his plan was to do a diagnostic
laparoscopy and possible laparotomy, and because the surgical consult never suggested looking for perforations, the FHC panel
stated that, "from the medical records, it reads okay." *Id.* at 115.

5. Case 5—# 196208—category 4, discussed *supra.* The panel had no further discussion about this case except to finish getting
the facts. *See id.* at 116–124. Plaintiff admitted that it was possible that he could have caused the perforations in this very
difficult case when he performed the laparoscopy. *See id.* at 122. [13]

6. Case 6—# 86820—category 4—another "medical management" question. *Id.* at 124. Dr. Remillard stated that the PRC's
concerns were that "the patient did not improve and it was sort of slow to start bringing in consultants to help manage this
patient." *Id.* at 130. But the PRC review form erroneously stated, "bowel injury" and "NO [blood] cultures," *see* Doc. 44, Ex. K6
at 1, which the Plaintiff showed were not true, based on the medical records. *See* Doc. 44, Ex. K6 at 6–8. The Plaintiff explained
that, for several days after he and Dr. Nwachuku had removed a post-operative abscess on September 24, the patient's only

problem was that she could not void; and that he had initially consulted Dr. Nwachuku, who told him that the problem could be a result of medication, and "that what he normally does is just keep them on the foley for a couple of weeks or transfer them out." *Id.* at 17; Doc. 44, Ex. R at 126–27. The hospital records showed that the patient was afebrile and stable until October 28, when she developed a "low grade fever," at which point Plaintiff immediately consulted "Dr. Snure." Doc. 44, Ex. M6 at 2. When she continued having a low-grade fever on October 29, Plaintiff consulted an infectious diseases specialist, who confirmed on October 30 that he was using an appropriate antibiotic. *See id.* When the patient expressed unhappiness with not being able to void and stated that she did not want Plaintiff to take care of her any longer, she was transferred to a hospital in Arizona. *See* Doc. 44, Ex. R at 125, 127, 131, 135–36. The patient began voiding within three days of transfer and was doing well. *See id.* at 127. After examining the charts, Dr. Remillard confirmed that the patient "did improve" after surgery on the 24th, contrary to the MEC's statement that she did not improve, and also confirmed that there were no other infection issues. *Id.* at 134–35.

**\*13** 7. Case 7—# 196208—category 4. This case involved the same patient as case 5, *supra,* but the PRC's concern was "post-op pain management." *Id.* at 141. Plaintiff had prescribed, and the patient had received 50 mg of demerol after she returned to her room after surgery, causing a low respiration rate and oxygen saturation. The PRC reviewer stated "pain med order excessive, better to repeat lower doses more often; slow to give Narcan." Doc. 44, Ex. K5 at 2. In his response, Plaintiff noted that 50–150 mg of demerol is the recommended dosage for adults; that the hospital's anesthetist erroneously gave the patient Nubain when she started crashing after the demerol had been administered; and that Plaintiff "immediately asked the anesthetist to administer Narcan" after the nurses called him. *See id.* at 3. He also showed that he withdrew his order for demerol or any other narcotic drug after the incident and ordered toradol for pain instead. *See id.; see* Doc. 44, Ex. K5 at 5. At the fair hearing, Dr. Donnell, the hearing officer and head of anesthesia at Gila Regional, confirmed that the anesthetist had initially erroneously administered the Nubain, and stated that "to a healthy person who hadn't received anything else, that [dosage of demerol] would have been fine," but noted that "the problem ... was that it occurred so quickly after surgery ... that the patient was probably still under the influence of medications from surgery and it was just too much at that time." Doc. 44, Ex. R at 141–42. The panel discussed that there was "no bad outcome" because medication to counteract the narcotic had been timely given and the patient recovered quickly. *Id.* at 143, 141.

8. Case 13—# 51082—category 4. According to Dr. Remillard, the PRC stated that Plaintiff's "H & P was felt to be inadequate" because Plaintiff deferred a pelvic exam prior to performing a D & C for a "missed abortion." *Id.* at 144–45. The PRC form also questioned whether there was documentation in the record showing that Plaintiff had ordered "clinically pertinent diagnostic tests." Doc. 44, Ex. K7 at 2. At the hearing, it was determined that the patient came in for the D & C after having had a pelvic exam by a midwife who had noted a "fetal demise"; and that she also already had an ultrasound affirmatively showing the demise, *see id.* at 7 (copy of ultrasound); and that she was actively bleeding and had passed blood clots in the ER while waiting for Plaintiff. *See* Doc. 44, Ex. R at 145–48. Plaintiff explained that he deferred another pelvic exam because she was in pain and he knew that she had to have an immediate D & C based on the referral, the ultrasound, and the blood clots. *See id.* at 149. The FHC panel concurred that there was no problem with deferring the exam. *See id.*

9. Case 11—# 205132—category 4. According to the PRC form, the "H & P pre-op [was] inadequate. Operative management was questioned due to 1500 ccs of irrigation, and there was some question about the use of mag citrate after" Plaintiff had performed a laparoscopic lysis of adhesions in a patient who had come in with severe abdominal pain. *Id.* at 150; *see* Doc. 44, Ex. K8 at 1. At the hearing, Plaintiff explained that, during the laparoscopy, he had used a medication created to reduce adhesions to irrigate the abdominal area according to the manufacturer's directions, and that there had been a transcription error in describing the medication. *See* Doc. 44, Ex. R. at 151–52. He explained that the patient had been sent home on non-narcotic pain killers; that she came back to the hospital complaining of constipation four days later; that after other medications for constipation did not work, he prescribed the magnesium citrate, which relieved the constipation and she went home. *See id.* at 153. He skipped a pre-op pelvic exam because "she was having too much pain" but stated that he did a pelvic exam when he inserted "the uterine manipulator" during the surgical proceeding. *See id.* at 153–54. He also mentioned in his written explanation that he had performed a pelvic exam at his clinic before he scheduled the surgery. *See* Doc. 44, Ex. K8 at 3.

**\*14** **[16]** The MEC did not call any expert witnesses or other gynecologists to testify about substandard surgical, gynecological, or obstetrical practices, nor did it present any reports or other information, other than the single incident in which

the Plaintiff had accidently perforated the bowl of patient # 196208 Case 5, showing that Plaintiff definitively had failed to follow a standard of care. No testimony or other evidence disputed the Plaintiff's explanations and testimony at the fair hearing. By failing to bring to Plaintiff's disciplinary hearing the PRC physician-reviewers who expressed their opinions that Plaintiff's performance fell below the standard of care, and by failing to bring in the other physicians who allegedly informed the MEC and PRC members that Plaintiff had committed errors falling by failing to consult, Gila Regional and its MEC deprived Plaintiff of an opportunity to cross-examine the witnesses against him. As a matter of law, this failure violated Plaintiff's rights of cross-examination under both the Bylaws and the minimum standards of constitutional due process.

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination.

*Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Wolff,* 418 U.S. at 567 (noting that "confrontation and cross-examination of those furnishing evidence against" a defendant "are essential" in trials in which "a person may lose his job in society") (citing *Greene v. McElroy,* 360 U.S. 474, 496–497, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)).

Because one of the panel members had to leave, the panel decided that there was no need to review or discuss the three category–3 cases submitted by the PRC, and Dr. Donnell informed Plaintiff that they were going to conclude the hearing and "reconvene on Thursday just as a panel to discuss *what was discussed here today* " and reach their decision. *Id.* at 155 (italics added). Thus, the FHC reviewed a total of 9 cases, discussed *supra,* only one of which indicated that Plaintiff had perforated a bowel during laparoscopic lysis of adhesions (and, as the outside peer reviewer later noted, unless Plaintiff had a pattern of perforating bowels during those procedures, that may have been a one-time simple mistake). As noted by the summary of the cases set out above, no surgical/ gynecological expert indicated that Plaintiff had fallen below the standard of care on any other kind of surgical or obstetrical proceeding or otherwise placed patients in danger. As noted, the PRC reviewers' most common complaint was Plaintiff's failure to fully document what he had done.

**\*15** But before the FHC reached a decision regarding a recommendation to the MEC and Board of Trustees, on December 17, 2008, Dr. Remillard wrote to the New Mexico Board of Medical Examiners to inform them of the two suspensions of Plaintiff's privileges. Doc. 44, Ex. Q.

The FHC panel reconvened on December 18 and made the following non-specific findings, none of which specifically concluded that Plaintiff had fallen below a standard of care:

(1) There was evidence of poor surgical judgment in several cases involving the laparoscopic lysis of adhesions;

(2) There was evidence of poor obstetrical judgment in one case; and

(3) There was evidence of poor documentation of preoperative evaluations and of intraoperative surgical findings in several cases.

Doc. 44, Ex. W at 1. Based on "the case reviews and these findings" the FHC panel made the following recommendations to the MEC and Board of Trustees.

(1) Restore [Plaintiff's] Gynecology privileges except for the laparoscopic lysis of adhesions.

(2) Institute ongoing focused chart review for [Plaintiff's] obstetric and gynecologic cases.

(3) Mandate additional education for [Plaintiff] with regard to the indications for and techniques of laparoscopic lysis of adhesion.

(4) Require additional education for [Plaintiff] focused on risk management and medical records documentation.

*Id.* at 2. Because it is clear, on undisputed evidence, that the December 15, 2008 hearing was not fair both because there was not an impartial hearing panel and because Plaintiff was not given a fair opportunity to confront and cross-examine the other physicians who had prepared the PRC forms and expressed "expert testimony" that was used against him, I conclude, as a matter of law, that the FHC's recommended disciplinary and sanction actions were not made "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3).

### D. Proceedings before the Board of Trustees.

The MEC held a special meeting on December 29, 2008 to discuss the FHC's recommendations. Despite the fact that Dr. Remillard, the only gynecologist on the FHC panel and Gila Regional's CMO, concurred in the FHC recommendations and signed off on them, the MEC sent a much harsher, more extensive set of recommendations to the Board that also affected Plaintiff's ability to practice obstetrics at Gila Regional. *See* Doc. 44, Ex. N at 1, 6. These recommendations included:

    1. Suspension of all gynecologic surgical privileges

    2. Obtain consultations for all obstetrical patients with medical or surgical complications and consultations for all Special Care Unit admissions.

    3. Send charts in question for outside review.

    4. Ongoing focused review of all obstetric patients.

    5. Six hours of Continuing Medical Education of Risk Management, including education on medical record documentation.

  **\*16**  6. Before GYN privileges reinstated, additional education with regard to the indications for and techniques for all gynecological surgery and receipt of information from an educator that Dr. Oswaguwu is competent to practice in a small town.

*Id.* at 1. The MEC gave no reasons for ignoring the recommendations of its PRC and its FHC, both of which had conducted a much more thorough review of the hospital records than had the MEC members, nor did it give any reasons for recommending imposition of these extremely harsh sanctions, many of which appear to have no basis in the evidence. As a matter of law, I conclude that the MEC did not make these recommendations or continue its sanctions "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement" of providing the Plaintiff with a fair hearing. 42 U.S.C. § 11112(a)(3), (4).

The Board of Trustees held its hearing on February 2, 2009. The questions the Board of Trustees posed were whether the Plaintiff had been given "notice and a hearing" and whether the MEC's recommendations are "reasonable and supported by substantial evidence." Doc. 44, Ex. N at 1. The Board's summary index of the proceedings contained untrue statements. For example, it stated that the Plaintiff had "provided input on selection of the [peer] Committee members," *see id.* at 2, even though the Plaintiff had no idea that a PRC had been convened to evaluate all of his hospital records before issuance of the second sanction on November 24, 2008, and it stated that category 3 cases were reviewed "in detail" at the fair hearing, *see id.* at 5 even though the FHC had decided not to consider those cases and did *not* review them at the December 15, 2008 hearing. In addition, the Board of Trustees considered case-note summaries of cases 1 and 2, which were category 3 cases that the FHC decided to disregard and about which Plaintiff had no opportunity to comment or defend at the fair hearing. *See id.* at 4.

It is unclear who made the summary of the case notes for the Board of Trustees in advance of the public hearing, but it appears that they came from the PRC's Medical Staff Q A & I sheets and the MEC's November 24 meeting because they included several cases that were never discussed at the fair hearing and several incorrect statements of fact that had been corrected at the fair hearing. *See id.* at 3.

For example, the summary of Case 4 stated as a criticism: "induction of labor in high-risk OB patient at [ ] 35 weeks gestation, pregnancy complicated by alcohol and methamphetamine use," *see id.* at 3, despite the facts that: 1) there was absolutely no evidence or testimony that the mother was high risk or had complications during her pregnancy; 2) Plaintiff testified that he had been the mother's OB physician since the first trimester; that she had been drug-free since her first trimester; and that her lab results continued to show no drug or alcohol in her system at the time he decided to induce, *see* Doc. 44, Ex. R at 64–65, 77; and 3) Dr. Remillard had established at the fair hearing that inducing labor in that patient was the correct thing to do under the circumstances, *id.* at 77.

