# EXHIBIT X

to

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Civil Action No.: 1:10-cv-00986-JFA**

*Transcript from deposition of Carlos Milanes in related case*

In the Court of Common Pleas
State of South Carolina
County of Aiken

TIMOTHY CRANE AND KATRINA B. CRANE,)
INDIVIDUALLY, AND KATRINA B., AS    )
PERSONAL REPRESENTATIVE OF THE      )
ESTATE OF JACOB CRANE, deceased,    )
                PLAINTIFFS,         )
                                    ) C.A. Number:
versus                              ) 2011-CP-02-02633
MARGO J. HEIN-MUNIZ, M.D. AND       )
PARKSIDE MEDICAL CONSULTANTS,       )
L.L.C. D/B/A MAGNOLIA MEDICAL,      )
                DEFENDANTS.)

The Deposition of Carlos Alberto Milanes

Braithwaite, Farmer, Boni and Timmerman
759 Richland Avenue West
Aiken, South Carolina 29802
2 p.m. - 3:40 p.m.
April 10, 2012

In behalf of the attorneys for the Plaintiffs, the deposition of the above-named witness was taken before me, Judith H. Hayes, Certified Court Reporter and Notary Public in and for the State of South Carolina, pursuant to notice and/or agreement in the above-entitled cause pending in the above-named court.

COLUMBIA TRANSCRIPTS, LLC - 803/206-7001
Judith H. Hayes - colatranscripts@sc.rr.com

**Appearing for Plaintiffs:**
Furr, Henshaw & Ohanesian
1534 Blanding Street
Columbia, South Carolina 29201
By: Charles L. Henshaw, Jr., Esq.

**Appearing for the Defendants:**
Nance, McCants & Massey
Post Office Box 2881
318 Newberry Street, S.W.
Aiken, South Carolina 29801
By: James D. Nance, Esq.
    Blair Ballard Massey, Attorney

**Appearing for Carlos Milanes:**
Nelson Mullins Riley & Scarborough
1320 Main Street, 17th Floor
Columbia, South Carolina 29201
By: Travis Dayhuff, Esq.

COLUMBIA TRANSCRIPTS, LLC - 803/206-7001
Judith H. Hayes - colatranscripts@sc.rr.com

---

I N D E X

Examination:
By Mr. Henshaw ............................... Page 4, 51
By Mr. Nance ................................. Page 36

EXHIBITS

Exhibit No.:                              Page No.:
Plaintiff's Exhibit No. 1 (2/25/2010 Letter)   32
Defendant's Exhibit No. 1 (Medical Staff
  Bylaws)                                      42
Defendant's Exhibit No. 2 (Credentialing
  Policy)                                      42
Defendant's Exhibit No. 3 (Organization and
  Functions Manual)                            42

COLUMBIA TRANSCRIPTS, LLC - 803/206-7001
Judith H. Hayes - colatranscripts@sc.rr.com

1    This deposition is taken pursuant to the
2  South Carolina Rules of Civil Procedure; that all
3  objections, except as to the form of the question, are
4  reserved until time of trial.
5       It is further stipulated among counsel and
6  the witness that the witness will not waive reading
7  and signing of the deposition.
8
9  THEREUPON,
10
11                Carlos Alberto Milanes,
12 being first duly sworn to tell the truth, the whole truth,
13 and nothing but the truth, as hereinafter certified,
14 testified as follows:
15
16                     Examination
17 BY MR. HENSHAW:
18      Q.   Please state your full name.
19      A.   First name is Carlos, middle name is Alberto, and
20 last name is Milanes, M-i-l-a-n-e-s.
21      Q.   Do you reside here in Aiken?
22      A.   I do.
23      Q.   What is your occupation?
24      A.   I am the Chief Executive Officer at Aiken
25 Regional Medical Center.

