# EXHIBIT Y

to

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## Civil Action No.: 1:10-cv-00986-JFA

*Holland and Hart Healthcare Law Blog*

# Magnolia Medical Center

Margo Muniz, M.D., R.Ph.
410 University Parkway
Suite 1560
Aiken, SC 29801

## FAX COVER SHEET

DATE: 2/15/11

FAX NUMBER: 803 231 7885

TO: BW

FROM: Dr Muny

RE: _____

*This fax is confidential. If not intended for you, please disregard.

Phone (803) 649-6366                    Fax (803) 649-6347

# Holland & Hart Healthcare Law Blog

May 22, 2006

## TWELVE SIGNS OF SHAM PEER REVIEW

Sham peer review is a "corrective action" proceeding commenced by a hospital medical staff against a physician to discipline the physician motivated by other concerns than the quality of patient concerns -- such as hospital politics, competitive advantage or retaliation. There are twelve telltale signs that individually and collectively may indicate a situation of malicious peer review.

1. A doctor with a good history and reputation suddenly deemed to have questionable performance indicators. Absent intervening external causes such as recent substance abuse, or mental illness and unusual stress of some kind, physicians usually do not suddenly turn south in terms of professional judgment and performance.

2. The presence of gunny sacking issues. Gunny sacking is the dredging up of old issues long since resolved to demonstrate present problems. While history can be important if it demonstrates a consistent pattern of misbehavior or uneven performance, old anecdotal grievances newly retrieved reminds one of a spouse who raises old grievances in new disagreements.

3. The existence of an "insider" clique of physicians who fiercely maintain control of peer review and credentials positions and pass key medical staff positions back and forth among themselves – while excluding "outsiders."

4. The lack of clear, definitive standards in medical staff bylaws for "disruptive conduct," denial or non-renewal of privileges or other discipline. This permits each physician participating in the process to bring his or her own "standards" no matter how subjective to the process. See *Kiester v. Humana Hospital Alaska, Inc.*, 843 P.2d 1219 (Alaska, 1992) (basic principles of due process of law require that criteria established for granting or denying of hospital privileges to physicians not be vague and ambiguous, and that as established, they be applied objectively.)

5. Medical staff acting in excess of authority or violation of the medical staff bylaws. Failure to follow the letter of the procedures set forth in the investigative or hearing process frequently underscores a separate agenda.

6. The existence of personal animus on the part of those participating in the investigative or hearing process is a clear marker of retaliatory intent.

7. The existence of a conflict of interest on the part of those measuring or participating in the peer review proceedings can violate fundamental conflict of interest principles – casting doubt on the genuineness of espoused quality of care concerns.

8. Minor issues of quality of care magnified beyond a reasonable expectation. Every professional makes mistakes and many of us are lucky when they do not precipitate major problems for our patients and clients. When a reviewing committee loses its perspective and elevates otherwise minor infractions into major violations, judgment becomes flawed and impaired.

9. The "piling on" of complaints. Rather than discrete, illuminating case issues the medical staff appears to throw every thinkable transgression, real and imagined, on the part of the physician against the wall in the apparent hope that something will stick.

10. Disparate, discriminatory treatment. When a physician on the "outside" is treated substantially different with respect to the intensity of scrutiny than a physician on the "inside," where it is clear that the insiders are not demanding from themselves and other insiders the same degree of practice performance as the physician under review. This can sometimes be seen most dramatically in the differential review treatment of two physicians involved in the same case.

11. In the failure to seek all relevant information concerning an issue before a rush to judgment – key physicians or nursing staff members not interviewed and the charts not carefully reviewed. The sample of cases reviewed in order to reach a judgment on competence is unduly narrow. See *Brown v. Presbyterian Healthcare Services*, 101 F.3d 1324 (10th Cir. 1996).

**12.** The existence of only a faint nod in the proceedings to a sincere concern for the concern about quality or safety of patient care. The lack of consistency in concern about quality of patient care can be a tip-off of a separate agenda or ulterior motive in the proceedings.

While true good faith peer review is an important function of medical staff physicians, the temptation to exploit its protections under the Health Care Quality Improvement Act of 1996 can sometimes be overwhelming, particularly in small, closed communities of providers. Vigilance for sham peer review should be maintained to protect against the erosion of basic constitutional rights.

May 22, 2006 in Peer Review | Permalink

**Comments**

Thank you for writing this article.
H. Butler M.D.
www.SemmelweisSociety.net

Posted by: H. Butler M.D. | January 03, 2007 at 04:38 AM

This is a good summary of points in Sham Peer Review. Of special note is the points of articles 2, 9, and 10. I have seen those up close and personal where others in the same case are not even examined and where old cases are brought up to try to make the evidence worse than it really is.

