# EXHIBIT Z

## to

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## Civil Action No.: 1:10-cv-00986-JFA

## *Transcript from deposition of Adrienne Marting*

Adrienne E Marting 8/12/2011

```
                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF SOUTH CAROLINA
                           AIKEN DIVISION

MARGO J. HEIN-MUNIZ, MD, and   )
PARKSIDE MEDICAL CONSULTANTS,  )
LLC, d/b/a MAGNOLIA MEDICAL,   )
           Plaintiffs,         )
     vs.                       ) CIVIL ACTION FILE
                               )
AIKEN REGIONAL MEDICAL CENTERS, ) NO. 1:10-CV-00986-MBS
UNIVERSAL HEALTH SERVICES, INC.,)
AIKEN OBSTETRICS & GYNECOLOGY  )
ASSOCIATES, P.A., CARLOS A.    )
MILANES, K. D. JUSTYN, OLETHA R.)
MINTO, MD, JAMES F. BOEHNER, MD,)
ROBERT D. BOONE, MD, JONATHAN H.)
ANDERSON, MD, and THOMAS P.    )
PAXTON, MD,                    )
           Defendants.         )


                  D E P O S I T I O N

WITNESS:      ADRIENNE E. MARTING
DATE:         August 12, 2011
TIME:         2:00 P.M.
LOCATION:     Balch & Bingham, LLP
              30 Ivan Allen, Jr., Blvd., N.W.
              Suite 700
              Atlanta, Georgia  30308-3036

TAKEN BY:     Attorney for the Defendants

REPORTED BY:  CATHERINE B. STEELE, GA CCR B-1123
_____
              COMPUSCRIPTS, INC.
        A Full-Service Court Reporting Agency
             Post Office Box 7172
          Columbia, South Carolina 29202
                 (803) 988-0086
                 1-888-988-0086
              www.compuscriptsinc.com
```

**Page 2**

```
1    APPEARANCES OF COUNSEL:
2      On behalf of the Plaintiffs:
3           DAVID C. DICK, ESQ.
            Sowell Gray Stepp & Laffitte, LLC
4           1310 Gadsden Street
            P. O. Box 11449
5           Columbia, South Carolina  29211
            803-929-1400, 803-929-0300 fax
6           ddick@sowellgray.com
7      On behalf of the Defendants:
8           TRAVIS DAYHUFF, ESQ.
            Nelson Mullins Riley & Scarborough, LLP
9           1320 Main Street, 17th Floor
            P. O. Box 1170
10          Columbia, South Carolina  29201
            803-799-2000, 803-256-7500 fax
11          travis.dayhuff@nelsonmullins.com
12                    - - -
13
14       (Reporter's Note:  Index at rear of
15    transcript.)
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1            (Whereupon, disclosure as required by the
2     Georgia Board of Court Reporting was made by the
3     court reporter, a written copy of which is
4     attached hereto.)
5                 ADRIENNE E. MARTING,
6     being first duly sworn, was examined and testified as
7     follows:
8                 CROSS-EXAMINATION
9     BY MR. DAYHUFF:
10       Q    Ms. Marting, my name is Travis Dayhuff.  I
11    represent the Defendants in this action.  Dr. Muniz is
12    the Plaintiff.  And I believe she has retained you in
13    this matter; is that correct?
14       A    That's correct.
15       Q    All right.  This deposition is being taken
16    pursuant to the Federal Rules of Civil Procedure, so
17    I'm required to provide you with some instructions.
18    You may hear some objections to the form of my question
19    today.  If Mr. Dick wants to make an objection, will
20    you pause your answer and allow him to enter that
21    objection.  The only exception would be if he instructs
22    you not to answer, which probably won't occur since you
23    don't have an attorney-client relationship with him.
24           If you don't understand my question, the
25    Rules require you to ask me rather than Mr. Dick for
```

**Page 4**

```
1     clarification before you answer.  Do you understand
2     that?
3        A    I do.
4        Q    If you need a break during your deposition,
5     feel free to ask and we can take one.  However, during
6     breaks you're not to discuss the substance of your
7     testimony with anyone.  Do you understand that?
8        A    I do.
9        Q    All right.  Generally speaking, the outline
10    of what I'm going to go over today is we're going to
11    discuss some preliminary matters, things like documents
12    you've seen, what you were retained to do.  I'm going
13    to ask you a lot of questions about your background,
14    your education, your practice of law.  And then I'm
15    going to examine you on the opinions you plan to offer
16    at trial.
17           Okay.  Let's start with what we have had
18    marked as Exhibit 1.
19           MR. DAYHUFF:  David, here is a copy.
20           (Whereupon, Defendant's Exhibit
                  No. 1 was marked for
21                identification.)
22       Q    (By Mr. Dayhuff)  Ms. Marting -- and is it
23    Marting (pronunciation variation) or --
24       A    Marting.
25       Q    Marting?
```

1 (Pages 1 to 4)

Adrienne E Marting 8/12/2011

Page 5

```
 1      A      Yes.  But you can say *ting* if you want to.
 2      Q      Your receptionist adds a little flare to it.
 3      A      Oh, she adds a little punch to it?
 4      Q      But I'm going to go with Marting.  Take a
 5  look at what's been marked Exhibit 1.  This is a list
 6  of documents provided to me by Mr. Dick.  And it was
 7  meant to list what materials you have received and
 8  reviewed in this matter.  So take a moment and look at
 9  that and tell me if you have received and reviewed
10  these documents.
11      A      Okay.
12      Q      And may I, while you are reviewing that,
13  take a look at that (indicating) and see if it
14  corresponds with this list?
15      A      Yes.
16      Q      And, for the record, I'm looking at a
17  notebook called Confidential Peer Review Material,
18  Margo Muniz, MD.
19      A      And I think that's reflected as Second Peer
20  Review Hearing Transcripts with Exhibits.  Well, not
21  really.  I understood that to be the hearing exhibits.
22          MR. DAYHUFF:  David, this appears to be, to
23      me, the exhibits for the 2010 peer review hearing.
24      Is that correct?
25          MR. DICK:  Yeah.  If you look at the Second
```

Page 6

```
 1      Peer Review Hearing Transcript with Exhibits,
 2      that's what it is.
 3          MR. DAYHUFF:  Got you.  So that's what this
 4      notebook contains?
 5          MR. DICK:  It's the notebook created by, I
 6      believe, Terri Ergle and distributed to us during
 7      the peer review hearing.
 8          MR. DAYHUFF:  Correct.
 9          MR. DICK:  Of 2010.
10          MR. DAYHUFF:  Excellent.
11      Q      (By Mr. Dayhuff)  All right.  Anything --
12  well, do you still need some time to scan that?
13      A      I'm still looking.  I don't know if I'm
14  missing it, but I also have some emails that were
15  produced in discovery.
16      Q      Okay.  If those are the e-mails, I will take
17  a look at them and make sure I understand what you've
18  seen.
19      A      This is it.  And I believe a lot of them
20  were attachments to Mr. Milanes, but I just took them
21  so I could read them and organize them.
22      Q      Sure.  These look familiar.  All right,
23  looked through the stack of emails.  And I believe
24  David told me before you came in here that you also
25  received some additional recent Medical Staff Bylaws,
```

Page 7

```
 1  some Board lists?
 2      A      Yes.  He sent me -- they are in my email,
 3  but I haven't look at them yet.
 4      Q      All right, fair enough.
 5      A      And, yeah, we should note that, because I
 6  did see that he sent the email, but I had a crazy day
 7  yesterday.
 8          MR. DICK:  That was just for your reference,
 9      I forwarded on your email.
10          MR. DAYHUFF:  I've got you.  Yes, I know
11      what that is.
12      Q      (By Mr. Dayhuff)  All right.  We've
13  established that you have received these documents
14  we've been talking about which appeared on Exhibit 1.
15  Have you been able to review all these documents?
16      A      Not fully.  I have focused most of my time
17  on the hearing transcripts and the Medical Staff
18  Bylaws, which I was basically familiar with the old
19  HortySpringer ones, but that was my main focus.  My
20  associate looked at Dr. Minto's deposition and tabbed
21  it, but I haven't had a chance to look at that, quite
22  frankly.  I have looked at the notebook of the hearing
23  exhibits page by page.
24      Q      Good, good.
25      A      And I had open on my screen the Amended
```

Page 8

```
 1  Complaint.  I have thumbed through it, but I haven't
 2  read every paragraph.  I was trying to focus on what I
 3  was being asked about.
 4      Q      Sure, sure.  I imagine some of the stuff
 5  isn't particularly important for your opinions and some
 6  of it is; right?
 7      A      That's right.
 8      Q      Obviously, I'm here today to get the
 9  opinions that you plan to offer at trial.  Do you
10  understand that?
11      A      I do.
12      Q      And have you -- well, are you to the point
13  where you can tell me what opinions you plan to offer
14  at trial?
15      A      I am at the point where I can tell you what
16  my opinions are today and, based on what I have seen, I
17  don't anticipate that they will change; but because I
18  haven't read everything, I'd like to reserve the right
19  to add or modify.
20      Q      Sure.  And that always happens, I guess,
21  with experts.  My only concern with that is if you
22  modify your opinions, I would need to come back to
23  learn about them.
24      A      Right.  We would let you know ahead of time
25  if anything changes.
```

2 (Pages 5 to 8)

Adrienne E Marting 8/12/2011

Page 9

1    Q    And is it fair to say right now that you
2  don't anticipate having to modify opinions materially
3  before trial?
4    A    That's right, that's right.
5    Q    Good.  Otherwise, of course, we might just
6  want to go home --
7    A    And start all over, which I really don't.
8    Q    -- and not waste the next two and a half or
9  three hours.
10    A    But I hate to have all these things on a
11  list that I haven't gone through and really digested.
12    Q    I understand.  Other than documents provided
13  to you about the peer review action at issue or peer
14  review actions at issue in my case, have you utilized
15  any other materials in developing the opinions you plan
16  to offer at trial?
17    A    The only thing I can think of is -- well,
18  that I was provided or that I plan to rely on?
19    Q    Utilized or plan to rely on, sure.
20    A    I reviewed HCQIA and the bylaws.
21    Q    Health Care Quality Improvement Act?
22    A    That's right.
23    Q    And just the statute; right?
24    A    That's right.
25    Q    Okay.  Anything else?

Page 10

1    A    Not at this point, no.
2    Q    And let's talk about documents, if any,
3  you've created regarding this matter.  I know you have
4  a retainer letter.
5    A    That's right.
6    Q    I guess you created that (indicating), and
7  I'll give you that which we'll mark Exhibit 2.  Just,
8  if you would, review that and --
9    A    It looks like the one I sent out.
10                (Whereupon, Defendant's Exhibit
                    No. 2 was marked for
11                    identification.)
12    Q    (By Mr. Dayhuff)  Okay.  For the record, is
13  No. 2 the retainer letter that you sent out to
14  memorialize the agreement you have with looks like
15  Sowell Gray, the law firm?
16    A    Yes.
17    Q    What were you retained to do in this case?
18    A    As reflected on here, basically?
19    Q    Sure.  Does that differ from reality?
20    A    Or what I was asked for?  Well, I didn't
21  know how precise you wanted me to be.
22    Q    That's okay.
23    A    To serve on behalf -- to serve as an expert
24  witness on behalf of Dr. Muniz in the matter that's
25  currently pending, Muniz, et al. versus Aiken Regional

Page 11

1  Medical Centers, et al., on the peer review aspects of
2  it, the fairness of the hearing, the compliance with
3  HCQIA, and the bylaws.
4    Q    Fairness of the hearing, compliance with
5  Health Care Quality Improvement Act, and what was the
6  last one?  Compliance with bylaws?
7    A    Bylaws, yes.  Technically, in this case,
8  it's the credentialing policy.
9    Q    Compliance with Aiken Regional Medical
10  Center's credentialing policy?
11    A    That's correct.  But I'll probably call it
12  the bylaws.
13    Q    We'll note that so we'll know what we're
14  talking about.  Okay.  So I was asking you what
15  documents you created, and we've got a letter that's
16  Exhibit 2.  Have you created any other documents in
17  this matter?  Reports or drafts or --
18    A    No.
19    Q    -- that type of thing?
20    A    I am not to that point yet.
21    Q    All right.  How about invoices, have you had
22  to invoice in this case yet?
23    A    Yes.  Just sent one out on Monday, I think.
24    Q    What's your total billing to date on this
25  matter, estimated?

Page 12

1    A    6,000.
2    Q    And about how many hours does that
3  represent?
4    A    Divide it by 420.
5    Q    There you go.  We can figure that out later.
6        MR. DAYHUFF:  Unless you've got a Rain Man
7    thing going on over there.
8        MR. DICK:  No, no.
9    Q    (By Mr. Dayhuff)  So $6,000 at 420 an hour.
10  And you've got an associate mixed in there too?
11    A    Yeah, I was just trying to think if the bill
12  that just went out reflects her time.  I don't know it
13  does, because that was August time, and that doesn't
14  reflect August time.
15    Q    Did you do anything to prepare for your
16  deposition today?
17    A    I reviewed the transcripts again.  And
18  that's all.
19    Q    How about chat with my friend Mr. Dick?
20    A    Well, yeah, I mean, we were sitting here.
21    Q    Did you guys discuss any of the opinions you
22  would offer or any of the substantive issues in this
23  case or just small talk?
24    A    Well, we -- I'm trying to be as accurate as
25  possible.  I was asked some questions and if I had

3 (Pages 9 to 12)

Adrienne E Marting 8/12/2011

Page 13

1 reviewed this or that. So and I told him what I found.
2 And I noted some points and I asked some questions.
3 There's so much in here factually and there's a lot of
4 players. You know, who is who? And actually I did a
5 -- well, my associate created it, but I did a timeline
6 of events really of just who the players are.
7 Q  Okay.
8 A  Because there's so many people.
9 Q  Sure.
10 A  And I was trying to pick all that out. And
11 I will give you a copy of this if you would like.
12 Q  And we'll make that an exhibit. Can we use
13 that copy or --
14 A  I can go make a copy.
15 Q  Okay. And I don't want to stop things, I
16 mean. If we can just make an exhibit of it, I may go
17 back to it later. Or do you need to retain the
18 original? I imagine it's on your word processing --
19 A  It's on my (witness nods head up and down.)
20 Q  So is it okay to make this 3?
21 A  Sure.
22          (Whereupon, Defendants' Exhibit
              No. 3 was marked for
23            identification.)
24 Q  (By Mr. Dayhuff) Anything else you can
25 think of that was created about this case?

Page 14

1 A  Emails on timing of the deposition.
2 Q  I think I probably have seen some of those.
3 A  Yes.
4 Q  Any emails that contain substantive
5 discussions of issues or opinions in this case?
6 A  No, more the passing on of documents like
7 the minutes he just sent me.
8 Q  Fair enough. Your meeting with David today
9 when you were asking some questions and talking about
10 what you had reviewed, how long did that meeting last?
11 A  Well, we were in the room together from
12 about 11:00 until we started, but that included lunch
13 and I was mostly reading. So we didn't chat for that
14 long.
15 Q  Got you. Anything that you would consider
16 material or important or particularly substantive that
17 came out of your meeting with Mr. Dick?
18 A  No.
19 Q  Any fact you learned that was material to
20 you that you learned from your meeting material to your
21 opinions?
22 A  No. It was more just to confirm who is
23 this, you know, and get the names straight, whether
24 people were related. There were like two
25 Dr. Robinsons. Just little factual questions like that

Page 15

1 I was just brushing up on.
2 Q  Fair enough. And I think I've asked you
3 this, but you're prepared today to provide the opinions
4 you will offer at the trial of this case?
5 A  Yes, I am, subject to the reservation I
6 stated earlier.
7 Q  All right. And I think you've described the
8 types of opinions you're going to offer and you
9 described them as peer review opinions?
10 A  That's my verbiage. That's what I consider
11 this whole process at the hearing, the peer review
12 hearing at the hospital.
13 Q  And you further broke that down into three
14 subparts: Opinions regarding the fairness of the
15 hearing.
16 A  Uh-huh.
17 Q  Opinions regarding compliance with the
18 Health Care Quality Improvement Act.
19 A  (Witness nods head up and down.)
20 Q  And compliance with the credentialing policy
21 or Medical Staff Bylaws of my hospital. Correct?
22 A  That's right.
23 Q  Any other subsets of opinions?
24 A  Not that I know of.
25 Q  Fair enough. Have you before -- well, we've

Page 16

1 obviously talked about this meeting at 11:00 o'clock
2 today with Mr. Dick. Have you had meetings with
3 Mr. Dick or Mr. Sowell before this?
4 A  We talked on the phone yesterday.
5 Q  You, Mr. Sowell, and Mr. Dick together?
6 A  Yes.
7 Q  How long did that call last?
8 A  About 45 minutes.
9 Q  What was kind of the nature of that call?
10 What were you discussing? This case?
11 A  Yeah, this case. You know, various people's
12 depositions, you know, confirming one way or another.
13 I had some basic questions on -- oh, we went over the
14 emails too, I think was a substantive thing that we
15 discussed.
16 Q  All right. How about communications with
17 anyone other than Mr. Sowell, Mr. Dick, your associate
18 regarding this case?
19 A  No one else.
20 Q  Not Dr. Muniz, for example?
21 A  No. I have not talked to her yet.
22 Q  All right. You're obviously ready to give
23 your opinions in this case, subject to that
24 qualification you mentioned. What more, if anything,
25 do you plan to do before trial in this case?

www.compuscripts.com

Adrienne E Marting 8/12/2011

Page 17

1    A    Read any -- well, finish reading the
2  depositions that were provided to me, and any
3  additional ones that come up and the Board minutes that
4  I haven't had a chance to look at.  And then case law
5  research just to, you know, back up.
6    Q    All right.  Let's talk about your
7  background, education, and employment.
8    A    Okay.
9    Q    Let's start with your current employment.
10   A    I am a partner at Balch & Bingham, LLC, in
11 Atlanta, Georgia.
12   Q    And how long have you been a partner at
13 Balch & Bingham?
14   A    Since December 2010.
15   Q    And before that let's just kind of go back
16 in time for your legal career.
17   A    Between 2007 and December 2010 I was at
18 Epstein, Becker & Green in the Atlanta office.  And
19 prior to that from -- I clerked in 1988.  And from 1989
20 to 19 -- no, sorry, 2007, I was at Powell Goldstein,
21 which is now Bryan Cave.
22   Q    Was that in Atlanta?
23   A    Yes, yes.
24   Q    And you clerked in 1988?
25   A    Uh-huh.

Page 18

1    Q    For a judge?
2    A    No, no, clerked at Powell Goldstein.
3    Q    I see.  '89 to 2007 at Powell Goldstein.
4  Were you an associate there? of counsel? partner?
5    A    I was an associate, and then I was a
6  partner.  And then our group blew up, and now they have
7  no health care lawyers there.
8    Q    Wow.
9    A    It's sad.
10   Q    Have you been doing health care law your
11 entire legal career?
12   A    Yes, yes.
13   Q    Do you have any certifications in law?
14   A    No.
15   Q    Specialty certifications?
16   A    No.
17   Q    Do you have --
18   A    Well, I did take the ABA course on hearing
19 officers for peer review hearings, and they did give us
20 a little certificate.  But it's not like, you know,
21 being a specialist in the Florida bar or something.
22   Q    Like in taxation or something, okay.
23   A    Yeah.
24   Q    Do you have any -- well, you mentioned your
25 ABA certification as a hearing officer.  Do you have

Page 19

1  any other certifications related to what you've
2  described as the peer review expertise?
3    A    No.  Just my 22 years of experience.
4    Q    Okay.  I noticed on your website that you
5  also practice -- it looked like your practice is
6  divided into three areas:  Business litigation,
7  corporate, and health law.  Is that correct?
8    A    I wouldn't say so, but I don't doubt that
9  that's on my website.  I think here they have the
10 health law practice, which is under the corporate.  And
11 then they have the health care litigation.  And in
12 other firms, it's been different.  I think what I do is
13 quasi-litigation, doing a lot of the CON work and the
14 peer review hearings.  So I think of myself more as a
15 quasi-health care litigator, to be fair.
16   Q    Health care litigator, okay.  And as a
17 health care litigator --
18   A    And regulatory.
19   Q    Okay, and regulatory.  And when you say
20 regulatory, are you talking about advice --
21   A    Yes.
22   Q    -- on Medicare/Medicaid reimbursement
23 issues, or advice on what?
24   A    I've done some of that.  But mostly
25 certificate of need, licensure, and I've done EMTALA

Page 20

1  matters, a lot of that, and peer review.  I have
2  trained medical staffs, you know, on their yearly, when
3  the new group comes in.
4    Q    Okay.  So you do some CON, you do some
5  EMTALA, and you do some other regulatory.  What
6  percentage of your legal work would you say is peer
7  review related?
8    A    Almost 50 percent.
9    Q    50 percent, okay.  And if we were to think
10 about that remaining 50 percent, how much of that is
11 CON?
12   A    Almost, you know, like 45 percent, I would
13 think.
14   Q    That's a very similar practice to mine.  45
15 percent CON and the remaining 5 percent miscellaneous
16 regulatory?
17   A    Right, right.
18   Q    And out of that 50 percent that is peer
19 review related, I imagine we could further break that
20 down.  How much of that 50 percent is litigating peer
21 review matters in state or federal court?
22   A    Very little, actually.  I have only had a
23 couple of cases go to trial.  Well, I -- yeah.  Mostly
24 it's at the hospital level representing either the MEC
25 or serving as a hearing officer.

5 (Pages 17 to 20)

Adrienne E Marting 8/12/2011

Page 21

1    Q    So you have done internal fair hearings at
2  the hospital level?
3    A    That's correct.
4    Q    And either represented the MEC or the
5  physician under review?
6    A    That's correct.
7    Q    Okay.  And out of that 50 percent of peer
8  review work, how much of -- how much of that work is
9  internal hospital litigation of peer review matters?
10   A    The actual litigation, like going through a
11 hearing?
12   Q    Uh-huh.
13   A    30 percent, I'm guessing, you know.
14   Q    Sure.  These are rough.
15   A    There's a lot of advising ahead of time.
16   Q    Absolutely.
17   A    And, hopefully, if you're good, you can make
18 the hearing not happen.
19   Q    Yeah.
20   A    So I think that's a fair assessment.
21   Q    Okay.  And that leaves us about 20 percent
22 of what?  You do some -- I saw from your bio that you
23 work on medical staff bylaws for hospitals?
24   A    That's correct.
25   Q    Do you ever advise physicians on the medical

Page 22

1  staff bylaws?
2    A    No, I haven't, I haven't.  Well, no, that's
3  not true.  Once a long, long time ago King & Spalding
4  was representing Southeast Georgia Regional Medical
5  Center and they -- it was a very contentious fight, and
6  I came in and was asked to represent the physicians as
7  a group.  That was years and years ago.
8    Q    Then I imagine the rest of that 20 percent
9  is advice on peer review matters that doesn't result in
10 a hearing?
11   A    That's exactly right.
12   Q    Okay.  And that advice is both to hospitals
13 and physicians or just hospitals?
14   A    Both, I've represented both.  Not at the
15 same facility, obviously.
16   Q    That would be an issue, wouldn't it?
17   A    Yes.
18   Q    Thinking about your peer review work, that
19 50 percent of your work that's peer review, give me
20 some sense of how it breaks down along the lines of you
21 representing and advising a hospital versus you
22 representing and advising a physician.
23   A    I would say that -- and I just want to be
24 fair here -- 80 percent would be the Medical Executive
25 Committee and 20 percent individual physicians.

Page 23

1    Q    Do you have a stable of hospital clients,
2  for lack of a better word, that you provide peer review
3  services to?
4    A    I do.
5    Q    Can you tell me who those clients are?
6    A    DeKalb Medical.
7    Q    Okay.
8    A    Both facilities.  Well, they have three
9  facilities, but the Hillandale and the main campus one.
10   Q    Okay.
11   A    Southern Regional Medical Center.
12   Q    All right.
13   A    Medical Center of Central Georgia.  And, I'm
14 sorry, ask me the question again.  Are you asking who I
15 represented when I'm representing the hospital or had
16 any dealings with?
17   Q    Representing the hospital or providing
18 advice to the hospital on peer review.
19   A    All right.
20   Q    Or medical staff bylaws, for that matter.
21   A    Northside Hospital.  And, actually, that
22 specific facility was Northside Hospital Cherokee.  And
23 I believe that's it.
24   Q    DeKalb Medical Center, it has three hospital
25 facilities, it sounded like?

Page 24

1    A    That's correct.
2    Q    Is that a nonprofit or for profit?
3    A    Nonprofit.
4    Q    So no one owns DeKalb Medical?
5    A    Right.
6    Q    All right.  Southern Regional Medical
7  Center, nonprofit or for profit?
8    A    That's nonprofit.  Actually, all of these
9  are nonprofit.
10   Q    All are nonprofit.  So there's no owner of
11 any of these that we would need to discuss?
12   A    That's right.  They're all reorganized
13 hospital authorities.
14   Q    Okay.  Are any of them public any longer?
15   A    No.
16   Q    They were apparently in the past when they
17 were hospital authorities?
18   A    Exactly, when they were hospital
19 authorities, but none of them are now.  And that's been
20 years.
21   Q    Okay.  Then out of that list that includes
22 both folks you advise on the -- or includes folks you
23 advise on medical staff bylaws, it includes hospitals
24 where you have represented the MEC.
25   A    Uh-huh.

6 (Pages 21 to 24)

Adrienne E Marting 8/12/2011

Page 25

1    Q    And hospitals where you have provided other
2 general peer review advice.  Is that accurate?
3    A    Yes.
4    Q    Okay.  You mentioned your hearing officer
5 training, that you are trained as a hearing officer, I
6 guess, and that you have helped train other medical
7 staff members to be hearing officers.  Did I go too far
8 with that?
9    A    No.  I ran things together.  I attended a
10 conference put on by the American Bar Association for
11 hearing officers and, you know, training them.  Funny
12 thing was I had already been a hearing officer before I
13 went there, but I thought it would be a good idea to
14 hone up on my skills.
15    Q    Sure, sure.
16    A    But what I was talking about with the
17 teaching was just when the new medical staff officers
18 come in, I have done training for them, you know, a day
19 conference where we'd come in.  I actually did it
20 jointly with the HortySpringer folks where we talked
21 about the bylaws and their duties and confidentiality
22 and the importance of all that.
23    Q    The ABA hearing officer training that you
24 went to, when was that?
25    A    More than three years ago and less than six,

Page 26

1 the best I can do with a guess.
2    Q    And did they provide you with written
3 materials?
4    A    Yes.
5    Q    And was this done by the ABA Health Law
6 Section?
7    A    Yes.
8    Q    And was it done at any particular location?
9    A    It was in Chicago.
10    Q    Chicago, okay.  And were there any
11 particular lawyers or folks that headed it up that you
12 recall?  You know, the primary teacher or --
13    A    I'm trying to think.  No.  I knew some of
14 the audience members who had been hearing officers in
15 some of my cases.
16    Q    And I was going to ask, your hearing officer
17 work, how often have you been a hearing officer in peer
18 review.
19    A    Only once.
20    Q    Once, okay.  And was that for one of your
21 hospitals you've listed?
22    A    Yes, Southern Regional.
23    Q    All right.  And you were a hearing officer
24 for Southern Regional, and were they also a client of
25 yours at that time?

Page 27

1    A    Of my partner's.
2    Q    Okay.
3    A    Yes.
4    Q    So there was a --
5    A    So, yes, they were.
6    Q    Okay.  And did your partner represent the
7 MEC in that matter?
8    A    No, no.  We wouldn't do that.  That's
9 totally inappropriate.
10    Q    That's not good.
11    A    No.
12    Q    Okay.  How did you come to be the hearing
13 officer in that one?  Did your partner recommend you?
14    A    Yes.  I'm trying to think.  David Winkle,
15 now your former -- or your current partner.
16    Q    I'll just ask David.
17    A    That's right.  David Winkle is like general
18 outside counsel for Southern Regional.
19    Q    And did the physician's counsel or the
20 physician object to the service of a member of a firm
21 that represented the hospital as the hearing officer?
22    A    No, they did not.  But that was made clear
23 to everybody.
24    Q    Sure.  Let's talk about expert witness
25 experience you have, if any.  Since this is your first

Page 28

1 deposition, maybe this is your first expert witness
2 experience.  Have you ever been retained to offer peer
3 review opinions before?
4    A    Yes, one time, for South Georgia Medical
5 Center in Valdosta.
6    Q    Tell me about that.
7    A    And I wasn't deposed.  It was while I was at
8 Epstein, Becker & Green, so it was between 2007 and
9 2010, sometime in that time frame.  David Winkle was
10 the one who put me in touch with the attorney.  He said
11 I've done more peer review hearings than anybody he
12 knows.
13    Q    Okay.
14    A    And I wrote a report.  And I looked for that
15 report, and I don't have a copy of it.  And we
16 submitted it.  And then the matter was -- I believe it
17 was resolved, because we were never deposed and I never
18 had to do anything else.
19    Q    Okay.  So it presumably settled, then, do
20 you think?
21    A    I believe so, I believe so.
22    Q    I guess the other alternative was it was
23 dismissed.  But you don't recall that?
24    A    No, I do not recall that.  All I know is my
25 services were no longer required, that it didn't

Adrienne E Marting 8/12/2011

Page 29

1    proceed to trial.
2        Q    And were you representing -- were you
3    offering opinions -- were you retained by the physician
4    or the hospital in that case to offer opinions, or the
5    hospital's counsel or the physician's counsel?
6        A    I'm hesitating because I believe it was -- I
7    can't think of the name of the attorney, but the
8    hospital's counsel.  It wasn't in-house counsel, it was
9    outside counsel.
10       Q    So you were offering peer review opinions,
11   for lack of a better word, defending the peer review
12   action process at South General -- South Georgia --
13       A    South Georgia Medical Center, I believe is
14   the name of it.
15       Q    Do you remember any of the major issues in
16   that case?
17       A    No.
18       Q    Not a single one?
19       A    And I looked for the report.  And now I'm
20   not even positive that I -- the fact I can't remember
21   anything, I wonder if I even did a report, you know
22   what I mean.  But I remember being asked to do it.  And
23   I don't have a copy of that report because it was at a
24   different firm.
25       Q    Sure, sure.

