# EXHIBIT EE

to

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## Civil Action No.: 1:10-cv-00986-JFA

*Transcript from deposition of James Boehner*

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**Page 3**

```
In the United States District Court
      District of South Carolina
            Aiken Division
      Case No: 1:10-CV-00986-MBS

Margo J. Hein-Muniz, MD          )
and Parkside Medical             )
                                 )
Consultants, LLC d/b/a           )
                                 )
Magnolia Medical,                )
                                 )        Deposition
        Plaintiff(s),            )
                                 )            of
vs.                              )
                                 )  JAMES F. BOEHNER, M.D.
Aiken Regional Medical           )
Centers, Universal Health        )
Services, Inc., Aiken            )
Obstetrics & Gynecology          )
Associates, P.A., Carlos         )
A. Milanes, K.D. Justyn,         )
Oletha R. Minto, MD, James       )
F. Boehner, MD, Robert D.        )
Boone, MD, Jonathan H.           )
Anderson, MD, Thomas P.          )
Paxton, MD,                      )
                                 )
        Defendant(s),            )
                                 )

     Deposition of JAMES F. BOEHNER, M.D., taken before
Jennifer L. Thompson, CVR, Nationally Certified Verbatim
Court Reporter and Notary Public in and for the State of
South Carolina, scheduled for 1:00 p.m. and commencing
at the hour of 1:27 p.m., Thursday, July 28, 2011, at
the office of Aiken Regional Medical Center, Columbia,
South Carolina.

                    Reported by:
                Jennifer L. Thompson, CVR
```

1                STIPULATIONS
2    This deposition is being taken pursuant to the
3    Federal Rules of Civil Procedure.
4                  - - - -
5    The reading and signing of this deposition is
6    reserved by the deponent and counsel for the
7    respective parties.
8
9  Whereupon,
10    JAMES F. BOEHNER, M.D., being duly sworn and
11   cautioned to speak the truth, the whole truth,
12   and nothing but the truth, testified and
13   deposed as follows:
14   Court Reporter:  State your full name for the
15   record, please.
16   Witness: James Francis Boehner
17                - - - - -
18           DIRECT EXAMINATION
19  BY MR. SOWELL:
20  Q   Dr. Boehner, when were you born?
21  A   I'm sorry?
22  Q   When were you born?  Or what's your birthday?
23  A   2/8/55.
24  Q   And where were you born?
25  A   Syracuse, New York.

---

**Page 4**

Any court, party, or person who has purchased a
transcript may, without paying a further fee to the
reporter, reproduce a copy or portion thereof as an
exhibit pursuant to court order or rule or for internal
use, but shall NOT otherwise provide or sell a copy or
copies to any other party or person without the express
consent of the reporter and/or reporting agency.

                    APPEARANCES

For the Plaintiff(s):
Thornwell F. Sowell, Esquire
David C. Dick, Esquire
Sowell, Gray, Stepp & Laffitte, LLC
1310 Gadsden Street
P. O. Box 11449
Columbia, South Carolina 29211

For the Defendant(s):
Travis Dayhuff, Esquire
Nelson, Mullins, Riley, & Scarborough, LLP
1320 Main Street
Meridian/17th Floor
Columbia, South Carolina 29201

                      INDEX

Stipulations . . . . . . . . . . . . . . . . . 3
Direct Examination by Mr. Sowell . . . . . . . . . 3
Cross Examination by Mr. Dayhuff . . . . . . . . 108
Errata . . . . . . . . . . . . . . . . . . . . 114
Certificate . . . . . . . . . . . . . . . . . 115

                    EXHIBITS

Plaintiff's Exhibit No. 1  Revised ED Call Schedule (3
pgs)
Plaintiff's Exhibit No. 2  Letter w/attachments
1/18/2011 (4 pgs)
Plaintiff's Exhibit No. 3  Fetal Monitor Strips (14 pgs)
Plaintiff's Exhibit No. 4  Medical Peer Review Meeting
Summary 6/23/2008 (1 pg)
Plaintiff's Exhibit No. 5  ARMC Medical Staff
Policy/Procedure (4 pgs)
Plaintiff's Exhibit No. 6  Letter 12/17/2010 (1 pg)

1   Q   Did you grow up there?
2   A   I grew up in a town called Liverpool which is just
3       northwest of Syracuse.
4   Q   Did you finish high school there?
5   A   Liverpool High School.
6   Q   And then what?
7   A   I went to Syracuse University.
8   Q   And what was your degree from there?
9   A   I had a bachelor's in both chemistry and
10      psychology.
11  Q   What did you do after that?
12  A   I had a graduate year doing organic chemistry.
13  Q   At Syracuse?
14  A   At Syracuse.
15  Q   Okay.  And then what?
16  A   Then I went to SUNY, S-U-N-Y, Upstate Medical
17      Center or Medical College for my medical degree.
18  Q   The BS from Syracuse, what year was that?
19  A   That was BA.
20  Q   Sorry.
21  A   Both of them were BAs.
22  Q   Okay.
23  A   It would be in 1977.
24  Q   And what year was the MD from SUNY Upstate?
25  A   1982.

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**5**

1  Q  What did you do after that?
2  A  Came down to Medical College of Georgia and had a
3     residency in OB/Gyn that extended from 1982 through
4     1986.
5  Q  So you finished that residency in 1986?
6  A  Correct.
7  Q  Did you do any fellowships after that?
8  A  I did not.
9  Q  Have you had any formal training beyond the 1986
10    completion of the residency at the Medical College
11    of Georgia?
12 A  No.
13 Q  So what did you do after you left the Medical
14    College of Georgia?
15 A  I was recruited to a practice in Aiken, South
16    Carolina.
17 Q  Is that the current practice or successor to it?
18 A  It is the current practice.
19 Q  It's the Aiken Gynecology and Obstetrics
20    Associates?
21 A  Aiken Obstetrics and Gynecology Associates.
22 Q  Who was in that group when you were recruited to
23    it?
24 A  Allen Kirchner.
25 Q  Does he still practice actively?

---

**6**

1  A  No, he doesn't.
2  Q  Is he still living?
3  A  He is still living.  He -- the last location I know
4     was Woodside in Woodside Plantation.
5  Q  In Aiken?
6  A  Correct.
7  Q  Who else was in the group when you were recruited
8     to it?
9  A  No one else.
10 Q  So how long was it just the two of you?
11 A  Approximately two years.
12 Q  And then what happened?
13 A  Then Dr. Boone joined the practice.
14 Q  And what was the next event in the practice, in
15    terms of the makeup of the physicians?
16 A  I believe Dr. Besson had entered the practice. I'm
17    not certain of the year.  And then she decided to
18    leave and form her own practice.  Following her was
19    Caroline Keller who came and became a partner and
20    then decided to leave.  I'm not sure of the time
21    when she did.
22 Q  Anybody else?
23 A  And then following that Dr. Minto joined the
24    practice.  I believe she's been with us about eight
25    or nine years.

---

**7**

1  Q  That practice is currently you, Dr. Boone and Dr.
2     Minto?
3  A  That's correct.
4  Q  So have there been any other physicians who
5     practiced with that practice either as employees or
6     partners?
7  A  There was a Dr. Dixon who had originally come to
8     the area working with a different practice and
9     elected to leave that practice and come to practice
10    with us.
11 Q  Is that D-i-c-k-s-o-n or D-i-x-o-n?
12 A  I think it's D-i-x-o-n.
13 Q  And what was -- is it a he?
14 A  It's a he.
15 Q  And what was his first name?
16 A  I cannot remember.  I cannot remember it.  And
17    there was one other person who had not been part of
18    our practice but actually operated -- that was
19    within our office space, and that was Dr. Greer.
20 Q  Was that a he?
21 A  That's a he.
22 Q  First name?
23 A  I think -- It's Edwin.  Edwin Greer.
24 Q  Is that a G-r-i-e-r or G-r-e --
25 A  G-r-e-e-r.

---

**8**

1  Q  So is it Kirchner?
2  A  K-i-r-c-h-n-e-r.  Wait a minute.  K-i-r-c-h-n-e-r.
3  Q  And when did he leave the practice?
4  A  I believe 2000.
5  Q  Dr. Boone came in about 1988 and he remains?
6  A  Correct.
7  Q  Dr. Besson, was she an employee or a partner?
8  A  She was an employee and chose to leave under that
9     status.
10 Q  How long was she an employee?
11 A  It was either one -- one to three years.  I can't
12    remember.  Perhaps one to two years.
13 Q  Caroline Keller was a partner.
14 A  She was a partner.
15 Q  And when did she leave?
16 A  I think she left 1999.  I think she left at the end
17    of 1999?
18 Q  What were the circumstances of her leaving?
19 A  She had a boyfriend that lived across the country
20    and she elected to move out to be with him.
21 Q  Do you know where she lives now?
22 A  I believe now she lives in Charleston, South
23    Carolina.
24 Q  Does she continue to practice medicine?
25 A  As far as I know, yes.

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

9

1   Q   Dr. Dixon, we believe D-i-x-o-n.  How long was he
2       with the practice?
3   A   Again, it's hard to remember.  But I think it was
4       one to two years.
5   Q   What were the circumstances of his departure?
6   A   From what I understand, he was from Boston.  He
7       came to work with Dr. Greer for a short period of
8       time then approached our Dr. Kirchner to see
9       whether or not he would be able to practice with
10      us.  We accepted him.  He came in and practiced
11      with us for a short period of time.  I believe his
12      divorce hearings and everything in Boston had
13      completed --
14  Q   Divorce?
15  A   Divorce --
16  Q   Marital divorce?
17  A   Correct.  And this, again, I didn't see any
18      documentation, but that was the information we were
19      given.  And then after that was all finished he
20      decided to go back up to Boston.
21  Q   And Dr. Edwin Greer, G-r-e-e-r, how long did he
22      practice with the group?
23  A   Now, he wasn't in the group, but he shared office
24      space with us.  And I would say one to two years.
25  Q   Where is he now?

---

10

1   A   He's dead.
2   Q   What were the circumstances of Dr. Kirchner's
3       departure from the group?
4   A   Dr. Kirchner was asked to leave the group.
5   Q   Was there any litigation over that separation?
6   A   There was litigation that was involved.
7   Q   I mean active litigation, a lawsuit?
8   A   Yes, there was an active lawsuit, and there was a
9       SLED complaint as well.
10  Q   SLED?  SLED complaint?  What was the substance of
11      the SLED complaint?  Was it by him against the
12      group or the group against him?
13  A   No.  It was the group against him.
14  Q   What was the general nature of it?
15  A   General nature is that there was some money taken
16      out of some of the accounts and we felt it was
17      inappropriate.
18  Q   Was the lawsuit tried, meaning was it taken to
19      court and tried in court?
20  A   It was not.  It was mediated.
21  Q   And settled?
22  A   And settled.
23  Q   Who was the group's lawyer?
24  A   It was a Greenville firm, and the name escapes me
25      right at the moment.  But it was a Greenville firm.

---

11

1   Q   Who was Dr. Kirchner's lawyer?
2   A   All I know is he went through several lawyers, but
3       I don't know who they were.
4   Q   But the litigation of the case was in Aiken County?
5   A   We traveled to Columbia for the mediator.  But the
6       mediation took place at one day and it was over
7       after that.
8   Q   But you think the case was filed in Aiken County?
9   A   I believe so.
10  Q   Now, has the group been engaged in any other
11      litigation since you've been there which was --
12  A   Not that I can recall.
13  Q   1986?
14  A   I don't believe so.
15  Q   What about you personally?  Have you been engaged
16      in any litigation since 1986?
17  A   When you say litigation, are you talking about
18      professional liability actions?
19  Q   That would be one category.
20  A   The only one that I recall is one professional
21      liability, and I don't remember the year.  I
22      believe it was within the last ten years.
23  Q   Was that action filed against you?
24  A   The action was filed against me.
25  Q   Was it filed against anybody else?

---

12

1   A   It may have been the hospital as well.  I don't
2       remember all of the defendants.
3   Q   Generally, what did it revolve around, what kind of
4       case?
5   A   It revolved around a laproscopic bladder entry.
6   Q   Bladder?
7   A   Uh-huh.
8   Q   Laproscopic bladder?
9   A   Uh-huh.
10  Q   So what you're talking about is essentially self-
11      explanatory, I guess.  Some injury to the bladder
12      as a result of a laproscopic cut?
13  A   It was a very simple laproscopic case and the usual
14      precautions were taken.  And the patient did not
15      exhibit any problems after surgery, nor problems
16      during surgery, that would have caused me to
17      suspect this.  She had some post-operative
18      difficulties in which she was to come in and be
19      evaluated.  In each case she refused.  And when she
20      finally came in she was in fairly serious shape.
21      And she had presented to the emergency room.  A
22      surgeon went with me to a laparotomy which is to
23      actually open up the abdomen.  And we were able to
24      identify this.  But, again, it was very unsuspected
25      by everyone.

---

**Thompson Court Reporting, Inc.**
**www.thompsonreporting.com**

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

13

1  Q  The injury was the first time around, not when you
2     opened her up to investigate?
3  A  That's correct.
4  Q  Who did the investigation with you?
5  A  Dr. Gibbs. David Gibbs.
6  Q  And what's his discipline?
7  A  Colo rectal.
8  Q  Has that litigation, lawsuit been resolved?
9  A  It has resolved.
10 Q  And about when?
11 A  Again, I can't remember. It's within the last ten
12    years. And it basically was a settlement.
13 Q  Was your insurance carrier for that the Joint
14    Underwriting Association?
15 A  Yes.
16 Q  Who was your lawyer? David Brown?
17 A  David Brown. But I know his daughter, and she has
18    a different name now so I'm . . . But it was David
19    Brown.
20 Q  And who was the Plaintiff?
21 A  The actual patient that was the Plaintiff?
22 Q  Patient, right.
23 A  Again, I can't remember the name.
24 Q  Do you remember her lawyer.
25 A  No. But my understanding -- I don't remember his

14

1     name.
2  Q  Have you been engaged in any other litigations as
3     Plaintiff or Defendant?
4  A  Not that I'm aware of.
5  Q  Okay. So we've identified two. One was the one
6     with Dr. Kirchner and the second one was this
7     professional liability action, which was resolved
8     by settlement, I assume?
9  A  Correct.
10 Q  Do you know who the hospital's lawyer was with
11    respect to the professional liability action?
12 A  I don't know that answer.
13 Q  Has the group, Aiken Gynecology and Obstetrics
14    Associates, been engaged in litigation since 1986?
15 A  Not that I know of. And it's Obstetrics and
16    Gynecology.
17 Q  I got you.
18 A  Okay.
19 Q  I said it wrong. Have any of the members of the
20    group been engaged in professional liability
21    litigation since 1986?
22 A  I believe Dr. Boone had a professional liability
23    action. I do not believe any of the others had
24    professional liability, at least not to my
25    knowledge.

