# EXHIBIT FF

to

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Civil Action No.: 1:10-cv-00986-JFA**

*Transcript from deposition of Oletha Minto*

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

In the United States District Court
District of South Carolina
Aiken Division
Case No: 1:10-CV-00986-MBS

Margo J. Hein-Muniz, MD )
and Parkside Medical )
 )
Consultants, LLC d/b/a )
 )
Magnolia Medical, )
 )                Deposition
        Plaintiff(s), )
 )                    of
vs. )
 )        OLETHA R. MINTO, MD
Aiken Regional Medical )
Centers, Universal Health )
Services, Inc., Aiken )
Obstetrics & Gynecology )
Associates, P.A., Carlos )
A. Milanes, K.D. Justyn, )
Oletha R. Minto, MD, James )
F. Boehner, MD, Robert D. )
 )
Boone, MD, Jonathan H. )
Anderson, MD, Thomas P. )
Paxton, MD, )
 )
        Defendant(s), )
 )

        Deposition of OLETHA R. MINTO, MD, taken before
Thea K. Salmonson, Verbatim Court Reporter and Notary
Public in and for the State of South Carolina, scheduled
for 1:00 p.m. and commencing at the hour of 1:26 p.m.,
Thursday, July 14, 2011, at Aiken Regional Medical
Center, Aiken, South Carolina.

        Reported by:
        Thea K. Salmonson

Exhibit No. 10: MEC 3/3/10 (2 pgs.)

Exhibit No. 11: MEC 3/9/10 (1 pg.)

Exhibit No. 12: AllMed Review (5 pgs.)

Exhibit No. 13: Letter dated 3/16/10 (2 pgs.)

Exhibit No. 14: On-Call Calendar (1 pg.)

Exhibit No. 15: Letter dated 5/4/10 (3 pgs.)

Exhibit No. 16: Letter dated 6/7/10 (1 pg.)

Defendant's Exhibit No. 1: Letter (5 pgs.)

---

Any court, party, or person who has purchased a
transcript may, without paying a further fee to the
reporter, reproduce a copy or portion thereof as an
exhibit pursuant to court order or rule or for internal
use, but shall NOT otherwise provide or sell a copy or
copies to any other party or person without the express
consent of the reporter and/or reporting agency.

        APPEARANCES

For the Plaintiff(s):
David C. Dick, Esquire
Sowell, Gray, Stepp & Laffitte, LLC
1310 Gadsden Street
P. O. Box 11449
Columbia, South Carolina 29211

For the Defendant(s):
Travis Dayhuff, Esquire
Nelson, Mullins, Riley, & Scarborough, LLP
1320 Main Street
Meridian/17th Floor
Columbia, South Carolina 29201

        INDEX

Stipulations . . . . . . . . . . . . . . . . . . 4
Direct Examination by Mr. Dick . . . . . . . . . . . 4
Cross Examination by Mr. Dayhuff . . . . . . . . . 106
Re-Direct Examination by Mr. Dick . . . . . . . . 118
Errata . . . . . . . . . . . . . . . . . . . . . 125
Certificate . . . . . . . . . . . . . . . . . . . 126
        EXHIBITS
Exhibit No. 1: Email dated 8/5/09 (1 pg.)
Exhibit No. 2: Medical Staff Bylaws (156 pgs.)
Exhibit No. 3: Letter dated 9/14/07 (7 pgs.)
Exhibit No. 4: Peer Review Minutes 1/15/08 (6 pgs.)
Exhibit No. 5: MEC 3/24/08 (5 pgs.)
Exhibit No. 6: Peer Review Form (2 pgs.)
Exhibit No. 7: Letter dated 10/30/08 (2 pgs.)
Exhibit No. 8: Letter dated 2/25/10 (2 pgs.)
Exhibit No. 9: Peer Review Scoring (2 pgs.)

---

4

1        STIPULATIONS
2        This deposition is being taken pursuant to the
3    Federal Rules of Civil Procedure.
4             - - - -
5        The reading and signing of this deposition is
6    reserved by the deponent and counsel for the
7    respective parties.
8
9    Whereupon,
10        OLETHA R. MINTO, MD, being duly sworn and
11    cautioned to speak the truth, the whole truth,
12    and nothing but the truth, testified and
13    deposed as follows:
14    Court Reporter:  State your full name for the
15    record, please.
16    Witness: Oletha Minto
17             - - - - -
18        DIRECT EXAMINATION
19    BY MR. DICK:
20    Q   All right.  Dr. Minto, again, my name is David
21        Dick, I represent the plaintiffs in this case.
22        Before we get started, are you under any medication
23        or other substance or suffer from any illness that
24        would prevent you from providing accurate testimony
25        today?

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**5**

1  A  No.
2  Q  Okay.  Have you been deposed before?
3  A  For the purposes of child support.
4  Q  Okay.  Is that --
5  A  For my husband to pay child support at that the
6     time, baby's daddy, I guess, yeah.
7  Q  So you've been deposed once then?
8  A  One time.
9  Q  Okay.  Well, just to give you a few of the kind of
10    procedural things that we'll try to follow today.
11    Obviously she's going to be taking everything down
12    that we say, so it's important that you and I not
13    talk over one another.  And I'll try to let you
14    finish your answers and if you can try to let me
15    finish my question, it will create a cleaner record
16    for us.  Along those same lines, make sure all your
17    responses are verbal, yes and no, no head nodding
18    or uh-huhs, huh-uhs, that sort of thing.  I'll try
19    to help with that if I notice that you're doing
20    that.  If you need a break just let me know.  If
21    you need to use the bathroom just say and we'll
22    take a break, it's not a big deal.  Now that the
23    deposition has started, I know you talked with Mr.
24    Dayhuff before we came in here, but now that the
25    deposition has started, you can't talk to him until

**6**

1     it's concluded, so -- well, you can talk to him,
2     just not about the testimony you're giving and the
3     issues in this case.
4
5     MR. DAYHUFF:  We can still talk about the weather.
6     MR. DICK:  Yeah.  Talk about the weather as much as
7        you'd like.
8     THE WITNESS:  Okay.
9     MR. DICK:  Which is actually nice today, yesterday
10       it stormed on our way in.
11
12  Q  Okay.  Just to get a little bit of background on
13     you, I'm assuming you are no longer married, is
14     that correct?
15  A  No, I'm married.
16  Q  Okay.  So you're remarried?
17  A  Uh-huh.
18  Q  Okay.
19  A  I'm married to my husband, yes.
20  Q  Is this the same husband who --
21  A  It's the same father of my children from before.
22  Q  Okay.  So how many times have you been married
23     then?
24  A  I've been married one time.
25  Q  One time.  Okay.

**7**

1     THE WITNESS:  I don't know what that has to do with
2        this case.
3
4  Q  Again, you can't talk to --
5  A  What does that have to do with this case?
6  Q  You can't talk --
7  A  You keep going.
8  Q  You can't talk to him.
9  A  Okay.
10  Q  And I'll tell you why.  And, again, you're not
11     really supposed to be asking me questions, that's
12     not really the way this works.  But just so you
13     know, it's important for us to know all of your kin
14     that are in Aiken County because if they happen to
15     be on the jury, we need to know who they are, that
16     way we can strike them from the jury.  So all --
17  A  Absolutely.
18  Q  -- these background questions are to get at those
19     issues, in fact, relevant to this
20     case.  What is your husband's name?
21  A  Artie, A-r-t-I-e Lee L-e-e, Walker, Jr.
22  Q  Okay.  And how many children do you have?
23  A  Four.
24  Q  All right.  What are their names?
25  A  Tyler, Tyler Walker a female, Tyson Walker a

**8**

1     female, Tate Walker a male, Teagan Walker a male.
2  Q  What are the ages on those?
3  A  Fourteen, four, she will be five this month, Tate
4     is three, and Teagan is two.
5  Q  Okay.  Are you originally from Aiken County?
6  A  No, sir.
7  Q  No.  Is your husband?
8  A  No, sir.
9  Q  So aside from your husband, do you all have any
10     other family in Aiken County?
11  A  No, sir.
12  Q  Okay.  What is your educational history, I guess
13     starting with high school?
14  A  Went to John Kennedy High School, Silver Spring,
15     Maryland, graduated in 1990.  And from there I went
16     to the University of Maryland, Baltimore County and
17     left there four years later with a degree in
18     chemistry, a bachelor's of science. I then went to
19     John Hopkins Medical School immediately following
20     graduation where I spent four years there.  And
21     then I went immediately from there to residency at
22     the York Hospital in York, Pennsylvania.  York
23     Hospital is now called WellSpan because it's joined
24     several hospitals.  From there, I came here.
25  Q  Okay.  Sorry, what did you say, York Hospital, what

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**9**

1  was your -- why were you there, that was your
2  residency, is that what you said?
3  **A  My residency in OB/GYN.  I spent four years there.**
4  Q  Okay.  Did you grow up in Maryland?
5  **A  I grew up in Maryland, yes, sir.**
6  Q  Okay.  So immediately after your residency at York
7  Hospital you came to ARMC?
8  **A  I came to Aiken OB/GYN.**
9  Q  Okay.  What precipitated your more from, I guess,
10  York Hospital down to Aiken?
11  **A  A job.  I had a job at Aiken OB/GYN as an**
12  **obstetrician/gynecologist.**
13  Q  Okay.  So Aiken OB/GYN already existed when you
14  moved down here?
15  **A  Yes, sir.**
16  Q  And who were the, I guess, the partners of Aiken
17  OB/GYN when you came down here?
18  **A  James Boehner and Robert Boone.**
19  Q  Okay.
20  **A  There was also a nurse practitioner that was there**
21  **in the practice prior to me being there.**
22  Q  Okay.
23  **A  Her name is Andriena Angle.**
24  Q  And how did it come that you got into contact with
25  Aiken OB/GYN and they offered you a job?

---

**10**

1  **A  When you're near the end of your residency you**
2  **begin compiling your resume.  The resume went**
3  **through various sources, including head hunters.**
4  **The head hunter saw the resume and felt that this**
5  **would be a good pick.  I wanted to be in the south**
6  **and this practice is in the south.  And we started**
7  **from there.**
8  Q  So then, I guess, did you go through an interview
9  process and that sort of thing?
10  **A  Absolutely.**
11  Q  Okay.  And did you obtain privileges at ARMC before
12  you accepted that job or did you accept the job and
13  then apply for privileges, how does that generally
14  work?
15  **A  To be honest with you, I can't tell which came**
16  **first.**
17  Q  Okay.
18  **A  But it was all in the same timeframe that I did**
19  **both together.**
20  Q  Okay.  Are you now a partner in the Aiken OB/GYN?
21  **A  Yes.**
22  Q  Okay.  So does Aiken OB/GYN have three partners
23  now, you, Boone, and Boehner, is that correct?
24  **A  Uh-huh.**
25  Q  Okay.  Say yes if --

---

**11**

1  **A  Yes, sir.**
2  Q  Okay.  Is that an LLC or is it a partnership, do
3  you know?
4  **A  I don't know the legal term behind that, Sir, I'll**
5  **be honest with you.**
6  Q  Okay.  What year was it that you came to Aiken
7  OB/GYN?
8  **A  2002.**
9  Q  Okay.  In your practice do you do primarily OB
10  versus, you know, gynecology or is there, I guess,
11  what would you say your split is, in terms of
12  gynecological work versus obstetrical work?
13  **A  I've have to see more numbers on that, to be honest**
14  **with you, but if I had to guess, which is all this**
15  **would be, I would say that I do - I'm a younger**
16  **partner - so I probably do more obstetrics.  I do**
17  **most of the obstetrical patients and I do some**
18  **surgery.  I have a pretty heavy practice in both**
19  **but I could not give you an accurate percentage**
20  **mix.**
21  Q  Okay.  And why, I mean, you say you're a younger
22  partner.
23  **A  Uh-huh.**
24  Q  Why does that tend to mean that you would do more
25  OB?

---

**12**

1  **A  You know, you just do when you're younger.  That**
2  **seems to be where your patients come from and as**
3  **they get older they need more surgery.  You tend to**
4  **have a younger mix.**
5  Q  Okay.  Do the majority of your patients come from
6  the Aiken area, I take it?
7  **A  As far as I know.  Some are from outside of Aiken,**
8  **I don't know if it's Aiken County or the City of**
9  **Aiken but some do come from New Ellington or**
10  **outside areas.  I mean, I see all kinds of cities.**
11  Q  And, I guess, how do you get most of your patients,
12  just through referrals or --
13  **A  At this time, the new gynecologic patients that I**
14  **take are by physician referral or by current**
15  **patient recommendation.  I don't have a practice**
16  **that's just open to the general public, because I'm**
17  **booked pretty much.  The obstetrical patients I do**
18  **take, some of them are recurring patients and some**
19  **are new ones that come, but gynecologywise it's by**
20  **physician referral mainly.**
21  Q  Okay.  I guess your connection with ARMC is simply
22  that you have privileges here and your patients who
23  are in your private practice this is where you do
24  surgeries and deliver children, is that correct, is
25  that basically what your, I guess, clinical

---

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

13

1   connection with ARMC would be?
2   A   That's where my connection comes from, yes.
3   Q   Okay.  And then you also serve as, I think, the
4       chief of surgery, is that correct?
5   A   Not at this time.
6   Q   Okay.
7   A   I was the chief of surgery, my term ended at the
8       end of 2010.
9   Q   Okay.  When did you become the chief of surgery?
10  A   That would have to be - and, again, this is a guess
11      - January 2008, because the terms are typically two
12      years.
13  Q   Okay.  And how ––
14  A   I think it was 2009.  Yeah.  I want to say it was
15      2009 actually, because 2009 is one year and 2010 is
16      the next year.
17  Q   Right, okay.  And how do you become appointed as
18      the chief of surgery?
19  A   You're voted in by the medical staff.
20  Q   Okay.  And were you voted, I guess, were you voted
21      in by the medical staff?
22  A   Uh-huh, yes, sir.
23  Q   Yes.  And that would have been, I guess, when did
24      that take place?
25  A   Again, this would be a guess but it has to be in

---

14

1       2008 before your term starts.
2   Q   What kind of meetings do you have?
3   A   Medical staff meetings.
4   Q   Is there like a general election meeting or each
5       year, how does that process work, generally?
6   A   I don't have the process memorized, Mr. Dick.  I
7       would have to go back and look at the bylaws as to
8       when all those things occurred.
9   Q   Okay.  But just best guess, I mean, obviously
10      everything that we're talking about today is just
11      to the best recollection.  I'm not asking you to
12      recite from any of the bylaws or the procedures,
13      I'm just asking generally how does that election
14      procedure work and ––
15  A   There's a meeting and there's a ballot and the
16      ballot is drawn.  And I know that you can decide on
17      who you'd like the person to be and your ballot is
18      handed to a staff, not an actual physician, but
19      someone who works for physician services who
20      tallies all the votes.  And sometime later, and I
21      don't know if it's the same day or the day after,
22      the votes are counted and the person who's voted in
23      gets distributed.
24  Q   Okay.  What were your, I guess, your duties as
25      chief of surgery?

