# EXHIBIT II

to

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## Civil Action No.: 1:10-cv-00986-JFA

*Transcript from deposition of Margo Hein-Muniz*

## Margo Hein-Muniz, M.D. 8/25/2011

### Page 1

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF SOUTH CAROLINA
 2                     AIKEN DIVISION
 3   MARGO J. HEIN-MUNIZ, M.D. AND
     PARKSIDE MEDICAL CONSULTANTS, LLC,
 4   D/B/A MAGNOLIA MEDICAL,
              Plaintiff(s),
 5
         vs.             Case No.: 1:10-CV-00986-MBS
 6
 7   AIKEN REGIONAL MEDICAL CENTERS,
     UNIVERSAL HEALTH SERVICES, INC.,
 8   AIKEN OBSTETRICS & GYNECOLOGY ASSOCIATES,
     P.A., CARLOS A. MILANES, K.D. JUSTYN,
 9   OLETHA R. MINTO, M.D., JAMES F. BOEHNER,
     M.D., ROBERT D. BOONE, M.D., JONATHAN H.
10   ANDERSON, M.D., and THOMAS P. PAXTON, M.D.,
11              Defendant(s).
12   ** THIS DEPOSITION CONTAINS CONFIDENTIAL INFORMATION **
13                 D E P O S I T I O N
14   WITNESS:      MARGO J. HEIN-MUNIZ, M.D.
15   DATE:         Thursday, August 25, 2011
16   TIME:         4:28 p.m.
17   LOCATION:     Sowell, Gray, Stepp & Laffitte
                   1310 Gadsden Street
18                 Columbia, South Carolina
19   TAKEN BY:     Attorneys for the Defendants
20   REPORTED BY:  SHERI L. BYERS
                   Registered Professional Reporter
21
     -------------------------------------------------
22             COMPUSCRIPTS, INC.
          A Full-Service Court Reporting Agency
23             Post Office Box 7172
          Columbia, South Carolina 29202
24             803-988-0086
               1-888-988-0086
25             www.compuscripts.com
```

### Page 2

```
 1   APPEARANCES:
 2   ATTORNEYS FOR THE PLAINTIFFS
          MARGO J. HEIN-MUNIZ, M.D. AND
 3        PARKSIDE MEDICAL CONSULTANTS, LLC,
          D/B/A MAGNOLIA MEDICAL,
 4
          SOWELL, GRAY, STEPP & LAFFITTE
 5        BY:  BIFF SOWELL, ESQUIRE
              -and- DAVID C. DICK, ESQUIRE
 6        1310 Gadsden Street
          Columbia, South Carolina  29201
 7        bsowell@sowellgray.com
          ddick@sowellgray.com
 8        803.929.1400
 9   ATTORNEYS FOR THE DEFENDANTS
10        AIKEN REGIONAL MEDICAL CENTERS, UNIVERSAL
          HEALTH SERVICES, INC., AIKEN OBSTETRICS &
11        GYNECOLOGY ASSOCIATES, P.A., CARLOS A. MILANES,
          K.D. JUSTYN, OLETHA R. MINTO, M.D., JAMES F.
12        BOEHNER, M.D., ROBERT D. BOONE, M.D., JONATHAN
          H. ANDERSON, M.D., AND THOMAS P. PAXTON, M.D.:
13
          NELSON, MULLINS, RILEY & SCARBOROUGH
14        BY:  TRAVIS DAYHUFF, ESQUIRE
          1320 Main Street, 17th Floor
15        Columbia, South Carolina  29201
          travis.dayhuff@nelsonmullins.com
16        803.799.2000
17
18
19
20
21
22             (INDEX AT REAR OF TRANSCRIPT)
23
24
25
```

### Page 3

```
 1        STIPULATION:  It is stipulated by and between
 2   Counsel that this deposition is being taken in
 3   accordance with the Federal Rules of Civil Procedure,
 4   and that the deponent reserves the right to read and
 5   sign the deposition transcript.
 6        - - - - - - - - - - - - - - - - - - -
 7            MARGO J. HEIN-MUNIZ, M.D., being
 8   first duly sworn, testified as follows:
 9            EXAMINATION
10   BY MR. DAYHUFF:
11     Q.   Dr. Muniz, my name is Travis Dayhuff.  We met
12   a moment ago, but for the record, I'm here on behalf of
13   the defendants in this case.
14        Do you understand that?
15     A.   Yes.
16     Q.   Good.  The rules require me to give you some
17   instructions before we begin, the Federal Rules of Civil
18   Procedure, so I'll run through those.
19        You may hear some objections to the form of
20   my question today from your counsel.  If they want to
21   make an objection to my question, you need to pause your
22   answer and allow them to enter the objection, and then
23   you answer,
24        Do you understand that?
25     A.   Correct.
```

### Page 4

