IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Margo J. Hein-Muniz, M.D., and<br>Parkside Medical Consultants, LLC,<br>d/b/a Magnolia Medical, | ) ) ) ) | C/A No.: 1:10-cv-986-JFA |
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER GRANTING MOTION FOR<br>SUMMARY JUDGMENT |
| Aiken Regional Medical Centers;<br>Universal Health Services, Inc.; Aiken<br>Obstetrics & Gynecology Associates,<br>P.A.; Carlos A. Milanes; K.D. Justyn;<br>Oletha R. Minto, M.D.; James F.<br>Boehner, M.D.; Robert D. Boone, M.D.;<br>Jonathan H. Anderson, M.D.; Thomas<br>P. Paxton, M.D.; and UHS of Delaware,<br>Inc., | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

This matter comes before the court on Defendants' Motion for Summary Judgment. (ECF No. 228). Defendants assert, in their motion, that they are entitled to the damages immunity provided by the Health Care Quality Improvement Act ("HCQIA") and summary judgment on the causes of action asserted by Plaintiffs in this suit. Plaintiffs oppose the motion and argue that, for a number of reasons, Defendants are not entitled to immunity under HCQIA. For the reasons that follow, this court grants Defendants' Motion for Summary Judgment and finds all other pending motions moot.

## I.     Factual and Procedural History

Plaintiff Dr. Muniz is an OBGYN who formerly held privileges at Aiken Regional Medical Centers ("the Hospital"), and Plaintiff Parkside Medical Consultants, LLC d/b/a Magnolia Medical is her medical practice.  Plaintiffs filed this suit in response to a peer review action, which resulted in the loss of Dr. Muniz's medical staff privileges.  The suit names the following as Defendants: the Hospital, a corporate entity that owns the Hospital, an OBGYN practice located in Aiken, various Hospital administrators, and various doctors who are on the medical staff at the Hospital.

*Suspension by Medical Executive Board*

The peer review action at issue in this case was spurred by a still birth caused by a placental abruption in a patient[1] (patient #6) of Dr. Muniz's on February 23, 2010.  On February 25, 2010, the Hospital's Chief Executive Officer ("CEO"), Chief of Staff, and Chief of Surgery suspended Dr. Muniz's medical staff privileges.  On March 9, 2010, after reviewing and discussing the medical record and allowing Dr. Muniz to appear and offer her comments, the Medical Executive Committee ("MEC") unanimously voted to suspend Dr. Muniz's privileges.  Though it had already made its decision, the MEC withheld the decision until after it received two external reviews of the case.  Once those reviews were returned and reviewed, the CEO informed Dr. Muniz that the MEC had voted to suspend her clinical privileges and had recommended that her clinical privileges and medical staff membership be revoked.

---

[1] Patient #6 was not a regular patient of Dr. Muniz's.  The patient presented to the Hospital's emergency room complaining of back pain, and Dr. Muniz was called to cover the patient though Dr. Muniz was not on call that day.

*Hearing Panel Upholds the Decision of the MEC*

On March 23, 2010, Dr. Muniz requested a hearing to challenge the MEC's recommendation that her privileges be terminated. A hearing was scheduled for June 15, 2010. In the letter giving Dr. Muniz notice of the hearing, the hospital notified Dr. Muniz that the MEC's decision was based on number of reasons, including inappropriate medication, delay of treatment, failure to recognize an emergent situation, and Dr. Muniz's prior peer review proceeding. (ECF No. 262-4, p. 39). The letter further identified the grounds/charges for the hearing as "[c]linical competence in the treatment of [six different] patients . . . and your professional judgment." (ECF No. 262-4, p. 41). A Hearing Panel consisting of four doctors from the Hospital, all with specialties other than OBGYN, and one external doctor, specializing in OBGYN, was selected. Ernest Nauful, an attorney from Columbia, was appointed as counsel ("Presiding Officer") for the Hearing Panel. The hearing lasted for three days. Both sides called witnesses and presented documentary evidence at the hearing.

The Report of the Hearing Panel issued on September 22, 2010 ("first report"), affirming the actions of the MEC. However, because the wrong burden of proof was used in the first report,[2] the Report of the Hearing Panel had to be reissued on October 12, 2010 ("second report") using the correct burden of proof. Before officially issuing the second report, Nauful emailed a copy of the report to counsel for the Hospital, asking them if he had used the correct burden. He did not include Dr. Muniz's counsel in the

---

[2] Although the Hospital's medical staff bylaws placed the burden of proof at the hearing upon the physician challenging the MEC's adverse recommendation, the MEC agreed that it would bear the burden of proof at Dr. Muniz's hearing.