 **\*17**  And the summary of Case 6 states the criticism of Plaintiff's treatment as, "Pelvic abscess: 5 days before infectious disease consult; 6 days before surgery consult." Doc. 44, Ex. N at 3. But undisputed testimony and evidence at the fair hearing had established that, after the pelvic abscess was removed, there were no further infection or surgical issues; that the patient's only problem after the abscess removal was that she could not urinate without a foley catheter; and that she was transferred at her request because she could not urinate. *See* Doc. 44, Ex. R at 134–37. The case-note summary also incorrectly stated that "no blood culture or urinalysis ordered," Doc. 44, Ex. N at 4, but as noted, *supra,* Plaintiff conclusively established at the fair hearing that he had obtained both blood cultures and urinalyses and the FHC panel extensively examined them.

At the February 4, 2009 hearing, contrary to Gila Regional's bylaws, the Board heard new evidence from Dr. Montoya, the only physician/member of the Board of Trustees, regarding two cases in which Dr. Montoya believed that Plaintiff's medical "performance was unsatisfactory," and Plaintiff was not permitted to challenge his testimony through cross-examination. Am. Compl. at ¶¶ 83–84. On February 4, 2009, the Board, without Dr. Montoya voting, decided to take the MEC's, instead of the FHC's recommendations and permanently suspended all of Plaintiff's gynecological privileges and imposed the other sanctions and requirements recommended by the MEC. *See* Doc. 57 at 4, ¶ 8 (accepting, as undisputed, these fact taken from "Pl.'s Memorandum of Fact and Law in Support of Pl's Mot. for Leave to Amend and Supplement Complaint, Part 2(X)").

Based on these undisputed facts, I conclude as a matter of law that Gila Regional, through its Board did not meet its statutory duty to impose permanent sanctions only "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and [ ] in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." 42 U.S.C. § 11112(a)(3), (4).

**E. Post-hearing events.**

On March 4, 2009, Dr. Remillard submitted a report to the National Practitioner Data Bank, informing it of the Board's February 2, 2009 final "indefinite" suspension and reduction of clinical privileges. Doc. 44, Ex. G (44–1 at 2–5). But there are errors in Dr. Remillard's report, the most negative being that he erroneously stated that the results of "an outside peer review of selected cases" contributed to the Board's decision to taking its final adverse actions. *Id.* at 2. As the basis for the Board's action, Dr. Remillard also cited "substandard or inadequate skill level," "immediate threat to health or safety," and "substandard or inadequate care," *id.* at 3, when there has never been a final finding made by an expert, the Board, the MEC, or the FHC that, in fact, Plaintiff fell below the standard of care or that he is so incompetent that he poses an "immediate threat to health or safety." And Dr. Remillard did not check the box indicating that Plaintiff disputed the report. *See id.* Plaintiff has presented compelling evidence, therefore, "for a jury to conclude [Dr. Remillard's] report was false and the reporting party knew it was false." *Brown,* 101 F.3d at 1334.

 **\*18**  Based on Dr. Remillard's report of Gila Regional's adverse actions and submission of some of the Gila hospital records regarding some of the same cases before the FHC, on January 18, 2011, the New Mexico Medical Board ("NMMB") sent Plaintiff a notice that it intended to impose sanctions that could include restricting, revoking, or suspending his medical license if Plaintiff did not adequately rebut or explain that evidence. *See* Doc. 44, Ex. U at 1. After a hearing, at which the state's expert in surgical gynecology and obstetrics testified, the NMMB noted that the expert concluded that the expert's clinical judgment differed in some cases from Plaintiff's, and that the expert would have documented the medical information more adequately or differently, but that the expert did not believe that the Plaintiff's judgment was "careless," "bad," or "unreasonable." *See* Doc.

44, Ex. S at 2. Accordingly, the Board found that the care given and the medical recordkeeping in these cases "represented matters of clinical judgment" and concluded that the charges that Plaintiff had "deviated from the standard of care with a resulting possible or probable change of outcome" were not "substantiated by a preponderance" of the evidence. *Id.* at 1, 9.

## III. CONCLUSION

 **[17]**  **[18]**   Although I conclude that it was not necessary for the MEC to give Dr. Osuagwu pre-deprivation notice and a hearing before it temporarily suspended his privileges and imposed other restrictions pending further investigation, *see Guttman v. Khalsa,* 669 F.3d 1101, ——, 2012 WL 76055, *8–*9, I also find that Plaintiff has presented undisputed and compelling evidence showing, as a matter of law, that the MEC and the PRC did not make "a reasonable effort to obtain the facts" of the specific cases during his temporary suspensions. *See* 42 U.S.C. § 11112(a)(2). As noted, *supra,* the MEC and PRC did not give Dr. Oswagwu post-suspension specific notice of the cases they were investigating that caused them to initially believe that he may be putting patients in imminent danger within 5 days of the suspensions, as required by the bylaws, nor did it give him an opportunity to defend his actions or to learn exactly what he was being accused of so that he could try to put to rest these concerns before the MEC imposed its second, indefinite suspension without notice or a hearing.

I also find and conclude that the MEC did not impose its December 30, 2008 suspensions and disciplinary actions, or make these recommendations as permanent sanctions to the Board "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement" of providing the Plaintiff with a fair hearing. 42 U.S.C. § 11112(a)(3), (4). As noted above, the MEC gave no reasons for ignoring the recommendations of its PRC and its FHC, both of which had conducted a more thorough review of the hospital records than had the MEC members, nor did it give any reasons for recommending imposition of its extremely harsh sanctions.

 **\*19**   I also conclude that the MEC, FHC, and Board of Trustees all failed to take action only "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." *Id.* § 11112(a)(3), (4). As noted, the December 15, 2008 hearing was not procedurally fair in that Plaintiff was not given a fair opportunity to confront and cross-examine the anonymous physicians who prepared the peer-review forms accusing Plaintiff of violating the standards of care upon which the FHC relied at least in part, and because the FHC panel was not impartial because Gila Regional's CMO—who holds a position of power over all of the physicians who participated in the disciplinary proceedings—served as Plaintiff's accuser, investigator, prosecutor, and one of his judges. The Board's February 2, 2009 hearing was not fair because the Board considered evidence not presented at the December 15, 2008 hearing and heard new testimony that Plaintiff was not permitted to defend against. Gila Regional's bylaws provided fair procedures for determining the reasonableness and propriety of imposing severe sanctions that will negatively affect Plaintiff for the rest of his professional career, but the record demonstrates that Gila Regional, through its MRC, PRC, FHC, and Board did not follow those procedures.

Because the undisputed evidence in the record conclusively demonstrates that the peer-review action did not meet the standards specified by Congress in 42 U.S.C. § 11112(a)(2), (3), and (4), I conclude that Gila Regional and the individual members of its MEC, PRC, FHC, and Board who have now been added as Defendants are not "immune from [Plaintiff's] private damage claims stemming from the peer review action." *Brown,* 101 F.3d at 1333. Similarly, I conclude that the undisputed evidence conclusively demonstrates that these Defendants did not "act in the reasonable belief that [their] actions or recommendations [were] warranted by the facts known to [them] after reasonable efforts to ascertain the facts is made." NMSA 1978 §§ 41–9–2, –4; *Leyba v. Renger,* 114 N.M. 686, 689, 845 P.2d 780, 783 (1992) ("The NMROIA reflects a reasoned balance between the competing needs of the public for frank and accurate review of a physician's qualifications and the needs of physicians being credentialed for a fair and impartial review process.").

 **IT IS ORDERED**  that the Defendant's motion for summary judgment [Doc. 57] is DENIED.

## Footnotes

1    The Court recently granted Plaintiff's motion for leave to amend his complaint to add the named individuals referred to in his original
        complaint and some additional allegations. *See* Doc. 86. Perhaps in anticipation that the Court would grant the motion to amend,

both parties cited to some of the exhibits attached to Plaintiff's motion to amend and his reply in support of their arguments related to summary judgment. Gila Regional's motion for summary judgment is not mooted by the filing of the amended complaint because it includes the new Defendants in its arguments, contending that "GRMC, and any person acting as a member of the professional review body, is immune from suit under [HCQIA]...." Doc. 57 at 1. The Court notes, however, that, according to the allegations in the second amended complaint, Dr. Ronald Dehyle, a physician whom Gila Regional hired to conduct an independent outside review, did not engage in any of the peer-review actions set forth in this opinion or in the amended complaint, and his findings were not submitted to Gila Regional until after the Board had issued its final order imposing the permanent sanctions and discipline, thus it cannot be said that the Board relied on his opinions in imposing its sanctions.

2    It is unclear how the outside expert's opinion was ever utilized. Gila Regional states that the Board did not send any cases to Dr. Dehyle until February 2, 2009, *after* it had decided to take negative action, Doc. 57 at 10, and the record indicates that Dr. Dehyle did not conduct his review until February 6, 2009, long after the fair hearing and two days after the Board of Trustees finally voted to permanently suspend Plaintiff's privileges. *See* Doc. 44, Exs. M1, M2, M5–M13; Doc. 46, Exs. M3, M4.

3    The Defendant devoted only two short paragraphs of its brief to discussion of the New Mexico Act, thus I will do the same. Because I conclude as a matter of law that the Defendants' actions were not reasonable under HCQIA, and the applicable sections regarding qualified immunity under New Mexico's Review Organization Immunity Act ("ROIA") similarly grants qualified immunity only if the peer-review individual or entity "act[ed] in the reasonable belief that [its] actions or recommendations [were] warranted by the facts known to [it] after reasonable efforts to ascertain the facts is made," NMSA 1978 §§ 41–9–2, –4, I reach the same conclusion that the Defendants are not entitled to qualified immunity under the New Mexico Act.

4    "The term 'professional review action' means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action." 42 U.S.C. § 11151(9).

5    On November 17, 2008, the Chief of Staff was Dr. Twana Sparks, but she had been replaced by Michael Sargent by November 24, 2008. *See* Doc. 57, Exs. 1, 2.

6    Thus there were six negative peer-review actions in this case: 1. The MEC's November 17, 2008 14–day summary suspension of Dr. Osuagwu's privileges to perform elective laparoscopic procedures, and requirement that Dr. Nwachuku assist Plaintiff on all emergency laparoscopies during that 14–day period, pending investigation, for which Plaintiff did not receive any pre-suspension notice or hearing. 2. The PRC's November 22, 2008 recommendation that the MEC continue the suspension of laparoscopic procedures. 3. The MEC's November 24, 2008 indefinite suspension of *all* gynelogical surgical privileges and imposition of a requirement that he obtain consultations for all obstetrical patients who had complications, also made without pre-suspension notice or hearing. 4. The FHC's December 22, 2008 recommendations that the MEC "restore [Plaintiff's] Gynecology privileges except for the laparoscopic lysis of adhesions, institute ongoing focused chart review for [Plaintiff s] obstetric and gynecologic cases, mandate additional education for [Plaintiff] with regard to the indications for and techniques of laparoscopic lysis of adhesion, and require additional education for [Plaintiff] focused on risk management and medical records documentation." 5. The MEC's December 30, 2008 final indefinite suspension, imposed after the FHC hearing, in which the MEC continued the indefinite suspensions and requirements imposed on November 24 and also instituted "focused chart reviews" for all of Dr. Osuagwu's obstetrical patients; required 6 hours of CME within 6 months; and required Dr. Osuagwu to obtain "additional education with regard to the indications for and techniques for all gynecological surgery and receipt of information from an educator that Dr. Oswaguwu is competent to practice in a small town." 6. The Board's February 4, 2009 permanent adoption of the MEC's December 30, 2008 recommendations and suspensions. *See* Doc. 57, Exs. 1, 2, 4; Doc. 44, Ex. W at 2 (44–3 at 8); Doc. 44, Ex. N at 1 (44–1 at 23); Doc. 57 at 4, ¶ 8.

7    Case numbers were assigned by the PRC and patient numbers were used for protection of privacy.

8    Plaintiff states that he also consulted with Dr. Nwachuku, who concurred in the laparoscopy, *see* Doc. 63 at 4, but he apparently did not document that consultation in the hospital records and the MEC never asked him about the events leading up to the laparoscopy.