COLUMBIA TRANSCRIPTS, LLC - 803/206-7001          4
Judith H. Hayes - colatranscripts@sc.rr.com

**Page 25**

1  peer review process?
2      A.  Yes.
3      Q.  Sometime in the previous two days?
4      A.  Yes.
5      Q.  And as a result of that outcome, did the bylaws
6  allow Dr. Muniz -- let me ask it this way. As a result of
7  that outcome, did the peer review process provide that
8  there would be a review of that decision within 14 days?
9      A.  Yes.
10     Q.  After 14 days, did the outcome of Dr. Muniz being
11 under precautionary suspension continue?
12     A.  Yes.
13     Q.  Under the peer review process, was Dr. Muniz
14 afforded an opportunity to request a meeting with the
15 Medical Staff Executive Committee within 10 days of
16 receiving the notice of her suspension?
17     A.  Yes.
18     Q.  I think this has already been stated another way,
19 but after the ten days that she was afforded to request a
20 meeting with the Medical Staff Executive Committee and the
21 14 days for the Medical Staff Executive Committee to review
22 the matter, did her precautionary suspension continue?
23     A.  It did.
24     Q.  Under the bylaws of Aiken Regional Medical
25 Center, was Dr. Muniz afforded a due process hearing?

**Page 26**

1      A.  Yes.
2      Q.  Were they carried out pursuant to the bylaws?
3      A.  They were.
4      Q.  Under those bylaws what would have been the steps
5  that would be taking place after the review by the Medical
6  Staff Executive Committee?
7      A.  Those are delineated in the bylaws in Article 9
8  specifically. There's time frames. The next step
9  typically is appointment of a hearing panel and there are
10 processes to get up to that point.
11     Q.  So the hearing panel is appointed?
12     A.  Yes.
13     Q.  And then is there an actual hearing of some type?
14     A.  A hearing or multiple hearings.
15     Q.  Is that called a due process hearing?
16     A.  Yes.
17     Q.  Just pursuant to the bylaws, at Aiken Reginal
18 Medical Center, how are those due process hearings carried
19 out?
20     A.  They are carried out -- there's very strict
21 guidelines that are documented in the bylaws in terms of
22 representation from either party. There's typically a
23 facilitator to the meeting which may be an outside party or
24 not. It's very delineated in the bylaws.
25     Q.  In those hearings, what role are lawyers allowed

**Page 27**

1  to play?
2      A.  They are, and they are to some degree, and again,
3  it depends on where we are, where the hearing panel is in
4  terms of the process, initial meeting versus followup
5  meetings. All that is delineated in the bylaws. I don't
6  have those memorized.
7      Q.  But based upon your experience and your knowledge
8  about those procedures, are these hearings wherein a panel
9  of doctors will make a decision after they hear evidence?
10     A.  Yes.
11     Q.  Is it limited to doctors who will be making that
12 decision?
13     A.  Yes.
14     Q.  Are doctors allowed to ask questions?
15     A.  Yes.
16     Q.  Is the doctor whose conduct is being reviewed
17 allowed to ask questions?
18     A.  Yes.
19     Q.  And they are allowed to participate by asking
20 questions within the hearing?
21     A.  That's correct.
22     Q.  Was the full peer review process carried out in
23 regard to Dr. Muniz?
24     A.  It was.
25     Q.  At the end of that process, was there a final

**Page 28**

1  result?
2      A.  There was.
3      Q.  What was the final result in regard to Dr. Muniz?
4      A.  The Board of Governors upheld the revocation of
5  privileges that occurred back in 2010.
6      Q.  As of this date have Dr. Muniz's privileges been
7  restored?
8      A.  They have not.
9      Q.  Prior to February 23, 2010, had there been
10 another peer review process approval involving Dr. Muniz?
11     A.  Yes.
12     Q.  In which there was a result?
13     A.  Yes.
14     Q.  Had that occurred in 2009?
15     A.  That's correct.
16     Q.  Was there a final result from that process?
17     A.  There was.
18     Q.  Again, was this a process that was carried out
19 through the bylaws of Aiken Regional Medical Center?
20     A.  It was.
21     Q.  There was a final result and that final result
22 was what?
23     A.  It was Dr. Muniz had to be subject to a
24 psychiatric evaluation by a third party and also a hundred
25 percent review of her cases.