Posted by: Gary Moore MD | July 14, 2007 at 06:06 PM

I am currently awaiting a "fair hearing" after being denied renewal of hospital privileges due to sham peer review for both "disruptive behavior" related to patient advocacy as well as unfair economic advantage and almost all of these points are relevent to my case.

Posted by: Mark Fahlen, MD | October 03, 2008 at 04:50 PM

I was attacked by this sham peer in Tucson Az which ultimately led to my revocation. All 12 signs were present in my sham peer review. I was attacked by competitors jealous of my hard work and success, At the time I was naive to this whole peer review process. There was not one single patient complaint in over 5 years at the Carondelet St. Mary's hospital in Tucson on which I was on staff. Never the less my accussers got what they deserve. Ie Dr. Edward Schwager was removed soon after from the Medical Board, The Hospital attorney Tom Murphy a well known alcoholic suffered tremendous professional embarresment, and the hospital has been cited for many violations including the lack of sterilization of Operating room equipment relating to deaths and public safety.

None the less great Physicians are being eliminated from clinical medicine and the public unfortunately suffers.

Lior Kahane MD MS

Posted by: Lior Kahane MD | November 23, 2008 at 04:51 PM

Wow! Every single one of those points applied to the way I was treated. Sham Peer Review should be renamed Malevolent Peer Review. I look forward to the time when "what goes around, comes around".



Impressive! I've experienced all these in my 38 year career. Number 9 come to mind: I was called into an Ad hoc hearing for a letter by the attending accusing me of inciting a lawsuit against another provider. I could not get the patient to confirm or denied this accusation. I contacted the Plaintiff's attorney he contacted the patient who stated I did not reflect this accusation. He gave me letter to that fact. I pressured the attending with my secret evidence he was lying. He stated he wanted to see if they was any more dirt? The ad hoc committee discharge the charges nothing was done to this provider.

Posted by: Robert Fox, Jr | October 31, 2009 at 09:07 PM



Number 1:Experienced by an Orthopedic young surgeon 35 yrs. boarded, he came to me as as a fellow outside physician asking for help as a board member and a general surgeon at his hospital were determined to get him kicked off staff due to his surgical practices that did not conform to their stds. This was not based on results but jealous motivation. It escalated to a State Board Hearing for which I was allowed onsite to speak on his behalf with a few board members trying to keep me from talking. The Board Chairman allowed me to present my case. How could a boarded young orthopedic surgeon go badly in just four years? After great discussion the board took no action on this providers license. In the end he was broken, divorce and loss everything he had worked for. The hospital was equally injured to the love of the neighboring hospital who absorbed all its business as it died a slow death. It is no longer a hospital.

Posted by: Robert Fox,jr | October 31, 2009 at 09:25 PM



9. The "piling on" of complaints: I once experienced the "piling on" as I returned from a medical meeting prior to cell phones. I had a stab patient who's vitals were stable, lab WNL, radiographic studies negative with soft abdomen. I let the telephone operator know where I was going and I called later talked to the nurse all was well. My competitor OB GYN surgeon discovered I was out of town and call a special meeting and accused me of patient abandonment. I unknowingly returned to the hospital and saw all the doctor cars and walked into the administrator's office to see what was happening. One of the Internal Medicine doctors said," We got you now cowboy." They shipped the patient to local hospital who operated on this poor boy and found that the knife did not enter the abdomen as I so stated. I was given a letter of reprimand. I should have left the hospital ASAP. I stay 24 years first fifteen was hell.

Posted by: Robert Fox | October 31, 2009 at 09:40 PM



Another Sham review 6. The existence of personal animus on the part of those participating in the investigative or hearing process is a clear marker of retaliatory intent.

I used to needle biopsy a liver during Gastric bypass surgery for morbid obesity. I was given a letter by an internal medicine provider calling for a moratorium on bypass surgeries. Investigated committee was called, I had an outside surgery audited on all my cases regional hospital and they clear and approved of all my cases.

We explained to the committee that at the time this was a standard practice at the leading regional hospitals. The response,"We don't care about other hospitals you are not there." After the meeting one our our outside anesthesiologist asked my why I was staying and putting up with this abuse? The internal medicine doctor later years killed himself in a airplane flying in MIC conditions. I cried of course.

Posted by: Robert Fox | October 31, 2009 at 09:50 PM



I agree with you in this topic,and thanks for you, and i had information about Patientcomplaints in King Abdulaziz Medical City ,I hope to like you

Posted by: Patient complaints | May 24, 2010 at 05:54 AM