Page 30

1        A    But I don't know the issues, quite frankly.
2        Q    Fair enough.  Other than your service as an
3    expert witness offering expert opinions for South
4    Georgia Medical Center, any other work that you've had
5    offering expert opinions other than this case?
6        A    To my husband all the time.  No, no.
7        Q    Expert opinions (indicating).
8        A    Right.
9        MR. DAYHUFF:  Does that show up when I do
10   that (indicating)?
11       THE COURT REPORTER:  Sort of.
12       Q    (By Mr. Dayhuff)  So two cases as an expert
13   witness, all right.  Have you ever been retained to
14   offer expert opinions to be used in litigation in other
15   subject matter areas?
16       A    No.
17       Q    Have you ever been qualified as an expert in
18   peer review by any court?
19       A    No.  I've gotten a lot of experts qualified,
20   but I haven't been on the other side.
21       Q    And you've never been qualified in any other
22   subject matter by any court?
23       A    That's correct.
24       Q    We talked about the relevant area for your
25   opinions today being peer review.  Have you published

Page 31

1    any in the peer review field?
2        A    The most recent thing --
3        Q    I didn't see it on your website.
4        A    No.  And I have a list from my old firm.  I
5    mean, I don't have it, but I know it once existed.  I
6    have done a number of client alerts and those type
7    things that were circulated, but I haven't published
8    anything.  Some of my partners write books, but I have
9    not done that.
10       Q    Let me take a look at something here.  One
11   of the things that I'm to get either in writing or from
12   you as an expert witness under the Federal Rules is a
13   list of cases during the previous four years in which
14   you have testified as an expert or by deposition.  And
15   we've got the cases.  You mentioned the one.
16       A    Right.
17       Q    A list of publications authored in the
18   previous ten years, I'd be interested in that.  Will
19   you be able to obtain that?
20       A    I might be.  I mean, specifically related to
21   peer review and that type of thing or any topic, any
22   health care topic?
23       Q    I'll take any topic, I guess.  Obviously,
24   I'm looking more closely at the peer review.
25       A    Uh-huh.  The only thing that's even closely

Page 32

1    related to anything here was the revision, the Joint
2    Commission revision of the bylaws, medical staff
3    bylaws.
4        Q    Maybe that's the way to go.  If I understand
5    your testimony, then, you have published one item that
6    relates to your peer review expertise.  And it is, for
7    the record, tell me again.
8        A    Related to the revision to the bylaws
9    standards, Joint Commission standards.
10       Q    All right.
11       A    MS.01.01.01.  There's points in between
12   there.
13       Q    And, for the record, tell us what the Joint
14   Commission MS.01.01 revision is about.
15       A    Well, it was a big stink.  Did you follow
16   all of that?  Where they said you -- well, let me back
17   up.  Several years ago a lot of hospitals, based on one
18   primary provider, and this is my belief, took their
19   bylaws and broke them out into various policies.  And I
20   think Aiken has the same thing where they have a
21   credentialing policy.  And the Joint Commission came
22   out and said, no, you have to have all the substantive
23   matters in one in your bylaws.  And the American Health
24   lawyers and a bunch of people threw a fit.  And they
25   went around and around a few times.  And they backed

8 (Pages 29 to 32)

Adrienne E Marting 8/12/2011

## Page 33

```
 1    off a little bit and they kind of refined, and so now
 2    it's not as onerous as it once was.  The way it
 3    initially came out, everybody thought they were going
 4    to have to immediately do a massive rewrite of their
 5    bylaws, and now they have softened that somewhat.
 6        Q       And your publication took what angle on
 7    this?
 8        A       The one that I think it was on is when it
 9    first came out and talked about what it was going to
10    do.  Then it changed later somewhat.
11        Q       All right.  And was that in the form of a
12    client alert or an article somewhere or --
13        A       A client alert.
14        Q       A client alert?
15        A       And I was at Epstein, Becker & Green at the
16    time.
17        Q       All right.  Then that should cover your
18    publications that are related, and so don't worry about
19    collecting the others.
20        A       Right.  And just so you know, I've done a
21    couple since I've been here.  One is pending in the
22    Atlanta Hospital News, but they are on other regulatory
23    issues, like home health and --
24        Q       The only thing I'm really interested in is
25    something related to your opinions or on peer review.
```

## Page 34

```
 1        A       Right.
 2        Q       And we've got the statement on the
 3    compensation to be paid.  How much more work on an
 4    hourly basis do you think is left, assuming you don't
 5    have to testify at trial?
 6        MR. DICK:  Do we get to hold her to this?
 7        MR. DAYHUFF:  Yeah.  I'm making you budget
 8        in front of your client.
 9        A       It depends on the extent that a written
10    report is done.
11        Q       (By Mr. Dayhuff)  If a written report is
12    required, there would be several more hours to do that?
13        A       Yes.
14        Q       And if there's not one?
15        A       Then I don't think there would be a lot
16    more.
17        Q       Is it fair to say you're 95 percent through
18    if there's not a written report requirement?
19        A       Well, the only reason I hesitate is I don't
20    know what else will be given to me, you know what I
21    mean?
22        Q       Sure.  Assuming you get nothing else.
23        A       If I get nothing else, yeah, I would say I'm
24    almost finished.
25        Q       Excellent.  Okay, enough of the rules.  You
```

## Page 35

```
 1    mentioned doing a lot of peer review hearings, internal
 2    hearings at hospitals.  What's a lot?  How many have
 3    you done, roughly?
 4        A       Oh, somewhere between 25 and 35.
 5        Q       Wow, you have done a lot.  And I probably
 6    asked you this, but what percent of those were for the
 7    MEC versus physician work?
 8        A       For the hearings -- oh, I forgot one.  No,
 9    that was on the physician side.  Never mind.  I think
10    almost 85 percent on the MEC side.
11        Q       Have you taught in this expert area, that
12    being peer review, anywhere at any time?
13        A       Outside of my firm?  Or, you know, the
14    medical staff, you know, to hospitals, I have.
15        Q       All right.  And you mentioned that to me.
16    So you provide an orientation service to new MEC
17    members? board members? both?
18        A       Both.  Credentialing, MEC, all of those.
19        Q       And is that focused on peer review or is it
20    more broad?
21        A       Peer review and credentialing, the whole
22    process, and following the bylaws.
23        Q       And you've done that a lot over the years?
24        A       A couple of times.
25        Q       Couple of times?
```

## Page 36

```
 1        A       They have used my materials again.
 2        Q       Okay.
 3        A       You know, they don't do it all the time.
 4        Q       All right.  And the materials that you
 5    provide to a board, I imagine you have a set of
 6    materials --
 7        A       Right.
 8        Q       -- that you provide over and over again to
 9    various boards?
10        A       Well, not boards, but it was to the MEC or
11    the -- you know, not MEC, the medical staff is the more
12    correct term.
13        Q       All right.  I would be interested in seeing
14    those --
15        A       Okay.
16        Q       -- at some point.  How voluminous are these?
17        A       There's a notebook that we put together that
18    is (indicating).  And I'll just get it for you.
19        Q       What's its title?
20        A       I don't know.
21        Q       Adrienne's Secrets to the Medical Staff?
22        A       Well, no, because it was combined.  It was
23    the HortySpringer folks, Paul Verardi.  And he went
24    over globally the peer review stuff, and I went over
25    the specifics of this hospital, these bylaws.
```

9 (Pages 33 to 36)

Adrienne E Marting 8/12/2011

Page 37

```
 1      Q     Got you.
 2      A     How to act, how to proceed, things to do.
 3      Q     And the two times you've done this, was it
 4  both times in conjunction with the HortySpringer
 5  attorney?
 6      A     No.
 7      Q     No?  One time on your own, one time with
 8  him?
 9      A     Well, I've just done in-house things with my
10  own associates and stuff.
11      Q     Okay.  You've also taught some peer review
12  concepts to associates?
13      A     Right.
14      Q     Was that like day-to-day teaching with like
15  my associate working with me type stuff or are you
16  talking about formal presentations or what?
17      A     Definite day to day.  And I'm trying to
18  think.  At Powell Goldstein we used to have a lot of
19  more formal.  I'm trying to think if I did one
20  specifically on peer review.  Maybe once.  I've trained
21  a few associates, so ...
22      Q     Do you consider yourself an expert in the
23  field of peer review?
24      A     Yes.  Experiences and seeing a wide, wide,
25  wide variety of things, then yes.  Certainly more than
```

Page 38

```
 1  anybody else I can think of.
 2      Q     And we've walked through some of your
 3  experience.  You've talked to me about your legal work
 4  on behalf of the hospital and physicians.
 5      A     (Witness nods head up and down.)
 6      Q     Is there anything other than your legal work
 7  on behalf of hospitals and physicians that has made you
 8  an expert in peer review?  Sounds like that's what it
 9  is.
10      A     Yeah, yeah, I believe that's correct.
11      Q     Okay.
12      Q     And you did not -- and I don't know if this
13  is important to you, but you asked about the hospitals
14  that I've --
15      Q     Worked for?
16      A     -- worked for on the MEC side.  I didn't
17  know if you wanted the --
18      Q     The hospitals you've worked against?
19      A     Right.
20      Q     Sure, why not.
21      A     I mean, just because it's reviewing
22  different bylaws and procedures.
23      Q     Sure, sure, that's fine.  I would like to
24  know.  That should be a shorter list.
25      A     And I don't know if this is a comprehensive
```

Page 39

```
 1  list.  Well, no, because most of these four main
 2  clients, they're also my CON clients, the ones I gave
 3  you.  I've done numerous hearings for each of them.
 4  The other ones, these are all one-timers.
 5      Q     Got you.
 6      A     Piedmont Fayette Hospital.
 7      Q     And one-timers, you've done a hearing for
 8  them?
 9      A     A hearing, yeah.
10      Q     And it could be on the physician side or --
11      A     No, no.  These are only the physician side.
12      Q     Okay.
13      A     I gave you all of the --
14      Q     Only hospital side?
15      A     No, only physician side.
16      Q     Physician side, okay.
17      A     I gave you the hospitals that I represented
18  the Medical Executive Committee.  You did not ask about
19  the physicians.
20      Q     Good.  Let me have the physicians.
21      A     Just so it's clear.
22      Q     Yeah.
23      A     Piedmont Fayette.  St. Joe's.  And both of
24  these are in Atlanta.  There's a hospital in Kansas
25  that I can't think of the name of.
```

Page 40

```
 1      Q     Good grief, you went all the way out to
 2  Kansas?
 3      A     Southeast Georgia.  And one of the HCA
 4  hospitals in the middle of Georgia off of I-20.  Do you
 5  know what that is?  It's in a little bitty town between
 6  here and there.
 7      Q     Jeff Baxter would have known.
 8      A     Exactly.  All I remember is there was a lot
 9  of bugs on my windshield.  And that may be it.
10      Q     And those four were working for a physician?
11      A     Right.
12      Q     Good.
13      A     And that went all the way through, completed
14  the hearing.
15      Q     All right.  Do you know of any nationally
16  known experts in the peer review field that you would
17  look to and say, hey, that guy or girl is an expert in
18  peer review?
19      A     Not that I could name.  I've read a fair
20  amount of materials, and I see names that are familiar;
21  but I did not read those to prepare for this, so I
22  don't want to list anybody's name.
23      Q     How about Hugh Greeley, have you ever heard
24  of him?
25      A     Oh, yeah.  We have used their bylaws.  I've
```

10 (Pages 37 to 40)

Adrienne E Marting 8/12/2011

Page 41

1    worked with hospitals who have used them.
2        Q    Would you say he's a nationally recognized
3    expert in peer review?
4        A    Yeah, I would say that.
5        Q    All right.
6        A    I also used -- well, that's expert witnesses
7    -- I mean, physicians.  Never mind.  I was going to say
8    I'm familiar with the Allmed folks.  I have had
9    hospitals who have used those before.
10       Q    Allmed for their reviews of medical records?
11       A    Right, right.  But you were thinking more --
12       Q    I was thinking more peer review experts
13   rather than experts on medical issues.
14       A    Exactly.
15       Q    When you represented a physician in those
16   four matters you talked to me about, did you retain a
17   peer review expert?
18       A    No.
19       Q    I guess they were internal hearings?
20       A    No, these were internal hearings, so they
21   weren't in court, no.
22       Q    And you had a couple of court matters?
23       A    Uh-huh.
24       Q    In your couple of court matters, have you
25   ever retained a peer review expert to offer opinions?

Page 42

1        A    I'm thinking, because the one that I'm
2    thinking of that went to litigation went to federal
3    court.  And this was in Macon.  It was a peer review
4    matter that went like four rounds.  And I'm not sure
5    that by the time it got to federal court it was solely
6    on the peer review part of it.  So, no, we did not have
7    a peer review expert.
8        Q    Okay.  And there were two cases, I guess,
9    that made it to court.  Do you remember the names of
10   those cases or any of the parties?
11       A    Yeah.  One was the Medical Center of Central
12   Georgia.  And I know the other one, I know the
13   physician's name, but I had rather not -- well, I guess
14   he filed a lawsuit.  It was Nwosu, N-w-o-s-u, I
15   believe, Dr. Nwosu.
16       Q    And you don't remember the hospital on that
17   one?
18       A    Yeah, Medical Center of Georgia.
19       Q    Oh, okay.  And the other case or --
20       A    I think that one went to court two different
21   times, is what I meant to say.
22       Q    All right.  And when was the last time it
23   was in court?
24       A    That was in the '90s.
25       Q    So a long time ago.

Page 43

1        A    Yeah, a long time ago.  I got better and I
2    kept them out of court.
3        Q    How did that one resolve, unless it's
4    confidential?
5        A    Medical Center won repeatedly.
6        Q    Did you get summary judgment or did it go to
7    trial?
8        A    Summary judgment.
9        Q    Was the summary judgment based on the Health
10   Care Quality Improvement Act?
11       A    No, because by the time it went to court, it
12   was on related contractual issues.
13       Q    Got you.
14       A    And it was a -- there was a preliminary
15   injunction, and then it went up, and then we won on
16   summary judgment.  But it had all started from a peer
17   review.
18       Q    I got you.  And I imagine there are reported
19   opinions on this thing out there; right?
20       A    Should be.
21       Q    If it's gone up and down and back four
22   times.
23       A    Yeah.  It was just at the District Court
24   level.  It didn't go up higher than that.
25       Q    I got you.

Page 44

1        A    And when I say up and down, it started in an
2    interior hearing in the hospital, went up to the board,
3    went back down, went to court, came back, went back to
4    court.  So it was my associate-to-partner litigation.
5        Q    I'll bet, I'll bet.  Did you represent the
6    MEC in that case?
7        A    Yes, yes.
8        Q    Then you also represented the hospital
9    during the case.  Do you remember the main issues in
10   that one that were kicking around?  Was this physician
11   suspended or revoked?
12       A    I don't remember that part of it as much.
13   The controversial part of it was that a new criteria
14   regarding board certification was approved by the Board
15   and the impact that it had.  And so that was -- that
16   went around and around.
17       Q    So really that one doesn't sound like the
18   Health Care Quality Improvement Act would have been an
19   issue?
20       A    Well, it had at the peer review part, at the
21   medical staff part before it went (indicating).  The
22   litigation, it was kind of bifurcated, I guess.  It had
23   an antitrust claim and contractual issues, so far as I
24   remember.
25       Q    Okay.  And I guess I was thinking if it was

11 (Pages 41 to 44)

Adrienne E Marting 8/12/2011

Page 45

1    a change in the bylaws to require board certification
2    or something --
3        A    Yeah.
4        Q    -- that there wouldn't have been -- but it
5    sounds like there must have been a quality of care
6    issue swirling around that resulted in a peer review
7    action internally at the hospital?
8        A    Yes, yes.
9        Q    So there were a couple of -- that change in
10   the bylaws issue was coupled with kind of a traditional
11   peer review issue?
12       A    That's correct.
13       Q    Okay.
14       A    Best of my recollection.
15       Q    And how was the traditional peer review
16   issue resolved?  Was it settled?  Was HCQIA applied to
17   end that part of the case, or do you recall?  And I
18   can, obviously, look it up, I know.
19       A    And, I'm sorry, I'm trying to remember and
20   state it accurately.  To the extent there was peer
21   review involved, I mean, it was just applied and how we
22   apply it in every hearing.  I don't know that it was
23   litigated separately, you know.
24       Q    Okay.
25       A    And I'm kind of fuzzy on those details.

Page 46

1        Q    That's fine.  I'll look it up.  Are there
2    principles and methods -- well, are there principles
3    that are applied by you in this expert field?
4        A    Yes.
5        Q    What are those principles?
6        A    Well, the way I proceed is first I read the
7    bylaws.  Then I take another quick look at the Health
8    Care Quality Improvement Act again.  And I look at the
9    decisions.
10       Q    Decisions of the peer review body?
11       A    Right.
12       Q    Okay.
13       A    Just to get -- because that's kind of a
14   summary of how it got to where it was.
15       Q    Sure.
16       A    And then the correspondence that led up to
17   it.  And then, most importantly, the hearing
18   transcripts, how it proceeded.
19       Q    So those are the keys, the decision of the
20   body, the correspondence, and the hearing transcripts
21   are the key elements of the peer review action that you
22   analyze?
23       A    Well, that's how I start.
24       Q    Okay.
25       A    But like in this one, I think some of the

Page 47

1    information that also bolsters my opinion are the
2    emails, the -- well, all of the exhibits to the
3    hearing.  Obviously, that went in with the transcripts.
4        Q    Got you.
5        A    And the subsequent depositions that I have
6    read.
7        Q    And we'll hit everything that's important to
8    you in this case.  Let me step back.  When I asked you
9    the question a little inartfully about principles, I
10   think the first two got at what I was getting at.  Are
11   there standards that you're applying to the peer review
12   action that you're looking at when you're analyzing --
13       A    I see what you mean now.
14       Q    And you mentioned the bylaws.
15       A    The bylaws and the Health Care Quality
16   Improvement Act.
17       Q    Any other standards that you would look to
18   to see whether the peer review action complied with?
19       A    More of my understanding of case law on
20   what's considered a fair hearing.
21       Q    And in that case law about what's a fair
22   hearing and what's not, what is the standard or
23   principle that those cases are applying?
24       A    Well, they're applying the Health Care
25   Quality Improvement Act.

Page 48

1        Q    Anything else?
2        A    No.
3        Q    I just want to kind of understand the
4    measuring stick that you're using.
5        A    Right, right.
6        Q    Okay.  What is the purpose of the peer
7    review system in your opinion?
8        A    To ensure that -- to improve quality of care
9    and to allow physicians to openly review each other and
10   the hospitals to act accordingly.
11       Q    And I understand the first two.  I don't
12   understand the last one.
13       A    Well, it goes up through the hospital and
14   the hospital has to, you know, help with the whole
15   process of peer review.  You know, have the hearing, it
16   goes up to the Board, and the Board is the one who is
17   ultimately responsible.
18       Q    Got you.  What is the purpose of the Health
19   Care Quality Improvement Act?
20       A    To, as I see it, to provide immunity to peer
21   review participants so that physicians will monitor
22   each other without fear of liability.  Everybody can be
23   sued, but the issue of liability.
24       Q    Yes, they can.  The purpose of the Health
25   Care Quality Improvement Act is to immunize peer

12 (Pages 45 to 48)

## Page 49

```
 1    reviewers that participate --
 2         A    And the -- I'm sorry.
 3         Q    Go ahead.
 4         A    The reporting part of it too.
 5         Q    And that's the National Practitioner Data
 6    Bank element?
 7         A    That's correct.
 8         Q    Which we'll refer to as the NPDB; is that
 9    okay?
10         A    That's correct.
11         Q    What's the purpose of the NPDB component of
12    the Health Care Quality Improvement Act?
13         A    It's so other hospitals and entities in
14    state or out of state can review a physician's
15    background if there's been any corrective action.  And
16    the problem with it, it was a good idea, but the
17    problem with it is hospitals -- and this is my opinion.
18         Q    That's what we're here for.
19         A    Is that instead of just working towards
20    improving quality of care, it's so damaging to a
21    physician's practice that it's kind of lost its value,
22    you know.  Well, maybe not lost its value if somebody
23    is really, really horrible and they've been kicked off
24    multiple staffs after a fair hearing.  That might be
25    something you would want to know.  But politics and
```

## Page 50

```
 1    hospitals and things often cause problems and other
 2    reasons to have somebody take action against somebody.
 3    And it can be more damaging.
 4         Say, you know, a lot of times peer review,
 5    I've had cases where they have gone up and this one
 6    physician was using a new procedure, and the
 7    physicians on the hospital were like, well, we've never
 8    seen this, so he must be outside the standard of care.
 9    And throughout the hearing process they had more
10    experts come in and testify.  And the MEC learned
11    things, the physician learned things, how to better
12    document so his cases won't be thrown out.
13         Q    Uh-huh.
14         A    So, you know, that's the goal of HCQIA and
15    the whole peer review process, is to improve the
16    quality of care.  What it's turned into is damaging
17    physician's care way above what it was originally
18    intended to do.
19         Q    All right.  And you mentioned that the NPDB
20    has damaged physicians more than it was intended to do.
21    Sounds like you also have a similar opinion with
22    respect to HCQIA or not?  Does your opinion carry over
23    into HCQIA, into other parts of HCQIA?
24         A    No, no.  I think HCQIA is very important.
25    Without it, we wouldn't have physicians monitoring
```

## Page 51

```
 1    physicians, and that's of utmost importance.  I think
 2    it's -- really, I have no qualms with that.
 3         I don't have any problem with the National
 4    Practitioner Data Bank.  I think it's a good principle.
 5    What I have some issue with is how it's being used.
 6    Instead of saying, yeah, this physician had an issue
 7    and we should dig into it before we credential that
 8    physician, it's almost that a lot of hospitals say that
 9    if you have anything, we're not going to even look at
10    you.  And that kind of goes against the whole point,
11    because then people or hospitals won't take action.
12    And physicians, when you have them on your panels,
13    often think, you know, the first question they ask is
14    is this reportable to the Data Bank.
15         Q    Sure, sure.  And let me push that just a
16    little bit further.  Would you advocate for reform of
17    the current NPDB system?  It sounds like --
18         A    No, no.
19         Q    Sounds like you're really more concerned
20    with how people are using it rather than the
21    legislation itself?
22         A    That's exactly right.  I have no problem
23    with the legislation.  I just -- it concerns me that
24    the whole point behind it, to improve quality of care,
25    isn't getting the benefit of what was intended.
```

## Page 52

```
 1         Q    Got you.  All right.  I'm about to ask you
 2    about your actual opinions in this case.  And I'm going
 3    to get myself some water or coffee, so do you guys want
 4    to take a few minutes?
 5         A    Yes, sure.
 6         MR. DICK:  Let's go back on the record.
 7         (Whereupon, a recess was taken from
 8         approximately 3:05 P.M. until 3:15 P.M.)
 9         MR. DAYHUFF:  Let's go back on the record.
10         Q    (By Mr. Dayhuff)  Okay.  I think the easiest
11    way to do this would be for you to give me a general
12    kind of bullet point list of your opinions without a
13    whole lot of detail the first time through, and then I
14    can go back.  Then I will get an understanding of what
15    I have to deal with.
16         A    Okay.  I was wondering how we were going to
17    do this.  Okay.
18         Q    So give me a bullet point listing of the
19    opinions you plan to offer at the trial of this case.
20    Let's go.
21         A    I'm trying to be concise.  It is my opinion
22    after reviewing all of the materials and with my
23    understanding and experience in peer review matters
24    that Dr. Muniz did not obtain a fair hearing, that
25    there were procedural flaws and indications, strong
```

Adrienne E Marting 8/12/2011

Page 53

1    indications of bias early on and throughout the
2    hearing. And just from my experience being on both
3    sides, you know, for the MEC and individual physicians,
4    to me it looks like the decision was made to get rid of
5    this doctor and they weren't going to stop until she
6    was gone.
7         And that's -- I did not look at very much of
8    the original hearing. I think I may have read the
9    decision.
10        THE WITNESS: Did you give me that?
11   A    (Continuing) I know there was a -- you
12   know, the correspondence in here talks about it in the
13   hearing exhibits. But from that point on, I think it
14   was clear that they didn't want this physician here and
15   it really didn't matter what the facts were.
16   Q    All right. It sounds like, then, two main
17   opinion areas, if you will, the first one being there
18   wasn't a fair hearing because of procedural flaws and
19   bias; and, part two, that you have an opinion that this
20   -- that there was a decision made to get rid of her.
21   And I don't know how to describe that.
22   A    Regardless of the facts, a predetermined
23   decision.
24   Q    Regardless of the facts, okay.
25   A    You're supposed to have an investigation and

Page 54

1    a recommendation and a hearing on that recommendation
2    to further flesh out the facts.
3    Q    Is that fair, that those are the two areas
4    we need to discuss? And I know there will be lots of
5    little subparts, I assume, in the first and maybe in
6    the second.
7    A    Yeah. And if you look at the evidence, the
8    actual evidence, the weight of the evidence, I believe
9    the reasonable conclusion is that the recommendation
10   was arbitrary and capricious.
11   Q    The 2010 recommendation?
12   A    Yes.
13   Q    And that's the MEC's recommendation, the
14   Board recommendation?
15   A    The MEC's. And didn't the hearing panel
16   just adopt it? I will have to look at that again to be
17   sure.
18   Q    Okay.
19   A    Yeah, the final decision to terminate her
20   privileges.
21   Q    And, obviously, for each opinion you're
22   going to offer any subopinion that flows from the main
23   opinion. And I want to know what evidence supports
24   that opinion, some of the stuff that you've looked at,
25   experiences you have had, whatever.

Page 55

1    A    Okay.
2    Q    So that's kind of the way I will go about
3    that. So let's start with the opinion that the fair
4    hearing was not fair, it had procedural flaws. Why
5    don't you list the procedural flaws that you believe
6    affected the hearing.
7    A    I believe the notice was faulty.
8    Q    And, I'm sorry, for the record, we have had
9    two fair hearings involving Dr. Muniz.
10   A    And all of this is the second hearing.
11   Q    2010?
12   A    2010.
13   Q    Maybe this will shortcut things. Are you
14   going to offer any opinions at all about the 2009 fair
15   hearing?
16   A    Can I consult with my counsel? I don't
17   think so, but I don't want to -- you know, I don't know
18   how much --
19        MR. DICK: I mean, I think, you know, we
20   addressed that in the Complaint in not nearly as
21   much depth as the 2010. I think there were still
22   some issues.
23        THE WITNESS: More the result.
24        MR. DICK: I mean, it flows over a little
25   bit just in maybe more the result and its use in

Page 56

1    the 2010. You know, it's --
2        MR. DAYHUFF: Well, let me ask her this
3    question then.
4    Q    (By Mr. Dayhuff) It doesn't sound like you
5    have engaged in any detailed or thorough analysis of
6    the process in 2009; is that accurate?
7    A    That's correct.
8    Q    The peer review process.
9    A    Right. I've only seen the decision of the
10   MEC, I believe, and then how it was modified by the
11   Board.
12   Q    Okay.
13   A    Okay. So that's the extent I would opine on
14   anything on that.
15   Q    Okay. And the 2010 peer review process
16   you've looked at with a little more care and
17   thoroughness?
18   A    Exactly. I've read the transcripts and
19   looked at all the exhibits and read depositions about
20   the people who participated, so ...
21   Q    All right. Do you have any opinions about
22   alleged procedural flaws in the 2009 peer review
23   process?
24   A    I have not really focused on that. That's
25   why I'm thinking.