15

1  Q  The Dr. Boone professional liability action, do you
2     know what it was generally related to?
3  A  This was related to a laproscopic entry injury.
4  Q  Laproscopic what injury?
5  A  Entry.
6  Q  Entry.
7  A  Entry into the abdomen, which she recognized and
8     brought in a general vascular surgeon to be able to
9     handle the difficulty. And basically it was
10    cleared by the surgeon and then the patient ended
11    up having significant problems post-op.
12 Q  You know who the Plaintiff was in that case?
13 A  I'm sorry I'm not very good with names. But no, I
14    don't know who the Plaintiff was.
15 Q  Do you know who any of the lawyers were involved in
16    that case?
17 A  I do not know.
18 Q  How long ago was that case?
19 A  It would have been greater than ten years.
20 Q  Was it resolved by settlement or did it go to
21    trial?
22 A  My memory is that it was resolved by settlement.
23    Since I wasn't directly involved, I'm a little hazy
24    as to the facts.
25 Q  But you're not aware -- you are not aware of any

16

1     other litigations that any of the individual
2     physicians in the group or the group, Aiken
3     Obstetrics and Gynecology Associates, has been
4     engaged in since 1986 other than what you've told
5     me about?
6  A  I do not believe there are any other actions.
7
8     MR. DAYHUFF: Let's not forget this action, right?
9     MR. SOWELL: Yeah, this action.
10
11 A  Okay. Yes.
12
13    MR. DAYHUFF: That's another. I guess we're now
14       involved in one other action.
15    MR. SOWELL: Right.
16
17 Q  SUNY Upstate, is that in Syracuse?
18 A  That's in Syracuse.
19 Q  Now, you're currently chairman of the Board of
20    Governors at Aiken Regional Medical Centers?
21 A  That's correct.
22 Q  Now, does that position have a description?
23 A  It does have a description and is defined in the
24    Board of Governors minutes. But mainly preside
25    over the board meetings.

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

17

1
2      MR. SOWELL: I think, Travis, along the lines of the
3          other day, we'll just make some requests to
4          you and then follow up with a letter. We'd
5          like to have a copy of whatever job
6          description is in place with respect to the
7          chairman of the Board of Governors at ARMC.
8      MR. DAYHUFF: We'll do what we did the other day.
9          Anything that you guys want to make requests
10         of, put it on that list and I'll --
11     MR. DICK: Did you get –
12     MR. DAYHUFF:  Did you send a letter.
13     MR. DICK: Yeah, I sent a letter.
14     MR. DAYHUFF: Did you sent it?
15     MR. DICK: Yeah.
16     MR. DAYHUFF: You sent it in the mail?
17     MR. DICK: I don't know.  I just –
18     MR. DAYHUFF: I haven't gotten it yet.
19     MR. DICK: Okay.  It's got that on there, actually,
20         I think.
21     MR. DAYHUFF: Good.  I'll take that up when I get
22         it.
23
24  Q   Who do you report to as chairman of the Board of
25      Governors?

18

1   A   I guess I don't understand the question. As Board
2       of Governors chair I basically just run the board
3       meetings.
4   Q   Understood.  And this question's asking the context
5       of what we were discussing before the deposition
6       started, which is the hospital, ARMC, we understand
7       now is owned by UHS Delaware, Inc. or UHS of
8       Delaware which was the first that -- the first time
9       we were aware of that.  And so my question is, do
10      you report to anybody at UHS Delaware, Inc.?
11  A   I have not reported to anyone at UHS Delaware. The
12      only contact that I truly had was Frank Lopez who
13      comes down for the board meetings.  But it's not a
14      reporting structure.  Basically he will participate
15      in the board meetings, as do the officers of the
16      hospital.  I don't specifically give my findings to
17      anyone.  It's, I believe, at this level the CEO
18      reports to UHS Delaware as to what is going on
19      through the board meetings.  But I don't have
20      communication with them.
21  Q   Now, does anybody else with UHS Delaware regularly
22      come to the board meetings other than Frank Lopez?
23  A   The only one I've seen at the board meetings has
24      been Frank Lopez on a regular basis of which he
25      tries to make quarterly visits.

19

1   Q   Does the board meet quarterly?
2   A   The board meets monthly with the exception of I
3       believe July and December.
4   Q   So approximately ten times a year?
5   A   Yes.
6   Q   How long have you been chairman of the Board of
7       Governors?
8   A   This is my second year.
9   Q   When did your term commence?
10  A   My term would have commenced in January 1, 2010.
11      I'm sorry.  Of the chairmanship 2010.  I was on the
12      board prior to that time.
13  Q   How long were you on the board prior to that?
14  A   I believe I started in 2007.  It's a six-year term,
15      and it ends at the end of next year.  I'm going to
16      be more specific.  It's a three-year term with a
17      renewal for another three years if desired.
18  Q   But in your case it will be a six-year term?
19  A   Correct.
20  Q   How were you made chairman of the board?
21  A   I was voted on by the board.  I was asked by the
22      current chairman to become her vice chairman.  And
23      I believe that was voted on by the board.
24  Q   Who was the prior chairman?
25  A   Kay Bearman Bruhl.

20

1   Q   Did that have to be approved by UHS Delaware?
2   A   I don't know the answer to that question.  My
3       information was that I was just affirmed by the
4       board.
5   Q   Does your election to the board in the beginning
6       have to be approved by UHS Delaware?
7   A   I believe it's approved only by the board.
8   Q   Do you know?
9   A   I don't know for a fact.  The bylaws state that
10      it's approval of any new member goes before the
11      board.
12  Q   But you don't know whether UHS Delaware approves
13      your election or not?
14  A   I'm not certain.
15  Q   Now, how were you elected the first time?  I know
16      what you said about the board, but how did it
17      transpire that you became interested in and/or
18      became a member of the Board of Governors?
19  A   I've been on medical staff committees off and on
20      for the number of years I've been here.  And I
21      received a call from KD Justyn, and she asked me to
22      be part of the Board of Governors.  And I consider
23      that a great honor, and I definitely accepted.
24  Q   Now, are the board members paid?
25  A   No, they're not paid.

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

21

1  Q   So there's no remuneration or other benefit to the
2      board members as a result of that service?
3  A   The only remuneration is if we have a yearly event,
4      which is basically our reasonable and customary
5      expenses are reimbursed.
6  Q   And where is that event?
7  A   That's at Hilton Head in September.
8  Q   Is that a board retreat?
9  A   That's a board retreat, and we have a meeting there
10     as well as go to the conferences there.
11 Q   Do persons from UHS Delaware or UHS, for that
12     matter, - We'll call UHS Delaware and UHS the
13     holding company UHS for purposes of this
14     discussion. - do they appear at the Hilton Head
15     meeting?
16 A   I've not seen them there.  I've never seen their
17     presence there.  And when I used to go there as
18     part of the Medical Executive Committee, I don't
19     remember seeing any representatives there.  And, of
20     late, while we have gone here while I was a board
21     member I have not seen them.
22 Q   Now, a little bit different question.  Are you paid
23     anything or benefitted as a result of being
24     chairman of the Board of Governors?
25 A   No, I don't.  Or, no, I don't have any remuneration

22

1      for that.  They feed us well.
2  Q   Good.  I guess just to establish this, since you've
3      been on the board since 2007, you have been on the
4      board with respect to whatever activities the board
5      conducted vis-a-vis Dr. Muniz in 2009 or 2010?
6  A   Correct.  I was on the board at that time.
7  Q   So you were on the board at the time the board
8      voted -- discussed and voted with respect to the
9      2009 peer review?
10 A   Yes.  I was there for that episode.  And I just
11     need to be more specific on the specifics incident
12     in 2009 that you're speaking of.
13 Q   We'll get to that.
14 A   Okay.
15 Q   All I'm trying to find out now is you were there.
16 A   I was present.
17 Q   You were also present for the 2010 episode?
18 A   Correct.
19 Q   What other medical staff committees have you served
20     on going back from your service on the board now?
21     Am I correct that you're not allowed to serve on
22     MEC and the board?
23 A   That's correct.
24 Q   So we know you're not serving on the MEC starting
25     in 2007?

23

1  A   Correct.
2  Q   Going backwards to 1986, as best you can summarize
3      what committees have you served on?
4  A   I've been on -- probably on an exhaustive list.  I
5      continue as a member of one of the committees
6      that's called Maternal Fetal Mortality.  It's a
7      committee that's mandated by DHEC and basically
8      kind of is an interface between obstetrics and
9      medical peer review committee.  I have served on
10     the Medical Review Committee before.  I have
11     been a member of the Medical Executive Committee
12     before.
13 Q   Was that as chairman of the department?
14 A   Yeah.  Well, yes --
15 Q   Or chief of staff?
16 A   No, not chief of staff.  I had -- I was involved in
17     the development of a new department called
18     perinatal medicine.  And once that was approved I
19     served as its director for a number of years, and I
20     attended Medical Executive Committee as the chair
21     of that department.
22 Q   Any others?
23 A   I have served on -- it seems that I served on
24     multiple committees.  I can't bring all of them to
25     mind right now.  But the perinatal department was a

24

1      section at one time.  I've been a represetnative of
2      the surgery department to the Medical Executive
3      Committee.
4  Q   You have been?
5  A   Yeah.  Over time.  And I can't remember the dates
6      on that.
7  Q   Tell me about the Maternal Fetal Mortality
8      subcommittee.
9  A   The Maternal Fetal Mortality conference basically
10     is held monthly in which charts are brought to us
11     for review.  We basically review and see whether or
12     not there's any substance in them to be moved to
13     Medical Peer Review Committee.  And we don't have
14     any authority to do anything other than just decide
15     whether or not a case really needs to go or not.
16 Q   To peer review?
17 A   Correct.
18 Q   So you're more or less in a reviewing function and
19     a reference function?
20 A   Correct.
21 Q   So if you reviewed one that you thought was
22     questionable, you would refer it to the peer
23     review?
24 A   Yes.
25 Q   Now, does the Maternal Fetal Mortality committee or

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

25

1    conference have records of its activities?
2  A  I believe so.
3
4     MR. SOWELL: Travis, we request those records.
5
6  Q  How long has that committee been in play?
7  A  It's probably in place for more than ten years.
8  Q  And I assume it is to review either maternal deaths
9     or fetal deaths?
10  A  Correct.
11  Q  Are the majority of those --
12  A  It's also morbidity.  If there's been fetal injury,
13     maternal injury, if any . . .
14     And just to make sure that the policies of the
15     department and section are followed.
16  Q  The department being what?
17  A  Sorry, I should say section.  Section of
18     obstetrics.
19  Q  And what would that be?  That would be obstetrics?
20  A  That would be obstetrics.
21  Q  Because you don't have a department of obstetrics
22     and gynecology, do you?
23  A  The perinatal medicine which encompass both the
24     obstetricians and pediatricians was dissolved.  We
25     do have a perinatal medicine section.  Actually, I

26

1     should say section because that does involve the
2     pediatricians and the obstetricians.
3  Q  Who represents the OB/Gyns on the Medical Executive
4     Committee?
5  A  Through the department of surgery.
6  Q  So that would be Dr. Minto currently or recently?
7  A  Recently, not currently.
8  Q  Who would be currently?
9  A  I'm not sure who the current department of surgery
10     chair is.
11  Q  So am I to assume from the fact that this committee
12     and conference has operated for more than ten
13     years, you've had more than one maternal or fetal
14     mortality at the Aiken Regional Medical Centers
15     during that period?
16  A  Yes.
17  Q  Do you know how many?
18  A  I don't know.
19  Q  Do you know how many occurred in the year 2010?
20  A  I don't have those numbers.
21  Q  But can you approximate?  I know you don't have
22     them, and I'm not asking you for the precision of
23     the numbers.  Can you approximate the numbers from
24     your recollection?
25  A  I feel uncomfortable in doing so.

27

1  Q  But you have records that would actually precisely
2     provide those numbers?
3  A  The records should show that.
4
5     MR. SOWELL: We request those records.  It's
6        probably the same thing I just requested, but
7        --
8     MR. DAYHUFF: It is.
9     MR. SOWELL: -- if not, --
10     MR. DAYHUFF: And it's probably a peer review issue.
11     MR. SOWELL:  -- I'm requesting it now.
12     MR. DAYHUFF: I know.
13
14  Q  Now, with respect to Dr. Muniz, returning to Dr.
15     Muniz for a minute and the 2009 peer review, other
16     than your service on the Board of Governors, did
17     you have any involvement with respect to that peer
18     review?
19  A  I believe a matter regarding Dr. Muniz was brought
20     up to the board in 2009.
21  Q  Right.  Some separate matter?  Separate from the
22     2009 peer review or is that what you're referring
23     to?
24  A  Again, I need to have specifics as to what you're
25     speaking of specifically.