---

15

1   A   As chief of surgery I managed things like when it
2       was time for reappointment, you had to sign off
3       based upon number of cases, various physicians to
4       continue doing privileges that they had before,
5       making sure that they had enough cases to continue
6       according to what they would point out to you with
7       the bylaws.  At times it was conflict management,
8       if there was issues concerning block time, issues
9       concerning things like not coming to the operating
10      room in a timely fashion.  I had a wide range of
11      duties associated with that, and at times chart
12      review.
13  Q   Okay.  So was it mostly administrative duties then?
14      I mean, all this stuff that you just said kind of
15      sounded like it was more administrative than, I
16      guess, clinical.
17  A   There are no clinical duties, as far as I know --
18  Q   Okay.
19  A   -- that occurred during my term, other than my
20      routine patients.
21  Q   Okay.  Other than, I guess, chart review would kind
22      of be considered clinical, right, because you're, I
23      mean, you're looking at those for medical issues,
24      correct?
25  A   I can't recall the reason I looked at all the chart

---

16

1       reviews.  Some were medical and I believe some were
2       for other reasons, but I can't recall all of them,
3       no, sir.
4   Q   Okay.  And when you say chart review, I guess, what
5       do you mean by chart review, is that part of the
6       peer review process, is that -- I guess just
7       explain to me what you mean by chart review or what
8       you would do when you say chart review.
9   A   Some of it is just number counting, counting how
10      many of this you see, make sure they can continue
11      doing that procedure.  And that was the bulk of it.
12      And occasionally you would get a case in which, you
13      know, I can't give you a specific, Sir, I really
14      can't, because it's so long ago.
15  Q   When you say counting, what were you counting?
16      Counting these is what you said, I don't know what
17      these are?
18  A   These could be number of total knee replacements,
19      is a specific physician okay to continue doing
20      total knees.  And they just have to do a certain
21      number of proficiency that shows they've done at
22      least one case in a certain amount of time that
23      they can continue to do that.
24  Q   Okay.
25  A   Determinations like that and be the primary surgeon

---

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

17

1  as opposed to an assistant surgeon.
2  Q   So is that what you were referring to in the
3      reappointment, that you'd just make sure that, and
4      I'm assuming -- well, I'll just let you tell me,
5      what is reappointment exactly?
6  A   Every few years, and I couldn't tell you exactly
7      how long, physicians have to reapply for the
8      privileges to say that I still want to do a certain
9      list of, you know, procedures. And they have to
10     demonstrate they've done those cases in that
11     timeframe to be able to stay proficient.
12 Q   Okay. Did you, I guess, hold any other positions
13     at ARMC?
14 A   Yes.
15 Q   And what were those?
16 A   Prior to chairman of surgery, I was the assistant
17     chair of surgery. And prior to that, and I can't
18     tell you how many years I spent on this committee,
19     I was on the credentials committee. And I'm on
20     credentials now.
21 Q   Okay. The assistant chair, would that have been
22     two years prior to your, or for the two years prior
23     to you being the chairman of surgery?
24 A   Yes, sir.
25 Q   Okay. So roughly '07 to '09 I guess?

18

1  A   Right.
2  Q   And you say you don't recall the time period for
3      the credentials committee?
4  A   It was before that. I didn't start, you're not
5      eligible to even to be asked to be on committees,
6      typically -- I know that for myself personally, I
7      was asked to say could you, could you be on a
8      certain committee, that's how I started out with
9      credentials or would you run for a certain
10     committee. And that's how those types of things
11     started. When I came, you were not eligible to be
12     on a committee until you were here for a year or
13     two, I want to say it was two but you can't quote
14     me on that. Well, I guess you're going to quote
15     me, but I can't give you the exact number.
16 Q   Okay.
17 A   Once I became eligible, that's how the credentials
18     committee came about.
19 Q   And so did you resign from the credentials
20     committee when you were assistant chair and chair
21     of surgery, or did you continue?
22 A   I was not on the credentials during that time, no,
23     sir.
24 Q   Okay. But you're back on it now?
25 A   I'm back on credentials now.

19

1  Q   Okay. And then as the assistant chair of surgery,
2      what were your duties under that position?
3  A   I did help with reappointment because there's a lot
4      of charts for one person to do. So when I was the
5      assistant chair, there's a lot of reappointments,
6      there are a lot of surgeons here and a lot of
7      numbers to count. When I was assistant, I helped
8      Dr. Carter who was the surgical chair and when I
9      was the chairman, my associate chair helped me with
10     reappointments too.
11 Q   Okay.
12 A   Occasionally if Dr. Carter was not in town and
13     couldn't handle a problem that they needed me to
14     handle, then we did that, then I did that.
15 Q   Okay. And are you also on the MEC?
16 A   While you are the associate chair, assistant chair,
17     you are on the MEC as a member, and while you're
18     the chairman, you're on the MEC because you're the
19     chair person.
20 Q   Okay. So were you a member of the MEC from
21     basically '07 until the end of 2010, would that be
22     correct?
23 A   I was on it for four years during my term of
24     assistant chair and chairman of surgery.
25 Q   Okay. Were you ever on it prior to that?

20

1  A   No.
2  Q   Okay. Are you on the MEC now then?
3  A   No.
4  Q   Have you ever been on the peer review committee?
5  A   No, sir.
6  Q   Okay. Do you know what positions at ARMC Dr.
7      Boehner holds?
8  A   Right now?
9  Q   Yeah, right now.
10 A   Right now he is chairman of the board, I believe.
11 Q   Okay. What about Dr. Boone?
12 A   I believe Dr. Boone was on medical peer review. I
13     believe, and, again, this is just guessing, that he
14     is on pharmacy committee. Now, I'm not sure the
15     name of that pharmacy committee. I believe he's on
16     the pharmacy committee right now. He's no longer
17     on peer review. He was on peer review during my
18     time, you know, here at Aiken OB/GYN.
19 Q   Okay.
20 A   He was on peer review at some time. Now, I
21     couldn't tell you the years of that.
22 Q   Okay. Is there a, I don't know, chair or head of
23     the OB/GYN department?
24 A   OB/GYN is not a department.
25 Q   Okay.

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

21

```
 1   A   OB/GYN falls under the arm of department of
 2       surgery.  There is a section chair person.
 3   Q   Okay.
 4   A   Who that section chair person is right now, I don't
 5       know who that person is.
 6   Q   Okay.  Do you know who the last, I guess, well,
 7       who's the last chair or section chair that you
 8       recall?
 9   A   Again, it'd be a guess, but I believe Dr. Boone was
10       it at one time since I've been here.  I know Dr.
11       Hoover has been the peri-natal section chair at one
12       time when I was here.  Who else has been on it in
13       the nine years, I couldn't tell you.
14   Q   Okay.  Do you know how those section chairs are
15       appointed?
16   A   No.
17   Q   Okay.  Do you know how the peer review committees
18       are appointed?
19   A   No.  I don't know how any committee is necessarily
20       appointed like what the rules are.
21   Q   Okay.
22   A   I do know that if someone is eligible for the
23       committee, I can speak for myself, I received a
24       phone call from a gentleman named Jason Fancey who
25       was here at the time, he was a pathologist, and he
```

22

```
 1       said you're eligible to be on committees now, do
 2       you want to be on committees because we'd like to
 3       put, you know, get your name out there for a
 4       committee.  And that was the sum total of the
 5       discussion.
 6   Q   Okay.
 7   A   The rest of what happened behind the scenes, I
 8       could not tell you.
 9   Q   Okay.  Do you or Aiken OB/GYN receive any funds
10       from ARMC or any subsidies from ARMC?
11   A   I don't receive any subsidies from ARMC at this
12       time.  When I was first in town, I believe my
13       salary was supplemented when I first got here, but
14       all that money had to be repaid and has been
15       repaid.  But at this time we have no monetary
16       agreements, to my knowledge, with Aiken Regional,
17       at this time, as far as I know.
18   Q   And when you say we, do you mean you and Aiken
19       OB/GYN?
20   A   I mean the practice as far as I know has not, has
21       no monetary agreement with them, as far as I know.
22   Q   Your all's office, is that a private office?
23   A   It's a private office.
24   Q   Have y'all ever rented space from ARMC?
25   A   I'm not sure, to be honest with you.  I know that
```

23

```
 1       at one time before I was really a partner there, I
 2       was more an associate, there was some thought of
 3       possibly seeing patients on the south side.  And we
 4       saw patients on the south side for one or two
 5       sessions, I'm not sure who owned that property.
 6   Q   And that raises another question.  I guess, in 2002
 7       when you came to Aiken OB/GYN you were an
 8       associate, when did you become a partner of that
 9       practice?
10   A   My associate term lasted one year.
11   Q   Okay.
12   A   And then in order to pay my way in, I actually
13       chose to do time, which was three years as opposed
14       to a formal buy in.
15   Q   So four years before you became partner?
16   A   Uh-huh.
17   Q   So in 2006, I guess?
18   A   Uh-huh.
19   Q   Okay.  And is that an equal partnership, are all ---
20   A   What does that mean?  Because practices really
21       aren't worth anything today.  It means we all get
22       the same pay, we all get the same benefits.
23   Q   I mean, how do you all ---
24   A   And I believe Dr. Boone and Boehner own that
25       property, but I don't own property.
```

24

```
 1   Q   Okay.
 2   A   Right.  But as far as bills, we share in the bills,
 3       as far as pay, we share in the pay.  As far as, you
 4       know.
 5   Q   Well, in terms of pay, do you all, do you take home
 6       what you bring in or is it literally what the
 7       practice earns you split three ways?
 8   A   It's what the practice earns.
 9   Q   Okay.
10   A   We take a salary is how that works, we have a
11       monthly salary and then we pay the bills with the
12       rest.  That's how our partnership works.
13   Q   Okay.
14   A   We operate --- I guess I'll just stop there.
15   Q   How many people do you have on staff right now, at
16       your practice?
17   A   I hope I'm not missing anybody, I could start
18       counting.
19   Q   We won't tell them.
20   A   Are you talking about front people, back people?
21   Q   How about if you can break it up, then break it up
22       for me.
23   A   Okay.  We have three physicians at this point.
24   Q   Okay.
25   A   There's myself, there's Dr. Boone, there's Dr.
```

25

1   Boehner. There's two nurse practitioners at this
2   point, there's Andriena Angle and Janet Powell. We
3   have two managers, we have a nursing manager, her
4   name is Jeannie Parkman and under Jeannie are all
5   the medical staff and that includes two
6   ultrasonographers, and there's Beth, Jennifer,
7   gosh, there's what's her name's nurse, Heather,
8   Andrea, I believe four.
9   Q   Okay.
10  A   Because she doubles as managing as well as seeing
11      patients. And then front office staff there is
12      Melissa, there's Callie, there's two other people
13      in the back. And then in the front there's check
14      in, forms, surgery scheduling, check out, phones,
15      and the float, so how many ever that was.
16  Q   Okay.
17  A   That's what I believe, at this point.
18  Q   Do you have privileges at any other hospitals?
19  A   No.
20  Q   Okay. Do you know if Boehner or Boone have
21      privileges at any other hospitals?
22  A   Hospitals, no, I don't believe so.
23  Q   Okay.
24  A   Hospitals, no.
25  Q   Okay. Your answer seems to indicate that there's

26

1   something other than hospitals.
2   A   I'm saying does the surgery center count, we can
3       operate at the surgery center too.
4   Q   Okay. So no other hospital privileges, --
5   A   No.
6   Q   -- but privileges at the surgery center.
7   A   At the surgery center, we can post cases there.
8   Q   Okay. And do you have privileges at the surgery
9       center also?
10  A   I can post cases at the surgery center.
11  Q   Are you a member of the surgery center?
12  A   No.
13  Q   Okay. Have you ever been a member of the surgery
14      center?
15  A   You mean financial partner, no.
16  Q   No. And why, you seem, why the expression in that
17      answer, I guess?
18  A   I've just, I didn't choose to participate because I
19      wasn't sure how it would work financially.
20  Q   And I guess there's been a lot of controversy
21      between the hospital and the surgery center and
22      maybe that's where some of your ---
23  A   No, that's not. I don't know about any controversy
24      between the hospital and the surgery center. I
25      know of none.

27

1   Q   Okay.
2   A   I'm talking about from my personal pocketbook, I
3       did not see how what was coming out of my
4       pocketbook and all of the people who were going to
5       do the surgery center, how that was going to work
6       financially, period.
7   Q   Okay.
8   A   Nothing to do with ARMC.
9   Q   Were you here when, I guess, ARMC sold their
10      portion of the surgery center to the physicians
11      that were the, I guess, the current partners?
12  A   I didn't know that happened. Once I chose not to
13      participate financially, the details of what
14      happened in the surgery center didn't have anything
15      to do with me.
16  Q   Okay. Are Boehner and/or Boone members of the
17      surgery center?
18  A   They are.
19  Q   Okay. Mark that Exhibit No. 1, I guess.
20
21          (Whereupon, Email, consisting of 1 page,
22          was marked Exhibit No. 1 for
23          identification.)
24
25  Q   Exhibit No. 1 was just handed to you. Have you

28

1   ever seen this email before?
2   A   I saw this email today.
3   Q   Okay. Do you know if Dr. Boehner has sold his
4       share of the surgery center?
5   A   I have no idea if he sold it.
6   Q   Do you know why he's selling his share?
7   A   I don't know the answer to that specifically. I
8       believe the reason is, is it just didn't work out
9       with our schedules and the way things were being
10      posted to continue.
11  Q   Okay.
12  A   And I believe that their agreement, and this is
13      just all guessing, that you have to operate a
14      certain percentage out of the surgery center in
15      order for them to want you to continue to be a
16      monetary partner.
17  Q   Okay.
18  A   And I don't believe that the two of them operated
19      enough for the surgery center.
20  Q   I'm sorry, so did you say that Dr. Boone was also a
21      partner in the surgery center?
22  A   (Non-verbal Response)
23  Q   Okay. Sorry, you have to say yes or no.
24  A   Yes.
25  Q   Okay. Do you know if his shares are also for sale

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

29

1   or have been sold?
2   A   I don't know if they've been sold.
3   Q   But they're --
4   A   I don't know if they're up for sale, I don't have a
5       piece of paper in front of me saying they are.
6   Q   Okay.  How often do you operate out of the surgery
7       center?
8   A   In the last six months, I would say zero.
9   Q   Okay.  In the six months prior to that, how much?
10  A   I couldn't guess, but it would be very close to
11      zero.
12  Q   Okay.
13  A   Me personally, with running back and forth, it just
14      didn't work for me.
15  Q   So in the last year, you haven't, you don't think
16      you've really --
17  A   I don't believe so.  I don't know what day my last
18      case was over there.  For me, it just didn't work.
19  Q   Okay.  Did you ever operate out of the surgery
20      center on a, I guess, a frequent basis?
21  A   Never frequently.  I may have posted a case or two,
22      it'd be under ten there.
23  Q   So under ten total in your entire span?
24  A   In my entire career.  It just did not work for me.
25  Q   Okay.  What about, do you know if Dr. Boone or Dr.