```
 1     Q.   The only exception to that would be if your
 2   counsel instructs you not to answer, and then you
 3   wouldn't answer.
 4        Do you understand that?
 5     A.   Yes.
 6     Q.   Good.  If you need any breaks during the
 7   deposition, we can certainly take them.  However, you
 8   are not to discuss the substance of your testimony
 9   during breaks with your counsel or anyone else.
10        Do you understand that?
11     A.   Yes.
12     Q.   Good.  If you don't understand one of my
13   questions -- that will certainly happen, that I will be
14   inartful in how I phrase a question at some point --
15   you need to ask me for clarification or explanation
16   rather than your counsel.
17        Do you understand that?
18     A.   Yes.
19     Q.   Good.  Generally speaking, the outline for
20   this deposition, I'm going to ask you some background
21   information, not some, probably a lot of background
22   information, understand who you are, your practice, your
23   work history, that kind of thing.  Then I'm going to
24   talk a lot about the two peer review actions that appear
25   to me to be the heart of this case.  I'll probably then
```

Margo Hein-Muniz, M.D. 8/25/2011

**Page 5**

1  finish with some discussions about the documents that
2  I've received and other stuff that I've received prior
3  to today.  Does that make sense?
4      A.  Yes.
5      Q.  Good.  Preliminarily, I imagine you had time
6  to consult with your attorneys before this deposition.
7      A.  Yes.
8      Q.  Okay.  I don't want to know what you talked
9  about, but how much time did you spend preparing for
10  this deposition with your attorneys today?
11      A.  How much time did I -- rephrase the question.
12      Q.  How much time did you prepare with your
13  attorney -- how much time did you spend with your
14  attorneys preparing for this deposition today?
15      A.  Today?  The hour we waited for you.
16      Q.  Okay.  And I understand that you may have met
17  with them yesterday as well; is that correct?  That
18  would have been Wednesday.  Maybe not.
19      A.  It was either Tuesday or Wednesday.
20      Q.  And did you spend that time preparing for the
21  deposition or for some other purpose?
22      A.  Reviewing and preparing for the deposition.
23      Q.  Okay.  And about how long was that?
24      A.  I'd say a couple or three hours, maybe more.
25      Q.  Did you talk to anyone else other than your

**Page 6**

1  counsel in preparation for this deposition today?
2      A.  No.
3      Q.  All right.  Let's see.  Did you review any
4  documents in preparation for this deposition, you
5  yourself that you thought would be important?
6      A.  Yes.
7      Q.  Okay.  What did you review?
8      A.  I reviewed the last patient's chart.
9      Q.  All right.  And for the record, that is K.
10  Crane; is that right?
11      A.  Yeah, K.C.
12      Q.  K.C.  All right.
13      MR. SOWELL:  We'll just call her K.C.
14      MR. DAYHUFF:  K.C.  I got it.
15  BY MR. DAYHUFF:
16      Q.  You reviewed that medical record, is that
17  what I understood you to say?
18      A.  Yes.  I briefly ran through the entire
19  document.
20      Q.  Okay.  Anything else?  Go ahead.
21      A.  Specifically the trial or peer review.
22      Q.  I'll bet that's the Fair Hearing Exhibit
23  Book; is that what that is?
24      A.  Correct.  The one provided by the hospital.
25      Q.  And that's the one for 2010?

**Page 7**

1      A.  Correct.
2      Q.  The 2010 hearing; is that correct?
3      A.  Correct.
4      Q.  Good.
5          All right.  Anything else?
6      A.  No.
7      Q.  It looked like, and I may be wrong, that you
8  produced to me -- well, I don't know what's in there,
9  but previous to today, a lot of the K.C. medical record.
10  Is that right?  Or do you know?  Produced to me as in
11  your counsel sent it to me.  Do you know anything about
12  that?  You may not.
13      A.  I don't know anything about that.
14      Q.  Okay.  I was going to ask you why you sent
15  that back to me, and then I was going to ask you if
16  there was an additional part of that medical record that
17  maybe you had that I didn't have or something like that.
18  But you don't know anything about that.  Fine.
19          Okay.  Background information.  What's your
20  date of birth?
21      A.  09-02-1965.
22      Q.  Okay.  Place of birth?
23      A.  Geneva, Illinois.
24      Q.  Current address?
25      A.  170 Waters, separate word, Edge, Drive, Aiken

**Page 8**

1  South Carolina 29803.
2      Q.  And how long have you been residing at that
3  address?
4      A.  Approximately ten years.
5      Q.  Okay.  What's your practice's address?
6      A.  My practice's address is Suite 2300, at 410
7  University Parkway, Aiken, South Carolina 29801.  And it
8  has a P.O. Box 2037.
9      Q.  2037.  Does your practice have an e-mail
10  address?
11      A.  Magnoliamedical@bellsouth.net.
12      Q.  Do you have a personal e-mail address?
13      A.  Margomuniz@gmail.com.
14      Q.  And has that practice address -- how long
15  have you had that practice address that you just gave to
16  me?  A long time?
17      A.  We've been probably up in that suite for,
18  let's see, I'm going to go with -- we have been up there
19  for Katrina Crane, we've been there for the thing
20  before that, probably since 2007.
21      Q.  Okay.
22      A.  2008.  I can't remember.
23      Q.  Your best estimate is fine.  2007 or 2008,
24  your practice has been located in Suite 2300 of the
25  address you previously provided?

Margo Hein-Muniz, M.D. 8/25/2011

## Page 9

1    A.   Yes.

2    Q.   Good.  Your e-mail address,

3  magnoliamedical@bellsouth.net, how long has that been

4  your e-mail for your practice?

5    A.   Seven years, give or take.

6    Q.   How long has margomuniz@gmail.com been your

7  personal e-mail address?

8    A.   One and a half to two years.

9    Q.   What was your prior e-mail address, personal?

10  Do you recall?

11    A.   Margomuniz@atlanticbroadband, I believe

12  they're a dot com.

13    Q.   And you had that e-mail address for going

14  back in time?

15    A.   Maybe about a year and a half to two years.

16    Q.   Okay.  Do you communicate via e-mail?  Let's

17  start with your personal e-mail address.

18    A.   To whom?

19    Q.   Some people use e-mail, some people don't use

20  e-mail.  Do you generally use e-mails as a means of

21  communication?

22    A.   Yes.

23    Q.   All right.  Would you characterize yourself

24  as a frequent user of e-mails, infrequent?

25    A.   I would characterize myself in between

## Page 10

1  infrequent and medium.

2    Q.   All right.  Infrequent and medium.  And

3  roughly would that be, you know, you e-mail every day,

4  you e-mail a couple of times a week, what would --

5    A.   I don't e-mail so much as I receive and read

6  e-mails.

7    Q.   Okay.  You receive and read e-mails every

8  day?

9    A.   No.

10    Q.   No.  Every other day?

11    A.   Probably every third to fourth day.

12    Q.   Okay.  And send e-mails every four days, five

13  days?

14    A.   About three to four days if they need a

15  response.

16    Q.   Okay.

17    A.   Or if they need forwarding.

18    Q.   Do you send and receive -- do you utilize

19  your practice's e-mail to send and receive e-mails?

20    A.   No.

21    Q.   No.  Okay.  Who would use that?

22    A.   My office manager.

23    Q.   Do you ever send or receive -- do you ever

24  send e-mails through your practice e-mail?

25    A.   My personal, do I personally?

## Page 11

1    Q.   Yeah, do you personally?

2    A.   No.

3    Q.   Okay.  Your education.  Did your undergrad

4  where?

5    A.   I won a scholarship to Perdue University --

6    Q.   Okay.

7    A.   -- for pharmacology and pharmacognosy.  And

8  it was a full tuition scholarship for all six years.

9    Q.   Good.  You came out of Perdue with what, an

10  M.S. in something?

11    A.   I came out of Perdue with a --

12    Q.   Or a B.S., rather?

13    A.   Yes, a B.S. in pharmacology and pharmacy.

14  And a subspecialty in nuclear medicine/nuclear pharmacy

15  certification.

16    Q.   All right.  And then you went to med school;

17  is that right?

18    A.   No, sir.

19    Q.   You worked some in the pharmacy?

20    A.   I worked for Hawthorn -- well, for

21  Medi-Physics which became Hawthorn, for Roche which

22  became Amersham International, for a period of

23  approximately five to six years in Chicago, Illinois, as

24  a nuclear pharmacist and then subsequently as the lead

25  pharmacist.

## Page 12

1    Q.   Okay.  And after five or six years, you went

2  back to med school?

3    A.   Correct.

4    Q.   Did you leave your pharmacy career on good

5  terms with your employer?

6    A.   Yes.

7    Q.   Med school, where did you go to med school?

8    A.   I went to med school at Springfield, Southern

9  Illinois University Med School.

10    Q.   The fighting Salukies?

11    A.   I don't know if they fight, but they're

12  Salukies.

13    Q.   Actually, they're racing dogs, aren't they?

14    A.   Yes.  They're an Egyptian a racing hound.

15    Q.   I should not have imputed the fighting to

16  them.

17    A.   They don't fight, by the way.  They just

18  blush.

19    Q.   All right.  Southern Illinois.  What year was

20  that you went to med school?  So walk back through your

21  life.

22    A.   Wow.  Okay.  Let's see how old am I?  I want

23  to say that I got out of med school in 1997.  I'd have

24  to look at my curriculum vitae to make sure that's a

25  hundred percent, but I want to say 1997.  I was in the

Margo Hein-Muniz, M.D.  8/25/2011

### Page 13

1  problem-based learning tract.

2      Q.  So you got out of med school in '97, is that

3  what you said, or you went to med school in '97?

4      A.  I want to say from '93 to '97 I was in med

5  school.

6      Q.  After med school, did you do a residency?

7      A.  I did.

8      Q.  Okay.  Where did you do your residency?

9      A.  I did my first two years, I stayed at

10  Springfield.

11      Q.  Okay.  And what specialty was your residency?

12      A.  OB/GYN.

13      Q.  Okay.  And you completed that residency?

14      A.  I did the third and fourth year out here at

15  Palmetto Richland.

16      Q.  Okay.

17      A.  Columbia, South Carolina.  Years three and

18  four.

19      Q.  All right.  How did you come to start a

20  residency at Springfield and finish at Palmetto

21  Richland?  Is that some sort of a program they had to go

22  out and --

23      A.  No, sir.  I found out that Dr. Stephen

24  Cruickshank was taking over the chairmanship of the

25  program at Palmetto Richland.  And he's one of the

### Page 14

1  leading physicians in the field of urogynecology, of

2  which I had a special interest, and I wanted to train

3  underneath him.  The program had lost a third-year

4  resident.  I came out and interviewed for the position,

5  along with several other residents, and I got the job.

6      Q.  Okay.  And did you finish your

7  residency?  I think you started Aiken in 2001.

8      A.  Yeah.  So it would have been right before --

9  right before that.  I finished in June, and I started

10  working, I want to say that September.  August or

11  September.

12      Q.  Okay.  All right.  Any other formal education

13  that we haven't hit?  I imagine you do CMEs, which I

14  don't need to hear about.  But any other major formal

15  education?

16      A.  I've done several preceptorships with

17  Dr. Mattox and with Dr. Cruickshank, learning special

18  techniques in urogynecology.  I've been sent to

19  laparoscopy courses by drug companies to do laparoscopy,

20  pigs who were asleep, and learn new surgical techniques.

21  I have recently recertified as a pharmacist, so I had to

22  complete about ten years of continuing education for

23  that.

24      Q.  Why did you recertify as a pharmacist?

25      A.  Because of the events of which have happened

### Page 15

1  to me.

2      Q.  Okay.  Because of the peer review suspension

3  and revocation in 2010?

4      A.  Because of the damages that I have incurred

5  in an effort to support my family.

6      Q.  Okay.

7      A.  And children.

8      Q.  So you recertified as a pharmacist.  Does

9  that mean -- I'm not sure what that means.  Does that

10  mean you make your license active again?

11      A.  You reactivate.

12      Q.  So you have a South Carolina pharmacy license

13  now?

14      A.  You reactivate in your home state, which was

15  Illinois.

16      Q.  Right.

17      A.  And then -- the procedure it's called

18  reciprocation, and I'm reciprocating in South Carolina

19  and Georgia.  And I still have to complete my final

20  examinations in both of those states.

21      Q.  All right.  So what date did you achieve

22  reactivation in Illinois or approximate date?

23      A.  Last year.

24      Q.  Okay.  2010?

25      A.  In the late -- late part of the year.

### Page 16

1      Q.  Was that -- did you reactivate before or

2  after the conclusion of the most recent peer review

3  action at ARMC?

4      A.  After.

5      Q.  After.  All right.  And when do you expect

6  you'll be able to reciprocate South Carolina and

7  Georgia, you need to take the law exam?

8      A.  I have to take the law exam in both places.

9      Q.  Is that coming up soon?

10      A.  I have to schedule it.  I've registered.

11  They'll assign me a date within the next two to three

12  months.

13      Q.  Okay.  And once you get your license active

14  in South Carolina, do you intend to practice?

15      A.  I intend to practice part-time.

16      Q.  All right.  And in what pharmacy capacity

17  would that be?

18      A.  I would probably practice in compounding

19  pharmacy, retail.

20      Q.  And is there one in particular or are there

21  compounding pharmacies in Aiken?

22      A.  There's several compounding pharmacies in

23  Aiken.  You have to train.  You have to have a

24  supervising pharmacist for a year in the state of

25  South Carolina.

Margo Hein-Muniz, M.D. 8/25/2011

## Page 17

1    Q.   All right.  Okay.  So you work with a
2  pharmacist for a year as a assistant?
3    A.   No.  More like --
4    Q.   Protege?
5    A.   Protege.
6    Q.   Okay.  All right.  Do you have any idea what
7  you would make as a part-time compounding pharmacist?
8  An estimate would be fine.
9    A.   Well, I already work two jobs trying to make
10  up for the financial losses, so I would work on the
11  weekends, probably eight hours each.  I would imagine
12  that --
13    Q.   I imagine they would pay you hourly, wouldn't
14  they?
15    A.   Yes.  So that would be 16 hours a weekend.
16  And the average starting pharmacist, my understanding,
17  at least, is about 120.  So whatever that divides out to
18  be.
19    Q.   16 hours at 120 an hour?
20    A.   No.  No, sir.  The average full-time
21  pharmacist makes between 120 to 150 is what I've been
22  told by other pharmacists.  So whatever the hourly rate
23  would break down.
24    Q.   Okay.  Maybe I'm tired, confused.  What
25  hourly rate do you expect you will receive?

## Page 18

1    A.   Does anybody have a calculator?
2    Q.   It will be somewhere between 120 and 150?
3    MR. DICK:  She's saying 120,000 a year.
4  Whatever the breakdown of the hourly that would be.
5    THE WITNESS:  Divided by 52 divided by 40
6  hours a week.  I do not know what the hourly rate would
7  be.  Significantly less than a physician.
8    MR. DAYHUFF:  Okay.  I was missing the
9  crucial year part of it.
10  BY MR. DAYHUFF:
11    Q.   Okay.  You mentioned you're working two jobs
12  currently to make up for the damages that you allege
13  you've suffered.  What are the two jobs?
14    A.   I work my main clinic, which is Magnolia
15  Medical.  And I'm also the medical director of a
16  methadone clinic in Aiken.
17    Q.   Okay.  Those are your two jobs.  And --
18    A.   I'm sorry.  In terms of education, I had to
19  get certified with DHEC and government bodies that do
20  addiction medicine.
21    Q.   Okay.  When did you begin your work as
22  medical director of the methadone clinic?
23    A.   I'm going to estimate around October to
24  December of last year.
25    Q.   October, December of 2010.

## Page 19

1    Did you take on that activity as a result of
2  the peer review suspension revocation?
3    A.   Yes.
4    Q.   Okay.  And how much do you receive?
5    A.   $125 an hour.
6    Q.   And how many hours do you work a week?  Or
7  however you want to quantify it for me.
8    A.   I work Monday through Thursdays,
9  approximately from 5:00 in the morning to 7:00.  So
10  about two hours a day.
11    Q.   Okay.  All right.  And do you have a -- let's
12  see, do you have an ownership interest in this methadone
13  clinic?
14    A.   No.
15    Q.   No.  So you are --
16    A.   A subcontractor employee.
17    Q.   Okay.  Who owns the methadone clinic?
18    A.   Brent Brady.  B-r-a-d-y.
19    Q.   Okay.  Do you have any written agreements or
20  contract, like what you do in consideration --
21    A.   It's a gentleman's agreement.
22    Q.   Okay.  So you receive a 1099 from Brent Brady
23  or his corporate entity?
24    A.   His corporate entity.
25    Q.   Okay.  Is that money that you make as the

## Page 20

1  medical director of that methadone clinic, is that run
2  in any way through your Magnolia Medical --
3    A.   No.
4    Q.   -- LLC?
5    A.   No.
6    Q.   Separate and apart?
7    A.   Correct.
8    Q.   Okay.  Where is this methadone clinic
9  located?
10    A.   Suite 1560 in the same medical building, 410
11  University Parkway, South Carolina.
12    Q.   Okay.  And is this the suites -- we were
13  talking about your suite and talking about this suite.
14  Is this the medical office building that's relatively
15  close to the Aiken Regional Medical Center?
16    A.   Yes.
17    Q.   Suite 1560, was that a suite that you had
18  control over before this became a methadone clinic?
19    A.   Yes.
20    Q.   Yes.  Okay.  So you rented that suite from --
21    A.   We own that suite.
22    Q.   You own that suite.  Okay.
23    Now, you are renting to Brent Brady's
24  corporate entity?
25    A.   Correct.

Margo Hein-Muniz, M.D. 8/25/2011

Page 21

1    Q.    All right.  There's a lease that reflects
2    that?
3    A.    He intends to purchase the facility.
4    Q.    Okay.
5    A.    We've had it up for sale.
6    Q.    All right.  Do you have an agreement in
7    principle of when he's going to purchase this unit?
8    A.    Yes, but I don't know the details of that.
9    The business matters are usually run by my husband.
10   Q.    And your husband's name is?
11   A.    Felix, F-e-l-i-x, Muniz.
12   Q.    Do you happen to know how much or
13   approximately how much Brent Brady will pay you for
14   Suite 1560?
15   A.    I don't.
16   Q.    How much did you pay for Suite 1560?
17   A.    I don't know.
18   Q.    Okay.  You mentioned your husband.  How long
19   have you been married?
20   A.    20 years.
21   Q.    Wow.  And Mr. Muniz, does he have -- is he
22   employed?  Does he have a profession?  What does he do?
23   A.    He's a professional financial adviser.
24   Q.    Okay.  I think you mentioned he handles a lot
25   of the finances.  Does he handle the finances for your

Page 22

1    practice, Magnolia Medical?
2    A.    The main finances are handled by my office
3    manager and my accountants, The Hobbs Group.  His role
4    is strictly as financial adviser to analyze the
5    practice, run pro formas, answer questions.
6    Q.    Okay.  Does he have any financial
7    certifications?
8    A.    He has multiple certifications.  He has an
9    MBA in business.  He has a Series 7, a Series 8, and a
10   couple of other things that I don't understand.
11   Q.    Okay.  Where did he get his MBA?
12   A.    He did undergraduate work through Aiken Tech,
13   and then he did part of it through, I want to say
14   University of Arizona online.
15   Q.    How long has he been an MBA?  Approximately,
16   if you don't know for sure.
17   A.    I'm going to approximate about four years.
18   Q.    Okay.  All right.
19   A.    Maybe longer.
20   Q.    That's okay.  Your best estimate as you sit
21   here.
22        Do you have any children?
23   A.    We have two adopted children.
24   Q.    Okay.  How old are they?
25   A.    We adopted them when they were 12.  They're

Page 23

1    18 now.
2    Q.    Okay.  Both are 18?
3    A.    They're a set of twins.  Slightly used twins.
4    Q.    Do your twins still live with you?
5    A.    My daughter lives up in Chicago.
6    Q.    Okay.
7    A.    My son still lives at home.
8    Q.    All right.
9    A.    And he's going to college now.
10   Q.    Okay.  Where is he going to college?
11   A.    At Aiken Tech.
12   Q.    Do you support your son and daughter still,
13   financially?
14   A.    I support my son.  I've stopped supporting my
15   daughter.
16   Q.    Okay.  All right.  Any prior marriages before
17   Felix?
18   A.    No.
19   Q.    Okay.  We've talked about medical director,
20   we've talked about what you are going to do with
21   pharmacy, and your other job is Magnolia Medical, your
22   OB/GYN practice; is that correct?
23   A.    Correct.  And I'm a professional speaker, for
24   what it's worth.
25   Q.    All right.  And what do you -- tell me a

Page 24

1    little about that.  What does that mean?
2    A.    To be hired by specific drug companies to
3    educate other physicians regarding medications.
4    Q.    All right.
5    A.    I get an occasional speaking engagement,
6    where they'll hire me.
7    Q.    Is that because of your OB/GYN background or
8    because of your pharmacy background?
9    A.    Both.
10   Q.    Both.  Okay.  How much do you make a year as
11   a professional speaker?  I imagine it varies year to
12   year, but if you can give me a rough estimate.
13   A.    Not a whole lot.  Certainly under 5,000.
14   Q.    Okay.  All right.  Any other work that you
15   do?  Professional speaker, director of the methadone
16   clinic.
17   A.    Besides running a household, no.
18   Q.    Running the household.  Good.  Okay.
19   Felix must help some with that?
20   A.    Absolutely.  He's a wonderful man.
21   Q.    Excellent.
22        All right.  You have a South Carolina medical
23   license, I presume?
24   A.    Yes, sir.
25   Q.    Do you have a medical license in any other

Margo Hein-Muniz, M.D.  8/25/2011

Page 25

1  state?

2      A.   I have a medical license in Georgia.

3      Q.   Okay.  And is both your South Carolina and

4  your Georgia medical license fully active at this time?

5      A.   Yes.

6      Q.   All right.  Have you reported the result of

7  the peer review action at ARMC to either South Carolina

8  or Georgia's board of --

9      A.   You're required to, yes.

10     Q.   Do you know whether or not they've started an

11 investigation regarding the report that you made?

12     A.   I had to -- I was not queried by Georgia.  I

13 had to produce an explanation to the head committee of

14 the medical board and in order to maintain my medical

15 license.

16     Q.   Is it your understanding -- what's your

17 understanding of the status of the South Carolina

18 investigation?  Is it closed?  Is it still open?

19     A.   It will be reevaluated every year for as long

20 as this event continues or until my name is cleared.

21     Q.   All right.  But at this time you are under no

22 sanction from the South Carolina Board of Medicine?

23     A.   No.

24     Q.   No sanction from the Georgia Board of

25 Medicine as a result of this action?

Page 26

1      A.   No.

2      Q.   Okay.  Are you board certified in your OB/GYN

3  specialty?

4      A.   I am.

5      Q.   All right.  And is that the ABOG?

6      A.   Yes.

7      Q.   And what does that stand for?

8      A.   American Board of Obstetrics and

9  Gynecologists.

10     Q.   Okay.  Did you report the result of the peer

11 review action to ABOG?

12     A.   I did.

13     Q.   And any adverse result from ABOG as a result

14 of your self-reporting?

15     A.   Initially, they told me I would not be

16 allowed to sit for my yearly mock examinations, is what

17 they're called.  And so we had to submit a letter of

18 appeal and call in several physicians.  I shouldn't say

19 several.  A couple of physicians to verify the veracity

20 of --

21     Q.   Your submissions?

22     A.   -- of my submissions and my continued ability

23 to practice medicine and to comment on their opinion on

24 why I was being subjected to what I was being subjected

25 to.

Page 27

1      Q.   What was the end result of that appeal?

2      A.   Eventually, through the grace of God, it was

3  released.  And I'm allowed this year to take my mock

4  exams and continue to be board certified.  And that,

5  too, will be reassessed every year as long as this is

6  whatever, pending.

7      Q.   Okay.  Why do you think that it will be

8  reassessed every year?  Did they tell you that?

9      A.   Yes.

10     Q.   And what will you have to do as part of that

11 reassessment every year?

12     A.   I don't know because I haven't done it.

13     Q.   Okay.  Did Mr. Dick and Mr. Sowell assist you

14 in your appeal of the ABOG?

15     A.   Yes.

16     Q.   Okay.  Good.  Any other certifications that

17 you have other than ABOG?  I don't know if there are any

18 other certifications that you would have.  Do you have

19 any through your pharmacy?

20     A.   Basic life support.  I carry a category X

21 prescription license because of the training I had to go

22 through for the methadone addiction.  And that's through

23 the American Academy of Addictive Psychiatry and through

24 DHEC.

25     Q.   Okay.  Anything other than that?

Page 28

1      A.   No, sir.

2      Q.   All right.  Let's talk some about your

3  practice.  What is the formal corporate name of your

4  practice, Magnolia Medical Center, LLC?

5      A.   Parkside Medical Consultants, LLC.

6      Q.   Parkside Medical Consultants, LLC.  All

7  right.

8      A.   D/B/A Magnolia Medical.

9      Q.   All right.  What do you call it in your day

10 to day, Magnolia Medical?

11     A.   Magnolia Medical.

12     Q.   All right.  I'll do that in this deposition,

13 and you'll understand that I refer to the LLC.  Okay?

14     A.   Okay.

15     Q.   All right.  How long has Magnolia Medical

16 been incorporated, for lack of a better word, formed as

17 an LLC?

18     A.   Since we moved in 410, so I'm going to

19 estimate about five to six years.

20     Q.   Five to six years.  Okay.  Who are the -- I

21 assume you are a owner of the LLC; is that right?

22     A.   My husband and I are 50 percent owners of

23 Parkside Medical Consultants.

24     Q.   Okay.  50/50 owners.

25          Do you know if it's a manager-managed LLC or

Margo Hein-Muniz, M.D.  8/25/2011

## Page 29

1  a member-managed LLC?

2     A.  I have no idea of what you're talking about.

3     Q.  I don't have any idea either.  David knows,

4  though.

5         Let's see.  In the past, have there been

6  other owners of Magnolia Medical?  I understand

7  currently you and Felix, 50/50.  Have there ever been

8  any other owners?

9     A.  No.

10    Q.  Okay.  Do you own any other business other

11  than publicly-held companies, in whole or in part?  You

12  told me about Magnolia Medical.

13    A.  Muniz & Muniz Holdings, which is our

14  corporation that owns our properties.

15    Q.  Okay.  Any other companies?

16    A.  No.

17    Q.  And you've mentioned that Muniz & Muniz

18  Holdings owns your properties.  What properties does

19  M & M Holdings own?

20    A.  It owns Suites 1560 and Suite 2300.

21    Q.  Anything else?

22    A.  I don't know if our house is in that or not,

23  but I don't think so.

24    Q.  Okay.

25    A.  Once again, I'm not the financial ...

## Page 30

1     Q.  Quite all right.  Whatever your understanding

2  of it is fine.

3         Do you know what kind of entity M&M Holdings

4  is?

5     A.  No.

6     Q.  Okay.  LLC or an Inc. or a -- I should have

7  deposed Felix.

8         Okay.  Tell me about how your work schedule

9  works now.  I imagine things changed a little bit, maybe

10  a lot after the 2010 peer review.  But I want to

11  understand how you are currently working as an OB/GYN at

12  Magnolia Medical.  It's kind of a broad question, but

13  what I'm looking for is, "Well, I do clinic," or

14  whatever you call your office hours, "from here to here,

15  and then I go wherever."  You know, just kind of give me

16  a picture of what your work week looks like.

17        You've already told me about being the

18  medical director and how that works.

19    A.  So I get up in the morning, and I do the

20  rehabilitation center first.  And then from there I go

21  upstairs, and we usually start working at Magnolia till

22  7:30 -- or starting at 7:30.

23    Q.  That's seeing patients in the office?

24    A.  Yes, sir.

25    Q.  Okay.  What's the rehab center?

## Page 31

1     A.  The methadone.

2     Q.  Oh, I'm sorry, the methadone.  I'm sorry.

3         All right.  Go ahead.  7:30, you start seeing

4  patients at Magnolia.

5     A.  We take lunch around 12:00 --

6     Q.  Okay.

7     A.  -- to 1:00.  And then we start seeing more

8  office patients until 5:00ish.

9     Q.  Okay.  And is that Monday through Friday that

10  that schedule is followed?

11    A.  Yes.  Except for every other Friday, we kind

12  of have a half-mast schedule in the office where people

13  can answer telephones.  I have a nurse that answers

14  patient questions and gets caught up on paperwork, and I

15  operate at the surgery center.

16    Q.  All right.

17    A.  Only minor procedures.

18    Q.  You call it the Surgi Center, is that

19  S-u-r-g-i?

20    A.  Surgery center.

21    Q.  Surgery.  Okay.

22    A.  Aiken Surgery Center.

23    Q.  I saw it written once as Surgi Center.  I

24  don't remember who's --

25    A.  It may be.  I don't know.  I can't think of

## Page 32

1  the legal name of it.  I don't know.

2     Q.  Surgery center.

3         And that -- you're there a half day every

4  other week?

5     A.  Every other Friday.

6     Q.  Okay.  And what schedule is that, is that

7  from morning until 1:00?

8     A.  We're not allowed to operate past 3:00, so

9  I'm usually out of there by 1:00.

10    Q.  Okay.  Now, that's your current schedule.

11  About how many patients are you seeing at Magnolia

12  Medical between 7:30 and 5:00?  I know it probably

13  varies.

14    A.  It fluctuates wildly --

15    Q.  Yeah.

16    A.  -- depending upon the season and whatever.

17  It can be anywhere from 30 to 60.

18    Q.  Wow.  Okay.  And when you are doing your work

19  at the surgery center that half day, how many cases are

20  you doing?

21    A.  Three to four.

22    Q.  Is that fairly steady?

23    A.  Yes.

24    Q.  Okay.  What kind of cases are you doing at

25  the surgery center currently?

Margo Hein-Muniz, M.D.  8/25/2011

Page 33

1    A.   I'm only allowed to do minors at the surgery
2  center.  All surgery centers only perform what's
3  considered minor procedure.
4    Q.   What is the -- give me some sense of what
5  that means.  What are minors?  Are these GYN or OB, what
6  is this?
7    A.   They're gynecologic procedures that are
8  outpatient procedures.
9    Q.   All right.  And some examples?
10    A.   Dilatation curettage, diagnostic laparoscopy,
11  simple cystectomy, bladder cystoscopy, that type of
12  stuff.
13    Q.   Okay.  If you were to tell me what your top
14  three procedures are based on volume, what would those
15  be at the surgery center?
16    A.   Hysteroscopy; polypectomies/myomectomies,
17  meaning to remove growths inside of the uterus;
18  diagnostic laparoscopies to look for endometriosis; and
19  tubal ligations.
20    Q.   Okay.  Has this peer review action with ARMC,
21  the suspension and revocation, had any effect on what
22  you can do at the surgery center?
23    A.   I'm watched much more closely, and I have to
24  have a backup physician willing to cover me in case
25  something happened at the surgery center and accept the

Page 34

1  patient at a hospital because I no longer have hospital
2  privileges.
3    Q.   All right.  Let me explore that a little bit.
4  You can still do it, it sounds like, the same procedures;
5  is that correct?
6    A.   Yes.
7    Q.   But now you're required to have a backup
8  physician observe those procedures?
9    A.   No, sir.  There has to be somebody willing to
10  admit the patient if something was to go array.
11    Q.   Okay.
12    A.   For example, let's say, you're doing a
13  dilatation or curettage on a morbidly obese woman and
14  she has a problem with anesthesia and she has
15  respiratory issues and the anesthesiologist feels she
16  needs to be admitted for respiratory issues.  There
17  needs to be an admitting gynecologist who would be able
18  to get her into the hospital.
19    Q.   I see.  Okay.  So it's not any kind of
20  observation or proctoring --
21    A.   No.
22    Q.   -- or standing beside you.  It's if somebody
23  needs to go in the hospital, you can't admit them any
24  longer to Aiken?
25    A.   Correct.

Page 35

1    Q.   Understood.  This watching you more closely
2  that you mentioned, how does that manifest itself at the
3  surgery center?
4    A.   It's not vigorous.  In the beginning, they
5  were a little bit skittish just because of the political
6  and reputational damage that I had occur or incurred.
7  But mostly they just -- I mean, they know what the real
8  story is, so mostly they leave me alone.  I think the
9  nurses are a little bit more nervous because they don't
10  know, like the physicians know, what the situation was.
11    Q.   It sounds like, but you correct me if I'm
12  wrong, that this more watchfulness, at least with the
13  physicians, has dissipated over time, is that accurate,
14  at the surgery center?
15    A.   I wouldn't say it was elevated astronomically
16  amongst the physicians.  I would say that it was more
17  elevated amongst the nursing staff --
18    Q.   Okay.
19    A.   -- because they weren't at the hospital.
20    Q.   And has that dissipated over time at the
21  surgery center?
22    A.   Yes.
23    Q.   Okay.
24    A.   As they've heard the chatter --
25    Q.   Diminished.  I don't know what the right word

Page 36

1  is.
2    A.   Yes.
3    Q.   All right.  Okay.  And you're an owner of the
4  surgery center, one of the owners; is that right?
5    A.   Yes.  I have one share or 1.1 share or
6  whatever it is.
7    Q.   Okay.  One share.  All right.
8         Do you know what kind of corporate entity
9  this surgery center is?  LLC?  Inc.?
10    A.   I'm sorry to say that my knowledge of
11  business is superficial at best.
12    Q.   All right.  One share.  And that one share
13  entitles you to a share of the profits that the surgery
14  center makes?
15    A.   Yes.
16    Q.   And what have those profits looked like?
17    A.   We have not had any profits distributed to
18  any of the members.
19    Q.   No profits?
20    A.   Ever.
21    Q.   That's too bad.
22         Have you had to -- what did you pay for your
23  share, do you recall?
24    A.   I'm going to approximate about $28,000.
25    Q.   Okay.  And did you have an expectation that

Margo Hein-Muniz, M.D. 8/25/2011

## Page 37

1  there would be profit when you entered into the --
2      A.  Yes.
3      Q.  -- when you made the purchase?
4      A.  Yes, I did.
5      Q.  Okay.  Do you know why there hasn't been a
6  profit?
7      A.  I have an idea.
8      Q.  Okay.  What is your idea?
9      A.  It's my understanding in order to get the
10  Certificate of Need, the hospital had to agree to allow
11  the surgery center to be built in Aiken, and in return
12  for that favor, they requested to run the surgery center
13  for the first year.  And there was sizable financial
14  losses.  And at the end of that year, the hospital was
15  eventually bought out by the physicians and the
16  productivity of the facility has improved; however, it
17  is not as profitable as we would like it to be.  That's
18  it basically.
19      Q.  Okay.  How long has it been since the
20  hospital was bought out by the physicians?
21      A.  They were bought out the year after.  There
22  were members for approximately a year and maybe a couple
23  of months, and then they were bought out.
24      Q.  Okay.  About a year ago, is that what you
25  said?  I'm sorry?

## Page 38

1      A.  No, a year into --
2      Q.  Into your ownership?
3      A.  Correct.
4      Q.  All right.  When did you become an owner?
5      A.  When the surgery center was built.
6      Q.  Okay.  I don't know when that was, do you?
7      A.  The surgery center probably has been in place
8  for approximately eight years, seven to eight years.
9      Q.  Okay.  Fair enough.  Are you attempting to
10  sell your share in the surgery center currently?
11      A.  Not right now.  I would have if I had been
12  allowed to move.
13      Q.  Okay.  If you had been allowed to move.  Oh,
14  you mean if you found privileges elsewhere, you would
15  have sold it?
16      A.  Correct.
17      Q.  I got you.  All right.  Is it your
18  understanding -- well, is it your understanding that
19  Dr. Boehner is a owner of the surgery center?
20      A.  Dr. Boehner is no longer an owner of the
21  surgery center, as far as I know.
22      Q.  Okay.
23      A.  Okay.  Correction.  I know that Dr. Boehner
24  and Mr. Boone had placed their shares up for sale.  I
25  don't know if anybody's bought them or not.

## Page 39

1      Q.  Okay.  So their shares are for sale as far as
2  you know?
3      A.  Yes.
4      Q.  Okay.  So they're currently owners still?
5      A.  I do not know.  I don't know if they've been
6  bought or not bought.  I've never asked.
7      Q.  Were they part of the initial ownership
8  group --
9      A.  Yes.
10      Q.  -- along with you?
11      A.  Yes.  We pulled call for about four or five
12  years.
13      Q.  I'm sorry?
14      A.  I said we pulled call for several years
15  together.
16      Q.  Pulled call.  Okay.  Took call together.
17  Okay.
18      A.  Uh-huh.
19      Q.  All right.  Now is as good a time as any.  I
20  spent the hour that you waited listening to the tape of
21  you and K.D. Justyn, and a lot of it seemed to do
22  with -- though it was hard for me to hear -- the surgery
23  center.  How did you come to have that tape?
24      A.  I taped her.
25      Q.  How did you tape her?

## Page 40

1      A.  With a taping device.
2      Q.  Okay.  Did you -- you had a taping device
3  that was concealed in some way?
4      A.  No.
5      Q.  Did she know she was being taped?
6      A.  She did not know she was being taped.
7      Q.  Okay.  How did you -- she didn't know.
8      Where was the taping device?
9      A.  The taping device was on my pocket.
10      Q.  Okay.  In your white doctor's jacket pocket?
11      A.  Clipped.
12      Q.  Okay.  Clipped in the pocket.  All right.
13      Had you ever taped -- you taped that
14  conversation, which was about an hour, I guess.  It
15  seemed to have two parts to it, if I can make it out.
16  There was a beginning part and then it sounded like you
17  went down and did a procedure or something or took care
18  of a patient and then came back for about an hour's
19  length of tape.  That's all that I heard.
20      Was there any other taping of her before or
21  after that hour?
22      A.  No.
23      Q.  No.  Okay.  Had you ever taped her on other
24  occasions?
25      A.  No.

## Margo Hein-Muniz, M.D. 8/25/2011

### Page 41

1    Q.   Okay.  Have you ever taped any of the other

2  defendants without them knowing about it in this suit?

3    A.   No.

4    Q.   You know who the defendants are, right?  I

5  wouldn't have to go through --

6    A.   No.  I know who they are.  No, I did not.

7    Q.   Is that the first time you've ever taped

8  anybody surreptitiously, or without them knowing?

9    A.   Yes.

10    Q.   Okay.  Why?

11    A.   On the recommendation of other physicians.

12    Q.   All right.  Why did they recommend that you

13  tape her?

14    A.   Because it was apparently becoming common

15  knowledge throughout the hospital gossip tree that they

16  were, quote, out to get me.  And they were working on

17  getting rid of me.

18    Q.   That they were out to get you.  Other

19  physicians recommended that you should tape K.D. Justyn,

20  the CEO of the hospital, because word on the street was

21  K.D. was out to get you or the hospital or both?

22    A.   Both.

23    Q.   Okay.  Who were the other physicians that

24  recommended that you do the taping?

25    A.   Denise Parnell.

### Page 42

1    Q.   Okay.

2    A.   Bonnie Szymik.

3    Q.   All right.  Anybody else?

4    A.   And then indirect -- I would call it an

5  indirect -- for example, a doctor may have said to me,

6  "Watch out, Margo, they're out to get you."

7        I may have said, "Okay.  This is what I've

8  heard, this is what I've heard, this is what K.D. told

9  me in a meeting."

10        And then they would say, "Man, you should

11  have gotten that on tape."

12    Q.   Okay.  And that's a little different than, I

13  guess, than Parnell and was it Szyreg?

14    A.   Szymik.

15    Q.   Szymik.  Theirs was more direct than that.

16  Is wasn't a "Well, it would have been great if you had

17  taped it."  Theirs was, "You ought to go tape her"?

18    A.   Yes.

19    Q.   Okay.  And were you just along for the ride

20  on that, or were you in favor of the plan to tape it?  I

21  guess you were in favor of it because you put the tape

22  recorder in.

23    A.   I believed her, that it might be a good idea.

24    Q.   Okay.  All right.  And I didn't -- I couldn't

25  tell a date or anything from what I listened to.  About

### Page 43

1  when was this?  I know K.D., she left before the end of

2  your first peer review action that ended in 2010.  And

3  Carlos was then the CEO.  I can tell from the documents.

4  About when would you have created that tape?

5    A.   I honestly cannot say without looking at the

6  time and date stamped on the computer file.  But it was

7  in and around the same that she had promised to assist

8  me in acquiring a new partner.

9    Q.   And about when were you looking to get a new

10  partner?  Would that have been 2008, '9?

11    A.   I was in 1560.  We were growing rapidly.  She

12  had suggested to me that I look for another partner.  It

13  was probably two years before she was retired, would be

14  my approximation.

15    Q.   So approximately 2008?

16    A.   Yeah.

17    Q.   Okay.  All right.  And did you capture

18  anything on that tape that you thought evidenced either

19  her desire or the hospital's desire to get you?

20    A.   No.

21    Q.   Okay.  Did that surprise you that you didn't

22  capture that on tape?

23    A.   Yes.

24    Q.   What did you expect you would hear from K.D.?

25    A.   I expected her to be a little bit more brazen

### Page 44

1  about not paying for my partner and why --

2    Q.   Okay.

3    A.   -- on the basis of the previous conversation

4  that we had had.

5    Q.   Sounded to me like there was a lot of

6  discussion of the surgery center and an apparent suit or

7  threat of suit by the owners of the surgery center

8  against the hospital.  Do you recall that?

9    A.   Yes.

10    Q.   What do you recall about what was going on at

11  the time between the hospital, apparently, or between

12  the surgery center owners and the hospital?

13    A.   There was a great amount of animosity between

14  the surgery center physicians and the hospital.  The

15  surgery center was costing the hospital a sizable amount

16  of surgical losses.  The surgery center believed that

17  there may have been some inappropriate management in the

18  first year.  They wanted to buy out the hospital.  The

19  hospital refused to be bought out.  The surgery center

20  physicians tried to force them out.

21        Eventually, they came to an agreement only if

22  all physicians would be willing to sign an agreement

23  saying that they would never sue regarding anything that

24  had been done by the hospital in terms of the management

25  of the surgery center.

Margo Hein-Muniz, M.D. 8/25/2011

Page 45

1    Q.    Okay.  So that was the settlement that was
2  ultimately reached?
3    A.    Yes.  With the exclusion of me.
4    Q.    Okay.
5    A.    They did not require me to sign.
6    Q.    Why didn't they require you to sign?
7        MR. SOWELL:  She said they did not, right?
8        MR. DAYHUFF:  Did not.
9        THE WITNESS:  They did not require me to
10  sign.  I don't know.  I had said I refused to sign.
11  BY MR. DAYHUFF:
12    Q.    Okay.  You wanted to retain your right to sue
13  the hospital over its management of the surgery center?
14    A.    I wanted to not be involved in war.
15    Q.    Well, that was the settlement, wasn't it?
16    A.    Right.
17    Q.    The end of the war or preventing the war.  So
18  how would you refraining from entering into the
19  settlement agreement keep you out of the war?
20    A.    I didn't believe it was proper.
21    Q.    Why?
22    A.    I believe that the hospital did things that
23  were inappropriate on the basis of what I had been told
24  by the management and other physicians.
25    Q.    Okay.  And by that you mean they had

Page 46

1  mismanaged the surgery center in some way?
2    A.    There was allegations to that fact.
3    Q.    And you wanted to retain your right to pursue
4  those allegations with a legal matter?
5    A.    No.  And it's hard for me to say exactly when
6  that lawsuit occurred.  It was in and around the same
7  time that I was starting to hear whispers that they were
8  working on trying to -- they knew that I was applying to
9  University and that they were working on getting rid of
10  me.  And so I didn't want to sign anything at all
11  because I didn't know what they were going to do to me.
12    Q.    Okay.
13    A.    In a nutshell, I was afraid.
14    Q.    Okay.  Was there an actual suit that was
15  filed by owners of the surgery center against the
16  hospital over this ownership dispute and management
17  dispute?
18    A.    I don't know what the word for it is, but
19  there was a letter sent.
20    Q.    A demand made or something?
21    A.    Something like that.
22    Q.    Okay.  All right.
23    A.    I don't know what it's called in lawyer
24  words.
25    Q.    When you went to meet with K.D., that

Page 47

1  conversation I listened to, did you know that the
2  members of the surgery center were planning a legal
3  action against the hospital?
4    A.    I actually did not.
5    Q.    Okay.  Did you know --
6    A.    That was the first time I had heard about it.
7    Q.    Okay.  Did you know that the members of the
8  surgery center had sent in a demand of some sort that I
9  heard referenced on the tape?
10    A.    I did not know what they were doing.  The
11  management team consists of three other physicians.
12  And, really, I try not -- or get myself into the
13  business of the surgery center or any other entity for
14  that matter.
15    Q.    Okay.
16    A.    I was mostly just trying to lay low.
17    Q.    Sure.  So when you told K.D. that you knew
18  nothing about the surgery center doctors getting an
19  attorney and sending in this demand letter or maybe
20  wanting to sue or not wanting to sue, you were telling
21  the truth?
22    A.    Yes, I was.
23    Q.    Okay.  All right.  During the middle part of
24  the tape when there was the break, I guess you had a
25  conversation with K.D., some of which I could hear.

Page 48

1  Sounded like you met with other folks to almost report
2  on what had gone on in the conversation.  But, you know,
3  it was very hard for me to hear, so I'm not sure.  It
4  sounds like you met with someone else, then went and
5  took care of a patient.
6    A.    I don't believe that to be true.
7    Q.    Okay.  It may be that I just didn't hear it.
8  I heard you say something about stealth mode on your
9  tape.  "I put it on stealth mode," something like that.
10    A.    I don't understand what you're saying to me.
11    Q.    Well, I may have misheard.
12        Okay.  What I heard K.D. say on that tape was
13  that -- well, what message did K.D. give you during that
14  conversation that had two parts?  What did you take away
15  from that?
16    A.    What I took away from that was she was no
17  longer going to subsidize my partner unless I made some
18  sort of maneuver to convince the surgery center
19  physicians to drop their lawsuit.
20    Q.    Okay.
21    A.    I believe that she was taking that somewhat
22  personally.
23    Q.    All right.  And you said no longer subsidize
24  or fund?  What did you say, subsidize?
25    A.    Subsidize, fund, help, assist.

## Margo Hein-Muniz, M.D. 8/25/2011

### Page 49

1    Q.  Well, she hadn't begun to help, assist, or
2  subsidize your partner at that time, had she?
3    A.  She had made several promises, and she was
4  the one that suggested I get another partner and that I
5  expand.
6    Q.  So your testimony is she had promised to
7  subsidize, fund, assist you with a partner prior to that
8  time?
9    A.  Correct.
10    Q.  All right.  But it is true, though, that no
11  funding, assistance, subsidy had occurred to that point,
12  the point of the conversation that day, for your new
13  partner?
14    A.  As far as I know.  And I was trying to
15  remember whether or not she had helped me with
16  recruitment, and I cannot remember if she did or not.
17    Q.  Okay.
18    A.  But I believe that she may have.
19    Q.  And it sounded like -- go ahead.  Are you
20  done?
21    A.  Yes.
22    Q.  I don't want to cut off your answer.
23       It sounded like she took the position that
24  she would need to run any subsidy, funding, relocation
25  package by corporate legal.  Do you recall that?

### Page 50

1    A.  Yes.
2    Q.  All right.  That's fairly common, isn't it?
3    A.  I have no idea.
4    Q.  Okay.  And she indicated that it would be
5  difficult for her to approve funding for a physician
6  that was suing her, that that might cause some hiccups
7  in the process, right?
8    A.  Yes.  I took that as a threat.
9    Q.  All right.  Did you -- did you find that to
10  be unreasonable, that if a physician is suing you --
11  suing the hospital, that it might cause some difficulty
12  with getting funds to assist that physician in doing
13  whatever that physician wants to do?
14    A.  It would be hard for me to have said at that
15  time, since her accusations I had no knowledge of.  I
16  had to verify that later.
17    Q.  Okay.  Well, I guess what I'm asking is, is
18  it unreasonable for somebody to withhold assistance to
19  someone that is suing them?
20       MR. DICK:  Object to the form.
21  BY MR. DAYHUFF:
22    Q.  Is that unreasonable?
23    A.  I think it depends on the situation and who's
24  actually doing the suing.
25    Q.  Okay.

### Page 51

1    A.  Who's actually running the show.
2    Q.  Okay.  Let's see.  I think you told me you
3  had never taped anybody other than that one time?
4    A.  Uh-huh.
5    Q.  Okay.  And if this happened about 2008,
6  you've had that tape for a long time.  It's now three
7  years.
8    A.  Yes.  But I also offered the caveat that I'm
9  very bad with timeline.
10    Q.  Okay.  Could have been two years?
11    A.  You must understand that there's a tremendous
12  amount of things that have happened to me and a
13  phenomenal amount of data, dates, times --
14    Q.  Sure.
15    A.  -- numbers and so --
16    Q.  Let me make it easier for you.  The first
17  peer review action, the five cases, that went to a
18  hearing in 2009, this conversation would have been
19  before that?
20    A.  Yes.
21    Q.  Okay.  So that helps me understand where we
22  are on the timeline.
23       When did you let your attorneys know that you
24  had possession of a recording of one of the defendants
25  in this suit?

### Page 52

1    A.  Probably at the time the first peer review
2  hit.
3    Q.  The first peer review action about the five
4  cases?
5    A.  Right.
6    Q.  Okay.  All right.  Do you have any other
7  tapes that are related to this case?
8    A.  No.
9    Q.  Have you ever had any other tapes that are
10  related to this case?
11    A.  No.
12    Q.  All right.  Okay.  Enough of the tape.
13       We were talking some about your practice, and
14  you gave me the good description of how your -- you need
15  a break?
16    A.  No, not at all.
17    Q.  Okay.  -- how your day looks, your week
18  looks.  And I want to know if your week looked
19  different, and I'm sure it did, before the 2010
20  suspension, which would have been in February or early
21  March of 2010.  What did your day look like, your week
22  look like then before, when you had full privileges at
23  Aiken?
24    A.  When I had full privileges?  It was much
25  busier.

## Margo Hein-Muniz, M.D. 8/25/2011

### Page 53

1    Q.   Okay.

2    A.   And much happier.  I would get up early in

3  the morning, maybe around 5:00.  I would get to the

4  hospital about 6:30.  I would round on my patients.

5  Discharging anybody that needed to be discharged, tweak

6  anybody that needed to be tweaked.  Starting any

7  inductions that needed to be started.  Write orders,

8  blah, blah, blah, hospital work.  And then I would go

9  over to my clinic, and it was very brisk and very busy.

10    Q.   About what time usually would you get to your

11  clinic?

12    A.   About 8:00.

13    Q.   Okay.  All right.  You do your clinic work

14  and see patients until when?

15    A.   Until we were done.

16    Q.   Okay.  And that would be 5:00?

17    A.   6:30.

18    Q.   6:30.  Okay.

19    A.   Sometimes later.  We were seeing about 70 to

20  75 patients a day.

21    Q.   Okay.

22    A.   Which is why K.D. recommended that I get a

23  partner.

24    Q.   And that partner that you were talking about

25  in the tape, is that who?

### Page 54

1    A.   Laura Irwin.

2    Q.   Laura Irwin.

3         Has she participated in this peer review?

4  That name is familiar.  Was she one of your witnesses?

5    A.   No.

6    Q.   No.  Okay.  Maybe she's one of the witnesses

7  on the list now.  That's fine.

8         Okay.  70, 75 patients, see them until about

9  6:30 or 7:00.

10         How common was it to go to 6:30 or 7:00?  If

11  we were looking at your average day, would you usually

12  end at 6:00, and at 6:30, and at 7:00?

13    A.   I would say we would usually end around 6:30.

14    Q.   That's a normal.  So that's a Monday,

15  Tuesday, Wednesday, Thursday, Friday?

16    A.   Uh-huh.

17    Q.   Okay.  And did you still have the half day

18  Friday where you go over to the surgery center?

19    A.   What I did was -- well, after clinic, I would

20  go back to the hospital and round again.  And if I had

21  any labors --

22    Q.   Okay.

23    A.   -- I would run over and, you know, do the

24  deliveries.

25    Q.   So you would round again after 6:30?

### Page 55

1    A.   Uh-huh.

2    Q.   Okay.  All right.

3    A.   And if I had any deliveries to do, I would do

4  them.  And then I would go home.

5    Q.   Okay.  And this may not make any sense for an

6  OB, but did you have a block time arrangement at the

7  hospital?

8    A.   Yes.  Every other Monday I had a full block

9  time, an entire day, devoted to major surgeries.

10    Q.   All right.

11    A.   And then I had -- if I recall correctly, I

12  believe that I had a half a day on the off Fridays.  And

13  then --

14    Q.   Okay.

15    A.   -- the other Friday was a surgery center

16  Friday.

17    Q.   Got you.  And that was a half day at surgery

18  center because you had to be by 3:00?

19    A.   Right.  Because I was doing some of the

20  minors at the hospital.

21    Q.   Okay.

22    A.   And then if I had any added cases that didn't

23  fit, we would try and fit them in at lunchtime or

24  whenever we could get them in.

25    Q.   Okay.  Lunchtime any day of the week or

### Page 56

1  lunchtime on Monday or --

2    A.   Any day of the week.

3    Q.   Any day of the week.  Okay.

4         How often did you have fit-ins, frequently?

5    A.   Frequently.

6    Q.   Okay.  How many surgery cases would you do

7  during your Monday block on average, how many cases?

8    A.   It would depend upon the complexity of the

9  case.  In general, my surgeries were complex in nature.

10  So I would say four to five.

11    Q.   Okay.  And what was the other day, Wednesday?

12    A.   Every other Friday.

13    Q.   Every other Friday.  How many cases would you

14  do on the every other Friday at the hospital?

15    A.   About four to five.

16    Q.   Okay.  Same thing at the surgery center, four

17  to five?  Though they would be minor, I guess.

18    A.   Correct.

19    Q.   Top three surgeries at the surgery center

20  during that time the same as the top three now?

21    A.   Yes.

22    Q.   What was your top three surgeries by volume

23  that you were doing at Aiken?

24    A.   Majors or minors?

25    Q.   Let's do both.  Give me your majors first.

Pages 53 to 56

Margo Hein-Muniz, M.D. 8/25/2011

Page 57