3

communication. In the second report the Hearing Panel again affirmed the actions of the MEC and provided the following support for its decision: Dr. Muniz lacked candor in dealing with her peers; Dr. Muniz lacked credibility based on her testimony and her medical record entries; and Dr. Muniz displayed poor clinical judgment in leaving a patient who appeared to have a placental abruption and in delaying a cesarean section of that patient.

### Board of Governors Affirms the Hearing Panel

Dr. Muniz then appealed the decision of the Hearing Panel to the Hospital's Board of Governors. The Chairman of the Board, Dr. Boehner, an OBGYN, recused himself from the Board's consideration and voting.[3] An Appellate Review Committee made up of Board members considered Dr. Muniz's appeal after receiving written briefs and hearing oral arguments from both Dr. Muniz and the MEC. On December 15, 2010, the Appellate Review Committee reported their recommendation to the full Board. The Board voted unanimously to affirm the recommendation to terminate Dr. Muniz's privileges on January 18, 2011.

### Hospital's Actions Following the Peer Review Action

Subsequently, the Hospital reported Dr. Muniz to the National Practitioner Data Bank ("NPDB"). Since that report, Dr. Muniz has applied to several hospitals and locum tenum positions but has been denied privileges due to the report in the NPDB.

---

[3] Dr. Muniz has submitted the deposition of the CEO, Carlos Milanes, to dispute this point. However, in Dr. Boehner's own deposition, he testified that he recused himself from the Board's vote and deliberation. Furthermore, the CEO has submitted an affidavit correcting his testimony.

*Procedural History*

Dr. Muniz filed a complaint in state court on March 23, 2010, and Defendants removed the case to this court on April 21, 2010. At that time, the review process had not been completed, but Dr. Muniz's privileges had already been suspended. Much of Plaintiffs' first Complaint discussed a 2009 review conducted by the Hospital regarding Dr. Muniz's actions with regard to five other patients. As a result of the 2009 review, Dr. Muniz was ordered to undergo a psychological evaluation and additionally required to undergo 100% case review for one year.[4]

In their most recent Amended Complaint, Plaintiffs have asserted the following causes of action against the Defendants: breach of contract, breach of contract accompanied by a fraudulent act, violations of the South Carolina and the United States Constitutions and HCQIA, illegality, conspiracy, unfair trade practices, breach of fiduciary duty, and interference with prospective contract. (ECF No. 193, pp. 20–27). As for relief, Plaintiffs seek the following: declaratory judgment, actual and compensatory damages, punitive damages, special damages, injunction, and attorney's fees. (ECF no. 193, pp. 27–28). In their Motion for Summary Judgment, Defendants assert that all of the causes of action should be dismissed and that Defendants are entitled to damages immunity under HCQIA.

---

[4] A "100% case review" required that all of Dr. Muniz's Hospital procedures be reviewed by another medical professional.

## II.     Legal Standard

### A.     Immunity Under the Health Care Quality Improvement Act

A defendant is entitled to damages immunity under HCQIA if a peer review action

against a physician was taken:

(1)     in the reasonable belief that the action was in the furtherance of quality health care;

(2)     after a reasonable effort to obtain the facts of the matter;

(3)     after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and

(4)     in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3).

42 U.S.C. §§ 11111(a) & 11112(a).  HCQIA provides a statutory presumption that the

peer review action at issue satisfies the four prerequisites for damages immunity unless

this presumption is rebutted by a preponderance of the evidence.  42 U.S.C. § 11112(a).

### B.     Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary

judgment shall be rendered when a moving party has shown that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The court must determine whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Summary

judgment should be granted in those cases where it is perfectly clear that there remains no

genuine dispute as to material fact and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trustees of Mayland Community College*, 955 F.2d 924, 928 (4th Cir. 1992). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III. Analysis

### A. HCQIA Standards

Summary judgment for the peer reviewers is appropriate unless a reasonable jury, viewing the facts in the best light for the plaintiff, could conclude that the plaintiff has shown by a preponderance of evidence that defendants' actions fail to satisfy the HCQIA standards. *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 175 (4th Cir. 2009).