9    It is difficult for me to understand how a physician who is not a gynecologist could give an opinion on the standard for care for a surgical gynecologist. My concern is supported by Dr. Neely, a member of the FHC panel who stated that, as an ER doctor, he did not feel comfortable trying to determine from his own review of hospital charts whether an obstetrical surgeon had done his job properly, and that he would have to rely on "what's come before ... and make sure that it wasn't skewed in some unfair way." Tr. of December 15, 2008 hearing at 35 (Doc. 44, Ex. R(44–2 at 10)). Dr. Donnell, an anesthesiologist who was the chair of the FHC panel stated that, "to some degree," relying on the PRC review forms and opinions was "appropriate," even though none of the PRC's anonymous physician reviews and opinions were prepared by surgical gynecologists.

**Osuagwu v. Gila Regional Medical Center, --- F.Supp.2d ---- (2012)**

---

10    The cases were sent to Defendant Dr. Dehyle, but not until February 2, 2009, after the Board had already finally decided to impose the harshest sanctions.

11    *See* Doc. 57, Ex. 3; Doc. 44, Ex. W at 2.

12    Plaintiff asked if Dr. Carreon had written down the names of physicians who allegedly told him that Plaintiff's requests for surgical consultations were late, and which cases they were talking about, "because every single thing you say here today has to be backed up by some sort of proof. We are talking here about my life. I mean, we can't just throw things around. If you say that anybody said anything, you have to provide proof of it." Tr. at 21 (Doc. 44, Ex. R) (44–2 at 7). Dr. Carreon responded, "I disagree. I was asked to come and give a summary." *Id.*

13    The outside expert who reviewed the cases in February 2009, after the Plaintiff's privileges had been permanently suspended, stated, "complications can happen with surgery, so I can't criticize MD unless he has a trend of similar complications. Dr. Nwachuku, I believe, should have called surgery sooner." Doc. 44, Ex. M7 at 1.

---

**End of Document**                           © 2012 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2149765

Superior Court of Pennsylvania.

Terrance E. BABB, M.D., Appellant

v.

CENTRE COMMUNITY HOSPITAL, Geisinger Clinic, Penn State Geisinger
Health System, Robin E. Oliver, and Michael J. Chmielewski, Appellees.

No. 1025 MDA 2011. | June 14, 2012.

Appeal from the Order entered May 12, 2011 in the Court of Common Pleas of Centre County Civil Division at No(s): 1998–1195.

BEFORE: GANTMAN, ALLEN, and MUNDY, JJ.

**Opinion**

OPINION BY MUNDY, J.:

**\*1** Appellant, Terrance E. Babb, M.D. (Dr. Babb), appeals from the May 12, 2011 order granting summary judgment in favor of Centre Community Hospital (CCH), Geisinger Clinic (Geisinger), Penn State Geisinger Health System (PSGHS), Robin E. Oliver, M.D. (Dr. Oliver) and Michael J. Chmielewski, M.D. (Dr. Chmielewski). After careful review, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

The relevant facts and procedural background of this case, in the light most favorable to Dr. Babb, are as follows. In June 1995, Geisinger offered, and Dr. Babb accepted, employment as a staff physician for their OB/GYN Clinic in State College.[1] Dr. Babb commenced his employment on September 1, 1995. At around the same time, Dr. Oliver was also hired as a staff physician for the OB/GYN Clinic. In July 1996, Geisinger hired Dr. Chmielewski as a third staff physician at the Clinic. Over time, the working relationship between Dr. Babb and his two colleagues deteriorated. Dr. Babb made professional complaints against Dr. Chmielewski. Subsequently, Dr. Oliver, Dr. Chmielewski and others made professional complaints against Dr. Babb. Pursuant to a routine annual performance review process, Dr. Babb was recommended for reappointment. However, the discord and additional targeted performance reviews culminated in Geisinger's decision to terminate Dr. Babb's employment.

To that end, on or about May 16, 1997, Dr. Charles Maxin, Senior Vice President for Clinical Operations, and Dr. David Wolfe, Medical Director for Geisinger Medical Group, met with Dr. Babb and requested his resignation. Dr. Babb refused to resign and he was fired that same day. The termination was confirmed by letter dated May 19, 1997, which indicated in part that quality of care concerns were at issue. Accordingly, Dr. Babb was afforded a hearing pursuant to Geisinger's Peer Review Fair Hearing Plan (Fair Hearing Plan) rather than the Involuntary Review Process otherwise provided for by Geisinger's employee policy # 412.[2] By letter dated June 17, 1997, Counsel for Geisinger advised Dr. Babb of the reasons for termination and advised him of his procedural rights under the Fair Hearing Plan.

The Fair Hearing proceeded with five sessions from November 17, 1997 to February 16, 1998. During the proceedings, several witnesses testified and exhibits were presented. Dr. Babb's counsel cross-examined the witnesses. Dr. Babb did not present any additional witnesses on his own behalf. On March 20, 1998, the Hearing Committee made the following findings.

### III. FINDINGS

1. The evidence *supported,* the allegation that Dr. Babb had been unable to work cooperatively and effectively with his colleagues and office staff.

2. The evidence *supported* the allegations that Dr. Babb was constantly delinquent in his record keeping, possibly altered medical records, failed to abide by the offices' "lab pending" policy and failed consistently and properly to maintain and document his medical charts.

**\*2**   3. The evidence *supported* the allegations (with respect to certain medical charts brought to the attention of the committee), that irregularity in medical care provided by Dr. Babb occurred including, failure to properly diagnose, performance of inappropriate operative procedures, lack of proper pre-operative evaluation in urological procedures and antiquated approaches to pelvic examinations.

4. Based on Findings 2 and 3 above, the Committee concludes that Dr. Babb's conduct had an adverse impact on patient care.

Geisinger Defendants' Motion for Summary Judgment, 12/10/10, Exhibit J, Report of Hearing Committee at 7 (emphasis in original). The Clinical Practice Committee, in a letter dated May 28, 1998, accepted the Fair Hearing Committee's findings and affirmed Dr. Babb's termination.

As a consequence of the Fair Hearing results, Geisinger submitted a mandated National Practitioner Data Bank (NPDB) Report on June 2, 1998. *See Jacksonian v. Temple University Health System Foundation,* 862 A.2d 1275, 1278 (Pa.Super.2004) (noting the Health Care Quality Improvement Act (HCQIA) [3] "requires hospitals to report information to the Data Bank, and to request information from the Data Bank when physicians join a hospital and every two years thereafter. *See* 42 U.S.C. §§ 11133, 11135"). Geisinger's report included the following statements.

This classification is being utilized although the actual adverse action is a termination of employment (as opposed to a pure revocation of privileges) based upon unprofessional conduct, etc. Penn State Geisinger Clinic terminated the practitioner's employment on May 16, 1997 subject to an internal review. The termination was based upon concerns regarding the practitioner's professional conduct and clinical competency and/or judgment. In addition to certain, specific incidents, the termination was also, based upon the practitioner's chronic failure to properly and promptly complete medical records and patient charts. The decision to terminate was upheld by a hearing committee. The Clinical Practice Committee accepted the recommendation of the Hearing Committee and affirmed/finalized the decision to terminate the practitioner's employment. The Hearing Committee determined that the conduct of the practitioner could have an adverse impact on patient care. *Id.,* Exhibit L, NPDB Adverse Action Report.

During his employment with Geisinger, Dr. Babb enjoyed clinical privileges with CCH. Upon his termination by Geisinger, those privileges were withdrawn because Dr. Babb no longer had malpractice insurance coverage. Dr. Babb subsequently obtained employment in Clearfield County.

On May 1, 1998, Dr. Babb initiated the instant action in the Court of Common Pleas of Centre County by filing a writ of summons against Geisinger, Dr. Oliver, and Dr. Chmielewski (Geisinger Defendants). [4] On July 24, 1999, Dr. Babb reapplied for clinical privileges with CCH. [5] On November 4, 1999, Dr. Babb filed a complaint in United States District Court for the Middle District of Pennsylvania against Geisinger, CCH, and others, alleging, *inter alia,* discrimination, antitrust violations, breach of contract, civil conspiracy to deny privileges, and interference with contra ct . [6]

**\*3**   Meanwhile, CCH, preparing for consideration of Dr. Babb's reapplication, received a copy of the NPDB Adverse Action Report filed by Geisinger. To further assess the basis for the report, CCH requested receipt of the information underlying the report from Geisinger in order to make its own independent evaluation. Geisinger refused to release information unless Dr. Babb signed a blanket release. [7] Dr. Babb refused to do so. None of the other information available to CCH regarding Dr. Babb's competence and qualifications either prior to or subsequent to the June 2, 1998, NPDB Adverse Action Report was negative. Nevertheless, the Credentials Committee for CCH recommended conditional acceptance citing concerns about the NPDB report and Dr. Babb's working relationship with the hospital's institutions and personnel. CCH's Medical Executive Committee, after

considering the Credentials Committee recommendation and reservations, ultimately did not recommend acceptance of Dr. Babb's reapplication. CCH advised Dr. Babb of the Medical Executive Committee's decision on December 11, 2000 and of his rights to a Fair Hearing. Dr. Babb did not request a hearing. On January 29, 2001, in consideration of the Medical Executive Committee's recommendation and Dr. Babb's decision not to request a hearing, CCH's Board of Directors voted not to grant Dr. Babb's reapplication for clinical privileges.

In conjunction with this action, CCH submitted a required NPDB report. The reported stated the following.

Adverse Action Classification Code: DENIAL OF CLINICAL PRIVILEGES (1650)

Date Action Was Taken: 01/29/2001

...

Clinical privileges were denied based on adverse reports of the physician's professional competence and professional conduct, either or both of which could adversely affect the health or welfare of patient care at Centre Community Hospital.

...

Basis for Action: UNPROFESSIONAL CONDUCT (10) INCOMPETENCE (11)
CCH's Motion for Summary Judgment, 12/10/10, Exhibit T.

Dr. Babb sought review from the U.S. Department of Human Services, which raised concerns about the sufficiency of the NPDB report resulting in a corrected report entered June 27, 2002, as follows.

CLINICAL PRIVILEGES WERE DENIED BASED UPON: Information contained in a national practitioner data bank report filed by the practitioner's former employer advising that the practitioner's employment had been terminated based upon concerns regarding the practitioner's professional conduct and clinical competency and/or judgment that could have an adverse impact on patient care; a letter received by the Hospital from practitioner's former employer referring the hospital to the data bank report in response to credentials committee reference check with former employer; and practitioner's statements during his interview with the Hospital's credentials committee. The Hospital believed: that practitioner's appointment to the active medical staff would result in an adverse effect on the quality of the medical care provided to OB/GYN patients because practitioner failed to provide evidence that contradicted his former employer's data bank adverse assessment; practitioner's interview statements to the hospital's credentials committee reflected mistrust and animosity towards members of Hospital's OB/GYN Department, Hospital's medical staff leadership and administration; and, practitioner's expressed animosity towards other members of the medical staff including charges against other members of the medical staff of unethical practice would preclude appropriate and necessary working relationships with the medical staff including quality improvement. The Hospital determined that granting privileges to practitioner would be disruptive to the operations of the hospital.

*4 Basis for Action: UNPROFESSIONAL CONDUCT (10)

Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 553, Appendix III.

On September 14, 2001, the District Court, with Judge Muir presiding, granted defendants' motions for summary judgment, terminating all federal claims but declining to address Dr. Babb's state claims. Subsequently, the defendants in the federal action sought attorney fees from Dr. Babb, alleging his federal causes of action were frivolous. At the hearing on defendants' motion for attorney fees, Judge Muir permitted Dr. Babb to submit evidence of the basis for his suit, as it pertained to his state of mind in commencing the action. On April 30, 2002, Judge Muir made extensive findings of fact and entered an order denying the motion for attorney fees. *Id.* at 450, Appendix III.

Meanwhile, on October 31, 2001, Dr. Babb filed a seven-count complaint in the still pending instant action against the Geisinger Defendants. [8] On January 25, 2002, Dr. Babb filed an amended six-count complaint, adding CCH as a party and alleging the following causes of action. [9] As against Geisinger, Dr. Babb sought monetary damages, alleging breach of contract (Count I), and illegal retaliation in violation the Pennsylvania Human Relations Act (Count VI). As against all defendants, Dr. Babb sought monetary damages, alleging defamation (Count II), intentional interference with contractual relations (Count IV), and civil conspiracy (Count V). In Count III, Dr. Babb also sought injunctive relief against Geisinger and CCH relative to the alleged defamation. *See* Dr. Babb's Amended Complaint, 1/25/02. The defendants filed various preliminary objections, which the trial court subsequently overruled. On June 4, 2003, CCH filed its answer and new matter to Dr. Babb's amended complaint. On January 6, 2004, the Geisinger Defendants filed their answer and new matter.