**Page 49**

1  that they think a doctor does that is not appropriate?
2      A.    I don't know the specifics of that creed what you
3  are talking about.
4      Q.    You've heard of it?
5      A.    I know, I can tell you conceptually that if a
6  nurse has a question of a physician's practice that is
7  going to harm a patient they are obligated to speak up,
8  yes.
9      Q.    They are obligated to do that, aren't they?
10     A.    Yes.
11     Q.    Who do they speak up to, who are they obligated
12 to go to, do you know?
13     A.    Typically their supervisor.
14     Q.    What about their supervisor, who are they
15 obligated to go to?
16     A.    It will go up the ranks.
17     Q.    Just keep on like the chain of command in the
18 military?
19     A.    Yes.
20     Q.    Is the only effect of losing hospital privileges
21 that it would have on a physician would be economic because
22 they couldn't go to the hospital anymore?
23     MR. DAYHUFF:    Object to the form of the question.
24 You can answer.
25     A.    It could also affect them seeking privileges at

**Page 50**

1  other hospitals.
2      Q.    Would it be a killer so to speak or could it just
3  may affect it?
4      MR. HENSHAW:    Objection to the form.
5      MR. DAYHUFF:    Objection.
6      A.    In my opinion it would be a killer.
7      Q.    Do you know of any hospitals who allow a
8  physician to practice who is not board certified?
9      A.    Yes. There are many hospitals that are now
10 non-board certified.
11     Q.    What is a hospitalist?
12     A.    A hospitalist is a physician typically where a
13 hundred percent of their practice is within the walls of
14 the hospital. They deal with patients that are admitted.
15 They don't have an office practice outside the hospital.
16     Q.    Do they assume the care for physicians who don't
17 want to come to the hospital and take care of patients?
18     A.    They do but only in certain specialties.
19 Typically the hospitalist is an internal medicine physician
20 so that's more of a primary care physician, not a surgeon,
21 so they would typically not assume a surgical case. They
22 would assume a medical case.
23     Q.    But once they take over the care of that patient
24 in the hospital, they would have the ability to send that
25 patient to whatever specialty they may need?

**Page 51**

1      A.    That's correct.
2      Q.    Let me ask you this. Is the policy of Aiken
3  Regional Medical Center to receive and care for all
4  patients who come in to the emergency room?
5      A.    Yes.
6      Q.    So even if Dr. Muniz decided that one of her
7  patients needed to be hospitalized, she could go to the
8  emergency room and she would be taken care of?
9      A.    Yes.
10     MR. NANCE:    Thank you. That is all I have.
11     Examination
12 BY MR. HENSHAW:
13     Q.    In terms of peer review proceedings, do they
14 ordinarily involve a review of patient records?
15     A.    Yes.
16     Q.    If patient records are used in peer review
17 proceedings, are steps taken to preserve or maintain any
18 kind of confidences within those records?
19     A.    Yes.
20     Q.    Tell me generally what is done to protect those
21 records.
22     A.    Typically when a proceeding like this occurs, the
23 record is protected in terms of the content. It does not
24 leave the hearing panel. Those discussions should not
25 leave the hearing panel and those physical evidence of

**Page 52**

1  those records are protected.
2      Q.    In the context of just generally speaking in the
3  context of a peer review proceeding, is the patient's name
4  ever announced?
5      A.    It would be, yes. That would be in the record.
6      Q.    Would the patient's records with the patient's
7  name on them be that way or would the name in any way be
8  whited out or blanked out during the course of the
9  proceedings, if you know?
10     A.    I don't know.
11     Q.    What about in a peer review process, again, just
12 generally speaking, not in the context of this particular
13 case, can records of the patient be brought in from other
14 sources, other physicians outside the hospital setting?
15     A.    They could be. I don't think that would be
16 typical.
17     Q.    But it can happen?
18     A.    Could be, sure.
19     Q.    So in terms of the record, in a particular peer
20 review proceeding and what was presented during that
21 hearing, is that kept in an archive somehow or kept as a
22 matter of record at the hospital?
23     A.    I believe it is, yes.
24     Q.    Subject to whatever protections of the peer
25 review statute and the bylaws allow?