14 (Pages 53 to 56)

## Page 57

1    Q    I understand the idea that you're going to
2  -- that you have looked at the result.
3    A    Right.
4    Q    And I understand the idea that you've
5  analyzed with some care the process in 2010.
6    A    (Witness nods head up and down.)
7    Q    It would seem to me that if you have not
8  analyzed with some care the process of 2009, you do not
9  have any, could not have any opinions about the 2009
10 process.  And we can certainly talk about the result, I
11 guess, if you want.
12    A    Right.  And I guess it's where do we draw
13 the line?  I don't want to forego talking about
14 anything.  The concern there, I believe, was that the
15 Board took a different tack.  You know, the MEC, after
16 the full-blown hearing, they looked at the cases and
17 said there wasn't credible evidence to support the
18 recommendation of termination of her privileges.
19    Q    Okay.
20    A    Okay.  Then the Board, it went up the
21 appellate review to the Board, and the Board said,
22 yeah, but she's disruptive and let's get her a psych
23 evaluation.
24    Q    Okay.
25    A    Then when that psych evaluation came back

## Page 58

1  favorable, no one from the hospital provided that to
2  her even though that was part of the process.  And as I
3  understand it, there was objection to all of that.  But
4  then she relented and said, fine, I will just go get
5  the evaluation done.  And she came out fine.
6    Q    Okay.  So that's your understanding of the
7  facts of 2009?
8    A    Right.
9    Q    Do you have any opinions you want to offer
10 me that you're going to offer at trial regarding that
11 process?  And you don't have to have opinions regarding
12 that process, but I just want to make sure that I'm not
13 surprised by --
14    A    Right, right.
15    Q    -- you saying to me, for example, well, the
16 notice in 2009 was an issue or, you know, the way they
17 cross-examined somebody.
18    A    No, not at the actual trial, the hearing
19 part of it, no, because I have not analyzed that.  I
20 have not read the transcripts.  And the only reason I
21 hedge a little bit is the fact that there was found to
22 be no credible evidence and then the Board took a
23 completely different tack.  I think that starts off the
24 -- you know, that by itself wouldn't be a problem; but
25 if you look at all of the evidence in total, it shows a

## Page 59

1  bias and a determination to get rid of this person.
2    Q    Which you think manifested itself in 2010,
3  what happened in 2010?
4    A    That's right.  I think it started there,
5  yes.
6    Q    All right.  So it sounds to me, then, to the
7  extent you have -- well, it's really not an expert
8  opinion, but it's the 2009 matter is evidence, the
9  result of the 2009 matter is evidence that you will
10 cite to for your opinion that the 2010 peer review
11 process was motivated by something other than quality
12 of care and appropriate peer review considerations; is
13 that fair?
14    A    I like that.
15    Q    Sounded good, didn't it?
16    A    Write that down.  That's exactly right.
17    Q    So, then, in other words, there are no
18 expert opinions, expert peer review opinions, about the
19 2009 peer review process that you are prepared to offer
20 me today?
21    A    I don't think --
22         THE WITNESS:  Can you read that back?
23         Can I ask her to do that?
24         MR. DAYHUFF:  I'll just ask it again.
25    Q    (By Mr. Dayhuff)  You have no expert peer

## Page 60

1  review opinions about the 2009 peer review process at
2  my hospital that you're going to offer at trial?
3    A    Not more than what I have stated.
4    Q    Okay.  And what you've stated to me that I
5  restated for you is that you looked to the result of
6  2009 as some evidence of animous or evidence of
7  improper motivation that then manifested itself through
8  the 2010 peer review?  Is that a fair characterization?
9    A    That I'm willing or ready or prepared to
10 give an opinion on now.  And the only reason I cloud
11 that up a little bit is that I know that there were
12 some issues that making -- asking Dr. Muniz to submit
13 to a psych evaluation was inappropriate, but then they
14 said, okay, we'll do that.  So I don't want you to
15 think that I think that that was fully appropriate or
16 that I'm making an opinion on that one way or another.
17 Okay?
18    Q    Okay.
19    A    But what you stated was for the purposes of
20 this case, talking about the 2010 hearing, I'll use the
21 result of the 2008 hearing or '9.
22    Q    And all I'm trying to do today is understand
23 what opinions you're going to offer at trial.
24    A    Right, right.
25    Q    So to the extent you're going to offer an

Adrienne E Marting 8/12/2011

Page 61

```
 1   opinion about the psych evaluation and the
 2   appropriateness thereof and whatever, I need to hear
 3   about that today.  If you're not, that's fine.
 4       A    I don't think I will.
 5       Q    Good.
 6       A    I didn't want you to take my answer as there
 7   are no problems with the first hearing.
 8       Q    Understood.  And you don't know because you
 9   haven't analyzed it thoroughly; is that correct?
10       A    That's fair.
11       Q    Excellent.  There goes 2009.
12       MR. DICK:  Well, I wouldn't say that.
13       Q    (By Mr. Dayhuff)  And we'll talk about how
14   you used the results.
15       A    (Witness nods head up and down.)
16       Q    Let's get into your critique, your
17   criticisms, your opinions regarding the 2010 process
18   and why it was procedurally flawed.  Let's go there.
19       A    I believe the notice was inappropriate.
20       Q    That's right, we started with the notice and
21   then jumped back to 2009.  Okay, the notice is
22   inappropriate.  Anything else?  And I'll analyze that
23   in more detail in a minute.
24       A    Yes.  The hearing officer, I believe,
25   grossly overstepped his bounds.  I think he may have
```

Page 62

```
 1   been confused in what his role was, frankly.
 2       Q    All right.  Problem with the hearing
 3   officer, the notice, and anything else?
 4       A    With the hearing officer there is some
 5   subparts in that to the extent that he cross-examined
 6   witnesses as if he were the attorney for the MEC.
 7       Q    Okay.
 8       A    The extent he had ex parte communications
 9   with the MEC's counsel.  And I know that, you know,
10   it's normal to talk to the medical staff officer to
11   coordinate with the panel, you know, and get this draft
12   to them, but not to talk to one party, one attorney for
13   one party and not the other at the same time.  I just
14   think that's grossly inappropriate.
15       Q    Okay.
16       A    And it shows either ignorance of the process
17   or bias.
18           Then allowing witnesses to testify, allowing
19   the mother to testify without notice.  It's not like
20   they didn't know the mother existed.  They could have
21   had her on the list well in advance.
22           The extent that you had individuals who were
23   both Dr. Muniz's competitors taking an active role in
24   both the prosecution of the case and then voting on the
25   ultimate decision of the case or participating in the
```

Page 63

```
 1   deliberations thereof.
 2       Q    Okay.
 3       A    Another concern that shows bias, the
 4   unfairness of the process, is the lack of any attempt
 5   to make any -- to take any intermediate actions.  These
 6   bylaws include -- and I know it's not mandatory -- but
 7   they specifically include collegial intervention.  They
 8   also -- you know, there's a number of steps that can be
 9   taken prior to the harshest step of precautionary -- or
10   summary suspension, is what it turned out to be,
11   meaning she lost her privileges even before the hearing
12   process was completed after they had gotten reports
13   from experts that were favorable.
14       Q    Okay.
15       A    If the true intent was to rehabilitate this
16   physician, they were a number of steps that could have
17   been taken.  Send her off for additional training, have
18   her monitored, have her, you know, even voluntarily, a
19   consultation, which would be reportable, but it's less
20   than losing her livelihood.  Additional education,
21   proctoring, reprimand, or all sorts of intermediate
22   steps.  And none of those appeared to be considered.
23       Q    Okay.  Anything else?  And we're talking
24   about --
25       A    Procedurally, yeah.
```

Page 64

```
 1       Q    -- why this hearing wasn't fair.
 2       A    Then if you just objectively look at the
 3   evidence, the hospital's Medical Executive Committee's
 4   witnesses, basically the summary suspension was brought
 5   on one case.  And I had the number for it, but the one
 6   case with the fetal demise.  And the experts for the
 7   Medical Executive Committee, if you look at their
 8   testimony in a whole, none of them really had a problem
 9   with her, Dr. Muniz's, doing an ultrasound before she
10   took any action.  Some of them said, well, maybe I
11   wouldn't and maybe I would, some said I would have done
12   sooner rather than later, but every single one of them
13   opined that it was a complex case and that it was
14   really a judgment call.
15           The testimony throughout, and even in the
16   decision, I believe, they say there is a two-hour
17   delay.  That's their mantra all throughout.  And the
18   evidence is really clear there was not a two-hour
19   delay.  The lady was in the hospital for about two
20   hours by the time she came in and then the delivery,
21   but it wasn't two hours of delay between getting the
22   C-section.
23           And we can go into more detail, and I will
24   think of them as we go, but that's the high points.
25       Q    Okay.  So I've got the notice, and we'll
```

16 (Pages 61 to 64)

Adrienne E Marting 8/12/2011

Page 65

1    pull out the notice and look at it; the hearing officer
2    overstepped his bounds; the mother testifying, the
3    competitors acting as prosecutors and voting and/or
4    deliberating; a lack of actions short of suspension,
5    intermediate actions.  And I've got --
6        A    Oh, sorry.  Well, go ahead.
7        Q    Did we miss one?
8        A    Yes.  With respect to -- with respect to the
9    hearing officer's misdeeds, it appears from the record
10   that the hearing officer rewrote, corrected the
11   decision of the hearing panel, and then circulated it
12   to the panel members instead of vice versa.  And we can
13   talk about that also.  And how you can make a decision
14   harsher than it originally was when you change the
15   burden of proof in a way that's more favorable to the
16   affected physician, I don't understand.
17       Q    All right.  Let's start with the first one,
18   with the notice.
19       A    Sure.
20       Q    And I'm sure I've got a notice somewhere.
21   Let's see.  Now, in 2010, there is a March 16th, 2010
22   Notice of Adverse Recommendation/Right to Request a
23   Hearing.  Then there's a subsequent notice that comes
24   out and provides more detail and a list of witnesses.
25   Which notice are we talking about.  Both?  Either?

Page 66

1        A    Well, I think it's important to look at them
2    all in total.
3        Q    Then let's mark them.  I will pull out one
4    of each.
5        A    The precautionary suspension, the notice of
6    adverse action, and then the notice of hearing.
7        Q    And do you have problems with the Notice of
8    Precautionary Suspension?
9        A    No.  Actually, that's what was open in my
10   notebook.  Let me see.
11       Q    Where should I start to understand your
12   opinions.  March 16th?
13       A    Well, no, I think to understand it all you
14   do need the February 25th, which is the Notice of
15   Precautionary Suspension.
16           MR. DAYHUFF:  Would you mark this, please.
17               (Whereupon, Defendant's Exhibit
                      No. 4 was marked for
18                    identification.)
19       Q    (By Mr. Dayhuff)  And I know you have got
20   your own little set.  And does your set you're looking
21   at --
22       A    It matches.
23       Q    -- match?
24       A    Perfectly.
25       Q    All right.  What, if anything, in this

Page 67

1    letter, this notice of suspension, do you find fault
2    with?
3        A    I don't find fault with this particular
4    notice or -- well, it is a Notice of Precautionary
5    Suspension.  Why I say it's relevant to why the notice
6    overall for this hearing was faulty is that it's real
7    clear that what prompted this second peer review
8    action, the 2010 peer review action, was the case
9    that's listed in here, the 227589 case, one case.
10       Q    Okay.
11       A    Nothing else is discussed.  And let's see.
12   The verbiage that they used, you gave inappropriate
13   medication, treatment was delayed for two hours, that's
14   completely contrary to the facts.  And they had the
15   chart with them, and they could have looked at the
16   chart ahead of time.  And I know this is early on.  But
17   failed to recognize an emergent situation is factually
18   incorrect.  But if you look at this, it's based on one,
19   on this case.
20       Q    So there's nothing technically wrong with
21   the Notice of Precautionary Suspension dated February
22   25, 2010?
23       A    I don't believe so, no.
24       Q    All right.  So it comports with the bylaws
25   of the Medical Center and the Health Care Quality

Page 68

1    Improvement Act and any other standards you would use
2    to measure it by?
3        A    I believe that's correct.
4        Q    Okay.  Let's move on to --
5        A    March 16th.
6        Q    I have it somewhere.  Just a minute.
7        A    Do you want mine?  I have a copy.  I think I
8    have two copies.
9        Q    If you do, that will be helpful.
10       A    Just to move things along.
11       Q    Well, I've got it.  I'm sorry.  It's right
12   in front of me.
13       A    Okay.
14               (Whereupon, Defendant's Exhibit
                      No. 5 was marked for
15                    identification.)
16       Q    (By Mr. Dayhuff)  Let's move on to March 16,
17   2010.  And my first question is is there anything
18   technically insufficient about the March 16, 2010
19   Notice of Adverse Recommendation.  And when I say
20   technically insufficient, is there anything wrong with
21   it with respect to compliance with the bylaws or any
22   other standard you would use in measuring this notice?
23       A    No.  But I just want to note that the
24   grounds listed are the exact same ones that were --
25       Q    That were in the Notice of Precautionary

www.compuscripts.com

1  Suspension?
2      A    Yeah.  Actually, where are they?
3      Q    In the third paragraph?
4      A    No.  Yeah, you're right, I'm sorry.  I was
5  skipping over that going where in the heck is it.  Yes.
6      Q    And I want to make sure I understand the
7  opinion you offered about the -- I mean, I understand
8  that they mention one case in the first notice.  You
9  dispute, it sounds like, the facts of what they're
10  saying in the notice, sounds like?
11     A    Yes.  I don't think that's necessarily a
12  procedural issue, to answer your question.
13     Q    I understand.  It's a separate question.
14     A    But having read the transcript, I can't help
15  but note that that's just flat wrong.
16     Q    All right.  This is my question.  An opinion
17  about whether or not this complies with the bylaws
18  would be an opinion I guess you would offer as a peer
19  review expert because you've studied bylaws and looked
20  at these notices over the years.
21     A    (Witness nods head up and down.)
22     Q    Can you give an expert opinion as to whether
23  or not facts are accurately portrayed in the notice,
24  that they match up with the evidence that was adduced
25  at trial?  Is that an expert peer review opinion?

1      A    I believe so.
2      Q    Okay.  Well, what standard --
3      A    I think it's within my capabilities, you
4  know.
5      Q    That's almost like, well, that would be
6  within my capabilities or David's capabilities, would
7  it not?
8      A    Right, right.
9      Q    To review a notice and say, okay, well, in
10  my opinion the notice doesn't properly encapsulate or
11  represent the facts of what occurred as represented by
12  this transcript, any person could make that opinion,
13  could they not?
14     A    If they could read, yeah.
15     Q    If they could read, okay.
16     A    And understand the material.
17     Q    Okay.  But not everybody -- well, forget it.
18     A    Yeah.
19     Q    Okay, I understand.
20     A    We got each other's point.
21     Q    Good.  Anything else we need to discuss
22  about this notice?  I asked you if it complied with the
23  bylaws, and we went through that.  You told me that
24  you've got an issue with the description and whether or
25  not that accurately reflects what was found at the

1  hearing.
2      A    Uh-huh.  Or actually that was known prior to
3  the hearing.
4      Q    Okay.  How do you know what they knew prior
5  to the hearing?
6      A    Because before they issued this letter,
7  Dr. Minto and Dr. Besson had reviewed the charts, I
8  believe.
9      Q    Have you reviewed the charts?
10     A    To the extent that they're in here, yes.
11  And by "in here," I mean the hearing notebook.
12     Q    And I don't remember.  Are they in there?
13     A    Excerpts of them are, the fetal strip and
14  nurse's notes, progress notes.
15     Q    And you reviewed that medical record?
16     A    I did.
17     Q    All right.
18     A    That's in this notebook, just to be clear.
19     Q    That's in that notebook, right.  And the
20  primary factual flaws that you found were what with the
21  description that is in both of those letters?
22     A    The fact that there was a two-hour delay.
23     Q    Okay.
24     A    That she failed to recognize -- and let me
25  get the verbiage exactly -- to recognize an emergent

1  situation.
2      Q    So those are the two factual errors?
3      A    The two-hour one is the one that anybody on
4  the street, I think, reading the documentation would
5  know that that's flawed.  And they harped on that
6  throughout the entire hearing even after testimony
7  after testimony showed that that wasn't factually
8  correct.
9      Q    What is factually correct with respect to
10  the delay?  What did the record show?  How long was the
11  delay?  Or was there a delay?
12     A    Well, there wasn't a delay, one.
13     Q    No delay?
14     A    No delay.
15     Q    And that comes from your review of the
16  medical record?
17     A    Right.  And, well --
18     Q    And the failure to recognize an emergent
19  situation?
20     A    Can I go back to the first one, just to be
21  factually correct, because I think I know where you're
22  going.
23     Q    Sure.
24     A    To the extent that Dr. Muniz was involved,
25  from the time that she heard about the patient to

## Page 73

1  calling the C-section was less than two hours.  To the
2  extent she had anything to do with this patient was
3  less than two hours.  So it's factually incorrect by a
4  completely objective standard that there was a two-hour
5  delay.  You can't delay on something that you're not
6  involved with.  Plus, there is medical evidence on the
7  whole delay issue that's, you know, for the experts
8  more to handle.
9      Q.     Sure.  And you're not offering any medical
10  opinions, are you?
11      A.     No.  I don't think my medical technology
12  degree would --
13      Q.     Excellent, because that would keep us here
14  longer.
15      A.     I was accredited by the American Society of
16  Clinical Pathologists, but I don't think that will do
17  it.
18      Q.     What portion of the medical record, if any,
19  convinces you there was no delay?
20      A.     The timing of when the results of the
21  ultrasound were found and the C-section was called.
22      Q.     So there's a report in there you reviewed
23  that shows the time at which the ultrasound report came
24  back?
25      A.     Uh-huh.

## Page 74

1      Q.     And there's --
2      A.     Documentation.  I mean, there's the progress
3  notes, there's a list, you know, the computerized list
4  of notes, and the nurse's notes that have specific
5  times listed.
6      Q.     And then what reflects the time she began
7  the C-section, her notes?  Some progress notes?  What?
8      A.     There's several.  I don't know if the op
9  report is in there, but there's notes regarding that.
10  And the testimony in the hearing.
11      Q.     Well, we're talking about beforehand.
12      A.     Prior to that, right.  I'm not sure what
13  this page is called, but it's Bates stamped No. 00384,
14  it talks about when the baby was delivered.
15      Q.     Uh-huh.
16      A.     And there's numerous pages that talk about
17  -- let me flip to tem.  I don't have them all tagged.
18  Mostly what I did was match the page cited from the
19  chart to the testimony of whoever was testifying about
20  it.  And they looked at progress notes.
21      Q.     So you went through the fair hearing
22  transcript and matched up the notes, progress notes,
23  with the testimony?
24      A.     Not on every single one, but yes, on the --
25  on mostly when it cited to the chart, I wanted to see

## Page 75

1  how it was reflected.
2      Q.     And we got to this a little bit when you
3  were discussing the facts, and I think you said
4  something along the lines of, well, you know, we don't
5  -- the people that are putting together these notices
6  don't know all the facts that are ultimately going to
7  be elicited at the hearing.  Isn't that true?
8      A.     That's true.
9      Q.     And I imagine you have had many occasions in
10  peer review hearings where there are portions of a
11  description that turn out later to be different when
12  you have a full hearing about it; right?
13      A.     Yes.  But the topic is noticed.  If you have
14  a fault with this case, you tell them you have a fault
15  with this case or how you handled this particular
16  aspect of the case.
17      Q.     And that's what they did; right?
18      A.     That's what they said in this notice.  But
19  if the physicians who -- and wasn't it Dr. Minto who
20  wrote the -- I'm not sure who wrote the precautionary
21  suspension letter.
22      Q.     Dr. Minto signed the precautionary
23  suspension letter.
24      A.     She was one of the chart reviewers.  She, of
25  all people, should have known there wasn't a two-hour

## Page 76

1  delay.  You know, a lot of times there's a medical
2  staff or, you know, a group body that does it.  She was
3  the actual reviewer.  She reviewed the chart and put in
4  facts that are patently false.  And that's just -- I
5  don't know if it was just sloppy or, you know, she
6  didn't look at it or she didn't care, but it was
7  factually incorrect.  And I think that's inappropriate.
8      Q.     All right.
9      A.     Because she had the ability to -- and I
10  understand your point about not all the facts are known
11  at this early stage of the process.  But those facts
12  were known to the author of the letter.
13      Q.     All right.  Let me go back to my notice
14  section.  Anything else about the notice we need to
15  talk about or the notices we need to talk about?
16      A.     Yeah.  I mean, we didn't get to the one
17  where it's flawed.
18      Q.     Then let's get to the one where it's flawed.
19  Is that the next one?
20      A.     Yeah, the notice of the right to a hearing.
21      Q.     And I've got that here.
22      A.     Now, this is Notice of Adverse
23  Recommendation, and then there should be one subsequent
24  to this that is the notice of the hearing.
25      Q.     All right.  Is that the one that has a

Adrienne E Marting 8/12/2011

Page 77

1  received stamp on it of May 4th, 2010?
2      A    Probably should be.
3      Q    And I'll show it to you (indicating).  Is
4  that the one?
5      A    Yeah.  But they don't date it, no.  Is this
6  it?
7      Q    Presumably it would be in your book and you
8  could match it up.
9      A    Right.  I just want to make sure.  There's a
10 lot of documents similar.  Yeah, this is it.
11     Q    So let's mark that, and I will give it back
12 to you.
13     A    Okay.
14          MR. DAYHUFF:  And would you mark that as our
15 next exhibit, please.
16               (Whereupon, Defendant's Exhibit
               No. 6 was marked for
17               identification.)
18     Q    (By Mr. Dayhuff)  And let's start with the
19 same question I asked about the others.  Is there
20 anything technically wrong with the notice, the undated
21 notice, but which has a received stamp of May 4th,
22 2010, from the McNair Law Firm?  It is Re'd Notice of
23 Hearing.  Is there anything technically wrong with that
24 notice in your opinion?
25     A    Yes.

Page 78

1      Q    Tell me what's wrong.
2      A    In the second paragraph and the indented
3  paragraph following that.
4      Q    All right.
5      A    They claim that the MEC decision or
6  recommendation was based on the following.  And they
7  used the same information, the case that brought this
8  up.  And we won't go into the factual issues regarding
9  that.
10     Q    We talked about that, okay.
11     A    Where is it?  I'm sorry.  Oh, here it is.
12 And then the next paragraph, the Medical Staff
13 Executive Committee, the recommendation is further
14 based upon your history, including the prior peer
15 review proceeding in which the Board of Governors
16 required that you submit to an evaluation, and
17 treatment if needed.
18     Q    Okay.
19     A    Okay.  And --
20     Q    I see those two paragraphs.
21     A    And then the rest of that.  That paragraph,
22 that adding on had nothing to do with -- well, two
23 things I have.  I think they were adding on, well,
24 let's get in everything, things that do not pertain to
25 this particular matter.  It's clear, and even

Page 79

1  Dr. DiBona's opening statement in the hearing says that
2  the case that brought us here is the 227589 case, you
3  know, that case.  He doesn't go into any of these
4  additional issues that are now added on here.
5          More importantly is to base a recommendation
6  to terminate a physician's privileges on the fact that
7  she got a favorable psych evaluation goes against
8  everything that HCQIA stands for, fairness and fair
9  play.  It's nonsensical.
10     Q    Okay.  What does -- and I'm trying to
11 understand.  And I understand your position, I guess,
12 that on the facts you don't think it's appropriate to
13 -- well, strike that and let me ask you this.
14     A    Yeah.
15     Q    It would seem to me not to be a problem when
16 you have a peer review action to -- it's not done in a
17 vacuum and that the physician's prior history of peer
18 review scrapes, problems, is able to be considered if
19 it's noticed in the next action.  Is that not your
20 opinion?
21     A    The fact that there was one, and the fact
22 that she was on hundred-percent monitoring, I don't
23 have any problem with that.  But to bring up that she
24 was required to get a psych evaluation, to list that as
25 grounds when the fact was she had a psych evaluation

Page 80

1  and it came back perfectly clear, that to me stinks.
2      Q    Okay.
3      A    Okay.
4      Q    So it's a little more limited than what I
5  first understood.
6      A    Well, can I add on something too?
7      Q    Sure.
8      A    Because I know if you just look at -- and
9  your word "vacuum" was helpful -- at this notice
10 completely by itself, there's no big glaring issues
11 that I see.  You know, it lists all the witnesses and
12 the panel members and all of that stuff it's supposed
13 to.
14     Q    In fact, it complies with what HCQIA would
15 expect for notice?
16     A    However --
17     Q    Is that a yes?
18     A    I believe it does, yes.
19     Q    Go ahead.  However?
20     A    To the extent it has those pieces.  However,
21 you have to look at where we are now is we're in court
22 and it's after the hearing, okay.
23     Q    Uh-huh.
24     A    And you have to look at this document and
25 then what happened at the hearing.  And they don't

20 (Pages 77 to 80)

Adrienne E Marting 8/12/2011

Page 81

1  comport, okay.  They don't go together.
2      Q     Okay.
3      A     When you look at the decision in this case,
4  I think they gave like nine reasons of what their
5  concerns were.  At least seven of them were never
6  noticed.  They were issues completely different than
7  what was in her notice.  In any of the prior three
8  notices, none of them listed things about -- and I
9  don't have it in front of me right now -- but her
10 behavior, her credibility, things completely outside of
11 -- her documentation.  Well, you know, documentation is
12 one of those throw-ins that they will always put in.
13 Any physician that you know can have a problem with
14 documentation, I mean, any physician.  And they usually
15 throw that in if there's anything wrong.  And they did
16 not put that in this notice, but then they found it as
17 a ground for their recommendation.  And that, I think,
18 is a fatal flaw.  You noticed her on A, B, C, and you
19 convicted her and ruined her practice on X, Y, Z.
20 Apples and oranges.
21     Q     Let me step back to the opinion about the
22 use of prior peer review or the consideration of prior
23 peer review action in a subsequent peer review action.
24 If I understood your opinion, that is not in and of
25 itself a problem looking at this in the abstract, I

Page 82

1  guess, that it's not uncommon and it's not a problem
2  for a medical staff or a hearing panel to not only
3  consider new cases where there has been a problem but
4  to consider a prior peer review action and the result
5  of that as part of the facts and circumstances that
6  they're analyzing to decide what the appropriate
7  sanction or remedy should be.
8          And the way you said that, and I'm not sure
9  whether you intended it, but if you're going -- you
10 have to look at the result of the prior adjudication,
11 okay.  In this case it was found that there was no
12 credible evidence.
13     Q     And I don't want to talk about the
14 particular one right now.  But just as a matter of
15 principle, the --
16     A     No, the prior one in this case.
17     Q     Right, right.
18     A     And I understand you have to look at that.
19 If in the prior one there was found in anybody's case
20 that there were no problems found or, you know, the
21 reason for the recommendation wasn't supported by the
22 evidence.
23     Q     Uh-huh.
24     A     To me it's patently unfair to say that we're
25 still going to use it against you.  We gave you a fair

Page 83

1  hearing and they determined that you were fine, the
2  cases shouldn't be held against you, but we're going to
3  hold them against you anyway.  I have a problem with
4  that.
5      Q     Okay.  So if I understand you, it is not
6  inappropriate to consider the results of a prior peer
7  review in a subsequent peer review as a matter of
8  principle; right?  It's just that you can't
9  mischaracterize the results of a prior peer review and
10 use that in a subsequent peer review; is that a fair
11 incapsulation of your opinion?
12     A     It's closer.  But I think really, just as a
13 practical matter -- and, I'm sorry, when I hear it
14 back, I'm like, well, no, not exactly.
15     Q     Well, let's try again just so I make sure I
16 understand.
17     A     Yeah.  The fact that she was on -- there was
18 something left hanging from the last review, and it was
19 ongoing, and that's kind of part of the reason that
20 they reviewed this case.  And I know there were others.
21 I think that's a fact and everybody should hear that
22 and that's reasonable.  But the five cases that were
23 discussed, they were adjudicated.  You know, a decision
24 was made on those.  And no adverse action was taken
25 against her.  They took it on a completely -- on her

Page 84

1  personality and nothing to do with her clinical care.
2  And I know you can't get my arms moving in here.  But I
3  think it would be inappropriate to say we're going to
4  use that as a ground to terminate your privileges now.
5  It's like you were found innocent, but we're going to
6  use it to convict you now.
7      Q     Have you ever in your hospital practice
8  assisted with a notice or assisted with a hearing where
9  you provided in the notice that this is about these
10 cases primarily and, by the way, we may also discuss
11 your peer review history as part of this hearing?  Or,
12 you know, words to that effect.
13     A     I'm trying to think.  I've done a lot of
14 notices.
15     Q     You have.  35 or so.  Have you ever sent out
16 a notice that says --
17     A     I'm thinking.
18     Q     -- we're going to consider as part of this
19 the result of what happened last time or your peer
20 review history?
21     A     I can only think of one case where it might
22 have, and I don't have it in front of me.  And the only
23 reason I say it might have is because it was more than
24 one hearing on this same physician.  And I'm thinking
25 of the ones I've written and also received on behalf of

21 (Pages 81 to 84)

Adrienne E Marting 8/12/2011

Page 85

1  physicians.  They're usually noticed on what they found
2  issues in, the current issues.  So I can't think of any
3  where I did that.
4      Q     Well, peer review is not like a criminal
5  matter where if I'm tried and convicted of assault,
6  assaulting David, okay, and then I serve my time and
7  it's over, and then I assault or I do something else,
8  like I steal a car, they're not going to consider that
9  assault, they're not going to try me for that or even
10  bring up the assault in the criminal trial for me
11  stealing the car.  You're not suggesting, are you, that
12  there's that kind of in-a-vacuum situation when it
13  comes to peer review, are you?  You're always going to
14  have the history of peer review being part of the
15  milieu that is considered, are you not?
16      A     Well, when it goes all the way through the
17  hearing and the bylaws specifically provide a physician
18  will only have, is only entitled to one hearing on one
19  matter, to me it's inappropriate to say, well, all
20  right, we went through these five cases and there was
21  no problem, you had a hearing on that, and to try and
22  have to defend on those cases again I think conflicts
23  with the bylaws.
24      Q     Did she have to defend on those cases again
25  in 2010?