28

1  Q  Well, I'll explain.  We know that her 2009 peer
2     review went to the board for a vote for
3     consideration and a vote.  So my question is, are
4     you referring to something other than that?
5  A  No, I'm not.
6  Q  So that's the only participation you had with
7     respect to her 2009 peer review?
8  A  To my knowledge, yes.
9  Q  Or Dr. Muniz, in any respect, was that peer review?
10
11     MR. DAYHUFF:  Object to the form of the question.
12        You can answer.
13
14  A  I'm not sure when her civil lawsuit was brought
15     against me and multiple others, so I'm not certain
16     whether or not there was any action other than
17     that, so.
18  Q  Okay.  That suit, I think it was brought after the
19     Board of Governors voted to impose 100 percent
20     review and also the referral to Dr. Schwarts-Watts
21     the psychiatrist.  That's when the lawsuit was
22     first filed.  And then after that there was some,
23     you know, resolution of the lawsuit at that point.
24     And it was dismissed.  I think all that occurred in
25     2009.  So with that background, I'm just trying to

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

29

1  find out if you had any involvement with respect to
2  any matters concerning Dr. Muniz other than the
3  Board of Governors vote on her peer review in 2009.
4  A  I don't believe so.  Nothing comes to mind.
5  Q  Now, with respect to the vote of the Board of
6  Governors in 2009, did you participate in the
7  discussions?
8  A  I did participate in the discussions.
9  Q  Did you participate in the vote?
10  A  I did.
11  Q  And I assume was your vote to do what the Board of
12  Governors directed be done in 2009?
13  A  My vote was that it went along with what the Board
14  of Governors suggest -- or --
15  Q  Recommendation?
16  A  Recommendation, yeah.
17  Q  So you voted with the recommendation of the Board
18  of Governors, which was to subject her to a 100
19  percent review and to refer her to a psychiatrist
20  in connection with assertions that she was a
21  disruptive physician?
22
23      MR. DAYHUFF: Object to the form of the question.
24        You can answer.
25

30

1  A  Yes.
2  Q  Now, did anybody on the Board of Governors vote
3  against that recommendation?
4  A  I don't have full recollection, but I believe
5  everything was in the affirmative.  I don't
6  remember if anyone abstained from that vote.  But I
7  believe they were all in that recommendation.
8  Q  Now, when Dr. Muniz's 2010 peer review was brought
9  to the Board of Governors you were the chairman at
10  that point?
11  A  That's correct.
12  Q  Now, did you participate in the discussions with
13  respect to the governing board's recommendation
14  with respect to her 2010 peer review?
15  A  If you're speaking of -- actually, I recused myself
16  from virtually everything that was involved at that
17  time.
18  Q  Did you participate in the discussions at the
19  governing board?
20  A  I need to know the specific governors' meeting.
21  The final one after the appellate review?
22  Q  Yes.
23  A  I did not participate in the discussions.  I did
24  not vote.  I recused myself.  Basically, after I
25  became part of the hearing panel in which I met

31

1  you, I did everything I could to stay out of the
2  matter at any other level.  I did not appoint the
3  Appellate Review Committee.  I left that up to my
4  vice chair, Sam Kelly, to handle the entire matter.
5  During the board meeting where this came up, I did
6  what I had to do to start the meeting and I turned
7  the meeting over to Sam Kelly with the instructions
8  to return it to me as soon as he finished with the
9  matter.  And he conducted the meeting from that
10  point onward until he turned it back to me after
11  the matter was completed.
12  Q  Did Sam Kelly participate in the discussions and
13  vote?
14  A  Yes, he did.
15  Q  Is Dr. Chandler who's on the Board of Governors or
16  do I have that wrong?
17  A  I don't recognize that name.  If you have a
18  specialty I could possibly . . .
19  Q  I can't remember.  I've got it in these papers
20  somewhere.  I'll come back to it.  Now, there were
21  two other -- this is what I'm getting at.  There
22  were two other members of the Board of Governors
23  who served on the appellate panel other than Sam
24  Kelly.  One of them was I think a county councilman
25  or a city councilman that replaced Bob Alexander on

32

1  that appellate panel.  I can't remember her name.
2  A  Clyburn?
3  Q  Clyburn, yes.
4  A  Beverly Clyburn.
5  Q  Beverly Clyburn.  Did she participate in the
6  discussion and vote of the Board of Governors?
7  A  I was not -- I don't know if she specifically spoke
8  during that meeting.
9  Q  Did she vote?
10  A  I believe she voted.
11  Q  Now, there was a physician --
12  A  I have to say one thing, though.
13  Q  Yes.
14  A  I don't specifically know that she was there.  But
15  I knew that there was no votes on this.  And I
16  believe there was no -- there were three
17  abstentions, but I don't believe it would have been
18  hers.  But if she was present, I'm sure she voted.
19  Q  Who were the abstentions?
20  A  The abstentions were two individuals who had just
21  come on the board in January and myself.
22  Q  Who were the other two?
23  A  I'm very bad on names.
24  Q  Can you describe them?
25  A  One is the CEO of Vista Bank and the other is a

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

### 33

1　　private businessman.
2　Q　Did they abstain on the premise that they had just
3　　been around long enough?
4　A　They did.
5　Q　Now, there was a physician, the one I was trying to
6　　remember his name, who was on the appellate panel.
7　　Do you remember who that was?
8　A　I'm not certain.
9　Q　See if I can find it.
10　A　It must be in the documents somewhere.
11　Q　It's in here. I'll find it. Yeah, Jonathan C.
12　　Collins.
13　A　Jonathan Collins.
14　Q　Did he participate in the discussions and the vote
15　　at the governing board in 2010?
16　A　Again, I cannot say that whether he actually said
17　　anything during the discussion, but if he was
18　　there, I know he voted.
19　Q　Okay. Is it correct that the goings on at the
20　　board meetings were audio taped?
21　A　I believe that they were digitally recorded for the
22　　purpose only of minutes.
23　Q　Who did that?
24　A　Pat, the secretary.
25　Q　Pat, the secretary in Carlos Milanes' office?

---

### 34

1　A　Say that again.
2　Q　Pat, the administrative assistant in Carlos
3　　Milanes' office?
4　A　That's correct.
5　Q　And would you expect that she has maintained those
6　　digital tapes?
7　A　I don't know the answer to that. I thought that
8　　they were just available for doing the minutes and
9　　then destroying them.
10　Q　But the minutes have been preserved?
11　A　Yes.
12
13　　MR. SOWELL: I'm sure we requested those yesterday
14　　or Tuesday -- Monday, I'm sorry. Monday. But
15　　if we didn't, we do.
16
17　Q　How did you come to participate in the judicial
18　　hearing in 2010 with respect to Dr. Muniz's peer
19　　review?
20　A　I was requested by our -- you're talking about the
21　　fair hearing process?
22　Q　Yes.
23　A　I was asked by Celeste, our lawyer, to participate.
24　Q　And what was your participation?
25　A　I believe the best way of saying this was to be one

---

### 35

1　　of the OB/Gyn experts as a representative for the
2　　Medical Executive Committee.
3　Q　Now, do you understand that the prosecution of that
4　　matter was conducted by the Medical Executive
5　　Committee?
6　A　I guess I don't understand the word "prosecution,"
7　　since it's a medical staff meeting.
8　Q　Right. That's a term being used loosely, not in
9　　any kind of criminal sense. But the carrying
10　　forward of the case. It was being carried forward
11　　by the Medical Executive Committee.
12　A　Okay.
13　Q　Is that your understanding?
14　A　I understand that, yes.
15　Q　Primarily or at least the point person was Dr.
16　　DiBona who was the chief of the medical staff?
17　A　That's correct.
18　Q　Now, when the governing board took its vote on Dr.
19　　Muniz in 2010, am I correct that Dr. DiBona both
20　　participated in the discussion and voted?
21　A　That is correct.
22　Q　As a member of the governing board?
23　A　That is correct.
24　Q　Now, was there anybody else who participated in the
25　　2010 fair hearing who's on the governing board

---

### 36

1　　other than you and Dr. DiBona?
2　A　If you're thinking of the panel, I don't believe
3　　any of the panel was on the governing board. And I
4　　don't believe any of the others had any direct
5　　contact with the case at all.
6　Q　Any of the other board members?
7　A　No. I don't believe any of the other board members
8　　had anything to do with this.
9　Q　So the universal people that would have had some
10　　contact with the case prior to the board vote in
11　　2010 would be yourself?
12　A　Uh-huh.
13　Q　Yes?
14　A　Yes.
15　Q　Dr. DiBona?
16　A　Yes.
17　Q　Dr. Collins at the Appellate Review Panel?
18　A　Yes, that's correct.
19　Q　Sam Kelly at the Appellate Review Panel?
20　A　Correct.
21　Q　And Beverly Clyburn at the Appellate Review Panel,
22　　correct?
23　A　That's correct. The appellate is a committee of,
24　　as a subset of the board.
25　Q　Right. Now, getting back to your participating in

---

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

37

1  the fair hearing. I mean, we -- you were there,
2  and we know you examined Dr. Thorpe.
3  **A  Yes.**
4  Q  Correct? By Skype?
5  **A  The individual on Skype from, I believe, Chapel**
6  **Hill.**
7  Q  Yes. And you also participated to the extent that
8  you provided expert OB/Gyn questions to other
9  questioners like Dr. DiBona or Dr. Minto?
10  **A  That's correct.**
11  Q  Did you participate in any other ways?
12  **A  I don't believe so.**
13  Q  Did you ever have any interface outside at the
14  hearing room with Ernest Nauful, the hearing
15  officer?
16  **A  I did not.**
17  Q  At any time before, during or after the hearing?
18  **A  There was a prehearing, and I met him at that**
19  **prehearing.**
20  Q  Tell me about the prehearing.
21  **A  Basically, he just went over what was agreed to by**
22  **the attorneys in terms of how the meeting was to be**
23  **conducted.**
24  Q  And who attended that hearing?
25  **A  I suppose it was Dr. DiBona, myself and I think Dr.**

38

1  **Minto was there. I'm not certain. But all he was**
2  **discussing was the form of how this was going to be**
3  **conducted.**
4  Q  And that was the meeting with Ernest Nauful.
5  **A  He was the hearing officer, yes.**
6  Q  Yeah. And it was before the hearing?
7  **A  That's correct.**
8  Q  And it was Ernest Nauful, Dr. DiBona, Dr. Boehner
9  and Dr. Minto?
10  **A  Yes. I'm not certain if there was anyone else**
11  **there.**
12  Q  Was it on the same day as the hearing or some day
13  prior to the hearing?
14  **A  I believe it was on the same day as the hearing**
15  **started.**
16  Q  But before it started?
17  **A  Correct.**
18  Q  Have you had any other interfaces or communications
19  with Ernest Nauful outside the hearing other than
20  that one?
21  **A  Not that I know of.**
22  Q  Do you know if Dr. DiBona has had any interfaces or
23  communications with Ernest Nauful outside of that
24  hearing?
25  **A  I can't speak for Dr. DiBona.**

39

1  Q  What about Dr. Minto?
2  **A  I can't speak for her either.**
3  Q  Of course, they would have been at this one
4  prehearing conference?
5  **A  Yes.**
6  Q  But other than that, you cannot speak for what they
7  might have done or not done?
8  **A  Correct. I don't have information regarding them.**
9  Q  Now, did you have any communications or interface
10  with any of the witnesses at the 2010 hearing
11  before or after the hearing?
12  **A  I don't believe so. I did my best to stay away**
13  **from them during this time period.**
14  Q  Did you have any communications or interface with
15  any of the members of the hearing panel before or
16  after the 2010 hearing?
17  **A  Before or after the hearing?**
18  Q  Yes.
19  **A  I worked with them on a collegial basis. I worked**
20  **with them as physicians, but not particular to this**
21  **matter.**
22  Q  Would you have had any communications or interfaces
23  with the hearing panel members regarding Dr. Muniz
24  either before or after the fair hearing?
25  **A  I do not believe so.**

40

1  Q  I know from what I've read on the internet that you
2  are a website manufacturer.
3  **A  I used to be.**
4  Q  And a trumpet player.
5  **A  Yes.**
6  Q  And a radio devotee.
7  **A  Yes.**
8  Q  With respect to electronic mail or any other sorts
9  of communications, have you made any or received
10  any related to Dr. Muniz?
11  **A  The only thing that I have would be communications**
12  **between our counsel, our attorneys and ourselves.**
13  **When the question came up, Celeste had informed me**
14  **about this, about electronic communications. I**
15  **went through and searched both my home computer and**
16  **my computer at work for the name Muniz. And,**
17  **basically, the only thing that came up were notices**
18  **relating to the surgery center, which both of us**
19  **have partial ownership, or the suite that we are**
20  **in. I didn't have anything specifically on**
21  **anything else. There was a situation where we**
22  **shared call at one time. Her name would come up on**
23  **the -- our call schedules. But that was the limit**
24  **of all information on Dr. Muniz.**
25  Q  And that would also include any discussions or

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

41

1  communications with respect to her fair hearing?
2  A  I don't believe I made any communications via email
3  that had anything to do with this unless the
4  lawyers had sent something to me.
5  Q  Okay.  What about communications with respect to
6  the votes at the Board of Governors either in 2009
7  or 2010 regarding Dr. Muniz?
8  A  Don't have any electronic mail regarding that.
9  That's not something that we would do by email
10  anyway.
11  Q  You would not do it by email?
12  A  No.
13  Q  You've offered for sale your interest in the
14  surgery center.
15  A  That's correct.
16  Q  Has it been purchased?
17  A  It has not been purchased.
18  Q  Do any of the other members of Aiken Obstetrics and
19  Gynecology own memberships in the surgery center
20  currently other than you?
21  A  Yes.  Dr. Boone does.
22  Q  Has he offered to sell his as well?
23  A  He has.
24  Q  Were you requested to do that by the hospital?
25  A  Not at all.

42

1  Q  So you weren't motivated in any respect by any
2  pressures or requests from the hospital?
3  A  No, not at all.  We had lost a significant amount
4  of money.  We were ready to get out of it.  And the
5  surgery center just did not work with us as far as
6  the way we schedule cases.  So, we elected to
7  resign and offer our shares up for sale.
8  Q  And Dr. Boone's done the same thing also with no
9  success to date?
10  A  Exactly.
11  Q  Did Dr. Minto ever have an ownership interest in
12  the surgery center?
13  A  She initially had an interest, but basically pulled
14  out before she had to commit.
15  Q  Before she had to commit --
16  A  The actual commit.
17  Q  Plunk down money?
18  A  Yes.  Exactly right.
19  Q  Now, Eric Hiner's the executive director of the
20  surgery center?
21  A  My last communications with them it was Eric Hiner,
22  yes.
23  Q  Did you ever have any discussions with either Dr.
24  Tommy Roland or Dr. Minassian, who was the
25  gentleman up in Pennsylvania, about their peer

43

1  review reports in connection with Dr. Muniz's 2010
2  peer review fair hearing?
3  A  I never -- again, my difficulty with names probably
4  comes out here, but the person you're talking about
5  is one of the experts called by the Medical
6  Executive Committee?
7  Q  Right.
8  A  That individual I have not spoken with before or
9  after.  I believe he came in on a conference call,
10  and I don't know him and have not had any
11  communications with him.  Tommy Roland is -- was
12  there for one of the pre-meetings, possibly the
13  first pre-meeting before we actually went into the
14  hearing.
15  Q  Who was in that first pre-meeting?
16  A  I believe it was myself, Dr. DiBona and Celeste,
17  and perhaps Dr. Minto had come later.
18  Q  That was to prepare for the hearing?
19  A  That's correct.
20  Q  Other than that one discussion, have you engaged in
21  any other discussions, communications or interfaces
22  with Tommy Roland about the Margo Muniz matter?
23  A  No.  I don't know him.  And just my only
24  communications with him were during that day that
25  he was there.