---

30

1       Boehner have been operating out of the surgery
2       center?
3   A   I don't believe they have been operating.
4   Q   Okay.
5   A   At least not that I've assisted them.  We tend to
6       assist each other on almost every case, but their
7       minors, D&Cs that don't require assistance, I mean,
8       I don't know the answer to that but they could have
9       posted, but I don't believe so.
10  Q   Okay.  That's fine.  The medical staff bylaws, I
11      guess, are you familiar with them?  And I can go
12      ahead and hand you them just so you have them.
13      Mark that Exhibit No. 2.
14
15          (Whereupon, Medical Staff Bylaws,
16          consisting of 156 pages, was marked
17          Exhibit No. 2 for identification.)
18
19  Q   Do you recognize Exhibit No. 2 that's been handed
20      to you?
21  A   I recognize the front sheet.
22  Q   Okay.  I guess you can flip through it if you want,
23      but does that appear to be the Aiken Regional
24      Medical Center's medical staff bylaws?
25  A   It appears to be the copy that you've given me,

---

31

1       yes.
2   Q   Okay.  Are you familiar with how these are enacted,
3       I guess?
4   A   I could not tell you, no.
5   Q   Okay.  Have you voted on them before?
6   A   Yes.
7   Q   Okay.  Do you know when?
8   A   No.
9   Q   In the time that you've been here, which I guess is
10      -- And I'm assuming you've had privileges at ARMC
11      from 2002 until the present, is that correct?
12  A   Yes, sir.
13  Q   So in that time, do you know how many times
14      you voted on the medical staff bylaws?
15  A   No.  I know that there are pieces of paper that
16      come over, a section that they want you to look
17      over and if you have any objections you raise them,
18      but how many times I've voted, I could not give you
19      an answer to that.
20  Q   Okay.  And does that voting also occur at your, I
21      guess, medical staff meetings?
22  A   I don't know if that's the only voting, I couldn't
23      tell you.
24  Q   Okay.  And I'm assuming the medical staff meetings
25      are just the physicians in the hospital, is that

---

32

1       correct?
2   A   The CEO is there and staff people are there, like
3       Terri and Sharon.
4   Q   Okay.
5   A   They're at the meetings.
6   Q   Do you know if they vote though?
7   A   I don't believe they vote, but I don't know the
8       answer concretely to that.
9   Q   I guess nurses aren't at the, the nurses don't vote on
10      these types of issues or things like that, right?
11  A   Not that I know of.
12  Q   Okay.  This is Exhibit No. 3.
13
14          (Whereupon, Letter, consisting of 7
15          pages, was marked Exhibit No. 3 for
16          identification.)
17
18      MR. DAYHUFF:  Is this the September 14th letter?
19      MR. DICK:  Yes.
20
21  Q   All right.  Do you recognize Exhibit No. 3 that was
22      just handed to you?
23  A   Yes.
24  Q   Okay.  And what is that?
25  A   This is a letter that members of the medical staff

---

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**33**

1    wrote to Mr. Miller at UHS about a turnover in the
2    pathology department.
3  Q  Okay. And I guess flip to page, I think, there's
4    no page numbers but I believe it is page five.
5  A  Yes.
6  Q  Second signature from the bottom, is that your
7    signature there?
8  A  That is mine.
9  Q  Okay. What was, I guess, could you explain the
10    situation that arose that caused the medical staff
11    to write this letter and for you to sign it?
12  A  For me to sign it was there was a turnover in the
13    pathology department. The details of why there was
14    a turnover, I was not privy to, but I knew that our
15    pathologists were leaving and I like our
16    pathologists, or liked the pathologists, I thought
17    they did good work and I was sad to see them go.
18    And I was hoping we could, you know, the hospital
19    and the group could work out whatever their
20    differences were so that they could stay and
21    continue being pathologists.
22  Q  Okay. Do you know if there was ever any resolution
23    to that situation?
24  A  I don't believe there was one. I know that the
25    pathologists still work in town, they operate their

---

**34**

1    lab in town and there's a new group of pathologists
2    here.
3  Q  Okay. Is that lab, is that in the same building
4    that you're in or is . . .
5  A  I think so. I'm not sure where the lab is located,
6    I think it is. They send a courier around we don't
7    drop off our specimens.
8  Q  Okay. Do you send stuff to, or sorry, stuff is not
9    a very good term, but do you send, I guess,
10    pathological work to that prior group, and I think
11    that is Denise Parnell and Bonnie Szymik, is that
12    correct?
13  A  We do send pathology specimens to Dr. Parnell, Dr.
14    Szymik, and Dr. Fancey, yes.
15  Q  Okay.
16  A  We send our, some of our lab --- I mean, I know
17    people use the labs and the patients use the lab in
18    that building, and that's one of the labs in the
19    building.
20  Q  Okay. Do you send your pap smears to them?
21  A  Yes, sir. We send some pap smears there.
22  Q  Okay. Do you also use the hospital's in-house
23    pathologists?
24  A  Yes. All surgical specimens must go to the
25    pathologist, you can't take them outside of the

---

**35**

1    building.
2  Q  Okay. So anything removed during surgery has to go
3    to the ARMC pathologist?
4  A  Yes.
5  Q  Okay. Well, I don't know these types of things.
6    You act very, very like it's a matter of fact but
7    ---
8  A  You can't just take a uterus out of the building,
9    you have to ---
10  Q  Well, clearly they bring in hearts and all sorts of
11    things from outside the building, so it's ---
12  A  Well, yes, those are for transplant, those are not
13    for surgical specimen.
14  Q  Okay.
15
16    MR. DAYHUFF: Have you been taking organs out
17    here when you leave?
18    MR. DICK: Yeah. Slipping a heart in my back
19    pocket, you know.
20
21  A  They do not allow you to take them out of the
22    building.
23  Q  Okay. Do you know what the policy reasons for that
24    are?
25  A  I do not know what the policy reasons are. I could

---

**36**

1    assume they were for contamination issues.
2  Q  Okay.
3  A  I'm sure the population wouldn't like us to be
4    taking uteruses out with us in a back pocket.
5  Q  I mean, is there a written policy on that or is it
6    just that's how it's always been done, or . . .
7  A  It's on the consent form, I believe it says
8    specimens are sent to pathologists. The one you
9    have, that's the one I've been using since I've
10    been here.
11  Q  Okay, all right. How long have you known Dr. Muniz
12    for?
13  A  I've known her since I've been here.
14  Q  Since 2002?
15  A  2002.
16  Q  When you came in 2002 who was she working for or
17    with, do you remember?
18  A  I believe she was working with Dr. Besson.
19  Q  And have you ever worked with Dr. Muniz?
20  A  I was never in practice with Dr. Muniz.
21  Q  Okay. Have you ever performed surgery with Dr.
22    Muniz?
23  A  I have been here when I've called her back once
24    because one of her patients was bleeding.
25  Q  Okay. Have you ever taken call with Dr. Muniz?

---

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

37

1    A    Our practice took call with Dr. Muniz, yes.
2    Q    Okay.  When was that?
3    A    Exact years I could not tell you, but it has been
4         in the time since I've been here.  It was after she
5         and Dr. Besson no longer took, were in partnership
6         together and she joined Dr. Hoover.  She and Dr.
7         Hoover had their separate practice and our group
8         had call with them.
9    Q    Okay.  Do you remember how long that was for?
10   A    No.
11   Q    Six months, year, any kind of estimate?
12   A    It was over a year but I couldn't give a
13        guestimate, I'd have to look at documents for that.
14   Q    And why did you all stop taking call with that
15        group?
16   A    It just didn't work out.  We still take call with
17        Dr. Hoover but we decided, as a group, that it was
18        not in our best interests to continue to take call
19        with Dr. Muniz.
20   Q    Okay.  And why was it not in your best interest?
21   A    Because some of the patients and some of the
22        patient care problems were occurring and we just
23        didn't want to continue that relationship.
24   Q    Was that a unanimous decision by your partnership,
25        I guess, to stop taking call with --

38

1    A    We all decided together.
2    Q    Was there anything in particular, any specific
3         incidents that made you all stop taking call with
4         Dr. Muniz?
5    A    There were many instances, some of the patients did
6         not like her, some of the patients wanted us to
7         come in and take call for them specifically when
8         they heard she was on call, and there were some
9         patient care issues, there were also some issues
10        with us having to take call for some of her
11        patients and we just didn't want to continue the
12        relationship.
13   Q    What would you say your relationship with Dr. Muniz
14        is?
15   A    We don't have a relationship.
16   Q    Okay.  What would you say your, I guess, your
17        feelings towards each other are?  What are your
18        feelings toward Dr. Muniz?
19   A    We don't have a relationship at all.  I would never
20        say that we'd go to dinner and eat together or
21        anything like that.  Colleagues, that's it.
22   Q    Okay.  I guess turning now to your involvement with
23        these peer review processes that involved Dr.
24        Muniz, and, again, I'll refer to them as a peer
25        review process.  I know that's general and involves

39

1    many steps and I'll try to be specific when I need
2    to be, but I believe you were directly involved in
3    both the second and first peer review actions
4    against Dr. Muniz, is that correct?
5    A    Do you mean my involvement with the medical
6         executive committee level?
7    Q    Yes.
8    A    That's it.
9    Q    Okay.  That was your only involvement in --
10   A    In the first one just being on the medical
11        executive committee.
12   Q    Okay.  Let me -- Is that Exhibit No. 4, is that
13        right?
14
15             (Whereupon, Peer Review Minutes,
16             consisting of 6 pages, was marked Exhibit
17             No. 4 for identification.)
18
19   Q    All right.  Exhibit No. 4, I just want to make
20        sure, I think I know your answer, were you involved
21        in any of these, and take your time and look
22        through them, any of these meetings of the medical
23        peer review?  It says medical peer review on the
24        top and medical peer review committee on a couple
25        of them.

40

1    A    I was not on the medical peer review committee
2         ever.
3    Q    Okay, all right.  That's fine, I just wanted to
4         make sure that was the case.  I'm going to hand you
5         Exhibit No. 5.
6
7             (Whereupon, MEC Minutes, consisting of 5
8             pages, was marked Exhibit No. 5 for
9             identification.)
10
11   MR. DAYHUFF:  You need a break?
12   THE WITNESS:  No.  I'm just waving the fly.
13   MR. DICK:  Yeah.  They're back.
14
15   Q    All right.  Exhibit No. 5, take a minute, I guess,
16        and flip through these but do you recognize these
17        documents?
18   A    Okay.  I see the minutes.
19   Q    Okay.  Are these, I guess, the minutes for the
20        medical executive committee?
21   A    As far as I know.
22   Q    Okay.
23   A    I don't take the minutes though, but as far as I
24        know.
25   Q    Okay.  And you would have been on the medical

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

41

1    executive committee at this time?
2    **A  Yes, sir.**
3    Q   Okay.  I guess just looking at them individually,
4        this first, the first page and it says at the
5        bottom there just for the record ARMC0007, it
6        indicates that you were present for this meeting.
7    **A  Okay.**
8    Q   Do you, I guess, recall discussion of - and you're
9        going to have to help me pronounce that first word
10       iatrogenic -- bladder?
11   **A  Iatrogenic.**
12   Q    -- bladder laceration with repair that required
13       return to surgery.  Recommendation is not clear on
14       details.  Defer recommendation until another report
15       from peer review next month.  Do you recall, is
16       that involving Dr. Muniz?
17   **A  I don't know which physician this is involving.**
18   Q   Okay.
19   **A  Because it doesn't say right here.**
20   Q   Okay.  So I'm assuming then you don't recall any
21       talks about this bladder laceration?
22   **A  Mr. Dick, in my time on the peer review, there were**
23   **many, many discussions about problems associated**
24   **with this particular surgeon, so what was discussed**
25   **on any particular date I could not tell you in any**

42

1    **details.  But there was discussion at meeting,**
2    **after meeting, after meeting, after meeting about**
3    **various surgical issues.**
4    Q   Okay.  It says defer recommendation until another
5        report from peer review, how generally did you all
6        operate in terms of, I guess, if there were
7        problems presented to you?  Would you all not,
8        would you wait for a, I guess, a report from peer
9        review and then the medical executive committee
10       would act on it?  I guess I'm trying to ask what
11       the process of, the peer review process, how it
12       worked and when the MEC and your involvement came
13       into play?
14   **A  My understanding is that there's certain criteria**
15   **that's for all surgeons, in which if that occurs a**
16   **report is generated in that regard.  And then those**
17   **reports are then referred to medical peer review**
18   **and medical peer review talks about those reports.**
19   **And every person who operates in this building,**
20   **their medical complications and their surgical**
21   **complications, there are a few extra for**
22   **obstetricians because it involves a baby, things**
23   **like lacerations, delivery before a certain**
24   **gestational age, transfer of infants, that would**
25   **not apply, for example, to an internist because**

43

1    **they don't deliver babies.  But all of these things**
2    **are there and every person has to, if you fall in**
3    **that criteria, a report's generated on you, if I**
4    **fall into it, a report's generated on me.  And**
5    **there are multiple members of the committee that**
6    **look at that piece of paper and staff that's on**
7    **there that trends those pieces of paper.  And then**
8    **some of those things come up to the medical**
9    **executive committee and we deal with what's given**
10   **to us at the medical executive committee level.**
11   **And then what we feel, it goes up to the board,**
12   **then it goes up to the board.**
13   Q   Okay.
14   **A  That's my understanding.  I don't know if that's**
15   **the truth, but that's my understanding.**
16   Q   Okay.  Mark this Exhibit No. 6.
17
18           (Whereupon, Peer Review Form, consisting
19           of 2 pages, was marked Exhibit No. 6 for
20           identification.)
21
22   Q   In Exhibit No. 6 that was just handed to you, is
23       this an example of one of those, I guess, reports
24       that's generated if certain criteria are met?
25   **A  I've actually never seen one of these forms.  I**

44

1    **thought it was on computer, so this --- I could not**
2    **tell you.**
3    Q   Okay.  So you --
4    **A  I've never been on peer review to receive one of**
5    **these forms.**
6    Q   Okay.  So you don't receive these from peer review
7        then from the MEC?
8    **A  No.**
9    Q   So what do you receive from peer review then?
10   **A  We receive a summary from the peer review chair**
11   **person who's on MEC.**
12   Q   Okay.  Is that like the minutes or is this
13       literally an incident specific summary?
14   **A  At times it's incident specific.**
15   Q   Okay.
16   **A  Where a summary is made.**
17   Q   Okay.
18   **A  We never see these forms.**
19   Q   And I'm guessing looking at exhibit No. 6, you
20       know, are you familiar with Dr. Boone's signature,
21       is that his signature?
22   **A  I can't verify his signature.  I won't verify his**
23   **signature.**
24   Q   Okay.  Regardless, I guess, since you say you've
25       never seen this document, you've never filled one

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

| | 45 |
|---|---|
| 1 | of these out then? |
| 2 | **A   No.** |
| 3 | Q   Okay.  Do you know who does generally fill these |
| 4 | out? |
| 5 | **A   I don't know who fills them out.** |
| 6 | Q   Okay. |
| 7 | **A   I believe it's the people on the peer review who** |
| 8 | **fills them out.** |
| 9 | Q   Okay, all right.  Turning back to Exhibit No. 5 |
| 10 | then, if you flip to page two, it says Dr. Paxton |
| 11 | presented the attached recommendation from peer |
| 12 | review.  I'm guessing that's what you mean and we |
| 13 | don't have the attachment, we never got it. But I'm |
| 14 | assuming the attached recommendation from peer |
| 15 | review is what you were just speaking of is you |
| 16 | would get some kind of recommendation or report |
| 17 | from the peer review, is that correct? |
| 18 | **A   We get a report from peer review.** |
| 19 | Q   Okay.  And this one says motion was made and |
| 20 | seconded to send recommendation back to peer review |
| 21 | committee for reconsideration due to the absence of |
| 22 | documentation and time limit issues.  Motion |
| 23 | carried.  What does that mean? |
| 24 | **A   I'm not sure what it means in this case.** |
| 25 | Q   Okay. |

| | 47 |
|---|---|
| 1 | MR. DICK:  Yeah. |
| 2 | MR. DAYHUFF:  But you're right, that doesn't look |
| 3 | like a Nelson Mullins Bates. |
| 4 | MR DICK:  Yeah.  That's not a Bates labeling from |
| 5 | this case, so . . . |
| 6 | THE WITNESS:  Is that something that involves me, I |
| 7 | don't know what you're talking about? |
| 8 | MR DICK:  No, no.  I just don't want -- because |
| 9 | Bates number 9 would actually be part of the |
| 10 | medical staff bylaws in this physician.  When I |
| 11 | don't want the record to be confused there, |
| 12 | but it's probably more confused now. |
| 13 | |
| 14 | Q   Okay.  This, I guess, third page of Exhibit No. 5, |
| 15 | says peer review has had four people working on |
| 16 | these cases for eight months, again, see attached |
| 17 | document, which we don't have.  Peer review |
| 18 | recommendation is to terminate medical staff |
| 19 | privileges for this physician.  When it says peer |
| 20 | review has had four people working on these cases |
| 21 | for eight months, what is that referring to? |
| 22 | **A   I couldn't tell you because I didn't write those** |
| 23 | **words.  But what I remember is that there was a lot** |
| 24 | **of discussion over many, many, many months, many** |
| 25 | **months, many months, about various issues** |

| | 46 |
|---|---|
| 1 | **A   I have no idea.  At times, if we don't feel we have** |
| 2 | **enough information we do ask them to go back and** |
| 3 | **bring some more.  And I don't know if that's what** |
| 4 | **this means in this case, but I do know of being at** |
| 5 | **meetings where we didn't feel there was enough** |
| 6 | **information and we said you need to bring something** |
| 7 | **else here.** |
| 8 | Q   Okay.  So sometimes you would send the review's |
| 9 | recommendations back down to the peer review? |
| 10 | **A   Uh-huh.** |
| 11 | Q   Okay, all right.  Flip over to page three which is, |
| 12 | I guess, listed as ARMC0009.  Just for the record |
| 13 | so it doesn't get confused, I don't think those are |
| 14 | the same Bates as --- |
| 15 | |
| 16 | MR. DAYHUFF: It's not my Bates. |
| 17 | MR. DICK:  Yeah.  It's a different Bates numbering |
| 18 | then. |
| 19 | MR. DAYHUFF:  It may be a Bates number that was |
| 20 | used during the peer review hearing at the |
| 21 | hospital. |
| 22 | MR. DICK:  Yeah. |
| 23 | MR. DAYHUFF:  It could have been a Bates used by |
| 24 | the McNair Law Firm if they produced stuff to |
| 25 | you before I got involved. |

| | 48 |
|---|---|
| 1 | concerning this surgeon and other cases.  I mean, |
| 2 | peer review works all the time because, again, |
| 3 | these reports are generated all day long, so it |
| 4 | could be this or it could be all kinds of cases.  I |
| 5 | mean, they have to meet every month over all kinds |
| 6 | of cases.  There were many discussions about this |
| 7 | physician. |
| 8 | Q   I mean, clearly, I mean, the reason we're here |
| 9 | today is because at some point I'm assuming you |
| 10 | voted to terminate Dr. Muniz's privileges over -- |
| 11 | **A   In the 2008 proceeding if you flip here to the** |
| 12 | **back, it says there was, motion was carried with a** |
| 13 | **vote of six yes and one no.  And if you count there** |
| 14 | **are one, two, three, four, five, six, seven, eight,** |
| 15 | **nine people.  And I was an abstaining vote, I chose** |
| 16 | **to abstain from this vote.** |
| 17 | Q   Okay. |
| 18 | **A   And the reason I chose to abstain from that vote is** |
| 19 | **because I didn't want to be here.  Because I did** |
| 20 | **not want anyone to say there was any type of** |
| 21 | **impropriety and I did not vote to terminate her** |
| 22 | **privileges at the 2008 session.** |
| 23 | Q   Okay.  You know, my question though is, you know, |
| 24 | they say they've got four people working on these |
| 25 | cases for eight months and I'm trying to ask you |