```
1     A.   Majors would be hysterectomies.
2     Q.   Okay.
3     A.   Pelvic organ reconstruction.
4     Q.   Okay.
5     A.   Incontinence procedures.
6     Q.   Okay.
7     A.   Female incontinence, obviously.
8     Q.   Minor?
9     A.   Major.
10    Q.   Now we can move to the minor.
11    A.   Sorry.
12    Q.   It's all right.
13    A.   Minors?  More detailed laparoscopy
14  procedures.
15    Q.   Okay.
16    A.   And then the same thing, hysterectomies and
17  tubals.
18    Q.   Okay.  Good.  All right.  And I guess the OB
19  portion of your practice is whenever that happens.
20  Can't very well schedule that.  I guess you can the
21  inductions.
22    A.   You have ability to induce, you know.  And
23  you have ability to time things and kind of plan around
24  things.
25    Q.   Okay.
```

Page 58

```
1     A.   For example, if you guesstimated that
2   somebody was going to deliver at 3:00, you might move
3   patients from 3:00 forward and work through lunch so you
4   could --
5     Q.   I see.  Okay.  Could you divide your practice
6   between GYN and OB by percentages?  I mean, were you
7   doing 80 percent GYN, 20 percent OB?
8     A.   Approximately.
9     Q.   Okay.  And that includes both outpatient
10  stuff and inpatient?
11    A.   Well, there's not -- I don't understand the
12  question.  Rephrase.
13    Q.   Well, I'm trying to make sure I'm asking the
14  right question.
15    A.   You mean like outpatient deliveries?  You
16  don't catch a baby outpatient.
17    Q.   Right.  That doesn't make any sense.  Maybe
18  we should break it down into your outpatient work, okay.
19  Not in the hospital or the surgery center.  That would
20  just be clinic work, right?
21    A.   Oh, my clinic work.  Okay.
22    Q.   What would that breakdown be between GYN and
23  OB?  Before the revocation -- the suspension revocation.
24    A.   Before, maybe 70/30.  30 percent obstetrics
25  and 70 percent gynecology.
```

Page 59

```
1     Q.   70 percent OB and --
2     A.   No, no.
3     Q.   Other way around.  30 percent OB,
4   70 percent --
5     A.   Gynecology.
6     Q.   -- gynecology.  That's a picture of your
7   outpatient work before suspension revocation?
8     A.   Correct.
9     Q.   All right.  If we were to look inpatient, and
10  I think I want to include in this -- most of this
11  doesn't make sense -- work at the hospital and work at
12  the surgery center, that's inpatient, right?
13    A.   No.  The surgery center is outpatient.
14    Q.   Let's just do work at the hospital.  How does
15  that breakdown between OB and GYN?
16    A.   My hospital work was approximately 80 percent
17  gynecology and 20 percent obstetrics.
18    Q.   Okay.  Same question.  Your work at the
19  surgery center, which is outpatient surgery, how does
20  that breakdown between GYN and OB?
21    A.   There are no obstetric procedures performed.
22         MR. DAYHUFF:  You're right.  Correct.  I've
23  got it now, David.  Thank you.
24         All right.
25         MR. SOWELL:  So we're saying a hundred
```

Page 60

```
1   percent gynecology at the surgery center?
2          MR. DAYHUFF:  See, Biff needed clarification
3   on that, too, David.
4          MR. DICK:  There's three things, clinical,
5   outpatient and inpatient.  You're calling outpatient
6   clinical earlier, so just clarifying it for you.
7          MR. DAYHUFF:  Remember, I had to listen to
8   that whole tape.  I'm worn down, David.
9   BY MR. DAYHUFF:
10    Q.   All right.  I want to go through the same
11  questions now.  What does it look like now.  So you're
12  obviously not doing anything at Aiken, that's right.  So
13  that's gone.  What is your practice -- your clinical
14  work look like now OB/GYN, your breakdown, your
15  percentages?
16    A.   Obviously --
17    Q.   I know you're not delivering babies at the
18  office, but you must be doing some OB stuff, right?
19  Maybe it's all GYN?
20    A.   No.  It's -- I do antenatal care, which means
21  to see the pregnant patient before the delivery.
22    Q.   All right.
23    A.   Because I have the support of a lot of
24  sympathetic physicians in the community of both Aiken
25  and Augusta.
```

# Margo Hein-Muniz, M.D. 8/25/2011

### Page 61

```
1      Q.   Okay.
2      A.   And so basically the concept is called
3  laborist.
4      Q.   All right.  And so that is OB work?  We'd
5  call that OB work, right?
6      A.   Well, for me clinical, but I don't get to
7  catch the babies.  And the patients don't like that.
8      Q.   Uh-huh.  What percent of your work is
9  antelabor?
10     A.   Natal.
11     Q.   Antenatal.
12     A.   Maybe 10 percent.
13     Q.   So 90 percent is GYN?
14     A.   Uh-huh.
15     Q.   Got it.  All right.
16          And all your work, of course, at the surgery
17  center is GYN?
18     A.   Yes.
19     Q.   Okay.  Good.  All right.  Has your payor mix
20  changed?  I can't imagine it would have before and -- or
21  after the suspension.  And payor mix, I mean Medicaid
22  versus -- you know, government payors versus private pay
23  versus self-pay.  Do you have any sense of what that
24  looks like?
25     A.   What I would give you is a sense because I
```

### Page 62

```
1  try and not focus on money and what kind of insurance
2  people have because people are people.  But my overall
3  feel would be that prior to what was done to me by the
4  hospital, I was more of a boutique-type private pay or
5  payor-insured clinic.
6      Q.   All right.  So you did less Medicaid before
7  the suspension revocation?
8      A.   Correct.  And because of patient loss and
9  damage to my reputation, we had more openings and,
10  therefore, we had more Medicaid and Medicare patients
11  coming in.
12     Q.   Okay.  So that affected both Medicaid and
13  Medicare?
14     A.   Correct.
15     Q.   All right.  And do you have any sense of --
16  and you may not, which is fine, what that would have
17  looked like before and after?  "Well, before I was only
18  doing 30 percent Medicaid, now I'm doing 60 percent
19  Medicaid."
20     A.   Before I was -- my approximation would be 15
21  to 20 percent of Medicare combined with Medicaid.
22     Q.   Okay.
23     A.   And afterwards, significantly more.  Maybe 40
24  to 50.
25     Q.   Okay.  All right.  And you believe that all
```

### Page 63

```
1  that change ought to be attributable to the loss of
2  privileges?
3      A.   Yes.
4      Q.   None of that would be attributable to the
5  economic difficulties the country has gone through?
6      A.   I think a small portion would have to do with
7  the economic difficulties, but we lost a lot of
8  patients.
9      Q.   Okay.  By the way, tell me if you need a
10  break at any time.
11          MR. SOWELL:  Why don't we take one.  Is that
12  okay?
13          MR. DAYHUFF:  Yeah, absolutely.
14          (A recess transpired.)
15  BY MR. DAYHUFF:
16     Q.   I want to understand who your current
17  employees are, and I have a list.
18     A.   Okay.
19     Q.   That may make this easy.
20          Mary K. Anderson, is she a current employee?
21     A.   You mean Sister Mary Katherine.  Yes.
22     Q.   Yeah.  She's a Sister?
23     A.   No.  I nickname all my employees.  It's just
24  a thing I do.
25     Q.   Because I'm a Catholic, and I would be
```

### Page 64

```
1  interested if you managed to get a sister to work for
2  you.
3      A.   Well, I mean, seriously, how many Mary
4  Katherines do you know that aren't a sister?
5      Q.   I know a lot of them that are, you're right.
6  Good point.
7      A.   I rest my case.
8      Q.   What does Sister Mary Katherine do?
9      A.   Mary Katherine does check in, check out.
10     Q.   Okay.
11     A.   And sometimes she works in the back --
12     Q.   Okay.
13     A.   -- loading rooms.
14     Q.   And how long has she been with you,
15  approximately?
16     A.   There's so many numbers.  Mary Katherine has
17  probably been with me for between two and three years.
18     Q.   Okay.  Do you have any idea what she makes an
19  hour?
20     A.   No.  My job is to be the doctor.
21     Q.   I know.
22     A.   They try and keep numbers away from me.
23     Q.   Okay.  She's probably an hourly employee.  Is
24  she full-time or part-time?
25     A.   She is a full-time hourly employee.
```

Margo Hein-Muniz, M.D. 8/25/2011

## Page 65

1    Q.    Dana Chambers?

2    A.    Full-time hourly employee.

3    Q.    Do you know how much she makes per hour or

4    have an estimate?  And it's fine if you don't.

5    A.    I don't know.

6    Q.    What does she do?

7    A.    Dana is a medical assistant.  She helps me in

8    rooms and she gives shots and does phlebotomy and

9    basically anything that needs to be done in terms of the

10   clinical side.

11   Q.    She's been with you for how long?

12   A.    A long time.  I'm going to go with seven

13   years.

14   Q.    Okay.  Maria Dixon.

15   A.    Maria Dixon is an hourly employee.  She's

16   full-time.

17   Q.    What does she do?

18   A.    She does billing.

19   Q.    Okay.  How long has she been with you?

20   A.    She's been with me probably going on

21   three-plus years.

22   Q.    Raymond Dixon?

23   A.    Gone.

24   Q.    Okay.  When did he leave your employ?

25   A.    About a month ago.

## Page 66

1    Q.    All right.  Why?

2    A.    Because we couldn't afford him anymore.

3    Q.    Okay.  And what did he do?

4    A.    He was a front office person.

5    Q.    Okay.

6    A.    He was a runner, essentially.  Because it's a

7    very large suite, and we're still on paper charts.  And

8    so he did filing and ---

9    Q.    I got you.

10   A.    -- pulling labs with charts and that kind of

11   stuff.

12   Q.    Was he full-time or part-time?

13   A.    He worked, I want to say, about 30 hours a

14   week.

15   Q.    Okay.  And before he was let go, how long had

16   he been with you?

17   A.    Two years.

18   Q.    Two years.  Is he related to Maria?

19   A.    Yes.

20   Q.    So he wasn't terminated for cause, he was let

21   go because the business couldn't support it?

22   A.    Both.

23   Q.    Both.  So there was a cause reason?

24   A.    Well, he was a weaker employee.  Yes.

25   Q.    Okay.

## Page 67

1    A.    And so you let the bad ones go first.

2    Q.    Anita Dukes?

3    A.    She is the check-out person.

4    Q.    All right.  Full-time?

5    A.    Full-time.

6    Q.    How long has she been with you?

7    A.    Anita has been with me for probably about

8    five years.

9    Q.    Charlene Felkel, full-time?

10   A.    Part-time.

11   Q.    What does she do?

12   A.    Contractual, 1099 nurse practitioner.

13   Q.    Okay.  Is she salaried?  She's not salaried,

14   she's part-time.  Do you know what she makes hourly?

15   A.    It's more of like a you-eat-what-you-kill

16   thing.  She gets paid what she averages out.  There's a

17   percentage of -- she gets to keep whatever percentages

18   of what she makes, and the rest goes to the house.

19   Q.    Okay.

20   A.    You know, for the equipment and nursing.

21   It's kind of averaged out.

22   Q.    How long has she been with you?

23   A.    For a very long time.  I'm going to go with

24   about seven years.

25   Q.    Seven years.  Is it your sense that she's

## Page 68

1    profitable for your LLC?

2    A.    Mildly.

3    Q.    Mildly.  Okay.  That's better than the

4    alternative.

5          Joanne Feutral.  I have her listed as a

6    former employee.

7    A.    She's gone.

8    Q.    When did she leave your employ?

9    A.    Probably going on a year and a half, a year.

10   Q.    And what did she do for you?

11   A.    Everything.  She was the other half of my

12   brain.  She was our lead nurse, and she was my surgical

13   assistant.

14         And was she terminated for cause or did she

15   find a different job?

16   A.    She left.

17   Q.    She left?

18   A.    She found another job because of the

19   instability in the practice, and she's older.

20   Q.    Okay.

21   A.    So she -- we still don't know if we're going

22   to survive, so ...

23   Q.    And she was full-time?

24   A.    Uh-huh.

25   Q.    Robyn Heath.  I have her listed as a former.

Margo Hein-Muniz, M.D. 8/25/2011

## Page 69

```
1    A.   Yes.
2    Q.   When did she leave you?
3    A.   Two years ago.
4    Q.   Okay.  And what did she do?
5    A.   She was a nurse.  She helped me with the
6  rooms.
7    Q.   Okay.  Full-time?
8    A.   Full-time.
9    Q.   Why did she leave?
10   A.   Because we couldn't afford her because of the
11 goings on and decreasing patient base.
12   Q.   Okay.  All right.  Margo Muniz, employee; is
13 that correct?
14   A.   Yes.
15   Q.   All right.  I know how long you've been with.
16        What does the LLC pay you in salary?
17   A.   200,000, I think.
18   Q.   200,000 a year.  That's currently.  What did
19 it pay you before the suspension and termination of
20 privileges?
21   A.   We have this written out somewhere.  It was
22 much more, plus bonuses.  375- plus bonuses.
23   Q.   375- a year plus bonus.
24        Is there any bonus when you're making 200- a
25 year?
```

## Page 70

```
1    A.   I haven't had any bonus since the event
2  occurred.
3    Q.   What did your bonuses average?
4    A.   They used to be great.  Maybe anywhere from
5  10- to 20- a quarter.
6    Q.   10 to 20 grand a quarter?
7    A.   Yes.
8    Q.   Okay.  And we do have more detailed
9  information that I haven't had time to go through.  But
10 you believe it to be 375- a year.  And, of course,
11 you've been -- that's during the time you were in
12 Magnolia Medical, which was -- you've worked in a
13 different LLC at some point or worked in a different
14 practice, didn't you, before Magnolia Medical?
15   A.   Uh-huh.
16   Q.   Okay.  How many years?  I know I asked you
17 this before, but I don't remember.  How old is Magnolia
18 Medical, LLC -- Parkside, LLC, doing business as
19 Magnolia Medical?
20   A.   Okay.  It's 2011 going on 2012, so -- I don't
21 know, six to seven years.
22   Q.   Six to seven years?
23   A.   I'm guesstimating.
24   Q.   Sure.  And your estimate would be you were
25 making 375- a year plus bonus over the six to seven
```

## Page 71

```
1  years, is that what we just said?
2    A.   Well, not after I lost my privileges.
3    Q.   Before, right.
4    A.   Before.
5    Q.   Okay.  That's an estimate.  Good.  All right.
6         So you get a W-2, right?
7    A.   Yes.
8    Q.   All right.  Vickie Lankford, I have as a
9  former?
10   A.   Uh-huh.
11   Q.   When did she leave you?
12   A.   Vickie left us about -- I'm going to go with
13 a year and a half.
14   Q.   Why did she leave?
15   A.   She's got pancreatic cancer metastatic.
16   Q.   What did she do for you?
17   A.   She was the front-end girl.
18   Q.   Okay.  Was she part-time or full-time?
19   A.   She was full-time.
20   Q.   All right.  Allison Morgan, former.
21   A.   She was part-time.
22   Q.   All right.
23   A.   And she left to do a full-time job at
24 University.
25   Q.   And what did she do for you?
```

## Page 72