#### 1. Reasonable Belief That Action Taken in Furtherance of Quality Health Care

In determining whether a professional review action was "undertaken in the reasonable belief that quality health care was being furthered," the courts apply an objective test which looks to the "totality of the circumstances." *Imperial v. Suburban Hosp. Ass'n Inc.*, 37 F.3d 1026, 1030 (4th Cir. 1994). This HCQIA standard does not require that the peer review decision be correct or that the decision actually improve the quality of health care. *Id.*

Defendants submit that they have satisfied standard one "because the record reveals Dr. Muniz's peer review action was undertaken to ensure patient safety and quality care, and this action was entirely reasonable in light of Dr. Muniz's serious and

well-documented problems with patient care and veracity." (ECF No. 228-1, p. 15). Defendants also have the testimony of many of the peer review participants who confirm that the peer review action was undertaken in the furtherance of quality health care. Additionally, Defendants point to OBGYNs both inside and outside of the Hospital who found Dr. Muniz's care lacking with regard to patient #6.

Plaintiffs submitted the following facts to support their argument that the peer review action was not taken in furtherance of quality healthcare: (1) the MEC voted to terminate Dr. Muniz's privileges before reading two outside reviews; (2) none of the experts during the Hearing testified that Dr. Muniz had breached the standard of care; (3) the MEC originally noticed Muniz on her lack of clinical skill in administering medication, delaying treatment, and failing to recognize an emergent situation, but ultimately terminated her privileges based on her lack of candor, her inability to work with other medical staff at the hospital, and "other unnoticed issues" (ECF No. 262, p. 14); and (4) the MEC never recommended any intermediate action.

In response to the fact that the MEC voted to terminate Dr. Muniz's privileges before receiving the external reviews, Defendants point out that the MEC was not the ultimate decision-maker in the peer review action. In addition to the MEC, Dr. Muniz's actions were reviewed by a Hearing Panel, an Appellate Review Committee of the Board, and the full Board—all of these groups voted to suspend her privileges. Though the MEC had not received the outside reviews at the time they voted, they had internal reviews already. Also, the MEC chose to hold off on releasing their decision until the outside reviews were received so that they could confirm that the outside reviews

8

reflected the same opinion as the internal reviews.[5]  As to the lack of testimony that Dr. Muniz breached the standard of care during the Hearing, Defendants note that multiple OBGYNs gave Dr. Muniz the worst standard of care rating when they reviewed her care of patient #6.  With regard to the notice that Dr. Muniz received regarding the charges against her, Defendants maintain that the MEC's focus throughout the hearing was upon Dr. Muniz's care of patient #6.  "[R]eview of Dr. Muniz's care properly considered her statements, that were ultimately found to be false and self-serving regarding the patient, the patient's mother, the radiologist, and the pathologist."  (ECF No. 276, p. 12).  Finally, though Plaintiffs assert that Defendants did not consider any intermediate action, Defendants argue that lesser measures than termination of privileges had been considered in Dr. Muniz's 2009 peer review, which resulted in a psychological evaluation and 100% case review.

In looking to the totality of the circumstances, the court finds that the peer review action at issue was taken in the reasonable belief that the action was in the furtherance of quality health care.  The peer review action was initiated while Dr. Muniz was under 100% case review from a previous incident and after she had a catastrophic outcome with patient #6.  The MEC terminated Dr. Muniz's privileges after considering their internal reviews and after confirming that the external views reflected the same opinion as the internal reviews.  After considering even more information about the circumstances surrounding Dr. Muniz's care of patient #6, the Hearing Panel and the Board affirmed the

---

[5] One of the outside reviews actually favored Dr. Muniz, in some respects.  The report indicated that the standard of care was appropriate but said that some decisions and considerations of Dr. Muniz were not appropriate.

decision of the MEC. The court finds that the Defendants have satisfied the first HCQIA standard.

### 2. Reasonable Effort to Obtain the Facts

Defendants submit that a peer review action that consists of multiple levels of investigation and review generally satisfies this element of HCQIA. (ECF No. 228-1, p. 19 (citing *Moore*, 560 F.3d at 175 – 76)). The presumption that standard two has been satisfied cannot be overcome by merely pointing out a single source of information that was allegedly overlooked in the investigation when the effort to obtain the facts included a multi-level process with a fact-finding hearing. *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 469 (6th Cir. 2003).