On December 10, 2010, the Geisinger Defendants and CCH each filed a motion for summary judgment. The Geisinger Defendants and CCH sought summary judgment or partial summary judgment on the following grounds. Relative to Counts V and VI of Dr. Babb's amended complaint, civil conspiracy and retaliation respectively, the Geisinger Defendants alleged the claims were barred by *res judicata* and collateral estoppel based on previous holdings of the District Court. CCH raised the same issues relative to Count V as well as invoking the statute of limitations and failure of sufficient proof. Relative to Dr. Babb's claim for monetary damages in Counts I, II, IV, V, and VI, the Geisinger Defendants and CCH aver they are covered by the HCQIA and Pennsylvania Peer Review Protection Act (PPRPA) [10] immunity. Relative to Count I, breach of contract, the Geisinger Defendants maintain that, as a matter of law, Dr. Babb was an at-will employee, precluding a contract based claim or, in the alternative, that Dr. Babb failed to allege any breach to his detriment. Relative to Counts II and III, the Geisinger Defendants and CCH contend Dr. Babb has failed to make out a case for defamation as a matter of law since the alleged statements fall outside the statute of limitations, involve expressions of opinion, or are privileged. On those counts, CCH additionally claimed Dr. Babb failed to raise an issue of material fact that the statements were capable of defamatory meaning or were untrue. Relative to Dr. Babb's Count III request for injunctive relief, the Geisinger Defendants and CCH allege the relief requested is unavailable as a matter of law because the Data Bank Report at issue was justified, privileged and mandated and an adequate remedy exists at law. Relative to Count IV, interference with contract, the Geisinger Defendants and CCH aver that Dr. Babb has failed to offer evidence of improper motive, intention or justification or that there was a reasonable probability that privileges would have been granted by CCH. CCH also alleged the application of the statute of limitations relative to this count. Finally, the Geisinger Defendants sought summary judgment relative to PSGHS since the entity no longer exists. *See* Geisinger Defendants' Motion for Summary Judgment, 12/10/10; CCH's Motion for Summary Judgement, 12/10/10.

**\*5** On May 12, 2011, the trial court issued an opinion and order granting summary judgment in favor of all defendants as to all counts and dismissed all claims with prejudice. The trial court based its grant of summary judgment for the counts seeking damages on the Geisinger Defendants' and CCH's claims of HCQIA immunity. In addition, the trial court noted, "due to the finding that the parties acted properly in their actions against Dr. Babb, the [trial c]ourt finds that [i]njunctive relief is improper and unavailable." Trial Court Opinion, 5/12/11, at 7. On June 9, 2011, Dr. Babb filed a timely notice of appeal. [11]

On appeal, Dr. Babb raises the following issues for our review.

1. Whether the [t]rial [c]ourt erred in failing to apply the Summary Judgment standard in making credibility determinations in relation to the dispute, rather than viewing the evidence in the light most favorable to the non-moving party as required.

2. Whether the [t]rial [c]ourt erred in failing to apply the correct standards for HCQIA or related privileges and in failing to apply inferences in favor of non-moving parties as required regarding due process, bad faith and substantive issues relating to alleged immunity.

3. Whether the [t]rial [c]ourt erred as a matter of law in failing to address the breach of contract and interference with contractual relations claims.

4. Whether the [t]rial [c]ourt erred in failing to address defamation claims regarding unsupported content in NPDB Reports and general defamatory statements to third parties.

5. Whether the [t]rial [c]ourt committed errors of law by failing to give effect to the findings of fact in the prior federal litigation.

6. [Whether t]he [t]rial [c]ourt erred in failing to find that there was sufficient evidence to demonstrate bad faith, defamation, and conspiracy as to the denial of privileges and NPDB report of Geisinger Defendants. Dr. Babb's Geisinger Defendants' Brief at 3. [12]

All of Dr. Babb's issues present arguments supporting his contention that the trial court erred in granting the summary judgment motions filed by the Geisinger Defendants and CCH. In reviewing a trial court's grant of summary judgment, we are guided by the following scope and standard of review.

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

**\*6** *ADP, Inc. v. Morrow Motors Inc.,* 969 A.2d 1244, 1246 (Pa.Super.2009) (quoting *Shepard v. Temple University,* 948 A.2d 852, 856 (Pa.Super.2008)).

*Foster v. UPMC South Side Hosp.,* 2 A.3d 655, 660 (Pa.Super.2010).

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Reeser v. NGK North American, Inc.,* 14 A.3d 896, 898 (Pa.Super.2011), quoting *Jones v. Levin,* 940 A.2d 451, 452–454 (Pa.Super.2007) (internal citations omitted).

Instantly, both CCH and the Geisinger Defendants claim immunity under the HCQIA. The trial court agreed and, as noted, based its grant of the defendants' motions for summary judgment on its determination that Dr. Babb did not provide sufficient facts to overcome the presumption of immunity. *See* Trial Court Opinion, 5/12/11. The HCQIA provides, in pertinent part, as follows.

#### § 11111. Professional review

(a) In general

(1) Limitation on damages for professional review actions

If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section—

**(A)** the professional review body,

**(B)** any person acting as a member or staff to the body,

**(C)** any person under a contract or other formal agreement with the body, and

**(D)** any person who participates with or assists the body with respect to the action,

shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

...

(2) Protection for those providing information to professional review bodies

Notwithstanding any other provision of law, no person (whether as a witness or otherwise) providing information to a professional review body regarding the competence or professional conduct of a physician shall be held, by reason of having provided such information, to be liable in damages under any law of the United States or of any State (or political subdivision thereof) unless such information is false and the person providing it knew that such information was false.

42 U.S.C.A. § 11111.

**(9)** The term "professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action. In this chapter, an action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on—

...

**\*7  (E)** any other matter that does not relate to the competence or professional conduct of a physician.
42 U.S.C.A. § 11151(9).

### § 11112. Standards for professional review actions

(a) In general

For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—

**(1)** in the reasonable belief that the action was in the furtherance of quality health care,

**(2)** after a reasonable effort to obtain the facts of the matter,

**(3)** after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

**(4)** in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.    6

> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.
>
> 42 U.S.C.A. § 11112(a).

Accordingly, our review of the trial court's grant of summary judgment must account for the presumption of immunity imposed by the HCQIA.

> A synthesis of our summary judgment law and the HCQIA reveals that a plaintiff bears the burden of proof in rebutting the presumption that a defendant acted in compliance with § 11112(a). Thus, the entry of summary judgment against a plaintiff will be reversed only if he can establish that there is either a genuine dispute about a material fact or that he has adduced sufficient evidence so that a jury, examining the totality of the circumstances, could conclude that the plaintiff had rebutted the presumption.

*Manzetti v. Mercy Hosp. of Pittsburgh,* 776 A.2d 938, 946 (Pa.2001).

> In considering the defendants' motions for summary judgment based on HCQIA immunity, we ask the following: "[m]ight a reasonable jury, viewing the facts in the best light for [plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" Therefore, [plaintiff] can overcome HCQIA immunity at the summary judgment stage only if he demonstrates that a reasonable jury could find that the defendants did not conduct the relevant peer review actions in accordance with one of the HCQIA standards.

*Singh v. Blue Cross/Blue Shield of Mass., Inc.,* 308 F.3d 25, 32 (1st Cir.2002) (citations omitted).

> It is true, as our formulation here of the summary judgment question suggests (asking whether a reasonable jury could find that a defendant did not meet one of the standards for HCQIA immunity), that the statutory scheme contemplates a role for the jury, in an appropriate case, in deciding whether a defendant is entitled to HCQIA immunity. The weight of authority from our sister circuits reflects this proposition.

*Id.* at 33 (collecting cases).

**\*8** In concluding Dr. Babb failed to overcome the HCQIA presumption of immunity, the trial court reasoned as follows:

> The Court finds that there are no genuine issues of material fact as to whether Defendants believed that there were patient quality issues relating to Dr. Babb's employment with Geisinger and his privileges at CCH. There are obviously other issues surrounding the relationships between Dr. Babb and the administrators and doctors at Geisinger and CCH, but those issues do not negate the fact that there were patient quality issues as well.

Trial Court Opinion, 5/12/11, at 3.

> While there may be some doubt that the motives of Geisinger were one hundred percent pure, Geisinger did raise significant questions about the quality of patient care. The Court is not saying that it has determined that Dr. Babb is anything less than a stellar physician, just that the issues Geisinger raised were sufficient to grant them immunity from damages. As such the Court finds that Summary Judgment must be granted as to all Defendants and as to all claims.

*Id.* at 7.

For ease of discussion, we address Appellant's first two issues together. We further divide our discussion of these related issues relative to Geisinger, Drs. Oliver and Chmielewski, and CCH, respectively. In his first issue, Dr. Babb avers the trial court erred in granting the motions for summary judgment by applying an incorrect summary judgment standard, and that the trial court's

findings were "subjective rather than objective as required." Dr. Babb's Geisinger Defendants' Brief at 59. Dr. Babb also avers that the trial court applied an erroneous standard to assess the applicability of HCQIA immunity. Dr. Babb argues,

> there was sufficient expert evidence presented that the alleged medical deficiencies were pretextual, retaliatory, and trivial. [The trial court] appears to adopt a "could have had a sufficient apprehension" standard, rather than the "reasonable good faith belief" following a "reasonable good faith effort to determine the facts" standard actually required by the HCQIA....

*Id.* at 57.

> > As detailed in the opinions of Mr. Artz and Dr. Schwartz and [other evidence], there were material issues of fact as to each of the required elements of conditional HCQIA privilege.... Geisinger did not act in furtherance of quality health care, did not make a reasonable effort to determine the facts, were not fair under the circumstances, and did not act based upon reasonable belief that termination of Dr. Babb was warranted.

*Id.* at 56.

We agree, in part, with Dr. Babb's assessment as it pertains to Geisinger. We note first, however, that much of Dr. Babb's analysis and his related references to the record are inapposite to a determination of whether Geisinger's actions accorded with the standards of section 11112(a). Dr. Babb devotes much of his argument to evidence of purported bias, pretextual motives, and bad faith on the part Geisinger. Courts reviewing the applicability of HCQIA immunity have made clear that a party's subjective motivation is irrelevant to the objective test of whether the professional review action was reasonable.

**\*9** [T]he HCQIA does not require that participants in the peer review process act with good faith in order to be entitled to a grant of immunity. *See Austin [v. McNamara],* 979 F.2d [728,] 734 [ (9th Cir.1992) ]; *see also Mathews [v. Lancaster Gen. Hosp.],* 87 F.3d [624,] 635 [ (3d Cir.1996) ]. In fact, evidence that the peer review process was conducted due to hostility toward the sanctioned physician is "irrelevant to the reasonableness standard of § 11112(a)." *Austin,* 979 F.2d at 734.

*Manzetti, supra* at 951.

> In an HCQIA action, plaintiffs are not permitted to introduce evidence of bad faith of the participants in the peer review process. The "reasonableness" requirements of § 11112(a) "create an objective standard, rather than a subjective good faith standard." *Austin v. McNamara,* 979 F.2d 728, 734 (9th Cir.1992). Thus, the alleged bad faith of the participants in the peer review process is immaterial to determining whether these participants are entitled to immunity under the HCQIA. Rather, the inquiry is whether a person presented with the same information that was placed before the peer review body " 'would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.' " *Id.* (quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 10). This inquiry examines the totality of the circumstances. *Imperial v. Suburban Hosp. Assoc., Inc.,* 37 F.3d 1026, 1030 (4th Cir.1994).

*Id.* at 946–947.

Accordingly, the trial court was correct to disregard Dr. Babb's evidence of Geisinger's alleged bias and subjective motivation in assessing whether Dr. Babb had presented sufficient evidence to rebut the presumption of HCQIA immunity. The proper focus for the trial court was whether, viewing all of the information available to it, the peer review body conducted a fair proceeding, made a reasonable effort to obtain the facts and possessed a reasonable belief its action was in furtherance of patient care. *See* 42 U.S.C.A. § 11112(a). Absent such fair proceeding, reasonable effort, or reasonable belief, immunity will not attach.

Instantly, the trial court determined "that there are no genuine issues of material fact as to whether Defendants believed that there were patient quality issues relating to Dr. Babb's employment with Geisinger...." Trial Court Opinion, 5/12/11, at 3. As noted however, to trigger HCQIA immunity it is not enough that the Geisinger Defendants merely believed that patient care issues were implicated, but rather that their belief, and the efforts made to adduce the facts supporting their belief, were reasonable.