Page 86

1      A     It was noticed.
2      Q     It was noticed.
3      A     Right.
4      Q     But isn't there a difference between having
5  to retry all those cases again, if they were to list
6  all those cases again and say we're going to go back
7  into the facts of all of those, isn't that different
8  than saying, look, we've got to consider you in light
9  of the history that has gone on before?  Isn't that
10  fair?
11      A     That's not what it says, though.  It doesn't
12  say we're going to consider you based on the history.
13      Q     Further based upon your history, including
14  the prior peer review proceeding in which the Board of
15  Governors required that you submit to an evaluation,
16  and treatment if needed, by a physician with expertise
17  in identifying and treating disruptive physicians and
18  physicians with personality and behavioral disorder and
19  issues, and also required 100-percent monitoring.
20      A     It says the recommendation -- and you have
21  missed the most important part -- is further based
22  upon.  And that's the problem.  So, yeah, I still have
23  a problem with it.  And it sounds like you're saying,
24  well, they told her about it.  They didn't -- you know,
25  if she had taken this for valid and prepared on those

Page 87

1  five cases, that took away from her preparation on what
2  was really at issue, the one case.  So here, you know,
3  you're making it -- you're clouding all of the issues
4  and making it more difficult for her to prepare for
5  trial.
6      Q     Well, they list later witnesses that would
7  give her some idea of what cases were going to be
8  inquired into; right?
9      A     Yes.
10      Q     Okay.  Let me see.
11      A     And they list the five cases.  So if, you
12  know, she was noticed that we're going to talk about
13  these five cases, and then you're saying they didn't,
14  you know, so they had her go and prepare for a hearing
15  to save her livelihood on those cases.
16      Q     Do you know whether she expended any
17  significant effort preparing to retry the five cases?
18      A     I do not know that.  But I think that doing
19  that to a physician is inappropriate.  Here, we're
20  going to try you on these grounds, and then try them on
21  something completely -- well, here is what happened.
22  We are going to try you on A, B, and C.  The hearing
23  was on a little bit of C, and then that didn't work, so
24  they added in a couple of other issues.  And then the
25  decision was on X, Y, and Z.

Page 88

1      Q     Can you recall ever submitting a little part
2  of your presentation on behalf of a hospital, on behalf
3  of an MEC, about a physician's prior peer review
4  history as part of a peer review action?
5      A     I'm sorry, ask your question again.
6      Q     When you represented the MEC in all of your
7  hospital work, can you recall a time when you presented
8  or had presented by a witness the prior peer review
9  history of a physician under review, prior peer review
10  history that predated the specific cases about which
11  the hearing was focused upon?
12      A     Yes.  And it was limited to -- well, to take
13  it in this case, it would have said there was a prior
14  peer review hearing and that she was under 100-percent
15  review.  That was the extent of it.
16      Q     Because that was the decision of the Board
17  of Governors; right?
18      A     Right.
19      Q     Okay.  You didn't retry the prior cases?
20      A     That's right.
21      Q     But you did provide the information about
22  the ultimate decision in the prior peer review action
23  in the subsequent one?
24      A     Right.
25      Q     And that's appropriate?  You wouldn't have

22 (Pages 85 to 88)

Adrienne E Marting 8/12/2011

Page 89

1  done it if it was inappropriate.
2      A      Well, I'm trying to see how -- ask your
3  question again.  I'm sorry.
4      Q      That was appropriate, what you did?
5      A      No, the one before.
6      Q      I don't remember that question.
7      A      Okay.
8      Q      When you did what you did, that you just
9  described, that was appropriate and there was nothing
10 wrong with that?
11     A      What I did was appropriate, yes.
12     Q      Excellent.  All right.
13     A      I believe, based on my recollection.
14     Q      Based on your understanding of peer review
15 concepts and principles?
16     A      That's correct.
17     Q      Okay.  Having somebody retry each individual
18 case on the merits of each individual case would not
19 have been appropriate in your opinion; right?
20     A      I believe that's correct.
21     Q      Because it's already been done?
22     A      It's already been done and they're not
23 entitled to another hearing on that matter.  And she
24 wasn't being tried on the hundred percent -- you know,
25 I think she was noticed on that, but the way they talk

Page 90

1  about this is that that was based -- that was the basis
2  of their decision.  And that's what bothers me.
3      Q      Is it a fair characterization -- well, it's
4  not a fair characterization, is it, to say she was
5  retried on the individual five cases after reviewing
6  that hearing transcript?
7      A      There was some testimony in there, but it
8  was very limited.
9      Q      So it wasn't a retrial of the five cases,
10 was it?
11     A      No, not a full.  But they did bring up
12 information and didn't counter it with the positive
13 information, so that was troublesome.
14     Q      All right.
15     A      And like -- well, I'll stop there.
16     Q      What's your understanding of what the
17 hearing panel found in 2009?
18     A      That there was not credible evidence to
19 support a decision for terminating her privileges, was
20 the main thing.
21     Q      Did they make any negative findings?
22     A      I think there were some additional, there
23 were some concerns, but not to warrant termination of
24 her privileges.  And I don't believe, but I'm not sure,
25 but I don't believe they recommended any reportable

Page 91

1  adverse action.  But I'm not positive on that.  I would
2  have to see the document to refresh my recollection.
3      Q      All right.
4      A      I think it was the Board that changed
5  things.
6      Q      And it's the Board's prerogative to change
7  things; right?
8      A      That's correct.
9      Q      And there's nothing wrong with that?
10     A      It has to be -- it should be based on fact
11 and sound peer review principles.
12     Q      Okay.
13     A      Not because the physician applied for
14 privileges at a competing hospital.
15     Q      Do you believe that's what happened?
16     A      I think that's a fact that should be
17 considered.  You have a physician that's on staff, you
18 know, never had a peer review hearing before for, what,
19 seven or eight years.  She applies for privileges at
20 another hospital, credentialing inquiries are made, and
21 shortly thereafter she's -- you know, a recommendation
22 to kick her off staff.  I think that's something that
23 needs to be factored in.
24     Q      Just so I'm clear, though, you're not
25 offering an expert opinion that there's a causal

Page 92

1  connection between her application at another hospital
2  and the result of the 2010 peer review, are you?
3      A      I don't know that I'm -- that anybody can
4  give an expert opinion on that.
5      Q      I would agree.  So you're not?
6      A      No.  I'm just saying it's a factor when you
7  look at the fairness of this whole process.
8      Q      Understood.  Sounds like part of your issue
9  with the notice was the notice as compared to what the
10 ultimate findings were?  Is that fair?
11     A      And the fact that they added on things that
12 were not appropriate.
13     Q      And I think we have talked about the added
14 on.
15     A      Yes.
16     Q      Is there anything else I need to hear, any
17 other part of that opinion that I haven't heard yet?
18     A      I don't think so.  I think we have the gist
19 of it.
20     Q      And I don't think we talked in very much
21 detail about what appears in the notice versus what
22 ultimately was the finding.
23     A      That's right.
24     Q      Maybe we should talk about that so I
25 understand that.  Do you have the hearing panel report?

23 (Pages 89 to 92)

Adrienne E Marting 8/12/2011

Page 93

1      A    I do, the corrected version.
2      Q    Is that the one?
3      A    The October 12th, I think that's the
4  ultimate one.
5      Q    All right.
6      A    Aren't they mostly similar except for an
7  added paragraph 9?
8          MR. DAYHUFF:  Let's mark this next, please.
9              (Whereupon, Defendant's Exhibit
                 No. 7 was marked for
10               identification.)
11     Q    (By Mr. Dayhuff)  We have had something
12 marked as Exhibit 7.  Can you let us know what -- can
13 you identify that for the record.
14     A    Exhibit 7 is the Aiken Regional Medical
15 Centers Corrected Report of the Hearing Panel, dated
16 October 12, 2010, signed by Dr. Searles, S-e-a-r-l-e-s.
17     Q    And that is the hearing report I think you
18 mentioned as we were discussing your opinions regarding
19 the deficiency of the notice; is that right?
20     A    That's correct.
21     Q    Now, tell me again why that notice -- and I
22 gathered it wasn't specific enough, was the gist of
23 your opinion, but you tell me.
24     A    It was apples and oranges.
25     Q    Apples and oranges, okay.  How so?

Page 94

1      A    Well, they say that the reason -- and I'm
2  saying "they," the notice of hearing for the reasons
3  set forth for the recommendation was the case of
4  227589.
5      Q    Okay.
6      A    Okay.  Then they say it was also based on
7  your prior history.
8      Q    Uh-huh.
9      A    The fact that you had a psych evaluation.
10 They don't mention that the psych evaluation came back
11 clean.  And that she was on 100-percent monitoring.
12     Q    Did you review the psych evaluation, by the
13 way?
14     A    I read it, yeah.
15     Q    Okay.
16     A    The first finding doesn't talk about
17 anything that's -- you know, you can't tie that to the
18 verbiage.  They say that the recommendation is not
19 arbitrary and capricious, but they didn't give any
20 specifics.  So let's move on to 2.
21     Q    Okay.
22     A    It says that during the course of the
23 proceedings practitioner lacked candor in dealing with
24 her peers.  And, obviously, there's a timing issue
25 there, but candor wasn't ever listed as a concern for

Page 95

1  her.
2      Q    Where do you think that finding that she
3  lacked candor came from?
4      A    From the hearing testimony, is what my
5  understanding is of what that reads.  And I understand
6  the timing of that.
7      Q    So the hearing panel observed the testimony
8  of all the witnesses at this hearing and decided, a
9  panel of her peers, that she lacked candor.  Is that
10 your understanding of that finding?
11     A    That's what it says.
12     Q    Do you dispute that finding?
13     A    I don't dispute that that's what the finding
14 says.  I mean, I can read.
15     Q    All right.
16     A    Okay.  So I'll give you that that doesn't --
17     Q    Do you have an opinion that flows from that
18 finding or a peer review opinion that flows from that
19 finding or that addresses that finding?
20     A    I don't think she lacked candor.  I think
21 she testified to what she knew.  But I don't know her,
22 and that's just reading the documentation.
23     Q    So if you were sitting on the hearing panel,
24 you would not have found she lacked candor?
25     A    I can't say that because so much of that is

Page 96

1  based on observing people.  I've just read the record.
2  I really don't have an opinion on that, okay, so how
3  about that.
4      Q    Fair enough.  What's the next one?  It's
5  very similar to No. 2, isn't it?
6      A    Right.
7      Q    This idea that they question her credibility
8  because of what she asserted about patient No. 6
9  refusing a C-section that she later recanted.  They
10 observed the testimony of all the witnesses and her to
11 have -- that they raised serious questions about her
12 credibility and she recanted her testimony.
13     A    And that's something that occurred in the
14 hearing.
15     Q    Very similar to No. 2?
16     A    Yeah.
17     Q    So you don't really have any opinions about
18 that and that's the factual finding made by people
19 observing witnesses; right?
20     A    I agree with you on that.  No. 4,
21 credibility is further demonstrated by post-incident
22 entries which are inconsistent with other credible
23 evidence.  You know, they had those entries in the
24 chart.  That wasn't an issue.  To the extent there were
25 inconsistencies in the record, they could have noticed

24 (Pages 93 to 96)

www.compuscripts.com

Adrienne E Marting 8/12/2011

Page 97

1   her on that.
2       Q       Now, that sounds like an opinion you're
3   offering.
4       A       That's an opinion I'm offering.
5       That No. 4 needed to be listed in the
6   notice; is that your opinion?
7       A       I agree, yes.  To the extent the issue of
8   her credibility based on documentation in the record,
9   if they're going to -- I think that should have been
10  listed.
11      Q       All right.  Now, they did list the case from
12  which this finding arose, right, in the notice?
13      A       Yeah.  But they also said specifically what
14  they found wrong with that case.  They said
15  inappropriate medication, delayed two hours, and
16  failure to recognize an emergent situation.  Nowhere
17  was there any mention of inconsistent record entries,
18  documentation to give them a broader term, any other
19  concerns with the record.  They said this is what we
20  found wrong.  What's interesting is they gave up
21  completely on the medication issue.  Their own expert
22  said no, giving Brethine or terbutaline was perfectly
23  fine.  And then on the delay of two hours, they said,
24  well, it could go either way.  I mean, they completely
25  abandoned what they noticed the hearing on and found,

Page 98

1   you know, we don't like her.  We still don't like her.
2   We didn't like her when we sent her for a psych
3   evaluation, and we don't like her even more now,
4   apparently.
5       Q       So what should that notice, if you were
6   writing the notice as the hospital medical staff
7   attorney or the medical staff credentialing person, you
8   would have written what to make that notice
9   appropriate?
10      A       Issues regarding credibility and candor, if
11  it fits in here, or inappropriate documentation
12  regarding post-incident entries.
13      Q       Okay.  Now, isn't it very possible that
14  candor issue didn't come out until witnesses were
15  called?
16      A       And I think that's what we already -- I gave
17  you that point in 2.
18      Q       We hit that, okay.
19      A       Yes.
20      Q       Okay.  But your point on No. 4 is that the
21  entries would have existed beforehand, right, before
22  the trial?
23      A       Well, that's what it says, inconsistent
24  post-incident entries.
25      Q       Which are inconsistent with other credible

Page 99

1   evidence.  Where do you think the other credible
2   evidence came from?
3       A       From the entire record.  I mean, they could
4   have added onto it in here, but they certainly -- I
5   didn't --
6       Q       It could have also come from witnesses'
7   testimony, couldn't it?
8       A       It could have.
9       Q       Okay.  So it's very possible they didn't
10  know until after witnesses testified that post-incident
11  entries were inconsistent with credible evidence; isn't
12  that true?
13      A       I mean, anything is possible.  But if they
14  had concern about her post-incident entries, I think
15  they should have noticed her on it.
16      Q       But it's possible they didn't have those
17  concerns until they heard the evidence at trial?
18      A       It's possible.
19      Q       And if that's the case, it wouldn't be
20  inappropriate to list that as a finding after you hear
21  the evidence when it didn't specifically appear in the
22  notice?
23      A       Possibly as a finding, not as a ground to
24  terminate somebody's privileges.  The ground of --
25  you've got to remember --

Page 100

1       Q       I don't understand.
2       A       Well, the recommendation to terminate her
3   privileges was based on, you know, medical care for
4   this particular patient.
5       Q       Uh-huh.
6       A       Okay.  And now they're saying, well, we
7   didn't like your credibility and your documentation,
8   you know.  We found your medical care was okay, but
9   we're going to use that to terminate your privileges,
10  the harshest possible remedy that they could issue.
11      Q       And that's kind of a separate issue, isn't
12  it?
13      A       That is.  But I think it's worth noting.
14      Q       And we'll get to that.  And that certainly
15  can be an opinion that this is too harsh of a sanction.
16  And it is your opinion, you have told me.  But the more
17  specific question that I asked was that if they didn't
18  discover the inconsistencies in the post-incident
19  entries until after they took testimony of witnesses,
20  then it would be appropriate to note that as a finding,
21  if they so found, and it is not a problem that it
22  didn't specifically appear in the notice that was sent
23  to her before, if my supposition is true?
24      A       Well --
25      Q       Do you agree with that?

25 (Pages 97 to 100)

www.compuscripts.com

Adrienne E Marting 8/12/2011

Page 101

1    A    Yes, if it was only based on information
2  that came out afterwards, if they're not talking about
3  inconsistencies in the record.
4    Q    Okay.
5    A    Okay.
6    Q    All right.
7    A    I think that's fair.
8    Q    Let's go on.  I'm on to No. 5.  This is
9  another that is very similar to 4.  And I guess while
10 we're here, you're talking to me about how or what's
11 found here may make the notice problematic.  So why
12 don't we keep on that tack and tell me what else here,
13 if anything, may make the notice problematic in your
14 opinion?
15   A    I don't see anything on this one because it
16 seems to be only talking about hearing testimony.  But,
17 again, it's completely off point of what they found
18 were grounds for summarily suspending her privileges.
19   Q    And you've got to explain that to me.  Do
20 you mean that the sanction was too harsh?  Is that like
21 a separate opinion?  Because right now we're talking
22 about what here would make the notice inappropriate;
23 right?
24   A    Right.  And for that point, I don't think
25 this -- just to take it as a whole, let me just say --

Page 102

1  and we can go through each one again.  But if you look
2  at what was noticed and what was found, the concerns
3  listed in the notice -- and I don't want to overstate
4  this.  But, you know, they didn't talk about the
5  medication, whether it was right or wrong, and they
6  didn't talk about failure to respond to an emergent
7  situation, and they didn't talk about the delay.  Well,
8  they did mention the delay, but they said it could go
9  either way.  So --
10   Q    And I see -- well, I'm interrupting.  Go
11 ahead.
12   A    So that's what my concern is, is that they
13 basically noticed her on one thing, tried her on one
14 thing, and then found findings on something completely
15 unrelated to what the initial notice was.
16   Q    Okay.
17   A    But I understand your point.  They're
18 allowed to find on things that came out during the
19 hearing, so I'm not saying that's wrong.
20   Q    Got you.  So you're not going back on that?
21   A    I'm not going back on that.  But I think you
22 need to look at, in fairness, what she was -- they said
23 we're going to terminate your privileges because of the
24 way you acted on this case in this care, and then they
25 said, well, we don't like your credibility and your

Page 103

1  candor and there's some inconsistency, so we're going
2  to kick you off staff.  And I don't think it is fair
3  and I don't think it's appropriate.
4         But as up to No. 5, I think you're right
5  that the notice issue is not a problem, okay.  How
6  about that?
7    Q    Fair.  How about 6 through 9, is there
8  anything in 6 through 9 -- and take a minute to look at
9  it -- that should have appeared in the notice?
10   A    Yeah, No. 6, completely.  Practitioner
11 exercised poor judgment in both contemporaneous medical
12 record entries and especially in the statement she
13 submitted to the MEC.  Furthermore, several
14 inconsistencies in this statement were noted.  But for
15 the last sentence, you can't tell whether they were
16 talking about hearing testimony.
17   Q    So if the inconsistencies were discovered
18 through opposing hearing testimony, then.  If it
19 was not, you would prefer to see that poor judgment, or
20 something along those lines, in the notice?
21   A    Well, it says in both contemporaneous and
22 records entries, so they were talking about her
23 judgment and what she wrote in the chart was
24 inappropriate, her documentation was inappropriate, her
25 judgment was inappropriate.  You can't find that in

Page 104

1  this notice, okay.
2    Q    All right.
3    A    And then 7?
4    Q    Yes, continue.  Go ahead.
5    A    All right.  This is where they start
6  waffling.  First we had a problem with I guess they're
7  saying -- well, I'm not going to guess.  But they say
8  if that -- if they're saying that her decision to leave
9  the hospital demonstrates poor clinical judgment, they
10 could have specifically listed that.  And they did not.
11 I mean, that's something they argued and they didn't
12 notice her on that.
13   Q    Okay.
14   A    Let me see.  What else?  Then what's more
15 important to read in this, just in the total package,
16 is that they backed off to the extent that was an
17 issue.  They don't think it really had any effect on
18 the ultimate outcome, but we don't like it.
19        And let me read 8.  Here we go.  Here they
20 backed off of their delay issue.  And I'll give you
21 that they did talk about delay in the notice.
22   Q    So that's not an issue in the notice?
23   A    That's not an issue in the notice.  It has
24 other problems.
25   Q    And we're going to hit other problems with

26 (Pages 101 to 104)

Adrienne E Marting 8/12/2011

Page 105

1    this after the notice issue.
2        A.   Okay.  Then in No. 9 raises concerns about
3    her ability to work with other members.  If that became
4    an issue -- well, all of these, actually, her lack of
5    candor and inconsistent entries, if that became an
6    issue, they could have -- that the MEC wanted to base
7    its recommendation on, they could have amended their
8    notice, okay.  If they're going to put on testimony and
9    claim that she doesn't have an ability to work with
10   others, she should have been noticed and given the
11   opportunity to call in her own list of witnesses and
12   other colleagues.  And she actually did, and the ones
13   that testified, you know, there weren't questions asked
14   on that specific issue.
15       Q.   All these findings in the corrected report
16   of the hearing panel flow from the analysis, the
17   findings -- the analysis of the hearing panel regarding
18   the case that was in the notice; right?  They aren't
19   about other cases; right?
20       A.   I believe so.
21       Q.   Okay.  So they're all about the case that
22   was in the notice?
23       A.   That's right.
24       Q.   The amending of the notice, the hearing
25   notice, do you commonly amend the hearing notices?

Page 106

1    Have you ever amended a hearing notice?
2        A.   No.  But I don't change tracks in mid field.
3        Q.   So you've never had to amend a hearing
4    notice because the hearing has raised a finding or an
5    issue that you didn't feel was appropriately noticed in
6    the notice you sent previously?
7        A.   I don't believe so.  Or the issue wasn't --
8        Q.   But in this case you would have sent out an
9    amended notice to her, and you would have said in
10   addition to what's there what?
11       A.   If they're going to try her on her ability
12   to work with others, which it seems like she did, and
13   her candor, as that became an issue -- because they
14   said many -- well, I can't cite that right now.  Let me
15   see.  I can't find it.  I thought I had it tabbed.
16       Q.   Sounds like you would want mention of her
17   candor issues and inability to work with others in an
18   amended notice?
19       A.   Yes.
20       Q.   All right.
21       A.   If they're going to -- well, yes.  I will
22   just leave it a yes.
23       Q.   Now, wouldn't my friend David and his
24   co-counsel, Biff Sowell, who were sitting there in the
25   hearing, wouldn't they have notice of these issues as

Page 107

1    they came up just by virtue of listening to the
2    testimony and hearing the arguments about those issues?
3        A.   (No response)
4        Q.   There was obviously a dispute about who was
5    telling the truth regarding certain elements of this
6    case; right?  There were a lot of nurses who testified
7    and Dr. Muniz testified and the pathologist testified
8    about what she said.  A lot of he said/she said; right?
9        A.   But there was no allegation that Dr. Muniz
10   was -- you know, that her credibility or her candor was
11   an issue at all.  You know, some people said the time
12   was this, or whatever, you know, and there was
13   conflicting evidence, but that's different.
14            If I testified the sky is brown and you
15   testified the sky is red, that doesn't tell me that
16   we're going to make an issue of the fact that there was
17   conflicting testimony.
18       Q.   You certainly --
19       A.   Well, let me restate that.  That that's
20   going to be used solely against me.  They could have
21   said, well, the nurse is lying.  You know, the nurse,
22   she doesn't get along with that nurse or that nurse
23   doesn't get along with her.  That was never brought up
24   as an issue.  There was just a -- there was three
25   nights of hearing.  To say, oh, you should have known

Page 108

1    that, you know, in the heat of battle I don't think is
2    completely fair.
3        Q.   So you wouldn't say that they were provided
4    notice, Dr. Muniz was provided notice by virtue that
5    testimony regarding the inconsistencies was obviously
6    taken at the hearing?  That wouldn't be notice?
7        A.   Say that again.  Say that again, I'm sorry.
8        Q.   You wouldn't be comfortable that Dr. Muniz
9    had notice of the candor and credibility issues by
10   virtue of her and her counsel participating in the
11   hearing at which conflicting testimony was elicited?
12       A.   I think that counsel for both sides could
13   have acknowledged, you know, could have seen that there
14   was conflicting testimony.  You know, that's obvious.
15   Hopefully, everybody did.  But to use it as grounds for
16   a completely separate ground to terminate her
17   privileges when it wasn't noticed, I think that's where
18   the fault is.
19       Q.   Okay.  And, as we discussed, it's very
20   possible that the hearing panel didn't come to a
21   finding or a finding about the lack of candor until after the evidence was in;
22   the lack of candor until after the evidence was in;
23   right?  You wouldn't have had the witnesses testify
24   yet, and we talked about that earlier.
25       A.   On the things where -- well, let's see.  Any

27 (Pages 105 to 108)

Adrienne E Marting 8/12/2011

Page 109

```
 1   inconsistency that -- like look at No. 9.  And this was
 2   added on after the fact.  This is after the corrected
 3   version came out, which is interesting and a whole
 4   'nother issue we need to talk about.
 5        Q    And we'll get to that, I'm sure.  No. 9 is
 6   talking about her testimony in contrast with the
 7   pathologist's testimony; right?
 8        A    Right.
 9        Q    And the hearing panel obviously listened to
10   that and decided that they believed the pathologist and
11   not Dr. Muniz; right?  And whether that's right or
12   wrong, they looked at the evidence, observed the
13   witnesses, and made that call.  And my question, I
14   guess, is that they can't make that call to put it on a
15   notice until they see those witnesses; right?
16        A    Well, the part on the dispute with the
17   pathologist is only, you know, one instance.
18        Q    Okay, you agree with me with respect to that
19   instance?
20        A    Right.
21        Q    Okay.  Go ahead.
22        A    Unless I -- I haven't looked at if there's
23   something on the pathologist's report.  I don't know
24   that yet.  Or if it's even in there, you know,
25   documentation that they had beforehand.  But on this
```

Page 110

```
 1   last sentence if they're only talking about testimony
 2   at the hearing, I understand your point about the
 3   notice.
 4        Q    Okay.  Did you have anything else on 9?
 5        A    Same issues.
 6        Q    All right.
 7        A    Well, also do you see any findings on, other
 8   than 8 -- well, let's see.  Is it 8 where it talks
 9   about -- only No. 8 really talks about the delay issue,
10   and it doesn't go into the two-hour issue.  They just
11   generically say, well, there may have been a delay and
12   we don't know if it had any effect.  They don't make a
13   finding on what they noticed her on.  They said you
14   gave inappropriate medication, and they made no finding
15   on that.  Well, we're going to forget about that one.
16        Q    And let me ask you what's wrong with that?
17        A    They noticed her and said you did this
18   wrong, and then they apparently found she didn't do
19   anything wrong or not enough to even put it in her
20   decision.  And that was one of the grounds for
21   termination.
22        Q    Got you.  Doesn't that happen all the time?
23   You have a list of things someone has done wrong, and
24   sometimes the hearing only finds you've done two of
25   those three.  And there's nothing wrong with that, is
```

Page 111

```
 1   there, from a peer review perspective?
 2        A    No.  But if you look at the -- you take
 3   that, and I guess that's where I'm --
 4        Q    Seguing into it?
 5        A    Yes, seguing into it.  And I can't help it,
 6   because I don't want to sound like, oh, they did
 7   nothing wrong, because I don't think that's -- that's
 8   -- if you look at this notice and you look at this
 9   decision, you wouldn't think that it was the same case,
10   pretty much, other than the use of the word "delay"
11   once.
12        Q    Well, there's delay in No. 7 too; right?
13   Not the word "delay," but the issue of delay appears
14   there, right, the decision to leave the hospital?
15        A    And, see, that's something they could have
16   specifically said, you have to be on campus during
17   cases.  And she was on campus, but she was just in a
18   different building.
19        Q    And, of course, we don't know if they -- we
20   don't know that anyone knew she left until this
21   hearing, do we?  I mean, was that in the medical
22   record, "I left"?  I don't remember reading that.  Do
23   you?
24        A    No, I don't.
25        Q    So that may have been discovered in the
```

Page 112

```
 1   hearing?
 2        A    Yes.
 3        Q    All right.
 4        A    But they don't say that there was a delay.
 5        Q    Well, I guess I'm inferring that in 7.  You
 6   don't infer that in 7?  And it's fine if you don't.
 7        A    No, I don't think that.  I think that's a
 8   different issue.
 9        Q    It's just a matter of her not being there?
10        A    Yeah.  They don't say -- yeah, I think your
11   inference is --
12        Q    Well, I guess I assume that by not being
13   there, that would delay treatment.
14        A    Well, she wasn't there because they were
15   doing -- waiting on her doing the ultrasound.
16        Q    Okay.  So delay only appears once?
17        A    Right.
18        Q    All right.
19        A    Out of nine items and no mention of --
20        Q    Got you, got you, all right.  And one more
21   question on this.  We talked about the issue being --
22   you know, this issue about credibility and whether you
23   would have notice of the credibility issue or not by
24   sitting there and listening to it.  And I think you
25   said, well, yeah, you would hope the attorneys would
```

28 (Pages 109 to 112)

Adrienne E Marting 8/12/2011

Page 113

1  know that. I mean, credibility in that case, it wasn't
2  just I said the light was red and you said it was
3  yellow. Wasn't there some pretty heated exchanges in
4  testimony on the credibility issue? And I'm thinking
5  of Mom is called. I mean, wasn't that a big issue in
6  this hearing from your review of the transcript?
7       A    I think they made an issue of it. But if
8  you look at whether it had any decision on when she
9  called the C-section, on the facts, the actual medical
10 care, it had nothing to do with it.
11      Q    Okay. And the only issue I'm trying to get
12 at, it wasn't a surprise, credibility being an issue
13 wasn't a surprise to anybody when you reviewed that
14 transcript. I mean, it's very clear it was a big issue
15 in that fair hearing. Agreed?
16      A    I think that, yeah, there were not --
17 Dr. Muniz -- well, the mom's testimony, you could tell
18 she -- I read it as she didn't say a truthful thing.
19      Q    Okay.
20      A    Until she was being crossed, and then she
21 was like, oh, yeah, she was upset, you know.
22      Q    My question is, I mean, the reason Mom was
23 called was strictly on the credibility issue, wasn't
24 it? She was called to dispute a position Dr. Muniz had
25 taken; right? She wasn't called on a medical issue.