44

1  Q  How long was that meeting?
2  A  It was probably less than an hour.
3  Q  But he was there and you were there?
4  A  Yes.
5  Q  For the entire meeting?
6  A  I believe so.  For the most part, we just exchanged
7  pleasantries.
8  Q  Was there anybody else there other than the persons
9  you've mentioned that you can recall?
10  A  I don't believe so.  I remember our lawyer being
11  there and Dr. DiBona.  I think Dr. Minto came
12  later.  But I believe that's all.
13  Q  Did you have anything to do with the appointment of
14  the appellate panel in the 2010 matter?
15  A  I did my best to stay away from it.  The answer is
16  no.
17  Q  That was something Sam Kelly did?
18  A  I asked that Sam Kelly have his own latitude to do
19  that.
20  Q  So in this case he appointed himself, Dr. Collins,
21  and Beverly Clyburn?
22  A  I believe by turning it over to him he was
23  automatically considered the chairman.  And I
24  believe he chose the others or was assisted to do
25  so by a physician services.

**Thompson Court Reporting, Inc.**
**www.thompsonreporting.com**

**James F. Boehner, MD - 7/28/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

45

1   Q    Had there been any discussions with any of those
2        three board members, PhD Dr. Kelly, Dr. Collins, MD
3        and Beverly Clyburn about Margo Muniz's case before
4        the appellate panel met?
5   A    You mean outside of board meetings?
6   Q    No. Inside board meetings.
7   A    I believe all of them had the same knowledge that
8        all of us had that was presented to us at any board
9        meeting in which she was brought up.
10  Q    Now, what was that knowledge? What information was
11       reported in board meetings regarding Dr. Muniz?
12  A    It depends on the actual time. When 2009 came up
13       and that information was regarded to her cases that
14       were reviewed.
15  Q    Right.
16  A    And that came up to the board, and the board had
17       knowledge of that.
18  Q    Right.
19  A    And then when this came up -- I'm not certain of
20       the time course, but they had information in
21       regards to cases under review, I believe, prior to
22       the Appellate Review Panel of being formed.
23  Q    There was only one case under review in 2010. Do
24       you recall that? Which was the fetal death?
25  A    I do recall that, yes.

---

46

1   Q    And five cases under review in 2009 --
2   A    Yes.
3   Q    -- peer review. Do you recall that?
4   A    I recall that there were five cases. I didn't have
5        the opportunity to review any of those five cases.
6   Q    Now, was anybody -- during the preparation sessions
7        for the 2010 fair hearing, was anybody at UHS
8        involved with those sessions by conference call,
9        telephone, in person, or whatever?
10  A    No, I don't believe so. The -- I don't -- No one
11       from UHS -- there were no conference calls that I
12       was aware of. And I do not believe the CEO had
13       anything to do with the hearing at all, so.
14  Q    For the preparations for the hearing?
15  A    I've not seen him at any of those.
16  Q    What about the discussions and the votes after the
17       hearing?
18  A    The CEO was present at the board meetings.
19  Q    You mean Carlos or do you mean Gary Lopez?
20  A    That's correct, Carlos. Carlos was there. I don't
21       remember if Lopez was there.
22  Q    What's his first name?
23  A    Frank Lopez.
24  Q    Frank, yes. I said Gary, but Frank. Frank Lopez.
25       Now, do you know if Frank Lopez was present at the

---

47

1        2009 Board of Governors vote on Dr. Muniz?
2   A    I don't remember that.
3   Q    Do you know if he was present at the 2010 Board of
4        Governors vote on Dr. Muniz?
5   A    That I don't remember. It should be available in
6        the minutes.
7   Q    But he could have been?
8   A    If he decided, certainly.
9   Q    Now, if he comes, does he participate?
10  A    I believe he participates. I do not believe he's a
11       voting member. Although, I'd have to review the
12       Board of Governors bylaws for that, but I don't
13       believe he has a vote.
14  Q    Now, do you -- I might have already asked you this,
15       but do you have a regular protocol for
16       communicating with anybody at UHS?
17  A    I've not spoken with anybody at UHS with the
18       exception of Frank Lopez and I believe one other
19       individual in regards to employment opportunities
20       and the rest for physician groups. Those are the
21       only two that I remember ever speaking to, other
22       than those that come down for evaluation and of
23       what's going on here such as looking at the
24       obstetrics unit and the rest.
25  Q    But other than seeing and meeting with Frank Lopez

---

48

1        every quarter, do you have any other regular
2        reports to anybody at UHS?
3   A    No. I don't report to anyone at UHS.
4   Q    What is the function of the board here?
5   A    The function of the board is to oversee the
6        operations of the hospital, to provide safety of
7        patients to the community, ensure proper patient
8        care, make sure that there's nondiscrimination in
9        terms of patient care.
10  Q    Does UHS ever veto decisions of the Board of
11       Governors?
12  A    I have never been in a situation where they have
13       done that.
14  Q    Have you ever been in the situation where UHS has
15       influenced a decision of the Board of Governors?
16  A    If there is influence, I would say that would be
17       through the CEO. But I have not even -- I have not
18       even noted that in the years that I've been on the
19       board.
20  Q    Have you ever given a deposition other than today?
21  A    I've only done one deposition before.
22  Q    And when was that?
23  A    That would have been probably about six months ago.
24  Q    And what was that related to?
25  A    In regards to a patient that had come to me that

---

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

49

1   was suing another doctor for previous care.
2   Q   Who was the other doctor being sued?
3   A   The other doctor is Dr. Glenn in Bamberg.
4   Q   And you gave a deposition to whom?
5   A   Lawyers.
6   Q   What lawyer.
7   A   I don't remember his name.
8   Q   Do you know the Plaintiff --
9   A   It was in town.
10  Q   In Aiken?
11  A   Yeah. In town in Aiken. And his office is right
12      near First Citizens, but I don't remember his name.
13  Q   Is it Jim Nance?
14  A   That sounds familiar. That sounds familiar. That
15      may be him.
16  Q   You're married?
17  A   I am.
18  Q   You've been married once?
19  A   Been married once.
20  Q   Who are you married to?
21  A   Deborah Boehner.
22  Q   And Deborah Boehner, does she have a job?
23  A   She does. She's the headmaster of Aiken
24      Preparatory School.
25  Q   And you have three children?

50

1   A   Four children.
2   Q   And who are they?
3   A   Chris, Jamie, Phillip, and Megan.
4   Q   And what do they do?
5   A   Chris is in China working on a business. Jamie is
6       someone who's now in China coming back and lives in
7       New York City looking for work. I have a son
8       Phillip who is at the College of Charleston doing
9       his fifth year. And my daughter is about to go to
10      college.
11  Q   Where is she going?
12  A   Coastal.
13  Q   Do you have any other relatives who live in Aiken
14      County?
15  A   I don't believe I have any other relatives here.
16  Q   I know about some of your interests, but do you
17      belong to any particular social groups in town?
18  A   When you speak of social, I mean, I'm a member of
19      things such as the concert band and a number of
20      musical organizations.
21  Q   Anything else?
22  A   Well, there's an amateur radio organization here as
23      well.
24  Q   Anybody -- are there any other physicians at ARMC
25      or persons on the administration who participate in

51

1   that concert band?
2   A   I do not believe so.
3   Q   What about the radio group?
4   A   If you include the IT director and the emergency
5       preparedness director, they would be involved in
6       that amateur radio group. But I do not believe
7       anyone from the upper administration has anything
8       to do with that.
9   Q   Any other social groups?
10  A   Local or national?
11  Q   Local.
12  A   Local? I don't believe I'm a member of anything
13      else, unless I'm forgetting something.
14  Q   What's your home address?
15  A   It's 525 Barnwell Avenue, NW in Aiken.
16  Q   I've heard, I don't know if it's true or not, but
17      I've heard that the emergency department here has
18      been dispatched, meaning terminated. Do you know
19      if that's true?
20  A   I know that the emergency room contract was
21      terminated, and they are looking for someone else
22      to be able to manage it, but wish that all
23      physicians stay on with this new company.
24  Q   The individual physicians?
25  A   That's correct.

52

1   Q   So they've terminated the current contract with the
2       group that performs that contract. Who is the head
3       person in that group?
4   A   Martin James.
5   Q   And I guess he's the person that they're having a
6       disagreement with?
7   A   Well, that's the one who is their spokesperson.
8   Q   Do you know what is the effective date of that
9       termination?
10  A   The actual effective date, I believe, is actually
11      January 1st.
12  Q   2012?
13  A   2012. However, a number of different dates have
14      come out in the newspaper and the rest.
15  Q   So the hospital, generally, is looking to reform
16      the emergency department?
17  A   They are hiring a new contractor to be able to set
18      up the emergency department, like I said, and
19      trying to keep all the ER physicians that are here
20      to become part of that.
21  Q   Now, do you know if Dr. DiBona or Dr. Minto had any
22      other meetings with Ernest Nauful other than the
23      one we talked about prehearing?
24  A   Again, I can't speak for them, but they never gave
25      me any information that they did.

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**53**

1  Q  Now, at the time you participated in the 2010 fair
2     hearing you were not on the Medical Executive
3     Committee?
4  A  That's correct.
5  Q  And you were not chief of any department?
6  A  That's correct.
7  Q  You were chairman of the Board of Governors?
8  A  That's correct.
9  Q  Do you have any kind of executive assistant
10    assigned to you as chairman of the Board of
11    Governors?
12  A  No, I do not.
13  Q  I mean, is Carlos Milanes pretty much responsible
14    for the administrative side of the Board of
15    Governors?
16  A  Yes.
17  Q  Does the Board of Governors have subcommittees?
18  A  Yes, they do form subcommittees from time to time.
19  Q  What are the current subcommittees of the Board of
20    Governors?
21  A  There's going to be the safety committee -- patient
22    safety committee.  There's going to be a board QIC,
23    quality improvement committee, that's going to
24    report to the Board of Governors.
25  Q  Board QIC?

**54**

1  A  Quality Improvement Committee.
2  Q  Anything else?
3  A  There are other subcommittees of the board that can
4     be formed from time to time.  Those are the public
5     safety committee -- or the patient safety committee
6     I participated in as a member for several years
7     prior to becoming board chair.
8  Q  Did Dr. Muniz ever come up with respect to the
9     patient safety subcommittee?
10  A  I don't remember her coming up through that
11    particular venue.
12  Q  Is Aiken Obstetrics and Gynecology currently
13    recruiting another physician?
14  A  The answer is no because we actually have someone
15    who will be us.
16  Q  Oh, yes.  But you did recruit one in conjunction
17    with ARMC?
18  A  Yes.
19  Q  And Universal Health Services?
20  A  Yes, I believe so.  Yes.
21  Q  They helped in the recruiting?
22  A  Yes, they did.
23  Q  Now, is ARMC or Universal Health Services
24    subsidizing that physician in the first couple of
25    years?

**55**

1  A  They are giving incremental expenses for that
2     physician for the first year.  And just basically
3     incremental expenses that are related to the cost
4     of that physician for that one year.
5  Q  What is that physician's name?
6  A  Her name is Jessica Keller.
7  Q  Has she reported for duty?
8  A  No, she has not.
9  Q  When?
10  A  She'll start August 15th.
11  Q  And where is she coming from?
12  A  Tennessee.
13  Q  She a new doctor or . . .
14  A  She's a doctor that's just completed her residency.
15  Q  Now, you are board certified in obstetrics and
16    gynecology?
17  A  Yes.
18  Q  Is that true of Dr. Boone and Dr. Minto?
19  A  Yes.
20  Q  The subsidies that are related to the doctor, do
21    they go directly to her or do they go to Aiken
22    Obstetrics and Gynecology or what?
23  A  I believe our arrangements are is that those
24    incremental expenses will come to us and that we
25    will be paying her.

**56**

1  Q  Is there actually a written contract or written
2     arrangement with respect to that arrangement?
3  A  Yes, there is.
4  Q  Executed between you and the hospital or between
5     you and Universal Health Services or both?
6  A  It may be both.  I don't remember the signatures on
7     the contract, but I believe Carlos Milanes had
8     signed on behalf of the hospital and UHS and myself
9     as the group and her as the physician.
10
11     MR. SOWELL: Travis, we'd like to request -- or do
12        request a copy of that document.
13     MR. DAYHUFF: Put it on your list.
14
15  Q  Has Aiken Obstetrics and Gynecology ever had any
16    other remunerative agreement or agreements which
17    provide remuneration, money, benefits or whatever
18    to the group with ARMC or UHS?
19  A  The only ones that I know of had to do with people
20    coming in that were recruited through UHS, but we
21    don't receive anything other than -- I'm not sure
22    what they call it.  Those disproportionate share
23    agreements if there was free care given.
24  Q  Yes.
25  A  A check is given to each one of us individually.