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

49

1    what your --- I mean, obviously it was a while ago
2    and I understand that there's ---
3  A  Uh-huh.
4  Q  --- it's hard to remember, but I'm trying to ask you
5    what your recollection of the discussion involving,
6    you know, these five cases that occurred over a
7    couple months in 2008.
8  A  **It wasn't just five cases, the five cases were some**
9    **of the issues concerning peer review, there were**
10    **way more than five cases.  There were five that**
11    **were sent out for outside review, but underneath**
12    **that were many, many, many instances that were**
13    **brought as reasons.  From my recollection the five**
14    **cases was a representative section.**
15  Q  This is the October 30th letter, Exhibit No. 7.
16
17        (Whereupon, Letter, consisting of 2
18        pages, was marked Exhibit No. 7 for
19        identification.)
20
21  Q  Have you ever seen this document, Exhibit No. 7?
22  A  **I see it today.**
23  Q  Okay.  Can you just read the first paragraph on
24    that page, read it out loud if you will?
25  A  **On October 28th the medical executive committee,**

---

50

1    **"the committee" considered the recommendation of**
2    **the medical peer review and the recommendation from**
3    **independent reviewer concerning patient charts, and**
4    **they list those charts.  On the basis of these**
5    **reports, the committee recommended that your**
6    **privileges be terminated.**
7  Q  So does it indicate anywhere on there that her
8    privileges are being terminated for something other
9    than those five charts?
10  A  **I don't know anything about this letter.  I did not**
11    **write this letter, so you'd have to ask the writer**
12    **of this letter what her, what she meant by that.**
13    **But I'm telling you, as a member of the committee,**
14    **that only five cases were sent out but there were**
15    **way more than five cases.**
16  Q  Has it ever been indicated to Dr. Muniz that she
17    was being terminated for more than those five
18    cases?
19  A  **I don't know what's been ---**
20
21    MR. DAYHUFF:  Object to the form of the question,
22    that misrepresents the facts in evidence on
23    the record.  You can answer.
24
25  A  **I don't know what's been represented to Dr. Muniz.**

---

51

1  Q  Okay.
2
3    THE WITNESS:  I'm going to have to pee soon.
4    MR. DICK:  You want to take a break?
5    MR. DAYHUFF:  Let's take a break.
6
7        (Short Break)
8
9  Q  All right.  Before the break we were looking at
10    Exhibit No. 5 here.  Turn to the, I guess, fourth
11    page of Exhibit No. 5.
12  A  **Okay.**
13  Q  Should have a ten at the bottom there.
14  A  **Yes, sir.**
15  Q  Okay.  In the middle of the second paragraph there
16    it says suggestions were that Dr. Muniz get
17    additional training.  There were also suggestions
18    to find out if there were any physical problems.
19    Is there a reason the MEC recommended to terminate
20    her privileges immediately rather than provide some
21    kind of remedial training or remediation?
22  A  **Are you referring to this little piece of paper**
23    **right there?**
24  Q  Well, I'm asking on this piece of paper, there
25    seems to be discussion that Dr. Muniz be required

---

52

1    to get additional training.
2  A  **Uh-huh.**
3  Q  Yes?
4  A  **Just suggestions, not that she be required.  I**
5    **don't know the answer to that as to why we chose**
6    **that versus something else.  I can't remember all**
7    **the particulars unless you give me some**
8    **documentation from that.  I can't remember all of**
9    **the particulars.**
10  Q  Okay.  Well, is it normal to immediately terminate
11    a physician without providing some kind of
12    remediation or additional training or something
13    along those lines?
14
15    MR. DAYHUFF:  Object to the form of the question.
16    You can answer.  It's all right.  There will
17    be objections periodically through the
18    testimony.
19    THE WITNESS:  And what am I supposed to do?
20    MR. DAYHUFF:  Just let me put it on the record.
21    It's something for me to put on the record and
22    then you can answer after I finish, okay?  So
23    go ahead.  And I know that's hard to get used
24    to, I'm sure.  Do you remember his question?
25    THE WITNESS:  Am I supposed to say something

---

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

53

```
 1        different?
 2    MR. DICK:  No, no.
 3    MR. DAYHUFF:  No.
 4    THE WITNESS:  I know I'm supposed to say the truth
 5        but am I supposed to not answer a part, I
 6        don't understand.
 7    MR. DAYHUFF:  The only time you wouldn't answer is
 8        if I instruct you not to answer.
 9    THE WITNESS:  Okay.
10    MR. DAYHUFF:  Otherwise I'm just preserving
11        something on the record.
12    MR. DICK:  Otherwise, yeah, ignore him and answer
13        it.
14
15  A   Okay.  So what was the question?
16  Q   The question was do you typically terminate a
17        doctor's privileges without providing some kind of
18        ability to obtain additional training or some other
19        remedial remedy?
20  A   I wouldn't know what's typical across other
21        hospitals, I just know what occurred in this case.
22        And in this person with this series here, which is
23        that there were many, many, many, many months and I
24        know that Dr. Muniz appeared before the MEC more
25        than one time in those months.  The details of
```

54

```
 1        every single discussion, I couldn't tell you and
 2        the details of what this person was offered, I
 3        couldn't tell you.  But in this proceeding I
 4        believe the end result was that, what occurred in
 5        between that, I couldn't tell you.
 6  Q   And when I say typical, I'm not referring to other
 7        hospitals, I'm saying in the four years that you
 8        were on MEC --
 9  A   Uh-huh.
10  Q   -- would that have been typical to immediately
11        terminate a physician?
12  A   This hospital doesn't have a lot, I mean, a whole
13        bunch of physicians that have a whole bunch of
14        problems that would come to that level.
15  Q   Okay.  In the four years that you were on MEC, did
16        you all ever terminate any other physicians?
17
18    MR. DAYHUFF:  Let me caution you.  He's asking you
19        a question but --
20    MR. DICK:  Don't say who it would be or any
21        details.
22    MR. DAYHUFF:  Any specialty or anything that would
23        identify.
24    THE WITNESS:  Okay.
25
```

55

```
 1  A   I believe that there were issues with other
 2        physicians at the facility, the exact number of
 3        physicians I couldn't tell you.  At times some
 4        people did appear before MEC and at times, I
 5        believe - and, again, I believe, this is just going
 6        way back and attempting to form an answer here -
 7        that they left, that there wasn't all of this.  All
 8        of this did not occur with those physicians.
 9  Q   Okay.  So is it your recollection then that no
10        other physicians were terminated by the MEC or
11        privileges were --
12  A   My recollection is that there are physicians who
13        had issues, there were physicians who had
14        significant issues in which they were called on
15        those issues and they no longer work at this
16        hospital.  That's my recollection.
17  Q   Okay.
18  A   Whether they were terminated or whether they just
19        chose to leave, I couldn't tell you the details of
20        that.
21  Q   Okay.  Do you know if the MEC recommended the
22        termination of any of those physicians?
23  A   I do not recall any of that, because there's no
24        paperwork in front of me.
25  Q   Okay.  Well, obviously, I mean, terminating a
```

56

```
 1        physicians's privileges is a fairly significant
 2        event in a physician's career and even at a
 3        hospital, correct?
 4  A   Oh, absolutely.
 5  Q   Okay.  So, I mean, I'm just asking if you, I mean,
 6        I would assume that you would remember terminating,
 7        you know, somebody's privileges because that's a
 8        pretty heavy, I guess, sanction to impose.  What
 9        you're saying is you don't remember if the MEC
10        recommended to terminate?
11  A   I can't remember whether or not any other physician
12        was necessarily, I know that there were many who
13        had problems and they were, had issues that they
14        had to discuss and they are no longer at this
15        facility.
16  Q   Okay.  Do you know if any of those physicians were
17        offered to seek training or proctoring or anything
18        of the like that would allow them to remain at the
19        hospital?
20  A   In my four years on the MEC, I cannot remember the
21        exact details of why those physicians were, are not
22        here anymore. But you'd have to ask people who were
23        here longer if there was any other cases, you know,
24        since they've been here, you'd have to ask them.
25  Q   Okay.  And, again, your answer may be that you
```

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**57**

1  don't know but I'm going to ask it anyway, aside
2  from the four years that you were on MEC, do you
3  know of any physician that was, whose privileges
4  were terminated while in your stay at ARMC from
5  2002 until the present?
6  A  I don't know the answer to why they're not here any
7     more.  I know that there have been physicians with
8     problems and those physicians no longer work here.
9  Q  Okay.  But I was just asking you --
10 A  The details, I don't know.
11 Q  -- I was expanding the time period from when you've
12    been here to --
13 A  The details of that I do not know.  I know that
14    there have been people with problems and the
15    details of those problems and the details of why
16    they're not here any more, I could not tell you.
17 Q  Okay.  Flipping to, I guess, looks like the last
18    page of Exhibit No. 5, I know you said you did not
19    participate in this vote, is that correct?
20 A  Yes, sir.
21 Q  Did you participate in the deliberations and
22    discussions regarding Dr. Muniz?
23 A  I participated in discussion, yes.
24 Q  Okay.  What was your recommendation regarding those
25    discussions?

---

**58**

1  A  They weren't recommendations, they asked me what my
2     impression of certain things were, and my
3     impressions was of great concern for patient
4     safety.
5  Q  Did you believe that Dr. Muniz should be
6     terminated?
7  A  I did not vote in that regard.  I had great --
8  Q  I know you didn't vote.
9  A  -- concern for patient safety.
10 Q  Okay.  My question is did you believe that she
11    should be terminated?
12 A  That question wasn't asked of me that day.
13 Q  But I'm asking you the question now.
14 A  It was a free vote.
15 Q  Did you believe that she should be terminated?
16 A  I believe Dr. Muniz has a serious problem, yes.
17 Q  So, again, the question is did you believe she
18    should be terminated?
19 A  Yes, I did.
20 Q  Okay.  In the second paragraph it says there was
21    much discussion.  Members agreed there was a
22    pattern of problems.  Dr. Muniz has a complication
23    rate much higher than her peers.  Do you know where
24    the statement Dr. Muniz has a complication rate
25    much higher than her peers came from?

---

**59**

1  A  I don't know where that came from, but I do know
2     that being on the committee and, again, receiving
3     information from the peer review committee up, that
4     there was a lot of discussion month after month
5     after month.  We hear about all of the significant
6     cases from the peer review committee, whether it
7     involves Dr. Muniz or any other practitioner that's
8     here.  And, you know, if you see someone one time,
9     okay, twice, okay, but it was almost every month in
10    which there was some discussion.
11 Q  And were these different cases they were discussing
12    or the same ones?
13 A  Sometimes the same, sometimes different.
14 Q  Do you know why they only sent out those five
15    cases, if there were so many others?
16 A  I believe that they chose five because you -- I
17    remember someone saying how can you send out that
18    many.  You just send this number and they sent that
19    number.
20 Q  So did they pick the worse ones then?
21 A  No, I don't believe.  I don't know how they picked
22    the five.  I wasn't part of picking the five.
23 Q  You think there were cases worse than the five that
24    they recommended to terminate her privileges on?
25 A  I know there were a lot of cases.

---

**60**

1  Q  Okay.
2  A  More than I felt --
3  Q  I mean, being on the MEC would it not be reasonable
4     to include the cases that were worse than these
5     five that are listed here?
6  A  I don't know how they chose the five.  I didn't
7     choose the five, I didn't choose the five.  The
8     five were chosen and were sent.
9  Q  Okay.  Are you aware of the outcome of that first
10    peer review hearing with Dr. Muniz?
11 A  You'd have to show me the paperwork for me to be
12    precise or even somewhat precise.  I know there was
13    some discussion about psychiatry.
14 Q  Okay.
15 A  I know there was some discussion about that.
16 Q  Okay.  After that first peer review hearing, was
17    there anymore discussion about Dr. Muniz?
18 A  Would you repeat that?
19 Q  After the first peer review hearing and --
20 A  Are you talking about --
21 Q  Let's say --
22 A  -- peer review hearing, are you talking about after
23    it left the MEC and then she had the panel thing?
24 Q  Yes.  I guess we can call, yeah, the peer review
25    panel we can call that.

---

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

61

1  A  But isn't that a different set of people?
2  Q  Yeah.
3  A  You go from the peer review committee to MEC, to
4     the board. And then it goes, if the physician
5     chooses, then there's a fair hearing, are you
6     speaking of that fair hearing?
7  Q  Right. After the first fair hearing which was on
8     the five cases that you and the MEC had recommended
9     her to be terminated on.
10 A  Right, uh-huh.
11 Q  Was there any further discussion by the MEC
12    regarding Dr. Muniz, after that time?
13 A  Only what was brought to us.
14 Q  Okay. And, I guess, I'll narrow it down, you know
15    that she was, again, I guess, precautionarily
16    suspended for an incident in 2010, is that right?
17 A  Right, uh-huh.
18 Q  Was there, between the time when that first peer
19    review panel hearing and the precautionary
20    suspension, was there any discussion about Dr.
21    Muniz in between that time?
22 A  I don't --- I couldn't tell you. If it's not on the
23    minutes, I couldn't tell you.
24 Q  Okay.
25 A  I couldn't tell you.