```
1    A.   She was the phone nurse.
2    Q.   Jewel Rowe, R-o-w-e?
3    A.   Full-time.
4    Q.   What did she do for you?
5    A.   Biller.
6    Q.   What's a biller?
7    A.   The one who fights insurance companies and
8  tries to get them to pay you what they owe you.
9    Q.   Tough job.
10   A.   Yes.
11   Q.   Marla Scott?
12   A.   Manager.
13   Q.   Practice administrator, manager?
14   A.   Yes.
15   Q.   Okay.  Full-time?
16   A.   She was, but now she's part-time.
17   Q.   All right.  And I don't know if I asked you,
18 is your biller, Jewel, full-time?
19   A.   Full-time.
20   Q.   All right.  Marla is part-time.  Why did she
21 go from full to part?
22   A.   She got a second job, and the stress of what
23 was going on was becoming psychologically overwhelming
24 for her.  And it was exacerbating her illnesses,
25 rheumatoid arthritis.
```

www.compuscripts.com

# Margo Hein-Muniz, M.D.  8/25/2011

## Page 73

1    Q.   Jacqueline Workman?

2    A.   Part-time.

3    Q.   What does she do for you?

4    A.   Secretarial.

5    Q.   Okay.  Any other employees that we might have

6    missed?

7    A.   Did you say Tammy?

8    Q.   I don't have a Tammy.

9    A.   We have a Tammy.  She's a phone nurse.

10   Q.   A --

11   A.   Phone nurse.

12   Q.   Phone nurse?

13   A.   Phone nurse.  Phone nurse.

14   Q.   Phone nurse?

15   A.   Yes.

16   Q.   Okay.  All right.  Full-time or part-time?

17   A.   I'm going to be honest with you, I'm not

18   really sure.

19   Q.   Okay.  You're not sure if she's full or

20   part-time?

21   A.   Yes.

22   Q.   All right.  That's fine.  Anybody else?

23   A.   She works in the back room, and she fights

24   with insurance companies and she pre-ops and she, you

25   know, sometimes will work full-time, sometimes she works

## Page 74

1    part-time.  She's got kids.  I mean, she comes and goes

2    as she pleases.

3    Q.   Okay.  Any other employees that we may have

4    left off?

5    A.   None that I can think of.

6    Q.   How about any folks with contractual

7    relationships, 1099-type relationships with your LLC,

8    are there any of those?

9    A.   Besides Charlene?

10   Q.   That's your nurse practitioner, right?

11   A.   Yes.

12   Q.   Besides Charlene.

13   A.   I have an ultrasonographer, who, I guess

14   she's a 1099 employee.

15   Q.   And she's full or part-time?

16   A.   Part-time.

17   Q.   All right.  She has a contract with you guys?

18   A.   Uh-huh.

19   Q.   Do you know what her contract pays her?

20   A.   No.

21   Q.   Okay.  All right.  Any other contractual

22   relationships that your LLC has with any other

23   healthcare providers that you're aware of?

24   A.   Rephrase the question.

25   Q.   Any contracts that your practice has with

## Page 75

1    healthcare providers, doctors?

2    A.   You mean like a written contract?

3    Q.   Yeah.

4    A.   Huh-uh.

5    Q.   Okay.  All right.  Do you have any kind of a

6    financial relationship at all with Gasnel Bryan, Janet

7    Larson, either of those two?

8    A.   No.

9    Q.   Okay.  Now am I correct that they're doing

10   some sort of covering for you or assisting you with your

11   OB patients?

12   A.   I wouldn't say assisting.  I would say if one

13   of my patients goes to ARMC, they're going to go to

14   Dr. Bryan.  He said that he would take care of them

15   while they were at ARMC.

16   Q.   Okay.

17   A.   And Janet Larson is a high-risk maternal

18   fetal medicine lady.  So if I have a patient that's

19   antenatal, I discover to be a risk patient, I turn it

20   over to maternal fetal medicine.

21   Q.   Okay.  And there's no written agreements or

22   financial relationships flowing from that relationship

23   you just described?

24   A.   Other than renting space.  She rents space.

25   Q.   Okay.  She rents space from you?

## Page 76

1    A.   Yeah, from -- well, from Magnolia.  A half a

2    day every Thursday.

3    Q.   From the LLC, she comes in and rents the

4    space that she uses in your suite?

5    A.   Correct.

6    Q.   All right.  And you have a lease agreement to

7    that effect?

8    A.   I don't know if it's written or not.

9    Q.   Okay.  Do you know what she pays in rent?

10   A.   I'm going to say about $900.

11   Q.   Okay.

12   A.   But that includes supplies -- all supplies,

13   computers, electricity, blah, blah, blah, gowns.

14   Everything she needs.

15   Q.   All right.  Does anyone else assist you with

16   your OB patients that need to be admitted to the

17   hospital other than Larson and Bryan?

18   A.   There's a Dr. Robillard that I turn my OB

19   patients over to when they're ready to be delivered if

20   they're low risk.

21   Q.   Is he or she on the medical staff at ARMC?

22   A.   No.  They're a University physician.  And his

23   partner Dr. Hatch.

24   Q.   Okay.  How do you decide whether you turn

25   over your patient to Gasnel Bryan or Robillard?

Margo Hein-Muniz, M.D. 8/25/2011

## Page 77

1   A.   Most of my patients refuse to go to ARMC.

2   Really?  I mean, how does that happen?  Did

3   they just come in and say, "I'm going to ARMC"?  I guess

4   I'm surprised.

5   A.   70 percent of the market in Aiken goes across

6   the river to University or MCG.  Aiken only captures

7   30 percent of the market.  At least that's what K.D.

8   told me.

9   Q.   So that may have been true as of when she was

10  there?

11  A.   Right.

12  Q.   Have you seen any documents or any kind of

13  actual studies that indicate that?

14  A.   She showed me some, yes.

15  Q.   Okay.  All right.  Do you steer patients one

16  way or the other?

17  A.   The majority of the patients that come to me

18  come to me because ARMC has a certain -- and they know

19  that the -- politically what's going on.  Everybody in

20  town knows what's going on.  I tell them I don't have

21  privileges to deliver.  I tell them that I have call

22  partners in both locations.  I tell them that

23  Dr. Robillard is the main one doing the deliveries.

24  We've sent patients to ARMC, and sometimes they weren't

25  treated so nicely.

## Page 78

1   Q.   Okay.  So is it fair to say that you steer

2   patients towards University and away from ARMC for their

3   OB?

4   A.   I don't like the word "steer."

5   Q.   How would you describe it?

6   A.   I would say more given the choice.

7   Q.   Okay.  All right.  So you're not influencing

8   that decision, you're presenting your two options in an

9   even-handed way?

10  A.   I would have to say it may be somewhat biased

11  by my body language and also biased by the community at

12  large.  Most of the patients know what's happened.  Most

13  of the patients that come want to be seen at the

14  convenience of Aiken, but they don't want to be

15  delivered at Aiken.  They want to be delivered at a

16  larger facility.

17       I have some patients that want doctors.  And

18  so if they want doctors, I have to turn them over to a

19  gentleman named Dr. Wilson and Dr. Grossman.  Same thing

20  with major surgeries.  I'll refer them wherever they

21  want to go.

22  Q.   I have in this -- in responses to discovery

23  from you put together by your counsel, I asked your

24  compensation for 2008, 2009, 2010, and 2011.  And I have

25  in the answer, and it may or may not be right, but it's

## Page 79

1   different.  That's why I'm going to ask you about it.

2   2008, they listed $212,199.33.

3   A.   Yeah.  That was after I got hit.

4   Q.   2008?

5   A.   Right.

6   Q.   It was before.

7   A.   Okay.  Oh, I know.  I remember.  Okay.  Yeah,

8   that's true.  There was a dip.  And that was because of

9   Irwin.  We had hired Irwin, and we were not reimbursed

10  by -- we were not given anything of what we were

11  initially told.  And so that was mostly the cost of

12  bringing her on.

13  Q.   Okay.  2009, your reported income on this

14  discovery response is $194,600.

15  A.   Can I see that piece of paper?

16  Q.   Sure.  The very top.

17  A.   Yes, sir.

18  Q.   Do you think -- that's far different than the

19  $325,000.  I mean, the documents will show us, but ...

20  A.   Yeah.  I retract my statement then.

21  Q.   Okay.

22  A.   Like I said, I'm not good with numbers.

23  These -- the drop occurred when we brought in Dr. Irwin,

24  and we were not compensated as we thought we were.  And

25  we had to outlay the cash to bring her in and to

## Page 80

1   compensate for the building that we had moved into under

2   the assumption that we were going to be compensated as

3   K.D. had promised us.

4   Q.   Okay.  So upon looking at this, do you think

5   this is a more accurate reflection of your income over

6   these years?

7   A.   Yes.

8   Q.   And that, for the record, is 2008, 212,000

9   and some change; 2009, 194,000; 2010, $194,000.  Okay.

10  2007, I guess.

11       MR. SOWELL:  What was 2010?

12       MR. DAYHUFF:  2010 is $194,600.  The exact

13  same number we have for 2009, which seems a little

14  interesting.  But could be.

15  BY MR. DAYHUFF:

16  Q.   Since your suspension and revocation, have

17  you done anything to attempt to -- you told me about

18  your pharmacy, you told me about your medical

19  directorship of the methadone clinic.

20       Have you attempted to ramp up or do more

21  clinical work?

22  A.   Yes.

23  Q.   Okay.  And how is that?  How have those

24  efforts -- describe those efforts.

25  A.   We've delved more into total women's

Margo Hein-Muniz, M.D. 8/25/2011

Page 81

1  healthcare, so basic primary care for women.  We've
2  advertised.  We've got an ad on the TV.  It's a little
3  tiny, itty-bitty station.  I tried giving lectures.
4        Q.   Have you seen those efforts bear fruit or
5  not?
6        A.   Mildly.
7        Q.   Okay.  Can you quantify that at all?  Have
8  you seen a 15 percent uptake in your clinical work?
9  That's the kind of estimate I'm thinking about.
10       A.   Since when?
11       Q.   Well, you lost your privileges in --
12            MR. SOWELL:  February 25.
13  BY MR. DAYHUFF:
14       Q.   Well, February 25, 2010.  I don't know when
15  these efforts began to increase your clinical practice.
16  When did the efforts --
17       A.   There was a precipitous drop afterwards.
18  This year it's gone up a little bit.
19       Q.   So you saw it go down precipitously after the
20  suspension revocation, and the trend line is going back
21  up now?
22       A.   I think you make it sound a little bit more
23  hopeful than it is.
24       Q.   Okay.  Well, is the trend line going up?
25       A.   The trend line is going up, but we are

Page 82

1  weighted down by the enormous debt that we've incurred
2  because of what's been done to us.
3        Q.   And you think the trend line is going up in
4  part because of the efforts you described to me, the
5  kind of marketing efforts you described to me?
6        A.   Yes.  And the ongoing political situation in
7  the town.
8        Q.   Okay.  In the town, which is broader than the
9  hospital.  What does that mean?  It's harming the trend
10  line?  It's helping the trend line?  I don't understand.
11       A.   I think the hospital's reputation, because of
12  what they're doing to their physicians and the way they
13  treat patients, is driving more patients away and in a
14  very small part is assisting us.
15       Q.   Okay.  All right.  What -- and I don't need a
16  whole lot of detail on this, but what is the hospital
17  doing, in your opinion, that is driving patients away or
18  helping you in your trend line because of, I guess,
19  their mistreatment of patients, what are you seeing or
20  hearing?
21       A.   I have patients tell me stories about things
22  that happen to them in the hospital that they were
23  unhappy with.
24       Q.   Uh-huh.
25       A.   I have patients tell me of injuries that

Page 83

1  they've incurred or family members have incurred in the
2  hospital that they're unhappy with.  I have patients and
3  just people pretty much -- the people I know or hang out
4  with or whatever in social venues, there's a lot of
5  chatter about the declining quality of care and their
6  firing of the ER staff certainly didn't help their
7  reputation.  There's other physicians that they've hurt,
8  and those physicians may talk and so on and so on.
9        Q.   Okay.
10       A.   It's a small town.
11       Q.   Before you had your LLC of which you and your
12  husband were 50/50 owners, you worked with other OBs in
13  the area; is that right?
14       A.   I pulled call with, is that what you're
15  asking?
16       Q.   No.  I'm talking about being a part of a
17  practice.
18       A.   I was a partner with Dr. Judith Hoover.
19       Q.   Okay.  How long were you a partner of
20  Dr. Hoover's?
21       A.   About four years.
22       Q.   Four years.  Okay.  So that would almost take
23  you back to when you arrived in Aiken, right?
24       A.   Yes.  Dr. Hoover, myself.  Dr. Hoover was a
25  full partner with Dr. Cindy Besson.

Page 84

1        Q.   Okay.
2        A.   I was brought in as an employee for Cindy
3  Besson.  At the end of my contract, which was like a
4  year and six months, we could not come to a resolution
5  regarding the contractual -- or the contract that she
6  offered me.
7             Dr. Hoover was not happy with the contract
8  either.  The practice broke down.  Dr. Besson
9  essentially kicked Judith and I outside one day.  And we
10  wound up setting up camp temporarily on a facility on
11  the south side and scrambled to set up Parkside Medical
12  Center.  And then we practiced for three or four years
13  together, and then broke up mostly because of
14  profitability issues.
15            It was a 50/50 partnership, and she was not
16  bringing in her 50 percent of the revenue.  And I asked
17  her to renegotiate the contract, which created a great
18  amount of anger.  And then subsequently left, which
19  created a great amount of anger.  I sold her that
20  building and practice.
21       Q.   I'm sorry, the last part?
22       A.   I sold her the building and practice.
23       Q.   As part of a legal settlement, I guess, at
24  that point or not?
25       A.   More like a divorce, I guess is what I would

Margo Hein-Muniz, M.D. 8/25/2011

## Page 85

1  call it. I don't know what it is in lawyer terms.
2          MR. SOWELL: Travis. Can we go off the
3  record?
4          MR. DAYHUFF: Sure.
5          (Off the record.)
6  BY MR. DAYHUFF:
7      Q.   When Besson, you and -- when you split from
8  Besson, you and Hoover split from Besson, and you had to
9  go set up practice somewhere else, did K.D. Justyn
10 assist you with finding a new place to practice?
11     A.   She assisted Judith and I in finding a
12 location to rent.
13     Q.   Okay. Was she helpful to you during that
14 time?
15     A.   At that particular time she was helpful to
16 us.
17     Q.   Okay. You mentioned that you and Hoover
18 split primarily over profitability issues?
19     A.   Uh-huh.
20     Q.   Were there other issues?
21     A.   On my part or her part?
22     Q.   Let's start with you.
23     A.   There was other issues.
24     Q.   Okay. Like?
25     A.   Her husband is a certain kind of man and he

## Page 86

1  insisted on participating in the business aspect of the
2  practice and he had a negative impact on the younger,
3  more attractive female employees of the practice.
4      Q.   Okay. So his role in the practice, I
5  understand. What was her issue -- other issue with you?
6      A.   She got angry when I asked her husband --
7  when I explained to her that her husband was becoming a
8  potential legal liability to our corporation and that he
9  could no longer be in the facility when there was
10 anybody under the age of 50 or female.
11     Q.   Any quality-of-care issues play a part in
12 your split?
13     A.   Yes.
14     Q.   All right. Tell me about those.
15     A.   Dr. Hoover, I felt, was a liability as a
16 partner.
17     Q.   All right. Well, with respect to her quality
18 of care?
19     A.   Correct.
20     Q.   All right. Did she feel the same way about
21 you?
22     A.   I do not believe she did.
23     Q.   Okay.
24     A.   She may say she does now, but at that time,
25 no, she did not.

## Page 87

1      Q.   I'm not saying she does, but I was just
2  curious. Okay. Any quality issues in play when you
3  split from Besson, on either side?
4      A.   No.
5      Q.   Okay.
6      A.   But it --
7      Q.   Have you ever sought help from K.D. other
8  than -- obviously you sought her assistance with a
9  recruitment of a new partner and a subsidy for the new
10 partner. And we've talked about how she provided you
11 and Dr. Hoover with some space, provided a rental space
12 for you. Have you ever approached her for assistance of
13 any other kind?
14     A.   She approached Judith and I and offered to
15 bring in another partner and was actively helping us
16 recruit partners. And then when I split from Judith,
17 she offered to continue to help me.
18     Q.   Okay.
19     A.   And she said some derogatory things about
20 Dr. Hoover and that she felt that Dr. Hoover was not
21 capable of maintaining a patient base in the community
22 like I was; and therefore, she was going to continue to
23 help me and not Dr. Hoover.
24     Q.   Okay. Any other instances of when she
25 assisted you or tried to help you?

## Page 88

1      A.   Not that I can recall.
2      Q.   Okay. Bamberg -- well, let me wait before I
3  go there.
4          I want to understand one other thing about
5  the practice, maybe two other things. And then I'm
6  going to talk about where you have privileges and where
7  you've tried to get privileges.
8          But before we go there, I want to understand
9  how -- you mentioned this pulling call idea, right, at
10 the hospital. How did that work? I know that you have
11 no call anymore. How did that work for you? Who did
12 you pull call with?
13     A.   For several years I pulled call with Boehner,
14 Boone, Minto, and Dr. Hoover. And we were a group of
15 five.
16     Q.   Okay.
17     A.   And we covered our own patients during the
18 week, and then we covered each other on the weekends
19 starting Friday at 5:00 p.m. until 7:00 on Monday.
20     Q.   Okay. All right. And how was that
21 scheduled? How did you guys do it? Did the hospital
22 schedule that? Did you schedule that?
23     A.   Dr. Boehner scheduled that.
24     Q.   Dr. Boehner gave you a schedule and your name
25 was on it at some point and then you would show up?

Pages 85 to 88

## Margo Hein-Muniz, M.D. 8/25/2011

### Page 89

1  A.  On the weekends.
2  Q.  Okay.
3  A.  He would tell us which weekend we were
4  working, and then we would divvy up.  He would call all
5  of us and ask us what holiday we wanted, and the
6  holidays would rotate according to who got what last
7  year.
8  Q.  Would the hospital also keep a schedule of
9  what practice was on or what group who pulled call
10  together was on at what particular time?
11  A.  The hospital has always known it's reasonable
12  and customary for all call groups to cover themselves
13  during the day.  And so, for example, if somebody comes
14  in for Dr. Minto and her partner, Dr. Boehner, is on
15  call for her, they would call Dr. Boehner.  They
16  wouldn't call -- you know, the -- what we used to call
17  "mega call."  Mega call was exclusively for weekends and
18  holidays.  And that tradition continued when I switched
19  call groups to Dr. Daniels and Dr. Daniels and
20  Dr. Bryan.
21  Q.  Okay.
22  A.  So we could continue to have, quote, mega
23  call on the weekends, but we would cover our own
24  patients during weekdays.
25  Q.  Okay.  Why did your call relationship with

### Page 90

1  Boone, Boehner, Hoover, Minto cease?
2  A.  There was an incident with one of Dr. Minto's
3  patients that was medically inappropriate on her part,
4  and it resulted in a C-section without anesthesia.  And
5  when I called it to her attention, the deficits that she
6  had made, she cussed me out and became physically
7  threatening.  And after that, she didn't want to cover
8  my patients anymore because she didn't like the fact
9  that I had called her to the mat on poor quality of
10  care.  And as she so succinctly puts, "There's only
11  going to be one hen in this hen house, and it's going to
12  be me."
13  And so Dr. Boehner tried to arrange a call
14  arrangement where it would be us and then she would
15  just -- her and I would not ever cross paths, but he
16  couldn't -- it was mathematically very difficult for
17  him.  And so I just volunteered to pull call with, you
18  know, the other people.
19  Q.  Okay.  This case in which you allege
20  Dr. Minto rendered medically inappropriate care that
21  resulted in the C-section without anesthesia, did you
22  bring that to the attention of the medical peer review
23  committee at ARMC?
24  A.  I did.
25  Q.  All right.  How did you do that?

### Page 91

1  A.  If I remember correctly, I went up and I
2  talked to K.D. about it directly.  And I submitted a
3  letter.  And then they queried me about the incident,
4  and I responded.
5  Q.  Okay.  You submitted a letter to K.D. or to
6  the medical peer review committee?
7  A.  To the medical peer review committee.
8  Q.  Who was the chairman of the medical peer
9  review committee at that time?
10  A.  At that time, I want to say it was Jonathan
11  Anderson.
12  Q.  Okay.  And then you were queried about it
13  subsequently?
14  A.  Uh-huh.
15  Q.  Who queried you?
16  A.  The peer review committee queried me because
17  in the process of doing the C-section, there was a
18  bladder tear, which I repaired.  And the lady did fine.
19  But the nurses did not do the proper irrigation to the
20  catheter, and Dr. Mintos, when she took over call on
21  Monday, did not adhere to the proper protocol nor did
22  the nursing staff and subsequently the bladder became
23  clogged up and they had to go back in and repair it.
24  Q.  Okay.  So who was being reviewed, you or
25  Dr. Minto, by the medical peer review committee or both?

### Page 92

1  A.  I have no idea if they reviewed Dr. Minto or
2  not.  I suspect not.
3  Q.  Okay.
4  A.  But they were asking me about the incident.
5  Q.  Because they believed that the bladder
6  laceration --
7  A.  Correct.
8  Q.  -- was an incident that they needed to
9  review?
10  A.  Correct.
11  Q.  Okay.  Was that incident that we're talking
12  about, that was one of the five cases in 2009; is that
13  right?  Because I remember C-section without anesthesia.
14  You don't have to look.  You don't have to look.  It's
15  okay.  Do you recall whether or not it was one of the
16  five cases at issue in 2009?
17  A.  I do not recall.
18  Q.  Okay.  Have you -- I mean, a C-section
19  without anesthesia would be a relatively rare thing, I
20  would think.
21  A.  It's happened, as far as I know, six times at
22  ARMC.  And I had had several conversations, along with
23  other physicians, to K.D. about how concerned we are
24  regarding that issue and that we felt, as an OB/GYN
25  unit, that there should be an on-call at least nurse

Margo Hein-Muniz, M.D.  8/25/2011

Page 93

1  anesthetist in the hospital at all times.  And she said
2  it was not cost effective.
3      Q.  How often have you done a C-section without
4  anesthesia?
5      A.  Just that one time.
6      Q.  One time.  All right.
7          Let's talk about privileges a little bit.
8  The first place I want -- I've seen some documents from
9  you, and I understand from David there are more in there
10  that I have not seen.  It looked to me like I had
11  partial applications for various places.  Do you know
12  why I would have had partial applications rather than
13  the entire application?
14      A.  I don't have a direct knowledge of why.  My
15  estimate would be that there has been so much
16  transaction of paperwork that it's lost somewhere in
17  these 500 boxes of paper.  But all applications were
18  filled out in their entirety.
19      Q.  Okay.  All right.  Well, is it possible that
20  the reason I don't have complete applications for some
21  is that with the passage of time parts of the
22  applications have been lost or discarded?
23      A.  I have no idea --
24      Q.  Okay.
25      A.  -- without looking through all of these boxes

Page 94

1  of paper.
2      Q.  Okay.  Well, is that a reasonable explanation
3  or unreasonable, in your mind?  I mean, you know your
4  documents better than me.
5      A.  I would say I know that somewhere in my
6  computers I have complete and entire documents.  And so
7  if the documents you require cannot be obtained, I will
8  do my best to find them.
9      Q.  Okay.  You retain all the applications in
10  your computer in PDF or some format?  How do you do
11  that?
12      A.  Well, the applications to the V.A. was an
13  electronic application.  The second time I applied to
14  Doctors, they had switched to a centralized
15  e-credentialing thing.  And then I've got hard copy
16  stuff buried in an avalanche of paper somewhere.  I've
17  tried scanning some things in, trying to get it all
18  organized.
19      Q.  So if we were thinking about, just kind of
20  globally thinking about the kind of documents you would
21  have regarding your applications for privileges at
22  various places, you would have some documents on your
23  computer, right?
24      A.  Yes.
25      Q.  Is that a practice computer or a home

Page 95

1  computer?
2      A.  It's a home computer --
3      Q.  All right.
4      A.  -- that I filled out the application online
5  with.  And then the HCA application was filled out by my
6  office manager on her computer.
7      Q.  All right.  Which would be an office
8  computer.  And then you would have paper copies in the
9  avalanche of paper, right?
10      A.  Uh-huh.
11      Q.  Would you have letters that would accompany
12  those applications?
13      A.  Define.
14      Q.  To and from places where you wanted to get on
15  staff.  "I'm Dr. Muniz, I'm interested, send me an
16  application."
17      A.  There was a lot of phone calls.  Most of it
18  was phone calls.
19      Q.  Well, the natural --
20      A.  A lot of these places you had to go and talk
21  to before they would even give you an application.
22      Q.  Okay.
23      A.  And a lot of the places I went and I talked
24  to, when they found out or looked at what was going on,
25  wouldn't even look at me.

Page 96

1      Q.  Okay.  I'm just -- and we'll get to that.
2  I'm just trying to understand the universe of documents
3  that may or may not exist regarding these things.
4          So some of these were phone calls.  When you
5  call up a place and they say, "Okay.  We're going to
6  send you a preapplication or an application," that would
7  come to you electronically or in paper form?
8      A.  Both.
9      Q.  Both.  Okay.  And so for every application
10  where you got somebody to send you a response, you
11  should have a letter that accompanies it or an e-mail?
12      A.  I don't understand your question.
13      Q.  Well, if you call somebody up and they say,
14  "Okay.  We're going to send you a preapplication or an
15  application," you would either receive or your practice
16  would receive an electronic communication, an e-mail,
17  "Here's your application with an attachment," or you
18  would receive a letter in the mail, paper, that would
19  come to you?
20      A.  We would receive the application in the mail
21  but not a letter.
22      Q.  Okay.  They didn't send a cover letter that
23  says, "Hey, thanks for calling us.  Here's the
24  application we need you to fill out.  I'm the medical
25  staff coordinator at University"?

Margo Hein-Muniz, M.D. 8/25/2011

Page 97

1    A.   If they did, I never saw it.
2    Q.   Okay.
3    A.   But in general, those forms are filled out by
4  my office manager.
5    Q.   All right.  Would it have been your office
6  manager's practice to retain every single letter that
7  came or is the focus going to be on the application?
8    A.   The focus would be on the application.
9    Q.   So it's conceivable, is it not, that certain
10  of the letters would have been discarded in the normal
11  course?
12    A.   It is conceivable.
13    Q.   All right.  Okay.  A lot of times folks have
14  issues with hard drives and the like.  Have you had
15  anything like that where you've had hard drives go down
16  either at your practice or at your home that could
17  account for the fact that I don't have all the documents
18  about a particular application?  Has anything like that
19  happened to you?
20    A.   Yeah.
21    Q.   Okay.  At your practice?
22    A.   Yeah.
23    Q.   Okay.  And at your home?
24    A.   Yeah.
25    Q.   All right.

Page 98

1    A.   But not as much as at the practice.  There's
2  two MRI machines that run on our floor, and then there's
3  a giant one that runs downstairs.  And there was a
4  period of time there where every time -- I mean every
5  day at 2:00 when they would turn on that big scanner, it
6  would blow off our Internet.  It would just shut us
7  down.  It was crippling.
8    Q.   Okay.
9    A.   In the conversion to EMR, the front end is
10  all run -- the scheduling is run by EMR and that type of
11  stuff.  So, yes, that's entirely conceivable.
12    Q.   All right.  So in addition to things being
13  discarded in the normal course by office folks when they
14  come in, things meaning applications and letters and
15  stuff, you could have also lost some data due to
16  computer hard drive failure?
17    A.   Yes.
18    Q.   Okay.
19    A.   Because we don't use Apple.
20    Q.   Okay.  All right.  Have you ever received --
21  well, we'll come back to that.  Let's talk about the
22  actual places a little bit.  You mentioned to me that
23  all the applications you filled out, they were filled
24  out in their entirety, right --
25    A.   Uh-huh.

Page 99

1    Q.   -- when they came to you?
2         What is your privileges relationship, if any,
3  with Bamberg Hospital?  I hear you do something for
4  them, and I don't know what it is.
5    A.   Bamberg Hospital is now closed.
6    Q.   Okay.  Well, that must be recent.
7    A.   Yes.
8    Q.   When did Bamberg close?
9    A.   Two weeks ago -- no, more than that.  Maybe
10  three weeks ago.
11    Q.   Okay.  Did you have some sort of a privilege
12  relationship with Bamberg before they closed?
13    A.   I was a contractual employee, so I guess that
14  would be my third job.  And I was doing an outpatient
15  women's clinic for them, and I was given privileges to
16  do minor procedures only.  But this is a very tiny
17  hospital --
18    Q.   Uh-huh.
19    A.   -- in rural, rural South Carolina.
20    Q.   The minor procedures you were privileged to
21  do, what were those?
22    A.   Your basic minor procedures.
23    Q.   The ones we've discussed heretofore?
24    A.   Correct.
25    Q.   Good.  All right.  Did you seek to get

Page 100

1  privileges beyond the minor stuff?
2    A.   I did.
3    Q.   All right.  What happened with that?
4    A.   It went nowhere.
5    Q.   Okay.  You filled out an application for
6  those privileges?
7    A.   Uh-huh.
8    Q.   And what happened?
9    A.   They wanted to watch me and see how I did on
10  the minors.  And then their plan was for expansion and
11  to eventually someday build an OB/GYN unit.  But there
12  was a situation with their CEO, and she got invited to
13  leave.  And then there was an interim CEO and then
14  another CEO and then they closed.
15    Q.   Okay.  Now, the idea that they would watch
16  you.  They would have an OB/GYN on staff monitor your
17  cases?
18    A.   I state that metaphorically.
19    Q.   Okay.  It wasn't a formal procedure they
20  proposed?
21    A.   No.  They wanted to make sure that their
22  hospital could handle gynecologic procedures.  The
23  majority of the procedures that they did at that
24  particular time when I applied was port access for
25  dialysis.

Margo Hein-Muniz, M.D. 8/25/2011

## Page 101

1     Q.   Okay.

2     A.   There was a gentleman out there named

3  Dr. Ross who was doing, I understand, up to 300 of these

4  ports a month.  So that's really what the whole hospital

5  was designed around.

6     Q.   Dialysis?

7     A.   Yes.

8     Q.   Ports?

9     A.   And ports.

10    Q.   And you were invited in in hopes of being the

11 seed for an OB/GYN?

12    A.   Well, Dr. Bryan was, and then Dr. Bryan would

13 have needed a partner.  And so that's how I kind of came

14 into the picture.

15    Q.   Okay.  How were you paid?  You said contract.

16 Was it hourly, was it --

17    A.   It was.  With the first CEO, it was just a

18 set sum.  But we got one payment, and then we never got

19 paid again.  And then there were some discrepancies, I

20 guess, with the monies.  And that's when he was invited

21 to leave.  And then so basically I worked out there for

22 no reason at all other than to help rural America, which

23 is fine, but being paid would have been good.

24         And then the new CEO came in, and he

25 negotiated a different contract where I would be given

## Page 102

1  $1,500 a month to go out there and see patients.

2     Q.   Okay.

3     A.   You know, but we billed for the patients, and

4  they got the ancillary services.

5     Q.   Okay.  And in addition to that, you got 1,500

6  bucks --

7     A.   Right.

8     Q.   -- to compensate you for what, traveling

9  there?

10    A.   Yes.

11    Q.   Okay.

12    A.   And bringing my entire staff with me.

13    Q.   Got you.

14    A.   And it was a subsidy.

15    Q.   Okay.

16    A.   Over a two-year period.

17    Q.   All right.

18    A.   So ...

19    Q.   Are there documents that reflect or

20 memorialize this relationship you had with Bamberg?

21    A.   I believe that there are.

22    Q.   Written contract?

23    A.   I believe that there is.

24    Q.   Okay.  Do you have that?

25    A.   Not on me.

## Page 103

1     Q.   Okay.  Would that be something that you

2  retained or -- that wouldn't be one of the things that

3  would be discarded?

4     A.   No, it would probably be somewhere.

5     Q.   Okay.

6     A.   My husband negotiated that contract, but like

7  I said, that didn't last very long either because then

8  there was a third CEO and then it closed at the end.

9     Q.   All right.  Let's see.  Was there going to be

10 the opportunity -- well, do they deliver babies at

11 Bamberg?

12    A.   No.

13    Q.   It's too small?

14    A.   Not for years.  Not for years.  And their

15 equipment was not -- this was like a five-year dream.

16    Q.   Okay.  I have in an interrogatory response

17 that you applied for privileges at Doctors Hospital in

18 Augusta, Georgia.  Is that true?

19    A.   Yes, sir.

20    Q.   All right.  Do you recall when you applied?

21 Before or after the suspension, both, the 2010

22 suspension?

23    A.   Before the suspensions.

24    Q.   Before.  Okay.

25         What was the result?

## Page 104

1     A.   I went over the first time and I met with a

2  group of doctors and presented my proposal.  And at that

3  time I was going to be pulling call with Dr. Grossman

4  and his potential new partner, Dr. Wilson.  And they

5  were all very excited about it.  And I submitted my

6  application, and there was a delayed response on the

7  part of ARMC until after they were able to hit me with

8  the peer review.

9     Q.   All right.  So you think ARMC delayed their

10 response in an effort to sabotage your application to

11 Doctors Hospital?

12    A.   Yes.

13    Q.   All right.  What evidence do you have of

14 that?  I know you believe it, but what evidence do you

15 have of it?

16    A.   The timeline.

17    Q.   Okay.  Anything other than the timeline?

18    A.   The fact that, once again, the gossip tree

19 told me that they had received the letters up on the

20 sixth floor and that they were extremely angry.

21    Q.   When you say the "gossip tree," who?

22    A.   You know, you're asking me to quote

23 physicians from, you know, several years ago.  You walk