The peer review action in this case included a multi-level process and exhaustive fact-finding, including a 3-day evidentiary hearing before the Hearing Panel. Nevertheless, Plaintiffs take issue with the fact that the MEC failed to speak with Dr. Gasnel Bryan, the physician who assisted Dr. Muniz in the delivery of the still born fetus, before recommending that Dr. Muniz's privileges be terminated. Plaintiffs cite recent case law where a court found that "the failure to interview hospital physicians and nurses, and the chair of the hospital's ob/gyn department, constituted an unreasonable investigation under the circumstances." *Smigaj v. Yakima Valley Mem'l Hosp. Ass'n*, 269 P.3d 323, 334 (Wash. Ct. App. 2012). In their response, Plaintiffs also submit that there was a pattern of ignoring facts favorable to Dr. Muniz, referring to the process employed in Dr. Muniz's earlier peer review action. Plaintiffs again raise the MEC's vote to

suspend Dr. Muniz's privileges before receiving the outside reviews in an effort to show inadequate fact-finding in this case.

Though the MEC failed to speak with Dr. Bryan before recommending that Dr. Muniz's privileges be terminated, Dr. Bryan's testimony was obtained during the 3-day evidentiary hearing before the Hearing Panel. Defendants note that the evidentiary hearing was the main fact-gathering tool during the peer review process, and Defendants argue that it is not appropriate to consider only the fact-gathering of the MEC. Additionally, Dr. Bryan arrived only for the cesarean section ("c-section"), thus missing the events leading up to the c-section, which Defendants contend were the subject of the peer review action. Defendants distinguish the *Smigaj* case from the instant case. In *Smigaj* the peer reviewers' investigation was wanting because it did not include interviews of the OBGYN department chair or any of the physicians or nurses with relevant information.

The court finds that the Defendants have met the second HCQIA standard. Because this peer review action consisted of multiple levels of investigation and review, there is a presumption that there was a reasonable effort to obtain the facts. Plaintiffs have identified two areas where they believe the MEC was not reasonable in obtaining the facts. This court disagrees. Furthermore, there were two other levels of investigation and review after the MEC made its initial decision, and one of those levels included a 3-day evidentiary hearing in front of a Hearing Panel, which shows the effort that the Defendants went through to obtain the facts before issuing a final decision about Dr.

Muniz's privileges.  Plaintiffs also take issue with the 2009 peer review, but that is not probative on whether the 2010 peer review action satisfied HCQIA standards.

### 3.    Adequate Notice and Hearing Procedures

The peer review participants are deemed to have satisfied HCQIA standard three if they meet the safe harbor requirements set forth in § 11112(b) or these requirements are waived by the physician.  *Wieters v. Roper Hosp., Inc.*, 58 F. App'x 40, 46 (4th Cir. 2003).[6]  However, even if the requirements in section (b) have not been met in every

---

[6] 42 U.S.C. § 11112(b) reads as follows:

(b)  Adequate notice and hearing

A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

(1)  Notice of proposed action

The physician has been given notice stating—

 (A) (i)  that a professional review action has been proposed to be taken against the physician,

  (ii)  reasons for the proposed action,

 (B) (i)  that the physician has the right to request a hearing on the proposed action,

  (ii)  any time limit (of not less than 30 days) within which to request such a hearing, and

 (C)  a summary of the rights in the hearing under paragraph (3).

(2)  Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating—

 (A)  the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

 (B)  a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3)  Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B)—

 (A)  subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)—

  (i)  before an arbitrator mutually acceptable to the physician and the health care entity,

  (ii)  before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

  (iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

 (B)  the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

 (C)  in the hearing the physician involved has the right—

  (i)  to representation by an attorney or other person of the physician's choice;

technical sense, peer reviewers still satisfy standard three if the physician was provided notices and hearing procedures that were fair under the circumstances. 42 U.S.C. § 11112(b).

Defendants contend that they have met standard three because Dr. Muniz received timely and appropriate notices that complied with the requirements in subsection 11112(b) at every stage of her peer review process. The notices provided a reasonable description of the adverse actions that were imposed and recommended and of the basis for those actions and recommendations. Moreover, the notices outlined Dr. Muniz's rights to request a hearing before a panel of her peers, to call witnesses, to cross examine witnesses against her, and to introduce evidence.