To address this question, Dr. Babb proffered two expert reports from Peter A. Schwartz, M.D. (Dr. Schwartz) and Charles I. Artz, Esq. (Attorney Artz), respectively. [13] Dr. Schwartz reviewed the entire record available to the Fair Hearing Committee. Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 486 (Report of Dr. Schwartz), Appendix III. His review included the full medical charts of the specific patient files brought to the committee's attention, the full transcripts of testimony, and exhibits presented. *Id.* On the basis of his review, Dr. Schwartz concluded there was no objectively reasonable basis to question patient care as a result of any of Dr. Babb's actions or omissions, and he further concluded that the process employed by the Fair Hearing Committee to adduce the facts was "fundamentally flawed." *Id.* Attorney Artz similarly concluded that the Fair Hearing Committee failed to make reasonable efforts to ascertain the facts necessary to evaluate whether the alleged actions or omissions by Dr. Babb in fact implicated patient care. *Id.* at 495 (Report of Atty. Artz), Appendix III.

**\*10** We note,

> [t]he requirement that the peer review body expend a "reasonable effort to obtain the facts" does not require that the investigation be flawless. Rather, it connotes that the investigation must be conducted in a sensible fashion.

*Manzetti, supra,* at 948. Nevertheless, we conclude the proffered reports and opinions from Dr. Babb's experts and the fair inferences derived therefrom are sufficient to raise a material issue of fact as to whether Dr. Babb has met his burden to show that either the peer review process or Geisinger's belief that its actions were in furtherance of patient care was unreasonable, thus precluding summary judgment based on HCQIA immunity. *See Manzetti, supra* at 946; *Singh, supra* at 32. In light of that issue, it is for a jury to decide whether Geisinger is entitled to HCQIA immunity. Accordingly, we conclude the trial court erred in granting summary judgment in favor of Geisinger on the basis of HCQIA immunity.

We next consider the position of Dr. Oliver and Dr. Chmielewski relative to the applicability of HCQIA immunity. These defendants' positions are different from that of Geisinger in that their immunity derives from section 11111(a)(2), covering individuals who provide information to professional review bodies. *See* 42 U.S.C .A. § 11111(a)(2). As such, their actions are not subject to the qualifications of fairness and reasonableness imposed on the professional review body by section 11112(a). Rather, section 11111(a)(2) immunity is afforded, "unless such information is false and the person providing it knew that such information was false." *Id.*

The trial court determined that HCQIA immunity did apply to Dr. Oliver and Dr. Chmielewski and stated as follows.

> The Court believes that even if Dr. Oliver and Dr. Chmielewski were in fact incorrect about their assertion that Dr. Babb provided inadequate care, it does not mean that they did not believe those assertions.

Trial Court Opinion, 5/12/11, at 6.

In his brief, Dr. Babb does not provide any distinct analysis of the record, showing Dr. Oliver and Dr. Chmielewski did not possess a belief in the veracity of the information they provided to their superiors and to the Fair Hearing Committee. Rather he conflates his argument pertaining to Dr. Oliver and Dr. Chmielewski with his argument concerning Geisinger's presumptive immunity. *See* Dr. Babb's Geisinger Defendants' Brief at 57–61. The expert opinions of Dr. Schwartz and Attorney Artz address the reasonableness of the Fair Hearing Committee's processes and beliefs, not the beliefs of Dr. Oliver and Dr. Chmielewski in the truth of the information they provided. *See* Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 486 (Report of Dr. Schwartz), 495 (Report of Atty. Artz), Appendix III. Further, the bulk of Dr. Babb's assertions regarding Dr. Oliver and Dr. Chmielewski pertain to their supposed bias and ulterior motives. As discussed above, such assertions, even if true, are irrelevant to the question of whether HCQIA immunity attaches. As noted by the trial court,

> **\*11** Dr. Oliver and Dr. Chmielewski might not have one hundred percent pure motives when the[y] reported Dr. Babb to the administration, but there is no doubt that they in fact raised patient care issues in those complaints. The Court will not punish whistleblowers based on the fact that they may have had some self interest in their initial complaint.

Trial Court Opinion, 5/12/11, at 6.

After a close review of the record, we conclude the trial court did not err in determining that Dr. Babb failed to establish the existence of a material issue of fact sufficient to preclude HCQIA immunity relative to Dr. Oliver and Dr. Chmielewski. The proffered evidence of Dr. Oliver and Dr. Chmielewski's alleged ulterior motives does not raise a question of whether the information they provided was knowingly false. Dr. Babb offers the opinions of his experts to demonstrate that Geisinger was unwarranted in concluding that the information about Dr. Babb, supplied to it by Dr. Oliver and Dr. Chmielewski, raised patient care issues. This contention is not relevant to the question of whether Dr. Oliver and Dr. Chmielewski provided knowingly false information. Accordingly, we discern no error in the trial court's grant of summary judgment in favor of Dr. Oliver and Dr. Chmielewski on the basis of HCQIA immunity.

We turn finally to a consideration of these issues as they apply to CCH. The position of CCH presents yet a third set of circumstances. Here we are concerned with the reasonableness of CCH's peer review process of Dr. Babb's re-application for clinical privileges and its belief that patient care issues were implicated by the information available to them at the time.

Dr. Babb develops similar arguments to those he raised against Geisinger.

> In this case, the treatment of expert opinions by the trial court is particularly at issue, both as to the alleged medical grounds for termination exposed and rebutted in the reports of Dr. Sandridge and Dr. Schwartz, and as to the non-compliance with HCQIA requirements documented by Attorney Artz and Dr. Schwartz.

Dr. Babbs CCH Brief at 55. "CCH did not act in furtherance of quality health care, did not make a reasonable effort to determine the facts, were not fair under the circumstances, and did not act based upon reasonable belief that termination of Dr. Babb was warranted." *Id.* at 57.

Similar to his argument relative to Geisinger, Dr. Babb again references evidence purporting to support his contention that CCH's "[m]alice and retaliatory animus infested the process throughout." *Id.* at 20. We have previously determined these issues are inapposite to the central question at issue here. That is; has Dr. Babb presented sufficient evidence to raise an issue of material fact as to whether CCH's belief that patient care issues existed, and the efforts it made to adduce the facts supporting its belief were reasonable and in compliance with 42 U.S.C.A. § 11112(a)? As above, we discern no error by the trial court in declining to consider evidence of bias and pretext in the context of the applicability of HCQIA immunity to CCH.

 *12  The gist of Dr. Babb's remaining argument, relative to CCH, is that the hospital's effort to obtain the facts pertinent to his re-application for clinical privileges was unreasonable. In particular, Dr. Babb faults CCH for acquiescing in Geisinger's insistence that Dr. Babb sign a second release that eliminated the "good faith and without malice" language. *See* n. 6 *supra.* Dr. Babb suggests that CCH should have viewed Geisinger's insistence on a release eliminating the "good faith and without malice" requirement as an admission of bad faith. Dr. Babb's CCH Brief at 64, *quoting* Attorney Artz's Report. Dr. Babb further faults CCH for amending its bylaws, after it received his re-application, to make an applicant responsible for securing access to the information underlying another institution's NPDB report, and declining to consider his evidence rebutting the report because he failed to supply the information requested from Geisinger. *Id.*

Here, Dr. Babb fails to apply the same objective test he accuses the trial court of ignoring. Dr. Babb argues that the procedures CCH employed in reviewing his re-application were unreasonable in the context of its bias and improper motivation. Unlike the opinions expressed by Dr. Schwartz and Attorney Artz in their respective expert reports pertaining to Geisinger, their opinions relative to the reasonableness of the process and decisions of CCH are entirely dependent upon their conclusions about CCH's bias and motivation. *See* Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 486 (Report of Dr. Schwartz), 495 (Report of Atty. Artz), Appendix III. Therein, they do not express an opinion that such procedures and actions are unreasonable absent that context. *Id.*

The proper question, as noted above, is whether the procedures are objectively reasonable, or more precisely, whether there exists an issue of material fact sufficient to overcome the presumption of reasonableness. Upon close review of the record, we

agree with the trial court that Dr. Babb has failed to proffer relevant evidence that the procedures employed by CCH to ascertain the facts pertinent to his re-application were objectively unreasonable. Accordingly, we discern no error by the trial court in concluding that Dr. Babb has failed to raise an issue of material fact sufficient to overcome the presumption of reasonableness and the applicability of HCQIA immunity to his claims for damages against CCH.

Alternatively, as we noted above, Dr. Babb never requested a Fair Hearing to challenge the findings and conclusions of CCH's Credentials Committee and Medical Executive Committee. Dr. Babb contends that he declined to request a hearing due to his belief that the result was predetermined and that no additional evidence would be reviewed. Dr. Babb's CCH Brief at 64, *quoting* Attorney Artz's Report. If Dr. Babb's beliefs were correct and he deemed those factors unreasonable, it was nevertheless incumbent on him to test those assertions at the prescribed hearing and not raise them for the first time before the trial court. "We do not believe a plaintiff can deprive defendants of immunity by refusing to participate in the hearing required under [section] 11112(b)(3)." *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 638 (3d Cir.(Pa.) 1996).

**\*13**   As noted, HCQIA immunity applies only to liability for damages. 42 U.S.C.A. § 11111. This immunity extends to damages, not to immunity from suit or from other remedies. "[S]ince the Act does not provide immunity from suit or from injunctive or declaratory relief, plaintiff's claims remain viable to the extent he seeks non-damage remedies." *Mathews v. Lancaster Gen. Hosp.,* 883 F.Supp. 1016, 1035 (E.D.Pa.1995), *affirmed,* 87 F.3d 624 (3d Cir.1996). Thus, HCQIA immunity cannot be the basis for the trial court's grant of summary judgment relative to Dr. Babb's count III, alleging defamation but seeking injunctive relief. Relative to this claim, the trial court held as follows. "[D]ue to the finding that the parties acted properly in their actions against Dr. Babb, the [trial c]ourt finds that Injunctive relief is improper and unavailable." Trial Court Opinion, 5/12/11, at 7. With respect to CCH only, we agree. Dr. Babb, having failed to support his underlying claim and exhaust his legal remedies, is not entitled to injunctive relief against CCH.

With respect to Dr. Babb's remaining allegations of error, although argued in the parties' respective briefs, we again note the trial court did not address or dispose of Geisinger's remaining grounds contained in its summary judgment motion. Accordingly, we decline to address whether there are any contested issues of material fact or whether Geisinger is entitled to summary judgment as a matter of law relative to those remaining issues. Those issues include the status of Dr. Babb's employment, the application of any statute of limitations, the existence of a cause of action for activity outside the peer review process, the *res judicata* or precedential effect of the U.S. District Court's rulings, the applicability of immunity under the PPRPA, and the status of PSGHS. "Resolution of [those] issue[s] requires a thorough review of the materials submitted in support of and in opposition to the motion for summary judgment, which is a task better left to the trial court ." *Somers v. Gross,* 574 A.2d 1056, 1061 n. 4 (Pa.Super.1990).

In sum, for all the foregoing reasons, we determine that the trial court erred in granting summary judgment in favor of Geisinger on the basis of HCQIA immunity since there exists an issue of material fact regarding Geisinger's compliance with 42 U.S.C.A. § 11112(a). However, we determine that the trial court committed no error in granting summary judgment in favor of Dr. Oliver, Dr. Chmielewski, and CCH on the basis of HCQIA immunity and failure to raise a proper claim for injunctive relief against CCH. Finally, we decline to review additional issues relative to Geisinger's motion for summary judgment not addressed by the trial court. Accordingly, we reverse that portion of the trial court's May, 12, 2011 order granting Geisinger's motion for summary judgment, vacate the judgment in favor of Geisinger, and remand for further proceedings. The judgments entered in favor of Dr. Oliver, Dr. Chmielewski, and CCH are affirmed. [14]

**\*14**   Order reversed in part. Judgment vacated in part. Case remanded. Jurisdiction relinquished.

Judge GANTMAN concurs in the result.

## GEISINGER CLINIC GUIDELINES FOR HEARING AND REVIEW FOR INVOLUNTARY TERMINATION OF EMPLOYMENT FOR PROFESSIONAL CLINICAL STAFF

...

## Parallel Citations

2012 PA Super 125

## Footnotes

1    The parties dispute whether Dr. Babb was a contract or at-will employee.

2    Dr. Babb contends the wrong review procedure was employed since the stated patient care concerns were pretextual and no true patient care issues existed. The pertinent language defining the respective procedures follows.