Page 114

1       A    Right.
2       Q    The pathologist was called on a credibility
3  issue to dispute what Dr. Muniz had said about what he
4  said; right?
5            MR. DICK: Object to form.
6       A    Yeah, I don't know about that. Sorry.
7       Q    (By Mr. Dayhuff) You don't recall?
8       A    Yeah. I don't know the pathologist's
9  testimony well enough.
10      Q    And the reason I ask that is credibility,
11 you would agree with me, credibility, Muniz's and the
12 other people, was a big issue in that fair hearing?
13      A    I think credibility of the witness is always
14 an issue in a hearing.
15      Q    It is. And in this one, in particular, it
16 was a big issue?
17      A    But --
18      Q    Would you agree?
19           MR. DICK: Object to form.
20      A    No.
21      Q    (By Mr. Dayhuff) You wouldn't agree
22 credibility was a big issue in this fair hearing?
23      A    Not more than a lot of hearings.
24      Q    Really?
25      A    I mean, you had witnesses coming in saying

Page 115

1  completely opposite things. I think that happens more
2  times than we would think.
3       Q    Really? Okay.
4       A    Especially you can tell with some of the
5  nurses, I mean.
6       Q    So it was an issue, but not a bigger issue
7  than the norm for you, credibility in that fair
8  hearing; is that fair?
9       A    Here's where I think we're differing in my
10 mind. That credibility is always -- you know, any good
11 lawyer or judge is going to look at the credibility of
12 the witnesses, I think. You know that's a factor that
13 you do. Okay. Whether it's something you're going to
14 be -- well, did those issues where there was a
15 credibility issue, did it affect the reasons, you know,
16 the clinical reasons that were found at fault for
17 Dr. Muniz? No. And they didn't find that they did.
18 They just said we don't think you're trustworthy.
19 Didn't have any effect on how you treated this patient
20 or any effect on the ultimate outcome, but we don't
21 like it. And that's what the concern is, that they
22 found different issues that did not relate to her
23 medical care to kick her off staff.
24      Q    Which is different than a notice issue. I
25 think it's a fundamental issue you have with the

Page 116

1  report.
2       A    But you need to look at them together, so
3  yes.
4       Q    All right. Anything else before we leave
5  the report? And I want to move to the hearing officer
6  overstepped his bounds, but while we're on the report,
7  we talked about the notice issue vis-a-vis the report.
8  Is there anything else, anything you're going to offer
9  about the report itself, the findings of the report?
10      A    Well, yeah, the whole process of it being
11 corrected and the standard of -- I mean the burden of
12 proof.
13      Q    Well, let's talk about that.
14      A    Do you want to talk about that?
15      Q    Sure, let's hit that. What happened that
16 was a problem? And before I go there, I'm sorry, I
17 think you have opined an amended notice should have
18 been issued on candor and judgment. Was that it or was
19 it just candor and credibility? I think it was candor
20 and credibility.
21      A    Yeah, I think those were the two.
22      Q    If they were to issue that notice, the
23 amended notice, during the hearing process, does that
24 violate the Health Care Quality Improvement Act or does
25 that result in a process that wouldn't qualify for

29 (Pages 113 to 116)

Adrienne E Marting 8/12/2011

## Page 117

1  immunity under the Health Care Quality Improvement Act?
2      A    To the extent she didn't have adequate
3  notice to defend on those, on those issues.
4      Q    Well, I guess that's the ultimate question.
5      A    Right.
6      Q    Do you believe that the lack of an amended
7  notice resulted in such a lack of notice that that
8  failing results in this peer review action was not
9  comporting with the Health Care Quality Improvement Act
10  standards?
11      A    I believe so, yes.
12      Q    Okay.  That alone?
13      A    Well, I think having inadequate notice is
14  grounds.
15      Q    I agree notice is one of the things you look
16  at.
17      A    That's right.
18      Q    My question is more specific.  The lack of
19  amended notice in this case, does that rise to the
20  level of a lack of notice that would result in the
21  Defendants losing their --
22      A    Immunity?
23      Q    -- immunity under the Health Care Quality
24  Improvement Act?
25      A    It's getting late.

## Page 118

1      Q    It is.
2      A    I don't think anything is taken in a vacuum.
3  I think that one factor in this is something that, yes,
4  I think it supports it.
5      Q    Supports it, but not alone?  You're going to
6  put that together with other things that you're going
7  to tell me about and that may or may not?
8      A    That's correct.
9      Q    All right, fair enough.  And I interrupted
10  you on the notice again, for some reason.  Why don't
11  you go ahead and tell me about --
12      A    The process of --
13      Q    -- the process of the corrected report, why
14  is that a problem?
15      A    Yeah.  And this goes under the --
16      Q    Hearing officer overstepped bounds?
17      A    Yes.
18      Q    Okay, good.
19      A    And just incorrect.  As I understand it from
20  reading the record, the parties had stipulated to
21  changing the -- to using a different burden of proof
22  than what's in the Medical Staff Bylaws.  They both did
23  that.  And the hearing officer was there and accepted
24  that stipulation and put it on the record.
25      Q    Okay.

## Page 119

1      A    Okay.  When the decision came out, they used
2  the burden of proof that was in the bylaws.
3      Q    Okay.
4      A    Which if no stipulation had been made, that
5  wouldn't have been a problem.  But there had been a
6  stipulation, so it was the wrong burden of proof.
7      Q    Okay.
8      A    Okay.  And the way the burden of proof is in
9  the bylaws is it almost has to be a miracle for the
10  physician to prevail, okay.  I mean, it's a really
11  difficult burden.  Clear and convincing evidence that,
12  you know, what they did was arbitrary and capricious.
13  It's a pretty hard burden.  But the burden shifted to
14  -- and I don't want to read it incorrectly.  Is it in
15  here?  Where is it?
16          Well, so the burden was on Dr. Muniz, right,
17  in the Medical Staff Bylaws, and she had to show by
18  clear and convincing.  And they shifted that to the
19  Medical Executive Committee by a preponderance of the
20  evidence.  And, I mean, I can look it up.  But if we're
21  all in agreement that that's what it is, I --
22      Q    And I don't remember the wording, but I
23  remember the burden was in the bylaws on the physician.
24      A    Right.
25      Q    And they shifted the burden to the MEC.  I

## Page 120

1  don't remember the phraseology of the burden, and I
2  don't know that it matters.  If it matters for your
3  opinion, we can go look at it.  But if it doesn't, then
4  we --
5      A    Well, let me see.  Hearing panel shall
6  recommend -- and this is from the credentialing policy
7  bylaws -- in favor of the MEC unless it finds that the
8  individual who requested the hearing has proved by
9  clear and convincing evidence that the recommendation
10  that prompted the hearing was arbitrary and capricious
11  or not supported by credible evidence.
12      Q    You got that almost right.  Perfect.  Very
13  good.
14      A    And they shifted that to the Medical
15  Executive Committee.  And I can't find it right now.
16  But they may have made it easier for the MEC, but --
17      Q    Does it matter for your opinion what the
18  ultimate burden on the MEC was?
19      A    Not really, because the fact that they
20  shifted it --
21      Q    And I think it was preponderance of the
22  evidence, but I don't remember.  But if it doesn't
23  matter for the opinion, then --
24      A    It doesn't that much.  But, I mean, if you
25  were going to ask me about it, I wanted to see.

30 (Pages 117 to 120)

Adrienne E Marting 8/12/2011

Page 121

```
 1      Q      That's okay.  So what was wrong with -- and
 2  I think you've told me your understanding of the facts.
 3      A      Right.  And --
 4      Q      What's the opinion?
 5      A      The opinion is -- well, I think we need to
 6  have a little more facts.  It's that an erroneous
 7  decision came out or, you know, there was a flaw in it,
 8  an inappropriate standard that was recognized.  And
 9  that was raised by Dr. Muniz's counsel.  So they sent
10  it back to the MEC -- well, the MEC piped in and said,
11  hey, we understand that's an error, so let's reissue a
12  corrected one.  Which there's a little question there,
13  but it's not in the bylaws.  And if it had gone up to
14  the Board, it probably would have come back.  So I
15  don't have a big problem with them reconsidering it.
16      Q      In fact, do you have any problem with them
17  reconsidering it?
18      A      Only in that I think it's very difficult to
19  get a body to say, you know, the MEC -- the doctor has
20  to prove this really incredibly hard burden, and they
21  deliberate on that and find that -- and it's a very,
22  you know, a very wishy-washy opinion on the actual true
23  facts.  But then to get those same people in a room and
24  say, oh, no, now we're going to put the burden on the
25  MEC.  And what they should have done is seriously
```

Page 122

```
 1  reconsider the evidence in light of the burden, okay.
 2      Q      All right.  But you don't know how seriously
 3  or not they considered the evidence, do you?
 4      A      Well, let me tell you what my decision is
 5  based on, my opinion is based on, is that it appears
 6  from the emails and the fact that I know how these
 7  hearings work that the matter went, after the MEC
 8  issued its letter saying we'll go back, or the panel
 9  member, that it went back to Mr. Nauful, okay.  And
10  there were email exchanges between Mr. Nauful, the
11  medical staff coordinator, other individuals, I think
12  in-house counsel, but I'm not positive, and Celeste
13  Jones, who I understand represented the MEC.  Nowhere
14  was Mr. Dick or Sowell copied on any of those emails.
15      Q      Okay.
16      A      So for the Medical Executive Committee
17  attorney and the hearing officer to be exchanging
18  emails I think is highly inappropriate.  So that's one
19  factor.  And I think that there's -- and we'll have to
20  look at this later, but --
21      Q      So kind of an opinion about the impropriety
22  of the process through which that amended report was
23  generated, and I understand that.
24      A      Yes.
25      Q      Okay.
```

Page 123

```
 1      A      Exactly, exactly.
 2      Q      Anything else?
 3      A      And then it looks in the record from the
 4  emails and when the document was issued, the corrected
 5  document, that the hearing officer, who, according to
 6  the bylaws, is not entitled to a vote, rewrote the
 7  decision basically by just changing the burden of
 8  proof, not changing any of the findings except for to
 9  add something else, that last No. 9, which that's a
10  whole different point I think we need to get into.  But
11  then circulated amongst the panel, if at all.  And it's
12  hard to tell from the record, because there's emails
13  that say, you know, I've changed this, circulating, we
14  need to have a meeting with the hearing panel, and
15  Mr. Nauful, the hearing officer, is already revising
16  the decision.  So he circulated a corrected version, it
17  wasn't signed by anyone, for them to look at, we hope.
18  And it's not absolutely clear, other than Dr. Searles
19  signed it.  But I think that's highly inappropriate.
20  The hearing officer took on the role of, oh, I will
21  just write the decision and they'll probably follow it.
22      I think what should have happened as a
23  hearing officer is they should have met again, either
24  by telephone or in person, and talked about the issue
25  of the burden of proof and what effect it has.  I think
```

Page 124

```
 1  the hearing officer can tell them about the burden of
 2  proof and how it does, but the hearing panel has to
 3  make the decision.
 4      Q      All right.  Let me see if I can encapsulate
 5  this.  Reconsidering the original report based on the
 6  appropriate standard of proof agreed to by the parties,
 7  that in and of itself is not problematic in your
 8  opinion?
 9      MR. DICK:  Object to form.
10      A      Well, the fact that the hearing officer made
11  the mistake in the first place is an issue.  But given
12  that --
13      Q      (By Mr. Dayhuff)  It's a mistake, sure.
14      A      It's a mistake.
15      Q      But does it raise -- I mean, what I'm here
16  about is to understand what -- you know, your standards
17  that I understood were does it violate the bylaws, and
18  then we would have a peer review problem, or does it
19  violate the peer review we would expect to see under
20  the Health Care Quality Improvement Act.
21      A      Which includes fairness and notice and
22  proper hearing.
23      Q      Okay.  And just the idea of setting the
24  critique of what you think happened in the process
25  aside, there's nothing wrong, per se, with
```

31 (Pages 121 to 124)

Adrienne E Marting 8/12/2011

Page 125

1 reconsidering a hearing report, doing another hearing
2 report, when you've got the wrong burden of proof in
3 there? That alone is not a problem, is it?
4        A    I think technically the decision should have
5 gone to the Board and it should have been the Board's
6 decision to send it back to the MEC. I don't think,
7 technically, that they should have said, oh, we made a
8 mistake and let me change. That could be grounds for
9 kicking it out that it's arbitrary and capricious
10 anyway. As a practical matter, I'll give you it's very
11 possible the Board would say send it back.
12       Q    Okay.
13       A    Okay. And I keep saying the MEC, but it's
14 really the hearing panel.
15       Q    So you don't find fault with the
16 reconsideration, per se, you find fault with the way
17 you believe that reconsideration went down; correct?
18       A    And I'm going to give you the same answer,
19 because I don't think it's absolutely correct to say I
20 don't have any problem with the hearing panel on its
21 own deciding they're going to issue a new decision when
22 there's an error made, because technically once they
23 issue their decision, it's supposed to go to the Board
24 or to the appellate body.
25       Q    Let me rephrase that just slightly then.

Page 126

1 You're not opining that the mere reconsideration by the
2 hearing panel made this unfair?
3        A    No.
4        Q    What you're alleging is that the way this
5 went down made it unfair?
6        A    Exactly. The fact that they did -- well,
7 that's the whole issue, isn't it, is did they really
8 even consider it.
9        Q    Okay.
10       A    Because I believe the evidence shows that --
11 and I know how these hearings work, is that the hearing
12 officer advised them -- the hearing officer drafted the
13 corrected decision, and that's what the evidence shows
14 in the emails, said that I'll fix it and then we have
15 to have another hearing. And there's no documentation
16 that they had another deliberation. There may have
17 been, I'm not saying that there is or isn't, but the
18 corrected draft precedes that.
19       Q    All right. So that opinion is based upon
20 your understanding of the facts that may or may not be
21 accurate; fair?
22       A    That's what everybody's opinions are based
23 on.
24       Q    Very good. And you don't know whether, you
25 don't know whether the hearing panel got together on

Page 127

1 the phone or in person to discuss this matter at all,
2 do you?
3        A    No. We can only go by what the evidence
4 shows.
5        Q    All right. And you're not expert in
6 analyzing what the evidence shows. I mean, that's
7 something, again, that, you know -- that's a jury
8 matter. That's something anybody can do. You're an
9 expert in peer review; right?
10       A    That's correct.
11       Q    And I understand that. I want to hit the ex
12 parte issue a little bit, because that seems to be a
13 part of this. You said earlier in your deposition, if
14 I'm not mistaken, that contact between the hearing
15 officer and the medical staff coordinator is not a
16 contact that you would view as inappropriate, right,
17 and that happens all the time?
18       A    I know for a fact that happens all the time.
19       Q    And it's just got to; right?
20       A    Because that role -- well, to the extent
21 that role is administrative. Here's the emails for the
22 panel members, get this to them, you know, give them
23 these documents.
24       Q    And it happens all the time, okay. What
25 you're concerned about is the contact between Celeste

Page 128

1 Jones and the hearing officer; is that correct?
2        A    That's correct.
3        Q    And what about that contact concerns you?
4        A    Is that --
5        Q    Just that it happened?
6        A    Well, that, and that Dr. Muniz's counsel was
7 not copied. If you're going to talk to one side, you
8 need to talk to all sides.
9        Q    Is it because it creates the appearance of
10 impropriety or because it was actually impropriety?
11       A    Both.
12       Q    Okay. And I would have thought that it
13 would be improper if Celeste was advocating for her
14 position, talking about the substance of a finding,
15 talking about the case. Isn't that the nature of what
16 improper ex parte contact is all about?
17       A    Yes. And I think that that is part of what she
18 did. Well, this is the -- you know, yes, the standard
19 was wrong, and she told them what she advised, and he
20 said he will correct it. I think that --
21       Q    So you think that's a substantive ex parte
22 contact that troubles you and you opine that?
23       A    Yes. I think that it would have been very
24 easy to copy counsel on that. They should have been
25 apprised of that conversation.

32 (Pages 125 to 128)

Adrienne E Marting 8/12/2011

Page 129

```
1       Q     In fact, counsel for Muniz is the one who
2  raised this in the first place; right?
3       A     That's right.
4       Q     And Celeste was transmitting the error that
5  they raised to the hearing officer; right?
6       A     Well, the way you say that, it was the
7  hearing officer's error and they pointed it out.
8       Q     Oh, yeah.  I didn't mean it was their error.
9       A     No, not their error.
10      Q     She was delivering a message from these guys
11 to the hearing officer, hey, you used the wrong burden
12 of proof.  That's what happened; right?
13      A     Yes.  And that was substantive in the fact
14 that this is how we're going to deal with this error.
15 It really should have gone to the Board.  If they were
16 going to make a decision that we're going to cut to the
17 chase and just have them reissue the decision under the
18 proper burden, all parties should have been in on that
19 decision or at least given an opportunity to be heard.
20      Q     Okay.  But you believe if that would have
21 gone up to the Board, in your experience in peer review
22 they would have said to take this back and analyze this
23 under the appropriate standard of proof; right?
24      A     I think it's a possibility.
25      Q     More likely than not?
```

Page 130

```
1       A     Probably.
2       Q     Yeah.  I mean, the alternative is they would
3  start over?
4       A     Yeah.  And so they don't want to do that.
5       Q     That's not going to happen.  Okay, that's
6  the ex parte, I think.  Is there any other part of the
7  ex parte we haven't talked about that?  Well, we need
8  to talk about No. 9.  You have a problem with No. 9
9  being added; right?  We did hit on that.
10      A     Yes, yes.
11      Q     Talk to me about that.
12      A     All right.  The issue was the standard of
13 proof, the burden of proof, okay.  Not let's re-go
14 over, you know, and add things that we found.  And the
15 standard was supposed to be lighter for Dr. Muniz.
16      Q     Understood.
17      A     Instead of doing that, you know, they didn't
18 take anything off.  Like on the ones where they found
19 that it could have gone this way or that on the delay,
20 they didn't say, well, the burden is on the MEC, and it
21 wasn't real clear, let's take off No. 7, you know.
22 That would have been reasonable given the change in the
23 burden of proof that was made.  What happened was the
24 complete opposite.  They said, oh, well, the burden
25 changed, so let's add on some stuff, you know.  They
```

Page 131

```
1  added a whole 'nother finding that they hadn't had
2  before based on Lord only knows what.  But I think my
3  opinion is they were trying to bolster their opinion
4  now that the burden had changed.
5       Q     But you're speculating; right?
6       A     I'm speculating.  I'm giving my opinion.
7       Q     Sure.
8       A     But I think any attorney or any health peer
9  review expert would see that as a problem.  We're going
10 to make it easier for this physician; but when they go
11 back and review this, they come back with a harsher
12 decision.  You don't see a problem with that?  Well, I
13 know I can't ask questions.  But that's a problem to
14 me.
15      Q     Does that violate the bylaws, adding No. 9?
16      A     To the extent that it didn't follow the
17 procedure that it was supposed to go to the hearing
18 panel, yes.  And I mean to the Board.
19      Q     Other than -- well, we talked about that.
20      A     Right.
21      Q     But, I mean, adding -- assuming that
22 reconsideration is going to be done, and we've talked
23 about how that could technically be a violation.
24      A     Right.
25      Q     But if a peer review panel is reconsidering
```

Page 132

```
1  their findings, is there anything per se violative of
2  the bylaws to change a finding, add a finding, remove a
3  finding?  It's all okay, isn't it?
4       A     I don't think the bylaws address it that
5  specifically.  But they do -- there is an overriding
6  issue of fairness.
7       Q     We're talking about the bylaws right now.
8       A     Well, even in the bylaws you're supposed to
9  get a fair hearing, you're supposed to get notice,
10 you're supposed to get all the due process that's
11 entitled to go to them.
12      Q     So while that may not violate a specific
13 provision of the bylaws, it violates the fairness
14 component of the bylaws, either inferred or expressed
15 somewhere?
16      A     That's correct, that's correct.  Well, I
17 don't think there's a bylaw that says you can't when
18 you make a mistake go back and add something else.
19            (Whereupon, the deposition was briefly
20      interrupted at this point.)
21      MR. DAYHUFF:  Do you want to take a break?
22      THE WITNESS:  Yeah, I could use a break.
23      MR. DICK:  Yes.
24      MR. DAYHUFF:  Let's take a break.
25            (Whereupon, a recess was taken from
```

33 (Pages 129 to 132)

Adrienne E Marting 8/12/2011

Page 133

1      approximately 5:00 o'clock P.M. to 5:10 P.M.)
2          MR. DAYHUFF:  Back on the record.
3      Q     (By Mr. Dayhuff)  We were talking about No.
4  9.  And I think I understood your analysis on 9.  Do
5  you think adding 9 you're talking about -- you don't --
6  you're not giving expert opinions on what the evidence
7  shows, you're giving peer review opinions, I know.  And
8  issues of fact, you're not giving opinions about what
9  happened in the underlying medical thing.  Do you think
10  the addition of No. 9 is evidence that weighs in favor
11  of the fact that they got together in some way to
12  reconsider this?  You've got a concern that they didn't
13  get together to reconsider this?
14      A     Yeah.
15      Q     Doesn't the addition of a finding indicate
16  that they probably got back together and said, hey, you
17  know what, let's include this?
18      A     No, because I think the draft was -- my
19  understanding is this was written by the hearing
20  officer.
21      Q     So you think the hearing officer added that
22  on his own?
23      A     Right.  And I don't know whether it was that
24  subsequently they said okay.  But if he added it, based
25  on my experience, they are probably not going to argue

Page 134

1  with him.
2      Q     But, of course, they have every opportunity
3  to argue with him, don't they?
4      A     Well, one would hope.  But if he's writing
5  the decision before he has deliberated with the panel,
6  that's a big issue.
7      Q     That's a big issue, okay.  If the panel for
8  some reason --
9      A     You can't have the judge, who doesn't get a
10  vote, write a decision and say:  Here.  Is this your
11  decision?  I've changed the burden of proof and added
12  this finding of fact.
13      Q     And that assumes that he hasn't had a
14  conversation with them about what they want; right?
15      A     That's right, all together deliberating
16  after understanding the change in the burden of proof.
17      Q     And we don't know what happened one way or
18  the other?
19      A     We can only go from what the evidence shows.
20  The evidence indicates that the hearing officer drafted
21  it before meeting or deliberating, whether
22  telephonically or in person, with the hearing panel.
23      Q     But that's not an expert opinion, a peer
24  review opinion, is it?
25      A     To the extent it goes to whether it was

Page 135

1  appropriate and whether this decision is faulty and the
2  hearing was unfair, it's part of my expert opinion, is
3  all I can say.
4      Q     And I understand that you would -- if what
5  you believe happened happened, you're using that as an
6  element to support your peer review opinion.
7      A     Right.
8      Q     But you're not offering expert testimony
9  that you know what happened by reviewing the documents
10  with respect to how that corrected hearing report went
11  down?  That's not an expert area, is it?
12      A     No, I don't think so.
13      Q     It's a factual issue --
14      A     A factual issue.
15      Q     -- to be decided by the fact finder in this
16  case; correct?
17      A     Correct.
18      Q     All right.  Oh, the hearing officer, I think
19  you said you didn't like the way he behaved during the
20  hearing?
21      A     Yes.
22      Q     Tell me about that.
23      A     These bylaws provide that -- and HCQIA says
24  you can be represented by counsel or another physician
25  or someone.  And it gives a couple of different

Page 136

1  categories.  These bylaws say that the -- that they can
2  be represented by counsel, but counsel can't do
3  anything, basically.  So that's not unfair on its --
4  you know, by itself, in that it applies to both
5  parties.  But when you have a physician having to, you
6  know, basically save her life or her livelihood having
7  to act as an attorney on her own behalf, and then you
8  have the hearing officer acting as counsel for the MEC,
9  that just distorts the fairness completely.  That just
10  makes it a completely unfair hearing.
11          If you look through, and you can just tab
12  through the transcripts, on the back they list who was
13  examined by whom, you know, which witness was examined
14  by Dr. DiBona and Dr. Robinson, and numerous, numerous
15  times Mr. Nauful.  I've been in a lot of hearings.  The
16  only time the hearing officers ask questions generally
17  is to clarify something in the record.  You know, did
18  you mean this exhibit?  Did you misstate -- you know,
19  can you restate that?  Do you understand this?  Just to
20  make sure that the process is fair to all of the
21  parties in the room, not to examine a witness in a
22  manner that gets testimony that's favorable to one
23  party.  And he does that, or attempts to, repeatedly
24  throughout, and that's inappropriate.
25      Q     What if the hearing panel has asked him to

34 (Pages 133 to 136)

Adrienne E Marting 8/12/2011

Page 137

1    ask questions on their behalf?
2        A    Write them down and give them to him?
3        Q    Yeah.  Is that okay?
4        A    No.
5        Q    That's not?
6        A    I don't think so.
7        Q    What if the hearing panel were to ask a
8    question?
9        A    The hearing panel can perfectly ask
10   questions.
11       Q    So the hearing panel could ask the type of
12   questions that Mr. Nauful asked and it's okay?
13       A    That's correct.
14       Q    But if the hearing panel asked him or sent
15   him a note to ask those type of questions, it's not
16   okay?
17       A    Without seeing it, my guess is, my hunch, my
18   gut feeling is that no, it's not okay.  The hearing
19   officer should not be asking questions.
20       Q    Tell me why it's not okay?
21       A    Because he's acting, if you look at the
22   record, he's acting as an advocate for one party.  The
23   type of questions and who he questions and the specific
24   -- the specificity of the questions are all as if this
25   MEC counsel.  It looks like, to follow your theme, that

Page 138

1    Celeste sent him the questions, here, ask these.  And
2    they're on completely -- you know, some of them are
3    additional topics that the hearing panel hadn't even
4    asked about, you know.  So I think that's
5    inappropriate.  And it happens again and again and
6    again.  You know, it can always happen a few times, one
7    or two questions here or there, but it's repeated
8    throughout.
9        Q    Because a hearing officer can ask questions;
10   right?  And I think you said that.  It's not, per se, a
11   problem for a hearing officer to ask a witness a
12   question at a fair hearing?
13       A    To clarify a point, not to prosecute a case.
14       Q    Okay.
15       A    Or defend.  If he cross-examined all of the
16   hospital witnesses in a manner that's favorable to
17   Dr. Muniz, that's inappropriate.  He's not supposed to
18   advocate on behalf of any party.  The fact that he did
19   ask multiple, multiple questions in a manner that was
20   favorable to the MEC and that he, you know, had
21   communications with MEC's counsel ex parte shows that
22   he just didn't understand his role.  He was hired by
23   the hospital, so I'm going to represent the hospital.
24   And I don't know that he went that far in his thinking,
25   but that's what you get when you review the record.

Page 139

1        Q    In your experience the hearing officer is
2    hired by the hospital all the time; right?
3        A    That's right, the hospital, not the MEC.
4        Q    Right.  Well, you have no -- you don't
5    believe, do you, that the MEC facilitated or was
6    involved in Nauful's asking questions at the fair
7    hearing, do you?
8        A    He had a meeting with some of the MEC
9    members.  Didn't they have a prehearing conference
10   where -- or not a conference but a meeting where
11   representatives from the MEC and Celeste and the
12   hearing officer were present and no one from
13   Dr. Muniz's counsel was present?
14       Q    Then you read the testimony about what
15   occurred at that meeting; right?
16       A    I'm sure I did.
17       Q    Do you recall anything that would indicate
18   to you that at that meeting Celeste used that as her
19   opportunity to get Ernie Nauful to ask questions that
20   would be favorable or helpful to her of witnesses?  Did
21   you see any indication of that at all?
22       A    I don't believe so.  I probably would have
23   remembered that.
24       Q    Yeah.  If you did, that would have caught
25   your eye?

Page 140

1        A    Yes.
2        Q    Now, let's assume for the sake of argument
3    that Nauful shouldn't have asked questions.  If we
4    assume that, does it matter at all to your opinion that
5    the MEC -- if the MEC had nothing to do with his
6    decision to ask questions, does that affect your
7    opinion?  I mean, is it still unfair to you?
8        A    It's still unfair because you have to look
9    at the process as a whole.
10       Q    Okay.
11       A    That's kind of what the whole issue is.  You
12   have to look, once it goes all the way to the Board and
13   the final decision, you have to look at the process all
14   the way through.
15       Q    Fair enough.
16       A    And it doesn't really matter whether the MEC
17   specifically asked him or he has friends on the Board
18   or he just thought his role was to ask questions and he
19   didn't know and that's just how his questions came out.
20   The fact is he asked a whole bunch of questions as if
21   he were an advocate for the MEC, okay.  That's not fair
22   when Dr. Muniz can't have counsel in there.  They
23   didn't even do an opening statement.
24       Q    They had counsel in there; right?
25       A    Right, but they couldn't say anything.

35 (Pages 137 to 140)

Page 141

1  There's a quote in here that attorneys, aren't allowed
2  to talk.  And that's Nauful saying that at one point.
3       Q      Well, attorneys were allowed to offer
4  objections on evidence issues, weren't they?
5       A      Right.  Apparently so was Dr. Minto.
6       Q      Well, they weren't potted plants; right?
7       A      Well --
8       Q      Well, David may have been.
9       A      David, right.
10      Q      But they were allowed, if something was
11  going off the tracks, the attorneys for the MEC or the
12  attorneys for Dr. Muniz were able to speak up and
13  object, weren't they?
14      A      Yes, in a limited extent.
15      Q      Well, did you ever see them precluded from
16  offering an objection they wanted to offer?
17      A      I can't answer that question yes or no.
18  There's a whole bunch of testimony.
19      Q      There is.
20      A      Sorry.
21      Q      You mentioned the mother testifying was an
22  issue for you or not?
23      A      Yes.
24      Q      Tell me about that.
25      A      There wasn't any -- she wasn't listed on the

Page 142

1  witness list.
2       Q      And because she wasn't listed on the witness
3  list, that --
4       A      Doesn't give --
5       Q      Doesn't give notice?
6       A      It's inappropriate.  Goes against HCQIA and
7  the bylaws.
8       Q      All right.  Would it matter to you, to that
9  opinion, if the mother was -- that the MEC didn't know
10  until testimony from other witnesses at the hearing,
11  that they didn't know until that testimony was entered
12  into evidence that they needed the mother to testify to
13  clarify what they viewed as an inaccuracy in the
14  record?  Would that matter?  And you can assume that
15  hypothetically and you don't need to look at the --
16      A      Well, sometimes it -- I tell my clients to
17  look at the bylaws.  And here it is highlighted that
18  presiding officer shall not act as an advocate for
19  either side of the hearing.  But let me get to your
20  point.
21      Q      Check out the witness section.
22      A      Right.  I think they can amend, but they --
23  if it's -- these bylaws are similar -- if they give,
24  you know, sufficient notice.  And I don't think that
25  was the case here.  Well, sorry.  Actually, here it is.