**James F. Boehner, MD - 7/28/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

| | 57 |
|---|---|
| 1 | Q   So you either get -- you get disproportionate share |
| 2 | payments from time to time for free care? |
| 3 | A   Uh-huh. |
| 4 | Q   And new doctors coming in who are recruited by the |
| 5 | hospital will typically be subsidized for a period |
| 6 | of time? |
| 7 | A   That's correct. |
| 8 | Q   Who actually found this new doctor? |
| 9 | A   I believe it was a headhunter from UHS.  Yeah.  I'm |
| 10 | bad with names.  I think it was Kim Lanzoni. |
| 11 | Q   Does she have to be approved by you as a member of |
| 12 | the group and also by the hospital for purposes of |
| 13 | obtaining credentials? |
| 14 | A   There's a credentialing process that goes on.  I |
| 15 | was not asked for my input in that.  But, |
| 16 | apparently, they have to stand on their own and be |
| 17 | able to pass all the requirements in the |
| 18 | credentials manual in order to become credentialed |
| 19 | here at this hospital. |
| 20 | Q   Is that not something that's set up in advance of |
| 21 | her hiring? |
| 22 | A   Generally, when they come they are -- they're |
| 23 | confirmed by the credentials committee.  I'm not |
| 24 | certain if that's happened yet. |
| 25 | Q   Do you understand that the bylaws of ARMC have been |

| | 58 |
|---|---|
| 1 | recently modified? |
| 2 | A   I am aware of that. |
| 3 | Q   How did that come about? |
| 4 | A   There is a bylaw committee that reviews the bylaws |
| 5 | every so often, and they suggest changes which then |
| 6 | are presented to the medical staff for adoption. |
| 7 | Q   Who chaired that committee this time? |
| 8 | A   I'm not certain. |
| 9 | Q   When were the bylaws amended? |
| 10 | A   I believe in the end of 2009.  I have to look up |
| 11 | the actual date. |
| 12 | Q   So were they effective prior to January 1, 2010? |
| 13 | A   Again, I'd have to look at the date to know |
| 14 | specifically when they were effective. |
| 15 | Q   What do you believe? |
| 16 | A   I believe that as soon as the general staff meeting |
| 17 | which occurs, that's when they're usually presented |
| 18 | and then that's when they're approved. |
| 19 | Q   Do you think that had occurred on or about January |
| 20 | 1, 2010? |
| 21 | A   I believe that it happened sometime late last year. |
| 22 | And I'm not certain of the effective date. |
| 23 | Q   That would be late 2010, last year? |
| 24 | A   Late 2010, last year. |
| 25 | Q   So you think it was late 2010, not late 2009? |

| | 59 |
|---|---|
| 1 | A   Again, I'd have to look and see specifically what |
| 2 | the bylaws say. |
| 3 | Q   What were the principle revisions to the bylaws? |
| 4 | A   I don't remember the principle revisions. |
| 5 | Q   Who initiated the activities to amend the bylaws? |
| 6 | A   I suppose that -- I don't know for certain, but I |
| 7 | assume that a number of changes that deal with the |
| 8 | joint commission and the rest usually motivates the |
| 9 | changing of the bylaws to be able to comply with |
| 10 | the regulatory agencies.  And that usually drives |
| 11 | the changes in the bylaws. |
| 12 | Q   Right.  Now, the initiative, though, changed the |
| 13 | bylaws.  Does that typically come from UHS? |
| 14 | A   That comes from -- generally comes from the |
| 15 | physician services office and also the individual |
| 16 | that deals with the joint commission in looking at |
| 17 | the new standards. |
| 18 | Q   At ARMC? |
| 19 | A   Yes, at ARMC. |
| 20 | Q   Okay.  So it doesn't generally come from UHS? |
| 21 | A   I don't know if it does or not, but I'm used to |
| 22 | seeing we have to go through these bylaws because |
| 23 | joint commission is now requiring this and we have |
| 24 | to make sure that we're consistent with those |
| 25 | bylaws. |

| | 60 |
|---|---|
| 1 | Q   Now, the person at ARMC who drives those functions, |
| 2 | is that Terri Ergle? |
| 3 | A   Yes. |
| 4 | Q   Is there anybody else who participates that you |
| 5 | know of? |
| 6 | A   I assume that Sharon Hagan has something to do with |
| 7 | that. |
| 8 | Q   Right. |
| 9 | A   And probably Gail Hendricks who deals mainly with |
| 10 | the joint commission, and she's quality improvement |
| 11 | coordinator. |
| 12 | Q   Now, you took call -- your group took call in |
| 13 | cooperation with Dr. Muniz at one time. |
| 14 | A   We did. |
| 15 | Q   Was that also with Dr. Hoover? |
| 16 | A   It was with Dr. Hoover and Dr. Muniz. |
| 17 | Q   And, at some point, it was a separation of those |
| 18 | call cooperations? |
| 19 | A   Correct. |
| 20 | Q   And that was while Dr. Hoover and Dr. Muniz were |
| 21 | still together? |
| 22 | A   I believe that's after Dr. Muniz and Dr. Hoover |
| 23 | split up into different practices. |
| 24 | Q   Who do you share call with now? |
| 25 | A   Just Dr. Hoover. |

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

61

1  Q   All right.
2  A   Our group and Dr. Hoover.
3  Q   Okay.
4  A   So four different -- four physicians.
5  Q   What was the reason for the split with Dr. Muniz?
6  A   Our concern was there appeared to be a relatively
7      high complication rate that she was having. Our
8      voice to the community was that we had different
9      practice styles. Internally we had met and just
10     decided that it would be best if we did not take
11     call with her. We gave Dr. Hoover her option as to
12     what she would like to do, and she decided to just
13     continue call with us but not share call with Dr.
14     Muniz.
15 Q   Now, but you think Dr. Hoover and Dr. Muniz had
16     split by this time?
17 A   I believe so.
18 Q   All right. Was there any other reason that you
19     wanted to not continue taking call with Dr. Muniz?
20 A   The main thing was the complication rate. It
21     seemed like we always came back from call Monday
22     morning with things that were bothering us, things
23     that we just needed to -- we needed to stop taking
24     call with her. It's difficult to enumerate exactly
25     what they are, but . . .

---

62

1  Q   Okay. When did that occur, approximately?
2  A   This is one of those things I should have looked up
3      because I did know that this was coming. I think
4      it was in 2007/2008. I have a -- I can find a more
5      specific date because I do keep the call schedules.
6  Q   Have you looked at the call schedule with respect
7      to the emergency call or staff call for February
8      23, 2009? I take that back, February 23, 2010.
9  A   I do understand in one of your exhibits you do have
10     that call schedule.
11 Q   Right. And I'll show it to you, but it has one of
12     the Daniels doctors inserted. This is right
13     here.
14
15     MR. SOWELL: I'll go ahead and get it marked.
16
17         (Whereupon, Revised ED Call Schedule,
18         consisting of 3 pages, was marked
19         Plaintiff's Exhibit No. 1 for
20         identification.)
21
22 Q   So the reporter has handed you Plaintiff's Exhibit
23     No. 1 which is the, according to the heading, the
24     revised -- what's ED? Emergency Department?
25 A   Emergency Department.

---

63

1  Q   Call Schedule, 12/31/09 at 11:30 a.m. So I guess
2      it was made then.
3  A   Oh, yes.
4  Q   Revised then.
5  A   Revised at that time.
6  Q   Who made it or revised it?
7  A   First, I have to assume that because the staple is
8      here that this all includes one document.
9  Q   Right.
10 A   Okay.
11 Q   And I don't know if it does or doesn't. This is
12     how we got it, so . . .
13 A   This is the call schedule that is just -- that is
14     usually generated by physician services and given
15     to all the obstetrician/gynecologists.
16 Q   So is that Terri Ergle?
17 A   That would be Terri Ergle.
18 Q   So does she actually make the call schedule?
19 A   She generally makes the call schedule and then
20     distributes it.
21 Q   Well, if you look at February 23, 2010, which is
22     the date of the incident that resulted in Dr.
23     Muniz's 2010 peer review, you see that Brandon
24     Daniels is the assigned physician for that day.
25 A   That's correct.

---

64

1  Q   Do you know then how it came to be that Dr. Muniz
2      was called to come over on that day?
3  A   I have no idea, other than she does take call with
4      that group of which there are about four members of
5      that group of which B. Daniels is a member of that
6      group. But the nurses would have to be able to
7      tell you further than that.
8  Q   How are the calls typically made? I mean, is this
9      schedule up on the labor and delivery floor, for
10     instance?
11 A   That should be on the labor and delivery floor and
12     postpartum and the emergency room.
13 Q   Right. So somebody from one of those floors,
14     probably not postpartum, but probably either the ER
15     or labor and delivery would have placed that call
16     to Dr. Muniz?
17 A   That's correct.
18 Q   And you believe they would have placed the call
19     based upon this schedule?
20 A   I believe so.
21 Q   I mean, they should have if the protocol was
22     followed?
23 A   They should have. Again, I don't know if she was
24     covering for him for that day.
25 Q   Understood. Now, is there a written protocol for

---

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

65

1  following this schedule, making it and following
2  it?
3  A  I don't know if there's a written protocol for
4  either.  All I know is that when an unassigned
5  patient, that is a patient who is not assigned to a
6  staff member at ARMC that comes in and they have no
7  doctor that the doctor that is on call for the
8  emergency department that day or the ED staff call
9  is the one who takes that patient.
10 Q  Now, this is part of the -- well, I don't know.  I
11    was going to say it's part of the free care.  I
12    don't know if that's necessarily true.  I mean, the
13    patient could have insurance, right?
14 A  It could be any unassigned patient that does not
15    have a standing physician at Aiken Regional Medical
16    Centers.
17 Q  But it is for unassigned patients?
18 A  It can be for both, yes.  For both unassigned or --
19    for unassigned patients --
20 Q  Whether it be free or insured --
21 A  Free or insured.
22 Q  -- but all unassigned?
23 A  That's correct.
24 Q  Were you on the labor and delivery floor the night
25    that the patient in this case was presented?

66

1
2      MR. DAYHUFF: Object to the form of the question.
3        Characterization of the evidence in the
4        record's not correct.  You can answer.
5      MR. SOWELL What is it?
6      MR. DAYHUFF: It was during the day, I think.
7
8  A  First of all, I was just going to say it's during
9    the day.
10 Q  Okay.
11 A  This is a Tuesday, and this is the day that I
12    normally do surgery and there's a very -- I mean, I
13    was there at the time.  I didn't know all the
14    events going on at the time, but I was there.
15 Q  Did you know any of the events at the time?
16 A  I knew there was something going on, but I knew it
17    was something I probably wouldn't want to get
18    involved with.
19 Q  Why?
20 A  Dr. Muniz has a very litigious nature, and I
21    figured that I would be answering for it if I got
22    involved.
23 Q  I mean, did you know about the proposition that
24    there was a deceleration showing up on this woman's
25    whatever she was hooked up to?

67

1  A  I believe I saw on one of the main monitors that
2    there was something going on with decrease beat-to-
3    beat variability.  I did not see the major
4    deceleration prior to that.
5  Q  Well, with respect to the decreased beat-to-beat
6    variability, did you intercede in any way, shape or
7    form?
8  A  No.
9  Q  Did Dr. Muniz intercede in any way, shape or form?
10 A  I know she was there.  I know she saw the strip,
11    but I wasn't aware of any sort of --
12 Q  Intercession?
13 A  Nothing that I know of.
14 Q  Were there any other OB/Gyns on the floor that day?
15 A  I don't remember any others.
16 Q  Were you aware of any other particulars of this
17    case other than the beat-to-beat variability?
18 A  I didn't know anything else.
19 Q  But you were aware of that in real time?
20 A  Beat-to-beat variability can be variable.  And
21    that's -- you have to evaluate the patient and the
22    remainder of the strip to really understand what's
23    going on.  And that's generally what an
24    obstetrician would do.
25 Q  But back to my question.

68

1  A  Yes.
2  Q  You were aware in real time of the decreased beat-
3    to-beat variability but nothing else?
4  A  Yes.  I saw the decrease just by glancing at the
5    monitor.
6  Q  Did you make any recommendations to Dr. Muniz or
7    the nurses?
8  A  No, I didn't.
9  Q  Did Dr. Minto make any recommendations to Dr. Muniz
10    or the nurses?
11 A  I don't know.  I don't know.
12 Q  Have you ever discussed with Dr. Minto the occasion
13    of that day?
14 A  I really didn't speak with her after that.  I know
15    that there were some comments that were made, but
16    again, I just did not want to get in the middle of
17    it.
18 Q  What were the comments that were made?
19 A  Just the comment that there was a fetal demise that
20    occurred on labor and delivery that day.
21 Q  That's happened more than once at ARMC in the last
22    five years?
23 A  Fetal demise can occur, yes.
24 Q  They have occurred?
25 A  They have occurred.

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

69

1   Q   Are you aware that with respect to the hearing
2       panel for the 2010 Dr. Muniz judicial hearing, that
3       there was a physician who was opposed to
4       terminating her privileges?
5   A   This was the appellate --
6   Q   No.
7   A   -- or this was the --
8   Q   The five person hearing panel.
9   A   I was not aware of that.
10  Q   Were you ever made privy to the deliberations of
11      that five person hearing panel?
12  A   I think the only information I had was the final
13      report.
14  Q   Did you participate in any of those deliberations?
15  A   Did not.
16  Q   And they were not made available to you?
17  A   No, they were not made available.
18  Q   Did you ever talk to any of the members of the
19      panel afterwards about how they came to their
20      conclusions?
21  A   Dr. Searles had said something about it, and I
22      basically just walked away.
23  Q   What did he say?
24  A   I think he was making a fact about how long it was
25      taking and that he was tired of it, and I decided I

---

70

1       wasn't going to get involved in that.
2   Q   Before the Board of Governors made its vote and
3       decision to terminate Dr. Muniz's privileges in
4       connection with the 2010 episode, did you ever talk
5       to Dr. Gasnel Bryan about that evening or that day.
6       I'll quit saying evening. That day. What occurred
7       that day?
8   A   Between them? I spoke with Dr. Bryan, but I did my
9       best to stay away from that issue. I -- the answer
10      will be no.
11  Q   But you know that he participated in the delivery
12      with Dr. Muniz?
13  A   He did.
14  Q   What do you know about the ARMC policy related to
15      disruptive physicians?
16  A   There's a full disruptive physician policy that is
17      available within the bylaws.
18  Q   Right.
19  A   And discusses policies and procedures in regards to
20      this.
21  Q   Right. And you know that in connection with the
22      2009 judicial hearing panel, that they recommended
23      that Dr. Muniz be treated for issues related to
24      being a disruptive physician?
25  A   I'm aware of that.