62

1  Q  All right. This is the February 25th letter,
2     Exhibit No.8.
3
4     MR. DAYHUFF:  Okay.
5
6        (Whereupon, Letter, consisting of 2
7        pages, was marked Exhibit No. 8 for
8        identification.)
9
10 Q  Do you recognize Exhibit No. 8?
11 A  Yes.
12 Q  Okay. And what is Exhibit No. 8?
13 A  It is a letter informing Dr. Muniz of the
14    precautionary suspension.
15 Q  Okay. And flipping over to the second page there,
16    is that your signature there?
17 A  Yes.
18 Q  Okay. So what was your involvement in this
19    precautionary suspension?
20 A  I received a phone call from Terri Ergle, there was
21    a case that had been brought and they wanted me to
22    immediately review what they had so far from the
23    medical record --
24 Q  Okay.
25 A  --- as the chairman of surgery. I believe they

63

1     attempted to call Dr. Boone who was the peri-natal
2     section chair at the time, and they couldn't get
3     him. And so I was at home at the time when I got
4     the phone call. And I came in and reviewed what
5     information they gave me.
6  Q  Okay. And, I guess, I can go back. Let's mark
7     Exhibit No. 9.
8
9        (Whereupon, Scoring Sheet, consisting of
10       2 pages, was marked Exhibit No. 9 for
11       identification.)
12
13 Q  Do you recognize Exhibit No. 9?
14 A  Yes, sir.
15 Q  Okay. And what is Exhibit No. 9?
16 A  Exhibit No. 9 is the scoring standard that they
17    gave me to use and some notes that I took
18    concerning the case.
19 Q  Okay. Is that your signature at the bottom of the
20    first page there?
21 A  Yes.
22 Q  And at the bottom of the second page?
23 A  Yes.
24 Q  Okay. You were just saying that Terri Ergle called
25    you and asked you to review a chart, is this, I

64

1     guess, your review of that chart?
2  A  Uh-huh.
3  Q  Okay. And you've circled care varied from best
4     practice did harm to patient, catastrophic adverse
5     outcome. And then you say other recommendations,
6     suspend summarily.
7  A  Uh-huh.
8  Q  So at that point you were recommending that she be
9     suspended summarily?
10 A  Uh-huh.
11 Q  Okay. And what was your reasoning for that?
12 A  I knew that Dr. Muniz was under 100 percent review
13    and that this was a significantly negative outcome
14    that a fetus, a baby had passed away and because of
15    that I felt it was prudent to stop. There were
16    some issues in the documentation that concerned me
17    and I felt we should just stop and she could
18    present her case further after stopping, no longer
19    taking care of the patient.
20 Q  Okay. For this report what did you review?
21 A  I reviewed, again, it's not in front of me, but I
22    believe I reviewed a fetal heart rate tracing, an
23    operative report, laboratory data, nursing notes
24    that were available at the time. I'm not sure if
25    the pathology report was available at that time,

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

65

1   but the operative report was available, nursing
2   notes, progress notes, nursing notes were all
3   available.
4   Q   Okay.  So all written material, you didn't speak
5       with anyone?
6   A   No.
7   Q   Okay.
8   A   I was brought, I went straight upstairs to
9       physician services and the stack of papers was
10      given to me.
11  Q   Okay.  Were you on the floor, at the time of this
12      incident?
13  A   I was all over the hospital that day, it was a
14      surgery day for me.  And I also had a high-risk
15      patient on labor and delivery that day, a vaginal
16      birth after caesarian in which the policy is that
17      we have to be around for that.
18  Q   Okay.  Were you aware that this incident was going
19      on, when you were on the floor?
20  A   I did not know the details of the incident.  I knew
21      that a patient, that patients were on labor and
22      delivery.  My patient was not the only patient on
23      labor and delivery.  I was looking at a record on
24      the floor and patients were walking up as I was
25      looking at my own records.

66

1   Q   Okay.  Did you ever see, while you were on the
2       floor, did you ever see the fetal heart tracing
3       strip or monitor for this patient?
4   A   I saw that and a whole bunch of others.
5   Q   Okay.
6   A   Because it's on a little screen, you know.
7   Q   Like at the nurse's station?
8   A   There's screens and I was in, most of the time I
9       was actually physically in my VBAC's room, because
10      she was having trouble.  She was kind of hung up
11      and the baby wasn't liking it, so I was in the, in
12      my patient room for a lot of what was going on that
13      day.
14  Q   Okay.
15  A   And back and forth to surgery.
16  Q   Okay.  Did you ever see the deceleration on this
17      patient that was on --
18  A   I saw a deceleration in one of the rooms, I
19      remember.  And I said to my nurse that was present,
20      I can handle what's happening here in our patient
21      room, I don't know if maybe you want to see if they
22      need some help.  And that was the sum total of any
23      discussion about any decelerations on the strip.
24  Q   Okay.  So you didn't ever go check it out or offer
25      your help or . . .

67

1   A   I was in a VBAC room.  I have to be with the VBAC
2       that was having trouble.
3   Q   Okay.  So the answer to my question is no then?
4   A   The answer to the question was that no one asked me
5       for any help.
6   Q   Okay.
7   A   And I was in a VBAC room at the time, so I don't
8       know how they could ask me for help.
9   Q   Well, I mean, when you see a heart rate tracing
10      like that, do you ever offer your support or . . .
11  A   It depends on what I have going on at the time.  At
12      the time, like I said, it was a surgery day, I had
13      a VBAC there.  If I was asked, would I have found a
14      way, absolutely.  But without knowing the details,
15      I don't just run up to every strip on the floor and
16      say hey, do you need help with that, especially
17      when there's people around to manage that.  I have
18      to manage my problem.
19  Q   So did any of the nurses ever talk to you about
20      this strip?
21  A   No, no.  Other than me saying that's a pretty large
22      decel, do you want to see if anyone needs some
23      help, that was it.
24  Q   Okay.
25  A   I saw when patients walked up to the desk and just

68

1   from the fair hearing, I know what the lady looked
2   like.
3   Q   You say from the fair hearing, what do you mean?
4   A   Uh-huh.  The mom --
5   Q   Yeah.
6   A   -- was at the fair hearing and I recognized her
7       walking up to the desk with another lady.
8   Q   Okay.
9   A   I recognized the mother.  And I had seen that face
10      before when I was sitting at the desk and a whole
11      bunch of patients were coming up.  And there just
12      wasn't enough room for me, so I picked up my things
13      and went around the corner.
14  Q   Okay.  As far as seeing that deceleration on the
15      monitor, did you ever, I mean, were you ever privy
16      to any of the other activities or actions that were
17      occurring in that patient's care?
18  A   No, other than the record.
19  Q   So this summary suspension was based on the fact
20      that Dr. Muniz was under 100 percent review and
21      there was a catastrophic outcome, I guess?
22  A   Yes, sir.
23  Q   So you just recommended out of, I guess, caution
24      that she be summarily suspended?
25  A   I was concerned about patient safety because this

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

69

1    was a big, negative outcome.
2    Q    Okay. Have you ever had a fetal death in your time
3         here?
4    A    No. Not like this, no.
5    Q    Well, I mean, at all, have you ever had a fetal
6         death?
7    A    No.
8    Q    Have there been fetal deaths at this hospital, in
9         your time here?
10   A    Not that I know of.
11   Q    So from 2002 until the present, you're unaware of
12        any fetal deaths that have occurred at ARMC?
13   A    I know of fetuses that were passed away before
14        ladies got here. I know of patients coming in
15        exsanguinating in the floor, literally, like before
16        they had an IV everything was pouring out onto the
17        floor. I mean, not that I can recall at this
18        point. I mean, in my entire career have I had
19        someone show up with fetal heart tones like that, I
20        mean, I couldn't answer that at this point. How
21        about that, that's the answer.
22   Q    Well, I mean, a fetal death, like you said, is a
23        fairly catastrophic event.
24   A    Uh-huh.
25   Q    You don't know, you can't remember an instance

70

1         where --
2    A    I think there have been fetal deaths, but I don't
3         believe there was two hours in between when the
4         person presented to the floor and the fetal death,
5         that I'm aware of. I think there have been fetal
6         deaths where the person was taken immediately for
7         delivery and the baby passed away, they did
8         everything they could. But I don't know of any in
9         which there was such a significant time delay
10        between presentation and infant death.
11   Q    But that's never occurred to you personally when a
12        baby has showed up, I guess, with a fetal heart
13        tone and then has not made it?
14   A    Not with two hours of time, no.
15   Q    Well, I'm not asking with two hours of time, I'm
16        saying has a baby shown up and presented with a
17        fetal heart tone and then --
18   A    Exsanguinated in the nursery or something like
19        that?
20   Q    Or expired, I guess, yeah.
21   A    I guess I'm not clear on your form of questioning,
22        I'll be honest with you. Because there are times
23        where someone comes in and you think you hear a
24        fetal heart tone and you take them to surgery and
25        the baby's already passed away. There has been no

71

1         time in which there was hours and hours on the
2         monitor and then you take them to surgery and the
3         baby passed away, to my knowledge.
4    Q    Well, I mean, the question is has there been a time
5         when a patient has presented and there has been or
6         at least appeared to be a fetal heart tone and the
7         baby has either been born stillborn or died
8         immediately after birth?
9    A    There have been times where the patient was taken
10        immediately to surgery and the baby has passed
11        away, but there has been no time in which there
12        were hours in which the patient was on the monitor
13        and the fetus was on the monitor that the baby
14        passed away that I am aware of.
15   Q    Okay.
16   A    That's my answer.
17   Q    In the instances when that has occurred, when
18        there's been a fetal heart tone and the baby has
19        expired, have you - if it's happened to you
20        personally - been summarily suspended for that or
21        has the, I guess, the physician that is handling
22        that case been summarily suspended for it?
23   A    As far as I know, all fetal deaths are reviewed by
24        peer review and the peer review process determines
25        whether or not they feel the patient has been

72

1         treated in what we feel is their best interests,
2         they determine that. So as far as I know.
3    Q    Okay.
4    A    As far as I know, as I've heard, it is -- I have
5         never heard of a case in which someone has been on
6         the monitor for this amount of time and the baby
7         passed away. I have never heard of one.
8    Q    So then why in this case -- so you say that the
9         fetal deaths are reviewed by peer review, why in
10        this case was it reviewed by you?
11   A    I believe it was reviewed by me, according to all
12        this paperwork, it was reviewed by a physician
13        member of peer review at the time. I believe the
14        chairman of peer review was aware of the case and I
15        believe a physician member of peer review also
16        reviewed the case, and then it came to me. It did
17        not come to me primarily.
18   Q    Okay. Have any of these other cases come to you
19        before though?
20   A    In my tenure?
21   Q    Yeah.
22   A    There were none. In my tenure, there were none
23        that came to me.
24   Q    How about has any peer review, I guess, question
25        come to you?

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**73**

1    MR. DAYHUFF:  Object to the form of the question.
2
3    A  I don't know what you're talking about.
4    Q  Well, you say you're not on peer review.
5    A  I'm not on peer review.
6    Q  And so my question is have you reviewed a chart?
7    A  In my four years as the surgical chair this is the
8       case, this case right here came to me through a
9       direct phone call.  This is the only one.
10   Q  Okay.
11   A  All the rest occurred through the medical executive
12      committee.
13   Q  Do you know why, in this case, they chose to go
14      directly to you?
15   A  They did not go directly to me.  I believe that
16      they had a peer review person who reviewed the
17      chart, and the chairman reviewed the chart, and
18      they asked for a second opinion.
19   Q  Okay.  Did you have discussions with, I guess,
20      let's see Exhibit No. 8 is signed by you, Dr.
21      DiBona, and Carlos Milanes, did you have
22      discussions with them about the summary suspension
23      before this letter was issued?
24   A  Other than what was discussed in medical executive
25      committee, no.  We did not discuss Dr. Muniz

---

**74**

1       outside of a peer review setting, medical peer
2       review, medical executive committee.
3    Q  Well, so did MEC discuss this issue before she was
4       summarily suspended?
5    A  I'm not sure when this letter went out.  I reviewed
6       the case after it was reviewed by others, and my
7       understanding of this is that once this is issued,
8       the physician has to be notified that this action
9       was taken.  And this letter is in response to the
10      action that was taken through the reviews that
11      occurred prior to that.
12   Q  Okay.  So you reviewed the chart and issued a
13      report in Exhibit No. 9?
14   A  Right.
15   Q  Who made the decision to summarily suspend Dr.
16      Muniz?
17   A  I know what my recommendation was, I don't know
18      what the other people's recommendation was who
19      reviewed the chart at this time.  Mine was I felt
20      we needed to precautionarily suspend her in the
21      interest of patient safety.
22   Q  Okay.  And you didn't have any other discussions
23      with people about what their recommendations were?
24   A  No, no.  I was not privy to anyone else's
25      recommendations.

---

**75**

1    Q  So before signing this letter, Exhibit No. 8, you
2       didn't have any discussions with Dr. DiBona or
3       Carlos Milanes or anyone else regarding your
4       recommendation to summarily suspend her?
5    A  I didn't have any discussions with them.  I said I
6       felt that she should be summarily suspended, this
7       was given to Terri Ergle, and this is the letter,
8       as far as I know, that was generated in response to
9       that.
10   Q  Okay.
11   A  As far as I know you can't suspend somebody without
12      notifying them.
13   Q  So then did, did somebody just present you with
14      this letter and you signed it, is that how that
15      occurred?
16   A  I did not type the letter.  The letter was typed by
17      the staff at the hospital, whoever types these
18      letters.
19   Q  Okay.  And then you just signed it?
20   A  I put my signature on the letter, yes.
21   Q  Okay.  But you didn't have any discussions with
22      people before that, regarding your recommendation
23      to summarily suspend her?
24   A  I received a chart, I reviewed the chart, I gave my
25      recommendation, and then the letter was generated

---

**76**

1       after that.  What other discussions occurred that
2       did not involve me, I do not know.
3    Q  Okay.  After the summary suspension was issued, did
4       you have discussions with anyone regarding this
5       patient and this incident?
6    A  There were meetings afterwards involving a special
7       session of the medical executive committee to
8       discuss this suspension.
9    Q  Okay.  This will be Exhibit No. 10.
10
11         (Whereupon, MEC Minutes, consisting of 2
12         pages, was marked Exhibit No. 10 for
13         identification.)
14
15   Q  Do you recognize Exhibit No. 10?
16   A  It appears to be minutes from a special meeting.
17   Q  Okay.  Is that the special meeting that you were
18      just referring to?
19   A  Yes, sir.
20   Q  Okay.  What took place in this meeting?
21   A  Dr. DiBona called it to order, Dr. DiBona described
22      that there was a suspension placed secondary to a
23      catastrophic outcome and that the, that's the
24      reason for the precautionary suspension.  The
25      record is available for all members of the

---

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

77

1 committee to review, and the report was that it was
2 sent to an outside reviewer. I believe it had
3 already been sent out, I remember people saying
4 have you sent this case out for people outside the
5 hospital to review.
6 Q Okay. Prior to this meeting, had you spoken with
7 anybody about this incident, other than your review
8 of the chart?
9 A Other than the people in this committee, this is
10 the committee right here.
11 Q Okay. But prior to this meeting is my question?
12 A The people who handed me the chart, Terri Ergle and
13 all them, I said is this all the information. I
14 mean, I don't know what you mean by discuss the
15 case. Do I have enough information or is this all
16 that you have, I did ask those questions.
17 Q Okay. But aside from that, that was the extent of
18 your discussions with anybody regarding --
19 A That's it.
20 Q Okay. On the, I guess, third paragraph here it
21 says it was reported that the medical record has
22 been sent out to an outsider reviewer but the
23 results are not yet back. Members suggested an
24 additional outside review also be obtained. So at
25 this special meeting the results of the special or

---

78

1 the results of the outside reviewers had not been
2 received yet, is that correct?
3 A No. As far as I know, no. According to this piece
4 of paper they had not been received.
5 Q So they had not been received yet. I'm sorry, it's
6 kind of a confusing question, I'm sorry. Let me
7 reask it. At this special meeting, were the
8 results from the outsider reviewer received at that
9 time?
10 A No.
11 Q Okay. Then the next paragraph down it says motion
12 was made and seconded to terminate Dr. Muniz's
13 medical staff privileges. Why did you all decide
14 to terminate her privileges before you even
15 received the outside reviewer's reports?
16 A The members of the medical executive committee were
17 aware that Dr. Muniz had had previous problems and
18 concerns of patient safety. The committee was
19 aware that Dr. Muniz was under 100 percent review.
20 The committee was then aware that the infant had
21 passed away, and therefore the committee felt,
22 again, in the interest of patient safety that they
23 should continue the suspension of privileges until
24 the review came back.
25 Q At this special meeting had you or anybody, or the