24 into a doctor's lounge, there may be seven or eight

25 doctors in there.  One or two of them, you know, may say

## Margo Hein-Muniz, M.D. 8/25/2011

### Page 105

1  something to you to the effect of, "Hey, I heard that
2  you applied to Doctors.  It's up on the sixth floor.
3  You're screwed."
4      Q.  Okay.
5      A.  That type of thing.
6      Q.  If somebody said that to me, "Hey, Travis,
7  you're looking to go to Biff's firm, they know about
8  that upstairs.  Morrison knows about it, and you're
9  screwed."  I would remember who told me that.
10         Do you remember who told you that?
11     A.  I remember comments from Dr. Page.  I
12  remember comments from Dr. Daniels Sr.
13     Q.  All right.  What do you recall Dr. Page
14  telling you?
15     A.  Essentially that.
16     Q.  Essentially that or actually that?
17     A.  It was years ago.
18     Q.  "You're screwed"?
19     A.  Yes.  Yes.
20     Q.  Okay.  That kind of language?
21     A.  "You're in trouble.  You're --" that kind of
22  thing.
23     Q.  All right.  Dr. Daniels?
24     A.  Dr. Daniels told me that I needed to be very,
25  very careful and that they were working on getting rid

### Page 106

1  of me because of my applications.
2      Q.  And you were in the doctors' lounge when
3  these things were said to you?
4      A.  And other places.  Once he talked to me on
5  postpartum.
6      Q.  Okay.  University Hospital, did you apply for
7  privileges there?
8      A.  Yes.
9      Q.  Before the 2010 suspension revocation or
10  after or before and after?
11     A.  I applied before, and then I had several
12  phone conversations with them after.  The conversations
13  afterwards were not documented because they were phone
14  calls.  And they said that they were having a tough time
15  getting what they needed from ARMC and that now -- and
16  then after I had been suspended, they told me that that
17  issue would need to be resolved before they would look
18  at my application further and would I like it to be put
19  on hold.  They had a special word for it, but in essence
20  put in limbo.
21     Q.  Table it?
22     A.  No, that wasn't the word.
23     Q.  That's all right.  I know what you mean.
24         So what did you say?
25     A.  I said, "Yes, please."

### Page 107

1      Q.  Put it in limbo?
2      A.  You know, "Yes, and I'll try and get this
3  matter resolved."
4      Q.  Okay.  Have you ever asked them to take it
5  out of limbo and process your application?
6      A.  No, because after that my privileges were
7  terminated.
8      Q.  Okay.  So you agreed to have your application
9  tabled or put in limbo and have not asked them to
10  reconsider it since that time?
11     A.  I wasn't able to because I was already told
12  that there was no point in me proceeding since I had had
13  my privileges pulled.
14     Q.  Who told you that?
15     A.  The gentleman that I talked to on the phone
16  who was the head of the -- the head of the credentialing
17  committee at the time.  And now I don't remember his
18  name, but I do remember that he was a cardiologist.
19     Q.  Okay.
20     A.  And he said, "Once you get that straightened
21  out," he said, "then call us."  He said, "But the board
22  of governors at University is nervous because of the Ann
23  Drayton-Smith affair and that they had recently had a
24  problem with another doctor.  So they were skittish."
25     Q.  Okay.  Trinity Hospital, is that in Augusta?

### Page 108

1      A.  Yes.
2      Q.  Okay.  Did you apply there?
3      A.  Yes.
4      Q.  When?
5      A.  I want to say that it was after I had got my
6  privileges reinstated after the first peer review bit.
7      Q.  Okay.  All right.  What happened with that
8  application?
9      A.  I filled it out.  I had a talk with him about
10  some of the things that had been going on.  He said, "Go
11  ahead and fill out the application."
12         I filled out the application.  I didn't know
13  how to answer certain questions because the
14  deliberations weren't complete.  And I asked a mentor of
15  mine what the appropriate response would be and wrote
16  down what he told me to write down.  And then they
17  didn't like the way I filled it out.  And they had
18  gotten, apparently, some sort of letter from ARMC that
19  was -- whatever.  And so they said that I had filled out
20  the application improperly and therefore nullified my
21  opportunity.
22     Q.  Who was your mentor that advised you about
23  how to fill it out?
24     A.  I had talked with Dr. Smith about it a little
25  bit, Dr. Terry Smith, on how he would do it.  And what

Margo Hein-Muniz, M.D. 8/25/2011

Page 109

1  did they mean by that questions -- some of these
2  questions.  And Dr. Cruickshank, how he would have, you
3  know, handled it.
4          Q.   That's your guy from residency, right?
5          A.   Correct.
6          Q.   And what was the question that you were
7  struggling with how to answer?
8          A.   I honestly don't remember.  There was two
9  questions and they were weird and I didn't know how to
10  answer them.
11          Q.   Do you remember anything about them?
12          A.   It was something to do with the fact of -- it
13  was the way that they were worded.  It was -- have you
14  had -- and I'm not going to stake my life on this, but
15  it was something to the effect of, you know, for
16  example, have you ever had your privileges permanently
17  pulled?  And so my question would have been something
18  like, "Does this count?"
19          Q.   The first peer review action?
20          A.   Right.  Is that, like, permanent, you know,
21  or should I put it down there because it happened and
22  then it unhappened?  I was cleared of all charges.  So
23  because I was cleared of all charges, does that count as
24  an event?  Or the question may have been something to
25  the effect of:  Were there any events, you know, that

Page 110

1  resulted in like prolonged blah?  And, you know.  And
2  then my question would have been, you know, what counts
3  as an event?  It was that sort of a scenario.  And so I
4  used their advice, and it was apparently the wrong
5  answer.
6          Q.   Okay.  And in the 2009 peer review, your
7  privileges were not suspended or revoked, were they?
8          A.   2009 peer review.
9          Q.   The peer review regarding the five cases.
10  Didn't you maintain your privileges during the pendency
11  of that one?
12          A.   If I remember correctly, I was cleared of all
13  charges.  But there was a claim -- a qualifier claim on
14  my release that I had a disruptive personality and
15  needed to be assessed by a forensic psychiatrist.
16          Q.   I remember that.  I want to ask a little
17  different question.  We'll get to the hearing panel
18  reports at some point.
19          Did you continue practicing during that first
20  peer review process, or did they take your privileges
21  such that you were not treating patients in the hospital
22  while that was all played out?
23          A.   I was not treating patients in the hospital
24  for a short period of time while that all played out.
25          Q.   Okay.  And that short period of time that you

Page 111

1  were not treating patients, was that when you were
2  trying to negotiate the end of this as it went up to the
3  board?  Is that the suspension you're talking about
4  there?
5          A.   I don't understand the question.
6          Q.   Okay.  All right.  When do you recall being
7  suspended as part of the first peer review action, if
8  you do at all.
9          A.   I recall being suspended for questioning and
10  not doing the psych evaluation until it was proven to me
11  as to why it was required.
12          Q.   Okay.  All right.  That's my understanding,
13  too, is that at the very end of that 2009 peer review
14  process, there was a dispute about whether or not you
15  were going to do the psych evaluation and the hundred
16  percent case review that the board wanted to do.
17          Do you recall that?
18          A.   Yes.
19          Q.   All right.  And because you didn't comply
20  with the board's recommendation to that effect, their
21  ultimate recommendation, you were suspended for a short
22  period of time.  Is that your recollection?
23          A.   Yes.  I would say that's accurate.
24          Q.   And then ultimately with the assistance of
25  your attorneys, it looked like you resolved that

Page 112

1  dispute, underwent the psychological evaluation, agreed
2  to a hundred percent case monitoring for a year or
3  whatever and then you were reinstated.  Is that your
4  recollection?
5          A.   No.
6          Q.   Okay.  What do you recall?  What's wrong with
7  what I just said?
8          A.   I agreed to undergo the forensic evaluation
9  and was cleared of the charge regarding my psychiatric
10  fitness.  It was forced upon me to undergo one hundred
11  percent monitoring.
12          Q.   Okay.
13          A.   And I was never told, despite multiple
14  requests, what I was being monitored for, why, who was
15  doing the monitoring.  And because I had been cleared of
16  clinical incompetence and I had been cleared of
17  psychiatric issues, why did I require one
18  hundred percent monitoring?  And that question was never
19  answered.
20          Q.   Okay.  So you don't recall agreeing to the
21  hundred percent monitoring part of it?
22          A.   I did not agree to the hundred percent
23  monitoring.
24          Q.   You did agree to go get the psychological
25  evaluation?

Pages 109 to 112

## Margo Hein-Muniz, M.D. 8/25/2011

### Page 113

1      A.   I did agree to get the psychological
2  evaluation.
3      Q.   Fair enough.
4           So you apparently answered that question, we
5  were talking about the question for Trinity Hospital, in
6  a way that didn't disclose the suspension that we were
7  just talking about?
8           MR. DICK:  Object to the form.
9           THE WITNESS:  Yes.
10 BY MR. DAYHUFF:
11     Q.   And when ARMC provided Trinity information
12 about your credentials at ARMC, they disclosed the
13 suspension?
14     A.   I have no idea what they said to them.
15     Q.   Well, I think you said a minute ago that
16 whatever ARMC sent over.
17     A.   What I said was whatever ARMC sent over there
18 resulted in them not allowing me to have the privileges.
19     Q.   Right.
20     A.   And they stated that it was because I had
21 filled out the application improperly.
22     Q.   Okay.  I guess I was thinking that logically
23 ARMC must have said to them you were suspended for a
24 period of time, and that contradicted what you had said
25 in your application.

### Page 114

1           MR. DICK:  Object to the form.
2  BY MR. DAYHUFF:
3      Q.   Go ahead.
4      A.   I don't recall what my answer was on the
5  application without looking at the application.  And I
6  wouldn't be able to answer that question unless I was
7  allowed to see what ARMC sent to the hospital because
8  the gentleman that we had talked to, I had told him I
9  was having problems at ARMC.  And so I figured my
10 verbal --
11     Q.   Disclosure?
12     A.   Thank you.  Verbal disclosure --
13     Q.   Would suffice?
14     A.   -- would suffice.
15     Q.   Okay.
16     A.   But apparently he has nothing to do with the
17 actual credentialing committee, which I obviously did
18 not understand.  So he obviously never told them, but I
19 had assumed that he would have mentioned that.  So ...
20     Q.   Understood.  So that's what happened with
21 Trinity.
22          Do you recall whether you retained all the
23 documents regarding that application?
24     A.   Regarding the Trinity application?
25     Q.   The Trinity one.

### Page 115

1      A.   I do not recall.
2      Q.   Okay.
3      A.   I will look.
4      Q.   That's okay.
5           Let's see.  Was there any e-mail exchanged
6  between you and the person at Trinity who you made this
7  disclosure to?
8      A.   No.
9      Q.   Just phone call?
10     A.   No.  We met with him in person.
11     Q.   Okay.
12     A.   My husband and myself.
13     Q.   And who was it, do you recall?
14     A.   I don't remember the gentleman's name.  I
15 remember his office.  He had a secretary in the front
16 and it was blue carpet and it was a horrible office.
17 That's all I remember.
18     Q.   Lexington Hospital, did you apply at
19 Lexington Hospital --
20     A.   I did.
21     Q.   -- for privileges?  Before or after the
22 suspension revocation or both?
23     A.   After.
24     Q.   After.  Okay.
25          What happened with that application?

### Page 116

1      A.   I made several phone calls.  The person that
2  I wanted to partner up with is a close friend that I did
3  residency with.  She had several talks with the powers
4  that be.  They agreed to talk to me.  I had filled out
5  the initial application.  And then I had tried to
6  arrange several meetings within this lady, but it kept on
7  getting delayed, delayed, delayed, delayed.  And then
8  eventually we got to meet.  And we talked about it, and
9  she said she would let me know.  And then she called me
10 later and told me, "Thank you so much for applying, but
11 we don't believe that you would be an appropriate fit
12 for Lexington."
13     Q.   Okay.  And did she say why?
14     A.   No.
15     Q.   And did you ask?
16     A.   Yes.
17     Q.   And she wouldn't tell you?
18     A.   No.
19     Q.   Okay.  Did you fill out the application?
20     A.   What I can tell you is, you know, my friend
21 felt that it was obviously my situation.
22     Q.   Do you know whether it was the way you filled
23 out that application that resulted in the rejection?
24     A.   No.
25     Q.   How do you know that?

Margo Hein-Muniz, M.D. 8/25/2011

## Page 117

1    A.    Because I filled it out properly.

2    Q.    You disclosed the suspensions?

3    A.    Well, I had learned what the proper way to

4  fill out an application was.

5    Q.    So you did disclose the peer review actions,

6  suspensions, revocation to Lexington?

7    A.    Correct.

8    Q.    All right.  I've got locum tenens positions

9  in S.C., Georgia, and Alabama.  Did you apply for locum

10  tenens positions in those states -- with companies in

11  those states?

12    A.    No.  I think you're confused.  I applied to a

13  locum tenens agency called MDA, Inc.

14    Q.    Okay.  MDA, Inc.

15    A.    And without my notes in front of me or my

16  computer in font of me or my little pad of paper in

17  front of me, I don't remember who the contact lady was.

18  And I was unable to get any positions because of my

19  situation.

20    Q.    MDA, Inc.?

21    A.    Yeah.  A lot of hospitals will not even look

22  at you if you've had your privileges revoked for any

23  reason.

24    Q.    All right.

25    A.    So that essentially negated me from all locum

## Page 118

1  tenens positions.

2    Q.    All right.  Any other locum tenens

3  organizations that you recall applying to?

4    A.    There was another one called Weatherby.

5    Q.    Okay.

6    A.    And same thing.  I had discussed the

7  situation with a handler, for lack of a better word.

8  And she had called multiple places trying to get me

9  jobs, but nobody was interested in looking at me.

10    Q.    Okay.  MDA, Inc., Weatherby.  Any other locum

11  tenens that you recall?

12    A.    No.

13    Q.    Okay.  And if I understand your testimony on

14  the locum tenens, the reason you did not get accepted

15  was it had nothing to do with the way you filled out an

16  application, right?

17    A.    No.

18    Q.    It had to do with the fact that you had

19  been -- your privileges had been revoked at ARMC?

20    A.    Uh-huh.

21    Q.    And you're sure that you disclosed everything

22  in those applications --

23    A.    Yes.

24    Q.    -- regarding your peer review?

25    A.    Yes.

## Page 119

1    Q.    Okay.

2    A.    And I had extensive conversations with these

3  people regarding the situation.

4    Q.    How about e-mails with those people?

5    A.    No.  That would have been too much to type.

6    Q.    You mentioned notes, your pad of paper with

7  notes regarding this.  Did you take notes as you were

8  doing the --

9    A.    I would write down the lady's name and her

10  number and the company, you know, so if she called me.

11  And then I would list what hospital she thought might

12  take me.  And then she would call me back and say,

13  "Okay, call these people," and "this isn't going to

14  happen."  And then after a while I just gave up.

15    Q.    Okay.  Would you have retained those notes,

16  or would that have been something you would have

17  discarded in the normal --

18    A.    I would have thrown that away.  That's scrap

19  paper.

20    Q.    Okay.

21    A.    That's a Post-it kind of thing.

22    Q.    Got you.  So it wouldn't have been a notebook

23  of my attempt to get privileges that you kept like in a

24  three-ring binder somewhere, much more causal than that?

25    A.    Yes, because at that time I didn't realize

## Page 120

1  how horrific this whole thing would turn into.

2        MR. DICK:  Travis, you've got the e-mails.

3  That's what's in there.  All the e-mails related to

4  locum tenens positions.

5        MR. DAYHUFF:  I have no idea what's in there.

6  I appreciate it.

7  BY MR. DAYHUFF:

8    Q.    So the e-mails that you were able to find --

9  and these were found on the practice computer or the

10  home computer or both?

11        MR. DICK:  These were forwarded from her.

12        THE WITNESS:  The practice computer.

13        MR. DICK:  You would have to ask her.

14        THE WITNESS:  A lot of it was my home

15  computer.

16  BY MR. DAYHUFF:

17    Q.    Okay.  Would there also be -- sounds like

18  from your prior testimony there could also be e-mail

19  correspondence on your personal computer related to your

20  attempts to get privileges?

21    A.    Yes.  But most likely they would be

22  duplicates.

23    Q.    Okay.

24    A.    Because a lot of times what I do is I will

25  forward myself something, you know, so that I could keep

Pages 117 to 120

Margo Hein-Muniz, M.D. 8/25/2011

## Page 121

1  it on my home computer, which was an XP. And we had a
2  small problem with the XP.
3      Q.   Okay. So most likely your home computer had
4  duplicates, but you couldn't testify to that. You could
5  have stuff on your home computer that wasn't on your
6  work computer and vice versa, right?
7      A.   Yes. That is a possibility.
8      Q.   Okay.
9      A.   I can certainly look for you.
10     Q.   Okay. We'll take a list, perhaps, of things
11 we might want to follow up with you on discovery later.
12     A.   Okay.
13     Q.   So to summarize with respect to University,
14 Trinity, Lexington -- I'm sorry, forget it. I won't
15 summarize.
16         Any other hospitals that you recall? You've
17 listed -- we've gone over the ones that were provided to
18 me as a response to an interrogatory. Do you recall any
19 other hospitals?
20     A.   I applied to a hospital in Alabama.
21     Q.   Okay. What hospital was that? Maybe what
22 town, city?
23     A.   It was part of the Baptist system. Walker
24 Baptist is what I want to say. And I went out there and
25 I interviewed. The recruiter was named Jason Spiece

## Page 122

1  from Merritt Hawkins. And he and I had a very
2  exquisitely long conversation about my situation. He
3  felt this hospital and I would be a good fit, and that
4  they would be sympathetic to my situation, as he had had
5  other doctors that were victims of sham peer review that
6  had successfully placed. I went out there. He got me
7  the interview. I went out with my husband. We
8  interviewed. It was wonderful. Wonderful, wonderful
9  place. Wonderful place. Good place. I would have been
10 happy there.
11     Q.   Okay. What happened?
12     A.   I got offered the job. Jason Spiece called
13 me and he had placed many physicians at that hospital
14 and he was very excited. I think mostly about the
15 commission. And he asked that I sign a letter of
16 agreement not to look for anything else.
17     Q.   Exclusivity?
18     A.   Sure. Whatever the word for that is.
19     Q.   Okay.
20     A.   And I signed it, and I sent it back to him.
21 And he called me the next day at work and he said --
22 let's take a break, shall we?
23         MR. DAYHUFF: Sure.
24         (A recess transpired.)
25 BY MR. DAYHUFF:

## Page 123

1      Q.   I'm going to run through -- I'm going to try
2  to short circuit some of this privileging discussion. I
3  think we've discussed it a lot already.
4          I saw evidence in the documents that you had
5  applied for Conway Medical Center for privileges.
6          Do you recall that?
7      A.   Yes, I do.
8      Q.   Did you disclose to Conway that --
9      A.   Absolutely. Absolutely.
10     Q.   Okay. You disclosed that you had been
11 suspended or your privileges had been revoked?
12     A.   Yes.
13     Q.   And that was denied -- that application was
14 denied for privileges?
15     A.   Uh-huh.
16     Q.   Did you receive final word from Conway that
17 it was denied or did you pull the application or how did
18 that work?
19     A.   I went out and I interviewed, actually,
20 twice. I interviewed with the doctor herself and she
21 knew my story. Her name is Dode Washington. Another
22 awesome opportunity. And so she wanted me, so she
23 talked to -- I can't remember his name right now, but it
24 will come to me. She talked to the chief of the
25 credentialing committee, so he said -- and she told him

## Page 124

1  the story. And he said fine, you know. He had looked
2  up -- he had seen my CV. He had looked up my stuff. He
3  felt like I was worth looking at. So they brought me
4  out again and I interviewed with him and his assistant,
5  like CEO. I believe that I met with the CEO or the CFO.
6      Q.   Bill Clayton is the CEO.
7      A.   Okay. I met with one of them. And then I
8  met with this director. And then yadda, yadda, yadda.
9  Dode called me, and she told me that they weren't going
10 to give me privileges.
11     Q.   Okay. Carolina Pines, have we discussed
12 Carolina Pines yet?
13     A.   Carolina Pines, I believe, was one of the
14 locum tenens places that wanted a regular locum tenens
15 physician. And same thing. When I talked to the woman,
16 she was like, "Until you get this issue resolved," she's
17 like, "we cannot proceed."
18     Q.   So you disclosed the issue fully to Carolina
19 Pines, the peer review issues?
20     A.   Right.
21     Q.   Palmetto Health Baptist, did you disclose the
22 peer review issues to them?
23     A.   I did. The gentleman I interviewed with is a
24 friend of mine and was my former chief resident.
25     Q.   Okay.

Pages 121 to 124

Margo Hein-Muniz, M.D.  8/25/2011

## Page 125

1  A.  They interviewed me twice.  And although the
2  OB/GYN was quite sympathetic that I had -- the
3  credentialing committee was quite sympathetic, she said
4  it would be pretty much impossible to push this through
5  until a final answer was ...
6  Q.  Okay.  Did we meant Credent?
7  A.  Credent.
8  Q.  C-r-e-d-e-n-t.  I don't know if it's a locums
9  group.
10  A.  I would imagine it was be a locums group.
11  Q.  Do you know whether or not you disclosed the
12  suspension revocations with them?
13  A.  Quite frankly, I don't even remember talking
14  to them.
15  Q.  Fair enough.  Let's move on.
16  You talked about Weathersby, and I think you
17  told me you disclosed everything to Weathersby.  Trinity
18  was the one you did not disclose.
19  A.  Right.
20  Q.  Doctors Hospital, did you --
21  A.  Well, let me rephrase that.
22  Q.  Well --
23  A.  I disclosed it verbally.
24  Q.  But not on the application?
25  A.  Correct.

## Page 126

1  Q.  Doctors Hospital, did you disclose?
2  A.  Yes.
3  Q.  Bamberg?
4  A.  Yes.
5  Q.  HCA?
6  A.  Yes.
7  Q.  Okay.  So other than Trinity, there's not a
8  single application when I get some time to go through
9  that that I will find where you didn't disclose the
10  existence of the suspension or termination?
11  A.  As far as I recollect.
12  MR. DAYHUFF:  Okay.  All right.  I want to
13  show you one.  And as I mentioned to you, I kind of have
14  pieces of things right now.  So I don't have a full
15  application to show you.  Let's see if I can find it and
16  give you a copy.
17  (DEFT. EXH. 1, Application Portions,
18  MUNIZ_000918 through 000922, was marked for
19  identification.)
20  BY MR. DAYHUFF:
21  Q.  For the record, this is a portion of an
22  application that's produced to me, Muniz 00918 through
23  922.  Can you tell -- take some time to review this.
24  I'm particularly interested in the second page.  As you
25  review it, I'm interested in knowing if you know which

## Page 127

1  institution this was sent to.  To provide you some help
2  with the dates, there's a fax date on the bottom of each
3  page of January 27, 2010.
4  A.  I think this was -- I think your date on the
5  bottom, you're misconstruing.
6  Q.  Okay.
7  A.  This is -- you got to remember, we were
8  faxing these back and forth to, like, everybody on the
9  planet.  And I think the thing to do is find out where
10  the number was from.  My husband filled out this
11  application for me.  This is his handwriting.  When I
12  first applied it to HCA, I hadn't been tapped yet.  So I
13  want to say this is part of the first application of
14  HCA.
15  Q.  All right.
16  A.  That was when they were still doing paper
17  applications.  And then the second HCA application was
18  the electronic one.
19  Q.  All right.  Take a look at the -- I guess
20  it's the next-to-the-last page.  It's got what appears
21  to be your handwriting.  The check is beside "courtesy."
22  Do you see that?
23  A.  Uh-huh.
24  Q.  And it says, "Would like to increase to
25  active as Dr. Bryan and I set up his office in

## Page 128

1  Barnwell."  I don't know what that says.
2  A.  These's are -- that's Barnwell.
3  Q.  Does that help you identify this application?
4  A.  These are not -- I don't think that this
5  is -- that these go together.
6  Q.  That's how I received them.  That's all I
7  know about them.
8  A.  Yeah.  I'm going to have to pull all of
9  these.  Bamberg was fully aware of everything that was
10  going on, and we were absolutely honest with them.  And
11  you can see that they were the only hospital that ever
12  received a response from ARMC talking about my
13  situation.  And I met with the MEC committee and we
14  talked about my situation at length.  And they all
15  know -- knew what was going on.  And but I don't ...
16  Q.  Hard to tell.
17  A.  I think this piece --
18  MR. SOWELL:  What page are you referring to
19  so there will be some record of it?
20  THE WITNESS:  He's talking about Muniz page
21  000921 where I asked for courtesy privileges.  And we
22  were trying to set up the OB/GYN clinic.  But then he's
23  got this other page that is 000918, and it was faxed
24  January 27th from somewhere.
25  BY MR. DAYHUFF:

www.compuscripts.com

Margo Hein-Muniz, M.D. 8/25/2011

---

Page 129

1    Q.  January 27, 2010.

2    A.  Yeah.  But I don't know.  I can show it to my

3  husband and ask him which application.  I think these

4  are different pieces.

5    Q.  Okay.  Take a look at 000919 for me, and

6  let's just establish on the record that under

7  disciplinary actions on 000919, no peer review

8  suspension is disclosed; is that correct?

9    A.  There is -- yes, that's correct.

10    Q.  Okay.  And your testimony a moment before was

11  that the only one you could recall where you didn't

12  disclose the peer review sanction to was Trinity.

13    A.  That is correct.  But once again --

14    Q.  Do you think this is Trinity is my question.

15    A.  It might be.

16    Q.  May be.

17    A.  It may be.  I don't know.  I'll have to --

18  I'll have to pull my files, and I'll have my husband

19  look at this --

20    Q.  Fair enough.

21    A.  -- and see.

22    Q.  That's okay.  You've struggled with that long

23  enough unless you want to continue.

24    A.  Yeah.

25    Q.  Let me ask kind of a concluding question

---

Page 130

1  about this.  You have alleged that ARMC has hindered

2  your efforts to get on staff.  By the only thing I

3  understood, the only evidence you had of it is, well,

4  two things.  One is the gossip or the grapevine.  Is

5  that what you described it as, as a grapevine?

6    A.  Uh-huh.

7    Q.  And the timeline of responses for ARMC.

8    Can you provide me -- I understand what the

9  grapevine was.  We've discussed that, right?  What was

10  the timeline that causes you to believe ARMC has

11  intentionally thwarted your efforts to get on staff at

12  these other places?

13    A.  What is the timeline?

14    Q.  Right.  That was kind of the other piece of

15  this that you said was your evidence of wrongdoing by

16  ARMC regarding your applications.

17    A.  I'm not going to limit myself to dates

18  because clearly it's all blending together --

19    Q.  Indeed.

20    A.  -- after several hours.  But in a nutshell,

21  the way it went down was I had started talking freely

22  with my call partners that I was intending to accept

23  University or try to get University privileges.  And

24  then I applied, and then University never got my data.

25  And then shortly after that, six very bizarre and

---

Page 131

1  somewhat frivolous cases that most -- pretty much every

2  physician that looked at said normal people wouldn't

3  have even brought up to peer review, you know, occurred.

4  And then I was cleared of those charges.

5    Q.  Okay.  We're going to talk about that.

6    MR. SOWELL:  Let her finish.

7  BY MR. DAYHUFF:

8    Q.  Go ahead.

9    A.  And then the same thing also happened with

10  Doctors.  And then I continued to try it with Doctors

11  because they were the most sympathetic to my situation,

12  and when we filled out the second medical application,

13  the electronic one, they kept doing a stall technique.

14  They wouldn't send back applications.  They said

15  electronic medical applications don't count.  I had to

16  sign it by hand.  And there was a paragraph in there

17  that said I agreed not to sue anybody that had ever been

18  associated with ARMC or any of its entities.  And so I

19  wanted to strike that and ARMC, you know, essentially

20  wouldn't allow that to be stricken.  And HCA needed it,

21  and so that's where that stalled up.

22  BY MR. DAYHUFF:

23    Q.  Okay.  So it sounds like there was some

24  holdup over the release language perhaps, right?

25    A.  Sure.

---

Page 132

1    Q.  The language of the release, right?

2    A.  Well, first they didn't respond --

3    Q.  Okay.

4    A.  -- after several attempts, and then they

5  wanted it to be hand-signed.  And then it went back and

6  they stalled more.  And then they wanted it to be a hard

7  chart and then, you know, so and so on.

8    Q.  This is just with respect to University?

9    A.  Doctors.

10    Q.  Doctors.  Okay.

11    A.  Which is also HCA.

12    Q.  HCA.  Got you.  All right.

13    But you did offer objections to the release

14  language?

15    A.  Yes.

16    Q.  Okay.

17    A.  After the third attempt, when they wanted me

18  to sign off on hard copy, sign off that I agreed not to

19  sue them.

20    Q.  Okay.

21    A.  Which, obviously, I couldn't do because they

22  had already started to destroy my life.

23    Q.  Okay.  All right.  Any other evidence that

24  you have that ARMC tried to thwart your attempts to get

25  on staff at other hospitals, other than what you've told

---

Margo Hein-Muniz, M.D.  8/25/2011

## Page 133

1    me?  And that may be it.

2        A.   Other than what happened with Alabama and

3    I -- yes, sure.

4        Q.   All right.  Well, you mentioned a specific

5    allegation about Dr. Anderson, I don't know, that he

6    sent some letter to one of the places where you were

7    trying to get privileges.  Do you have any information

8    or any evidence that Dr. Anderson did anything to hinder

9    your ability to get privileges at any institution?

10       A.   It's my understanding that he sent the letter

11   to University.

12       Q.   Okay.  And that letter said what?

13       A.   I don't believe we've gotten a copy of it

14   yet.

15       Q.   Okay.  And that's what your discovery says to

16   me.  Have you asked University for it?  Do you know

17   whether your counsel or you have --

18       A.   I don't.

19       Q.   Have you asked University for it?

20       A.   I told University to hold on to all paperwork

21   regarding this case.

22       Q.   Okay.  But you haven't asked them for that

23   specific letter, you personally?

24       A.   I personally have not asked them for that.

25       Q.   And you don't know whether your counsel has?

## Page 134

1        A.   I don't know.

2        Q.   Okay.  And why do you think -- why do you

3    think Anderson sent a letter to University?  Why do you

4    suspect that?

5        A.   Because Dr. Daniels told me.

6        Q.   And Dr. Daniels would know that how?

7        A.   Because Dr. Daniels -- everybody talks to

8    Dr. Daniels.  And Dr. Paxton was apparently along with

9    Dr. Anderson talking to Dr. Daniels about these --

10       Q.   Okay.

11       A.   -- these incidences.

12       Q.   What did Dr. Daniels tell you what

13   Dr. Anderson's letter said?

14       A.   He said that it was negative and that they

15   were very angry that I had applied to University and

16   that Dr. Paxton had been instructed to proceed to hurt

17   my career.

18       Q.   Okay.  All right.  Other than this lawsuit,

19   are you currently a party to any other lawsuits?

20       A.   Not that I know of.

21       Q.   Okay.  Well, that would be malpractice suits,

22   business disputes, of that nature?

23       A.   (Shakes head.)

24       Q.   No?

25       A.   No.

## Page 135

1        Q.   Okay.  Have you ever served in the military?

2        A.   No.

3        Q.   Do you have any kind of criminal record at

4    all?

5        A.   No.

6        Q.   Kind of a general kind of practice question

7    here, how long do you intend to continue practicing

8    medicine?

9        A.   Until I'm dead.

10       Q.   Really?

11       A.   Seriously.

12       Q.   Okay.

13       A.   I would go nuts.

14       Q.   Well, most people don't do that.  They

15   practice until they reach a certain age.  Now, if you're

16   serious about that, that can be your testimony.

17       A.   No, I'm serious about that.  And I know a lot

18   of doctors who practice until the day they die.

19   Dr. Pryor, gosh, how old was she?  She was in her 90s

20   and she just died last year and she was practicing.

21       Q.   Fair enough.

22       A.   A lot of OB/GYNs drop OB after a certain time

23   because of the hours and the hassle associated with

24   that.  It's what I've been told.

25       A.   Once I'm old.

## Page 136

1        Q.   Right.

2        A.   Or --

3        Q.   Did you plan to drop OB -- when did you plan

4    to drop OB?

5        A.   I hadn't made any specific date.

6        Q.   Sure.

7        A.   When I was no longer physically capable of

8    doing it.

9        Q.   Okay.

10       A.   You know, when I got old and tired or I was,

11   you know, physically incapable of, you know, the lack of

12   sleep depravation.

13       Q.   All right.

14       A.   Lack of sleep depravation?

15       Q.   Sleep depravation.

16       A.   You get my point.

17       Q.   Right, I get it.

18            You mentioned in the hearing, and I think it

19   was the 2010 hearing, someone asked you a question

20   about, "Okay, you know, what's your plan as this thing

21   moves through?"

22            And I think you said something, but you tell

23   me if you recall this.  About, "You know, if I come

24   through this hearing and I still have privileges, I

25   would like to drop OB."

www.compuscripts.com

## Margo Hein-Muniz, M.D. 8/25/2011

### Page 137