With regard to the third HCQIA standard, Plaintiffs have asserted a number of deficiencies with the peer review process, including the following: Dr. Muniz was never properly noticed; the Hearing Panel originally concluded not to terminate privileges; the Hearing Panel was improperly allowed to reconsider its recommendation; the Presiding Officer was biased, unduly influenced the Hearing Panel, and generated ex parte communications; two prosecutors at the Hearing level participated and voted at the Board

---

      (ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

      (iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

      (v) to submit a written statement at the close of the hearing; and

   (D) upon completion of the hearing, the physician involved has the right—

      (i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

      (ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.

of Governors level; and Hospital administrators were present during the Hearing Panel deliberations.

*Notice*

Plaintiffs submit that Dr. Muniz was not properly noticed because the Hearing Panel's reasons for terminating privileges (lack of candor, lack of credibility, poor judgment) differed from those originally noticed to Dr. Muniz (inappropriate medication, delay, failure to recognize an emergent situation). Plaintiffs also take issue with the fact that the MEC never amended the charges against Dr. Muniz although it was possible under the Hospital's bylaws for them to do so (even during the hearing). Plaintiffs further assert that the MEC never gave Dr. Muniz notice that the mother of patient #6 would be called as a witness. Dr. Muniz and her counsel properly objected to the witness during the hearing.

Defendants disagree that there was improper notice in this case and argue that notice should not be construed so narrowly to exclude Dr. Muniz's communications about her care. In the Defendants' view, credibility is always under review by a fact-finder. They note that the issue of Dr. Muniz's lack of candor and truthfulness only arose when Dr. Muniz lied about communications regarding her care during the hearing. Thus, that issue could not be noticed in advance. As to the testimony of patient #6's mother, the MEC called the mother as a rebuttal witness after Dr. Muniz made false statements at the hearing regarding the desires and statements of patient #6 and her mother, and Dr. Muniz had the opportunity to cross-examine the mother during the hearing. Additionally,

Defendants point out that Dr. Muniz knew at least 5 days in advance of the hearing that patient #6's mother could be called as a witness.

*Hearing Panel's Recommendation*

According to a draft of the Hearing Panel's Report, the original vote of the Hearing Panel was not to terminate Dr. Muniz's privileges. However, Plaintiffs submit the Panel's recommendation changed when the Presiding Officer informed the Panel that they could only uphold or deny the MEC's recommendation. The Hearing Panel then met and decided to uphold the MEC's recommendation. Plaintiffs submit that the Panel could have taken an alternative course and modified the recommendation of the MEC. Plaintiffs further assert that the Hearing Panel was improperly allowed to reconsider its recommendation after initially using the incorrect burden of proof. Plaintiffs note that in the second report the Hearing Panel used the correct burden of proof, which imposes a higher burden on the MEC, but in that report the Hearing Panel made more findings against Dr. Muniz than in its first report. Plaintiffs deem that outcome illogical and evidence of improper procedure.

In response to the problems Plaintiffs raise about the Hearing Panel's recommendation, Defendants contend that it is the final report of the Hearing Panel, not the draft, that is material. The draft was sent out by the Presiding Officer for further review and consideration by members of the Hearing Panel—some of the elements of the draft were eventually incorporated into the final report, and others were not. In addressing the issue of the Hearing Panel's reconsideration of its recommendation, Defendants urge that it was reasonable for the CEO to instruct the Hearing Panel to

reconvene and take up the matter again using the correct burden rather than to delay a decision any longer. After all, the parties, counsel, and Hearing Panel members had invested a good bit of time in the Hearing.

*Presiding Officer*

Plaintiffs have raised three separate issues with respect to the actions of the Presiding Officer, Ernest Nauful. First, Plaintiffs assert that Nauful was biased. According to Plaintiffs, Nauful's questions and remarks were biased in favor of the MEC in that they aimed to advance the position of the MEC. Plaintiffs also contend that the additional recommendation in the second report is evidence of Nauful's bias. Second, Plaintiffs contend that the Presiding Officer unduly influenced the Hearing Panel. Again, Plaintiffs bring up Nauful's instruction to the Hearing Panel that they could only uphold or deny the recommendation of the MEC, which Plaintiffs claim resulted in the Hearing Panel changing its vote to uphold the MEC recommendation. Third, Plaintiffs find error in Nauful's *ex parte* communications with counsel for the MEC, such as the email where he sent a copy of the second report to MEC's counsel.