   Geisinger Clinic is charged with the responsibility to review any reports of information which raise questions regarding the professional competence of any physician or dentist which affects or could affect the health and welfare of Geisinger clinic patients. In addition, Geisinger Clinic is contractually obligated to provide credentials and quality assurance review of Geisinger Health Plan physicians and dentists, including those not affiliated with the Geisinger system of healthcare. Should the Regional Medical Director or the Clinical Practice Committee of Geisinger Clinic conclude that information received warrants the initiation of a Formal Peer Review Process, the Geisinger Clinic or Geisinger Health Plan physician or dentist involved will be entitled to notice of a proposed action and hearing by a Hearing Committee selected as set forth herein. The recommendation of such a Hearing Committee for professional review action against a Geisinger Clinic or Geisinger Health Plan physician or dentist shall be submitted to the Geisinger Clinic Clinical Practice Committee for final decision. The right to a hearing under this peer review process is strictly limited to cases in which professional review action is necessary to address quality of care concerns arising out of medical care provided to patients by Geisinger Clinic or Geisinger Health Plan physicians or dentists. The hearing process outlined herein has no application to decisions by Geisinger Clinic management to terminate the employment of members of its professional staff or Geisinger Health Plan physicians or dentists for business reasons, including but not limited to, elimination or reduction of staff positions or decisions surrounding the renewal of existing contractual relationships.

   Geisinger Defendants' Motion for Summary Judgment, 12/10/10, Exhibit F, Geisinger Clinic-wide Quality Improvement Program —Preamble.

   1) Before a Professional Clinical Staff member's employment can be involuntarily terminated for reasons unrelated to the quality of care to patients [1] by the member, the physician manager seeking to effect the termination shall review the underlying circumstances with the site Medical Director and the Regional Medical Director.

   1 Terminations related to quality of care to patients shall follow the Peer Review Fair Hearing Plan provided under the Geisinger Clinic-wide Quality Improvement Program.

   *Id.,* Exhibit G, Geisinger Clinic Operations Manual, Policy # HR–412 (footnote in original).

3    42 U.S.C.A. § 11101 *et seq.*

4    PSGHS and CCH were not named defendants on the May 1, 1998 writ. In the context of this opinion, our discussion of issues relating to Geisinger shall include PSGHS unless otherwise noted.

5    The timing of Dr. Babb's re-application was affected by non-compete conditions attendant to his original employment with Geisinger. *See* Geisinger Defendants' Summary Judgment Motion, 12/10/10, Exhibit A, Geisinger Clinic—Physician Network Practice Agreement, 6/30/95.

6    Although Dr. Babb's reapplication for clinical privileges with CCH was still pending when the federal action was filed, his claims against CCH were premised on the hospital's failure to act in a timely manner.

7    Dr. Babb signed a release at the time of his amended release of information to CCH by other institutions and provided immunity if the release was made "in good faith and without malice." Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 20, Exhibit 125. Geisinger insisted on a release that did not contain the qualifying "in good faith and without malice" language. *Id.* at 54, Exhibit 51.

8    Appellant added PSGHS to the caption on the complaint without notice to any of the parties or requesting leave of the trial court. In the complaint Appellant stated, "it is believed and averred that Geisinger Clinic was acquired by Penn State Geisinger Health System (PSGHS), and was known as the Penn State Geisinger Clinic (PSGC) during the periods relevant to this Complaint." Appellant's Complaint, 10/31/01, at ¶ 2.

9    The trial court granted leave for the caption on the amended complaint on September 6, 2002.

10   63 P.S. § 425.1–425.4.

**Babb v. Centre Community Hosp., --- A.3d ---- (2012)**

2012 PA Super 125

11    Dr. Babb and the trial court have complied with Pa.R.A.P.1925. We note, for purposes of Rule 1925(a), the trial court referenced its May 12, 2011 opinion as containing the reasons for its determination.

12    Dr. Babb filed separate briefs, respectively addressing his claims against CCH and the Geisinger Defendants, which contain identical statements of questions presented on appeal. We shall reference the briefs as Dr. Babb's Geisinger Defendants' Brief, and Dr. Babb's CCH Brief, respectively.

13    Dr. Schwartz is a physician with 30 years of experience in OB/GYN practice with supervisory experience including service in several professional associations. Attorney Artz has practiced in the field of medical practice legal matters, including medical staff privileges, since 1992. *See* Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 486 (Report of Dr. Schwartz), 495 (Report of Atty. Artz), Appendix III.

14    Appellees filed a joint petition to dismiss Dr. Babb's appeal on the basis of various alleged violations of the rules of appellate procedure, specifically with respect to his reproduced record and briefs. While we note with disapproval various deficiencies in this regard on the part of Dr. Babb, we decline under all the circumstances to quash this appeal as we do not deem our review sufficiently hampered thereby.

**End of Document**

© 2012 Thomson Reuters. No claim to original U.S. Government Works.

336 Fed.Appx. 311

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate

Procedure 32.1 generally governing citation of judicial decisions issued on or

after Jan. 1, 2007. See also Fourth Circuit Rule 32.1 (Find CTA4 Rule 32.1)

United States Court of Appeals,

Fourth Circuit.

Calvin ANTHONY, Plaintiff-Appellee,

v.

Robert WARD; Charles Sheppard, in their individual capacities, Defendants-Appellants,

and

South Carolina Department of Corrections, Defendant.

No. 07-1932. | Argued: May 12, 2009. | Decided: July 7, 2009.

**Synopsis**

**Background:** Former correctional facility warden brought action against state Department of Corrections officials, alleging civil conspiracy under South Carolina law. The United States District Court for the District of South Carolina, Margaret B. Seymour, J., entered judgment on a jury award of $510,000, and officials appealed.

**[Holding:]** The Court of Appeals held that district court did not abuse its discretion in refusing to charge jury on scope of employment immunity for state employees.

Affirmed.

West Headnotes (3)

**[1]**    **Federal Courts**  👉  Failure or refusal to instruct;  modification of request

District court's error in failing to give jury instruction concerning scope of employment in former correctional facility warden's civil conspiracy action against state Department of Corrections officials under South Carolina law was not prejudicial, since there was ample evidence that officials' actions against warden, including their conduct in seeking his termination after hostage situation at facility, were personally, rather than professionally, motivated.

1 Cases that cite this headnote

**[2]**    **Conspiracy**  👉  Conspiracy to injure in person or reputation

District court did not abuse its discretion in refusing to charge jury on scope of employment immunity for state employees under South Carolina Tort Claims Act (SCTCA) in former correctional facility warden's civil conspiracy action against state Department of Corrections officials under South Carolina law; Act was not intended to protect state employees from liability for their intentional torts, and jury was required to find that officials intentionally injured warden in order to impose liability for civil conspiracy. S.C.Code 1976, § 15-78-70.

1 Cases that cite this headnote

**[3]    Conspiracy** 👉 Evidence

Evidence was sufficient to support jury finding that state Department of Corrections officials acted with common design to force former correctional facility warden's involuntary retirement, as required to establish civil conspiracy under South Carolina law; evidence indicated that officials met together to discuss warden on numerous occasions, sought his termination following hostage situation at facility and acted contrary to Department policy and procedure in forcing warden's demotion.

**\*312**  Appeal from the United States District Court for the District of South Carolina, at Columbia. Margaret B. Seymour, District Judge. (3:05-cv-01636-MBS).

**Attorneys and Law Firms**

**ARGUED:** William L. Howard, Sr., Young, Clement & Rivers, LLP, Charleston, South Carolina, for Appellants. J. Lewis Mann Cromer, Cromer & Mabry, Columbia, South Carolina, for Appellee. **ON BRIEF:** Stephen L. Brown, Young, Clement & Rivers, LLP, Charleston, South Carolina, for Appellants.

Before NIEMEYER and MICHAEL, Circuit Judges, and FREDERICK P. STAMP, JR., Senior United States District Judge for the Northern District of West Virginia, sitting by designation.

**Opinion**

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Defendants Robert Ward and Charles Sheppard, officials in the South Carolina Department of Corrections (SCDC or the Department), appeal a judgment based on a jury award of $510,000 to plaintiff Calvin Anthony, the former warden of Lee Correctional Institution, for civil conspiracy under South Carolina law. According to Anthony, Ward and Sheppard conspired for personal and malicious reasons to force his termination from the Department. On appeal Ward and Sheppard raise numerous challenges to trial and post-trial proceedings. Because we conclude that there is no reversible error, we affirm the judgment.

## I.

We recite the facts in the light most favorable to Anthony, the prevailing party. *See Lack v. Wal-Mart Stores, Inc.,* 240 F.3d 255, 258 (4th Cir.2001). From 1999 until his involuntary retirement from the Department in 2004, Anthony was the warden at Lee Correctional Institution, a maximum security prison in South Carolina. Anthony, who is African-American, began working for the Central Correctional Institution at SCDC in 1978. He was promoted through the ranks and attained his wardenship at Lee in 1999. Anthony received excellent reviews as a warden from 1999 until 2002 and was named Warden of the Year in 2002. In 2002 defendant Ward, the Director of Operations for SCDC, became Anthony's supervisor and thereafter Anthony did not receive evaluations.

Anthony initially drew Ward's ire following a hostage situation that occurred at Lee in late October 2003, during Anthony's tenure at that institution. At the time of the hostage incident, Laurie Bessinger was the Director of Security and Training at SCDC. Bessinger had been a candidate for Ward's job as Director of Operations. After Bessinger was passed over for the Operations Director position, he was placed under the supervision of defendant Charles Sheppard, the Inspector General for

SCDC, with whom Bessinger had an acrimonious relationship. Even before the hostage situation Sheppard sought to undermine and discredit Bessinger, soliciting information from Bessinger's subordinates to accomplish that goal.

Both Ward and Sheppard voiced strong disapproval of Bessinger's handling of the **\*313** hostage situation at Lee, and Ward went so far as to ask Jon Ozmint, the Director of SCDC, to "relieve" Bessinger the night of the incident. J.A. 1067. Anthony, as the warden of Lee, was responsible for compiling an After Action Report about what had occurred that night. After Anthony gave Ward a draft of the report, Ward asked Anthony to "put some negative things in" the report about Bessinger, J.A. 155, including things that were untrue. Anthony refused and thereafter Ward's attitude toward him changed.

Sheppard's dislike for Anthony stemmed from Anthony's role in the grievance process of Rickie Harrison, an African-American warden at Kershaw Correctional Institution who was demoted by Ward in 2002. The events leading to Harrison's demotion began with a surprise "shakedown" (or inspection) of Kershaw. In Harrison's eighteen years of experience as a warden, this was the only shakedown that had occurred without the warden receiving prior notification. Sheppard was Harrison's interviewer during the investigation following the shakedown and ultimately recommended Harrison's demotion. After Harrison's demotion, Sheppard handled both the investigation of Harrison's grievance and acted as the lawyer for the SCDC at the grievance hearing, which was an unprecedented action for the Inspector General. Sheppard initially subpoenaed Anthony to testify at the grievance hearing, but after Anthony made pre-hearing statements to Sheppard and others in the Department that he believed Harrison was the victim of racial discrimination, Sheppard declined to call Anthony as a witness.

Like Harrison's demotion, Anthony's termination from SCDC resulted from an unannounced shakedown of his institution. In the spring of 2003 Sheppard placed an investigator, Karen Hair, at Lee. Hair reported directly to Sheppard, and Anthony had no knowledge of the nature of Hair's investigative activities prior to the shakedown. At 6 a.m. on January 29, 2004, Anthony received a call from Ward informing him that a shakedown of Lee was about to commence. As with the shakedown at Kershaw, but unlike any other shakedown Anthony (or Bessinger) could remember, Anthony was given no advance warning of the event. Ward participated directly in the shakedown.

The shakedown targeted the boiler room at Lee. The inspection revealed a significant number of items in the boiler room that were classified by Ward and Sheppard as contraband, including unaccounted for computer parts, televisions, cameras, a scanner and various bulk food items. The inspection also revealed a number of other irregularities in the boiler room, including inmates working without supervision, possible access to outside phone lines and the Internet, and video surveillance cameras being used to monitor entry and exit from the room.

There were four levels of oversight of the boiler room below Anthony on the prison's organizational chart, and Anthony himself was never linked to any of the problems that occurred in the boiler room. Anthony inspected the boiler room regularly, including within the month prior to the shakedown, but had not observed anything out of the ordinary. During his inspections he checked mainly for cleanliness and sanitation, and not to see whether there were unauthorized computers in the room.

Regarding unsupervised inmates, there were identical memoranda dating from 1996 and 2000 and posted on the walls in the boiler room that authorized inmates to work in the room with minimal supervision from the courtyard officer in the event that the officer with direct supervision over the boiler room needed to attend to **\*314** business outside the room. The former memorandum predated Anthony's wardenship, but the latter was signed by Anthony and the four other employees with direct supervisory responsibility over the boiler room.