Page 143

1           Ask your question again.  Sorry.
2       Q      You offer the opinion that allowing the
3  mother to testify without providing her name in the
4  initial hearing notice is unfair, inappropriate;
5  correct?
6       A      That's correct.
7       Q      Okay.  My question to you was if you assume
8  that the MEC didn't -- couldn't have known the need for
9  this witness, the mother, until after evidence offered
10  at the hearing, i.e., Muniz or other witnesses making
11  statements about her daughter's desire to have a
12  transfer or not have a C-section or what-have-you, if
13  they couldn't know until that evidence was entered that
14  her testimony was necessary, does that change your
15  opinion about the unfairness or the impropriety of
16  allowing her to testify?
17      A      Actually, that specific fact, one way or
18  another, the bylaws allow for the parties to amend
19  their witness list, but it has to give -- provided that
20  notice of the change is given to the other party.  And
21  that would assume in here, as in all the notice
22  provisions, enough to allow the other side to do
23  something about it, you know.  Now, hey, we're going to
24  call her right now.
25      Q      How much notice would you say is

Page 144

1  appropriate?
2       A      Well, they knew of the mother, and that she
3  was an issue, and the patient.  They could have put her
4  in originally.  I think your issue of saying they
5  somehow didn't know, I think that's --
6       Q      I'm asking you to assume that.
7       A      Well, you could come up with any fact
8  pattern that said, oh, yeah, maybe under this scenario.
9       Q      Okay.  Well, I'm asking you as an expert
10  under my scenario, assuming what I say is true, would
11  that change your opinion?
12      A      The MEC didn't know -- all right.  Let's
13  just say the MEC wanted to amend its witness list.  I
14  think that both parties can amend their witness list,
15  provided they have enough notice.  And it doesn't say
16  exactly how much notice.
17      Q      Sure.  That's a separate issue.  My question
18  is assuming that the MEC didn't know the need for Mom
19  to come testify until they heard other witnesses at
20  that hearing.  Does that change your opinion about
21  whether Mom needs to be on the initial notice?  And I'm
22  asking you to assume --
23      A      Well, that's why you would amend your
24  witness list, is you learned something new.  So I think
25  we might be agreeing.

36 (Pages 141 to 144)

Adrienne E Marting 8/12/2011

Page 145

1    Q    Okay. So that would change your opinion,
2  but you would like to see an amended witness list?
3    A    You have to notify the other side. You
4  don't show up and say I'm going to call this person or
5  I'm going to do an affidavit.
6    Q    In any particular form or as long as there's
7  notice?
8    A    It says amend their witness list.
9    Q    Okay. Could you amend the witness list
10  through an email? Why not?
11    A    Why not? That's how we all live.
12    Q    Yeah. I mean, you could amend the witness
13  list through an email, could you not?
14    A    It doesn't say one way or another.
15  Theoretically, yes, if everybody is in agreement to it.
16  But counsel was not in agreement. He vehemently was
17  opposed to the issue.
18    Q    We're not talking about whether they wanted
19  Mom to testify or not, we're talking about notice.
20    A    Right.
21    Q    Could you have --
22    A    But you talked about the form of notice.
23    Q    Yeah.
24    A    The formality of it.
25    Q    So you're saying if I was Celeste and I sent

Page 146

1  David an email about Mom testifying, he could object to
2  the form of that notice and that objection be a valid
3  one?
4    A    I don't think that the two of them by email
5  can resolve the issue. I think the hearing officer has
6  to be there. It has to be appropriately amended.
7  Whether it's, you know -- okay.
8    Q    Resolve the issue of whether she gets to
9  testify or not?
10    A    Right, right.
11    Q    No, I understand that.
12    A    Okay, I'm sorry. Maybe that's why we're
13  going at it with --
14    Q    I'm just talking about the notice.
15    A    Yeah.
16    Q    The bylaws say you've got to amend your
17  witness list --
18    A    Oh, I'm sorry, I was focusing on --
19    Q    -- and my question was could you do that
20  amendment through a phone call; how about that? Could
21  you do it through an email? As long as there is notice
22  provided, it's okay, isn't it, the notice part?
23    A    The notice part? But, then, well, how do
24  you know -- I mean, if you say, oh, I called Adrienne
25  and told her, but I never got that call, I don't think

Page 147

1  notice is appropriate, you know what I mean. So I
2  think that's an issue. I think it has to be real clear
3  that everybody got notice.
4    Q    All right. If --
5    A    For it to be appropriate.
6    Q    -- counsel for Muniz admitted that they knew
7  of Celeste's desire to call Mom days before they were
8  going to call Mom, is that notice?
9    A    Yes.
10    Q    Okay. Now, to the issue of whether she
11  should have testified or not. Do you have an issue
12  with Nauful's decision to allow her to testify, or not,
13  or is that within his discretion?
14    A    Well, there was strong objection.
15    Q    There was.
16    A    Very strong objection. And the hearing
17  officer can control how the hearing proceeds.
18    Q    The mode and method of the hearing; right?
19    A    Exactly.
20    Q    So do you have a problem with his decision
21  that was entered over the objection of Muniz's counsel
22  to allow Mom to testify? Does that violate some peer
23  review principle?
24    A    It does not violate any specific provision
25  that I know of, but I think it goes to the fairness of

Page 148

1  the hearing. So, you know, it doesn't say you can't,
2  you know, amend the bylaws or you -- I mean, amend the
3  witness list.
4    Q    Do you view that decision, that decision, to
5  be unfair?
6    A    How much notice was given?
7    Q    I don't know. How much notice would you
8  require to be given such that it wasn't unfair?
9    A    Several days if you're going to call the
10  patient's mother, I mean.
11    Q    Several days?
12    A    Yeah.
13    Q    All right.
14    A    I mean, especially since -- well, weren't
15  there gaps in time between this hearing?
16    Q    I think so.
17    A    Yeah.
18    Q    Of course, Dr. Muniz would have the right
19  and the ability to cross-examine Mom once she is
20  called; right?
21    A    Yeah. And how much legal training did
22  Dr. Muniz have? And she didn't have the benefit of the
23  hearing officer helping her.
24    Q    She had her counsel with her, didn't she?
25    A    Who wasn't allowed to speak.

37 (Pages 145 to 148)

Adrienne E Marting 8/12/2011

Page 149

```
 1      Q     They were allowed to talk to her; right?
 2      A     Yes.
 3      Q     And assist her with her cross-examination if
 4   she so desired; right?
 5      A     Beforehand.  But I don't think during the
 6   hearing, as a practical matter, you can get a full
 7   cross-examine that an attorney would ask versus what a
 8   physician would ask.
 9      Q     Okay.  So you believe that attorneys are
10   better at cross-examining than physicians; right?
11      A     I would hope.  Although, I must say that
12   these physicians did very well.
13      Q     Did pretty good?
14      A     Yeah.  I was real impressed, all of them, on
15   both sides.
16      Q     And I understand that opinion.
17      A     From a legal point.
18      Q     And I just want to make sure that Dr. Muniz
19   would have access to her counsel for assistance --
20      A     Uh-huh.
21      Q     -- With questioning at the hearing; right?
22      A     I would hope.
23      Q     Okay.
24      A     And the MEC had the hearing officer and
25   their own counsel.
```

Page 150

```
 1      Q     We've got that opinion.
 2      A     I just want to make sure you didn't miss
 3   that one.
 4      Q     Oh, no.  Competitors voting and
 5   deliberating, I have as No. 4, and assisting the MEC I
 6   guess is the issue?
 7      A     Yes.
 8      Q     Talk to me about that.
 9      A     And I've got to get these names straight,
10   because there's Boone, Boehner, DiBona.  And I have
11   this little cheat sheet.  Do you have my little cheat
12   sheet with all the names on it?
13      Q     Is it that chart you had?
14      A     Yes.
15      Q     Okay, you have your chart you were looking
16   at.
17      A     And I don't want to misstate who is who.
18   All right.  Boone, Boehner, and Minto are partners.
19   And Bana -- no, Boehner and DiBona both serve on the
20   Board; is that correct?  Do I have the names right?  I
21   know two of them do.  And I know you're not going to
22   answer me, but that's what I'm looking for.
23            Okay, here we go.  Dr. Boehner is chairman
24   of the Board and he is also an OB and he helped
25   prosecute the case against Dr. Muniz.  And, you know,
```

Page 151

```
 1   this might be something I have to further support,
 2   because I don't have the minutes with me, but my
 3   understanding in looking at everything that I've looked
 4   at is both Dr. DiBona and Dr. Boehner, who partook in
 5   presenting the case, also participated in the final
 6   decision by the Board.  And Dr. Boehner, as I
 7   understand it, is a competitor.
 8      Q     Okay.
 9      A     Okay.  And I believe I read that he did not
10   vote, that he recused himself for the actual vote.
11      Q     At the Board?
12      A     At the Board.  But he did not recuse himself
13   from the meeting and the deliberation.  That's not what
14   it says.
15      Q     We can assume that for purposes of your
16   opinion today; how about that?
17      A     All right.
18      Q     So you would have a problem if Dr. Boehner,
19   the chairman of the Board of the hospital, voted and/or
20   deliberated about this matter?  That would be a problem
21   for you; right?
22      A     Yes.
23      Q     About Dr. Muniz's peer review, okay.
24      A     That's right, because he also participated
25   in presenting it.
```

Page 152

```
 1      Q     And that was my next question.
 2      A     And he's her competitor.
 3      Q     So because he is her competitor and because
 4   he participated at the fair hearing level?
 5      A     Yeah.  It's like me going in and being a
 6   witness against you at trial and then I turn around and
 7   I get to be the judge too.  That violates all concepts
 8   of fairness.
 9      Q     Does that violate the bylaws?
10      A     If he voted, yes.
11      Q     And does that -- well, does HCQIA address
12   that at all?
13      A     Yes, it does.
14      Q     In what respect?
15      A     To the extent that any of the decision-
16   makers -- well, the fact that he's a competitor, he's
17   allowed to present, you know, and oppose them or be a
18   witness, but he's not allowed to be in the decision.
19      Q     All right.  And that's pursuant to HCQIA?
20      A     HCQIA.
21      Q     I understand that.  Any other competitors/
22   prosecutor kind of issues that you have?  That's got to
23   be it.  You just told me that it's okay for Boehner to
24   present at the fair hearing or be a witness at the fair
25   hearing; right?
```

38 (Pages 149 to 152)

Adrienne E Marting 8/12/2011

Page 153

1    A    That's right.
2    Q    So it would also be okay for Minto, a
3  competitor, an OB, to present at the fair hearing or be
4  a witness the fair hearing?
5    A    Yes.
6    Q    Okay.  And I don't think Boone did, but if
7  Boone --
8    A    No, I don't think he did.
9    Q    -- an OB competitor presented at the hearing
10 or was a witness at the fair hearing, that's okay?
11   A    Right.
12   Q    All right.  I've got my next one, unless you
13 have anything else on the competitor issue, lack of
14 attempt to take intermediate action.
15   A    Yes.
16   Q    Talk to me about that.
17   A    Without belaboring the decision again and
18 all of the faults we found on that, the difference
19 between the notice and what they actually found on what
20 they said they were going to try her on and what their
21 findings were, I think it's clear and my expert opinion
22 is when you read the record, all the correspondence,
23 the hearing transcript, the decision and how it went up
24 through to the Board, that the hearing panel who heard
25 all the evidence backed off considerably on their

Page 154

1  concerns, on the concerns that were originally raised
2  with respect to this case, you know, whether she
3  recognized an emergent situation, whether there was a
4  delay, and the medication issue.  The medication issue
5  was dropped completely.  After hearing testimony it was
6  like, fine, since several maternal-fetal experts said
7  that was perfectly fine, they, to their credit, dropped
8  that as an issue.  And they dropped off and said, you
9  know, well, the delay, they didn't make a specific
10 finding that there was a clear delay of a certain time
11 and that it even affected the ultimate outcome, all
12 right.
13   Q    Okay.  This dropping down, dropping off,
14 however you described it, there's nothing wrong with
15 that, is there?
16   A    No, no, that's what I'm saying.  And thank
17 you, that brought me around.  I forgot where I was
18 going, quite frankly.  I was going to say that I had a
19 point here.  But intermediate sanctions, it's
20 questionable when you have one case -- and I perfectly
21 understand whenever you have a death that it's
22 reasonable to look at the case, okay.  They could have
23 done normal peer review, questionable, and we can argue
24 all day whether precautionary suspension, whether there
25 was imminent harm.  I would say no and you would say

Page 155

1  yes.  But that's a gray area.
2       But the sanction for that one case, given
3  the testimony -- well, even if you look at the record
4  even before you get to the testimony, the sanction of
5  summarily suspending this physician's privileges and
6  medical staff membership is so overboard from what the
7  testimony supported.  The testimony of their own
8  witnesses was, you know, one of them said that I might
9  have done it sooner and the other one said I wouldn't
10 have done it sooner and I thought it was within the
11 standard of care.  I mean, there was a whole bunch of
12 testimony from the MEC's own witnesses that Dr. Muniz's
13 care was not outside the standard.  So to take away her
14 privileges on that ground is way beyond what was
15 necessary.
16       If they thought, look, and what they
17 basically found, when you look at the decision, is, you
18 know, we can't believe what this woman said, she is
19 fighting for her life, we don't know if she said this
20 right or this right, and she misstated this word, which
21 had nothing to do with the substance of the actual care
22 provided.  And we don't know whether she can work with
23 people.  You know, they could have used the disruptive
24 physician policy.  They could have sent her out to be-
25 nice school, which they do to a lot of physicians.  You

Page 156

1  know, they could have reprimanded her, made her get
2  counseling, a whole manner of things.  But instead they
3  completely destroyed her career.  And I think the
4  failure to do that puts into question the whole
5  fairness of this hearing.
6    Q    Let me ask you a few follow-ups on that.
7  Sounds like if you were on the hearing panel, you would
8  have made a different decision after review of that
9  evidence; right?
10   A    That's true.
11   Q    Okay.  You would have chosen a different
12 sanction or remedy or solution other than revocation;
13 correct?
14   A    That's correct.
15   Q    All right.  What I'm struggling with is
16 isn't that -- isn't that in the discretion of the
17 panel, the physician peers, to make that decision?
18   A    But it has to be based on the evidence.
19   Q    All right.
20   A    All right?
21   Q    I hear you.
22   A    You have to look at what they found fault
23 with, what they thought was the problem with this
24 physician's care, and what they ended up deciding after
25 hearing all the evidence and based on their evidence

39 (Pages 153 to 156)

Adrienne E Marting 8/12/2011

Page 157

```
 1   what they eventually did.  The Board, as the final
 2   determiner, should consider all of that as well.
 3       Q     And they did?
 4       A     Uh-huh.
 5       Q     And they decided in their discretion
 6   revocation was the answer; right?
 7       A     Yeah.  And the chairman of the Board was the
 8   one waving the flag through the whole process.  Where's
 9   the fairness in that?
10       Q     Under your assumption that he participated
11   in the --
12       A     He was at the meeting, unless the meeting
13   minutes are incorrect.
14       Q     All right.  So, let's see, different
15   sanction.  What sanction would you have chosen?
16       A     Assuming which facts?
17       Q     The facts as you know them.
18       A     I don't agree with the facts that they find.
19   If they really found that, you know, we don't think she
20   can get along with people, send her to counseling, send
21   her to be-nice school, a 29-day suspension.  You know,
22   get her attention.  She has already spent a ton of
23   money, you know, to get through this process.  And, I
24   mean, I'm not pointing fingers at him (indicating), but
25   for any one of us in this room it would have been a ton
```

Page 158

```
 1   of money.
 2            MR. DICK:  I'm a lot cheaper than you two,
 3       I'll tell you.
 4            THE WITNESS:  That's just a nice way of
 5       saying you're younger.
 6            MR. DAYHUFF:  Thanks a lot.
 7       Q     (By Mr. Dayhuff)  Well, let me ask you this
 8   question.  In the short time I've had to take a look at
 9   your outline, your outline recognizes and I would
10   imagine you would not dispute --
11       A     What outline?  Oh, that was for --
12       Q     Something.
13       A     That's not for this case, you know.
14       Q     I know not this case.  This is more of a
15   general question.
16       A     Okay.
17       Q     The decision to take a case into corrective
18   action versus the disruptive physician policy.
19       A     Right.
20       Q     Those are two different avenues; right?
21       A     That's right.
22       Q     And it's up to the MEC if they want to take
23   it into corrective action or if they want to refer this
24   to administration to take it under the disruptive
25   physician; right?
```

Page 159

```
 1       A     That's right.
 2       Q     I mean, there's nothing wrong with choosing
 3   which avenue you go down; right?
 4       A     That's right.
 5       Q     All right.
 6       A     But you asked me which sanctions.
 7       Q     I did.
 8       A     So that's where that came in.
 9       Q     I got you.  Now, I think I've got a few more
10   questions for you, but I think --
11       A     And can I just add one thing on the
12   decision?
13       Q     Sure.
14       A     You had asked me about peer review and the
15   purpose.  The whole purpose of peer review is to
16   improve the quality of care, you know.
17       Q     Right.
18       A     Not to destroy physicians' careers.  There
19   was a whole lot that could have been done to address
20   any concerns, valid or not, by this or any participant
21   in this hearing process, that could have addressed the
22   concerns and not destroyed this person's career.
23       Q     So you disagree with the sanction that was
24   chosen; right?
25       A     That's correct.
```

Page 160

```
 1       Q     There's nothing in the bylaws that makes
 2   that sanction that was chosen inappropriate, is there?
 3       A     Well, it has to be -- yeah.  I mean, the
 4   standard of proof.  There has to be credible evidence.
 5   I believe it was arbitrary and capricious.
 6       Q     Well, you're not an expert in determining
 7   whether there was credible medical evidence or
 8   credibility of the evidence to make a decision, though;
 9   right?
10       A     No.  I base that on reading the record and
11   my 25 years of experience.
12       Q     Just like I could read the record or David
13   could read the record and weigh evidence; right?
14       A     You asked me my opinion, and that was it.
15       Q     That's not an expert peer review opinion,
16   that's me, Adrienne, reading that record and deciding
17   what I think about that evidence, medical evidence, by
18   the way, but evidence; right?
19       A     No, not necessarily, because you have to
20   look --
21       Q     What peer review standard do you apply to
22   make that decision about the weighing of the evidence?
23       A     It's the bylaws standard.
24       Q     Which bylaws standard does that violate?
25       A     It says you have to do it -- where's the
```

40 (Pages 157 to 160)

Adrienne E Marting 8/12/2011

Page 161

```
 1   bylaws?  Actually --
 2        MR. DICK:  There's the bylaws (indicating).
 3        A    (Continuing)  Well, it wouldn't be this
 4   exact standard because they agreed to a modified one.
 5   But it was, you know, the grounds for the decision
 6   can't be arbitrary and capricious.
 7        Q    Okay.  So you -- okay.
 8        A    And that's both --
 9        Q    So you looked at the evidence and decided
10   that the grounds for their decision -- well, that they
11   acted arbitrarily and capriciously based on your review
12   of the evidence?
13        A    The recommendation based on the evidence,
14   yes.
15        Q    Okay.  And I guess what I'm asking you is
16   how is that a peer review opinion?  Isn't that like you
17   as a fact finder or you a medical weigher of evidence,
18   I mean?
19        A    I think it's a crossover.  I think if I'm
20   here testifying as a peer review expert, I've looked at
21   the standards and I've looked at the evidence and
22   considered the process, and with all of the peer review
23   hearings I've been in and the research I've done, and
24   that I'm giving my opinion based on that.  So I think
25   we can just agree that's what it is.
```

Page 162

```
 1        Q    All right.  Let me ask you a few others.
 2        A    Sure.
 3        Q    Peer review, internal hospital trials, there
 4   are a lot of elements in those that are very much like
 5   kind of a civil trial; right?
 6        A    That's correct.  Quasi-judicial, I believe.
 7        Q    Quasi-judicial.  The concept of -- and we've
 8   talked a little bit about this.  The concept of making
 9   objections, contemporaneous objections, applies in
10   internal hospital peer review, right, at hearing?
11        A    Yes, to the --
12        Q    And let me make it more concrete.
13        A    Yeah.
14        Q    If you're sitting there as hospital counsel,
15   like you are 30 times in your career, and physician's
16   counsel raises an issue or brings in a piece of
17   evidence and you have a problem with it, you need to
18   make a contemporaneous objection if you want to hope to
19   exclude it; right?
20        A    I think it would be prudent.  But I don't
21   think you can say -- I think what you're trying to say
22   is that the Rules of Civil Procedure apply, and they
23   don't.  I mean, they clearly say that the evidentiary
24   rules don't apply.
25        Q    Sure, sure.  What I'm saying is a little bit
```

Page 163

```
 1   different.  I agree that the Rules of Civil Procedure
 2   don't apply and the evidence rules are more broad in
 3   peer review.
 4        A    Exactly.
 5        Q    But if you've got a problem with something
 6   someone is about to testify to or offer into evidence,
 7   don't you believe that you're required to make that
 8   contemporaneous objection or it comes in; right?
 9        A    Oh.  Yeah.
10        Q    All right.  If you have a problem with the
11   hearing panel members --
12        A    Right.
13        Q    -- you have an obligation as counsel for the
14   physician or counsel for the MEC to make an objection
15   to the hearing panel member?
16        A    And I think that was done in this case.
17        Q    Before the hearing; right?
18        A    Right.
19        Q    Okay.
20        A    When they put Dr. Toomer on the hearing
21   panel and he was a participant in the matter.
22        Q    And they objected timely and the person was
23   removed; right?
24        A    Yeah.  And then they called him as a
25   witness.  Very incestuous.
```

Page 164

```
 1        Q    Nothing wrong with calling him as a witness,
 2   is there?
 3        A    No, no.
 4        Q    Good.  Question for you:  If Dr. Muniz and
 5   her counsel had a problem with Ernie Nauful as hearing
 6   officer, they needed to make a contemporaneous
 7   objection to have him removed, did they not?
 8        A    If there was something before the hearing
 9   started that they knew about, you know, say, oh, you
10   know, he's married to some -- you know what I mean?
11        Q    Married to Celeste Jones?
12        A    Yeah, exactly.
13        Q    Okay.
14        A    Or to the witnesses.
15        Q    I'm talking about during the hearing.
16   Because what we have is an allegation that this guy is
17   asking questions that are too MEC friendly.  Don't --
18   doesn't Dr. Muniz have the obligation, or her counsel,
19   to object when that happens and say:  Hold on.  You
20   can't ask these questions; that's not right.
21        A    And how's that going to help her?
22        Q    It's going to be -- well --
23        A    You know what I mean?
24        Q    I know what you mean, but --
25        A    As a practical matter.
```

41 (Pages 161 to 164)

Adrienne E Marting 8/12/2011

Page 165

1    Q    I know what you mean.  You're worried about
2    the strategery involved in that kind of an objection;
3    right?
4    A    Right.
5    Q    But that's their call; right?
6    A    Or the ultimate effect.
7    Q    And that's their call, isn't it?  And by
8    "their," for the record, I mean Dr. Muniz and her
9    counsel.
10    A    Right.
11    Q    You and I have been there too when you make
12    a decision to object or not based on how it's going to
13    affect everything; right?
14    A    Right.
15    Q    But that's still our call, isn't it?
16    A    Yes.  But still --
17    Q    They could --
18    A    Go ahead.
19    Q    They could have objected if they felt that
20    Dr. Ernie Nauful -- well, not Dr. but Mr. Ernie Nauful
21    was asking questions that were favorable to the MEC,
22    they could have objected and they didn't; right?
23    A    I don't believe they did.  I mean, you know,
24    I haven't memorized it, but I don't recall that.
25    Q    The question is they could have; right?

Page 166

1    A    Yes, they could have.
2    A    Sure, they could have.  And by not
3    objecting, for whatever reason, it's just like letting
4    in that piece of evidence, now it's in and it's too
5    late to raise that now?
6    A    I don't think so.
7    Q    Why not?
8    A    Because what you're doing is looking at the
9    whole process, okay.  And the fact that he acted this
10    way during the hearing and then all the irregularities
11    with respect to the ex parte communications and
12    forgetting to do the proper burden of proof, and then
13    the questions regarding how the corrected report was
14    done, all of those you have to look at.  And that
15    wasn't known until after the fact.
16    Q    And I understand what you're saying, you
17    still don't let my friend Mr. Nauful off the hook for
18    what happened later.  My question is more narrow,
19    though.  If they wanted to stop the questions that he
20    was asking during the hearing, don't they have an
21    obligation to make a contemporaneous objection to stop
22    those; otherwise, they have waived that complaint?
23    A    I don't -- I don't know, to tell you the
24    truth.  I can't say absolutely that there is a specific
25    standard that says that they waive, you know.

Page 167

1    Q    What does your experience tell you with
2    respect to hearings that you have been in 30 years?  If
3    you don't make a contemporaneous objection, you waive?
4    A    Well --
5    Q    That's the way the world works?
6    A    The bad act comes in, okay.  So the bad act
7    occurred.  And I will give you that they did not object
8    during the hearing while the hearing is there, but who
9    knows what the questions would have become after that.
10    But you have to look at all of the actions of the
11    hearing officer.
12    Q    And I'm not -- I'm not even talking about
13    the totality of the stuff.
14    A    And I gave you your point, but you have to
15    acknowledge mine.
16    Q    Just so I'm clear on my point, absent a
17    contemporaneous objection, you can't raise later the
18    questions he asked as a grounds for unfairness?
19    A    I disagree with that.
20    Q    Really?
21    A    Yeah.
22         MR. DICK:  And I object to form.
23    A    (Continuing)  On the whole reasons that I
24    just said.  And there's not a standard that says that
25    in the bylaws or HCQIA.  What I will agree with you on

Page 168

1    is if they didn't object to it and it came in, it's in
2    the record, okay.  That's where we agree.
3    Q    All right.
4    A    But I don't think we're precluded to say,
5    look at this guy, he didn't give us a fair hearing.
6    Look at all these things he did.  That's one of the
7    things.
8    Q    And I guess I would say you've got the
9    obligation to take the steps when you see it happen or,
10    otherwise, you've waived.  But you disagree?
11    A    I understand that's your position.
12    Q    But you disagree with that position?
13    A    Yes, to the extent -- yes.  And I think the
14    record reflects what my opinion is.
15    Q    Fair enough.  Do you know whether Aiken
16    Regional Medical Center is a public institution or not?
17    A    I believe it's a for-profit owned by UHS.
18    Q    All right.  And if it's a for-profit owned
19    by UHS, the Fifth Amendment of the Federal
20    Constitution, the Fourteenth Amendment of the Federal
21    Constitution, and the due process clauses in the South
22    Carolina Constitution, do those apply to my client?
23    A    I don't believe so.  However, those concepts
24    are --
25    Q    You don't believe so or, no, they don't

42 (Pages 165 to 168)

Adrienne E Marting 8/12/2011

Page 169

1  apply?

2      A      I don't believe so is the strongest.

3      Q      Okay.  Why do you not believe that?

4      A      Because they're not a public entity, they're

5  private.

6      Q      Right, and constitutions apply to public

7  entities?

8      A      Exactly.

9      Q      Okay.

10     A      However, if you look at the whole line of

11  nonprofits that have been reorganized, there's mix in

12  the case law whether they call them public or private.

13  And there's a whole bunch of public institutions that

14  still have to abide by those criteria.  So --

15     Q      Whole bunch of private institutions?

16     A      Public.

17     Q      Public, okay.

18     A      You know, open to the public.  And that's --

19  I'm getting off my area of expertise.  This is going

20  back to law school.

21     Q      Isn't it?

22     A      Yeah.

23     Q      And maybe I can short-circuit it and say

24  this:  You wouldn't opine, in fact you would disagree

25  with an opinion that due process applies to a private

Page 170

1  institution?

2      A      I'm sorry, say that again.  I just beamed

3  out.

4      Q      You don't believe due process, the notion of

5  due process, as in constitutional due process, applies

6  to a private entity, do you?

7      A      Not as a constitutional process.  But here

8  we have two different sets of standards that are

9  applying that, for lack of a better term, can be

10  summarized by due process, the Medical Staff Bylaws and

11  the Health Care Quality Improvement Act.

12     Q      Well, let me make it more specific then.

13  You couldn't assert a legal claim against a private

14  institution for violation of the due process clauses in

15  state or federal constitutions, could you?

16     A      I have not researched that issue.  I'll give

17  you that I don't think so, but I haven't researched

18  that issue.

19     Q      Fair enough.

20     A      And I don't want to opine on it one way or

21  another.