---

71

1   Q   Do you know if before that she was ever afforded
2       the rights that are laid out in the disruptive
3       physician policy you just referred to?
4   A   I'm told that prior to this time she did have some
5       information from the previous CEO and chief of
6       staff. I don't have any knowledge about it in this
7       particular case.
8   Q   So you're not aware that she was afforded those
9       protections in this particular case?
10  A   I don't believe so.
11  Q   What do you -- the board decided in 2009 that Dr.
12      Muniz would be subject to 100 percent review,
13      correct?
14  A   Yes.
15  Q   What does that mean?
16  A   Basically that all of her charts would be reviewed
17      for quality issues.
18  Q   Do you know how and who?
19  A   Basically it will be the medical staff peer review
20      coordinator. I don't have any knowledge other than
21      that.
22  Q   And who is that?
23  A   I don't know who the current one is.
24  Q   Who was the one back then?
25  A   I don't remember her name either, but that's

---

72

1       available.
2   Q   What's the job of Lois El?
3   A   Lois El is a risk coordinator for the hospital.
4   Q   And who does she report to?
5   A   Carlos. I believe Carlos, and I assume there's a
6       UHS contact she also reports to. But I believe her
7       primary contact is Carlos Milanes.
8   Q   Who's the coordinator of peer review at the
9       hospital?
10  A   I don't know who that is right now.
11  Q   Who was it back then in 2010?
12  A   I'm not certain. I don't have her name.
13  Q   Now, has Aiken Obstetrics and Gynecology Associates
14      assumed any of Dr. Muniz's patients since her
15      privileges were terminated here?
16  A   There are some of her patients who have chosen to
17      come to us.
18  Q   About how many?
19  A   I can only talk about my own personal experience.
20      I may have had six or seven. She would probably be
21      a better clue to this because if there is something
22      in which we need to request the records, we send it
23      to them and our computer system does not have an
24      easy way of being able to figure out how many. But
25      if there's something that we need information on,

---

**James F. Boehner, MD - 7/28/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

73

1     we usually send a request to records.

2  Q  Do your records indicate where the patient came

3     from?

4  A  Not generally.

5  Q  Do they indicate who was the prior physician?

6  A  I do not believe there's a field for that for us to

7     be able to search on.

8  Q  But you would know because Dr. Muniz's records

9     would be in there after you ordered them?

10  A  Yes. There would be no way of actually finding

11     them unless we looked at each specific patient and

12     then looked back to see if her records were scanned

13     into it. There's also a confounding problem

14     because Dr. Leo Muniz is in town, and a word search

15     for Muniz may show up more than that because I know

16     we do get referrals from him as well.

17  Q  He's not an OB/Gyn?

18  A  No, he's not.

19  Q  What is he?

20  A  I believe he's general practice or family practice.

21  Q  What positions has the hospital taken in the last -

22     - well, since you've been chairman of the board

23     with respect to your competition with University

24     Hospital and Doctors Hospital in Augusta?

25

---

74

1     MR. DAYHUFF: Object to the form of the question.

2       You can answer it.

3

4  A  University Hospital, Doctors Hospital, they're in

5     the same market as Aiken Regional Medical Centers.

6     And I believe it's the same sort of a competition

7     issue that would deal with any group of hospitals

8     within a certain market.

9  Q  Would University Hospital and Doctors Hospital be

10     the two main competitors with Aiken Regional

11     Medical Centers in this area?

12  A  I would believe University would probably be the

13     most of a competitor because it's closer. Possibly

14     MCG.

15  Q  What do you do about trying to transfer patients

16     who come to the ARMC pregnant and you think that

17     the baby may be delivered prematurely?

18  A  If we do that, my usual response is to send it to

19     Richland which is within our perinatal district.

20     They offer us the usual seamless way of being able

21     to transfer the patients.

22  Q  Now, is it the current standard that anything below

23     39 weeks is pre-term?

24  A  No. Actually, the current standard is a level two

25     hospital like as we are can theoretically take care

---

75

1     of babies that are 32 weeks and above.

2  Q  Thirty-two and above?

3  A  Thirty-two and above. But we usually will defer to

4     the pediatricians if we have young, and we will

5     usually transfer out anything that is below 34

6     weeks. And that is if they are stable for

7     transfer.

8  Q  Right. If the mother is stable? And the child?

9  A  That's correct.

10  Q  Are stable for transfer?

11  A  If there's fetal distress or something that will be

12     dangerous like imminent delivery, we would -- it

13     would be best to deliver here and then transfer the

14     infant for care. And typically, just to fully

15     answer your question, the pediatricians are

16     actually a subset of the Medical College of

17     Georgia. So even though we would transfer the

18     mother with baby to Richland, they would take the

19     baby to MCG.

20  Q  If the baby comes before --

21  A  That's correct.

22  Q  -- the transfer?

23  A  Uh-huh.

24  Q  So if you're transferring the mother typically to

25     Richland and you're transferring the baby typically

---

76

1     to MCG because the pediatricians are a subset of

2     MCG?

3  A  That's correct. And they have the best seamless

4     arrangement. That's only me. I mean, there's some

5     people may prefer to transfer to University; some

6     might transfer to MCG. But I've just found it

7     easiest to work through Richland.

8  Q  Now, University and MCG are closer?

9  A  They are.

10  Q  Than Richland. And you're speaking of Palmetto

11     Richland?

12  A  That's correct.

13  Q  Who's your relationship with at Palmetto Richland?

14  A  I believe it's Dr. Brown now that is maternal fetal

15     medicine at Richland. Paul Brown.

16  Q  Do you have a preference for getting out of here a

17     mother and a baby at 30 weeks gestation?

18  A  If everything was stable and I was able to

19     transfer, I would, particularly if there was

20     imminent delivery or concern.

21  Q  That's because a 30 week baby is at significant

22     risk when delivered at that stage?

23  A  They are. The stabilization can occur here and

24     then transport can be arranged. But if we can

25     effect delivery prior to that time, we would want

---

**James F. Boehner, MD - 7/28/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

77

1  to do that.
2  Q   Do you ever call, I guess it would be neonatal? I
3      don't even know if I have that right. It might be
4      something else. Do you ever call baby teams over
5      from MCG to come over here?
6  A   That would most likely be up to the pediatricians
7      to decide upon. I trust the pediatricians here to
8      be able to stabilize the baby for transport. Now,
9      they may very well know that there's a problem and
10     they may make the phone call.
11 Q   Right.
12 A   But I've never had to do that.
13 Q   But you, more or less, defer to the pediatricians
14     with respect to calling some specialist over from
15     MCG?
16 A   I give them the clinical situation and let them
17     make that decision.
18 Q   Does Aiken Regional Medical Centers have a policy,
19     either written or unwritten, formal or informal,
20     that it expects its physicians to only be
21     credentialed here?
22 A   Not that I'm aware of. I'm not sure that's even
23     legal.
24
25     MR. DAYHUFF: Can we take a two minute break?

---

78

1      MR. SOWELL: Yeah.
2
3          (Short Break)
4
5  Q   Do you have any privileges anywhere other than
6      ARMC?
7  A   No.
8  Q   Does Dr. Boone have any other than ARMC?
9  A   Not to my knowledge.
10 Q   Does Dr. Minto have any other than AMRC?
11 A   Not to my knowledge.
12 Q   Do any of the OB/Gyns at ARMC have privileges
13     anywhere other than ARMC?
14 A   I can't speak for anyone else. I don't believe so,
15     but don't know for certain.
16 Q   Were you aware that the hearing panel for the 2010
17     peer review issued a report that was subsequently
18     revised?
19 A   I understand there was a revision.
20 Q   Do you know how the revision came about?
21 A   I believe it was something in regards to South
22     Carolina law and a preponderance of evidence or who
23     is responsible for the evidence.
24 Q   Did you participate in any of the --
25 A   No.

---

79

1  Q   -- any of the revision?
2  A   I did not.
3  Q   Did you know it was going on?
4  A   I was told that it was going on.
5  Q   Were there ever any complaints other than the one
6      by Dr. Searles about how long that peer review
7      hearing process took?
8  A   I believe Dr. Minto probably said something about
9      it being long and the fact that it was spread over
10     a long period of time because of the hearing
11     officer having to postpone it.
12 Q   Right. Vacations and things like that?
13 A   And surgery, I believe.
14 Q   Did you ever hear anybody else complain about the
15     length of it, other than Dr. Searles and Dr. Minto?
16 A   Not that I can recall.
17 Q   Did you ever hear anybody complain about the
18     hearing officer himself?
19 A   No, I did not hear anyone complain about him.
20 Q   Did you ever hear anybody complain about the
21     process other than with respect to its length?
22 A   I don't remember anything on that. It was some
23     time ago, and I --
24 Q   Right. I understand. I'm just asking you what you
25     recall.

---

80

1  A   Sure.
2  Q   Be honest with what you recall.
3  A   Sure.
4  Q   With respect to the 2010 fair hearing, do you know
5      that after that hearing that Dr. Muniz's counsel
6      complained and asserted that the hearing officer
7      was biased?
8  A   I do believe I knew about that.
9  Q   Did you ever investigate those assertions?
10 A   No, I did not.
11 Q   What did you do with them?
12 A   That was something that was handled at a different
13     level than myself.
14 Q   By whom?
15 A   I believe I heard of this happening by Sharon
16     Hagan. And I'm not sure where it went from there.
17     That's not a spot where I would have gotten
18     involved.
19 Q   Well, it was one of the assertions that was made to
20     the appellate panel.
21 A   Okay.
22 Q   And then the appellate panel recommended adopting
23     the hearing panel's recommendation, correct?
24 A   I believe so, yes.
25 Q   And then the Board of Governors also not only

---

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**81**

1 recommended but adopted the appellate panel's
2 recommendation but also the fair hearing panel's
3 recommendation, correct?
4 A  I believe so.
5
6 (Whereupon, Letter w/attachments
7 1/18/2011 consisting of 4 page(s) was
8 marked Plaintiff's Exhibit No. 2 for
9 identification.)
10
11 Q  I ask you to look at Plaintiff's Exhibit No. 2
12 which is the January 18, 2011 letter from Carlos
13 Milanes to Margo Muniz with a copy to yourself and
14 Dr. Paxton.  Do you recognize that as the
15 notification to Dr. Muniz that the Board of
16 Governors had concluded its deliberations
17 concerning her appeal?
18 A  Yes, I do.
19 Q  During those deliberations, was there ever any
20 discussion about the proposition that Dr. Muniz had
21 asserted that the hearing officer was biased?
22 A  I can't recall that specifically.
23 Q  But the Board of Governors upheld the
24 recommendation of the MEC, the hearing panel and
25 the Appellate Review Panel, correct?

**82**

1 A  Yes.  I believe all of them were in agreement.
2 Q  And that was without any discussion that you know
3 of that the hearing officer was biased?
4 A  I'm not aware of that.  If it did occur, I'm not
5 aware of it.
6 Q  Did you ever in the Board of Governors discuss the
7 fact that the hearing officer had mishandled the
8 report of the hearing panel?
9
10 MR. DAYHUFF: Object to the characterization with
11 the evidence in the record.  You can answer
12 it.
13
14 A  I understood that there was a revision to the
15 report in regards to the -- in accordance to what
16 we considered a technical question.
17 Q  Okay.  Did you know that Dr. Muniz had asserted
18 that it was not a technical question.  That as a
19 result of the application of an inappropriate
20 standard of proof, that it was not appropriate for
21 the hearing panel or the appellate panel or the
22 Board of Governors to terminate her privileges?
23 A  I'm not certain if that came out at the time.
24 Q  You don't know if that was discussed or not
25 discussed?

**83**

1 A  I don't.  I do not.
2 Q  But it should be in the audio tape or the minutes?
3 A  If it was discussed, it would.  It would be in the
4 audio tape.  I'm not certain if the minutes would
5 characterize it because the minutes represent a
6 summary.
7 Q  Do you know if Pat -- is it Pat Johnson?
8 A  It's Pat Jackson.
9 Q  Jackson.
10 A  Uh-huh.
11 Q  Do you know if she keeps handwritten notes of those
12 meetings?
13 A  I think she depends heavily on the tapes, but she
14 may have some handwritten notes in regards to this.
15 Q  Is there anybody else who participates in the
16 meetings of the Board of Governors who makes notes
17 or keeps recordings?
18 A  I do not believe anybody on a regular basis either
19 takes notes or keeps recordings.  She's considered
20 the recording secretary.
21
22 (Whereupon, Fetal Monitor Strips,
23 consisting of 14 pages, was marked
24 Plaintiff's Exhibit No. 3 for
25 identification.)

**84**

1
2 Q  Look at Plaintiff's Exhibit No. 3 and tell me if
3 you can identify it.
4 A  Is it acceptable for me to remove the paper clip?
5 Q  Yes.
6 A  Okay.  I recognize this as a fetal monitoring strip
7 that is unlabeled as to the patient --
8 Q  It's actually labeled on the front down there at
9 the bottom as to the patient.
10 A  Okay.  I have a patient's name here by the initials
11 of K. C.
12 Q  Right.
13 A  And it's labeled as confidential peer review
14 material.
15 Q  Right.
16 A  And it starts at strip number 07890.
17 Q  Where do you see that?
18 A  The first copy is upside down.  That's why I had to
19 take this down.  If you look at the fetal monitor
20 over to the bottom of the strip to the right where
21 it says fetal monitor, there's a specific page
22 number which is 07890.  It's right here.
23 Q  Oh, yeah, I see that 0890.
24 A  7890 is what I read, and I believe that's
25 consistent --

**James F. Boehner, MD - 7/28/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

85

1  Q   Oh, yeah, well, there's two of them.  There's one
2      on the left that says 07890 and then there's one
3      that says 07891.
4  A   **That's correct.  Each one of those are separate**
5      **pages.  It's about this long, and that's usually**
6      **how we monitor or we label monitor strips.**
7  Q   I don't know if you remember or not, but without
8      mentioning the patient's name, this is the same
9      patient that was the subject of Dr. Muniz's peer
10     review.  But, if you would, look at that label on
11     top that says fetal monitor.
12 A   **I have that.**
13 Q   Do you see where it's written in and then crossed
14     out Boehner.
15 A   **Yes.  My name was there and then crossed out.**
16 Q   And Dr. Muniz's name was written in?
17 A   **That's correct.**
18 Q   Do you know why?
19 A   **I don't have an answer for that.  Because I've been**
20     **on staff for greater than 20 years, I have opted**
21     **off of the staff call schedule and, therefore, I'm**
22     **not even on the --**
23 Q   Schedule?
24 A   **-- Exhibit No. 1 here that you have.**
25 Q   All right.