---

79

1 MEC or anybody on the MEC met with Dr. Muniz about
2 this incident?
3 A I don't believe Dr. Muniz was at this meeting. I'm
4 not sure, but she was at another meeting.
5 Q Okay, right. I'll hand you that. Look at that.
6 A She came to another meeting which she presented a
7 flow sheet of her thoughts of the day.
8
9  (Whereupon, MEC Minutes, consisting of 1
10  page, was marked Exhibit No. 11 for
11  identification.)
12
13 Q Okay. Do you recognize Exhibit No. 11?
14 A It is another special meeting called a few days
15 later. And Dr. Muniz came to another, came to the
16 meeting and presented a piece of paper, a handout
17 that discussed a timeline as well as her thought
18 process involving the patient.
19 Q Okay. So, I guess, going back then to Exhibit No.
20 10, at the time of that special meeting in Exhibit
21 No. 10, had the medical executive committee talked
22 with or heard from Dr. Muniz?
23 A Not at that time, no.
24 Q And during the meeting on March 9th in Exhibit No.
25 11 here, Dr. Muniz, I guess, presented her case at

---

80

1 that meeting?
2 A She spoke, yes.
3 Q Okay. And what were the, I guess, discussions of
4 the MEC at that time?
5 A Dr. Muniz was given a time period to speak. I
6 believe the time was limited because we had been in
7 meetings with her and other physicians who talked
8 for a very, very, very long time, and so she was
9 given a time limit to speak. She presented a
10 handout, the handout, she reviewed that in detail.
11 Discussions went back and forth with some questions
12 with Dr. Muniz, who asked what I couldn't tell you.
13 And then Dr. Muniz was allowed to leave. The
14 document was discussed, there were concerns, again,
15 and we decided to continue with the termination.
16 Q Okay. And, again, it says the outside reviews are
17 not back yet, so at the time of the meeting on
18 March 9th this Exhibit No. 11, had the medical
19 executive committee received outside reviews yet?
20 A We had not received them which is why we continued
21 to keep her on suspension until we knew the results
22 of that.
23
24  (Whereupon, AllMed Peer Review,
25  consisting of 5 pages, was marked Exhibit

---

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

81

1          No. 12 for identification.)

2

3    Q    Okay.  Do you recognize Exhibit No. 12?

4    A    It is a review, who the review is by I don't know.

5         But it is a review.

6    Q    I guess is this one of the outside reviews that the

7         MEC obtained regarding this incident?

8    A    Skip Freedman.

9    Q    I believe Skip Freedman is the medical director.  I

10        think the review is actually done by Dr. Minassian.

11        The way AllMed works is the medical director

12        actually signs the reviews.

13   A    Oh, okay.  So Dr. Minassian's name isn't actually

14        on here?

15   Q    No.

16   A    Okay.

17   Q    But does this appear to be one of the outside

18        reviews that you all obtained or that the MEC

19        obtained in relation to this incident?

20   A    I know there were two, and who wrote them, I

21        couldn't tell you who wrote them.  But if you say

22        it is.

23   Q    Okay.  Look at page four if you would.

24   A    Four.  Okay.  I'm on four.

25   Q    And it says, there's a question there in the second

---

82

1         paragraph that says was the standard of care

2         appropriate.  And the answer is yes, the standard

3         of care was appropriate.  Do you know why Dr.

4         Muniz's termination was continued even though the

5         outsider reviewer said that the standard of care

6         was met?

7    A    It was continued because there were some qualifiers

8         after the yes and the review is also made in a

9         vacuum and the reviewer is not privy to any

10        previous issues that the physician has had, whereas

11        the medical executive committee is.  It was yes and

12        there were a bunch of conditions after that.

13   Q    What were the conditions?

14   A    Mainly that there was a delay in treatment.  And

15        one of the things that was of grave concern to the

16        medical executive committee as you show in Exhibit

17        No. 11 was the real dilemma in treatment was the real dilemma

18        that the medical executive committee had, and it

19        says there was delay.

20   Q    Looking at the last paragraph there, it says that

21        this episode took about 30 minutes, do you see

22        that?

23   A    What took 30 minutes?

24   Q    I'm just reading from the fourth paragraph there.

25   A    There was one part that took 30 minutes but the

---

83

1         patient was here for two hours.  It says yes, in

2         part, there is evidence of delay in decision making

3         for appropriate treatment.  That's what it says,

4         and there's a whole paragraph, not just one of the

5         paragraphs, there's more than one paragraph there.

6         It says here, however, according to the nurse's

7         notes the obstetrician initially intended to

8         transfer the patient for NICU reasons.  After

9         discussion with pediatrician and, again, according

10        to the nurse's note the obstetrician decided to

11        perform cesarian section.  That was all of those

12        discussions there but there were other issues that

13        caused delay.

14   Q    And this episode caused, took about 30 minutes, so

15        . . .

16   A    There was that --

17   Q    Is there anywhere --

18   A    -- plus ten, plus another hour.  That's what this

19        reviewer said.  But from the time the patient

20        arrived on labor and delivery to delivery of the

21        infant was over two hours.

22   Q    Right.  I understand that the patient was on labor

23        and delivery for two hours, but the reviewer here

24        says that the obstetrician arrived appropriately

25        ten, within ten to 11 minutes within being called

---

84

1         to labor and delivery, Terbutaline was

2         administered.  Aside from this 30 minute episode,

3         does this reviewer indicate anywhere that there was

4         a delay beyond 30 minutes?  And you can read the

5         whole thing if you want.

6    A    I believe they said there was a delay in part.

7         They said there was a 30 minute discussion period.

8         What the reviewer is referring to as the sum total

9         of the delay, I don't know.  I can't get that from

10        this paragraph.

11   Q    Mark Exhibit No. 13.

12

13             (Whereupon, Letter, consisting of 2

14             pages, was marked Exhibit No. 13 for

15             identification.)

16

17   Q    So in Exhibit No. 11 the medical executive

18        committee, I guess, recommended to continue the

19        termination of Dr. Muniz's privileges?

20   A    Yes, sir.

21   Q    Okay.  Do you recognize Exhibit No. 13?

22   A    I see it here today but, again, this letter's not

23        dated to me, it's not written to me.

24   Q    Okay.  Does this appear to be the letter continuing

25        Dr. Muniz's suspension of her clinical privileges?

---

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

85

1   A   Again, I didn't write this letter.

2   Q   Okay. But I'm just asking you, I mean, in looking

3      at the letter, does it appear to be the letter that

4      continued the suspension of her privileges and

5      recommended that the, or informed her that the MEC

6      recommended that it be revoked?

7   A   Okay. I didn't receive the letter and I didn't

8      write the letter.

9   Q   Okay.

10   A   So I can't verify if this was sent or not, but if

11      you say so.

12   Q   Will you read where it starts, the basis of that

13      recommendation is as follows. Will you read that.

14   A   You attended to the patient who presented to labor

15      and delivery 30 weeks pregnant and in pain. You

16      gave inappropriate medication, and while fetal

17      strips identified the baby in distress, treatment

18      was delayed for two hours. You failed to recognize

19      an emergent situation.

20   Q   Does that paragraph mention anything about her

21      previous cases or incidences?

22   A   This paragraph does not.

23   Q   Okay. Do you see anywhere in this letter that it

24      mentions anything about her previous incidences?

25   A   Not to my knowledge.

86

1   Q   Does that paragraph indicate anything about any

2      alleged behavioral problems with Dr. Muniz?

3   A   Not to my knowledge.

4   Q   Okay. Does any of the letter cite any behavioral

5      or alleged behavioral issues with Dr. Muniz?

6   A   Not to my knowledge.

7   Q   Okay. Prior to this March 9th, medical executive

8      committee meeting, had the MEC discussed any

9      alleged behavioral issues of Dr. Muniz?

10   A   Prior to the March -- Repeat that question.

11   Q   Prior to this Exhibit No 11, March 9th meeting of

12      the MEC, had the MEC discussed Dr. Muniz's, or any

13      alleged behavioral issues by Dr. Muniz?

14   A   The committee discussed the previous, not this one,

15      but the previous MEC, or the MEC at the time

16      discussed the results of the other fair hearing,

17      because those do come back to the MEC, in which it

18      described behavioral issues.

19   Q   Okay. Prior to that, prior to the MEC receiving

20      the outcome of that first peer review hearing, had

21      the MEC discussed behavioral issues or alleged

22      behavioral issues of Dr. Muniz?

23   A   Prior to the first fair hearing, so we're not

24      talking about this case here, and this we're

25      talking about the previous proceedings, had we

87

1      discussed behavioral concerns?

2   Q   Yes.

3   A   I believe there were some instances in which there

4      were some behavioral concerns, as far as usage of

5      foul language, certain, you know, that there was

6      talk of that, that there was foul language used in

7      front of the staff or towards the staff and that

8      there was some documentation points that were

9      considered aggressive or, you know, at meetings

10      those were some of the things that were discussed.

11      Again, I told you there were numerous, numerous,

12      numerous, numerous discussions of Dr. Muniz in the

13      previous time, there was always a case and always

14      something talking about something that she's done.

15   Q   So you're saying the MEC did discuss in the MEC

16      meetings behavioral issues or alleged behavioral

17      issues of Dr. Muniz?

18   A   You're talking about before the first fair hearing

19      is my understanding of the question?

20   Q   Before the first fair hearing.

21   A   There were some discussions, as far as I know, that

22      people talked about foul language and things like

23      that that she used on the floor.

24   Q   Did the MEC ever do anything about that, aside from

25      discuss it?

88

1   A   Not to my knowledge. I can't really remember all

2      that was done about that.

3   Q   In discussing Dr. Muniz's termination that was

4      eventually recommended in this Exhibit No. 11 March

5      9th meeting, did the MEC ever discuss alleged

6      behavioral issues?

7   A   Didn't you just ask that?

8   Q   No. I'm asking in the March 9th, you know, in the

9      March 3rd and the March 9th meetings of the MEC you

10      all discussed the incident that occurred on

11      February 23rd --

12   A   Right.

13   Q   -- involving Dr. Muniz. My question to you is

14      during those discussions, did you guys ever discuss

15      any alleged behavioral issues of Dr. Muniz.

16   A   We discussed the case a lot. That's what I recall

17      as being the important part of the case, of the

18      discussion was we discussed the case a lot.

19   Q   Okay.

20   A   Yeah. We discussed the case a lot. We discussed

21      the cases actually.

22   Q   In the second fair hearing that Dr. Muniz received,

23      you were present for that hearing?

24   A   Say that again.

25   Q   Were you present for the, I know the answer to

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

89

1     this, so sorry if I phrase it wrong but were you
2     present for the second, second peer review hearing?
3   A  Yes.
4   Q  That Dr. Muniz received?
5   A  Yes, I was present for that one.
6   Q  Okay.  Were you representing the MEC at that
7     hearing?
8   A  At that hearing, I believe because I was the
9     chairman of the department of surgery they told me
10    I could come to the meeting and I chose to.
11  Q  Okay.  Have you ever appeared in any other peer
12    review hearings at ARMC?
13  A  I was not the chairman of the department, so no.
14  Q  Okay.  While you were the chairman of the
15    department, were there ever any other peer review
16    hearings?
17  A  Like what, that fair hearing thing, that I'm aware
18    of?
19  Q  In the four years that you were on MEC, were there
20    ever other, yeah, other fair hearings?
21
22    MR. DAYHUFF:  Without disclosing any names of
23        physicians that may have been subject to a
24        fair hearing.
25

90

1   A  Again, the only thing I can answer is, is there
2     were physicians who were discussed and physicians
3     who no longer work here.  And how they came not to
4     work here anymore, I can't remember the details of
5     that.
6   Q  Okay.
7   A  I just know I came to this last one and I did not
8     attend the first one, because I was not the chair
9     of the department of surgery.  So I did not.  I was
10    an associate chair and I was not requested.
11  Q  So you're unaware if there were other fair
12    hearings?
13  A  I'm unaware.
14  Q  During your four years?
15  A  I just couldn't answer that question without
16    documentation.
17  Q  Okay.  Then would it be fair to say that you did
18    not attend any fair hearings?
19  A  I attended this one.
20  Q  Other than the one at issue here?
21  A  Yes.
22  Q  During your four years on the MEC?
23  A  Yes.
24  Q  Okay.  Do you know why Dr. Boehner was present at
25    the fair hearing?

91

1   A  I don't know why he was there at the fair hearing.
2   Q  Okay.  What was your participation in the fair
3     hearing?
4   A  It was mainly to listen.  I know that I had, was
5     asked some questions, I was one of the people on
6     the list that was being asked questions.  It was to
7     listen to responses and to, you know, hear what
8     they had to say, and sometimes there was a question
9     that I had in my mind.
10  Q  Okay.  Did you provide those questions to, I guess,
11    Dr. DiBona who was actually asking them?
12  A  Sometimes.
13  Q  Okay.
14
15        (Whereupon, On-Call Calendar, consisting
16        of 1 page, was marked Exhibit No. 14 for
17        identification.)
18
19  Q  Do you recognize Exhibit No. 14?
20  A  No.
21  Q  Have you ever seen Exhibit No. 14 before?
22  A  No, other than today.
23  Q  Okay.  How were, I guess, how were the call
24    schedules created?
25  A  There's two call schedules here, there's a call

92

1     schedule according to your practice, and there's
2     something called staff call.
3   Q  Okay.
4   A  I'm not involved in the assignment of staff call.
5     I actually don't see a piece of paper like this, I
6     get a group call schedule.  On the group call
7     schedule in bold are the initials of the person
8     from our group that is on staff call and then
9     underneath is someone else's name, could be the
10    same name or it could be your name and that's who
11    assigns staff call.
12  Q  Okay.  Who creates your call list then?
13  A  My call schedule's created by Dr. Boehner.
14  Q  Okay.  And do you know if he, I mean, where does he
15    get these?  I guess, he has to get a staff call
16    schedule in order to integrate that onto yours, is
17    that . . .
18  A  I don't know how he gets it.  I assume, I mean, I
19    don't know how he gets it to be honest with you,
20    I've never asked.  That's not one of my duties, my
21    duties is front office staff, so . . .
22  Q  Okay.  And did you say it was Boehner or Boone that
23    you said does that?
24  A  Boehner does that part.
25  Q  Okay.  But he does put on there who's on staff call

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

93

```
 1     that day?
 2  A  Right.
 3  Q  And do you know if he creates staff call or if
 4     somebody at ARMC does that?
 5  A  I don't know who creates staff call, I have no
 6     idea.
 7  Q  Okay.  The Exhibit No. 14, and I'll just, I know
 8     that you don't know who creates staff call and you
 9     don't see the actual staff call schedule, but I'll
10     represent that this is the staff call schedule for
11     February of 2010.  And who's listed for February
12     23rd?
13  A  It says Daniels, "B" Daniels.
14  Q  Okay.  Is that Brian Daniels, is that correct?
15  A  Brandon.
16  Q  Brandon Daniels.  Okay.  And, I guess, he's got a
17     son here also, is that the "L" Daniels on here?
18  A  No.  "L" Daniels is the father and Brandon Daniels
19     is the son.
20  Q  Okay, sorry.  Do you know why Dr. Muniz was called
21     on the 23rd for a staff call patient when Brian, or
22     Brandon Daniels is listed as the staff call doctor?
23  A  I do not know the answer to that.  What I do know
24     is that they all used to take call together, so I
25     don't know if that had something to do with it or
```

94

```
 1     if it's a misprint, I don't know.
 2  Q  Okay.
 3  A  I don't know.  Or if something was traded between
 4     the two of them, I don't know.
 5  Q  Okay.  Do you know who called Dr. Muniz on the
 6     23rd?
 7  A  No.
 8  Q  Who usually calls you when there's a staff call
 9     patient that needs to be seen?
10  A  The nurse does.
11  Q  The nurse does?
12  A  The nurse.
13  Q  Okay.  And just the nurse at the time, I mean,
14     there's not, it's not the same person every time I
15     assume?
16  A  I don't know how the nursing assignment goes.  I
17     would assume that whoever is eligible for the next
18     patient gets that patient, finds out who they
19     belong to, and if they don't belong to somebody
20     they call whoever's on staff call.
21  Q  Okay.  So it would be the nurse that would be
22     assigned to that patient who would call?
23  A  Right.
24  Q  Okay.
25  A  And sometimes the charge nurse calls you depending
```