```
 1              Do you recall anything like that?
 2        A.   I do recall that.
 3        Q.   All right.
 4        A.   But it was specific to that particular
 5   situation.
 6        Q.   All right.
 7        A.   You know, the ...
 8        Q.   So was that --
 9        A.   The people -- I would not be able to practice
10   at ARMC in an obstetric capacity because of the pain.
11   It's sort of like being gang raped and then being forced
12   to work with the rapist.  I would not be able to go back
13   onto that floor with those OBs and mentally be
14   subjecting myself to that.
15              Gynecology, you can go into an OR, you can
16   operate, you can leave.  On an OB floor, you would be
17   running into those obstetricians all the time.  And this
18   was -- what I attribute to, you know, basically rape.
19        Q.   Okay.  All right.  You had your evaluation
20   from Dr. Schwartz-Watts in 2010; is that correct?
21        A.   I'm not going to go with any date specific,
22   but yes.
23        Q.   As a result of the first peer review action,
24   you agreed to be evaluated by a psychiatrist --
25        A.   Correct.
```

### Page 138

```
 1        Q.   -- and were ultimately evaluated by a
 2   Dr. Donna Schwartz-Watts?
 3        A.   Uh-huh.
 4        Q.   After you received that evaluation, did you
 5   continue in treatment with Dr. Schwartz-Watts?
 6        A.   No.  I didn't require treatment.  According
 7   to her note, I was deemed not to be a disruptive
 8   physician, nor did I have any personality
 9   characteristics consistent with somebody with disruptive
10   personality.  And so I was essentially cleared of that.
11   Her purpose was to evaluate me specifically for
12   personality disorders and disruptive behaviors.
13        Q.   Okay.  Did you continue with anyone other
14   than Dr. Schwartz-Watts?
15        A.   In terms of?
16        Q.   Psychiatry.
17        A.   I do have a psychiatrist that I see, and I
18   also have a family practice doctor that assists me.
19        Q.   Who is your psychiatrist?
20        A.   Dr. Steiner.
21        Q.   Okay.  And who is your GP?
22        A.   Well, it was Dr. Angley, and then I've
23   recently switched over to Dr. Danijela Zotovich.
24   Z-o-t-o-v-i-c-h.  And I've also seen Dr. Degnan in the
25   past.  Lisa Degnan.  D-e-g-n-a-n.
```

### Page 139

```
 1              So sometimes if I can't get in to see
 2   Dr. Steiner, because the man is booked out like nine
 3   months, if I need a refill, I will talk to my family
 4   practice doctor.  But I've been on essentially the same
 5   regimen for decades.
 6        Q.   Okay.  Are you currently suffering from any
 7   kind of psychiatric disorder?
 8        A.   Not any more than any perimenopausal woman --
 9        Q.   So the answer is no?
10        A.   -- who is a doctor who is going through this
11   situation.
12        Q.   So is the answer no?
13        A.   I have been diagnosed with depression and
14   obsessive compulsive features, and I've been treated
15   throughout the course of my life for major depressive
16   disorder.
17        Q.   Okay.
18        A.   I have never required hospitalization.  It's
19   never interfered with my ability to function in any of
20   my capacities, including dealing with radioactive
21   isotopes and psychotrauma facilities.
22              MR. DAYHUFF:  Okay.  I'm going to show you
23   something that we're having marked as Exhibit 2.
24              (DEFT. EXH. 2, Peer Review Notices, was
25   marked for identification.)
```

### Page 140