Defendants deny that the Presiding Officer was biased, pointing out that eliciting facts is not biased and that Nauful elicited few facts during the Hearing. Moreover, Defendants note that neither Dr. Muniz nor her counsel objected to any question or interposed an objection to the practice of the Presiding Officer asking questions. In fact, the allegation of bias was only raised after the issuance of the report affirming the MEC's recommendation. As to the *ex parte* communications, there is no evidence that the Presiding Officer met with the MEC and its counsel before the Hearing, and Nauful

merely sent the email to MEC counsel to confirm that he had stated the correct burden of proof since it had been incorrect in the First Report.

<em>Other Peer Review Action Participants</em>

In addition to the Presiding Officer, Plaintiffs take issue with some of the other participants at various levels of the peer review process. For example, Plaintiffs submit that it was improper for Dr. Minto, one of Dr. Muniz's competitors, to vote on the termination of Dr. Muniz's privileges at the MEC level. Dr. Boehner and Dr. Minto were also competitors of Dr. Muniz, and Plaintiffs believe that it was improper for them to act as prosecutors on the Hearing level. Additionally, Plaintiffs argue that it was improper for two of the doctors who acted as prosecutors on the Hearing level (specifically, Dr. DiBona and Dr. Boehner) to participate and vote on the final decision at the Board of Governors level.

Defendants deny that there is a problem with any of Dr. Muniz's competitors either have voting as a member of the MEC or acting as a prosecutor at the Hearing, and Dr. Muniz's expert agrees. Plaintiffs' information regarding Dr. Boehner's participation at the Board of Governors level is based on the mistaken testimony of the CEO, Carlos Milanes, which he later corrected. Finally, even if Dr. DiBona and Dr. Boehner had deliberated and voted at the Board level, which Defendants adamantly deny, this conduct does jeopardize compliance with the third HCQIA standard.

<em>Hospital Administrators</em>

The Bylaws provide that the Hearing Panel shall deliberate outside of the presence of anyone except the Presiding Officer; however, Plaintiffs submit that Terri Ergle, an

employee of the Hospital, was present for deliberations. Plaintiffs allege that Ergle acted as a direct feed of information to the CEO of the Hospital.

Defendants contest Plaintiffs' allegation that Ergle was feeding information to the Hospital's CEO. During Ergle's deposition, she testified that she did not provide oral reports of the Hearing Panel's deliberations. In addition, Defendants submit the testimony of Dr. Muniz's expert, which explains the presence of Ergle during any of the Hearing Panel's deliberations. Plaintiffs' expert confirmed that medical staff coordinators (like Ergle) routinely communicate with and provide administrative assistance to hearing panels and hearing officers during peer review actions.

The court is aware that there were procedural deficiencies during the Hospital's peer review process. The court is particularly disturbed by the discrepancies between the original reasons for terminating Dr. Muniz's privileges and the reasons given by the Hearing Panel in their report upholding the MEC's recommendation. The Hearing Panel should have made it clear to Dr. Muniz that they were also evaluating her truthfulness and candor and that their assessment of those attributes could factor into their decision. They could have done so by being more specific in the charges against Dr. Muniz. The letter setting the Hearing identified the grounds/charges for the Hearing as "[c]linical competence in the treatment of [six different] patients . . . and your professional judgment." (ECF No. 262-4, p. 41). Broadly construing the term "professional judgment," the court believes that truthfulness and candor are part of that concept. Nevertheless, upon realizing that those qualities in particular were at issue in Dr. Muniz's case, the Hearing Panel should have alerted Dr. Muniz that she needed to take that into

account in presenting her case. Both the use of the incorrect burden of proof in the first report and the Presiding Officer's contact with the MEC's counsel flawed parts of the instant peer review process in this court's view. It is evident that the peer review action against Dr. Muniz was not perfect. However, 42 U.S.C. § 11112 does not require perfection. Rather, the statute requires notices and hearing procedures that were fair under the circumstances. Thus, even though the process was flawed in several relatively minor particulars, the court finds that standard three of HCQIA was met by the Defendants.

### 4.    Reasonable Belief That Action Was Warranted by Facts

"[T]he role of the federal courts 'on review of [peer review] actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the . . . termination of medical staff privileges.'" *Bryan v. James E. Holmes Reg. Med. Ctr.*, 33 F.3d 1318, 1337 (11th Cir. 1994) (internal citations omitted). A plaintiff must show the facts relied upon for the peer review were so obviously mistaken or inadequate that reliance upon them was unreasonable. *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 471 (6th Cir. 2003).