In April 2004, slightly over two months after the shakedown, Anthony made a decision to pursue the Teacher and Employee Retention Initiative (TERI)-a program through which qualified employees are permitted to retire early, begin receiving their retirement, and at the same time return to work for a substantial fraction of their original pay. Anthony informed Ward about his decision to "accept the retirement opportunity," and Ward told him that he was "approved and to plan to return." J.A. 201-02. Ward also informed Anthony at that time that the investigation was over: "don't worry about it, go back to your institution and run your institution, because that's over with." J.A. 202.

On June 16, 2004, Anthony's immediate supervisor, Carl Fredericks, handed Anthony a corrective action charging him with gross negligence (for permitting inmates to work unsupervised in the boiler room) and falsification of documents (specifically, documents signed by Anthony in which he stated that he had inspected the maintenance area of Lee, in which the boiler room was located, and failed to detect any of the irregularities discovered during the shakedown). Anthony maintained that he never falsified any documents. He talked with Sheppard after receiving the corrective action, and Sheppard told him to "think about retiring." J.A. 253. On June 22, 2004, Anthony met with Ward and was informed that if he had not already put in his retirement papers, he would have been terminated. He was permitted to retire in lieu of termination.

Anthony then filed this action in federal district court for the District of South Carolina. He sued Ward and Sheppard in their individual capacities alleging that they conspired to force him out of his job at Lee. His complaint also included a claim against the Department itself alleging that he was discriminated against on the basis of his race in violation of Title VII of the 1991 Civil Rights Act. The case went to trial and the jury returned a verdict in SCDC's favor on the Title VII discrimination claim and in Anthony's favor on the civil conspiracy claim. The jury awarded Anthony $510,000 in damages against Ward and Sheppard in their individual capacities. Ward and Sheppard appeal.

## II.

 [1]    Ward and Sheppard first contend that the district court erred in refusing their proposed jury instructions on the intracorporate conspiracy doctrine. We review jury instructions for abuse of discretion. *Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426, 432 (4th Cir.2004); *see also S. Atl. Ltd. P'ship of Tenn. v. Riese,* 284 F.3d 518, 530 (4th Cir.2002). "The test of the adequacy of jury instructions is whether the jury charge, construed as a whole, adequately states the controlling legal principle without misleading or confusing the jury." *Chaudhry v. Gallerizzo,* 174 F.3d 394, 408 (4th Cir.1999). "An error of law constitutes an abuse of discretion." *A Helping Hand, LLC v. Balt. County, Md.,* 515 F.3d 356, 370 (4th Cir.2008). However, "[w]e will not set aside a jury verdict based on an instructional error 'unless the erroneous instruction seriously prejudiced the challenging party's case.' " *Willingham v. Crooke,* 412 F.3d 553, 560 (4th Cir.2005) (quoting *College Loan Corp. v. SLM Corp.,* 396 F.3d 588, 595 (4th Cir.2005)).

 **\*315**  Under South Carolina law "[a] civil conspiracy ... consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes him special damage." *Lee v. Chesterfield Gen. Hosp., Inc.,* 289 S.C. 6, 344 S.E.2d 379, 382 (1986). South Carolina courts have recognized an exception to civil conspiracy liability when all the alleged members of a conspiracy are agents of a single corporate entity and act on behalf of the corporation: a so-called intracorporate conspiracy. *See McMillan v. Oconee Mem. Hosp., Inc.,* 367 S.C. 559, 626 S.E.2d 884, 886-87 (2006); *Anderson v. S. Ry. Co.,* 224 S.C. 65, 77 S.E.2d 350, 351 (1953).

The intracorporate conspiracy doctrine in South Carolina draws its origins from *Goble v. American Railway Express Co.,* where the state Supreme Court indicated that "it is impossible to conceive that a conspiracy between a corporation and its agents may be established by the act of such agents alone." 124 S.C. 19, 115 S.E. 900, 903 (1923). More recently, the South Carolina Court of Appeals held that although "a corporation, as a legal person in contemplation of law, cannot conspire with itself," "the agents of a corporation are legally capable, as individuals, of conspiracy among themselves or with third parties." *Lee,* 344 S.E.2d at 383.

The district court below interpreted the above cases as distinguishing between two types of civil conspiracies: (1) principal-agent conspiracies and (2) conspiracies between agents of a corporation. Based on its reading of South Carolina case law, the court concluded that the intracorporate conspiracy doctrine in South Carolina only applies to principal-agent conspiracies. Because the facts of this case placed it "squarely within" the latter context, the district court concluded that an instruction on civil conspiracy was unwarranted. J.A.2071.

Defendants, in contrast, assert that immunity for intracorporate conspiracy only ceases to apply when agents or employees of a corporation step outside the course and scope of their employment and act as individuals rather than as agents of the corporation. Defendants argue that the district court erred in refusing a jury instruction on "whether or not [Defendants] were acting for the interest of their employer and in the course and scope of their employment." Appellants' Br. at 16. According to defendants,

the scope of employment question is "quintessentially a factual issue" and must therefore be resolved by the jury. Appellants' Reply Br. at 4.

In *McMillan* the South Carolina Supreme Court indicated that scope of employment was relevant to the intracorporate conspiracy doctrine, holding that "no conspiracy can exist if the conduct challenged is a single act by a single corporation acting exclusively through its own directors, officers, and employees, *each acting within the scope of his employment*." 626 S.E.2d at 887 (emphasis added). Other courts have similarly held scope of employment to be relevant under the doctrine. *See Garza v. City of Omaha,* 814 F.2d 553, 556 (8th Cir.1987) ("While it is true that a corporation cannot conspire with itself, an intracorporate conspiracy may be established where individual defendants are also named and those defendants act *outside the scope of their employment for personal reasons.*") (emphasis added); *McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1036 (11th Cir.2000) ("Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, *when acting in the scope of their employment,* cannot conspire among themselves." **\*316** ) (emphasis added). Our circuit has recognized a similar "personal stake exception," holding that (under Virginia's civil conspiracy law) "the intracorporate immunity doctrine does not apply where a corporate officer has an independent personal stake in achieving the corporation's illegal objectives." *ePlus Tech., Inc. v. Aboud,* 313 F.3d 166, 179 (4th Cir.2002) (internal quotations omitted).

The jury verdict form in this case failed to explicitly address whether Ward and Sheppard were acting within the scope of their employment, and they made a timely objection before the district court. We conclude, however, that even if the district court erred in failing to give the requested instruction, the error was not seriously prejudicial when considered in light of the record as a whole.

The verdict form specifically required the jury to find that Ward and Sheppard had entered into an agreement "*for the purpose of injuring* [Anthony]." J.A.2007 (emphasis added). The jury was also instructed that:

> With respect to the second element [of civil conspiracy], the plaintiff must prove by a preponderance of the evidence that Mr. Ward and Mr. Sheppard specifically intended to injure the plaintiff. The primary purpose of the alleged agreement or conspiracy must be to injure the plaintiff. Mere speculation about a party's motives with respect to certain conduct does not constitute proof of conspiracy.

J.A.1965. Further, there was ample evidence adduced at trial that Ward's and Sheppard's actions toward Anthony were personally, rather than professionally, motivated. Anthony provided evidence that Ward disliked him, not for any professionally relevant reason, but because he had refused to accommodate Ward's request that he alter his After Action Report to make it more unfavorable to Bessinger. Similarly, Anthony's refusal to testify negatively about Warden Harrison during Sheppard's handling of Harrison's grievance hearing motivated Sheppard to act against Anthony's interests. Defendants' decisions to act contrary to longstanding custom, for example by declining to give Anthony advance notice of the January 2004 shakedown of Lee, is similarly suggestive of a personal, rather than a professional, motive. And finally, Anthony introduced considerable evidence at trial that wardens at other institutions in which security lapses were discovered that were comparable to those at Lee, but against whom defendants did not bear any personal grudge, were permitted to continue working or participate in the TERI program.

In sum, the finding of a specific intent to injure Anthony, coupled with the evidence that defendants had a personal stake in injuring plaintiff, leads us to conclude the error in this case was not seriously prejudicial. Thus, although the district court erred in refusing to give the requested scope of employment instruction, we conclude that this error does not necessitate a new trial.

### III.

 **[2]**    Ward and Sheppard next contend that the district court erred in failing to charge the jury on immunity from suit under the South Carolina Tort Claims Act (SCTCA). We review a court's failure to give a requested jury instruction under the abuse of discretion standard described above.

S.C.Code Ann. § 15-78-70 provides that:

(a) This chapter constitutes the exclusive remedy for any tort committed by an employee of a governmental entity. **\*317** An employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefor except as expressly provided in subsection (b).

(b) Nothing in this chapter may be construed to give an employee of a governmental entity immunity from suit and liability if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude.

S.C.Code Ann. § 15-78-70(a), (b) (2005). Under S.C.Code Ann. § 15-78-30: " 'Scope of official duty' or 'scope of state employment' means (1) acting in and about the official business of a governmental entity and (2) performing official duties." S.C.Code Ann. § 15-78-30(i) (2005).

Defendants argue that the desire to terminate an employee cannot constitute intent to harm because "any time a supervising government employee participates in sanctioning an employee, they, by definition, intend to do that employee 'harm' in the general sense of the word." Appellants' Br. at 20. Consequently, defendants say, "intent to harm" under the SCTCA "must require a malicious or personal motivation in order for the exception to become operable." *Id.* Defendants note that malice or intent to harm must be "proved" under § 15-78-70(b), and they contend that mere allegations are therefore insufficient.

The district court concluded that the SCTCA is not intended to protect state employees from liability for intentional torts, noting that "irrespective of whether Defendants Ward and Sheppard acted outside the scope of their official duty, they are not immune from suit under the SCTCA because their conduct was proven to be intentionally tortious." J.A.2079. The court determined that

> it was not necessary ... to give additional charges to the jury regarding intent to harm because the elements of civil conspiracy, an intentional tort, already encompass such intent. The jury's finding that Defendants had civilly conspired against Plaintiff was sufficient to remove from the purview of the SCTCA's protected class of government employees.

*Id.* We agree. The jury was specifically required to find that defendants intentionally injured Anthony in order to award damages on the civil conspiracy claim: namely, that Ward and Sheppard entered into an agreement "for the purpose of injuring Plaintiff." J.A.2007. The jury was also instructed that it must find Anthony had proved by a preponderance of the evidence that defendants "specifically intended to injure the plaintiff" and that this was "[t]he primary purpose of the alleged agreement or conspiracy." J.A.1965. The district court therefore did not abuse its discretion in refusing to include an additional jury instruction on scope of employment under the SCTCA.

## IV.

Ward and Sheppard further contend that they were entitled to judgment as a matter of law based on Anthony's failure to allege and prove special damages or, in the alternative, that the district court erred in failing to adequately charge the jury on special damages as an element of civil conspiracy. Specifically, defendants contend that Anthony neither alleged [1] nor **\*318** proved damages under the civil conspiracy claim over and above those alleged for the race discrimination claim.

## A.

In reviewing whether plaintiff has proved special damages, we view the evidence in the light most favorable to the plaintiff as the non-moving party, drawing all reasonable inferences in his favor without weighing the evidence or credibility of the witnesses. *Baynard v. Malone,* 268 F.3d 228, 234-35 (4th Cir.2001) ("The question is whether a jury, viewing the evidence in the light most favorable to [the non-moving party], could have properly reached the conclusion reached by this jury."). "We must reverse if a reasonable jury could only rule in favor of [the movant]; if reasonable minds could differ, we must affirm." *Id.* at 235.