22     Q      Well, you know, while I've got somebody to

23  opine, I might as well chat with you.

24     A      That's not a peer review.  Well ...

25     Q      Does a private hospital's acceptance of

Page 171

1  Medicare and Medicaid funds turn it into a public

2  institution?

3      A      I am hesitating because I think there is

4  something to that.  But I can't cite you anything, so I

5  am going to say I don't -- I am not positive on that.

6      Q      Okay.

7      A      Because there's a whole bunch of criteria,

8  like EMTALA and there's a whole bunch of criteria that

9  apply to private hospitals by virtue of the fact that

10  they get Medicare and Medicaid.

11     Q      Is the --

12     A      So --

13     Q      I'm sorry.

14     A      Go ahead.

15     Q      Okay.  Is the violation of hospital bylaws,

16  in a peer review process, does that constitute a

17  violation of the Health Care Quality Improvement Act?

18     A      It could, I mean, to the extent that they

19  have very similar, you know, notice, adequate notice,

20  adequate hearing, you know, all of the rights in the

21  hearing.  So they mirror each other to some extent.

22     Q      To some extent they do, but you could

23  certainly violate the hospital bylaws and still be

24  found by a court to have complied with the HCQIA

25  standards?

Page 172

1      A      That's correct.  I believe that to be

2  correct.

3      Q      Are medical staff bylaws in your opinion a

4  contract between a physician and a hospital?

5      A      It depends on what state you're in.  I --

6  I'm sorry, go ahead and ask that question again.

7      Q      Do you believe that medical staff bylaws are

8  a contract between a physician and a hospital?

9      A      I know that it's been argued and adjudicated

10  differently in multiple -- in a variety of opinions.

11     Q      What's Georgia's?

12     A      I don't believe it's a contract.

13     Q      How about South Carolina?

14     A      That I don't know.  I'll know by the time I

15  -- I'll tell you when I know the answer.

16     Q      Question about the burden of proof.  You

17  mentioned that you talked about the original burden of

18  proof in our bylaws putting the burden on the

19  physician.  You've done a lot of work with medical

20  staff bylaws.  Have you drafted medical staff bylaws

21  provisions that placed the burden of proof on the

22  physician in a peer review matter?

23     A      Yes.

24     Q      And nothing wrong with that?

25     A      No.  Just got to follow what's in the

43 (Pages 169 to 172)

Adrienne E Marting 8/12/2011

Page 173

1  bylaws.
2      Q     Okay.  So you could have that kind of burden
3  you were talking about, you, physician, must prove by
4  clear and convincing evidence that the MEC's decision
5  was arbitrary and capricious, and that's okay?
6      A     I've never put that in a bylaws.  I think
7  that's overreaching.
8      Q     What do you put in there?
9      A     Preponderance of the evidence.  And usually
10  -- well, in this case it's a little bit different.  The
11  way the burden is stated, it really seems to be talking
12  initially about credentialing and whether they should
13  have privileges, you know.  So it's a little bit of a
14  different issue.  I think it's the clear and convincing
15  on the physician by itself.  I think a lot of
16  physicians don't read their bylaws before they vote on
17  them.  And they wouldn't do that, frankly.
18      Q     Just so I'm clear, though, bylaws that would
19  place the burden of proof on a physician in a peer
20  review matter are okay in your opinion, your peer
21  review opinion?
22      A     If voted on and adopted by the medical staff
23  and approved by the Board.
24      Q     And they wouldn't run afoul of the Health
25  Care Quality Improvement Act?

Page 174

1      A     That's correct.
2      Q     Okay.  Your opinion about the decision made
3  by the hearing panel, this idea that they got the
4  evidence wrong and they got -- well, they got the
5  findings wrong and they got the sanction wrong, right,
6  in summing that up?
7      A     Uh-huh.
8      Q     There are -- well, setting aside your
9  opinion that that was the wrong decision on the
10  evidence that you reviewed --
11      A     Uh-huh.
12      Q     -- setting that aside --
13      A     Right.
14      Q     -- was their decision one that was still
15  within the realm of reasonable, despite your
16  disagreement with it, or --
17      A     Yeah, I'm not sure I can separate that.
18      Q     -- or was it unreasonable?  There's a
19  continuum?
20      A     Right.
21      Q     We can have a disagreement that's
22  reasonable.
23      A     Right.
24      Q     You know, the color of David's tie is blue,
25  gold and green or blue, golden rod and navy.  That's a

Page 175

1  difference, okay?
2      A     Right.
3      Q     But if I were to say that's red, orange and
4  purple, that's a difference that's not reasonable;
5  right?
6      A     That's right, unless you're colorblind.
7      Q     Right.  So my question is:  I know you
8  disagree with the findings here.
9      A     Right.
10      Q     Setting that aside, is this reasonable or
11  unreasonable?
12      A     It's unreasonable to the extent it's not
13  based on the evidence.  And that kind of bleeds into
14  it.
15      Q     That's where you're going then?
16      A     Yes.
17      Q     So you're saying this isn't an issue about
18  one over which reasonable minds can differ, these
19  findings; right?
20      A     Right.
21      Q     That's what you're saying?
22      A     Ask your question again.  I'm sorry.
23      Q     You're saying that these findings are not in
24  the category of reasonable minds can differ and your
25  opinion is these are beyond the pale, unreasonable

Page 176

1  findings; right?
2      A     No, I wouldn't necessarily say that.
3      Q     So is this that reasonable minds can differ?
4  You believe they're wrong, but reasonable minds can
5  differ?
6      A     I think reasonable minds can differ on
7  anything, you know.
8      Q     Not on blue, green, gold and orange, purple,
9  red; right?  That's not reasonable.
10      A     But that's not the standard we're going by.
11  The standard is credible evidence.
12      Q     I'm asking a question about reasonableness
13  right now.
14      A     Well, I don't know how you get to that.  I
15  can't -- I guess, I can't separate that from being
16  credible evidence to support what they've done.
17      Q     Okay.
18      A     And I'm not trying to be difficult, I just
19  really can't --
20      Q     Well, here's the question, and tell me
21  however you feel about it.
22      A     Okay.
23      Q     These findings, setting aside your position
24  that they are wrong, is it going to be your opinion or
25  would you say that these are, that these findings are

44 (Pages 173 to 176)

## Page 177

1  unreasonable, it was unreasonable for this panel to
2  make these findings, or are these findings issues about
3  an issue of reasonable minds can differ?  And that was
4  inartful, but you know what I'm asking.
5      A     Yeah.
6      Q     Do you think these are unreasonable, the
7  findings in the hearing panel decision?
8      A     The findings --
9      Q     And I know you disagree with them, but are
10 they unreasonable?
11     A     The fact that they found this?  I'm sorry,
12 I'm really struggling, but maybe it's because it's
13 late, because I don't think -- here's the problem with
14 your question, as I see it.  These aren't purple and
15 red versus golden rod and navy, okay.  They're are they
16 supported by credible evidence.  And if they're not
17 supported by credible evidence, they're not reasonable.
18 That's the way my mind thinks about it.
19     Q     I hear you.
20     A     And so I'm sorry if that's not answering
21 your question.
22     Q     Are you familiar with the Substantial
23 Evidence Rule in administrative procedures?
24     A     Right, right.
25     Q     Okay.  If a trial court or the hearing

## Page 178

1  officer, whoever it is, makes a decision on facts and
2  that's appealed, the legal errors are, you know, it's
3  de novo.  If there's a legal error, you can reverse it.
4      A     Right.
5      Q     But if it's a finding of fact, Substantial
6  Evidence applies, right, the Substantial Evidence Rule?
7      A     Right.
8      Q     Which means what?  What's the Substantial
9  Evidence Rule?
10     A     Are you talking about the Any Evidence Rule?
11     Q     Right.
12     A     Yeah.
13     Q     Okay.  If there's any evidence in the record
14 upon which a reasonable mind could come to the
15 conclusion that the trial court came to, it can't be
16 reversed; right?  That's the way findings of fact work
17 and the Substantial Evidence Rule works; right?
18     A     Right.  I mean, that's what the standard
19 says.
20     Q     And I'm trying to take it into your credible
21 evidence position.
22     A     Well, that's a different standard to me.  I
23 thought you were just asking do I think it's
24 reasonable, you know.
25     Q     Okay.

## Page 179

1      A     And under the --
2      Q     Well, would these be upheld, these factual
3  findings in the recommendation, could they be upheld
4  under the Substantial Evidence Rule that we've just
5  discussed?
6      A     Not if there was a thorough review of the
7  record.
8      Q     Okay.  So your opinion is is there is not
9  evidence in the record upon which a reasonable mind
10 could look at it and come to these conclusions?
11     A     That's correct.
12     Q     Fair enough.  All right.  And what was the
13 second part?  The sanction.  Same question on the
14 sanction.
15     A     Yeah.
16     Q     Is there evidence in the record that a
17 reasonable mind could look at and come to the
18 conclusion that revocation is the answer?
19     A     Yeah, that's actually more to my point.  I'm
20 sorry, I --
21     Q     That's all right.
22     A     Go ahead and ask that question again.  I
23 think I already answered, in my mind.
24     Q     And you may have.  Is it that you believe
25 that -- you know, when thinking about the sanction, you

## Page 180

1  know, the decision-makers at the hospital said
2  revocation is the answer.  And I know you disagree with
3  that, okay.  But the question is:  Is there evidence in
4  the record that a reasonable mind could look at and say
5  revocation is the answer?
6      A     No.
7      Q     Okay, no, okay.
8      A     And that's stronger, much stronger.  Like on
9  some of these, I understand your point, you know, on
10 some of the individuals.  But when you look at the
11 entire decision and what they decided to do as the
12 sanction, I don't have any qualms saying no, that's
13 unreasonable.
14     Q     Okay.
15     A     And that's my opinion.
16     Q     Do you have an opinion whether the peer
17 reviewers at Aiken undertook this peer review in the
18 reasonable belief that the action was in the
19 furtherance of quality health care?
20     A     We have to kind of break that down.  In
21 complete fairness, I think that whenever you have a
22 death of a patient and they're going to investigate and
23 look into it, that's in the furtherance of health care.
24 I think that's okay.
25     Q     All right.

45 (Pages 177 to 180)

Adrienne E Marting 8/12/2011

Page 181

```
1       A    But after going through all of the hearing
2  and all of the evidence and the parties who
3  participated in the decision-making and the hearing, I
4  think that it was not based on the furtherance of
5  quality of care.  As I understand it, and I read
6  somewhere that --
7       Q    Okay.  And --
8       A    Wait.  And let me just say, because this
9  goes to why I say that, that this hospital needed more
10 OBs.  In fact, they were recruiting for more OBs.
11 That's not in the furtherance of quality health care to
12 kick somebody off when the evidence shows that
13 termination of privileges aren't supported.  Or isn't
14 supported, excuse me.
15      Q    Okay.  I'm going to kind of walk through the
16 HCQIA factors.  First one we talked about, the
17 reasonable belief that the action was in the
18 furtherance of quality health care, if I understand you
19 correctly, you have a problem down the line on the
20 HCQIA factors.  Like ultimately, after you've
21 investigated everything, you seem to have a problem.
22 But at least I think I heard you say that instigating
23 this investigation was in the reasonable belief that it
24 was in furtherance of quality health care?
25      A    I think it's arguable.  I don't think it --
```

Page 182

```
1       Q    You wouldn't opine that they did not act
2  when they instigated this in a reasonable --
3       A    To do a chart review and all of that, no.  I
4  don't have any problem with that.
5       Q    To start a peer review action, okay.
6       A    To start.  And, well, you have the whole
7  issue of when does a peer review action start.
8       Q    Do you believe they engaged in a reasonable
9  effort to obtain the facts in this matter?
10      A    No.
11      Q    Why not?
12      A    And I meant to bring that up, I'm sorry.
13 This is one of the other ones.  They did not question
14 Dr. Bryan, who was the assistant surgeon in the
15 C-section matter.
16      Q    Any other reason that it wasn't a reasonable
17 investigation other than that?
18      A    I'm trying to think, because there were
19 several -- well, I think that's it.
20      Q    Okay.  It doesn't matter to you, then,
21 apparently, that Dr. Bryan testified at the fair
22 hearing where his observations and testimony could be
23 elicited?  Does that assuage your concerns about the
24 investigation?
25      A    A two-part answer.  And that's kind of the
```

Page 183

```
1  problem with these whole things when you look at HCQIA,
2  what part of the process are you talking about.  HCQIA
3  says you're supposed to make a reasonable investigation
4  into the facts, okay.  Before they summarily suspended,
5  means they already acted, she doesn't get a right to a
6  hearing until she is already losing money, losing
7  patients, patients are being put at risk.  They did not
8  talk to the surgeon in the room who observed the
9  surgery and who was there in the -- by the desk on the
10 L & D floor.  So I think they did not investigate
11 appropriately.
12      Q    All right.  And the fact that he testified
13 at the fair hearing doesn't change that opinion?
14      A    No, because by that time they had already
15 made a recommendation to terminate.  Then if you look
16 at his testimony, his testimony doesn't support
17 recommendation of terminating privileges.  So not only
18 did they not go get it before they made a
19 recommendation, when they heard his testimony, they
20 ignored it.
21      Q    Discovery in an internal peer review matter,
22 discovery isn't permitted in a hospital peer review
23 matter, right, discovery like we talk about discovery
24 in a civil action?
25      A    It's really -- it depends on what the bylaws
```

Page 184

```
1  say.
2       Q    Right.
3       A    And I usually give almost anything that I
4  can because I, public or private, go under due process.
5  Due process them to death, is my advice.  So if it's
6  something that's related to the hearing that's not
7  protected by -- I won't give out other physicians'
8  records.  But if it's related to the hearing and was
9  relied on, yes.
10      Q    Why won't you give other physicians'
11 records?
12      A    Another physician's records?
13      Q    Uh-huh.
14      A    Peer review records?
15      Q    Uh-huh.
16      A    Because it's not relevant, A; and it
17 violates that other physician's case.
18      Q    Okay.
19      A    The fact that a hospital took action or
20 didn't take action, that type of information can be
21 discussed.  But pulling all this and -- say there was a
22 separate hearing on Dr. Jones, okay.  I don't think
23 it's appropriate to pull in that peer review material
24 into another peer review material.
25      Q    Okay.
```

46 (Pages 181 to 184)

Adrienne E Marting 8/12/2011

Page 185

1    A    Data regarding fetal deaths, you know, other
2  types of statistical data, or the fact that they kicked
3  this physician off staff not by name, I think it can
4  come in and is appropriate.
5    Q    So you would keep the identity of the
6  physician secret?
7    A    That's right.
8    Q    And statistical information that doesn't
9  identify anybody you are okay with?
10   A    Right.  Like the normal peer review type
11 information, the quality assurance information, you
12 know, how many delays in OR, how many injuries, you
13 know, that type of thing.
14   Q    What if it breaks that down by physician,
15 would you provide that?
16   A    Yeah, redacting the names.
17   Q    What if there were only three physicians?
18   A    Still, as long as they were redacted, yeah.
19   Q    It wouldn't concern you that you were
20 revealing protected --
21   A    Statistical information like that?  I would
22 -- I certainly -- I think if you look at the case law,
23 it clearly says you have to -- well, the latest case
24 I'm talking about is a Georgia case.  So I don't know
25 if --

Page 186

1          MR. DAYHUFF:  Steady, David.
2          MR. DICK:  Sorry.
3          THE WITNESS:  And I'm sure that's an issue
4  between y'all.
5          MR. DAYHUFF:  You're getting David excited.
6          THE WITNESS:  Yeah.
7    Q    (By Mr. Dayhuff)  All right.  And --
8    A    But that's always an issue.  And I've been
9  on the MEC side and they say, well, so and so, and
10 you're not supposed to bring up other physicians.
11   Q    Let's say you had three -- or let's say you
12 had four OBs on staff.  You would provide data that
13 lists, you know, complications or whatever else on
14 those four OBs, but you would just redact their names?
15   A    Uh-huh.
16   Q    And you would think that would be sufficient
17 to protect the peer review?
18   A    Yeah.
19   Q    Okay.
20   A    And that's not an opinion.  That's not --
21 that's information that is tracked by the hospital.
22 That's not a physician -- the whole point of peer
23 review is I'm a physician and you're a physician, you
24 messed up, I'm supposed to be free enough to feel like
25 I can write a bad report on you or at least have it

Page 187

1  looked at without, you know, recrimination.
2    Q    And I guess it depends on how that and for
3  what purpose that information is collected too, right,
4  as to whether it's producible or not?
5    A    Well, it's -- it's --
6    Q    I mean, if it's part of the peer review
7  system at the hospital --
8    A    Well, I've played that game before too.  But
9  it's usually through the QA Committee or Performance
10 Improvement, because they change the name every few
11 years, that creates that data.  The peer review process
12 is generally, in most case law that I'm familiar with,
13 is the hearing process, the notice, and those types of
14 things, not the collection of data that applies to all
15 physicians.
16   Q    And the peer review privilege or
17 applicability of the privilege is a state-by-state
18 thing, isn't it?
19   A    That's correct.
20   Q    With case law in each state that interprets
21 the various statutes that are different?
22   A    That's right.  But there's not that many
23 cases.  They look at cases all over the country.  When
24 you look at any of those cases, they rely on other
25 courts.

Page 188

1    Q    Do you know if South Carolina courts have
2  ever cited a peer review case from any other state?
3    A    I'm sure they have.  And I don't know of
4  any, but odds are.
5    Q    Is it normal for a hospital to require
6  execution of a release before providing information to
7  other hospitals about a physician's privileges?
8    A    Usually when you sign onto the medical staff
9  and sign your application, it says that.
10   Q    Have you ever been in the position of
11 advising hospitals about responding to credentialing
12 inquiries from other hospitals?
13   A    Yes.
14   Q    All right.  You don't advise them that a
15 release is a good idea before they send out information
16 about a physician?
17   A    You usually -- it's usually attached.
18   Q    Okay, yeah.  But there's a release; right?
19   A    Yeah.
20   Q    But you would -- well, that's fine.
21   A    Because that's what the application says, I
22 release you and you have the ability to inquire from
23 other hospitals and everything.
24   Q    Okay.  These opinions that you have offered
25 me today -- and we talked about this at the beginning

Adrienne E Marting 8/12/2011

Page 189

1  of this, I guess, a little bit -- the standards you are
2  applying for me today are the Medical Staff Bylaws and
3  your understanding of the Health Care Quality
4  Improvement Act; right?
5      A    Uh-huh.
6      Q    All right.  The Health Care Quality
7  Improvement Act is a legal standard, is it not?
8      A    Yes.
9      Q    All right.  So are your opinions that relate
10 to the Health Care Quality Improvement Act legal
11 opinions?
12     A    To the extent -- well, to the extent they --
13 well, you've asked me -- I'm here to testify as an
14 expert on peer review.  And part of that on peer review
15 is understanding the case law, the Medical Staff
16 Bylaws, and the HCQIA immunity provisions, which,
17 whether it's legal or not, for HCQIA they are applied
18 in the bylaws, so you have to look at them.  And I
19 think it's appropriate to opine on them, whether they
20 were followed or not.
21     Q    Well, I'm not -- I didn't ask you whether
22 it's appropriate to opine on them or not.  I asked you
23 whether when you are opining about whether a peer
24 review action complies with HCQIA, isn't that at its
25 heart a legal determination?

Page 190

1      A    I believe it is.
2      Q    Okay.  Same question with the bylaws, when
3  you're opining --
4      A    And I'm not trying to sweat you all out of
5  here.
6      Q    Okay.  When you are opining about whether a
7  peer review action complies with the bylaws, isn't that
8  at its heart a legal opinion or conclusion?
9      A    I guess because I'm a lawyer it's a legal
10 opinion.  I don't know.
11     Q    You are, after all, a lawyer.
12     A    Yeah.  I'm not sure how to answer that
13 entirely.
14     Q    Well --
15     A    Because I'm being asked to opine on the
16 bylaws and whether they were followed or not from a
17 peer review perspective.  So I think it can be both.
18 To the extent you can separate my opinions from legal
19 to peer review -- well, I think they're kind of
20 combined, I guess is what I'm saying.
21     Q    So the opinion about whether something
22 complies or not with HCQIA is a legal opinion.  The
23 opinion about whether -- correct?
24     A    Whether it complies?  I'm going to the "I
25 believe so," is what I said.

Page 191

1      Q    Well, you said "yes" a moment ago, so --
2      A    No, I said "I believe so."
3      Q    And you can change it if you want to.
4      THE WITNESS:  Didn't I?
5      THE COURT REPORTER:  (Court reporter nods
6  head up and down.)
7      THE WITNESS:  Thank you, Madam Court
8  Reporter.
9      Q    (By Mr. Dayhuff)  All right.  So you believe
10 when you opine about whether a peer review process
11 complies with the Medical Staff Bylaws, that's a
12 combination of legal conclusion and what?  Seems like
13 there were two parts.
14     A    Well, to the extent -- I guess I'm not
15 saying this very clearly.  The HCQIA immunity issue I
16 believe is a legal issue.  Well, I guess all of this
17 is.  I guess peer review is a legal issue, to the
18 extent that you look at it in the big picture.  So --
19     Q    Why do you say that?
20     A    Well, it all goes to whether it was
21 followed.  I mean, I'm not sure I --
22     Q    Whether rules are followed; right?
23     A    Right, right.
24     Q    Any other reason that it's legal in nature?
25 Whether statutes are followed?

Page 192

1      A    Process, statutes.
2      Q    Process?  Due process; right?
3      A    No, the process.
4      Q    The process?
5      A    That complies with the bylaws, notice,
6  adequate hearing, all of the criteria that's set forth
7  in there.
8      Q    And tell me if you agree with this.  If we
9  were talking about a public hospital, wouldn't you also
10 have whether the conduct violated due process?
11     A    Yes.
12     Q    And that's certainly legal?
13     A    I've seen that argued.  Yes.
14     Q    So that's why, those reasons we have just
15 discussed, are why you believe this is at heart a legal
16 issue?
17     A    I guess I'm not sure what your question is.
18 At heart?  We're all living in a legal forum.
19 I'm not sure I fully understand your question.  It
20 might be the heat and the --
21     Q    Well, I'm near the end of this.
22     A    -- and the time of day.  And I'm not trying
23 to be obtuse.
24     Q    And, believe me, I'm near the end.
25     A    I just don't want to state something and go

48 (Pages 189 to 192)

Adrienne E Marting 8/12/2011

Page 193

1    why did I say that, because I'm really not clear.  I
2    apologize.
3         Q    Well, take a moment.  The fundamental
4    question I'm getting at is, you know, what is the
5    nature of these opinions?  We discussed the standards
6    you applied at the beginning of this.
7         A    Uh-huh.
8         Q    And you told me about the bylaws and you
9    told me about the Health Care Quality Improvement Act.
10        A    Right.
11        Q    And I understand all that.  When you're
12   offering opinions about whether the peer review process
13   complies with the bylaws or complies with the Health
14   Care Quality Improvement Act, I believe those to be, at
15   heart, at their heart, opinions about legal issues.  Do
16   you agree?
17        A    Only to the extent that if we can agree that
18   fairness is a legal issue.  I think that's a -- I can't
19   -- I don't think that fairness, when you look at the
20   big picture in all of this, can be separated from HCQIA
21   or the bylaws, the whole purpose behind the bylaws.
22        Q    Fundamental fairness?
23        A    Right.
24        Q    Okay.  So we throw that in.  That's like a
25   standard for you, then?

Page 194

1         A    Yeah.
2         Q    Okay, fundamental fairness, the Health Care
3    Quality Improvement Act, and the Medical Staff Bylaws
4    are the standards by which you are judging the peer
5    review action in this case?
6         A    Yes, I believe that's fair.
7         Q    And at the heart of those three components
8    is a legal determination, a legal issue, fundamental
9    fairness, compliance with the Health Care Quality
10   Improvement Act, and compliance with the Medical Staff
11   Bylaws?
12        A    I don't know, quite frankly.  I'm not sure I
13   can say.
14        Q    Okay.  What other kind of issue would it be?
15        A    Well, to the extent -- that's the problem, I
16   don't know what else it could be.  But it sounds from
17   the way you're questioning that, well, it's not this,
18   it's that.
19        Q    Well, take a moment.  This is probably my
20   last question.  Think about it.
21        A    Okay.  At the heart of it, is it a legal
22   standard?
23        Q    Yes.
24        A    Is that what we're saying?  I don't know.  I
25   mean, I don't know how that answer is being used, so

Page 195

1    I'm not clear on --
2         Q    It doesn't matter.
3         A    Then my answer is I don't know.
4         Q    I mean it doesn't matter how the question is
5    being used.  The question matters.
6         A    That's what I'm saying.  My answer is I
7    don't know.
8         Q    The Health Care Quality Improvement Act is a
9    statute; right?
10        A    That's correct.
11        Q    Whether something complies with a statute or
12   not is a legal issue?
13        A    Yes.  And we have already said that.
14        Q    And Medical Staff Bylaws are rules?
15        A    That's right.
16        Q    Rules agreed to between the medical staff
17   and the hospital, I guess?
18        A    Uh-huh.
19        Q    As to how things are going to be governed at
20   the hospital; right?
21        A    That's correct.
22        Q    All right.  Whether or not something
23   complies or not with the Medical Staff Bylaws, is that
24   a legal issue or determination just like whether you
25   comply with a statute is a legal determination?

Page 196

1         A    I guess my problem is -- well, yes, but it's
2    based on the facts and the evidence.  It's not just a
3    pure legal standard.
4         Q    Sure.  And so is HCQIA.  HCQIA is based on
5    the facts and the evidence, right, and you look at all
6    of that.
7         A    Right.
8         Q    So it's a legal determination too; right?
9         A    I just really don't know.
10        Q    The last part of your testimony is this idea
11   of fundamental fairness.  Whether something or not is
12   fundamentally fair or not, that at its heart is a legal
13   issue or a legal determination.  We call it due process
14   if this were a public entity.  We're calling it
15   fundamental fairness because due process doesn't apply
16   to a private entity.  But at its heart that's a legal
17   determination; do you agree?
18             MR. DICK:  Objection to form.
19        A    No.
20        Q    (By Mr. Dayhuff)  Okay.  Why not?
21        A    Well, because I think it's -- I think the
22   legal conclusion, after you look at the facts may be a
23   legal conclusion, but I think the fundamental fairness
24   applies -- it's a finding of fact as well and a legal
25   conclusion.

49 (Pages 193 to 196)

Adrienne E Marting 8/12/2011

Page 197

1     Q    Okay. So after you analyze the facts of
2  whether something is fundamentally fair or not, you
3  would make a legal conclusion about fundamental
4  fairness? That's what you're doing; right?
5     A    I'm not making the conclusion. I'm offering
6  my opinion.
7     Q    You're offering an opinion about whether
8  something is fundamentally fair and that opinion, at
9  its heart, is a legal one?
10         MR. DICK: Object to form.
11    A    Well, I think we have -- I think it's a
12  combination, is the best I can answer.
13    Q    (By Mr. Dayhuff) It's a combination of
14  legal and factual?
15    A    Uh-huh.
16    Q    I'll take that, okay.
17    A    Okay.
18         MR. DAYHUFF: And I just need to review
19    these notes and I think I'm done.
20         (Whereupon, a recess was taken from
21    approximately 6:30 P.M. until 6:35 P.M.)
22         MR. DAYHUFF: Back on the record.
23              (Whereupon, Defendant's Exhibit
24              No. 8 was marked for
25              identification.)
25    Q    (By Mr. Dayhuff) Could you identify for the

Page 198

1  record our last exhibit, which is in front of me.
2     A    Yes. That's Exhibit 8. This is an outline
3  that I prepared for my portion of a presentation that
4  was given to the DeKalb Medical staff in 2004.
5     Q    Now, this is kind of just a general kind of
6  wrap-up question. I'm obviously here to hear all of
7  the opinions you plan to offer at trial. Do you have
8  any other opinions that we have not hit upon that you
9  plan to offer at trial?
10    A    None that are known at this time. And I
11  just say that because -- and I don't expect more, but I
12  don't believe so.
13    Q    And if you do come up with new opinions,
14  that will result in us having to do this again. And
15  not here, by the way.
16    A    You can't threaten me. I can change my mind
17  if I need to. But we will certainly let you know.
18         MR. DAYHUFF: Great. Dave, do you have any
19    questions?
20         THE WITNESS: In all due process and
21    fairness.
22         MR. DICK: Fundamental.
23         THE WITNESS: Fundamental fairness, right.
24         MR. DICK: Okay, I just have a few
25    questions. I know you thought you were all done,

Page 199

1  didn't you.
2              DIRECT EXAMINATION
3  BY MR. DICK:
4     Q    Just to harp on Travis's last point -- and I
5  will try to go quickly through this.
6     A    Sorry. I feel ignorant.
7     Q    I understand. It's a confusing topic.
8  HCQIA has a lot of kind of arbitrary language in it,
9  doesn't it? You know, the furtherance of health care,
10 reasonable efforts, you know, things that are not
11 concrete and I guess what I would consider arbitrary.
12 Is that correct?
13         MR. DAYHUFF: Object to the form of the
14    question. Go ahead.
15    A    You mean -- well, I'm not sure I would say
16 arbitrary. I would say non -- not specifically defined
17 or broadly worded. There's a word I'm looking for, and
18 it's not coming to me now. So that's what I would say.
19 There's a lot of gray area.
20    Q    (By Mr. Dick) Gray area, okay. And are
21 those gray areas -- and I guess what I'm trying to ask
22 is are those areas gray because they are used to
23 determine whether or not a hearing would be fair?
24         MR. DAYHUFF: Object to the form.
25    A    Yes, I think that's exactly right. That's

Page 200

1  the whole point. And I think that's what I was trying
2  to say earlier when I said that it's fundamental
3  fairness -- and that's my word -- is strewn all
4  throughout HCQIA and the bylaws.
5     Q    (By Mr. Dick) So would it be fair to say
6  that, as Travis said, you know, he was saying that the
7  heart of HCQIA and the bylaws was a legal question, but
8  really more the heart of HCQIA and the bylaws is a
9  fairness question?
10         MR. DAYHUFF: Object to the form of the
11    question.
12    A    I believe that you can't determine whether
13 HCQIA was complied with or not unless you address the
14 fairness issue.
15    Q    (By Mr. Dick) Okay. And is the fairness
16 issue something that in your experience in your, I
17 think, 22 plus years in the hospital health care
18 section and in your 30 plus peer review cases that you
19 have been involved with, is that something your
20 experience would help you determine?
21    A    Yes. I mean, that's -- yes.
22    Q    All right.
23         THE WITNESS: And let the record reflect
24    opposing counsel is chomping loudly on the
25    witness's lunch.

www.compuscripts.com

Adrienne E Marting 8/12/2011

---

Page 201

1          MR. DAYHUFF:  I apologize.

2          MR. DICK:  Is this a distraction tactic?

3          MR. DAYHUFF:  No, I'm starving.

4      Q    (By Mr. Dick)  And I don't know what

5  exhibits they are, but Travis showed you the notices,

6  the three notices that there were.