---

86

1  A   **I do take staff call for those people that I cover**
2      **for who are on staff call.  But this was during the**
3      **day, so there would be no reason why I would be on**
4      **there, with the exception that this could have been**
5      **-- well, this looks like it would have been right**
6      **on the label.  But this would not have been me**
7      **because I don't take staff call.**
8  Q   Were you ever called with respect to this patient?
9  A   **Never.**
10
11         (Whereupon, Medical Peer Review Meeting
12          Summary 6/23/2008 consisting of 1 page(s)
13          was marked Plaintiff's Exhibit No. 4 for
14          identification.)
15
16 Q   These are some minutes apparently of the peer
17     review meeting on June 23, 2008.  It looks like Dr.
18     Paxton called the meeting to order.  And there were
19     some discussions of Dr. Muniz.  If you see down at
20     the bottom there, there's a recommendation to the
21     MEC that a board certified urologist be called and
22     be present for the repair of any urologic injuries.
23     Do you know if -- did you participate in this
24     meeting?
25 A   **I'm not on the medical peer review committee.**

---

87

1  Q   Do you know if that ever occurred, the
2      recommendation?
3  A   **If this came to the MEC or --**
4  Q   Well, no.  I understand what you're saying, but my
5      question is -- maybe your question to yourself is
6      better than mine.  Did it ever come to the MEC?
7  A   **Since I'm not on the MEC, I don't know.  And I**
8      **don't know if it actually specifically came to the**
9      **board in this form.**
10 Q   Do you know if it was ever recommended by the MEC
11     or the board or anybody else at ARMC that a board
12     certified urologist be called and be present for
13     the repair of any urologic injuries when Dr. Muniz
14     was performing surgery?
15 A   **I don't know the answer to that question.  It's not**
16     **-- it had not come from the board, as far as I**
17     **know.**
18 Q   Yeah.  It wouldn't come from the board, would it?
19 A   **I mean, to the board.  I don't remember --**
20 Q   It wouldn't typically come to the board?
21 A   **No.**
22 Q   It would go to the MEC and the MEC would make the
23     recommendation if one was made?
24 A   **Yes.**
25 Q   And you don't know whether one was made or not?

---

88

1  A   **I'm not certain on that.**
2  Q   Do you --
3  A   **No.  I do not know.**
4  Q   Now, there's a reference in here under audit
5      results to OB/Gyn incident report referrals.
6  A   **Uh-huh.**
7  Q   Are those maintained as a business record of the
8      hospital?
9  A   **I'm not sure about the business record because I**
10     **don't usually see the business records --**
11 Q   Medical record.
12 A   **This is, I guess, they're kept by the medical peer**
13     **review coordinator.**
14 Q   But those are typically and commonly kept?
15 A   **Yes, they're typically kept.**
16 Q   OB/Gyn incident report referrals, correct?
17 A   **I have to say, I was on the NPRC and I know that**
18     **this is one of the things that would be tracked.  I**
19     **have not specifically seen them, but I believe this**
20     **is supposed to be tracked and available by a**
21     **medical peer review coordinator.**
22 Q   And who is that?
23 A   **I still don't know her name.**
24 Q   And that would be with respect to all such incident
25     report referrals for all OB/Gyns?

---

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

89

1    A   Yes, that's correct.
2
3        MR. SOWELL: We'd like to see those.
4        MR. DAYHUFF: Put it on your list.
5
6    Q   What's a TAH audit?
7    A   I assume, first of all, total abdominal
8        hysterectomy or trans abdominal hysterectomy
9        depending on the nomenclature that you use. They
10       basically look to see whether or not the
11       hysterectomies were appropriate.
12   Q   Are the records of those kept by the hospital as
13       well?
14   A   I believe so. It may not be in great detail
15       without going directly to the medical record. They
16       may very well just tally those that they feel could
17       be potential problems and those that are justified.
18
19       MR. SOWELL: We would like to see those records.
20
21   Q   If you look up at the top of this document it says
22       after the meeting was called to order by Dr. Paxton
23       that "time line of events with Dr. Muniz and
24       comparative peer data was reviewed." That would be
25       data as indicated by or related to her OB/Gyn

90

1        peers?
2    A   Without having the direct information, this would
3        basically see whether or not her number of
4        complications was an outlier from the other group
5        of OB/Gyns.
6
7        MR. SOWELL: Travis, if there's any regularly kept
8        records of comparative peer data related to
9        the OB/Gyns, we'd like to see those.
10       MR. DAYHUFF: Okay. The issue there would be the
11       peer review privilege, but I will revisit that
12       upon receipt of your list. Other people's
13       peer review data.
14
15   Q   Do you know what prompted KD Justyn leaving her job
16       as CEO of the hospital?
17   A   I understand she was able to retire from the
18       hospital. The information she gave to us at the
19       board level was just that she found that she was
20       able to retire and decided to do so.
21   Q   During the time of Dr. Muniz's 2010 peer review,
22       was Dr. Ronald Robinson the chairman of medical
23       peer review?
24   A   I don't know that for a fact, but I believe it to
25       be true.

91

1    Q   And he's a radiologist that practices with Dr.
2        Searles?
3    A   That's correct.
4    Q   Now, are you aware that the original referral of
5        the incident of February 23, 2010 was made by Dr.
6        Robinson to Dr. Minto and Dr. Besson?
7    A   The answer is I believe so. I believe so.
8    Q   And then Dr. Searles who is Dr. Robinson's partner
9        was the chairman of the Fair Hearing Committee,
10       Judicial Hearing Committee.
11   A   I didn't realize he was chairman, but I knew he was
12       on it.
13   Q   What do you consider to be a fair hearing under
14       these peer review guidelines?
15   A   Well, first of all, all of that is spelled out in
16       the fair hearing plan, but it's basically to give
17       an individual an ability to respond and evaluate
18       anything that is brought against them.
19   Q   But you would agree that the hearing should be
20       fair?
21   A   Hearing should be fair, as is inherent to the name.
22   Q   Exactly.
23
24       (Whereupon, ARMC Medical Staff
25       Policy/Procedure, consisting of 4 pages,

92

1        was marked Plaintiff's Exhibit No. 5 for
2        identification.)
3
4    Q   The reporter has handed you Plaintiff's Exhibit No.
5        5. Can you identify that as the ARMC medical staff
6        policy and procedure related to disruptive conduct
7        by a member of the medical staff?
8    A   I read from the top that this is a policy and
9        procedure with a subject of a code of conduct with
10       an approval date of February 21, 2007.
11   Q   Look under paragraph two. Is it to establish
12       guidelines and processes to address disruptive
13       conduct by a member of the medical staff?
14   A   To establish guidelines and processes to address
15       disruptive conduct by a member of the medical
16       staff.
17   Q   And do you agree that if it is asserted that a
18       member of the medical staff has been disruptive or
19       has engaged in disruptive conduct, that they should
20       be able to avail themselves of this policy and
21       procedure?
22   A   If there is an individual that's identified as a
23       disruptive individual or physician then, yes, it
24       would be good to be part of this policy to keep in
25       with guidelines.

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

93

1  Q    Do you know where the placenta from the still birth
2       on February 23, 2010 that's the subject of the 2010
3       peer review went?
4  A    Where it went?
5  Q    Yes.
6  A    For pathologic analysis?
7  Q    Yes.
8  A    I believe to our pathology department.
9  Q    Do you know if it was sent anywhere else for
10      pathological analysis?
11 A    I don't know if it would be or not.
12 Q    Should it still be available in the pathology
13      department of the hospital?
14 A    I don't think the placenta would be.  The slides
15      are probably available because they're kept for a
16      period of time.
17
18      MR. SOWELL: We would like to see those, Travis.  If
19      the placenta's still available we'd like to
20      see it, review it, analyze it.  If the slides
21      are the only thing available, we'd like to see
22      them.
23
24 Q    Do you know why the hospital chose in the 2010 peer
25      review to appoint the hearing officer when they did

94

1       not do so in the 2009 peer review?
2  A    I don't know the answer to that.
3  Q    Do you know if the hospital typically appoints
4       hearing officers for these fair hearings?
5  A    I believe that this was a situation which they
6       wanted to I'd say ensure fairness.  And going from
7       the way medical staffs, the way the doctors deal
8       with things, the way lawyers deal with things,
9       lawyers deal with things different than we do, but
10      I believe, and I wasn't party to any of these
11      discussions, but they wanted to make sure the
12      proper decorum was set and that there was a truly
13      fair hearing process.
14 Q    Who was involved in those discussions?
15 A    Again, I came in towards the end of it.  I wasn't
16      involved.  I was just asked by the lawyers to
17      participate.  I'm not certain who called the fair
18      hearing.  I'm not certain -- I guess it would have
19      had to go through policies as far as why it was
20      more of a legal proceeding than the other.  I think
21      it just went by the guidelines of a fair hearing
22      committee.
23 Q    But do you know who made the decision to engage a
24      hearing officer?
25 A    I don't know, but thinking back to the actual

95

1       policy for fair hearing it basically states that
2       there should be a hearing officer which can be a
3       physician or it could be a lawyer or a previous
4       judge or . . .
5  Q    But you don't know who participated --
6  A    I don't --
7  Q    -- in choosing the hearing officer?
8  A    That I don't know.
9  Q    What is the job of Jessie Ford at ARMC?
10 A    Jessie Ford's a nurse manager of Aiken Regional
11      Medical Centers Women's Life Care.  She handles
12      nursery, labor and delivery, and postpartum.
13 Q    Nurse manager just means what it says?  She's a
14      manager of nurses?
15 A    She is.  And deals with policies and procedures of
16      the unit and deals mainly with the nursing and the
17      rest.
18 Q    Has she had that job for some time?
19 A    She's had it for at least two years, maybe three.
20 Q    Does she report to the director of nursing?
21 A    Yes.  That would be the next step up.  Actually, I
22      can't say that for certain.  There may be an
23      intermediate level between her and the nurse -- the
24      chief nurse executive.
25 Q    Do you know who that is, the intermediate level?

96

1  A    I don't know.
2  Q    Who is Rebecca Gardner?
3  A    That name sounds familiar.
4  Q    Well, the reason I ask, I'm just looking at one of
5       the peer reviews that was done in the 2010 case.
6       It's addressed to Rebecca Gardner at ARMC.
7  A    I'm not certain what she does.
8  Q    Now, before the vote was taken in the 2010 Board of
9       Governors meeting with respect to Dr. Muniz, did
10      you review the transcript of the fair hearing?
11 A    I did not review the transcript.
12 Q    Did you review any of the exhibits from the fair
13      hearing?
14 A    While I was in the fair hearing is when I did all
15      of that.  I didn't -- as far as the final report
16      and order -- or not -- whatever's it called, the
17      report.
18 Q    Recommendation and report.
19 A    Recommendation.  I knew of it, but I -- as I said,
20      I turned that over to my vice chair and let him
21      handle it all.
22 Q    At the appellate panel level?
23 A    The appellate panel.  Uh-huh.
24 Q    But it was not reviewed at the Board of Governors?
25 A    The entire transcript, no, but the recommendation I

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

97

1  believe was read.
2  Q  Were you present for the entire hearing, meaning, I
3     think it was three days and nights.
4  A  I think I was there for the entire time.
5  Q  Do you have an opinion whether the delivery of that
6     child 30 minutes earlier would have made any
7     difference in terms of the outcome?
8  A  I can't be certain that the outcome would have been
9     different.
10 Q  What do you think?
11 A  I would have been very concerned about a fetal
12    monitor strip that looked like that with the
13    clinical history. And the fact that the -- as
14    information was received, even if I decide to delay
15    a little bit, I would have least proceeded on a
16    little bit faster than that. But I can't tell you
17    the outcome was going to be different.
18 Q  Have you ever seen an abruption without any vaginal
19    bleeding?
20 A  We have -- or I have.
21 Q  How many times? What percentage of cases?
22 A  It's going to be less than ten percent with
23    concealed abruptions.
24 Q  It's not common, is it?
25 A  No, I don't see it very often.

98

1  Q  So it's uncommon to see an abruption without any
2     symptoms of vaginal bleeding?
3  A  No. It's something that we think about if someone
4     comes in with abdominal pain. We think about that
5     and try to rule that out.
6  Q  You think about vaginal bleeding?
7  A  We definitely -- No. I mean, if someone comes in
8     with pain and there's no vaginal bleeding, of
9     course, if there's vaginal bleeding that kind of
10    makes the diagnoses for you. But if you have pain,
11    you worry about a concealed abruption. I mean,
12    that should be, you know, foremost in mind in
13    thinking, okay, I have to rule this out.
14 Q  Right. You mean a concealed abruption, that is an
15    abruption without vaginal bleeding?
16 A  Correct. In other words, the bleeding is more
17    towards the centralized area of the placenta but it
18    hasn't come to the periphery.
19 Q  So the course at that point if you suspect a
20    concealed abruption is to rule it out?
21 A  Generally, yes.
22 Q  Do you think the Board of Governors would have
23    terminated Dr. Muniz's privileges over this one
24    incident of a still birth?
25 A  I can't answer that question. I mean, it basically

99

1     was all the information available to it from this
2     last couple of years.
3  Q  So that would include the 2009 peer review?
4  A  Yes.
5  Q  Anything else?
6  A  I don't understand.
7  Q  Well, you said the information from the last couple
8     of years. So I'm asking was it anything other than
9     the 2010 peer review information and the 2009 peer
10    review information?
11 A  I believe that was the main focus was the 2009. I
12    don't know if there was anything else. But most of
13    the board had already gone through the 2009
14    situation.
15 Q  Right. Had been present on the board and voted on
16    the board and, therefore, been aware of the 2009
17    situation?
18 A  Yes.
19 Q  So the 2009 situation and whatever facts were
20    induced from it were a significant factor in the
21    board's decision to terminate Dr. Muniz's
22    privileges?
23 A  I believe so.
24 Q  Do you know if the deliberations of the Appellate
25    Review Panel were recorded either by audio tape,

100

1     digital recorder or handwritten notes or any other
2     way?
3  A  I don't have information on that. I'm not certain
4     who took notes during that meeting.
5  Q  Who typically comes to the board meetings other
6     than the board members, Carlos Milanes, Sharon,
7     Terri Ergle, Frank Lopez, Pat Jackson?
8  A  Sharon Hagan doesn't always come to the board
9     meetings. She only comes when she's called.
10    Generally, it's the officers that usually are
11    there. It's Carlos Milanes, the COO, Scott.
12    It's the CNO, the chief nurse executive, Denyse
13    Finkbeiner. CFO which currently is vacant, but
14    kind of a guess the way that the board is made up
15    is that there's an equal of number physicians and
16    equal number of lay people, and three
17    administrative representatives from ARMC and all of
18    them are voting members.
19 Q  The three administrative people?
20 A  They're voting members.
21 Q  Who is that other than Carlos?
22 A  It's Carlos, Scott Ansede who is the COO, and
23    there's Denyse Finkbeiner who's the CNO.
24 Q  Chief nursing officer?
25 A  Chief nursing officer.