95

```
 1     upon what's going on.  And this particular day, I
 2     don't know who called Dr. Muniz, I have no idea.
 3  Q  Okay.
 4  A  I've received call from all kinds of people, all
 5     kinds of nurses that were working that day.
 6
 7            (Whereupon, Letter, consisting of 3
 8            pages, was marked Exhibit No. 15 for
 9            identification.)
10
11  Q  Do you recognize Exhibit No. 15?
12  A  This is a letter that I received from Conway
13     Medical Center, yes.
14  Q  Okay.  And is this a, I guess, a credentialing
15     request or questionnaire?
16  A  Yes.
17  Q  Okay.  And it says you received that on May 4th.
18     Did you ever fill this, this document out?
19  A  I received this on May 4th?
20  Q  I'm sorry, it looks like it was sent on May 4th, my
21     mistake.  Did you ever, my question's still is the
22     same though, did you ever fill this document out
23     and return it?
24  A  I did not fill this document out.  And the reason I
25     did not fill the document out is because I didn't
```

96

```
 1     feel comfortable filling it out and so I took it up
 2     to physicians services and gave it to Terri Ergle.
 3  Q  Okay.  Do you know if she ever filled it out?
 4  A  I do not know who filled out the form, but I didn't
 5     feel comfortable filling it out and so I brought it
 6     up there and she said that they would handle that.
 7  Q  Okay.  After you gave it to Terri Ergle, did you
 8     ever follow up with her?
 9  A  No.  Because once I put it in her hands they
10     usually call us back and tell us if there's
11     something more we're supposed to do with that.
12  Q  Okay, all right.  How many patients does Aiken
13     OB/GYN have?
14  A  I don't know the answer to that.  A lot, a lot.
15  Q  Okay.  Do you know how many roughly you have?
16  A  No.
17  Q  Any rough estimate?
18  A  A lot.
19  Q  I mean, are we talking, you know, 20 patients here,
20     200 patients?
21  A  Way more than that.
22  Q  Okay.
23  A  On average I do between 20 and 30 deliveries a
24     month every month.
25  Q  Okay.  So you do 20 to 30 deliveries a month on
```

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

97

1  average?
2  **A  Or more.**
3  Q  Or more?
4  **A  On average.**
5  Q  How many, I guess, gynecological procedures do you
6  do a month?
7  **A  It depends on the week. It's between two,**
8  **sometimes four, sometimes one, sometimes it's all**
9  **obstetrical during the week, it just depends on**
10 **what's posted. I'd have to get documentation on**
11 **that.**
12 Q  Okay.
13 **A  I mean, some months it's eight, but we're scheduled**
14 **out for months and months. Our block has a lot of**
15 **different people on the block, so if Dr. Boone for**
16 **example schedules more that month he has a lot of**
17 **block, or Dr. Boehner.**
18 Q  Okay.
19 **A  And if I just didn't get mine in on time, then mine**
20 **may be later, and I may have more in a given month**
21 **so it's variable.**
22 Q  Okay. And when you say 20 or 30 deliveries, you're
23 referring to yourself individually not the practice
24 right?
25 **A  That's me, that's just me.**

98

1  Q  Okay. And then the gynecological part varies you
2  say, or you said eight a month, something like that
3  would be average, maybe?
4  **A  Eight to ten a month, on average. I mean, like I**
5  **said, some are slower, some are busier.**
6  Q  Okay. Would you say that Aiken OB/GYN is a
7  competitor of Magnolia Medical and Dr. Muniz?
8  **A  No.**
9  Q  And why not?
10 **A  Because we don't really compete, we just take care**
11 **of patients we have. We have so many that you**
12 **can't even see all of them.**
13 Q  Okay.
14 **A  They're more than enough patients to go around in**
15 **this community. They're more than enough, an**
16 **abundance.**
17 Q  Do you know what's being done with Dr. Muniz's
18 patients now that she does not have hospital
19 privileges?
20 **A  No, I don't. I do, I know that when she had her**
21 **summary suspension Dr. Bryan was picking up the**
22 **patients.**
23 Q  Okay. Did you talk with Dr. Bryan about that?
24 **A  I asked Dr. Muniz who she would prefer, I felt I**
25 **should do that, and she said she preferred Dr.**

99

1  **Bryan. And so I said Dr. Bryan could you do that**
2  **and he said yes.**
3  Q  Okay.
4  **A  That was at the summary suspension time period.**
5  **After that, what agreement that have, I don't know.**
6  Q  Have you picked up any of Dr. Muniz's patients,
7  since she was summarily suspended?
8  **A  I think the entire area has picked up some of the**
9  **patients.**
10 Q  Okay. So you have picked up some of her patients
11 then?
12 **A  I believe some came from Magnolia, but a lot came**
13 **before the summary suspension too. I mean, I don't**
14 **think there's any difference in the amount that**
15 **came, that came into the practice before or after.**
16 Q  Okay. Any idea how many?
17 **A  No.**
18 Q  Okay. Have you ever turned away any of Dr. Muniz's
19 patients?
20 **A  I don't take the appointments, what I do know is**
21 **that gynecologically all of my patients come by**
22 **referral now or if another patient has a family**
23 **member and asks me to take them, I take them. But**
24 **I don't take, you know, if your wife were to call**
25 **for example, not that she would, but if she were to**

100

1  **call and she'd say Dr. Minto --**
2  Q  Careful, I don't have a wife. Let's not start
3  creating --
4  **A  Okay.**
5  Q  I don't want a wife.
6  **A  Okay. If your wife or your mom were to call, you**
7  **do have one of those, and say can I get in with Dr.**
8  **Minto, they would say I'm sorry Dr. Minto's not**
9  **accepting any patients right now.**
10 Q  Okay.
11 **A  That's what they'd say. And that's been for years.**
12 Q  Have you --
13 **A  We take the OB because we feel a commitment to the**
14 **pregnant ladies, but the gynecological patients,**
15 **no. I've been closed except for by physician**
16 **referral or from the hospital.**
17 Q  Have you ever informed any of Dr. Muniz's patients
18 that she no longer has privileges?
19 **A  No.**
20 Q  Have you ever informed any of them that she's no
21 longer practicing?
22 **A  No.**
23 Q  Have you ever informed anyone that Dr. Muniz is no
24 longer practicing?
25 **A  No.**

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

101

1  Q  Have you ever informed anyone that Dr. Muniz no
2      longer has privileges?
3  A  **No. I don't discuss her privileges, I don't**
4      **discuss if she's practicing, I don't know anything**
5      **about what she's doing now.**
6  Q  Is this Exhibit No. 16? This is the June 7th
7      letter, a single sheet.
8
9              (Whereupon, Letter, consisting of 1 page,
10             was marked Exhibit No. 16 for
11             identification.)
12
13  Q  Do you recognize Exhibit No. 16?
14  A  **It is a letter to Dr. Muniz and it talks about a**
15      **hearing panel.**
16  Q  Okay. And you were at the hearing, so is this the
17      same panel that was present at the hearing of Dr.
18      Muniz?
19  A  **That's who I believe was there, yeah.**
20  Q  Okay.
21  A  **Yeah. It was Searles. Okay.**
22  Q  And yes, so that is the same panel?
23  A  **Yes.**
24  Q  Okay. Which of these doctors is with ARMC? Sorry,
25      that's not a very good question. Which of these

---

102

1      doctors operates out of the ARMC?
2  A  **Dr. Degnan is a general surgeon, Dr. Searles is**
3      **actually a radiologist but is in a group, as far as**
4      **I know.**
5  Q  Okay. Meaning, meaning --
6  A  **There's four core radiologists that operate**
7      **together.**
8  Q  Okay.
9  A  **Dr. Buchannan is a general surgeon, Dr. Degnan is**
10      **internal medicine, Dr. Kinsey is a pediatrician,**
11      **and Dr. Robinson, there's no maternal/fetal**
12      **medicine person here.**
13  Q  Okay. And I think he's out of Charleston if I
14      remember correctly, I don't know if you remember
15      that.
16  A  **I don't remember where he was from, there was a**
17      **gentleman that wasn't from this region.**
18  Q  So these first four, Degnan, Searles, Buchannan and
19      Kinsey, do you know them?
20  A  **They're on the medical staff here. I wouldn't say**
21      **that I'm -- I wouldn't, again, I've never been to**
22      **dinner with any of those people.**
23  Q  Okay. Have you ever talked to any of them about
24      Dr. Muniz?
25  A  **No.**

---

103

1  Q  Have you ever talked to any of them about the peer
2      review of Dr. Muniz or the hearing?
3  A  **No.**
4  Q  Have you ever talked to anyone about the peer
5      reviewing, I mean, the peer review of Dr. Muniz?
6  A  **No.**
7  Q  Okay. Have you ever written any emails regarding
8      Magnolia Medical or Dr. Muniz?
9  A  **No.**
10  Q  Not a single email has ever mentioned Dr. Muniz?
11  A  **I have not written any emails.**
12  Q  Do you not write emails?
13  A  **I write emails, but I have not written any that**
14      **concerned Dr. Muniz, other than lawyer**
15      **correspondence.**
16  Q  Okay.
17  A  **And most of those were receipts.**
18  Q  Meaning you've received them?
19  A  **Uh-huh.**
20  Q  Okay. I was just making sure you didn't mean like
21      a receipt for buying something. Okay. Have you
22      and your partners Dr. Boone, Dr. Boehner ever
23      discussed Dr. Muniz and Magnolia Medical?
24  A  **We discussed Dr. Muniz and Magnolia Medical Center**
25      **when it came time to discuss whether we'd continue**

---

104

1      **call. We decided that wasn't in our best interest.**
2  Q  And you never discussed her or Magnolia Medical
3      since then?
4  A  **No. Not really, to be honest with you.**
5  Q  And you've never talked to either Dr. Boone or Dr.
6      Boehner about Dr. Muniz's, I guess, alleged
7      complications or issues at ARMC?
8  A  **Well since she hasn't been practicing there haven't**
9      **been any more. I do take it back, there were some**
10      **discussions about money that was owed to the**
11      **building about Magnolia Medical Center.**
12  Q  Okay.
13  A  **In the last few months.**
14  Q  Bus aside from that, you haven't ever talked about
15      Dr. Muniz or Magnolia Medical?
16  A  **(Non-verbal Response)**
17  Q  I think I know your answer but I'll ask it anyway,
18      have you ever written any letters or about Dr.
19      Muniz or Magnolia Medical?
20  A  **No, sir.**
21
22      THE WITNESS: I'm going to get some more water, if
23          you don't mind.
24      MR. DAYHUFF: You need a break, a couple minutes?
25          Are you okay?

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

105

1    THE WITNESS:  I just need some water.

2    MR. DICK:  I might grab one also.

3

4    Q    Okay.  Aside from what, well, I'll try to ask you

5    this way, have you seen any of Dr. Muniz's patients

6    since the, since her precautionary suspension?

7    A    **I don't see them at any higher rate now than I did**

8    **before.**

9    Q    Okay.

10   A    **No. I mean, do I see patients that have**

11   **transferred, but patients transfer all over, I've**

12   **seen Bryan's patients, Daniels' patients.**

13   Q    Okay.

14   A    **I've seen all kinds of patients, I'm sure they've**

15   **probably seen some of mine.  I mean, patients go**

16   **wherever they want to.**

17   Q    Have any of Dr. Muniz's patients presented to the

18   hospital and where you have seen them?

19   A    **There was one patient that came in that was Dr.**

20   **Muniz's and I asked the emergency department to**

21   **call Dr. Bryan and Dr. Bryan took care of that**

22   **patient.**

23   Q    Okay.  And is that part of the agreement that you

24   talked about earlier that you'd asked Dr. Bryan to,

25   or Dr. Muniz told you to ask Dr. Bryan to cover all

---

106

1    her patients, I guess, that presented to the --

2    A    **The agreement was for the patients that were**

3    **immediately in the hospital.**

4    Q    Okay.

5    A    **But I do know that, that she likes him and I would,**

6    **I wanted to respect that.  And so he was here and,**

7    **you know, I asked them if they'd call him, and he**

8    **took care of it.  They didn't call me back about**

9    **the patient, so I'm assuming that he took the**

10   **patient.**

11   Q    Are you aware of what Dr. Muniz is currently doing

12   in her practice?

13   A    **No.**

14   Q    Okay.  I'm assuming you haven't had any discussions

15   with anyone about her current practice?

16   A    **I don't know what her current practice is, what it**

17   **involves, where she goes, I don't know.**

18   Q    Okay.  I think that's all I have, I might have a

19   couple more after Mr. Dayhuff.

20

21              CROSS EXAMINATION

22   BY MR. DAYHUFF:

23   Q    Okay.  Let me ask you a few questions.  You need a

24   little break?

25   A    **I'm okay.**

---

107

1    Q    You ready for the second attorney of the day?  I'm

2    your attorney though, so it should be better.  All

3    right.  Just a few questions.

4

5    MR. DICK:  He's just going to throw you softballs,

6    don't worry about it.

7

8    Q    I'm going to start by asking you about some of the

9    assertions, allegations, things that have been said

10   by Dr. Muniz in documents we've received --

11   A    **Okay.**

12   Q    -- in this suit, okay?  Let's see, where do I want

13   to start.  All right.  Dr. Minto have you ever made

14   false statements about Dr. Muniz and her practice?

15   A    **No.**

16   Q    Have you ever treated Dr. Muniz's patients poorly?

17   A    **No.**

18   Q    When you undertook to review the catastrophic

19   patient case in 2010, the one about which you

20   signed the precautionary suspension, were you, when

21   you decided that revocation or the precautionary

22   suspension was merited, were you motivated by

23   personal and economic self interests?

24   A    **No.**

25   Q    What motivated you, when you signed that letter for

---

108

1    precautionary suspension?

2    A    **Patient care.  Patient, surely patient care.  I was**

3    **aware that she had some issues before.  She was on**

4    **100 percent review and that an infant had passed**

5    **away.  And there were some, you know, I just, I was**

6    **concerned, I knew what could happen at this**

7    **institution for that type of patient.**

8    Q    You described your role in the 2009 peer review and

9    the 2010 peer review.  Your 2009 peer review role,

10   if I understood your testimony, was restricted to

11   sitting on the MEC and hearing about Dr. Muniz's

12   cases and hearing about recommendations that were

13   made, is that correct?

14   A    **Right.**

15   Q    All right.  You did, though, as you sat on the MEC,

16   observe the meetings, observe the communications

17   that the physician peers were having about Dr.

18   Muniz, is that correct?

19   A    **Yes.**

20   Q    All right.  In any of your observations, did you

21   see any evidence that anyone on the MEC was

22   motivated by anything other than concern for

23   patients and quality of care?