```
 1   BY MR. DAYHUFF:
 2        Q.   This is a composite exhibit of notices that I
 3   believe will be familiar to you from the -- what I've
 4   been calling the 2009 peer review that began in 2008.
 5   Okay.  I want you to take a look at that, and I'm going
 6   to run through some questions.
 7              You see the first document in Composite
 8   Exhibit Number 2.  Have you had a chance to review it?
 9   It's dated October 30, 2008.
10        Q.   Okay.  I've looked at page 1.
11        Q.   Okay.  Take a look at page 2, and see it's
12   from K.D. Justyn.  I'm going to ask you to identify this
13   document for the record, if you can.
14        A.   Okay.  I read page 3.  Do you have a page 2?
15   Wait.  This is page 2.  I don't know where page 1 -- are
16   we talking about different pages?
17        Q.   You're fine.  You're fine.  This came off of
18   your complaint, I'll tell you that.
19        A.   Okay.
20        Q.   And the page 2 and page 3, because there was
21   a cover sheet to this exhibit to your complaint, that's
22   where you're getting confused, the top right page
23   numbers.
24        A.   Okay.
25        Q.   Okay.  Now, do you recognize this as the
```

Pages 137 to 140

**Margo Hein-Muniz, M.D. 8/25/2011**

---

### Page 141

1    Notice of Adverse Recommendation that you got during

2    what we've been calling the 2009 peer review action that

3    was sent to you by K.D. Justyn referencing the five

4    cases that were at issue in the 2009?

5    A.   Yes.

6    Q.   You do recognize that?

7    A.   Yes.

8    Q.   Okay.

9    A.   Without verifying these five ID numbers, I'm

10   going to say yes.

11   Q.   All right.  What was your understanding of

12   what was at issue in the 2000 -- I'm, again, calling it

13   the 2009 peer review that began with a recommendation

14   dated October 30, 2008.  Did you understand that the

15   five cases whose medical records are listed in paragraph

16   1 were at issue?

17   A.   "On the basis of these reports, the committee

18   recommended that the privileges be terminated."

19   Q.   Is that what you recall, that they were

20   recommending that your privileges be terminated in the

21   2010 peer review?

22   A.   Yes.

23   Q.   2009 peer review, I'm sorry.  Okay.

24      And you did receive this letter, right?

25   A.   Yes.

---

### Page 142

1    Q.   And take a look at the next one, which I

2    believe is your response to that letter.  But you review

3    it and tell me if that's the case.

4    A.   Yes.  Page whatever this is.

5    Q.   The one, two -- third and fourth page of

6    Composite Exhibit Number 2 is your letter to K.D.

7    Justyn; is that correct?

8    A.   Yes.

9    Q.   Wherein you requested a hearing to challenge

10   the recommendation from the October 30, 2008, letter; is

11   that correct?

12   A.   Yes.

13   Q.   Good.  Flip to the next one.  I'll give you a

14   moment to review that.

15   A.   Okay.  I'm sorry, where were we again?

16   Q.   Quite all right.  I want to give you some

17   time to review it.

18   A.   Okay.

19   Q.   My question is, the third letter in our

20   composite exhibit, do you recognize that to be the

21   notice of hearing that you received after you requested

22   a hearing?

23   A.   Okay.

24   Q.   You do recognize this to be the notice of

25   hearing you received after requesting a hearing?

---

### Page 143

1    A.   I believe that it is.

2    Q.   Okay.  Did this notice provide you with the

3    cases that were at issue in your peer review hearing

4    that was to be forthcoming?

5    A.   Without being able to verify those numbers, I

6    only remember five.  This one has six.

7    Q.   Are you looking at the double-indented

8    paragraph in the middle?

9    A.   Yes.  On page 3 or 4, which is really page --

10   like -- which is really page 6 of this block of paper.

11   Q.   Okay.

12   A.   Cindy Besson is expected to testify.

13   Q.   Take a look at that section.  I believe that

14   lists the cases that were at issue, and I think there

15   were five.

16   A.   Right.  There's five here --

17   Q.   Okay.

18   A.   -- but there's six over here.

19   Q.   Where is there six?

20   A.   Number 3.

21   Q.   Okay.  I see that.  "She's expected to review

22   and testify to the charts."  Okay.

23      Do you recognize that list of witnesses as

24   the witnesses that appeared at your hearing in 2009,

25   Paxton, Robinson, Besson, DiBona and Miller?

---

### Page 144

1    A.   That actually appeared at the actual hearing?

2    Q.   Uh-huh.

3    A.   The only people that presented at the actual

4    hearing -- well, I can't say a hundred percent.

5    Q.   Okay.

6    A.   But I remember Paxton and I remember DiBona

7    and I remember Barbara Miller.

8    Q.   Take a look beneath the witnesses.  Does the

9    hearing notice provide you with the members of the

10   hearing panel?  Jack Ratliff, Terry --

11   A.   It does.

12   Q.   -- DeLeon, Stahura, Haas?

13   A.   Yes.

14   Q.   Okay.  If you had any objections to those

15   members, it provides you with a means of objecting,

16   right?  The next paragraph.

17   A.   Yes.

18   Q.   Did you object to any of the panel members

19   in -- during the 2009 peer review?

20   A.   I don't recall.  I know that there was in one

21   of these -- in one of these situations, there was -- I

22   don't recall.  In one of these situations, there was one

23   person that we had requested to be replaced.

24   Q.   I think that was in the 2010 peer review.

25   Somebody who participated in the care of the patient.

---

**Pages 141 to 144**

Margo Hein-Muniz, M.D.  8/25/2011

## Page 145

1    Does that sound familiar?
2        A.   Yes, that's familiar.
3        Q.   Okay.
4        A.   But I don't recall if we contested number 2
5    and number 3.
6        Q.   Fair enough.
7             Take a look at the next document in this
8    composite set, please.  I'm going to ask you, do you
9    recognize this to be the hearing -- the report of a
10   hearing panel for what I've been describing as the 2009
11   peer review, your first peer review?
12       A.   You mean attending a prehearing conference?
13       Q.   I'm sorry, the very next page.
14       A.   One of the persons is missing.
15       Q.   Okay.
16       A.   Dr. Haas.
17       Q.   The question is, do you recognize this to be
18   the report of the hearing panel for the 2009 peer
19   review?
20       A.   I can't say that I do.  I thought in my mind
21   that Dr. Haas was on here.  He was at the committee.  So
22   I can't say that this is accurate because I know that
23   Dr. Haas was at peer review committee, and he's not
24   listed in the top paragraph of this document that you've
25   provided to me.

## Page 146

1        Q.   Okay.  Did the recommendations help you
2    recognize this as your hearing panel report?  Do those
3    look familiar?  1, 2, and under 2A and 3, take a moment
4    and review those.
5        A.   I remember it.  I remember this second half.
6        Q.   So is it fair to say that this is your
7    hearing panel report for 2009?
8        A.   I think that the bottom half is.
9        Q.   Okay.  But you're not sure about the top
10   half?
11       A.   I'm not sure.
12       Q.   If this same document was attached to your
13   complaint, would that reassure you that it's the right
14   hearing panel report?
15       A.   I'm going to tell you that the bottom part,
16   after the conclusion of the hearing, I remember reading
17   these whatevers.
18       Q.   Okay.  Were there any OB/GYNs on the panel
19   for the 2009 peer review?
20       A.   No.
21       Q.   During the 2009 peer review, did David Dick
22   and Biff Sowell appear with you at the hearing?
23       A.   Yes.
24       Q.   At that hearing, were you afforded the right
25   to present evidence on the issues in this case or that

## Page 147

1    were -- the matters that were at issue during these
2    hearings?
3        A.   When we did the 2009 hearing, we talked about
4    the cases.  The only thing that was ever discussed were
5    the cases in which I was alleged to be incompetent in
6    terms of my clinical abilities.  The statement of number
7    2A, "Evidence presented to the hearing panel indicates
8    that Dr. Muniz is narcissistic and lacks insight into
9    her behavior," et cetera, et cetera.  That was a
10   completely new thing and was never discussed at the
11   actual hearing.
12       Q.   Okay.
13       A.   Nor at any time before that had I ever been
14   told that I was the subject of any investigation --
15       Q.   Okay.
16       A.   -- for any sort of behavioral issues.
17       Q.   And I want you to focus on this question.
18   Did you -- with the assistance of counsel, did you at
19   that hearing have a right to bring witnesses you wanted
20   to testify and introduce evidence that you wanted the
21   panel to consider?
22       A.   As far as we were able to, yes.
23       Q.   Well, do you recall them telling you you
24   couldn't bring witnesses that you wanted to bring or
25   that you couldn't introduce evidence that you wanted to

## Page 148

1    introduce?
2             MR. DICK:  Object to the form.
3             THE WITNESS:  I brought what I thought I
4    could, and I did the best in terms of bringing accurate
5    data.
6    BY MR. DAYHUFF:
7        Q.   Did you have the right to cross-examine the
8    witnesses that were presented against you?
9        A.   The witnesses that were presented against me?
10       Q.   Right.  The MEC put up its case first.  Were
11   you allowed to question the MEC's witnesses?
12       A.   Witness.
13       Q.   Witness.  Were you allowed to question the
14   MEC's witness?
15       A.   Nobody else bothered to show up.
16       Q.   Were you allowed to question that witness?
17       A.   I believe that I was.
18       Q.   Okay.  Take a look at the next document.  Did
19   you -- I'm going to ask you to identify that for the
20   record, if you can.  It's dated August 21st, 2009.
21       A.   I recognize it.
22       Q.   What is it for the record?  Can you identify
23   it?
24       A.   This was Notice of Board of Governors Final
25   Decision.

Margo Hein-Muniz, M.D. 8/25/2011

Page 149

1    Q.    Okay.  And you received that?

2    A.    Yes.

3    Q.    Did you have the opportunity to present a

4  written statement to the board of governors in favor of

5  your position?

6    A.    I don't recall.

7    Q.    Okay.  So perhaps your attorneys did and

8  perhaps they didn't submit a written statement

9  supporting your position to the board?

10   A.    I know that we went to Judge Early regarding

11 the added on and previously unidentified accusation of

12 being disruptive.

13   Q.    Okay.

14   A.    I know that several inquiries were made

15 regarding what I was being monitored for, for a hundred

16 percent, who was doing the monitoring.  And we never

17 received answers.

18   Q.    Okay.  The question back on the hearing panel

19 report, just back up a page or two.  You mentioned their

20 findings, which I gathered you disagreed with.  The

21 evidence presented indicates that you are a

22 narcissistic, lack insight into your behavior, evidence

23 indicates you may not recognize or respect the limit of

24 your clinical skills, documents in evidence indicate

25 episodes of surgeon confrontation, acts of aggression,

Page 150

1  inflammatory note entries, nursing staff.  That finding,

2  that evidence that they're talking about, the documents,

3  did that --

4    A.    I wasn't presented with those documents.

5    Q.    What I was going to ask you was, did this

6  evidence arise from the cases under review?

7    A.    No.  As far as I know, no.

8    Q.    Follow-up question.  Did this evidence have

9  anything to do with the care you provided in the five

10 cases under review?

11   A.    Did the evidence have anything to do -- are

12 you asking was I full of angst, aggression,

13 confrontation and assertion in dealing with the five

14 patients in question?

15   Q.    No.  I'm asking you where you think these

16 findings arose from.  I know you disagree with the

17 findings, but do you agree that they -- the findings

18 arose from the panelists' consideration of your care in

19 the five cases?  I know you disagree with the finding.

20         MR. DICK:  Object to the form.

21         THE WITNESS:  I do not -- rephrase the

22 question one more time.

23 BY MR. DAYHUFF:

24   Q.    I know you disagree with the findings that I

25 just read, that you're narcissistic, that you lack

Page 151

1  insight into your behavior, that you have inflammatory

2  note entries, that you have episodes of assertion,

3  confrontation, angst and aggression.  I know you

4  disagree with that.  But do you agree with me that those

5  findings that they made arose from their view of the

6  care you provided in the five cases at issue?

7         MR. DICK:  Object to the form.

8         THE WITNESS:  I don't believe that those

9  things that they listed arose from the issue of my

10 question of clinical competence.  The original complaint

11 was regarding clinical competence, and this was

12 something that they tacked on at the end.  And I did not

13 nor was I ever told where that data or information came

14 from --

15 BY MR. DAYHUFF:

16   Q.    Okay.

17   A.    -- or where that conclusion came from.

18         You know, the accusation of having a

19 personality disorder as they are -- such as narcissism

20 can only -- in any personality disorder, can only be

21 diagnosed by a trained psychiatrist or other adept

22 practitioner who has met with the psychiatric patient

23 over a long period of time.

24         And these persons, particularly the

25 psychiatrist, Mary DeLeon, I had never met before in my

Page 152

1  entire life.  And so how she -- and I'm assuming this

2  phrasing, whatever phrasing, must have come from her.

3  It's my personal opinion that this was an effort for the

4  physicians to appease Carlos Milanes and his team and

5  not wind up in the same position that I was.

6    Q.    Okay.

7    A.    As Dr. Ratliff put in his -- in his final

8  declaration to me at the end of the hearing, he asked me

9  specifically, "Dr. Muniz, I see a lot of smoke, but I

10 don't see the fire.  How did you get yourself into this

11 position?"

12         And my response to him was, "Politics."

13         And I recall Dr. Haas being very upset and

14 angrily leaving the room.  And so I would have to

15 presume that this was a way of appeasing and not getting

16 themselves in trouble for ...

17   Q.    Do you recall the inflammatory note entry

18 concerning nursing staff?  Did that arise from the care

19 of any of the five cases or arise from your action in

20 any of the five cases?  The inflammatory note entries,

21 or what were alleged to be inflammatory note entries.

22   A.    I don't recall any document that gives

23 evidence of episodes of assertion, although, I don't

24 think asserting something you believe in is necessarily

25 a bad thing.  I don't recall anything in the notes, you

Margo Hein-Muniz, M.D. 8/25/2011

## Page 153

1  know, that would indicate aggressive confrontation,
2  angst.
3     Q.  Do you recall a note?
4     A.  I'm talking about notes in general.
5     Q.  I'm talking about the inflammatory note
6  entries that they're specifying here, do you recall
7  this?
8     A.  You're going to have to show me the
9  inflammatory note entries, please.
10    Q.  Well, the simple question is, do you recall
11 what those inflammatory -- what they're describing as
12 inflammatory note entries?
13    A.  I do not recall what generated this
14 paragraph.
15    Q.  Fair enough.
16       Take a look at the last document in this set.
17 It's -- no, we've already looked at that one.  Let's go
18 one more.  It is dated October 20, 2009, and review it,
19 if you would.
20    A.  Are you talking about the October 20th note,
21 2009, from Biff?
22    Q.  Uh-huh.
23    A.  Okay.  What was your question about it?
24    Q.  Take a look at what's attached to it.  The
25 Agreement to Comply with Terms.  I think earlier, and

## Page 154

1  you must have been mistaken, you testified that you
2  agreed to do the evaluation but didn't agree to the
3  hundred percent case monitoring?
4     A.  Correct.
5     Q.  Upon reviewing this, isn't it pretty clear
6  that you did agree to both the evaluation and the
7  hundred percent case monitoring?
8     A.  I never agreed to the hundred percent case
9  monitoring.  What we were talking about with this
10 document was agreeing to go forward with the psychiatric
11 evaluation and, you know, the predominant point of this
12 letter is we agree to see the psychiatrist, and we
13 understand that we will split the cost made payable to
14 Dr. Schwartz-Watts.
15       I see where you're trying to tweak this and
16 twist it into where you want it to go.  But never once
17 did we understand where the hundred percent monitoring
18 came from, nor did we ever agree to it.
19    Q.  Okay.  That's fine.  Your testimony is what
20 it is.
21       The Agreement to Comply with Terms, which is
22 the last page of Composite Exhibit 2, says, "You hereby
23 agree to comply with all requirements, terms, and
24 conditions of the decision of the board of governors."
25       Okay.  Do you see that?

## Page 155

1     A.  Uh-huh.
2     Q.  All right.  Now, look back to the decision of
3  board of governors, which is the October 21, 2009,
4  decision, and doesn't it include in number 2, as one of
5  its terms and conditions, that you can receive one
6  hundred percent monitoring for one year?
7        MR. DICK:  Object to the form.
8        THE WITNESS:  I repeat, at no time did we
9  agree or intend to agree to a hundred percent
10 monitoring, and that was -- that was questioned.  And we
11 never received a response.
12 BY MR. DAYHUFF:
13    Q.  You would agree with me that the intention
14 you had appears to be contrary to the document signed by
15 you?
16       MR. DICK:  Object to the form.
17       THE WITNESS:  I believe that you can read a
18 document, and you can make it say whatever you want in
19 your head.
20 BY MR. DAYHUFF:
21    Q.  Okay.
22    A.  And maybe the verbiage should have been
23 written differently in anticipation that several months
24 from now this particular issue would come up.  And I can
25 see where you're trying to -- I don't want to say the

## Page 156

1  word twist, but where you're trying to form it into the
2  box that you're trying to form it into.  But never once
3  did we comply -- or excuse me, did we agree to being
4  monitored a hundred percent.  Because we were never told
5  what I was being monitored for since I had been cleared
6  of clinical incompetence and I had been cleared of being
7  a narcissistic and disruptive physician.
8        We had repeatedly asked what were we being
9  monitored for, who is doing the monitoring, and you
10 know, would I be even told if I had made a breach of the
11 monitoring and would I receive any sort of remediation
12 or chance to improve myself or correct the problem.  And
13 none of those issues have been ever addressed.
14    Q.  Okay.  All right.  Let's move on.
15       Question for you.  In your interrogatory
16 responses -- well, it comes from your complaint.  -- you
17 said that ARMC withheld a favorable external peer review
18 from you as part of the first peer review action, what
19 I'm calling the 2009 peer review action.  Do you believe
20 that allegation to be true, that someone intentionally
21 withheld a favorable review from you?
22    A.  Will you show me the document?
23    Q.  I'll read it to you because it's got my notes
24 on it.
25       "The physician reviewer is not listed on the

**Margo Hein-Muniz, M.D. 8/25/2011**

1  review." This is the answer. "It appears to be a
2  review from AllMed on January 4, 2008, with the patient
3  J.D. Review is obtained from ARMC's files."
4         I had asked -- that was your response, your
5  attorney's response. I had asked to provide me
6  information about a claim you made in your complaint
7  regarding the withholding of favorable information.
8  External review information. My question is to you,
9  that's your complaint, do you believe that to be true?
10 First question.
11        A. I know that there was a peer review document
12 that was sent out the first -- in the first peer review.
13 There was a case that they had sent out for an
14 independent review, and it came back favorable. And
15 because it came back favorable, they issued another
16 request for another evaluation from a different firm.
17        The only document that I was initially
18 provided or my lawyers were provided with was the
19 negative report. I was able to acquire the first
20 report, and that came up in the peer review process and
21 Dr. DiBona. I specifically asked Ms. Miller if it was
22 reasonable and customary to send out multiple reports or
23 did they usually just send out one, and she said they
24 sent out one. And I asked her if there was any
25 instances, and this is off of my memory of the

1  transcripts, but was it reasonable and customary for ARC
2  to send out multiple requests until they finally got a
3  negative one? And she said, "No, they only send out
4  one."
5         And then I produced this document. And
6  Dr. DiBona got very upset, and he wanted it verified
7  that it was, in fact, an ARMC document. And it was
8  passed around the table, and it was verified as being an
9  ARMC document. And Dr. DiBona asked me where I got it
10 from, and I didn't want to tell him because I knew the
11 lady would lose her job. And I was impelled to give the
12 name of the person that provided me with that document.
13        Q. Well, who provided you with the document?
14        A. Barbara Miller.
15        Q. Okay. And --
16        A. She's no longer working for ARMC.
17        Q. How did you get it from her?
18        A. I went down and I was talking to her about my
19 concerns and she essentially gave it to me. She said,
20 "I don't think that this would be going against what the
21 lawyers are telling us to do for me to provide you with
22 this document." She said, "And it may help you." So
23 she gave it to me.
24        Q. Okay. And you were able to use it in your
25 hearing?

1         A. And I was.
2         Q. Okay.
3         A. And she was subsequently invited to retire,
4  is my understanding.
5         Q. Well, do you have any evidence?
6         A. I have no evidence. All I know is she's
7  gone.
8         Q. So you have no evidence that her providing
9  you that external review resulted in her retirement?
10        A. No. But I do remember her crying.
11        Q. Okay.
12        A. And I felt bad because it was a good woman
13 who was trying to do the right thing.
14        Q. Do you believe that the recommendation to
15 terminate your privileges in 2010 was malicious and
16 arbitrary?
17        A. Yes.
18        Q. Do you believe that the MEC at ARMC, the
19 hospital, acts at the direction of UHS?
20        A. Yes.
21        Q. Why do you believe that?
22        A. Multiple reasons. In Dr. Paxton's
23 discussions with Dr. Daniels, he had indicated that he
24 had been told to do these things. And he was under the
25 direction of K.D.

1         As the events progressed, I know that it was
2  being -- well, I can't say I know for sure, but it had
3  been indicated to me that it was now in the hands of
4  King of Prussia, corporate.
5         I had a patient who had some sort of
6  complaint with King of Prussia and they had been up
7  there talking to them and they mentioned my name. And
8  whoever they were talking to said, "Yes, we know who
9  Dr. Muniz is."
10        Q. Okay. Let me understand that. You have
11 talked to a patient who you believe heard your name
12 mentioned in King of Prussia?
13        A. Uh-huh.
14        Q. Who is the patient?
15        A. I don't remember.
16        Q. Any other evidence --
17        A. No.
18        Q. -- that the MEC at ARMC is controlled by UHS,
19 other than what you've told me? You don't have to
20 repeat that.
21        A. I don't know if I can adequately answer your
22 question.
23        Q. Why not? It's all what you know. I mean,
24 I'm not asking you for anything other than what you
25 know.

Margo Hein-Muniz, M.D. 8/25/2011

### Page 161

1    A.   I know that King of Prussia was intimately

2 involved in all actions having to do with anything going

3 on at ARC in terms of the surgery center and my case.

4 And their involvement and specific exclusion of me being

5 required to sign the document was, at least as far as I

6 remember, told to me by the triad that runs the surgery

7 center, that part of that deal was the understanding

8 that King of Prussia knew that this wasn't going to stop

9 and that they were going to continue and eventually I

10 would try and defend myself.  And so they knew that, you

11 know, they have --

12    And when I talked to K.D., she was always

13 talking about corporate.  And in the tape that you

14 heard, she was like, "I can't do anything without

15 talking to corporate."  And everything is always about

16 talking to corporate.

17    And so I know that corporate is very involved

18 in the running of ARMC, as indicated by my multiple

19 conversations with K.D. and the conversations I've had

20 with persons dealing with these issues between the

21 hospital and the surgery center.  And the fact that the

22 UHC or UHS, King of Prussia entity was willing to and

23 knew who I was in terms of that whole surgery center

24 event indicates that they knew who I was.

25    Q.   Okay.

### Page 162

1    A.   Otherwise they would have forced me to sign

2 the document.

3    Q.   We talked about the reasons why you didn't

4 sign the document, right, earlier in the deposition?

5    A.   Uh-huh.

6    Q.   Okay.  Do you believe that folks were acting

7 out of personal, and by folks I mean DiBona, Minto, and

8 the other defendants -- were acting in their -- during

9 your peer review in their personal and economic

10 self-interest?

11    A.   Yes.

12    Q.   What evidence do you have of that?

13    A.   I think that Dr. DiBona was malicious in the

14 fact that he was essentially doing what he was told as

15 the henchman.  Oletha Minto had expressed to me on

16 numerous occasions her dislike for me after that

17 incident.  She was very free in talking about it in the

18 hospital.  And I'm sure it will come out in trial.  And,

19 you know, what her opinion of me is.

20    I'm in direct competition with them, and it

21 would be absolutely illogical for anybody to assume that

22 the competing group, you know, wouldn't have a benefit

23 by destroying my career.

24    Q.   Okay.  Well, you're assuming they would,

25 right?

### Page 163

1    A.   Well, that --

2    Q.   As a matter of logic?

3    A.   As a matter of logic and also as a matter of

4 the fact, you know, that they were instrumental in the

5 organization and the execution of this entire process.

6    Q.   Okay.  Anything else?  Any other evidence

7 that causes you to believe that they -- the competing

8 OB/GYN group did what they did in your peer review

9 actions as a result of economic or personal

10 self-interest?

11    A.   I think that they have an agenda to destroy

12 my practice and drive me out of town, yes.  The mere

13 fact that they tried to block the methadone clinic from

14 being active and thereby driving out my only paying

15 renter and also by destroying my second income line is

16 another example.

17    Q.   Do you have any evidence that Dr. Boehner

18 participated in the deliberations of the entire board

19 and voted on the final decision of the board of

20 governors with respect to your 2010 peer review?  The

21 second one.

22    A.   He's the head of the board of governors?

23    Q.   Chairman of the board of governors.

24    A.   And I recollect that it was a unanimous vote.

25    Q.   Okay.  All right.  Any other evidence?

### Page 164

1    A.   No.

2    Q.   Okay.

3    A.   Not that I know of.

4    Q.   That's all I'm asking about, what you know.

5    You mentioned this as a sham peer review.

6 What is a sham peer review?

7    A.   A sham peer review is defined as a peer

8 review process that's basically instigated to or -- not

9 instigated.  It's a peer review process that is

10 performed in an effort to remove a physician from a

11 hospital scenario for various reasons, usually economic.

12    Q.   Okay.

13    A.   Or instigated by a competing group that

14 carries power within the hospital.

15    Q.   Did you develop your own definition of sham

16 peer review, or does that come from someplace?

17    A.   Internet.

18    Q.   Internet, okay.  What site?

19    A.   Type in the word "sham peer review" and see

20 what comes up.

21    Q.   Do you recall which site?

22    A.   I read probably about 150 different articles

23 on this.

24    Q.   Wow.

25    A.   So if you would like that data, I would be

Pages 161 to 164

## Margo Hein-Muniz, M.D.  8/25/2011

### Page 165

1  happy to present it to you.  There was an organization
2  that is made up of physicians trying to help physicians
3  who are victims of sham peer review.  And I talked to
4  one of them, and I talked to a gentleman who is
5  basically the developer of the Semmelweis organization
6  which is for victims of sham peer review.
7      Q.   Okay.  Who are the individuals you talked to?
8  You mentioned a physician and a developer.
9      A.   The developer -- I would have to look these
10  up.  I'm sorry, my memory just isn't that great.
11         One gentleman was a victim of sham peer
12  review and he was basically telling me his story and he
13  wound up not being able to get a job again and wound up
14  having to be an abortionist.
15      Q.   And this was on the -- is this on the
16  Semmelweis Society page?
17      A.   No.  This was different conversation.
18  It's a blog cite that Dr. Page talked to me about maybe
19  going on and finding out ways to find jobs after you've
20  been damaged.  And that's where I found this gentleman's
21  story.
22      Q.   It's not Verner Waite, is it?  W-a-i-t-e.
23      A.   I don't think so.  I think I would remember a
24  name like Verner.  I'll look it up.
25      Q.   Dr. Moore?

### Page 166

1      A.   Dr. Moore?
2      Q.   Blake Moore.
3      A.   Blake Moore.  No, that doesn't sound
4  familiar.
5      Q.   Bill Hinnant.
6      A.   I really honestly don't remember this
7  gentleman's name.  We had some conversations, and he
8  was -- it was very depressing to me.
9      Q.   Okay.
10      A.   All I could see myself was winding up as an
11  abortionist, which I would never do.  So, you know, that
12  was the end of that.
13      Q.   All right.  Well, I started that line of
14  questioning because your definition of sham peer review
15  sounds a lot like what I've heard on the page called the
16  Semmelweis Society.  Have you been on that Web page?
17      A.   Yes, I've seen that Web site.
18      Q.   Do you subscribe to their views with respect
19  to peer review in the United States?
20      A.   I can't answer that question because I don't
21  know what their views are off the top of my head.
22      Q.   I can tell you.  They view peer review in the
23  United States as a process that has been entirely
24  corrupted and is illegitimate because of the role of bad
25  faith sham peer review that has taken the place of

### Page 167

1  legitimate peer review.  They're against the Healthcare
2  Quality Improvement Act.
3      A.   I believe that there are genuine victims of
4  sham peer review.  I think that sounds a little bit
5  extremist.  I think that the peer review process works
6  well in certain institutions, and I think that other
7  institutions use it in a negative way.  An example would
8  be a physician in Augusta who had some events that were
9  quite serious and was remediated.  And I have a friend
10  who had an egregious complication and was remediated for
11  a year and salvaged and still works for that hospital to
12  this day.
13         And, you know, to throw away a physician's
14  career without any sort of remediation after they've
15  been working for you for ten years is sort of odd.
16      MR. SOWELL:  Can we take a short break?
17      MR. DAYHUFF:  Sure.
18      (A recess transpired.)
19  BY MR. DAYHUFF:
20      Q.   I'm going to try to make my questions more
21  narrow.  I know how you feel about these things because
22  I've read your stuff, you know, so a lot of my questions
23  are going to be focused on what evidence you have.
24  Okay.  So rather than, you know, "I believe this
25  happened," which I understand you believe X, Y and Z, I

### Page 168

1  want to focus narrowly on what evidence you have and
2  then kind of bam, bam, bam, move through.  Does that
3  make sense?
4         But if you feel like you need to explain, I
5  don't want to cut anything off, okay?
6      A.   Uh-huh.
7      Q.   Does that make sense?
8      (Off the record.)
9  BY MR. DAYHUFF:
10      Q.   Do you seek any damages from the 2009 peer
11  review action, or is your damages claim limited to the
12  harm you alleged was caused to you by the 2010 peer
13  review action?  That's not an evidence question, but
14  it's a specific question.
15      A.   What I know is that I've been damaged
16  financially, professionally, emotionally, as have the
17  people that have been around me and associated with me,
18  my family, my practice girls, you know.  The exact
19  numbers, I think that I've pretty much demonstrated, you
20  know, that I rely on people that are experts in that
21  arena because my job is to focus on medicine.
22      Q.   Okay.
23      A.   And that is why I hire people to do those
24  calculations.
25      Q.   Okay.  So is it a fair answer to say you're

Margo Hein-Muniz, M.D.  8/25/2011

## Page 169

1    not sure?

2        A.    I'm not sure.

3        Q.    Fair enough.

4              Do you believe your hearing officer in the

5    2010 peer review was biased against you?  That's Ernie

6    Nauful.

7        A.    Yes, I do.

8        Q.    Why?  What evidence do you have of that?

9    It's one of those narrow-evidence questions.

10       A.    What you consider evidence and what I

11   consider evidence and what the court would consider

12   evidence are probably different things.

13       Q.    Evidence is something you observed or a

14   document you have.  That's, I guess, what I would

15   consider evidence.  But you tell me.

16       A.    Okay.  Let's go with what I observed.

17       Q.    Okay.

18       A.    Or -- yeah, we'll go with what I observed.

19   He was constantly talking to ARMC's attorneys -- and

20   what is the word I'm looking for?  To talk secretly in a

21   corner and appear to be planning.

22       Q.    Okay.  That was in your presence when you

23   were in the hearing room?

24       A.    Uh-huh, or like during breaks.

25       Q.    Okay.

## Page 170

1        A.    He made it very difficult for me to -- or I

2    felt that he was making it difficult for me and cutting

3    me off and trying to lead me in directions that would

4    favor ARMC.  When he would query or when he would

5    discuss things with the panel or with experts, he would

6    sometimes redirect them in what I believed to be a

7    position more favorable to ARMC.

8        Q.    Any other evidence?

9        A.    That's what I have so far.

10       Q.    Okay.  I asked -- you have a claim in your

11   amended complaint that ARMC's own pathologist concluded,

12   "The fetus --" and this is the 2010 case, I guess the

13   K.C. case, right?  "The fetus was brain dead upon

14   arrival to ARMC and delivery two hours prior to the

15   actual C-section, would have resulted in the same

16   outcome."

17             And I asked you what supported that claim.

18   And you said, "A report issued by Dr. Williams --" and I

19   think I've seen that.  He's the pathologist, right?

20       A.    Uh-huh.

21       Q.    I've seen that.  "And a verbal report made by

22   Dr. --" T-r-z-p-u-c?

23       A.    Trzpuc.  He's the other pathologist.

24       Q.    Okay.  Tell me about this verbal report.

25       A.    Dr. Trzpuc and I discussed the placenta, and

## Page 171

1    he agreed that it was extensively clotted.  I think that

2    that -- well, we'll go back to Trzpuc.

3              We had a discussion about it, and as I said,

4    the placenta was, you know, very abnormal and even on

5    gross inspection.  So we discussed collegially and in a

6    scientific manner the findings of the placenta, which

7    were, you know, from a medical standpoint and scientific

8    standpoint quite interesting.  And he basically was

9    like -- I had wanted him to do what's called a gross

10   autopsy on the -- or basically just a physical exam.

11   And it's reasonable and customary in every other

12   hospital I've ever been in when there's a fetal death,

13   that the pathologist comes up and does a physical

14   examination on the infant and documents the external

15   findings.

16             And on this infant it was not normal, and it

17   showed signs of chronic anoxia and damage.  And its

18   right face -- its right face was peeling already,

19   starting to squamate.  And I had told him about that.

20   And he said, in essence, you know, "Margo, this is a

21   really bad-looking placenta," and he said, "This baby

22   has been without adequate oxygen for a long time."  And

23   I believe that also.

24             And we talked about -- we speculated about

25   how long the baby had probably been suffering from

## Page 172

1    anoxia.  And it was -- the statement more was like it

2    was -- and I don't mean to sound in any way cruel, but

3    that this baby would have had severe brain injury, you

4    know, brain death, you're dead, brain injury.  And I

5    guess the baby did die.  But if it had survived, it

6    would have had severe neurologic damage.

7        Q.    So if I were to -- well, did Dr. -- is

8    Trzpuc?

9        A.    Trzpuc.

10       Q.    Trzpuc.  Did he testify at the hearing?

11       A.    No, he was absent.

12       Q.    Okay.  Did you want him to testify?

13       A.    Yes.  I wanted him to testify.

14       Q.    Okay.  But he would not?  Or did you ask him,

15   I guess, is a better question.

16       A.    I don't recall why he wasn't there.

17       Q.    Do you recall asking him to testify?

18       A.    I don't recall.

19       Q.    Okay.  If I asked him tomorrow, "Did you say

20   anything, Dr. Trzpuc, that could be construed as the

21   fetus was brain dead upon arrival to ARMC and delivered

22   two hours prior to the actual C-section, would it result

23   in the same outcome?", would he tell me, "Yeah, I

24   agree"?

25       A.    It depends upon whether he would tell the

Margo Hein-Muniz, M.D.  8/25/2011

Page 173

1 truth or not.
2 　Q.　And you would be concerned he wouldn't?
3 　A.　I think a lot of people would do things if
4 they wanted to keep their job especially in hard
5 economic times.  And I think there's probably a reason
6 why he wasn't there and why they had Dr. Williams come
7 instead.
8 　Q.　Now you're speculating about that.  You don't
9 have evidence of that?
10 　A.　This is a speculation.
11 　Q.　Okay.
12 　A.　This is a speculation.  But I have seen
13 people lie before.  And you have a 50/50 shot.
14 　Q.　Okay.  Question.  We talked about ARMC
15 providing or not providing information timely to your
16 credentialing recipients.  Do you believe they provided
17 false information at any time?
18 　A.　I'm sorry, back up.
19 　Q.　We're talking about you made an allegation
20 earlier that your attempts to get privileges elsewhere
21 were thwarted in part by -- in certain -- with certain
22 providers, with certain hospitals, by ARMC's failure to
23 provide stuff timely, right, or -- yeah, or failure to
24 provide something timely to the other hospital, right?
25 　A.　Yes.

Page 174

1 　Q.　Okay.  Little different question.  Do you
2 believe they provided false information about you to
3 other entities -- they've written in "providing it too
4 slowly."
5 　A.　Do I believe?
6 　Q.　Yeah, believe.  Then I'll ask you if you have
7 any evidence of that.
8 　A.　I believe it, but I don't know if I can prove
9 it.
10 　Q.　Fair enough.  Let's go to this.  You say --
11 well, let me ask you this.  Did Dr. Paxton say anything
12 about running you out of the hospital?
13 　A.　To me personally?
14 　Q.　Do you believe -- let's start with this.  Do
15 you believe he said that he wanted to run you out of the
16 hospital?
17 　A.　Yes, I believe that.
18 　Q.　Okay.  And then the question, what is your
19 evidence of that belief?
20 　A.　I base that evidence on what Dr. Daniels told
21 me.
22 　Q.　Okay.
23 　A.　And --
24 　Q.　Is this the senior or the junior?
25 　A.　Senior.

Page 175

1 　Q.　That's the guy everybody talks to, Senior?
2 　A.　Uh-huh.
3 　Q.　Okay.  All right.  Did he say those words to
4 you, "Dr. Paxton said to me, 'Margo, he's going to run
5 you out of the hospital'"?
6 　A.　He said, "Margo, Dr. Paxton has been
7 instructed by K.D. to run you out of the hospital, and
8 he feels bad about it, but he's afraid he'll lose his
9 job."
10 　Q.　So if I were to go ask Dr. Daniels Sr. that,
11 do you think he would tell me that?
12 　A.　If you were an OB/GYN who had witnessed
13 another OB/GYN with a clean record be totally destroyed,
14 would you answer the question truthfully?
15 　Q.　So he would be afraid to tell me that?
16 　A.　Would you be?
17 　Q.　I've got to ask the questions.
18 　A.　I'm sorry.
19 　Q.　It's all right.  I understand your testimony.
20 　A.　You know, I believe that he may or may not
21 tell the truth.
22 　Q.　Fair enough.
23 　A.　We won't know until we ask.
24 　Q.　Sure.
25 　A.　If I was him, I would be afraid.  But I would

Page 176

1 do the right thing.
2 　Q.　You would tell the truth?
3 　A.　I don't know if he would.
4 　Q.　Do you believe that any of the defendants
5 have made -- have diverted patients from you?
6 　A.　Define "diversion."
7 　Q.　I think it's your allegation, but let me
8 think.  The allegation is that defendants interfered
9 with your patient relationships.  Do you believe they
10 interfered with your patient relationships?
11 　A.　Yes.
12 　Q.　Okay.  And do you believe they interfered
13 with the patient relationships by suspending you and
14 revoking your privileges, which interfered with the way
15 you would normally interact with patients?  Like doing
16 work for them at the hospital, is that what we're
17 talking about or is there something more to it?
18 　A.　Which specific person?
19 　Q.　Well, I don't know.  You said defendants,
20 plural.
21 　A.　Yes.  I believe that their actions diverted
22 patients.
23 　Q.　Okay.  And what would those -- well, the
24 diversion -- let's set that aside.
25 　　How did that interfere with your patient

Pages 173 to 176

Margo Hein-Muniz, M.D. 8/25/2011

## Page 177

1    relationship?  Is it anything other than suspending and
2    revoking your privileges?  Is there more to it than
3    that?
4         A.   You know, I can give you an example of Cindy
5    Besson saying unsolicited negative things about me even
6    prior to all of this, which would indicate a chronic
7    need to retaliate for Judith and I leaving.  Her actions
8    in terms of not practicing obstetrics for five years and
9    yet signing off on the documentation to immediately
10   terminate me without any sort of remediation and without
11   knowing what even the current criteria for reading them
12   or for reading fetal heart strip, I think is indicative
13   of revenge.
14         I think a reputable physician or a physician
15   who wasn't motivated by anger would have recused herself
16   and said "I'm not up to date on obstetrics, and you need
17   to get somebody who is."  I think that --
18         Q.   I guess I'm thinking -- and I understand your
19   testimony about the stuff within the peer review.  My
20   question is a little more specific, which is -- and I
21   understand how you would believe that the peer review
22   action suspension, the revocation has interfered with
23   your ability to practice in the way you want to.
24         A.   Yes.
25         Q.   I get that.  Have defendants interfered with

## Page 178

1    your ability to -- interfered with your patient
2    relationships in any way other than the suspension and
3    revocation that I need to understand?  Well, forget the
4    last part.  In any other way.
5         A.   The treatment of any patients in the
6    hospital.
7         Q.   Okay.
8         A.   The treatment of my staff in making it --
9    giving us such a difficult time in obtaining data in
10   order to maintain our patient's health.  For example,
11   not giving us our mammogram reports.
12         Q.   I think I saw a statement that you submitted
13   from somebody about that, right?
14         A.   Uh-huh.  And so, yes, in essence I think
15   there's other instances.
16         Q.   Okay.  And I've seen the statements that
17   David has provided to me from those folks.  Anything
18   outside of those statements that you think is evidence
19   of interfering with your patient relationships and, of
20   course, excluding what we've already talked about with
21   the peer review action?
22         A.   I think the way they talk about me in the
23   community has had a big effect.  Of course, that's a
24   difficult thing to prove.
25         Q.   Yeah.  They're not talking to you, are they?

## Page 179

1         A.   No.  It's everybody else coming into my
2    office saying, "I heard from" that kind of thing.
3         Q.   Gotcha.
4         A.   So we'll just have to end it there.
5         Q.   Okay.  With respect to this claim you have
6    that you have not been paid for treating -- for your
7    work, taking call where you have a patient who comes in
8    who is, I guess, either Medicaid or maybe even self-pay,
9    you have a claim that you haven't been paid for that
10   work, right?
11        A.   These are patients that have no funding, and
12   the hospital is paid to take care of those patients.
13   That they receive grant money for underserved areas.
14   And the physicians are, as part of the contract,
15   required to see those patients and are subsequently
16   reimbursed for seeing those patients.  And I have not
17   received what is due to me.
18        Q.   Have you provided all the information that
19   the hospital has sought?
20        A.   Yes, we have.
21        Q.   You have?
22        A.   Yes, we have.
23        Q.   And how do you know that?  Have you looked at
24   it?
25        A.   My office manager and my biller have shown it

## Page 180

1    to me, and we've faxed it over to our attorneys.
2         Q.   And what -- I'm sorry, go ahead.  And you
3    faxed it to your attorneys?
4         A.   So you should have copies of that data.
5         Q.   Is that something that's recent that I
6    haven't seen?  Okay.  I haven't seen that.
7              What do you understand to be the information
8    that was faxed over?
9         A.   The different responses that I believe his
10   name is Mike Tierny.  The conflicting statements that he
11   was giving to my biller and my office manager in his
12   refusal to turn over those monies.
13             And it's my understanding -- it's my
14   understanding, I'm putting that as a qualifier, that,
15   you know, these were bills that occurred even before all
16   of this went south.
17        Q.   Okay.
18        A.   So, I mean, these were monies long owed me
19   and then just were never given to me for this reason or
20   that reason, et cetera, et cetera, et cetera.
21        Q.   Do you believe that your ownership interest
22   in the Aiken Surgery Center resulted in or has a causal
23   relationship with the peer review actions of 2009 or
24   2010?
25        A.   Yes.

## Margo Hein-Muniz, M.D. 8/25/2011

### Page 181

1    Q.    What evidence do you have other than your
2    feeling?
3    A.    It was conversations I had with K.D.
4    Q.    She said, "We're going to get you a peer
5    review because you own an interest in the Aiken Surgery
6    Center"?
7    A.    She told me that she wouldn't -- that unless
8    I gave her back my pap smears, which the doctors had
9    pulled universally from the hospital, and unless I
10   dropped my membership from the surgery center, and, you
11   know, yadda, yadda, that basically she was not going to
12   assist me in finding a partner and she was going to make
13   it very difficult for me, is the word she used.
14   Q.    Okay.  That's a pretty serious allegation.
15   Were there any other witnesses that heard
16   that conversation between you and K.D.?
17   A.    K.D. has an I.Q. of probably 140.  No, this
18   occurred in her office.
19   Q.    Okay.  And when did it occur?
20   A.    It occurred a couple of months before I got
21   tapped.
22   Q.    For the first peer review?
23   A.    For the first peer review.
24   Q.    All right.  And by your own testimony, even
25   if what you've just told me happened, she didn't mention

### Page 182

1    peer review, did she?  She said she wouldn't assist you,
2    isn't that what she said?
3    A.    She said she wouldn't assist me, and she said
4    she was going to make things very difficult for me.
5    Q.    And you assume --
6    A.    I knew I was being threatened.  I didn't
7    understand what she meant.  If I had known what she
8    meant, I would have run.
9    Q.    Okay.  So you assumed --
10   A.    Like hell.
11   Q.    You assume now that that meant peer review?
12   A.    Yes.  I assume now that that meant peer review.
13   Q.    All right.  All right.  And this wasn't the
14   conversation that I listened to that you taped, right?
15   A.    No.  But it sure would have been nice, huh.
16   No.
17   Q.    Okay.  You mentioned the pathologist, so then
18   I would suppose that you believe that your utilization
19   of pathologists outside the hospitals, contracted
20   pathologists, has a causal relationship to what happened
21   to you at peer review?
22   A.    Yes.
23   Q.    Right?  Okay.
24   How do you explain the fact that there are
25   other physicians in the medical staff who both have an

### Page 183

1    interest in the surgery center and utilize the
2    pathologists outside the hospital, how do you explain
3    that those folks have not been subjected to peer review,
4    what you would view as sham peer review?  I guess why
5    you?
6    A.    None of them applied to University.
7    Q.    Okay.  Do you believe that there are no other
8    medical staff members that have privileges at both Aiken
9    and University?
10   A.    There are, but they had University privileges
11   first.
12   Q.    Okay.  All right.
13   A.    So once you've got the privileges over there,
14   what are they going to do to you?  But when you try and
15   go across the river ...
16   Q.    Okay.  The patient, I believe you testified
17   at your hearing, and you may have produced documents on
18   this, I don't know, because I don't have a pleading
19   telling me what actually lines up with what.  I believe
20   you testified at your 2010 hearing that you left to go
21   back to your office during the care of K.C., right, to
22   see a patient at your office?
23   A.    Uh-huh.
24   Q.    Do you know whether you produced to me
25   documents regarding the medical record regarding that

### Page 184

1    patient?
2    A.    Yes.
3    Q.    What was that patient's condition that you
4    went to see at your office?
5    A.    This patient had come in and she was almost
6    term and she was having basically dark brown blood
7    discharge and she was having some pain and she had
8    reported no fetal movement.  I was having difficulty
9    getting a Doppler on her.  And she was complaining of
10   leaking fluids.  So I wasn't sure if she was having
11   partial abruption, if she was ruptured.  And we were in
12   the process of looking at her, you know, when this
13   episode came about.  When they were doing the
14   ultrasound, I went over to check on her to see if she
15   needed to be transferred.
16   And that was a main point in their argument.
17   But the facility 410 is on campus.  It is three minutes
18   away.
19   Q.    What was the ultimate outcome of that
20   patient?
21   MR. SOWELL:  Wait.
22   MR. DAYHUFF:  Go ahead.
23   MR. SOWELL:  She needs to be allowed to
24   finish if she's got --
25   MR. DAYHUFF:  You're right.  I'm getting

## Margo Hein-Muniz, M.D. 8/25/2011

### Page 185

1  tired.  Go ahead.  I'm sorry.

2          THE WITNESS:  That 410 building is considered

3  on compass, and it is not unreasonable and certainly

4  within the standard and scope of practice as documented

5  by some of the testimony of the maternal fetal medicine

6  people to go check on other patients, you know, while,

7  you know, you've got two high-risk situations, you're

8  trying to handle both.

9          410 is on medical campus, and it has direct

10  extensions into 410.  For example, AI, Dr. Boehner Boone

11  and Mintos, have a direct hospital line.  They're a

12  simple extension.  We asked for one, we were never given

13  one, which is also a show of favoritism.  But I

14  digress.

15          It takes me three minutes to walk from the

16  hospital to my office and three minutes to walk back.

17  And I've timed that a hundred thousand times.  I'm being

18  metaphysical.  But many, many times.  I know exactly how

19  long it takes me.  And this patient was getting an

20  ultrasound.  I had my pager and my phone on.  Could have

21  turned around at any second.  The OR was already open,

22  and this patient needed to be checked on.

23          And so I did not delay care of that patient

24  in any way by going and checking on my other patient,

25  who was also at risk for abrupting.  And the only delay

### Page 186

1  that occurred was that 12-minute delay while they tried

2  to get the patient back into the C-section room and get

3  her spinal in place for us to do the C-section.

4          So me walking three minutes has got

5  absolutely nothing to do with how the outcome of this

6  baby turned out.

7  BY MR. DAYHUFF:

8      Q.   Okay.  The ultimate outcome of the other

9  patient in your office that you went to go check on, how

10  did that resolve?  Did this patient abrupt?  Was it --

11  how did that resolve?

12      A.   She had -- if I remember correctly, and I

13  would have to go back and look at the chart, she had a

14  non-reassuring tracing in the beginning.  And we left

15  her on the monitors.  And the nurse was left behind to

16  watch her.

17          And I came back and I did the nitrazine test,

18  and it came back equivocal, essentially staining

19  positive for rupture of membranes.  And I did see some

20  blood in the vault.  And she was somewhat tender.

21          So if I recollect, we did send her and she

22  subsequently got delivered the next day.  And she did

23  not have an abruption, but what she did have was what's

24  called a marginal placenta where the placenta is over

25  here and then there's filming membranes stretching off

### Page 187

1  of it and the blood vessels run through the membranes.

2  And so that's a very high-risk situation because if the

3  lady goes into labor and one of those blood vessels rips

4  in the membranes and they're not attached directly to

5  the placenta, it's fetal death.

6      Q.   Okay.

7      A.   And so that's how she wound up.  The baby

8  came out okay.

9      Q.   Okay.  Good.  Thinking about the care of

10  K.C., that's the subject of the 2010 peer review,

11  looking back on that as an OB/GYN, a board certified

12  OB/GYN, would you have -- you know, looking back with

13  hindsight, would you have done anything differently in

14  the care of that patient?

15          MR. DICK:  Object to the form.

16          THE WITNESS:  I wouldn't have done anything

17  differently as an OB/GYN.

18  BY MR. DAYHUFF:

19      Q.   Another way to say that question is, do you

20  feel like you made any mistakes looking back at that

21  case now?

22      A.   I think that I should have ---

23          MR. SOWELL:  Wait, wait.  Let's stop for a

24  minute.  Can you rephrase that question?

25          MR. DAYHUFF:  Sure.

### Page 188

1  BY MR. DAYHUFF:

2      Q.   Looking back on the 2010 K.C. case, the K.C.

3  case that was the subject of the 2010 peer review

4  action, looking back on it now, do you feel like you

5  made any mistakes with respect to the care of that

6  patient that day?

7      A.   No, not at all.

8      Q.   Okay.

9      A.   I think I did a fabulous job.  And I think

10  I'm one of the few physicians that would have actually

11  worked her up for thrombophilias and actually caught it.

12  And I think because of that finding, she was able to

13  subsequently go through IVF without dying and become

14  pregnant again without dying.  Because now they know how

15  to treat her.

16          And that patient stayed in town.  She did not

17  go back to Spartanburg.  They were happy with my care.

18  She stayed with her mother for -- and I don't know, I'd

19  have to look back at the chart, for several weeks

20  afterwards because she needed to be on Lovenox and she

21  was afraid to go home.  And we treated her appropriately

22  for her thrombophilias.  We got her a consultation with

23  a hematologist.  We got her a consultation with high-

24  risk maternal fetal medicine, for genetic counseling.

25          She, during that period of time, presented to

Margo Hein-Muniz, M.D. 8/25/2011

## Page 189

1  me quite ill with abdominal pain.  And I immediately
2  recognized that she had acute cholecystitis and sent her
3  for an operation.
4           The surgeon was unfamiliar with
5  thrombophilias and called me and asked me how to manage
6  this patient intraoperatively and postoperatively, and I
7  told him how to do so.  And therefore she did not die
8  during surgery, and she did not have a DVT after the
9  surgery.  And I believe that I saved her life twice.
10     Q.  So suffice it to say, I asked you the
11  question about did you make any mistakes in the care of
12  patient.  If you had it to do all over again, you would
13  do the same thing again?
14     A.  Yes, I would.
15          MR. DAYHUFF:  Fair enough.
16          MR. SOWELL:  Now, for the reporter's benefit,
17  this question and answer about mistakes is deemed
18  confidential.
19          MR. DAYHUFF:  We'll probably make the whole
20  deposition confidential.  There's been enough stuff, I
21  think, in here, and we'll probably have confidential on
22  the exterior of that.  "This deposition contains
23  confidential information."  That way no one can just
24  file it or something.
25          And I need to give you a copy of the

## Page 190

1  confidentiality order that I have with me before I
2  leave.
3  BY MR. DAYHUFF:
4     Q.  All right.  What's the name of the patient
5  that you were seeing at your office while this was
6  going, do you recall?
7     A.  I don't recall off the top of my head.
8     Q.  Okay.  Did you talk to the patient K.C. or
9  her mother about your suspension or revocation on her
10  subsequent visits with you?
11     A.  No.  Because after that, after the
12  cholecystectomy, I want to say that she saw me once
13  afterwards and then she was supposed to go back to
14  Spartanburg and they were planning on moving back to
15  Aiken.  And that's all I know.  I didn't see her after
16  that.
17     Q.  Okay.  Did you make any statements to the
18  mother of the patient about the care that she received
19  from her Spartanburg physicians?
20     A.  No, sir.
21     Q.  Okay.
22     A.  I hadn't even gotten the prenatal record when
23  I was treating her.
24     Q.  Fair enough.  Is it your understanding that
25  Ernie Nauful was paid by Aiken Regional Medical

## Page 191

1  Center --
2     A.  Yes.
3     Q.  -- to do his hearing officer duties?
4     A.  Yes.
5     Q.  Do you have any objection to that?
6     A.  Yes.
7     Q.  Okay.  Did you offer to split the cost of the
8  hearing officer with Aiken Regional Medical Center?
9     A.  I did not know that, A, I had a choice; and
10  B, I wasn't allowed to pick the hearing officer.  And
11  that's not something that was ever offered to me.
12     Q.  Okay.  But suffice it to say, then, you did
13  not offer to ARMC, "Hey, I want to pay for half of the
14  hearing officer"?
15     A.  That would be illogical.
16     Q.  Why is that?
17     A.  That's not protocol.
18     Q.  So it didn't happen, right?
19     A.  It didn't happen because it's not protocol.
20     Q.  Okay.
21     A.  The hearing officer is picked by the hospital
22  and usually it's somebody from the hospital.  It's
23  usually, at least from every other physician I've ever
24  talked to, a member of the staff, not a lawyer.
25     Q.  Okay.  Do you have any proof that ARMC is

## Page 192

1  subsidized by Aiken County?  Evidence?
2     A.  Other than the fact that we get checks, no.
3     Q.  We get checks?
4     A.  We had been getting checks.
5     Q.  What checks?
6     A.  Are you talking about the underserved
7  patients?
8     Q.  I'm talking about Aiken County, whether or
9  not -- do you have any proof that Aiken County, the
10  County of Aiken is subsidizing ARMC?
11     A.  I can't answer that question.  I don't know.
12     Q.  You don't know if you have any proof or have
13  any evidence?  You know what you have.
14     A.  I don't -- I'm having a tough time with the
15  question.
16     Q.  Okay.  Aiken County is a political
17  subdivision, right?  It's a county.  Do you have any
18  evidence that Aiken County pays Aiken Regional Medical
19  Center anything or subsidizes them in any way?  Have you
20  seen documents to that effect?  Have you talked to
21  somebody, the county commissioner that says, "You know
22  what, we pay Aiken Regional Medical Center"?
23     A.  I know that the town and the hospital are
24  extremely closely knit as evidenced by the gargantuan
25  Alltel or is it SunCom, whatever, tower on top of their

Pages 189 to 192

Margo Hein-Muniz, M.D.  8/25/2011

## Page 193

1  hospital. You know, so they receive subsidies and
2  payments from people in town or businesses in town by
3  allowing the tower to be on top of their building.
4      Q.  Okay. Anything else on that issue?
5      A.  You know, but in terms of do they receive
6  county monies to run their operation, I have no idea.
7      Q.  Do you consider yourself to have contracts
8  with your patients?
9      A.  I consider myself to have a relationship with
10  my patients.
11      Q.  Yeah. But do you consider yourself to have a
12  contract with them?
13      MR. DICK: Object to the form.
14      THE WITNESS: I don't understand the
15  question.
16  BY MR. DAYHUFF:
17      Q.  You know what a contract is, an agreement
18  between two parties, right?
19      A.  We don't write out handwritten agreements, if
20  that's what you're saying.
21      Q.  So you don't have a written agreement with
22  your patients, right, a written contract?
23      MR. DICK: Object to the form.
24      THE WITNESS: We have paperwork that, you
25  know, says if you don't -- if your insurance company

## Page 194

1  doesn't cover this bill, you'll be responsible. You
2  know that sort of stuff, this is what HIPAA means, stuff
3  like that.
4  BY MR. DAYHUFF:
5      Q.  Right. That they need to pay you, and that
6  there are certain privacy things going on. Okay.
7  Anything other than that that you would describe as a
8  contractual relationship that you have with a patient?
9      MR. DICK: Object to the form.
10  BY MR. DAYHUFF:
11      Q.  If you are describing that as a contractual
12  relationship.
13      A.  I think I have a normal physician
14  relationship with my patients like any other doctor.
15      Q.  Fair enough. I believe you alleged that
16  you're the only gynecologist who performs gynecological
17  malignancy surgeries and female incontinent surgeries in
18  the area; is that true?
19      A.  I'm the one that does a large portion of
20  them.
21      Q.  Okay. So it's not true that you're the only
22  one, right?
23      A.  No.
24      Q.  Okay.
25      A.  I do the majority of them. At Aiken

## Page 195

1  Regional, as far as I know, there's only been maybe two
2  operations for malignancy performed by another
3  physician.
4      Q.  Even though you haven't had your privileges,
5  isn't it true that you have been able to provide care,
6  good care to your patients?
7      MR. DICK: Object to the form.
8      THE WITNESS: I do the best with what I have,
9  but I've been crippled. And patients who could come to
10  me with significant problems and the charity cancer
11  patients I used to treat no longer get treatment because
12  I can't operate and so they die. Because a lot of
13  doctors won't operate on cancer patients when they don't
14  have any money.
15  BY MR. DAYHUFF:
16      Q.  You can't get any assistance from Dr. Bryan
17  or any of the other folks?
18      A.  They don't feel comfortable doing those types
19  of operations. I do those operations with people like
20  Dr. Frei, a general surgeon, a urologist. And once you
21  get the tissue and you prove it's cancer, then you can
22  get the patient funding.
23      Q.  Gotcha. Have you asked anybody to take on
24  those cases that you used to take on?
25      A.  Yes.

## Page 196

1      Q.  Who?
2      A.  I send them up to Palmetto Richland and see
3  if they can do something for them.
4      Q.  Okay. So you send them to different -- so
5  have you asked any doctor, "Hey, I had this clientele
6  that I used to serve, I would like you to be the one to
7  step up and take this on"?
8      A.  I've talked to Dr. Smith, and I've sent him
9  charity patients. Whether or not he's been able to take
10  care of them, I don't know.
11      Q.  Okay.
12      A.  Because, you know, he's a fabulous doctor,
13  but he's tremendously busy and he never ever writes
14  follow-up notes. So a lot of times they get stuck in
15  the cancer world, and you never find out what happened
16  to them.
17      Q.  Who is Hilda Hanks? Did we talk about her?
18      A.  Hilda is a lady that used to work in medical
19  records.
20      Q.  Does she work for you now?
21      A.  She worked for me briefly.
22      Q.  Okay.
23      A.  Now I believe she works for another
24  physician. But she worked for years and years in
25  medical records.

Pages 193 to 196

## Page 197