At the time of the 2010 peer review, Dr. Muniz was already subject to 100% case review as a result of an earlier peer review action. During the 2010 review brought on by a still born birth due to a placental abruption, Dr. Muniz was found to have exhibited poor judgment. Additionally, based on her own statements during the review, Dr. Muniz was found to have a lack of candor and credibility, which ultimately resulted in the termination of her hospital privileges. Defendants urge that "[t]he peer reviewers'

decision to terminate Dr. Muniz's privileges could not be 'obviously mistaken' under these circumstances." (ECF No. 228-1, p. 25).

Plaintiffs disagree. Though Plaintiffs admit that the facts here present a very difficult case, not one expert concluded that Dr. Muniz failed to meet the standard of care. Plaintiffs contend that the termination of Dr. Muniz's privileges is too harsh of a punishment based on the facts and that, in this case, intermediate steps could have been taken to improve the quality of health care related to this case.

In their reply, Defendants stress that it is not for the court to reweigh the facts in this case. Here, the evidence is such that the peer reviewers could have reasonably concluded that the peer review sanction chosen would further quality health care; therefore, no more is required.

The court agrees with the Defendants. The facts relied upon by the peer reviewers were not so obviously mistaken or inadequate that reliance upon them was unreasonable. The court finds that the Defendants have satisfied standard four.

### 5. Spoliation of Evidence

Based on this court's previous determination that evidence, including audio recordings of Board of Governors meetings, handwritten notes of the MEC meetings, and surveillance tapes, was spoliated by Defendants, Plaintiffs ask this court to make an adverse inference that the preponderance of the evidence would show a violation of HCQIA. Plaintiffs submit that the spoliated evidence would have shown the improper influence of Doctors DiBona, Boehner, and Minto. According to Plaintiffs, "[b]ecause these recordings and documents have been destroyed, the court should impose an adverse

inference that this evidence would have provided a preponderance of the evidence that the HCQIA had been violated, and summary judgment should be denied." (ECF No. 262, p. 33–34).

Defendants, however, submit that even if the doctors had acted in bad faith and malice towards Dr. Muniz, such motivation would not be relevant to a HCQIA analysis. An adverse inference that Plaintiffs have met the preponderance of the evidence standard goes too far when even evidence that showed bad faith by Doctors DiBona, Boehner, and Minto would be irrelevant to this court's determination of whether Defendants have satisfied the standards set forth by HCQIA.

The court agrees with the Defendants that the adverse inference requested by the Plaintiffs goes too far in this case. Thus, the court declines to make such a ruling.

### 6.    Expert Testimony

Plaintiffs' expert, Adrianne Marting, has testified that the actions of the Defendants were not taken in the furtherance of quality health care, that Dr. Muniz was never properly noticed, and that the peer review action was not taken in the reasonable belief that the action was warranted by the facts. Plaintiffs argue that they have raised a jury question based on the testimony of their expert regarding the HCQIA standards.

In response, Defendants argue that Plaintiffs' expert's opinions are opinions about the law, not opinions raising questions of fact. Dr. Muniz cannot avoid summary judgment by reference to inadmissible legal opinions.

The court agrees with the Defendants.

### 7.     Conclusion as to HCQIA Immunity

Defendants in this case are entitled to a presumption that they satisfied the HCQIA standards.  Plaintiffs have failed to show by a preponderance of the evidence that Defendants failed to satisfy any of the standards.  As such, Defendants are entitled to damages immunity.

### B.     Individual Causes of Action

The parties spent the majority of their briefs discussing damages immunity pursuant to HCQIA.  The court has resolved that issue in favor of the Defendants, but the court must address the individual causes of action in this case because Plaintiffs have asked for additional relief, including a declaratory judgment, injunctive relief, and attorney's fees.

### 1.     Breach of Contract

Plaintiffs have alleged that the Hospital breached its contract with Dr. Muniz by failing to follow the bylaws, failing to follow the disruptive physician policy, and by failing to pay Dr. Muniz for emergency call coverage.  Plaintiffs have further alleged that the breach of contract was accompanied by the fraudulent act of "performing a bad faith sham peer review."  (ECF No. 262, p. 36).