As noted above, the third element of a civil conspiracy in South Carolina is that the defendants' agreement to injure the plaintiff "causes special damages." *Pye v. Estate of Fox,* 369 S.C. 555, 633 S.E.2d 505, 511 (2006). According to *Pye,* "[b]ecause the quiddity of a civil conspiracy claim is the damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other causes of action." *Id.* In *Todd v. South Carolina Farm Bureau Mutual Insurance Co.,* the South Carolina Supreme Court held that "[w]here the particular acts charged as a conspiracy are the same as those relied on as the tortious act or actionable wrong, plaintiff cannot recover damages for such act or wrong, and recover likewise on the conspiracy to do the act or wrong." 276 S.C. 284, 278 S.E.2d 607, 611 (1981) (quoting 15A C.J.S. *Conspiracy § 33 (1967),* at 718). The plaintiff in *Todd* had brought five causes of action, including four tort claims and a fifth claim for "conspiracy to so damage the plaintiff." 278 S.E.2d at 608. As the court pointed out, "[t]he fifth cause of action simply takes all the prior allegations and alleges that the acts were done in furtherance of a conspiracy among the defendants. Damages are then sought for injury resulting from the conspiracy." *Id.* at 611. The court held that "[t]he trial judge erred by overruling the demurrer to the conspiracy cause of action in the complaint, since Todd can recover no additional damages for the alleged fifth cause of action." *Id.*

The case law makes clear that the concern is with a plaintiff receiving a double recovery. *See Kuznik v. Bees Ferry Assocs.,* 342 S.C. 579, 538 S.E.2d 15, 31 (S.C.Ct.App.2000) ("An action for civil conspiracy will not lie if a plaintiff has obtained relief through other avenues."). Here, because the jury only awarded damages on one of the two claims in this case, there is no possibility that plaintiff received an impermissible double recovery. *See Peoples Fed. Sav. & Loan Ass'n of S.C. v. Res. Planning Corp.,* 358 S.C. 460, 596 S.E.2d 51, 60 (2004) ("The damages alleged in [plaintiff's] breach of fiduciary duty and conspiracy claims are similar. However, since the referee directed the verdict in favor of [defendant] on [plaintiff's] breach of fiduciary duty claim, [defendant] is not twice subject to payment for damages for the same act. There is no error."). Defendants failed to challenge the adequacy of Anthony's complaint prior to trial, and the jury awarded damages on only one of Anthony's two claims. Consequently, any deficiency in the complaint was harmless; defendants are not entitled **\*319** to judgment as a matter of law based on a failure to prove special damages.

### B.

Ward and Sheppard also contend that the trial court erred in refusing their requests "to elaborate sufficiently to allow the jury, as laymen, to understand the element of special damages as it applies to a cause of action for civil conspiracy." Appellants' Br. at 27-28. Defendants argue that the trial court's instructions on the special damages requirement were misleading and confusing because they led the jury to believe that if Anthony was awarded no damages under the discrimination claim, any damages awarded under a civil conspiracy claim would necessarily satisfy the special damages requirement. Defendants fail, however, to indicate what alternative language they believe should have been used. [2]

On the issue of special damages, the judge instructed the jury as follows:

With respect to the third element [of civil conspiracy], plaintiff must prove special damages. And special damages are damages for losses that are not natural and proximate-that are not the natural and proximate result of the injury. The plaintiff must sufficiently state and claim special damages.

This element is an important element in the tort of civil conspiracy because it requires a showing of the damage resulting to plaintiff from an overt act done pursuant to the alleged conspiracy.

The damage alleged must go beyond the damages alleged in other causes of action. In other words, plaintiff must prove that he had incurred damages greater or different from the damages arising from his discrimination claim.

Different damages are damages over and above the damages he alleged he suffered from the other claim. Damages allegedly resulting from the conspiracy must not overlap with or be subsumed by the damages allegedly resulting due to the race discrimination claim.

J.A.1965-66.

We disagree with defendants that these instructions misstate the relationship between damages recoverable for the race discrimination and civil conspiracy claims. *See Pye,* 633 S.E.2d at 511. The jury was instructed that damages for the civil conspiracy must be different from those for the race discrimination claim and that it must not award damages on the civil conspiracy claim if it concluded that these damages were merely duplicative of those in the race discrimination claim. *See Peoples Fed. Sav. & Loan,* 596 S.E.2d at 60. This is correct. We therefore conclude that the district court did not abuse its discretion with respect to the special damages instruction.

## V.

 [3]    Ward and Sheppard next contend that they are entitled to judgment as a matter of law based on Anthony's failure to prove a "combination" between defendants  **\*320**  and because the jury verdict was contrary to the weight of the evidence presented. As explained above in part IV.A, "[w]e must reverse if a reasonable jury could only rule in favor of [the movant]; if reasonable minds could differ, we must affirm." *Baynard v. Malone,* 268 F.3d at 235.

Under South Carolina law "[a] conspiracy is actionable only if overt acts pursuant to the common design proximately cause damage to the plaintiff." *A Fisherman's Best, Inc. v. Recreational Fishing Alliance,* 310 F.3d 183, 195 (4th Cir.2002) (citing *First Union Nat'l Bank of S.C. v. Soden,* 333 S.C. 554, 511 S.E.2d 372, 383 (S.C.Ct.App.1998)). However, "[c]ivil conspiracy is an act which is, by its very nature, covert and clandestine and usually not susceptible of proof by direct evidence." *First Union,* 511 S.E.2d at 383. Consequently, "[c]onspiracy may be inferred from the very nature of the acts done, the relationship of the parties, the interests of the alleged conspirators and other circumstances." *Island Car Wash, Inc. v. Norris,* 292 S.C. 595, 358 S.E.2d 150, 153 (S.C.Ct.App.1987) (noting also that "concert of action, amounting to a conspiracy, may be shown by circumstantial as well as direct evidence").

Defendants claim that Anthony introduced "no evidence of any combination or agreement between Appellants Ward and Sheppard." Appellants' Br. at 30. They claim that "[t]here was no testimony that [Defendants] had any discussions, meetings or other communications regarding the investigation into the discrepancies in [Anthony's] official reports, or played any role in making the decision as to the appropriate level of discipline to be recommended to Director Ozmint." *Id.* at 30-31.

In response, Anthony contends that "[t]he nature of the acts committed and the relationship of Ward and Sheppard itself is evidence of conspiracy." Appellee's Br. at 33. According to Anthony, "[t]here were numerous times that Ward and Sheppard met in discussion of Anthony, and Ward and Sheppard acted together, in concert, in a course of action that was contrary to the normal policy and procedure at SCDC, but which furthered their own personal objective to harm Anthony." *Id.*

We agree with Anthony that the jury heard sufficient evidence at trial regarding motive, opportunity, and concerted action from which to conclude that defendants reached an agreement to harm Anthony and committed civil conspiracy. With regard to motive, as discussed above in part II, Anthony provoked the enmity of both defendants by failing to cooperate with their efforts to discredit other employees in the Department. Anthony believed these efforts were inappropriate and refused to be complicit. Regarding opportunity, despite attempting to downplay the connection between himself and Sheppard, Ward conceded at trial that he had a "professional friendship" with Sheppard and that the two men ate lunch together "a couple days a week." J.A. 1052. Ward also testified that he spoke with Sheppard about Laurie Bessinger's actions during the hostage situation at Lee. And Sheppard admitted forwarding to Ward an email he received from Inspector Hair about concerns over activities in the boiler room at Lee.

The jury also heard testimony regarding adverse actions taken by the defendants against other SCDC employees they disliked. Bessinger testified that the defendants acted in a concerted manner to force his own retirement by working together to discredit him. According to Bessinger, Sheppard initiated conversations with employees under Bessinger's direct supervision to try to elicit information which could  **\*321**  be used to undermine and discredit Bessinger. Ward admitted that he asked Ozmint to "relieve" Bessinger on the night of the hostage situation. J.A. 1067. And Associate Warden Pridgen testified that on the night of the hostage incident Ward complained to him about Bessinger being a problem: "Bessinger's trying to run everything. But if you tell anybody, I'm going to tell you are lying." J.A. 476.

Harrison, for his part, testified that Sheppard deviated from Department custom by personally serving as both investigator and then lawyer in Harrison's grievance hearing, which resulted in Harrison's demotion from warden of Kershaw. Sheppard served these roles despite the existence of a separate Office of General Counsel which acts as counsel for SCDC.

In Anthony's case, Ward admitted deviating from standard SCDC policy in failing to inform Anthony about the shakedown of Lee in January 2004, and he participated directly in the shakedown. John Near, the Human Resources Director for SCDC, testified that he does not know of any other warden who has ever been terminated or refused rehire because of an inspection-related issue. Warden Harrison also testified that he had never known of a warden losing his job either because of contraband found in an institution (absent firsthand involvement by the warden), or for failure to make inspections. Ultimately, we must conclude that reasonable minds could differ regarding the existence of a common design by Ward and Sheppard to harm Anthony. *See Baynard,* 268 F.3d at 235. Sufficient evidence was presented in this case for the jury to find that defendants conspired to bring about the forced retirement of Anthony. The jury verdict must therefore stand.

## VI.

Defendants further contend that the district court erred in failing to charge the jury on the employment-at-will doctrine. Again, as explained above in part II, we review jury instructions for abuse of discretion.

Under South Carolina law "[a]t-will employment is generally terminable by either party at any time, for any reason or for no reason at all." *Prescott v. Farmers Tel. Coop., Inc.,* 335 S.C. 330, 516 S.E.2d 923, 925 (1999). South Carolina recognizes only three exceptions to this general rule: (1) an employee has recourse against his employer for termination in violation of public policy; (2) an at-will employee may not be terminated for exercising constitutional rights; and (3) an employee has a cause of action against an employer who contractually alters the at-will relationship and terminates the employee in violation of the contract. *Nelson v. Charleston County Parks & Recreation Comm'n,* 362 S.C. 1, 605 S.E.2d 744, 746 (S.C.Ct.App.2004). The South Carolina Supreme Court has held that "an at-will employee may not maintain a civil conspiracy action against her employer." *Angus v. Burroughs & Chapin Co.,* 368 S.C. 167, 628 S.E.2d 261, 262 (2006) (citing *Ross v. Life Ins. Co. of Va.,* 273 S.C. 764, 259 S.E.2d 814, 815 (1979)).

Ward and Sheppard argue that Anthony was an at-will employee and that, to the extent that defendants were acting within the scope of their employment, they are protected by the employment-at-will doctrine. Anthony counters that he was not terminated by SCDC but was instead refused rehire under South Carolina's TERI program. More important, Anthony points out that neither defendant actually had the power to terminate him; that power resided in Jon Ozmint, the Director of SCDC. Ward merely had the power to make a recommendation to Ozmint regarding what action SCDC should take; Sheppard **\*322** lacked even this power. Because we agree with Anthony that his civil conspiracy claim is not against his employer, the employment-at-will doctrine is inapplicable. The district court did not abuse its discretion in failing to instruct the jury on the doctrine.

## VII.

Finally, defendants urge this court to consider the combined effect of the errors committed by the district court and claim that the cumulative effect of the errors occurring during trial mandates a remand for a new trial. *See Beck v. Haik,* 377 F.3d 624, 644-45 (6th Cir.2004). Although this court has yet to determine whether the cumulative error doctrine applies in the civil context, *cf. United States v. Martinez,* 277 F.3d 517, 532-34 (4th Cir.2002) (applying the cumulative error doctrine in the criminal context), we need not make this determination in order to resolve this case. Assuming without deciding that such a doctrine is appropriate in the civil context, *see Beck,* 377 F.3d at 644-45 (adopting cumulative error doctrine in civil context), *overruled on other grounds by Adkins v. Wolever,* 554 F.3d 650 (6th Cir.2009) (en banc); *Frymire-Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 188 (7th Cir.1993) (same); *Malek v. Fed. Ins. Co.,* 994 F.2d 49, 55 (2d Cir.1993) (same); *Hendler v. United States,* 952 F.2d 1364, 1383 (Fed.Cir.1991) (same); *Gordon Mailloux Enters., Inc. v. Firemen's Ins. Co. of Newark,* 366 F.2d 740, 742 (9th Cir.1966) (same), *but see SEC v. Infinity Group Co.,* 212 F.3d 180, 196 (3d Cir.2000) (noting rejection of cumulative error doctrine in civil context), reversal would nevertheless be inappropriate in this case. The only error that occurred in this case

was that the jury was not specifically asked to find that defendants acted outside the scope of their employment when they injured Anthony. As explained above, because we conclude that his error was not prejudicial, the cumulative error doctrine does nothing to alter this conclusion.

* * *

For the foregoing reasons, the judgment is

*AFFIRMED.*

**Parallel Citations**

2009 WL 1931192 (C.A.4 (S.C.))

Footnotes

1    Defendants devote much of their briefing to arguing that the damages sought in the race discrimination and civil conspiracy claims were largely overlapping and therefore Anthony failed to adequately allege special damages. This argument was not raised before trial and is therefore untimely. On a motion for judgment as a matter of law, the relevant question is not whether Anthony adequately alleged special damages but whether he proved special damages at trial.

2    We also note that defendants' counsel never made any argument based on the distinction between general and special damages. South Carolina case law is clear that damages in a civil conspiracy action must not duplicate those alleged in other causes of action. South Carolina courts have been less clear about what additional specific limitations might exist with respect to damages that may be recovered on a civil conspiracy claim. *See Gynecology Clinic, Inc. v. Cloer,* 334 S.C. 555, 514 S.E.2d 592, 593 (1999) (citing *Charles v. Texas Co.,* 199 S.C. 156, 18 S.E.2d 719, 726-29 (1942) (discussing available damages in context of unlawful conspiracy)).

**End of Document**

© 2012 Thomson Reuters. No claim to original U.S. Government Works.