7      A    Yes.

8      Q    And he asked you if they complied with

9  HCQIA.  Looking at the final determination that was

10 made by the hearing panel, the Board of Governors, and

11 then looking back at those notices, do you think those

12 notices complied with HCQIA?

13         MR. DAYHUFF:  Object to the form of the

14     question.

15     A    No.

16     Q    (By Mr. Dick)  Ernie Nauful made the

17 determination that Dr. Muniz's cross-examination

18 questions would be considered testimony and evidence.

19 Do you think that was appropriate?

20         MR. DAYHUFF:  Object to the characterization

21     as evidence.

22     A    No.  And I should have said that.  That's

23 grossly inappropriate.  First they make this woman --

24 they take her career away, they make her act as a

25 lawyer on her own behalf, and then they use her what

---

Page 202

1  sometimes were ill-formed questions against her as if

2  she were testifying.  I think that was inappropriate.

3      Q    (By Mr. Dick)  As far as you know, was there

4  ever an amended notice issue?

5      A    I did not see one.  And I looked through

6  everything that was given to me.

7      Q    And Travis harped on this for a while, so I

8  will just ask it.

9          MR. DAYHUFF:  Object to the characterization

10     of my questions as harping.

11     Q    (By Mr. Dick)  I just want to ask this to

12 make sure we're clear.  By counsel for Dr. Muniz

13 hearing testimony that was conflicting, do you believe

14 that that put Dr. Muniz or her counsel on notice that

15 she was being terminated or her privileges were being

16 terminated based on her lack of candor or credibility?

17         MR. DAYHUFF:  Object to the form of the

18     question.

19     A    No, not at all.

20     Q    (By Mr. Dick)  And this is just kind of an

21 opinion question.  But you told Travis that you believe

22 that if it had gone up to the -- sorry.  That if the

23 incorrect burden of proof standard report that was

24 issued had gone up to the Board of Governors, they

25 would have likely rejected it, turned it around and

---

Page 203

1  sent it back to the panel for reconsideration; is that

2  correct?

3      A    That's my best guess.  I believe that.

4      Q    Do you think the panel would have taken the

5  reconsideration more seriously if it had come via the

6  proper procedure and straight from the Board?

7          MR. DAYHUFF:  Object to the form of the

8      question.

9      A    Yes, actually, I do.  Yes, I do.  The manner

10 that it was handled made it like, oh, we're just going

11 to correct this typo almost, you know.  That's what I

12 got from reading the record.

13     Q    (By Mr. Dick)  Looking at the corrected

14 hearing report, Exhibit No. 7 -- and you really

15 probably don't have to look at it for this question.

16 I'm just referencing it for the record.  Do you believe

17 that -- well, I guess in your expert opinion do you

18 believe it was a violation of HCQIA and the Medical

19 Staff Bylaws to list as a reason for her termination

20 her inability to work with the medical staff in No. 9

21 of that corrected report?

22         MR. DAYHUFF:  Object to the characterization

23     of evidence in the record.

24     A    (No response)

25     Q    (By Mr. Dick)  Let me step back and ask it

---

Page 204

1  in a two-part question.  Prior to this Exhibit No. 7

2  was Dr. Muniz ever noticed about her ability or I guess

3  the questions regarding her ability to work with the

4  medical staff?

5      A    Not that I saw.  And, in fact, a fair amount

6  of the testimony was favorable or indicated that she

7  did work with the nurses and, you know, other

8  physicians well.

9      Q    Was it a violation of -- well, I guess in

10 your expert opinion was it a violation of the bylaws

11 and HCQIA to include that as a reason for a finding of

12 the panel without providing that notice?

13     A    Yes.  To the extent it wasn't noticed to

14 her, yes, I believe it was inappropriate.

15     Q    And that just goes to your expert opinion

16 that proper notice wasn't provided to Dr. Muniz?

17     A    That's right.

18     Q    Travis asked you a whole lot of is-it-

19 possible questions, so I figured I would ask you one.

20 Is it possible that Celeste used her ex parte

21 communications with Ernie Nauful, the hearing chair, to

22 influence his questioning or opinions?

23     A    It's certainly possible.

24         MR. DICK:  Off the record.

25         (Whereupon, a discussion ensued off the

---

Adrienne E Marting 8/12/2011

Page 205

```
 1        record.)
 2        Q     (By Mr. Dick)  As far as the --
 3        A     Let me just say that I just can't stress
 4   enough how inappropriate those communications were.
 5   That's just very inappropriate.
 6        Q     You talked a lot about the witness list and
 7   the fact that the mother was never on the original
 8   witness list and that, you know, it could have been
 9   amended.
10        A     Uh-huh.
11        Q     So you've got, I guess, the first hearing --
12   and I guess as you know, the hearing took place in two
13   separate time periods.
14        A     Right.
15        Q     One time period being June 28th and 29th,
16   and the subsequent being August 17th, middle of August.
17        A     Middle of August.
18        Q     If during the first two days of the hearing,
19   June 28th and 29th, the MEC discovered that they needed
20   to call the mother as a witness, in your expert opinion
21   would it have been appropriate for them to immediately
22   after that hearing list her as a witness or send an
23   amended notice or inform counsel that they were
24   intending to call her as a witness?
25              MR. DAYHUFF:  Object to the form of the
```

Page 206

```
 1   question.
 2        A     Yes.  I mean, the whole point --
 3        Q     (By Mr. Dick)  And if they waited up until
 4   right before the August 17th date, would that be
 5   inappropriate?
 6        A     Yes.
 7        Q     And why is that?
 8        A     Because it goes against the whole point of
 9   fairness to all the parties.
10        Q     In your 30 plus cases regarding peer review,
11   has a chairman of the board ever presented a case
12   against a physician?
13        A     No.
14        Q     Does that seem odd to you?
15        A     Yes.  It may be less odd if the Board was
16   the original decision-maker.  You know, the Board can
17   take action on its own.  And maybe that would be
18   reasonable.  But not in an MEC case.  It should be the
19   MEC's recommendation what they're doing.  And to me,
20   just having the prosecutor -- it's the same person
21   being the prosecutor and the judge.
22        Q     How about has any Board member at all ever
23   participated in the prosecution of a physician at a
24   panel hearing?
25        A     Not at any of the hearings I've been in on.
```

Page 207

```
 1        Q     If Dr. Minto, who is a competitor of
 2   Dr. Muniz, were to participate and vote on her
 3   termination at the MEC level, would that be
 4   appropriate?
 5        A     At the MEC level?
 6        Q     Uh-huh.
 7        A     That's a decision-making -- well, let me
 8   check something.  I don't want to misstate something
 9   that fundamental.  Where is my HCQIA?
10        Q     If you don't know offhand, you don't need to
11   -- just say "I don't know."
12        A     Well, I do know, but I'm just -- I don't
13   want to say the wrong thing.  Ask the question again.
14   I'm sorry.
15        Q     Okay.  You stated it was okay for a
16   competitor to participate in the prosecution of
17   Dr. Muniz at the hearing panel level.
18        A     That's right.
19        Q     Right?
20        A     Right.
21        Q     And we know that's okay because you said it
22   was okay for Dr. Boehner and Dr. Minto as competitors
23   to be at the --
24        A     As witnesses.
25        Q     Yes, as witnesses or prosecutors at the
```

Page 208

```
 1   hearing panel level.  But is it appropriate for
 2   Dr. Minto as a competitor to participate in and vote at
 3   the MEC level on her termination?
 4        A     I guess I'm struggling.  I believe HCQIA
 5   says -- they're talking about the decision-makers with
 6   respect to the hearing panel.  And that's what I -- if
 7   I had it before me, I could be more clear on this
 8   point.  But I think what's making me hesitate is in
 9   every case that I've had when there's a competitor on
10   the MEC, they recuse themselves from the vote.
11        Q     Okay.  So in your experience the competitors
12   at the MEC level always recuse themselves?
13        A     Yes.
14        Q     What about have you ever had a competitor
15   participate in the prosecution of a doctor at the
16   hearing panel level?
17        A     I've never -- in all the hearings I've done,
18   there were counsel representing and actually doing all
19   the legal work.  So I didn't have a physician actually
20   asking the questions.  But I've always had like a
21   member of the MEC sit with me and advise me, and I've
22   called them as witnesses, whether they were competitors
23   or not.  That's okay.  They shouldn't be making the
24   decision.  They can offer evidence.  Especially in a
25   lot of the small hospitals you might only have a few
```

Adrienne E Marting 8/12/2011

1    OBs.

2        Q    We talked about that HCQIA requires you to

3    make a reasonable effort to obtain the facts, but

4    doesn't HCQIA also require that you act accordingly on

5    those facts?

6        A    That's exactly right.  And that's a huge

7    part of the problem in this case.  First, they didn't

8    gather all the facts.  And then when they did, they

9    didn't follow the evidence.

10       Q    So was it a violation of HCQIA, then, to

11   terminate her privileges based on these facts?

12       A    I think it's more whether it was a

13   violation, to answer it how I can answer it, it's a

14   violation of HCQIA in not giving her appropriate

15   notice, not giving -- you know, acting in the

16   furtherance of quality health care, all of those

17   factors.

18       Q    I mean, in HCQIA aren't you required to, I

19   guess -- well, I don't have it in front of me.

20       A    And I had it here just earlier.  Oh, no,

21   those are the decisions.

22            MR. DAYHUFF:  I can look through if you

23       would like.  I'm going to ask you about that.

24            THE WITNESS:  Well, I had it and I might

25       have -- can we take a real quick break?  I just

1        had it in my hands a little while ago.

2            (Whereupon, a recess was taken from

3        approximately 6:50 P.M. until 6:55 P.M.)

4        Q    (By Mr. Dick)  What I was asking you about,

5    and I phrased it not very well, but HCQIA -- and this

6    is, I guess, 42 USC 11112, Section 4, requires that a

7    professional review action must be taken in a

8    reasonable belief that the action was warranted by

9    facts known after such reasonable effort to obtain the

10   facts and after meeting the requirements of paragraph

11   3.

12            In your opinion was termination of

13   Dr. Muniz's privileges an action that was warranted by

14   the facts in this case?

15       A    No, it was not.

16       Q    And why is that?

17       A    Because they basically brought charges

18   against her -- and I say charges, their grounds were

19   based on three or four factors.  And they found that

20   those factors weren't really supported by the evidence

21   and they went on additional factors that were related

22   to her personality and credibility that she wasn't

23   noticed on.

24       Q    Okay.

25       A    And all the additional flaws that we have

1    talked about throughout the afternoon, you know, the

2    procedural irregularities.

3        Q    You testified that the questioning by Nauful

4    was inappropriate because I guess it showed bias and

5    showed that he was not being impartial.  And you said

6    that, you know, in your experience sometimes a hearing

7    officer asks one or two or three of those types of

8    questions, I guess, in --

9        A    More of a clarification, you know, like

10   someone -- like the wrong document was cited or they

11   misspoke or, you know, something to get the hearing

12   back on track.  Not substantive questions.

13       Q    And I guess my question to you is is it

14   possible to not recognize that the hearing officer is

15   being biased until you look at the record as a whole

16   and observe all of his questions?

17            MR. DAYHUFF:  Object to the form of the

18       question.

19       A    I believe that's correct.  And I almost said

20   that earlier.  That, you know, in the heat of the

21   moment when he is asking two or three questions at a

22   time -- and sometimes he asked two or three, but a lot

23   of times he asked several, you know.  But if you look

24   at the volume of the questions that he asked and the

25   pattern, he really developed a pattern throughout

1    that's -- and, you know, you couldn't have known that

2    until you're through with the hearing and calmly

3    reviewing the transcript.

4        Q    (By Mr. Dick)  Right.  And that pattern

5    couldn't be discovered until the end of the hearing?

6        A    That's right.

7            MR. DAYHUFF:  Object to the form of that

8       question.

9        Q    (By Mr. Dick)  So is it appropriate for

10   counsel to object to Mr. Nauful -- well, let me

11   rephrase that.  Was it appropriate for counsel to

12   object to Mr. Nauful after the hearing on the appeal of

13   the hearing panel report?

14            MR. DAYHUFF:  Object to the form of the

15       question.

16       A    I see what you're saying.  Yes.

17       Q    (By Mr. Dick)  Could counsel for Dr. Muniz

18   have objected to Dr. -- you know.  Could counsel for

19   Dr. Muniz have objected to Mr. Nauful's ex parte

20   communications if they didn't know about them?

21       A    No.

22            MR. DICK:  Okay.  I think that's it.

23            MR. DAYHUFF:  And I have just a couple of

24       follow-ups to make sure the record is clear.

25                 RECROSS-EXAMINATION

53 (Pages 209 to 212)

Adrienne E Marting 8/12/2011

Page 213

```
1    BY MR. DAYHUFF:
2         Q    Dr. Boehner's participation at the hearing,
3    fair hearing, is not inappropriate -- well, it is
4    appropriate; isn't that true?  I mean, there's nothing
5    wrong with his participation?
6              MR. DICK:  Object to the form.
7         A    Dr. Boehner?
8         Q    (By Mr. Dayhuff)  Dr. Boehner, the chairman
9    of the Board.  There was some discussion about what the
10   chairman of the Board could and couldn't do.  I just
11   want to make it clear that I -- I understood your
12   opinion to be that Dr. Boehner, a competitor of hers,
13   can participate in the fair hearing, competitor and
14   chairman of the Board, can participate in her fair
15   hearing and it not run afoul of the bylaws or the
16   Health Care Quality Improvement Act?
17        A    As a witness?
18        Q    Presenter or witness.  Right?
19        A    I don't know about presenter.  But I assume
20   that that's correct, yes.
21        Q    Well, I think that's what you testified to
22   earlier, that competitors of hers could present or be
23   witnesses at the fair hearing.  Is that right?
24        A    I know or I think I said witnesses, because
25   that's all I've ever observed.
```

Page 214

```
1         Q    All right.  Well, what about presenters?
2         A    I don't believe that that's specifically
3    prevented.
4         Q    Okay.  Now, what I understood you to have a
5    problem with is if Dr. Boehner voted and deliberated at
6    the Board level; right?  That's what you had a problem
7    with?
8         A    Right, right.
9         Q    Okay.  Because he participated below and
10   because he was an OB competitor; right?
11        A    And a Board member.
12        Q    Right, right.
13        A    Yeah.
14        Q    And I just wanted to make sure I understand
15   what your opinion is.
16        A    Yes.
17        Q    It's that if he voted and deliberated at the
18   Board, that's where the problem lies?
19        A    Yes.
20        Q    Because of his prior participation and
21   because he is a competitor?
22        A    That's correct.
23        Q    Okay.  David asked you about Dr. Minto's
24   participation at the MEC level in this matter.  No. 1,
25   do you know whether or not she voted at the MEC level
```

Page 215

```
1    in the 2010 period?
2         A    Not without looking at the minutes.
3         Q    And the question he asked you was more
4    specific.  It was that a violation of the Health
5    Care Quality Improvement Act for Dr. Minto to have
6    voted at the MEC level.  And you have had time to take
7    a look at the Health Care Quality Improvement Act.  Do
8    you see anything in that statute that would preclude
9    Dr. Minto from participating at the MEC level or find
10   that to be improper?
11        A    Let's see.  It's kind of spread out over a
12   couple.  There's one that specifically says a
13   competitor can do this or that.  This one has all the
14   stuff, okay.
15        Q    I'll tell you what I'm familiar with.  Under
16   Section 3 it talks about the notice and the hearing;
17   right?
18        A    Right.
19        Q    And it goes down and kind of describes
20   things that should and shouldn't happen.  And the only
21   place I'm familiar with that mentions competitors is
22   with respect to serving on the hearing panel.
23        A    And that's what I said.
24        Q    Okay.  So --
25        A    I said that's what I remembered.  And that's
```

Page 216

```
1    why I hesitated.
2         Q    And that's why you wanted to check, I've got
3    you.  So after you checked, isn't it true that
4    Dr. Minto's participation at the MEC level, if she
5    voted -- and let's assume that she did -- that would
6    not run afoul of the Health Care Quality Improvement
7    Act?
8         A    That's correct.
9         Q    All right.  Let me ask you this question:
10   You guys discussed this idea of whether in the heat of
11   the moment an objection could have been made to
12   Mr. Nauful's alleged bias in this matter; right?  Do
13   you recall that?
14        A    Uh-huh.
15        Q    And I think you said, well, you know, it
16   might not have been apparent until reviewing the entire
17   transcript.  Right?
18        A    That's correct.
19        Q    Well, let's assume -- well, then I assume
20   you would say that the time to make that objection to
21   Mr. Nauful as a hearing officer would have been after
22   getting the transcript, reviewing it, you could make
23   your objection then; right?  After reviewing the
24   entirety of the transcript it would then become
25   apparent, if it wasn't before, that he was biased and
```

54 (Pages 213 to 216)

Adrienne E Marting 8/12/2011

Page 217

1  you should make your objection then; right?
2       A    Yes.
3       Q    Okay.  And if you don't make it then, would
4  you agree with me that you have waived that objection?
5  You didn't agree with me before that you would have
6  waived, I don't think.
7       A    Yeah.
8       Q    If after reviewing that whole transcript and
9  you don't make an objection, then would you have waived
10 that?
11      A    No, I don't think so.
12      Q    Really?
13      A    Because it's part of a whole, you know.  One
14 part of it is whether you actually object to something,
15 is what we were talking about in the hearing, and then
16 the issue of seeing it all, that might have made you
17 think, man, I wish I would have objected to that.  But
18 what we're complaining about is all of these factors
19 put together.
20      Q    Okay.
21      A    The fairness.  And you have to look at all
22 of the evidence.
23      Q    All right.  How about waiting until the
24 hearing panel decision comes out to make the objection,
25 is that too late, to the hearing officer's alleged

Page 218

1  bias?
2       A    Well, they didn't have all the discovery.
3  They didn't know about the ex parte communications.  I
4  don't think it was waived, is the short answer.
5       Q    All right.  Because of the later ex parte
6  communications?
7       A    The knowledge of that.
8       Q    Absent the ex parte communications could
9  they have raised it or was it too late?
10      A    Could they have raised it?  Yeah, they could
11 have raised it.
12      Q    Validly raised it?
13      A    I don't think they waived it.
14      Q    Okay.
15      A    I don't think that -- I don't think they
16 waived it, is my opinion.
17      Q    When a judge looks at this case, she is
18 going to apply the Health Care Quality Improvement Act
19 to --
20      A    Right.
21      Q    -- this peer review, isn't she?
22      A    She should.
23      Q    And when she decides whether or not it
24 complied with the Health Care Quality Improvement Act,
25 she will be making a legal determination, won't she?

Page 219

1       A    Yes.
2            MR. DAYHUFF:  Okay.  No further questions.
3            THE WITNESS:  That's what judges do.
4            MR. DAYHUFF:  Absolutely.
5            MR. DICK:  Just a couple of quick
6       follow-ups.
7                    REDIRECT EXAMINATION
8  BY MR. DICK:
9       Q    You said that Dr. Boehner as a competitor
10 had the ability, you know, according to HCQIA and the
11 bylaws, to participate in the hearing panel prosecution
12 of Dr. Muniz.  As the chairman of the Board of
13 Governors, do you think that that was appropriate for
14 him to do?
15           MR. DAYHUFF:  Object to the form of the
16      question.
17      A    No, I don't.  I think -- no, I don't.
18      Q    (By Mr. Dick)  Dr. DiBona was the lead
19 prosecutor for the MEC in the hearing panel --
20      A    Yes.
21      Q    -- and then participated in and voted at the
22 Board of Governors level.  Was that inappropriate?
23      A    With respect to fairness, yes, I think that
24 was inappropriate.  But -- well, yes.
25      Q    Would that be a violation of the process

Page 220

1  that we've been talking about to have somebody repre --
2  someone act as a prosecutor and then vote at the next
3  level, the Board of Governors level?
4       A    It's not -- you can't look in there and it's
5  not like the provision that says you can't be a
6  competitor and be on the hearing panel, okay.  And,
7  actually, let me look at it again.  Sorry.
8            MR. DAYHUFF:  And please don't eat during
9       the deposition.
10           MR. DICK:  Well, I'm hungry now.
11      A    (Continuing)  All right.  And I can't think
12 when I'm hot and hungry.  Hang on.  I just want to look
13 at the verbiage one more time.  Well, I'm sorry, I'm
14 just going blind.  Where did it go?  There we go.  And
15 I am blind.  I skipped over it three times.
16           Ask your question again.  Dr. DiBona what?
17      Q    (By Mr. Dick)  Well, I will ask you this.
18 Did it violate the fundamental fairness of this process
19 to have Dr. DiBona serve as the prosecutor of Dr. Muniz
20 and then vote and deliberate at the Board of Governors
21 level?
22      A    I believe so.  I think his presence as
23 prosecutor and leading the charge, you know, had to
24 have carried the day or have significant influence on
25 his other Board members.

55 (Pages 217 to 220)

## Page 221

1          MR. DICK:  No further questions.
2          FURTHER RECROSS-EXAMINATION
3  BY MR. DAYHUFF:
4      Q    Did Dr. DiBona's conduct violate the Health
5  Care Quality Improvement Act?
6      A    I'm looking at the specific provision, and
7  that's what I wanted to double check.  It pertains to
8  the conduct of the hearing and notice and discusses the
9  hearing panel, so it's silent on the Board members.
10     Q    Right.  So there's nothing in the Health
11 Care Quality Improvement Act that could be pointed to
12 to say that DiBona's participation as described by
13 Mr. Dick violates the Health Care Quality Improvement
14 Act?
15         MR. DICK:  Object to form.
16     A    Well, it says after adequate notice and
17 hearing procedures are afforded to the physician
18 involved or such other procedures as are fair to the
19 physician under the circumstances.  I think you can
20 argue, a strong argument can be made that those
21 circumstances weren't fair to the physician.
22     Q    (By Mr. Dayhuff)  All right.  Does the
23 Health Care Quality Improvement Act speak at all about
24 participating at different levels?
25     A    No.  And that's what I answered.  Not

## Page 222

1  specifically.
2      Q    And all you need to do is comply with the
3  standards set forth there to have HCQIA immunity;
4  right?
5      A    To comply with HCQIA you have to comply with
6  HCQIA.  Yeah, I think that's fair.  I just want to make
7  sure I understood the question.
8      Q    You mentioned that Section 3 was meaningful
9  to you on that question, adequate notice and hearing
10 procedures provided to the physician or after such
11 other procedures as are fair, okay.  And it defines
12 adequate notice and hearing procedures below, does it
13 not?
14     A    Well, I wouldn't say it defines everything.
15 Isn't there some soft language around there that says
16 that these can be?  Let's see.  It says the health care
17 entity is deemed to have met the adequate notice.  It
18 doesn't say you absolutely have to do all of these
19 things.
20     Q    You are deemed to have met prong 3 if you do
21 what is beneath the section called Adequate Notice; is
22 that correct?
23     A    Yes, that's what it says.
24     Q    And under that section there's no
25 prohibition on what Dr. DiBona did in this matter; is

## Page 223

1  that correct?
2          MR. DICK:  Object to the form of that
3  question.
4      A    I think that's correct, if I remember your
5  question correctly.
6      Q    (By Mr. Dayhuff)  My question was after you
7  read through adequate notice and hearing procedures
8  that defines adequate notice and hearing procedures in
9  3, is there anything in that section that would
10 prohibit DiBona from undertaking the conduct he did in
11 this peer review action?
12         MR. DICK:  Object to form.
13     A    I don't see anything that specifically
14 addresses that point.
15     Q    (By Mr. Dayhuff)  My question was is there
16 anything that would prohibit or find fault with what he
17 did?
18         MR. DICK:  Object to form.
19     A    That's what I'm saying.  One way or another,
20 there's nothing that addresses it.
21     Q    (By Mr. Dayhuff)  Well, if there's nothing
22 that addresses that as a flaw, then if you --
23     A    I think that's a legal conclusion.
24     Q    I do too.
25     A    No, your question.

## Page 224

1      Q    Oh.
2      A    You want to argue from what my answer is.  I
3  think I've answered your question.
4      Q    Well, let me just make sure.  You say
5  nothing in -- you said nothing in subsection (b),
6  adequate notice and hearing.
7      A    That's what you asked.
8      Q    Right.  Nothing in there prohibits DiBona
9  from doing what he did in this matter?
10         MR. DICK:  Object to form.
11     A    I said nothing specifically addresses that.
12     Q    I guess I can live with that.  Thanks.
13         MR. DAYHUFF:  That's all the questions I
14 have.  Thank you.
15         MR. DICK:  Nothing further.
16         (Whereupon, the deposition was concluded at
17 approximately 7:15 P.M., after 4 hours 45 minutes
18 of testimony.)
19
20
21
22
23
24
25

Adrienne E Marting 8/12/2011

### Page 225

SIGNATURE OF DEPONENT

I, the undersigned, ADRIENNE E. MARTING, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony with the following corrections, if any:

Page / Line / Change / Reason
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____

### Page 226

Page / Line / Change / Reason
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____
_____ / _____ / _____ / _____

_____
ADRIENNE E. MARTING

### Page 227

C E R T I F I C A T E

STATE OF GEORGIA:

DEKALB COUNTY

I, Catherine B. Steele, do hereby certify that the foregoing deposition was taken before me on the date and at the time and location stated on page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

This, the 18th day of August 2011.

_____
CATHERINE B. STEELE
GA CCR B-1123

### Page 228

DISCLOSURE

STATE OF GEORGIA:
COUNTY OF DEKALB:

Deposition of ADRIENNE E. MARTING

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of CompuScripts, Inc.
I am not disqualified for a relationship of interest under the provisions of OCGA 9-11-28.

Regency-Brentano, Inc. was contacted by the offices of CompuScripts, Inc. to provide court reporting services for this deposition.

Regency-Brentano, Inc. will not be taking this deposition under any contract that is prohibited by OCGA 15-14-37 (a) and (b).

Regency-Brentano, Inc. has no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Regency-Brentano, Inc. will charge its usual and customary rates to all parties in the case and a financial discount will not be given to any party to this litigation.

CATHERINE B. STEELE, GA CCR B-1123.   DATE: 08/12/2011

57 (Pages 225 to 228)

Adrienne E Marting 8/12/2011

Page 229

1                   INDEX TO EXAMINATIONS

2    EXAMINATION                                    PAGE

3

4    Cross-Examination by Mr. Dayhuff ................... 3

5    Direct Examination by Mr. Dick ................. 199

6    Recross-Examination by Mr. Dayhuff ............... 212

7    Redirect Examination by Mr. Dick ................. 219

8    Further Recross-Examination by Mr. Dayhuff ........ 221

9

10   Signature of Witness/Deponent .................... 225

11   Certificate of Court Reporter ................... 227

12

13                  INDEX TO EXHIBITS

14   EXHIBIT NO.                                     PAGE

15

16   Defendant's Exhibit No. 1, 5925/1503, Materials
             Sent to Expert Adrienne Marting .......... 4

17

     Defendant's Exhibit No. 2, Retainer letter

18           dated August 2, 2011, from Adrienne
             E. Marting to Thornwell E. Sowell,

19           Esq. ..................................... 10

20   Defendant's Exhibit No. 3, Timeline of Events ...... 13

21   Defendant's Exhibit No. 4, February 25, 2010

             Notice of Precautionary Suspension ....... 66

22

     Defendant's Exhibit No. 5, March 16, 2010

23           Notice of Adverse
             Recommendation/Right to Request a

24           Hearing .................................. 68

25

Page 230

1    Defendant's Exhibit No. 6, Notice of Hearing
             stamped Received May 04, 2010, McNair

2            Law Firm ................................. 77

3    Defendant's Exhibit No. 7, Aiken Regional
             Medical Centers Corrected Report of

4            the Hearing Panel, October 12, 2010,
             In the Matter of Margo Muniz, MD ......... 93

5

     Defendant's Exhibit No. 8, Outline for

6            Addressing Inappropriate Practitioner
             Conduct .................................. 197

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25