**James F. Boehner, MD - 7/28/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

101

1  Q   And they're all three voting members?
2  A   I believe so.  I'm remembering that just from the
3      fact that when the CFO was there he was saying that
4      he wasn't voting because he wasn't one of the
5      board.
6  Q   He was saying he wasn't voting?
7  A   Was not.  He said he was not a voting, but --
8  Q   But you think the other three were?
9  A   The other three, according to the board
10     composition, there should be three administrators
11     and equal number, I think it's not less than nine,
12     not more than 14.
13 Q   But you believe those three administrators do vote?
14 A   They do vote, yes.
15
16             (Whereupon, Letter 12/17/2010, consisting
17              of 1 pages, was marked Plaintiff's
18              Exhibit No. 6 for identification.)
19
20 Q   Now, the reporter's handed you Plaintiff's Exhibit
21     No. 6 which is the letter from Carlos Milanes to
22     Dr. Muniz with respect to the deliberations and
23     recommendation of the Appellate Review Panel.  Now,
24     what did you receive from the Appellate Review
25     Panel to consider?  I mean, did you receive some

102

1      sort of a report or summary of their deliberations
2      and recommendation or what?
3  A   Well, you're talking about the Appellate Review
4      Panel of the board?
5  Q   Yes.
6  A   I believe, -- and, again, this was my vice chair
7      that was handling this.  He basically presented an
8      oral report of their findings.  And as far as any
9      documentation, I'm not certain exactly what -- I
10     don't think anything was passed out.  I think
11     everything was verbal.  But there may have been
12     some documents that were circulated.
13 Q   But those should be recorded in some way, shape or
14     form in the minutes or the audio tape of the
15     January 2011 Board of Governors meeting?
16 A   They should.  Again, I don't know in what detail,
17     but they should be there.
18 Q   Does Pat Jackson keep those records?
19 A   Pat Jackson keeps the minutes for the board
20     meetings.
21 Q   But do you think she keeps them archivally, she
22     stores them, preserves them?
23 A   The actual minutes should be persevered, whether or
24     not any of the detailed information was there, I
25     don't know.  And all of this is taken on a digital

103

1      recorder like this.  I'm not certain if it's just
2      erased and restarted every board meeting.
3  Q   Did you ever have any discussions -- I think I've
4      already asked you this, and if I have you can
5      remind me.  Did you ever have any discussions with
6      Dr. Timothy Kinsey about the fair hearing?
7  A   I remember talking with him about maternal fetal
8      medicine consultants, so I did speak with him in
9      general terms about maternal fetal medicine
10     consultants and the fact that they tend to be
11     extremely variable in the way that they view things
12     and that it's not usual for a number of maternal
13     fetal medicines to dissent on any particular issue.
14 Q   Was that after the hearing?
15 A   I believe that was after the hearing.
16 Q   Did you ever have any discussions with Christopher
17     Robinson who was the maternal fetal medicine member
18     of that panel?
19 A   I don't know it we ever talked.  I may have said
20     hello to him, but that's all.
21 Q   Did you have any discussions with any of the other
22     members of that panel who were Jill Buchanan,
23     Robert Searles and Alyssa Degnan?
24 A   Degnan.
25 Q   Degnan, yes.

104

1  A   I don't believe I had any conversations.  I did see
2      Dr. Degnan in the hall at one time and just said
3      hello and pretty much that was it.
4  Q   Has the hospital been sued since you've been on the
5      board?
6  A   I'm certain they've been sued.  I'm not sure for
7      what.
8  Q   Do you recall any of the cases?
9  A   Are you talking -- I'm sorry.  I don't know if I
10     should be asking the questions, but --
11 Q   You can ask the question.
12 A   I assumed they've been sued for several things that
13     I'm not aware of.
14 Q   So I'm only asking you about the ones you're aware
15     of.
16 A   I don't know of ones they've actually been sued
17     for.
18 Q   Do those not come to the Board of Governors for
19     discussion?
20 A   There may have been some lawsuits.  I'm just not --
21     they're not coming to mind right now.
22 Q   Who's responsible for those inside the hospital,
23     monitoring them?
24 A   Well, I believe it's Lois El who's the risk manger
25     and Carlos Milanes as the executive.  To further

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

105

1    answer your question, the -- I know there was some
2    lawsuit that was brought to the board.  I just
3    can't recall what it was.
4  Q   Does the hospital keep -- I might have asked this,
5    but if I haven't I'm asking it now.  Does the
6    hospital keep records with respect to other
7    maternal or fetal deaths?
8  A   I'm not certain what you mean by other.  But --
9  Q   Other than the one in this case, really.  That's a
10    bad question.  Does the hospital keep records with
11    respect to maternal or fetal deaths?
12  A   I believe throughout -- through the peer review
13    process they do keep those numbers.
14
15    MR. SOWELL: We'd like to request those and,
16    therefore, we do.
17    MR. DAYHUFF: Then your request will be considered.
18
19  Q   The hospital has an intranet?
20  A   They have an intranet, yes.
21  Q   And does UHS have an intranet?
22  A   I believe they're all hooked up through the same
23    internet -- yeah, internet.
24  Q   Do you participate?
25  A   No.  I -- the most I have is I've access to the

---

106

1    firewall, but the other internet that is available
2    is a public internet, and that doesn't go through
3    the hospital system.
4  Q   Does the Board of Governors have any written
5    protocol for reviewing these recommendations and
6    privileges be terminated?
7  A   They are bylaws that are related to the Board of
8    Governors and they accept reports of standing or
9    special committees and then deliberate and make
10    decisions on them.  I don't know if there's a
11    specific protocol that is specific to removing
12    privileges.
13  Q   Is there a specific protocol applied to the board
14    when it reviews these reports and recommendations
15    of various committees?  In other words, protocol
16    for how you do the review?
17  A   All I know from the bylaws is that the Board of
18    Governors appoints a subcommittee to be able to
19    study something.  That subcommittee comes with its
20    findings to the board and final action is taken by
21    the board.
22  Q   But not in any specific protocol?
23  A   I'm not certain of that.  I don't think so.
24  Q   You don't know of one?
25  A   I don't know of one, no.

---

107

1  Q   In other words, with respect to the review of a
2    recommendation that privileges be terminated,
3    you're not aware of any specific guideline, policy,
4    procedure or protocol about how to conduct that
5    meeting and what you should consider or not
6    consider in deliberating and voting?
7  A   I'm not aware of anything specific in that regard.
8  Q   Do the bylaws require a physician on staff here to
9    take emergency call or staff call?
10  A   That's correct, with certain exceptions.
11  Q   And Dr. Muniz was required to take emergency or
12    staff call as a condition to her privileges here?
13  A   That's correct.
14  Q   For both paying and non-paying patients?
15  A   That's correct.
16
17    MR. SOWELL: Got anything, David?
18    MR. DICK: I don't think so.
19    MR. SOWELL: Thank you.
20    MR. DAYHUFF: I've just got a couple questions for
21    you.
22
23            - - - - -
24        CROSS EXAMINATION
25  BY MR. DAYHUFF:

---

108

1  Q   You mentioned in response to Mr. Sowell's question
2    that there was an occassion when you, Dr. Minto and
3    I believe Dr. Boehner -- no, I think it was --
4
5    MR. SOWELL: DiBona.
6
7  Q   DiBona, sorry, were present with Ernie Nauful, the
8    hearing officer --
9  A   That's correct.
10  Q   -- before the hearing.  Now, was that before any of
11    the testimony had begun?
12  A   I believe so.
13  Q   And about how long did that encounter with the
14    hearing officer last?
15  A   I know it was short, and it was supposed to be
16    procedural.
17  Q   Okay.
18  A   In other words, they just said how it was going to
19    be conducted.
20  Q   And I want to make sure I have the people right.
21    You, Dr. DiBona, Dr. Minto and Ernie Nauful?
22  A   I remember those to be present.  Dr. Minto came in
23    later.
24  Q   Okay.
25  A   Because I know that we were all there at the

---

James F. Boehner, MD - 7/28/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**109**

1  appointed time and Dr. Minto had a case and had to
2  come in a little later.
3  Q   All right.
4  A   But I think she was there to see when he was there.
5  Q   And I recalled you saying something about procedure
6  or process and pleasantries.  Is that your
7  recollection of the two subjects of that encounter?
8
9         MR. SOWELL: I object to the form of the question.
10
11 Q   What was the subject of the -- what were the
12 subjects discussed in this encounter?
13 A   Again, it's been a while, but I --
14 Q   Whatever you can recall.
15 A   What I can recall is that it was a procedural
16 thing, how it was going to be managed and handled.
17 And, I'm sorry, Celeste there was there, too, if
18 you didn't mention her.  Celeste was there.
19 Q   Okay.
20 A   But it was kind of procedure on how the fair
21 hearing was to be conducted.
22 Q   And by that do you recall any of the details of
23 this procedure, for example, who was going to go
24 first or where people were going to sit.  Are we
25 talking about those type of procedural details or

---

**110**

1  do you recall?
2  A   I believe, first of all, we did have a specific
3  area to sit when we were in the conference room.
4  The people giving -- and I hate using legal terms
5  in a medical staff meeting, but the ones who were
6  giving testimony were up against the wall.  We were
7  over to the side.  Dr. Muniz and counsel were
8  there, and in the back was the hearing panel with
9  hearing officer in the middle.
10 Q   Okay.  And I know that's how a hearing room is
11 usually laid out.  Was that -- I'm trying to
12 understand what it means when you say there was --
13 there were discussions of procedural issues.  Were
14 things like that discussed or do you recall?
15 A   I don't recall exactly what things were, but I just
16 remember that they were just giving instructions on
17 how it was to be conducted.
18 Q   Anything about the substance of any of those cases
19 discussed at that time?
20 A   We didn't talk about anything that I recall.
21 Q   Do you think anything -- did anything -- was
22 anything discussed that made you feel like it was
23 improper to discuss it or unfair to discuss it?
24 A   I don't think so.
25 Q   Would you have recalled if something made you

---

**111**

1  uncomfortable where you felt that something was
2  unfair?
3  A   If there was something that appeared that they were
4  -- that he was favoring our side, I would have
5  remembered that.  I don't remember that.
6  Q   Do you have any concerns that Mr. Nauful was unfair
7  in his role as hearing officer?
8  A   This is my opinion.
9  Q   Sure.
10 A   My opinion was I feel that he was fair.  I feel
11 that he actually gave more latitude than he needed
12 to, and that's my own opinion.  And I base that on
13 the fact that some information was held from the
14 actual members that were going to make the
15 decision.  And within the bylaws, I believe, or the
16 fair hearing it said that the panel should be
17 availed of any and all information.
18 Q   Okay.
19 A   But I realize in a court of law some things are
20 admissible and not admissible.  But it seems that
21 the hearing officer said, look, let's just let the
22 panel be dismissed.
23 Q   So when you say he gave more latitude, you mean he
24 gave more latitude to Dr. Muniz and her counsel
25 than you thought was --

---

**112**

1
2         MR. SOWELL: I object to the form.
3
4  Q   What did you mean by more latitude.
5  A   I think that he gave more latitude to Dr. Muniz's
6  side on that issue.
7  Q   Okay.  And that was some sort of an evidence issue
8  that apparently came up during the hearing?
9  A   Yes.
10 Q   And the hearing officer did not allow some evidence
11 in due to the objection of Dr. Muniz and her
12 counsel?
13 A   Yes.
14 Q   Okay.  Now, do you know -- well, the subcommittee
15 of the board in 2010 that considered the
16 recommendation of the MEC that was headed up by Sam
17 Kelly, PhD.
18 A   Sam Kelly.  Uh-huh.
19 Q   Did you participate in their deliberation at all?
20 A   I stayed as far away as I could.
21 Q   Were you even present for their consideration?
22 A   For that meeting, no.
23 Q   So you don't know what they took up at that
24 meeting, what they considered and didn't consider?
25 A   Well, obviously they considered the recommendation,

---

**James F. Boehner, MD - 7/28/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

113

1    but you don't know all the substance of the issues
2    they hashed out?
3    **A    No, I don't.**
4    Q    So you wouldn't know whether or not they took up
5        Mr. Sowell's objection about the fairness of the
6        hearing officer at that subcommitee meeting?
7    **A    I can't be certain of that.**
8    Q    Gasnel Bryan, did he testify at the fair hearing?
9    **A    He did.**
10
11        MR. DAYHUFF: That's all I got.  Any follow up?
12        Thank you for your time.
13        MR. SOWELL: Thank you, Dr. Boehner.
14
15                - - - - -
16        (Whereupon, at 4:10 p.m., the deposition
17        in the above-entitled matter was
18        concluded.)
19
20
21
22
23
24
25

---

114

1        The witness reserved his/her right to review
2    the deposition transcript.  This transcript has
3    been made available to the witness with the
4    appropriate instructions to complete the review and
5    submit a signed errata sheet within the thirty (30)
6    days provided for by the SC Rules of Civil
7    Procedure.
8
9        Any corrections and/or changes requested and
10    submitted by the witness will be sealed under
11    separate cover and forwarded to the taking party
12    with instructions to place with this original
13    sealed transcript.
14
15
16
17
18
19
20
21
22
23
24
25

---

115

State of South Carolina  )
                         )    CERTIFICATE
County  of Lexington  )
    Be it known that the foregoing Deposition of
JAMES F. BOEHNER, M.D. was taken by Jennifer L.
Thompson, CVR;
    That I was then and there a notary public in
and for the State of South Carolina-at-Large;

    That by virtue thereof I was duly authorized
to administer an oath;
    That the witness was by me first duly sworn to
testify the truth, the whole truth, and nothing but the
truth, concerning the matter in controversy aforesaid;
    The foregoing transcript represents a true,
accurate and complete transcription of the testimony so
given at the time and place aforesaid to the best of my
skill and ability;

    That I am not related to nor an employee of
any of the parties hereto, nor a relative or employee of
any attorney or counsel employed by the parties hereto,
nor interested in the outcome of this action.
    Witness my hand and seal 4 DAY OF AUGUST, 2011

                    Jennifer L. Thompson, CVR


Notary Public for South Carolina
My Commission Expires: August 14, 2019

    This transcript may contain quoted material.  Such
    material is reproduced as read or quoted by the
    speaker.

---