24   A    **It was always concern for quality of care, it was**

25   **always concern about patients, and at times there**

---

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**109**

1    was concern about Dr. Muniz. To be honest with
2    you, nobody wants to be on this and I, mean, and
3    nobody wants to be on these things.
4  Q  Okay. Did, in the 2009 peer review, and, again,
5    you were sitting on the MEC, did anyone from the
6    hospital staff, CEO, other members of the staff,
7    attempt to manipulate or influence the physician
8    peer review of Dr. Muniz?
9  A  No.
10  Q  Did anyone conspire to harm Dr. Muniz, as part of
11    the 2009 peer review?
12  A  No.
13  Q  All right. Let's move to 2010 peer review. Did
14    you personally, were you influenced by anybody on
15    the administration, hospital employees with respect
16    to the decisions and the conduct you undertook in
17    the 2010 peer review?
18  A  No.
19  Q  In what you observed at the hearing, are you
20    concerned that anyone was motivated by improper
21    things, economics, ill will, anything like that?
22    Do you have any concerns, after what you observed
23    of the 2010 peer review?
24  A  No.
25  Q  All right. I want to take one more look at the

---

**110**

1    minutes. We're on Exhibit No. 10 and Exhibit No.
2    11, these are the MEC minutes from 2010. Now, this
3    Exhibit No. 10 reflects the March 3, 2010 special
4    called meeting at the MEC, isn't that correct?
5  A  Yes, sir.
6  Q  All right. And that meeting was held after you
7    conducted your chart review?
8  A  Right.
9  Q  Of the catastrophic case, is that correct?
10  A  Yes.
11  Q  You also mentioned that there was another review
12    before yours --
13  A  Yes.
14  Q  -- of the same case, who conducted that review?
15  A  It was Dr. Besson, Dr. Cindy Besson.
16  Q  All right. Dr. Besson was, was she on the medical
17    peer review committee?
18  A  I believe she was on peer review.
19  Q  Okay.
20  A  I believe Dr. Robinson brought her.
21  Q  Okay.
22  A  Dr. Robinson is the chair of that and he was given
23    the report and then he had her as the member of the
24    peer review, review that.
25  Q  I see. The minutes, and I'm reading from them,

---

**111**

1    reflect this file has been reviewed by the OB/GYN
2    member of the peer review committee and a second
3    review was done by the chairman of surgery. You
4    were obviously the chairman of surgery.
5  A  Yes.
6  Q  We think the OB/GYN member of the peer review
7    committee was?
8  A  Cindy Besson.
9  Q  Cindy Besson. Okay, all right. The very bottom of
10    this page it says motion was made and seconded to
11    terminate Dr. Muniz's medical staff appointment and
12    privileges and it carried with a unanimous vote.
13    What I understood when you testified about that,
14    you described that as a continuation of her
15    precautionary suspension, is that what you
16    understood was the action coming from the March 3
17    2010?
18  A  That was my understanding.
19  Q  Okay, all right. Despite the fact that this says
20    termination, was your understanding that you were
21    merely continuing the precautionary suspension that
22    you, the chief of staff, and Carlos Milanes had put
23    in place?
24  A  That's what I understood. That's what I
25    understood.

---

**112**

1  Q  All right. If we go forward to the March 9, 2010
2    meeting, Dr. Muniz is present.
3  A  Right.
4  Q  So she gets to say her peace in this case, right?
5  A  Right.
6  Q  And there's more discussion.
7  A  Right.
8  Q  Then we see a motion to terminate but you're going
9    to hold your final recommendation until receipt of
10    the outside reviews.
11  A  That's correct.
12  Q  Okay, all right. And only if the outside reviews
13    come back positively for Dr. Muniz would you need
14    to meet to discuss again, Is that your
15    understanding of what this means?
16  A  Yes. Only if they were positive, meaning that they
17    felt as though what she did was okay. If they felt
18    as though there was a delay in treatment, which it
19    says there, then the termination would go forward.
20  Q  All right. So if the outside reviews confirmed the
21    internal reviews, your recommendation would be
22    effective to terminate her privileges, at that
23    point.
24  A  Yes. I remember my concern was the delay. You
25    know, being a person who practices here, I know

---

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

113

1    that two hours seemed to be a lot longer than it
2    needs to take to get the patient to the OR. That
3    was my main, my huge concern, was the delay.
4  Q  Okay. And what I'm trying to make sure I
5    understand is when the actual recommendation of the
6    MEC was made to terminate. And it looked --
7  A  Yes. It was here after we talked to her.
8  Q  All right. Here meaning March 9th?
9  A  Yes.
10 Q  Okay, all right.
11 A  She came and talked to us.
12 Q  Got you. You waited until she talked to you, and
13   then on March 9th that was the recommendation,
14   unless positive reviews came back from the external
15   reviewers?
16 A  Right.
17 Q  All right. And I think that corresponds with this
18   letter, let's look at Exhibit No. 13, March 16,
19   2010 letter. This is the Notice of Adverse
20   Recommendation that Mr. Dick showed you.
21 A  Okay.
22 Q  And it looks like it reflects on March 9, 2010 you
23   elected to continue the suspension and the
24   committee recommended on that day that the clinical
25   privileges would be revoked.

---

114

1  A  Right.
2  Q  Does that comport with your understanding of what
3    happened at the March 9th meeting?
4  A  That's my understanding of what happened at the
5    meeting.
6  Q  All right. Now Mr. Dick made a point to mention or
7    to have you read the description of the basis of
8    the notice of adverse recommendation.
9  A  Right.
10 Q  He had you read this basis, you attended to the
11   patient, then he asked you a question about whether
12   or not anything about the prior cases appeared
13   here, do you recall that?
14 A  Yes.
15 Q  And he asked you if anything about her behavior
16   appeared here, do you recall that?
17 A  Right.
18 Q  All right. And you said no. Do you know whether
19   or not a subsequent notice went out from Mr.
20   Milanes that referred to, in addition to this, her
21   prior history and her behavioral issues?
22
23   MR. DICK: Object to form.
24
25 Q  Do you know?

---

115

1  A  I --
2  Q  I tell you what, let me withdraw that question, let
3    me just show you this. Let's make this --- well,
4    let's show it to you first.
5  A  All these letters in front of me.
6  Q  Yeah. I tried to avoid one more letter. All
7    right. Take a look at this and we may or may not
8    make it an exhibit. This is not addressed to you,
9    but take a look at it there.
10
11   MR. DAYHUFF: David, I'll give you a copy.
12
13 A  Okay. There's a letter, I'm reading this bottom
14   paragraph, the recommendation of the medical
15   executive committee is further based on your
16   history, including prior peer review proceeding in
17   which the board of governors required that you
18   submit to an evaluation and treatment if needed.
19   It describes that she had a prior history and we
20   did talk about that prior history.
21 Q  All right. And if you look further on page two,
22   three, let's look at page three, description of
23   grounds/charges.
24 A  Clinical competence in the treatment of patients by
25   the chart numbers, and it listed them, and your

---

116

1    professional judgment.
2  Q  It lists one, two, three, four, five, six chart
3    numbers, including the last one which was 227589?
4  A  Right.
5  Q  Do you recognize 227589 as the catastrophic case?
6  A  That's the one that's listed there.
7  Q  All right. And do you, you probably don't
8    recognize but do you believe that the other five
9    cases are the original five cases from 2009?
10 A  I believe that those were the five cases.
11 Q  All right. Well, let's make that an exhibit,
12   exhibit whatever number we're on.
13
14   MR. DICK: Seventeen, I believe.
15
16 Q  Oh, I guess it could be my first exhibit, that's
17   fine.
18
19       (Whereupon, Letter, consisting of 5
20       pages, was marked Defendant's Exhibit No.
21       1 for identification.)
22
23 Q  Dr. Minto, do you have any idea where --- Well, I
24   guess you received one request for information
25   about Dr. Muniz's practice from Conway that we

---

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

---

**117**

1  looked at already.
2  **A   Right.**
3  Q   Are you aware of anywhere else that she may or may
4     not have applied for privileges?
5  **A   No.**
6  Q   Okay.
7  **A   Huh-uh.  The newspaper, the newspaper said that she**
8     **might go to Bamberg, I think, it's Bamberg.**
9  Q   Okay.
10  **A   Bamberg.**
11  Q   Other than that, were you aware of any other
12     hospitals where she may or may not have applied for
13     privileges?
14  **A   No.**
15
16     MR. DICK:  Let's go off the record.  Let's take a
17        break.
18
19        (Off the Record)
20
21  Q   That's about it, I'm done.
22
23     MR. DAYHUFF:  Any further follow up?
24     MR. DICK:  Yeah.  A couple questions.
25

---

**118**

1     RE-DIRECT EXAMINATION
2  BY MR. DICK:
3  Q   Okay.  Looking at Exhibit No. 11, the special
4     meeting on March 9th, after that meeting did the
5     MEC ever meet again to discuss this issue?
6  **A   I'd need minutes, I would really need minutes,**
7     **because it's been so many meetings and so many**
8     **days.**
9  Q   Okay.  Unless it was -- if you had met after this
10     date and discussed Dr. Muniz, would it be in the
11     minutes then?
12  **A   I don't know the answer to that.  I don't do the**
13     **minutes, so I, you know, I would need something to**
14     **jog my memory is what I'm telling you.  I would**
15     **need something, sometimes what jogs it is seeing**
16     **something else on the page.**
17  Q   Okay.  Then do you remember if the MEC met after
18     this March 9th meeting to discuss this issue, this
19     incident?
20  **A   Off the top of my head, I cannot recall.  I know**
21     **that people on the committee asked if there, what**
22     **her response was, I do remember that and them**
23     **saying she requested a fair hearing.**
24  Q   Okay.
25  **A   I do remember that.**

---

**119**

1  Q   But you don't remember any further discussion about
2     the incident itself?
3  **A   No.  Not that I --**
4  Q   Okay.  Do you know if the, after the March 9th
5     meeting the MEC ever met to discuss the outside
6     reviews that were received?
7  **A   I don't know the answer to that.  I know there was**
8     **discussion about the outside reviews, but I'm not**
9     **sure if, I'm not sure, I'm not sure.  I know there**
10     **was discussion about the outside reviews and what**
11     **they came back at.  But I'm not sure if they'd**
12     **already terminated or if it was just an FYI or, I**
13     **don't know.**
14  Q   On the March 9th meeting, Exhibit No. 11, did you
15     vote on that recommendation to terminate Dr.
16     Muniz's privileges?
17  **A   What I remember is that it wouldn't have mattered**
18     **if I voted or not.**
19  Q   Okay.  But the question is did you vote?
20  **A   I can't remember if I voted.  It says unanimous**
21     **though.**
22  Q   Okay.
23  Q   But they didn't count votes like they did on that
24     previous one.  The previous one there was six yes
25     and a one no.

---

**120**

1  Q   Okay.  And, again, I mean, this is a pretty
2     critical point because you're voting to terminate a
3     Doctors privileges, so I guess my question --
4  **A   What I remember from that meeting, I'm telling you**
5     **is the committee was very, very concerned about**
6     **patient safety and care to the point that one vote**
7     **would not have mattered either direction.  It was**
8     **almost every, everybody at the table as far as my**
9     **eye could see, voted in the same regards.**
10  Q   Okay.  Was your recommendation, at that time during
11     discussions, that she be terminated?
12  **A   Based upon her history and this current case, that**
13     **would have been my recommendation, yes.**
14  Q   Okay.  Exhibit No. 10, the meeting on March 3rd,
15     did you vote in that meeting to continue and/or
16     terminate her privileges?
17  **A   Again, it was unanimous.**
18
19     MR. DAYHUFF:  Object to the form of the question,
20        mischaracterizes prior testimony.  You can
21        answer, unless you want to rephrase.
22
23  Q   Yeah.  I'll just rephrase it.  I'll just ask it,
24     the final recommendation that was, I guess, issued
25     from this meeting, did you vote on that

---

**Thompson Court Reporting, Inc.**
**www.thompsonreporting.com**

Oletha R. Minto, MD - 7/14/2011
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

121

1      recommendation?
2    A   Again, the minutes say unanimous vote. And, again,
3        what I remember from that meeting is as far as the
4        eyes could see it was all in the same direction.
5        It wasn't any dissenting votes.
6    Q   Okay.
7    A   So it wouldn't have mattered either way.
8    Q   So do you remember whether or not you voted?
9    A   The reason I remember in the first one is because
10       there was discussion, I audibly said to myself and
11       to others, they said Minto you're not voting and I
12       said the reason why I wasn't voting. In this one
13       there wasn't that discussion, so I can't remember
14       that. But I would almost say that I voted along
15       with everyone else.
16   Q   Okay. During discussions on this March 3rd, during
17       this March 3rd meeting, did you, what was your
18       recommendation in terms on Dr. Muniz's privileges,
19       status of her privileges?
20   A   In this meeting my thoughts were that members of
21       the committee and I were concerned about the
22       patient safety and care. There were discussions
23       all around as to what to do and there was the
24       motion to terminate and we voted on that motion.
25   Q   Okay.

122

1    A   Who made the original motion, I couldn't tell you
2        who made it.
3
4        MR. DAYHUFF: Was that question addressed to the
5            March 3rd or the March 9th?
6
7    A   The March 3rd.
8    Q   This March 3rd was to continue the suspension. And
9        whether or not, I don't know who made the motion to
10       continue the suspension, I voted along or I believe
11       I voted along because it says unanimous.
12   Q   Okay.
13   A   March 9th it was if the reviews come back, this is
14       the way that we were going to proceed, that was the
15       vote on the table.
16   Q   Okay. During the March 3rd and March 9th meetings
17       did, and they've listed, on March 3rd they've got
18       Scott Ansede, Carlos Milanes, Sharon Hagan, and
19       Terri Ergle listed as, I guess, the non-medical
20       personnel that are there. Did they participate in
21       the discussions during these meetings?
22   A   They don't participate in any discussions at all.
23       I know that they're questions that are asked of
24       what the options are, what do the bylaws say, Terri
25       will pull out the bylaws and everybody will read

123

1        the bylaws. That's usually what they're, that's
2        what their part in it is.
3    Q   Okay. So they don't participate in the discussions
4        then?
5    A   Not that I can recall, no.
6    Q   Have they ever, in any of the MEC meetings,
7        participated in the discussions?
8    A   It's mainly presentation of whatever they have to
9        present, this is what the bylaws say, you know.
10       Sometimes they have things to talk about that have
11       nothing to do with the case you're talking about,
12       sometimes it just has to do with something going on
13       in the hospital it has nothing to do with any
14       physician at all. It could be some new forms or
15       some new things by JCAHO. I mean, that's usually
16       their purposes at these meetings.
17   Q   Okay. Have you ever had a professional liability
18       or malpractice claim filed against you?
19   A   No.
20   Q   Never?
21   A   Never.
22   Q   Have you ever been the subject to peer review?
23
24       MR. DAYHUFF: Objection. I mean, we can't inquire
25           into her peer review, much less anyone else.

124

1        I mean, haven't we agreed to set that aside?
2        MR. DICK: Not really. But that's fine. I'll
3            reserve my right to come back and ask it later
4            if we so choose or if we get a judge to rule
5            on it.
6        MR. DAYHUFF: Okay.
7
8    A   I don't know what that --
9    Q   You don't have to answer that question. That's all
10       I've got.
11       - - - - -
12       (Whereupon, at 4:14 p.m., the deposition
13       in the above-entitled matter was
14       adjourned.)
15
16
17
18
19
20
21
22
23
24
25

**Oletha R. Minto, MD - 7/14/2011**
Margo J. Hein-Muniz, MD, et al. v. Aiken Regional Medical Centers, et al.

125

1        The witness reserved his/her right to review
2    the deposition transcript.  This transcript has
3    been made available to the witness with the
4    appropriate instructions to complete the review and
5    submit a signed errata sheet within the thirty (30)
6    days provided for by the SC Rules of Civil
7    Procedure.
8
9        Any corrections and/or changes requested and
10   submitted by the witness will be sealed under
11   separate cover and forwarded to the taking party
12   with instructions to place with this original
13   sealed transcript.
14
15
16
17
18
19
20
21
22
23
24
25

126

State of South Carolina )
                        )        CERTIFICATE
County   of Lexington )
        Be it known that the foregoing Deposition of
OLETHA R. MINTO, MD was taken by Thea K. Salmonson;

        That I was then and there a notary public in
and for the State of South Carolina-at-Large;
        That by virtue thereof I was duly authorized
to administer an oath;

        That the witness was by me first duly sworn to
testify the truth, the whole truth, and nothing but the
truth, concerning the matter in controversy aforesaid;

        The foregoing transcript represents a true,
accurate and complete transcription of the testimony so
given at the time and place aforesaid to the best of my
skill and ability;
        That I am not related to nor an employee of
any of the parties hereto, nor a relative or employee of
any attorney or counsel employed by the parties hereto,
nor interested in the outcome of this action.

        Witness my hand and seal 21 DAY OF JULY, 2011


        Thea K. Salmonson

Notary Public for South Carolina
My Commission Expires: March 15, 2020

        This transcript may contain quoted material.  Such
        material is reproduced as read or quoted by the
                        speaker.