```
 1      Q.   What information would she have, if any,
 2  about this case?
 3      A.   She wouldn't have any information about this
 4  particular case, but she would be able to give
 5  information regarding the general practices of ARMC and
 6  the way they deal with certain issues.
 7      Q.   Okay.  Which issues, how they provide medical
 8  records to people or what?
 9      A.   Adulteration of medical records.
10      Q.   Okay.  You believe she has evidence that ARMC
11  is engaged in the adulteration of medical records?
12  She's on your witness list, so it must be the reason.
13      A.   Uh-huh.
14      Q.   Okay.  And has she told you she's observed
15  this?
16      A.   Yes.
17      Q.   Okay.  And she's prepared to testify?
18      A.   We'll find out, won't we?
19      Q.   I guess so.  Okay.
20           Denise Parnell, have we talked about Denise?
21      A.   I don't believe so.
22      Q.   Okay.  Who is Denise Parnell, M.D.?
23      A.   Denise Parnell is a pathologist.
24      Q.   We have just briefly.
25      A.   Yeah, we have just for a minute.
```

## Page 198

```
 1           Denise Parnell is one of the pathologists
 2  that was fired by ARMC.
 3      Q.   I recall.  I've seen the documents from
 4  Mr. Sowell.
 5           Levosia Ramsey, R-a-m-s-e-y, Levosia,
 6  L-e-v-o-s-i-a.  Do you know who she is?
 7      A.   I want to say that she's one of the other
 8  medical record ladies.
 9      Q.   Okay.  63 Dryback Road, Aiken.
10      A.   I'd have to look at the files.
11      Q.   Tanya Cordell?
12      A.   (Shakes head.)
13      Q.   No idea?
14           Maranda M. Clark?  Maranda, M-a-r-a-n-d-a.
15      A.   A lot of these people that we've collected
16  are patients or people that, you know, in some way may
17  or may not be able to help us with the case.  And so I
18  can't answer those questions on people that I
19  peripherally know.
20      Q.   If you're not sure, that's fine.  Whatever
21  you know, I would like to know.  But if you don't know,
22  we'll just move on.
23      A.   Okay.
24      Q.   Don't know?
25      A.   Don't know.
```

## Page 199

```
 1      Q.   Mary M. Lynes.  L-y-n-e-s.
 2      A.   That name is familiar, but I can't think of
 3  why.
 4      Q.   Deidra Dortch.
 5      A.   I want to say she's a patient.
 6      Q.   And do you have any idea what she would
 7  testify about?
 8      A.   I don't remember.
 9      Q.   Natasha Rudolph?
10      A.   Patient.
11      Q.   Any idea what she would testify about?
12      A.   I don't remember.
13      Q.   Candace Fields?
14      A.   Don't remember.
15      Q.   Teara Burgess?
16      A.   Patient.  Don't remember.
17      Q.   T-e-a-r-a.  Patient, don't remember what she
18  would testify about?
19      A.   Huh-uh.
20      Q.   Amber M. Hall?
21      A.   Don't remember.
22      Q.   Okay.  Patient or don't know?
23      A.   Don't know.
24      Q.   Shirley Anderson?
25      A.   Don't know.
```

## Page 200

```
 1      Q.   Shiree, S-h-i-r-e-e, Huntington?
 2      A.   Patient.
 3      Q.   Do you know what she will testify about?
 4      A.   Huh-uh.
 5      Q.   This adulteration of medical records issue, I
 6  mean, tell me about that.  Why would that happen?
 7  What is Hilda going to say?
 8      A.   I have no idea what Hilda is going to say.
 9      Q.   How did you come to name her?
10      A.   Hilda had told me that she routinely saw the
11  adulteration of medical records during her tenure at
12  ARMC, and we were able to get another lady who basically
13  said she saw the same thing.  And this goes along with
14  the fact that some of my documents were missing pages
15  and my hearings, and the fact that the good review was
16  not given to us initially, and I had to acquire it.  It
17  just kind of goes to the general tendency of ARMC to
18  move data in a way that benefits them.
19      Q.   Okay.  And the people doing the adulteration
20  of the medical records, is that doctors or staff or who
21  is that or all of the above?
22      A.   Both.
23      Q.   Both.  Okay.
24           Did you receive at any time any instruction
25  to preserve all documents related to this case in
```

Margo Hein-Muniz, M.D. 8/25/2011

## Page 201

1  written form?
2      A.   From whom?
3      Q.   From anybody.
4      A.   Not that I recall.
5      Q.   Okay.  Did you receive that orally from
6  anybody?
7      A.   Not that I recall.
8      Q.   Fair enough.
9           I heard you won the lottery recently.  Is
10 that true?
11     A.   I did not win the lottery.  It would be nice.
12     Q.   No, I really heard you won the lottery.  Did
13 you not win the lottery?
14     A.   No, I don't play.  I don't gamble.
15     Q.   Did your husband win the lottery?
16     A.   My husband won the lottery several years ago.
17     Q.   Okay.
18     A.   It was a couple like three, four years ago.
19     Q.   Wow.  How much did he win?
20     A.   He won $250,000 of which the government took
21 their --
22     Q.   Half?
23     A.   -- 50 percent.  And then we were taxed on it
24 again at the end of the year, double taxation, illegal,
25 constitutional breach.

## Page 202

1      Q.   David's next case.
2           Okay.  None of that would be reflected in any
3  the financials, right?  None of that would have been run
4  through the practice, that's the reason I asked about
5  it.
6      A.   It has absolutely nothing to do with that.
7      Q.   Okay.  I just wanted to make sure it wasn't
8  somehow in that mix.
9      A.   No.
10          MR. DICK:  I think that may be reflected on
11 the personal, actually.
12          MR. DAYHUFF:  On the tax returns?
13          THE WITNESS:  Yeah.  It's on the tax returns,
14 I promise you.
15 BY MR. DAYHUFF:
16     Q.   Have you looked into moving elsewhere to do
17 your office space GYN practice?
18     A.   No.
19     Q.   Why not?
20     A.   Because my patients are here, and they're
21 loyal to me.  If I was offered -- or it was discussed, I
22 should say, with the physician down in Savannah whether
23 or not that would be feasible, and it wouldn't be
24 because I wouldn't even be able to get surgery center
25 privileges and I would be useless.  And both of the

## Page 203

1  hospitals there wouldn't even look at me.  So this is
2  the only practice I have, and the only venue that I will
3  ever practice medicine in again.
4      Q.   Have you considered hiring or contracting
5  with an OB/GYN, bringing them into Magnolia Medical,
6  LLC, on the Parkside, LLC, to take -- to work with you
7  and then be able to do your OB -- OB part that you
8  can't do anymore?
9      A.   To --
10     Q.   Have you considered that?
11     A.   To bring in a physician as a partner or as an
12 employee would have the same devastating financial
13 outcome that Dr. Irwin resulted in because we would not
14 be receiving any subsidies and support by the hospital.
15 Most physicians get subsidies from the hospital in order
16 to bring in patients, as evidenced by AI's recent
17 acquisition of a new partner.  That's the way they
18 afford it.
19     Q.   Okay.  Did Irwin -- is that her name or his
20 name?
21     A.   Her.
22     Q.   Her.  Did she actually come on board with you
23 for a time?
24     A.   She was an employee.
25     Q.   Okay.

## Page 204

1      A.   And we wound up having to pay for everything
2  because K.D. reneged on the oral contract.
3      Q.   Okay.  How long was she with you, for how
4  long?
5      A.   A year and a half.
6      Q.   Why did she leave?
7      A.   Multiple reasons.  Number one, she got breast
8  cancer.
9      Q.   Okay.
10     A.   Number two, she had already been talked to by
11 Dr. DiBona twice.  She was the -- a very well-published
12 author.  She came from MCG.  She was the director for
13 the residency program.  She sits on the ABOG, American
14 Board of OB/GYN, committee and designs the questions.
15 She is a lady who has designed and implemented many of
16 the ACOG protocols that are standard of care across
17 America.
18          And the practices that were currently at
19 Aiken were very troubling to her.  And when she would
20 voice her concerns about it, it was not received well.
21 And she was very unhappy in the hospital, and she was
22 afraid that they were going to do to her what they did
23 to me.  And she had told me she couldn't afford to have
24 her record ruined like that, but she would -- you know,
25 essentially she would be planning to leave.

Pages 201 to 204

# Margo Hein-Muniz, M.D. 8/25/2011

## Page 205

1      And then when she got her cancer diagnosis,
2  you know, essentially she said to me, you know, "There's
3  nothing in God's green earth that's going to make it
4  worth it after that."  And she wound up covering call
5  for me for a long period while, you know, this first
6  pulling of privileges happened.  And she was having some
7  productivity issues, and the stress on her was
8  astronomical.  And I offered her to go as a 1099
9  employee and a fight ensued and she was angry at being
10 dropped down to a 1099 employee and she wasn't
11 interested in being at ARMC and she subsequently left.
12      Q.   So those are the factors.
13           Where is she now?
14      A.   I don't know.
15      Q.   Okay.
16      A.   Last I heard she wasn't practicing.
17      Q.   I got something to show you.
18      A.   Okay.
19           (DEFT. EXH. 3, Memo to the Record Dated
20  3-6-2007, ARMC001950, was marked for identification.)
21      MR. DICK:  Can you give us just a minute to
22  go talk about this?
23      MR. DAYHUFF:  Sure.
24           (A recess transpired.)
25  BY MR. DAYHUFF:

## Page 206

1      Q.   Doctor, have you had a chance to review
2  what's been marked as Exhibit, what, 3 or 4?
3      A.   Yes.
4      Q.   Do you recall what this was all about?
5      A.   Yes.
6      Q.   Talk to me about it.  What was this all
7  about?
8      A.   Joanne and I were in the OR doing a vaginal
9  case.  I don't remember what the case was, but I know
10 that it required my surgical nurse and a scrub, so I had
11 an assistant each side along with the circulator nurse.
12 And they were very careless about the way they were
13 dealing with the needles and sponges and that had
14 happened other times in the OR, particularly with this
15 one specific circulator.  And by that I mean have.
16           And when we completed the procedure, they
17 told me they couldn't find a sponge.  And I told them
18 that they needed to find the sponge.  And that it was --
19 this was becoming a problem, and that I was going to
20 file a formal complaint.
21           And eventually they found the sponge in the
22 vagina, which is the job of the circulator and the scrub
23 who is standing there the entire time you're operating.
24 They should be watching where the sponges are going at
25 all times.  And that's why you have a double count at

## Page 207

1  the end.  And that's why when you put a sponge or you
2  give a sponge to the surgeon, you say sponge in the
3  abdomen.  Lap in the abdomen, two laps in the abdomen,
4  three laps in the abdomen.  And the circulator is
5  writing it down.  And the fact that they lost this
6  sponge was frustrating to me.
7           And that's why I told the nurse that I was
8  unhappy with her performance and that I was going to be
9  filing a formal complaint and she did not like that.
10 She said that I left the sponge on the patient on
11 purpose, which, obviously, why would I do that because
12 it would get me sued?  And, plus, it's just bad
13 medicine.  But I did stand there and I made her find the
14 sponge.  And I don't think that she took kindly to the
15 correction.
16           And so I met with the head of the OR and had
17 a discussion with her about it and asked her to file an
18 incident report.  Unfortunately and retrospectively, I
19 probably should have gotten a copy of that.  The nurse
20 also filed a complaint anticipating my complaint, and I
21 was asked to meet with K.D. and Jonathan Anderson
22 regarding the incident.
23      Q.   Okay.  So do you feel like your behavior in
24 the incident that's reflected here on this exhibit was
25 appropriate?

## Page 208

1      A.   I don't think that I was inappropriate at
2  all.  The nurse was very angry and why they took her
3  position over my position, I don't know.
4      Q.   Okay.
5      A.   But, you know, their opinion was that I
6  should have just, you know, gone and looked for the
7  sponge myself.  My opinion was that in order to learn,
8  you need to fix your own mistake.  They basically said
9  that was -- you know, if I had helped, it would have cut
10 down the OR time and cost to the hospital, and, you
11 know, I shouldn't have chastised her, reprimanded the
12 nurse.
13      Q.   Did you or did you not leave the nurses in
14 the room with the patient, walk out of the room and say,
15 "You find the sponge"?
16      A.   I don't recall doing that.  I don't recall
17 doing that.
18      Q.   Okay.  Could you have done it, you just don't
19 recall?
20      A.   If I did do it, I would have done it -- I
21 know that I would have left Joanne behind to make sure
22 that everything -- and I would have come back.  If I
23 left, it would have been because I have certain medical
24 issues that sometimes I need to go take care of.
25      Q.   Okay.  With other patients, you mean?

Margo Hein-Muniz, M.D. 8/25/2011

## Page 209

1  A.  No.  I mean with my personal body functions.

2  Q.  Do you recall whether that occurred in this

3  case?

4  A.  I don't remember.  It happens.

5  Q.  All right.  Did you use any foul language

6  with respect to this incident?

7  A.  No.

8  Q.  Okay.  No cursing?

9  A.  No.

10  Q.  Any yelling?

11  A.  I don't yell.

12  Q.  Good.  This document, does this reflect a

13  counseling of you under the disruptive physician policy,

14  in your opinion?

15  A.  No.  I think they were just bringing it to my

16  attention.  And, you know, I told them my side of the

17  story and they told me her side of the story and that

18  was basically the end of that.  And at least I thought

19  the conversation between the three of us ended

20  collegially.

21      You know, this was not a disruptive hit.  You

22  know, as evidenced right here on the bottom it says,

23  "Dr. Muniz expressed understanding," blah, blah, "and

24  that any future behavior of this type will be dealt with

25  according to the medical staff code of conduct policy."

## Page 210

1      So what they're saying is if I continued to

2  do that type of behavior, they would initiate the code

3  of conduct policy.  This was several years ago.  This is

4  2011.  This was 2007.

5  Q.  Absolutely.

6      Have you ever used colorful language with

7  ARMC staff in the OR or elsewhere, cursing?

8  A.  I think that everybody curses at least once

9  or twice in their life.

10  Q.  Okay.  So you have used foul language with

11  ARMC staff?

12  A.  I haven't screamed at the staff and cussed at

13  them, if that's what you're asking.

14  Q.  Yes.

15  A.  Do I cuss if I stab myself in the hand, yes.

16  You know, did -- and, obviously, I'm working on that

17  because it's just unladylike.  But if I get frustrated

18  and, you know, I can't, let's say -- I'm going to just

19  make up an example, I'm having difficulty getting a

20  uterus out of a vagina, would I cuss at the uterus,

21  maybe.

22  Q.  Fair enough.

23      But you wouldn't direct it at the individual

24  staff members?

25  A.  No.

## Page 211

1  Q.  That sounded like you're directing it to

2  yourself, you're hurting yourself, you're having

3  difficulty with something you're working on.

4  A.  And you get frustrated and say --

5  Q.  You don't cuss and direct it at others,

6  right, foul language at others?

7  A.  No.

8  Q.  Good.  This is a document you produced to me.

9  I'm not going to make it an exhibit.  Do you know what

10  SX means on the left side?

11  A.  Symptoms?

12  Q.  I don't know.

13  A.  I have no idea.

14  Q.  Okay.  Thanks.

15      All right.  When you treat folks who have

16  insurance at your practice, is that primarily Blue Cross

17  Blue Shield?

18  A.  Our major private people would be Blue Cross

19  and Aetna and UHC and this other one that I don't even

20  know what it stands for, which is UHC.

21  Q.  That's the one you said, right.  All right.

22      I wanted to get some sense of the major

23  insurance companies.  I mean, is Blue Cross Blue Shield

24  out of your insurance folks 80 percent of it,

25  50 percent?  You have no idea?

## Page 212

1  A.  I don't know.

2  Q.  Fair enough.

3  A.  I just try and look at the person.

4  Q.  True.  Are you expecting any hires in the

5  near future at your LLC?

6  A.  No.  I'm planning on laying off people and

7  cutting medical insurance.

8  Q.  Okay.

9  A.  Which is unfortunate.

10  Q.  Any further attempts at going elsewhere for

11  privileges on the horizon?

12  A.  Nobody is going to take me.

13  Q.  Okay.

14  A.  Not damaged like this.

15  MR. DAYHUFF:  Okay.  I'm nearly done.  I'm

16  going to look through my notes.  If you want to take two

17  minutes, you can, or feel free to sit.

18  (A recess transpired.)

19  BY MR. DAYHUFF:

20  Q.  You have not been on any other medical staff

21  other than ARMC and in your role at Bamberg, right?  You

22  were on their medical staff?  Were you on their medical

23  staff, Bamberg?

24  A.  I don't know.  I had some sort of privileges,

25  but I don't know what they're called.  They're not

Margo Hein-Muniz, M.D. 8/25/2011

## Page 213

1   courtesy privileges, they're something like paid
2   proprietary privileges or I don't know.
3       Q.   So you had privileges from Bamberg and you
4   had them from Aiken.  Any other hospital where you had
5   privileges?
6       A.   At my residencies.
7       Q.   Okay.  Have you ever been subject to any
8   other peer review actions other than the ones we're here
9   about?
10      A.   Never.
11      MR. DAYHUFF:  All right.  Any questions for
12  this witness?
13      MR. DICK:  I have a few.
14          EXAMINATION
15  BY MR. DICK:
16      Q.   All right.  Dr. Muniz, you talked with Travis
17  about a whole lot of hospitals.  I think you said
18  University, Doctors, Trinity, Richland or Lexington.
19      A.   Lexington.
20      Q.   Conway, Carolina Pines or something?
21      A.   Baptist.
22      Q.   Baptist.
23      A.   Carolina Pines was a --
24      Q.   Locum tenens?
25      A.   Locum tenens.

## Page 214

1       Q.   Okay.
2       A.   Alabama.
3       Q.   Alabama.
4       A.   And Springfield.
5       Q.   And Springfield.
6       A.   I tried to go home.
7       Q.   Okay.  That was in Illinois?
8       A.   Yes.
9       Q.   Are there any other hospitals that you
10  applied for privileges at as of now?
11      A.   I went down and I interviewed with a lady in
12  Savannah who wanted to hire me, and I did meet with both
13  of those hospitals.  But I was not offered or invited to
14  fill out an application.  The one hospital was just,
15  "No, you've had privileges pulled.  That's it.  You
16  can't apply."
17          And the other one was like, "We're not
18  touching this.  We've heard about this case."  Which was
19  kind of creepy.  And that was it.
20      Q.   Okay.  And what about -- I know you said
21  Barnwell, but have you applied to Bamberg, also?
22      A.   I already had privileges at Bamberg.
23      Q.   Wait.
24      A.   I applied at Barnwell.
25      Q.   You've applied to Barnwell.  Wait.  I may be

## Page 215

1   switching the two.  I got them backwards.
2       Okay.  So you have privileges where or the
3   courtesy or the proprietary?
4       A.   I had privileges at Bamberg, but they closed
5   it.
6       Q.   Okay.
7       A.   And I applied to Barnwell because that's part
8   of the Tri-County project.  And that's a little dinky,
9   itty-bitty, teeny-weeny hospital, too.
10      Q.   So you've also applied to Barnwell?
11      A.   Right.
12      Q.   Gotcha.  Any other hospitals aside from, I
13  guess, you named now Savannah -- I think you said
14  Savannah to Travis, I'm not sure. -- Illinois and
15  Barnwell.  Any other hospitals you can think of that
16  you've applied to?
17      MR. DAYHUFF:  Do you have one in mind?  You
18  could ask about it specifically.
19      MR. DICK:  No.
20      THE WITNESS:  I think that's it.  Oh, the
21  V.A.
22  BY MR. DICK:
23      Q.   Okay.  You haven't heard anything from the
24  V.A.?
25      A.   Huh-uh.

## Page 216

1       MR. DICK:  Let's, I guess, mark this
2   Plaintiff's Exhibit 1.
3       (PLF. EXH. 1, OB/GYN Call Schedule Memo,
4   ARMC001956, was marked for identification.)
5   BY MR. DICK:
6       Q.   Take a look at it.  Read over it.
7       A.   Okay.  Well, it's certainly creative, isn't
8   it?  Okay.
9       Q.   Okay.  Do you recall the incident that's
10  discussed in Plaintiff's Exhibit 1?
11      A.   Uh-huh.
12      Q.   Have you ever seen this document before?
13      A.   No.  I was never given this document by the
14  hospital at all.
15      Q.   Okay.  I guess, can you identify what that
16  Plaintiff's Exhibit 1 is?
17      A.   Apparently this is some sort of a letter that
18  was written by Terri Ergle to I don't know who because
19  it's not sent to anybody in particular.  The date is
20  handwritten.  I remember -- I don't know about the date,
21  but I do remember this incident.  But I think the bottom
22  half is a little bit creative.
23          Terri Ergle was consistently not professional
24  with my staff and was a little bit heckling, I guess is
25  the word I would use.  And it was very frustrating to my

Pages 213 to 216

Margo Hein-Muniz, M.D. 8/25/2011

Page 217

1  staff.  And Dr. Besson had an objection to the call
2  schedule because she could gone gyne only, and she
3  wanted to be on call one in seven, which means that she
4  would be on call with the same doctor every single day
5  because there were seven of us.  So it would be the
6  same day.  You know, like if you put her on Mondays,
7  then she would always be on Mondays and she would always
8  be with Doctor A.
9          And I had talked to Dr. Boehner about it.  We
10  were pulling call at the time.  And he was very
11  frustrated with it and particularly with Dr. Besson.
12  They have a history.  And he suggested that we stack it
13  so it would be like one in five and one in seven and
14  one -- you know, so that it would stack out that she
15  would be rotating with different people.
16          But one in seven doesn't make sense because
17  when you would map it out, you would wind up being
18  essentially into this very complex, like, mathematical
19  complex, like, mathematical equation.  And he was mad.
20  Terri was mad.  I was frustrated.  Terri kept on calling
21  and yelling at Marla, you know.  It got ridiculous.
22          I called Terri and basically told her that
23  she needed to turn the schedule over to Dr. Boehner
24  because I wasn't going to get involved.  And I was very
25  upset with the way she kept on.  And it wasn't the first

Page 218

1  time that she had had -- it was a routine problem
2  between her and the way she talked with my staff.  And I
3  filed a formal complaint after this, you know, with K.D.
4  about the professionalism of K.D.'s staff, particularly
5  Terri Ergle, and I'll try and look and see if I've still
6  got the letter.
7          And I don't know if anything was done -- or
8  if anything was done about it or if Terri was
9  reprimanded or corrected in any way.  I would have to
10  assume this would be her response to my grievance.  But
11  did I call her a blankity blankity blank blank blank
12  blank blank blank blank blank blank blank blank blank
13  blank, no.
14      Q.  Okay.  Were you ever contacted by a K.D. or
15  did anyone ever talk to you about this letter written by
16  Terri Ergle?
17      A.  I was never talked with about this letter at
18  all.  But the next time I went up and, you know, talked
19  to Terri and I asked her if she had gotten the schedule
20  from Dr. Boehner, she told me that she had and she
21  apologized.  And we were actually kind of cool after
22  that.
23      Q.  Okay.  So did anyone ever reprimand you for
24  anything you said to Terri Ergle?
25      A.  No.  I didn't even know she wrote this

Page 219

1  letter, otherwise, I probably would still be mad.  But,
2  no, I mean, once she apologized to me, I was fine and,
3  you know, the schedule had been turned over to
4  Dr. Boehner and so I lived happily ever after.
5      Q.  Now, in that letter, she says that you used
6  multiple curse words during your phone conversation with
7  her.  Is it possible that you used curse words during
8  that conversation?
9      A.  I don't think so.  I mean this is like a
10  sailor or a Marine.
11      Q.  Does she allege in there anywhere that you've
12  directed any of this alleged curse words at her, at
13  Terri Ergle?
14      A.  No.  She says that I was talking about
15  Dr. Besson being a blank blank blank, and she couldn't
16  have her way because she was a blank blank blank blank
17  blank blank blank.
18      Q.  Okay.
19      A.  And that Dr. Besson should do this and
20  Dr. Besson should do that and that I won't to talk to
21  blank again.  You know, I never talked to Cindy about
22  the schedule ever.  "Dr. Muniz told me that she would
23  not talk to that blank blank because she did not want
24  her car keyed again."
25      Q.  Did you say that?  Answer yes or no.

Page 220

1      A.  I'm going to go with no.  "Dr. Muniz told me
2  that --" "She told me that I could call her and then
3  maybe my car could get keyed this time."  She told me
4  that I could call her and --" oh, Terri saying -- no,
5  Terri -- okay.  No.  Terri is not saying that I'm
6  directing this toward her.  She's saying that I am
7  saying nasty things about Dr. Besson.
8      Q.  Okay.
9      A.  It's half true.
10      Q.  Half true?  And what would the true part be
11  about that?
12      A.  The true part is that she did call us
13  multiple times regarding call schedule and that
14  Dr. Besson did want to do it one in seven.  And I don't
15  know if she spoke with Dr. Boehner not.  But I called
16  Dr. Boehner and asked him to what to do and asked him to
17  just take over the schedule.
18      Q.  Okay.  And all those inflammatory remarks in
19  there that Terri alleges you made about Cindy Besson, do
20  you know if you made those remarks, or do you remember
21  making those remarks?
22      A.  No.  I don't cuss like a sailor like this.  I
23  mean, I've cussed.  I'm not saying that I haven't
24  cussed, but I don't think I would go on and on and on
25  and use the same three cuss words over and over and over

www.compuscripts.com

Margo Hein-Muniz, M.D. 8/25/2011

## Page 221

1    and over again.

2        Q.   Okay.  All right.  You can put that down.

3            Do you know if having your privileges -- or I

4    guess when you seek privileges at another hospital and

5    those -- that credentialing request is denied, do you

6    know if that's a reportable event to the National

7    Practitioner Database?

8        A.   I believe that it is.

9        Q.   Okay.  So that would be bad?

10        A.   It's very bad.

11        Q.   Okay.  Did you pull any of your applications

12    to any of the hospitals that we've previously listed in

13    an effort to avoid being reported to the National Data

14    Bank for having your credential request denied?

15        A.   No.  The reason I tabled University and

16    Doctors Hospital was because we weren't getting the

17    data.  And by the time it got jammed up, like how we

18    have previously discussed ad nauseam, with the other

19    hospitals, they were actually being very, very kind, I

20    think, and professional.

21            For example, Conway.  They didn't offer me

22    the application.  They wanted to meet me first because

23    they knew that there was a situation.  And the gentleman

24    even told me that.  He says, you know, "We don't give

25    the people the applications unless we know they're going

## Page 222

1    to get privileges because we don't want to damage your

2    career any more than it's been damaged."  And I

3    appreciated that.

4            And it was the same way with Baptist when I

5    talked to the head of their credentialing committee.

6    She said, "Listen, you know, before you go any further,

7    you know, you need to know that the probability of you

8    being accepted until this thing is resolved is highly

9    unlikely and that'll go on your National Practitioner

10    Database."  And she was the first one to tell me about

11    that, and then Conway was the second one to tell me

12    about that.

13            And then the Savannah River -- or the

14    Savannah lady -- I mean, we just went and talked to the

15    hospitals, and we decided not to apply to either one

16    of them, so -- and actually same thing with Alabama.

17            So most of these places, I didn't get the

18    application to even fill out because once they found

19    out, you know ...

20        MR. DICK:  Okay.  I'm done.

21        MR. DAYHUFF:  No further questions.

22        (DEFT. EXH. 4, Consent Confidentiality Order,

23    was marked for identification.)

24        (The deposition concluded at 10:13 p.m.)

25

## Page 223

1            SIGNATURE OF DEPONENT

2

3            I, the undersigned, MARGO J. HEIN-MUNIZ, M.D.

4    , do hereby certify that I have read the foregoing

5    deposition and find it to be a true and accurate

6    transcription of my testimony, with the following

7    corrections, if any:

8    PAGE LINE        CHANGE            REASON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    _____

    MARGO J. HEIN-MUNIZ, M.D.  DATE

24

25

## Page 224

1            CERTIFICATE OF REPORTER

2
    I, Sheri L. Byers, Registered

3    Professional Reporter and Notary Public for the
    State of South Carolina at Large, do hereby certify:

4
    That the foregoing deposition was

5    taken before me on the date and at the time and
    location stated on page 1 of this transcript; that

6    the deponent was duly sworn to testify to the truth,
    the whole truth and nothing but the truth; that the

7    testimony of the deponent and all objections made at
    the time of the examination were recorded

8    stenographically by me and were thereafter
    transcribed; that the foregoing deposition as typed

9    is a true, accurate and complete record of the
    testimony of the deponent and of all objections made

10    at the time of the examination to the best of my
    ability.

11
    I further certify that I am neither

12    related to nor counsel for any party to the cause
    pending or interested in the events thereof.

13
    Witness my hand, I have hereunto

14    affixed my official seal this 29th day of August,
    2011, at Columbia, Richland County, South Carolina.

15

16

17

18    _____
    Sheri L. Byers,

19    Registered Professional Reporter,
    Notary Public

20    State of South Carolina at Large
    My Commission expires:

21    January 5, 2014

22

23

24

25

Pages 221 to 224

Margo Hein-Muniz, M.D. 8/25/2011

Page 225

```
 1                    I N D E X
 2                                      Page
 3     Stipulation                        3
 4     EXAMINATION
 5           BY MR. DAYHUFF                3
             BY MR. DICK                 213
 6
 7     Signature of Deponent            223
 8     Certificate of Reporter          224
 9
10
11
12                 E X H I B I T S
13     Defendant's
14     1     Application Portions,       126
             MUNIZ_000918 through 000922
15
       2     Peer Review Notices         139
16
       3     Memo to the Record Dated    205
17           3-6-2007, ARMC001950
18     4     Consent Confidentiality Order  222
19
20     Plaintiff's
21     1     OB/GYN Call Schedule Memo,  216
             ARMC001956
22
23
24
25
```

www.compuscripts.com