According to the parties, South Carolina courts have not ruled on whether medical staff bylaws are contracts between physicians and hospitals.  However, Plaintiffs point out that the Supreme Court of South Carolina has found that an employee handbook may form the basis for a contract between the employer and the employee.  *Miller v. Schmid Laboratories, Inc.*, 414 S.E.2d 126, 126 (1992).  In response, Defendants argue that even

if the bylaws were recognized as a contract, there are no provisions in the bylaws requiring the Hospital to apply the disruptive physician policy[7] to Dr. Muniz or to pay her for the care of uninsured patients. Finally, Defendants contend that Dr. Muniz cannot show that any alleged breach caused her damages.

The court agrees with the Defendants that summary judgment should be granted on the breach of contract claim. South Carolina courts have not recognized medical staff bylaws as contracts between physicians and hospitals, and even if they had, Plaintiffs have not shown that the disruptive physician policy would apply to Dr. Muniz or that any alleged breach caused Plaintiffs' damages.

## 2. Tortious Interference with Contractual Relations

According to Plaintiffs, Dr. Muniz had lost several contracts associated with hospitals, locum tenum agencies, and other health care entities due to the Hospital's refusal to respond to credentialing requests. Plaintiffs allege that Terri Ergle did not respond to credentialing requests for Dr. Muniz because she was instructed not to by counsel for UHS of Delaware ("UHS") and the Hospital and that Dr. Muniz was unable to gain privileges at other hospitals as a result of Ergle's failure to respond. As such, Ergle, the Hospital, and UHS improperly interfered with Dr. Muniz's prospective economic relationships.

Defendants deny that Ergle failed to respond to any credentialing requests for Dr. Muniz by other institutions. Even if such conduct occurred, Defendants argue that this cause of action would still fail because Dr. Muniz has not presented any evidence that the

___

[7] Disruptive physician policies are generally used to address bad behavior that does not result in harm to a patient.

Hospital's conduct resulted in the loss of a single "identifiable contract or expectation." *See United Educ. Distributors*, 564 S.E.2d 324, 328 (S.C. Ct. App. 2002).

The court grants summary judgment as to the tortious interference with contractual relations claim, finding that Plaintiffs have submitted insufficient evidence to support this claim.

### 3.     South Carolina Unfair Trade Practices

The Fourth Circuit has held that physician peer review actions are not trade or commerce actionable under South Carolina's Unfair Trade Practices Act. *Moore*, 560 F.3d at 178. Nevertheless, Plaintiffs contend that the sham peer review, tortuous interference, and breach of contract were all conduct that occurred in trade or commerce. In particular, Plaintiffs take issue with the Hospital's report of Dr. Muniz to the NPDB, which they claim was an act of bad faith. Defendants respond that such a claim is not credible because reports to the NPDB of doctors who have had their privileges terminated comply with the law.

Because peer review actions are not actionable under SCUTPA, the court must grant summary judgment on this claim.

### 4.     Conspiracy

According to Defendants, Plaintiffs' conspiracy claim fails because Defendants are shielded by the intra-corporate immunity doctrine, which provides that when a hospital's medical staff, administrators, and other agents conduct a peer review action, they are considered a single person and therefore cannot conspire. In response, Plaintiffs raise an exception to the intra-corporate immunity doctrine called the personal stake

24

exception, which provides that the intra-corporate immunity doctrine does not apply when certain parties act in their individual capacity as opposed to their capacity as members of the medical staff. Plaintiffs allege that the Hospital conspired with Doctors Minto, Boehner, and Boone, who were all acting in their individual capacities as competitors of Dr. Muniz. However, Defendants point out that there is no evidence to support this allegation.

The court agrees with Defendants that there is no evidence to support Plaintiffs' conspiracy cause of action. Thus, the court must grant summary judgment as to that claim.

### 5.    Other Causes of Action

In their motion, Defendants argued that the remaining causes of action failed for various reasons, and Plaintiffs did not address these arguments in their Response. As such, Defendants submit that summary judgment should be granted as to the following remaining causes of action: violation of due process and the HCQIA, illegality, and breach of fiduciary duty. The court agrees and grants summary judgment as to those causes of action.

## IV.     Conclusion

For all of the reasons above, the court grants Defendants' Motion for Summary Judgment (ECF No. 228).  All other pending motions are found to be moot.  This case is dismissed with prejudice.

IT IS SO ORDERED.

Joseph F. Anderson, Jr.

October 25, 2012
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge